# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Yalcin Ayasli,<br><br>               Plaintiff,<br><br>     v.<br><br>Sezgin Baran Korkmaz, Kamil Feridun Ozkaraman**,** Fatih Akol, SBK Holdings Anonim Sirketi, SBK Holdings, USA, Inc., Bugaraj Elektronik Ticaret ve Bilisim Hizmetleri Anonim Sirketi, and Mega Varlik Yonetim Anonim Sirketi.<br><br>               Defendants. | **VERIFIED COMPLAINT**<br><br><br>**Jury Trial Demanded** |

## TABLE OF CONTENTS

INTRODUCTION _____ 5

    Relevant Geopolitical Background_____ 8

    Overview of Schemes Against Dr. Ayasli _____ 9

    Overview of the RICO Enterprise's Pattern of Racketeering Activity _____ 10

THE PARTIES AND RELEVANT NON-PARTIES _____ 12

    Plaintiff_____ 12

    The RICO Enterprise _____ 13

    The Defendants_____ 14

    Non-Party Co-Conspirators _____ 19

SUBJECT MATTER JURISDICTION AND VENUE _____ 26

PERSONAL JURISDICTION _____ 27

    Defendant Sezgin Baran Korkmaz _____ 27

    Defendant Feridun Ozkaraman_____ 28

    Defendant Fatih Akol _____ 29

    Defendant SBK Turkey _____ 31

    Defendant Bugaraj _____ 33

    Defendant SBK USA _____ 34

    Defendant Mega Varlik _____ 35

FACTUAL BASIS FOR CLAIMS _____ 37

A.    BACKGROUND _____ 37

    1. Plaintiff Dr. Ayasli's Scientific Background and Accomplishments _____ 37

    2. Dr. Ayasli's Charitable Organizations _____ 39

    3. Dr. Ayasli's Investments in Turkey _____ 42

    4. The July 15, 2016 Coup d'Etat Attempt in Turkey_____ 45

B.    FORMATION OF THE RICO ENTERPRISE _____ 46

    1. The RICO Enterprise Defrauds the United States Government and Secures Funding

    for Its Other Activities_____ 46

C.    THE RICO ENTERPRISE'S EXTORTION SCHEME TO ACQUIRE BORAJET__ 51

    1. The RICO Enterprise's Defamatory Media Campaign to Disparage Dr. Ayasli and

    BoraJet_____ 51

    2. BoraJet's Financial Distress Resulting from the RICO Enterprise's Defamatory

    Media Campaign _____ 62

    3. The RICO Enterprise Concludes its Extortion Scheme by Acquiring BoraJet for No

    Monetary Consideration _____ 66

D.    THE RICO ENTERPRISE'S POST ACQUISITION EXTORTION SCHEME_____ 69

    1. The RICO Enterprise's Mismanagement of and Failure to Flip BoraJet_____ 69

    2. The RICO Enterprise's Unlawful Acceleration of Dr. Ayasli's Retained Debt __ 69

    3. The RICO Enterprise's WhatsApp Threats and Intimidation Directed at Dr. Ayasli

    in the United States _____ 73

    4. The RICO Enterprise's Sham Commercial and Criminal Litigation in Turkey __ 76

    5. The RICO Enterprise's Intimidation, Assault and Bribery of Dr. Ayasli's Lawyers

    and Business Associates _____ 80

    6. The RICO Enterprise Makes False Claims to Turkish Prosecutors to Open Sham

    Criminal Investigations and Prosecutions_____ 83

    7. The RICO Enterprise Blackmails Kadir Peker _____ 86

    8. The Continuation of the RICO Enterprise's Defamatory Media Campaign_____ 88

    9. The RICO Enterprise Visits and Threatens Professor Hakun Yavuz in Salt Lake

    City, Utah _____ 90

10.   The RICO Enterprise Visits New Hampshire to Confront Dr. Ayasli _____ 93

11.   The RICO Enterprise Threatens a U.S.-based Journalist _____ 94

CLAIMS FOR RELIEF _____ 95

FIRST CLAIM FOR RELIEF _____ 95

SECOND CLAIM FOR RELIEF _____ 118

THIRD CLAIM FOR RELIEF_____ 120

FOURTH CLAIM FOR RELIEF_____ 122

FIFTH CLAIM FOR RELIEF _____ 122

SIXTH CLAIM FOR RELIEF _____ 123

SEVENTH CLAIM FOR RELIEF_____ 124

**INTRODUCTION**

1.      This case involves an elaborate and sophisticated extortion scheme targeting the Plaintiff, Dr. Yalcin Ayasli ("Dr. Ayasli"), a distinguished inventor, entrepreneur, and philanthropist, dual U.S. and Turkish citizen, and New Hampshire resident.  The RICO Enterprise unlawfully obtained over $500 million USD from the U.S. Treasury as part of a fraudulent fuel tax credit scheme.  It then laundered over $210 million USD of those funds into Turkey.  The RICO Enterprise used a portion of those funds to underwrite its extortion campaign against Dr. Ayasli seeking to: (1) acquire ownership of his airline BoraJet and its affiliates; and (2) extort additional payments after the BoraJet acquisition.  The RICO Enterprise executed its scheme, in part, by threatening Dr. Ayasli and his wife in New Hampshire, his family, and his business associates with violence, and repeatedly causing the Turkish media to publish false allegations that Dr. Ayasli was a terrorist, a member of Fetullahci Teror Orgutu ("FETO"), and a participant in the July 2016 *coup d'état* attempt in Turkey.  Despite the RICO Enterprise's continuing effort to tar Dr. Ayasli and his business associates as terrorists, Defendant Sezgin Baran Korkmaz has acknowledged in writing that he knows that Dr. Ayasli is not, and never was, a terrorist or a member of FETO.  Nonetheless, the RICO Enterprise's scheme has destroyed Dr. Ayasli's life and reputation and injured him in his business and property.

2.      Dr. Ayasli founded, ran, and later sold a successful technology company in Massachusetts.

3.      Dr. Ayasli is an individual with a deep sense of pride in his Turkish heritage. Accordingly, after selling his technology company, Dr. Ayasli invested substantial portions of the proceeds of that sale in domestic and foreign non-profit entities and businesses.  He did this

in pursuit of his overarching goals of promoting and educating people about Turkish culture worldwide and supporting friendly relations between Turkey and the United States.

4.     One such investment was in a regional Turkish airline called BoraJet.  Dr. Ayasli believed BoraJet could further his cultural and philanthropic goals of making areas of Turkey more accessible to educational and cultural tourism.

5.     From April 2016 through the date of this filing, however, a RICO Enterprise conceived of and operating in both the United States and Turkey, including at least two individuals hostile to Dr. Ayasli's support of Turkish culture and historical claims, has targeted, extorted, defrauded, and otherwise tortiously injured Dr. Ayasli here in New Hampshire, in the United States, and in Turkey.

6.     The RICO Enterprise carried out this scheme through both U.S.- and Turkish-based companies and individuals, including several U.S. citizens and residents.

7.     The RICO Enterprise's overall goals were (1) to acquire BoraJet from Dr. Ayasli at a "fire sale" price; (2) to acquire Dr. Ayasli's ownership interests in his prominent and valuable real estate holdings; (3) to extort additional cash payments from Dr. Ayasli; and (4) to "flip" BoraJet to a major international air carrier, producing a substantial windfall to the RICO Enterprise.

8.     In furtherance of those aims, the RICO Enterprise devised a scheme (1) to slander and defame Dr. Ayasli through the Turkish media in the United States, Turkey and elsewhere in order to damage his professional reputation as the sole stakeholder in BoraJet; (2) to impugn the reputation of Dr. Ayasli's charitable and philanthropic organizations in the United States and abroad to further tarnish his professional reputation; (3) to destabilize BoraJet and its affiliates and devalue Dr. Ayasli's ownership interest in BoraJet; (4) to exert enough financial pressure on

Dr. Ayasli to force him to sell BoraJet; (5) to appear, disguised as a "white knight," for the purpose of purchasing BoraJet at a fire sale price; (6) after the sale, to acquire bank loans guaranteed by Dr. Ayasli; (7) to place attachments on Dr. Ayasli's prominent and valuable real estate holdings and use those attachments to pressure and extort Dr. Ayasli into paying "ransoms" from New Hampshire-based bank accounts; and (8) to exhaust Dr. Ayasli's liquid assets through these ransom payments and then forcibly divest Dr. Ayasli of his real estate holdings.

9.      Dr. Ayasli's extortion-forced sale of BoraJet to the RICO Enterprise, a sale he would not have made but for the RICO Enterprise's unlawful activities, resulted in actual, verifiable losses to him of more than $230 million USD.

10.      Since unlawfully defrauding Dr. Ayasli of his ownership in BoraJet, the RICO Enterprise continues to engage in related activities in furtherance of its scheme, including: (1) threatening acts of violence against Dr. Ayasli and his family in New Hampshire and elsewhere in the United States; (2) filing a series of sham litigations in Turkey; (3) using the Turkish media to promote and report on those cases to further damage Dr. Ayasli's reputation in New Hampshire, the United States, and internationally; (4) filing false criminal complaints resulting in bogus indictments and ongoing criminal investigations against Dr. Ayasli and his business associates in Turkey; (5) threatening and intimidating Dr. Ayasli's current and former business associates into providing false testimony in support of these sham cases; (6) committing actual acts of violence against Dr. Ayasli's business associates in Turkey; (7) inducing the arrests of Dr. Ayasli's CFO, attorney, and business associates when they would not accede to the RICO Enterprise's threats and demands; and (8) imposing a fear of further economic loss and reputational harm to Dr. Ayasli and his business interests.

11.     Since its acquisition of BoraJet, the RICO Enterprise has taken and continues to take affirmative steps to obtain more than $100 million USD of Dr. Ayasli's additional personal wealth and real estate holdings through additional acts of fraud, extortion, and threats of violence.

## **Relevant Geopolitical Background**

12.     The Turkish government has reported that, on July 15, 2016, individuals affiliated with exiled Turkish cleric Fethullah Gulen attempted to overthrow the Turkish government by force.

13.     According to the Turkish government, rogue soldiers commandeered tanks and helicopters, attacked the Turkish Parliament and buildings housing the state intelligence agencies, attempted to assassinate President Erdogan, and gunned down hundreds of unarmed civilians.

14.     In the aftermath, the Turkish government accused Gulen and Fettullahci Teror Orgutu ("FETO") of masterminding the coup attempt.  The Turkish government then began a widespread crackdown aimed at dismantling FETO.  Anyone believed to be sympathetic to Gulen and FETO was subject to investigation, and, in many cases, arrest.

15.     Nearly all Turkish media is owned by closely-held for-profit conglomerates that also own diverse businesses across many industries, including construction, energy, mining, and manufacturing.  Those conglomerates often require approvals or solicit business from the Turkish government.

16.     Although the Turkish media is active, Turkish media companies produce only a small fraction of these conglomerates' annual revenue.  Accordingly, to avoid risking these

8

conglomerates' other important interests before the Turkish government, journalists attached to these media companies often self-censor.

17.     This self-censoring by the media only became more pronounced after the July 15, 2016 coup attempt.

### Overview of Schemes Against Dr. Ayasli

18.     Taking advantage of a deeply suspicious public and the "State of Emergency" declared by the government, the RICO Enterprise capitalized on its connections to and influence over various Turkish media outlets.  In the wake of the coup, the RICO Enterprise used the Turkish media to spread lies, rumors, and accusations in the media linking Dr. Ayasli to the coup attempt, and claiming that Dr. Ayasli, and his business and charitable interests had treasonous and conspiratorial ties to FETO and Gulen himself.

19.     One such defamatory but widely disseminated false story in the Turkish media claimed that Dr. Ayasli used a BoraJet aircraft to secretly fly Gulen into Turkey to plan the coup.

20.     A steady drumbeat of defamatory media stories was both (1) published in print throughout Turkey; and (2) disseminated on the Internet, including on Turkish language websites broadly available to, and commonly frequented by, people living in New Hampshire and throughout the United States.

21.     As a result of these defamatory media accounts, the RICO Enterprise directly and proximately caused several of BoraJet's business partners to abruptly cancel codeshare contracts, leases and other business arrangements with BoraJet.

22.     BoraJet ridership plummeted as a result of the RICO Enterprise's defamatory media campaign.

23.     Fearing reprisal in the face of the FETO allegations made against Dr. Ayasli and BoraJet, banks and lending institutions shut down BoraJet's lines of credit and refused to grant additional credit to BoraJet or to Dr. Ayasli.

24.     These calculated actions by the RICO Enterprise crippled BoraJet financially, destroyed BoraJet's corporate reputation, and exerted tremendous financial pressure on Dr. Ayasli to commit substantial additional funds from his New Hampshire-based financial accounts to BoraJet to protect his initial investment.

25.     As these challenges were mounting, Dr. Ayasli did not know the source of the defamatory media stories, or understand the reasons behind them.

26.     Knowing that the media stories were false and that BoraJet had solid business prospects, Dr. Ayasli further invested in BoraJet hoping that BoraJet would weather the media firestorm.

27.     Ultimately, however, due to the relentless nature of the RICO Enterprise's defamatory media campaign and Dr. Ayasli's inability to either determine its source or correct its falsehoods, the RICO Enterprise succeeded in forcing Dr. Ayasli to sell his ownership of BoraJet to escape the fledgling carrier's rapidly declining prospects.

### Overview of the RICO Enterprise's Pattern of Racketeering Activity

28.     In furtherance of this deep and remarkable effort to destroy Dr. Ayasli and BoraJet, the RICO Enterprise has engaged in the following pattern of racketeering activity:

a.  laundered money from the United States to fund its scheme;

b.  used its connections to and influence over Turkish media to spread defamatory information about Dr. Ayasli and BoraJet through media outlets read widely in New Hampshire, the United States, and Turkey;

c.  exerted pressure and control over financial and lending institutions to call Dr. Ayasli's bank loans, close credit lines, and refuse him additional credit and loans;

d.  used the U.S. wires in furtherance of its scheme to defraud and extort millions of dollars from Dr. Ayasli;

e.  blackmailed former executives of BoraJet to provide false testimony and accusations against Dr. Ayasli in the RICO Enterprise's sham proceedings;

f.  physically assaulted, threatened, and intimidated BoraJet's board members and Dr. Ayasli's past and current business associates, including threatening to stalk, rape and murder his female CFO;

g.  used U.S. wires to threaten and intimidate Dr. Ayasli and his immediate family members;

h.  travelled both to the United States, and to New Hampshire specifically, to further intimidate and threaten Dr. Ayasli;

i.  attempted to bribe one of Dr. Ayasli's attorneys to "switch sides" in their representation;

j.  threatened at least three of Dr. Ayasli's attorneys;

k.  filed sham commercial lawsuits against Dr. Ayasli in Turkish courts in an effort to obtain attachments over Dr. Ayasli's real estate holdings;

l.  pressured Turkish prosecutors to file trumped up and false criminal complaints;

m.  submitted false claims to Turkish prosecutors to commence a secret investigation alleging that Dr. Ayasli and his CFO Zahide Uner are FETO members involved with orchestrating the failed coup and other acts of terrorism (now punishable by life imprisonment in Turkey), despite knowing that these statements were false as demonstrated by his own WhatsApp message and later statements;

n.  threatened to complain to U.S. government investigators about Dr. Ayasli's past business dealings;

o.  threatened to influence Turkish tax authorities to reopen a closed tax audit in an effort to further intimidate and harass Dr. Ayasli;

p.  sent to Dr. Ayasli in New Hampshire a photograph of a RICO Enterprise member's subpoena from Special Counsel Robert Mueller in an effort to further intimidate and harass Dr. Ayasli; and

q.  twice trespassed onto Dr. Ayasli's private properties in Turkey and instructed a member of Dr. Ayasli's staff that the residence would soon belong to the RICO Enterprise.

29.     The RICO Enterprise's racketeering activity has been ongoing relentlessly since the summer of 2016, as the RICO Enterprise, and its agents and representatives, continue to harass and threaten Dr. Ayasli, his family, assets, and business interests in New Hampshire, the United States, and Turkey.

30.     The RICO Enterprise's conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq.*, with predicate acts of extortion, mail and wire fraud, money laundering, and witness tampering.

31.     In addition, Defendants' conduct sounds in claims of: (1) unfair trade practice, as defined by N.H. RSA 358-A; (2) fraudulent misrepresentation; (3) defamation; and (4) invasion of privacy.

32.     Defendants' misconduct entitles Dr. Ayasli to, among other relief, damages for the injury to his business and personal interests, treble damages, and attorneys' fees and costs.

## THE PARTIES AND RELEVANT NON-PARTIES

### Plaintiff

33.     **Plaintiff Dr. Yalcin Ayasli**, an individual, is a dual United States and Turkish citizen.[1]

34.     Dr. Ayasli is domiciled, and maintains his primary residence, in Hillsborough County, New Hampshire.[2]

35.     Dr. Ayasli has a New Hampshire driver's license.

36.     Dr. Ayasli has voted in the State of New Hampshire since 2006.

---

[1] In cases of dual citizenship, only the U.S. citizenship is recognized in the diversity analysis. *See* 15-102 Moore's Federal Practice Civil §§ 102.70, 102.37.
[2] Dr. Ayasli's full address is not provided herein due to legitimate concerns for his safety and the safety of his family members given specific threats made against him and his family by members of the RICO Enterprise.

37.     Dr. Ayasli has, at all times relevant to this Complaint, maintained New Hampshire-based financial accounts.

## The RICO Enterprise

38.     The RICO Enterprise is comprised of a number of individuals and business entities, some of whom/which are named in this complaint as Defendants, and others who are included in the complaint as non-party co-conspirators.

39.     The members of the RICO Enterprise include Turkish citizens Sezgin Baran Korkmaz ("KORKMAZ"), Fatih Akol ("AKOL"), Kadir Peker ("PEKER"), Kamil Ekim Alptekin ("ALPTEKIN") and Kamil Feridun Ozkaraman ("OZKARAMAN"), U.S. citizens Jacob Kingston ("J.KINGSTON") and Isaiah Kingston ("I.KINGSTON") (and collectively "the KINGSTONS"), Lev Aslan Dermen (f/k/a Levon Termendzhyan) ("DERMEN"), George "G.T." Termendzhyan ("TERMENDZHYAN"), their Turkish-based businesses, SBK Holdings, Anonim Sirketi ("SBK TURKEY"), Bukombin Bilisim ve Teknoloji Anonim Sirketi ("BUKOMBIN"), Bugaraj Elektronik Ticaret ve Billisim Hizmetleri Anonim Sirketi ("BUGARAJ"), Mega Varlik Yonetim Anonim Sirketi ("MEGA VARLIK"), Komak Isi Yalitim Sistemleri Sanayi ve Ticaret Limited Sirketi ("KOMAK"), and Blane Teknoloji Sistemleri Sanayi ve Ticaret Anonim Sirketi ("BLANE"); Isanne S.A.R.L., a Luxembourg-based "private equity fund" ("ISANNE SARL"), and and their US-based businesses, SBK Holdings USA, Inc. ("SBK USA"), Washakie Renewable Energy, LLC ("WASHAKIE"), Noil Energy Group, Inc. ("NOIL ENERGY"), Speedy Lion Renewable Fuel Investments, LLC ("SPEEDY LION", and G.T. Energy, LLC ("GT ENERGY").

## The Defendants

40.    **Defendant Sezgin Baran Korkmaz** (**"KORKMAZ"**), an individual, is a citizen of the Republic of Turkey ("Turkey") and is domiciled in Turkey.[3]

41.    Defendant KORKMAZ's initials, "SBK" form the names of two of his affiliated companies described further below.

42.    Defendant KORKMAZ is a leader of the RICO Enterprise and has control and influence over Defendant businesses MEGA VARLIK, SBK TURKEY, and SBK USA.

43.    Defendant Korkmaz directed explicit and extortionate threats to Dr. Ayasli in New Hampshire.

44.    Defendant Korkmaz orchestrated a defamatory media campaign against Dr. Ayasli and BoraJet.

45.    Defendant Korkmaz threatened, intimidated, and in at least two known cases, physically assaulted Dr. Ayasli's business associates and attorneys.

46.    Defendant Korkmaz induced the filing of sham commercial and criminal litigation in Turkish courts.

47.    Defendant Korkmaz undertook all of these actions in an effort to extort money from Dr. Ayasli and take control of BoraJet and other business interests and real estate holdings owned by or affiliated with Dr. Ayasli.  *See* **Exhibit F-H.**

48.    Defendant KORKMAZ has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

---

[3] In February 2018, Defendant KORKMAZ represented via social media that he held a U.S. Passport.  The picture depicts a United Airlines boarding pass next to what appears to be a U.S. Passport, which is actually a depiction of a faux passport cover intended to present as a U.S. Passport.   Defendant KORKMAZ is not a U.S. citizen and does not legally hold a U.S. Passport.

49.     Defendant KORKMAZ is an individual existing separate and distinct from the RICO Enterprise.

50.     **Defendant Kamil Feridun Ozkaraman ("OZKARAMAN")**, an individual, is a Turkish citizen domiciled in Turkey.

51.     Defendant OZKARAMAN was actively involved in the acquisition of BoraJet from Dr. Ayasli on behalf of Defendant SBK TURKEY.

52.     Immediately after Dr. Ayasli sold BoraJet to the RICO Enterprise, on December 30, 2016, Defendant OZKARAMAN was appointed to BoraJet's Board of Directors and was granted the authority to represent and bind the company.

53.     On March 30, 2017, Defendant OZKARAMAN was appointed as the Director-General of BoraJet.[4]  In this capacity, he was given the additional authority to *individually* represent and bind BoraJet.

54.     Defendant OZKARAMAN has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

55.     Defendant OZKARAMAN is an individual existing separate and distinct from the RICO Enterprise.

56.     **Defendant Fatih Akol ("AKOL")** is an individual and Turkish citizen domiciled in Turkey.

57.     Defendant AKOL was the General Manager and Chairman of the Board of Directors of BoraJet until February 2017.

58.     Taking advantage of the fact that Dr. Ayasli lacked contacts in the Turkish Ministry of Transportation, which regulates the airline industry in Turkey, Defendant AKOL

---

[4] Defendant OZKARAMAN later resigned this post on June 5, 2017.

used his position of trust with Dr. Ayasli to influence Dr. Ayasli to sell BoraJet to an entity controlled by the RICO Enterprise.

59.     Defendant AKOL accomplished this by convincing Dr. Ayasli that Defendant SBK TURKEY would be the buyer "preferred" by the Ministry of Transportation due to SBK TURKEY's close personal ties to the Ministry.

60.     Defendant AKOL recommended that Dr. Ayasli sell BoraJet to SBK TURKEY notwithstanding the fact that there were other companies and individuals interested in acquiring BoraJet.

61.     Defendant AKOL then conducted all negotiations to effectuate the sale of BoraJet and its affiliates, BoraJet Bakim, and Aydin Jet to Defendant BUGARAJ on December 29, 2016.

62.     Defendant AKOL has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

63.     Defendant AKOL is an individual existing separate and distinct from the RICO Enterprise.

64.     **Defendant SBK Holdings Anonim Sirketi ("SBK TURKEY")** is a Turkish "distressed asset management" corporation with its principal place of business at Kandilli Mah.  Kandilli-Goksu Cd. No:19/1 Uskudar/Istanbul, Turkey.

65.     Defendant SBK TURKEY is the parent company of Defendant BUGARAJ which acquired BoraJet from Dr. Ayasli.

66.     Defendant SBK TURKEY is controlled by Defendant KORKMAZ and Defendant OZKARAMAN.

67.     Alptekin Yilmaz, a participant in one of the money laundering transactions described below, is listed by Defendant SBK Turkey as its "corporate representative."

68.     Defendant SBK TURKEY received millions of U.S. dollars laundered from the RICO Enterprise's illegal activities in the United States.

69.     Defendant SBK TURKEY has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

70.     Defendant SBK TURKEY is a business entity existing separate and distinct from the RICO Enterprise.

71.     **Defendant SBK Holdings, USA, Inc. ("SBK USA")** is a California corporation with its principal place of business at 5801 Randolph Street, Commerce, CA, 90040.

72.     Defendant SBK USA purports to be "a commercial and residential real estate investment firm" and is described on its website as a "short-term lender" focusing on commercial bridge loans and construction loans.[5]

73.     Defendant SBK USA has engaged in loansharking activities in the State of California.

74.     Defendant SBK USA is the U.S.-based affiliate of Defendant SBK TURKEY and served as a conduit for the RICO Enterprise's money laundering activities between the United States and Turkey.

75.     Defendant SBK USA has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

76.     Defendant SBK USA is a business entity existing separate and distinct from the RICO Enterprise.

---

[5] SBK USA, however, does not hold a California Finance Lender's License, and is also not registered at the California Department of Business Oversight as a Financial Institution, Money Transmitter, or Financial Service Provider.  SBK USA is, likewise, not registered as either a Mortgage Loan Originator with the Nationwide Mortgage Licensing System or as a Dealer or Broker with the Financial Industry Regulatory Authority.

77.     **Defendant BUGARAJ Elektronik Ticaret ve Bilisim Hizmetleri Anonim Sirketi ("BUGARAJ")** is a Turkish corporation with its principal place of business at İnönü Cad., Hoşgör Sok. No: 3, Çeliktepe, Kağıthane, İstanbul, Turkey.

78.     Defendant BUGARAJ is the subsidiary of Defendant SBK TURKEY that was used by the RICO Enterprise to acquire BoraJet.

79.     Defendant BUGARAJ is also the named plaintiff and complainant in several sham civil and criminal litigations filed by the RICO Enterprise against Dr. Ayasli and his business associates in Turkish courts.

80.     Defendant BUGARAJ has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

81.     Defendant BUGARAJ is a business entity existing separate and distinct from the RICO Enterprise.

82.     **Defendant Mega Varlik Yonetim Anonim Sirketi ("MEGA VARLIK")** is a Turkish "financial services" corporation with its principal place of business at Beylerbeyi Mahallesi Iskele, Cad No 16/1 Beylerbeyi Uskudar, Istanbul, Turkey.

83.     Defendant MEGA VARLIK purchased a BoraJet loan and other debt personally guaranteed by Dr. Ayasli—and then used its status as a "creditor" to unlawfully accelerate and foreclose on that debt in an effort to pressure Dr. Ayasli and extort money from him.

84.     Defendant MEGA VARLIK has committed acts that were purposely directed, both in whole and in part, at the State of New Hampshire and the United States generally.

85.     Defendant MEGA VARLIK is a business entity existing separate and distinct from the RICO Enterprise.

<u>**Non-Party Co-Conspirators**</u>[6]

86.     Certain other non-party individuals and business entities played roles, direct or indirect, in the scheme to defraud the United States, launder money obtained from the RICO Enterprise's fraudulent activities in the United States into Turkey, and to extort and defraud Dr. Ayasli.  Foremost among these individuals and business entities are the following non-party co-conspirators.

87.     **Jacob Kingston ("J.KINGSTON")**, an individual, is a United States citizen domiciled in Utah, and a friend and business associate of Defendant KORKMAZ.

88.     J.KINGSTON is a former shareholder of SBK USA.

89.     J.KINGSTON is also the Chairman of the Board of Defendant MEGA VARLIK and admits to owning "over 99% of the company's shares."

90.     J.KINGSTON has invested at least $10 million USD in Defendant SBK Turkey.

91.     J.KINGSTON is also the Chief Executive Officer and 50% shareholder in WASHAKIE, a Utah-based entity allegedly engaged in the business of producing and marketing renewable biofuels that has been raided by the FBI under suspicion of fraud and/or tax evasion.

92.     J.KINGSTON was the signatory on many of the wires transferring laundered proceeds from WASHAKIE to Defendant SBK TURKEY and other Turkish-based entities controlled by the RICO Enterprise.

93.     J.KINGSTON is also an owner in Turkish-based businesses KOMAK and BLANE, which feature named RICO Defendants on their Boards of Directors.

94.     J.KINGSTON has also invested substantial sums of money originating in the United States into other Turkish businesses through ISANNE SARL.

---

[6] The Plaintiff reserves the right to amend this Complaint to add some or all of these non-party co-conspirators as named Defendants as the case progresses.

95.     J.KINGSTON has been indicted in the United States District Court for the District of Utah on counts of (1) money laundering offenses; (2) aiding in the preparation and filing of a false claim; (3) conspiracy to commit mail fraud; (4) conspiracy to commit obstruction of justice offenses; (5) destroying and concealing records and objects; and (6) attempted force or threat of force for his role in defrauding the United States Department of Treasury.  He is currently incarcerated and awaiting trial.  *See* **Exhibit A.**

96.     **Isaiah Kingston ("I.KINGSTON")**, an individual, is a United States citizen domiciled in Utah.

97.     I.KINGSTON is the Chief Financial Officer of WASHAKIE.

98.     I.KINGSTON was the signatory on many of the wires transferring laundered proceeds from WASHAKIE to Defendant SBK TURKEY and other Turkish-based entities controlled by the RICO Enterprise.

99.     I.KINGSTON was recently indicted in the United States District Court for the District of Utah on counts of (1) various money laundering offenses; (2) aiding in the preparation and filing of a false claim; (3) conspiracy to commit mail fraud; (4) conspiracy to commit obstruction of justice offenses; (5) destroying and concealing records and objects; and (6) attempted force or threat of force for his role in defrauding the United States Department of Treasury.  He is currently incarcerated and awaiting trial.  *See* **Exhibit A.**

100.    **Lev Aslan DERMEN ("DERMEN")**(f.k.a. Levon Termendzhyan)[7] is an individual and an American citizen domiciled in California.

101.    DERMEN is the Chief Financial Officer and director of Defendant SBK USA and was, at all times relevant to this complaint, at least a 50% shareholder in SBK USA.

---

[7] DERMEN recently changed his middle name to Aslan, which means "lion" in Turkish.

102.    DERMEN is also the Chairman of the Board of NOIL ENERGY, and also controls the activity of SPEEDY LION.

103.    DERMEN was recently indicted in the United States District Court for the District of Utah on (1) various money laundering offenses; and (2) conspiracy to commit mail fraud for his role in defrauding the United States Department of Treasury.  He is currently incarcerated and awaiting trial.  *See* **Exhibit A.**

104.    **George Termendzhyan ("TERMENDZHYAN")** is an individual and an American citizen domiciled in California.

105.    TERMENDZHYAN is DERMEN's son.

106.    During all times relevant to this Complaint, TERMENDZHYAN was a shareholder of SBK USA, and one of two individuals (DERMEN being the other) who had the authority to sign checks and/or transfer money between accounts held by Defendant SBK USA, from Defendant SBK USA to Defendant SBK TURKEY, and from Defendant SBK USA to other overseas entities and accounts.

107.    TERMENDZHYAN is also the "Manager" of SPEEDY LION, signed through the alias "Grigor Termendjian."

108.    **Kadir Peker ("PEKER")** is the former General Manager of BoraJet.

109.    PEKER was threatened and then blackmailed by Defendant KORKMAZ and the RICO Enterprise into making a number of false written statements about Dr. Ayasli and BoraJet in support of the RICO Enterprise's sham civil litigations and criminal complaints.

110.    The RICO Enterprise convinced Turkish banks to place attachments on PEKER'S residence and personal property to blackmail him into providing this false testimony.

111.   **Kamil Ekim Alptekin ("ALPTEKIN")** is an individual and a Turkish citizen domiciled in Turkey.

112.   At Defendant KORKMAZ's direction, ALPTEKIN actively participated in the defamatory media campaign intended to disparage Dr. Ayasli and devalue BoraJet.

113.   During the defamatory media campaign, ALPTEKIN joined Defendant MEGA VARLIK's board of directors, and was on MEGA VARLIK's board of directors at the time that MEGA VARLIK purchased portions of BoraJet's debt that had been personally guaranteed by Dr. Ayasli.

114.   ALPTEKIN witnessed Defendant KORKMAZ assault Dr. Ayasli's female CFO, Zahide Uner, and heard Defendant KORKMAZ threaten to stalk, rape, and then murder her.

115.   ALPTEKIN was recently indicted by Special Counsel Robert Mueller in the United States District Court for the Eastern District of Virginia (Case No. 1:18-CR-457 (AJT)) and charged with (1) conspiracy to act as an agent of a foreign government (Turkey) and to make false statements and willful omissions in a FARA filing; (2) acting in the United States as an agent of a foreign government; and (3) multiple counts of making false statements. *See* **Exhibit B.**

116.   ALPTEKIN is currently residing in Turkey.

117.   **Bukombin Bilisim ve Teknoloji Anonim Sirketi ("BUKOMBIN")** is a Turkish shell entity and is the sole shareholder of BUGARAJ.

118.   Defendant SBK TURKEY was the founding shareholder and sole director of BUKOMBIN.

119.   On May 26, 2017, Defendant SBK TURKEY named Defendant OZKARAMAN the sole shareholder and Chairman of BUKOMBIN's Board of Directors.

120. **Komak Isi Yalitim Sistemleri Sanayi ve Ticaret Limited Sirketi ("KOMAK")** is a Turkish corporate entity founded by Defendant KORKMAZ.

121. Defendant OZKARAMAN is now the sole shareholder in KOMAK.

122. Defendant KORKMAZ and another minority interest holder transferred all of their interest in KOMAK to Defendant OZKARAMAN.

123. KOMAK was one of a number of Turkish entities used by the RICO Enterprise to launder money through Turkey.

124. KOMAK shares the identical corporate address as BLANE.

125. **Blane Teknoloji Sistemleri Sanayi ve Ticaret Anonim Sirketi ("BLANE")** is a Turkish corporate entity.

126.  J.KINGSTON is the majority shareholder in BLANE.

127. BLANE was one of a number of Turkish entities used by the RICO Enterprise to launder money through Turkey.

128. BLANE shares the same corporate address as KOMAK.

129. **Isanne S.A.R.L. ("ISANNE SARL")** is a Luxembourg-based "private equity fund."

130. ISANNE SARL is controlled by J.KINGSTON.

131. ISANNE SARL was one of a number of entities used by the RICO Enterprise to launder money.

132. ISANNE SARL specializes in "investing in Turkish businesses."

133. ISANNE SARL received proceeds of the RICO Enteprise's money laundering scheme sent from WASHAKIE to ISANNE SARL's Turkish-based bank accounts at Turkiye Garanti Bankasi A.S. ("Garanti").

134.    **Washakie Renewable Energy, LLC ("WASHAKIE")** is a Utah limited liability company allegedly engaged in the business of producing and distributing renewable biofuels.

135.    WASHAKIE has a principal place of business at 3950 South 700th Street East, Suite 100, Salt Lake City, Utah, 84107.

136.    J.KINGSTON is the Chief Executive Officer and Managing Member of WASHAKIE.

137.    I.KINGSTON serves as WASHAKIE's Chief Financial Officer.

138.    WASHAKIE has transferred millions of dollars to Defendant SBK TURKEY and other Turkish-based entities and financial accounts controlled by the RICO Enterprise.

139.    Both WASHAKIE and J.KINGSTON maintain Turkish-based bank accounts at Garanti Bank into which U.S.-based funds were laundered.

140.    WASHAKIE has also acquired assets in Turkey through Defendant KORKMAZ and the RICO Enterprise.

141.    WASHAKIE's offices were raided by the FBI and other agents of the U.S. Government.

142.    J.KINGSTON, whose movements were being monitored, was arrested in August 2018 while attempting to leave the United States on a commercial flight with an itinerary taking him to Turkey.

143.    J.KINGSTON and I.KINGSTON were subsequently indicted. *See* **Exhibit A.**

144.    J.KINGSTON and I.KINGSTON are both presently incarcerated and being held without opportunity for release pending trial.

145.    **Noil Energy Group, Inc. ("NOIL ENERGY")** is a California corporation established in 2007.

146.   Daniel McDyre is the CEO of NOIL ENERGY, but DERMEN is the company's "boss," and serves as the Company's Board Chairman.

147.   NOIL ENERGY allegedly engages in the production of biodiesel fuel.

148.   DERMEN and the KINGSTONS used NOIL ENERGY to defraud the United States in a green energy tax credit scheme.

149.   DERMEN, the KINGSTONS and NOIL ENERGY later laundered millions of dollars from the proceeds of that scheme from the United States into Turkey.

150.   Like WASHAKIE, NOIL ENERGY has made investments in Turkey through Defendant KORKMAZ and the RICO Enterprise.

151.   NOIL ENERGY has an affiliated Turkish company, NOİL Yatırım İnşaat Turizm Sanayi ve Ticaret A.Ş. in Turkey ("NOIL-TURKEY").

152.   DERMEN is the Chairman of the Board of Directors of NOIL-TURKEY.

153.   Defendant KORKMAZ serves as NOIL-TURKEY's Director General.

154.   Defendant OZKARAMAN formerly served as NOIL-TURKEY's sole shareholder.

155.   **Speedy Lion Renewable Fuel Investments, LLC ("SPEEDY LION")** is a now-dissolved California-based limited liability company controlled by DERMEN and his son TERMENDZHYAN.

156.   SPEEDY LION was one of a number of entities used by the RICO Enterprise to launder money.

157.   **G.T. Energy, LLC ("GT Energy")** is a Nevada-based limited liability company controlled by DERMEN and his son TERMENDZHYAN.

158.   Defendant SBK USA's CEO, Daniel McDyre, is GT Energy's registered agent.

159.    GT ENERGY "operates" in Nevada and California.

160.    GT ENERGY was one of a number of entities used by the RICO Enterprise to launder money.

## SUBJECT MATTER JURISDICTION AND VENUE

161.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1332 (diversity), 18 U.S.C. § 1964(c) (RICO jurisdictional statement); and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

162.    Dr. Ayasli's claims for civil RICO violations arise under 18 U.S.C. § 1961 et seq. and pose federal questions.

163.    Complete diversity of citizenship between the Plaintiff and the Defendants exists pursuant to 28 U.S.C. § 1332 because (1) Dr. Ayasli is domiciled in the State of New Hampshire; (2) Defendant KORKMAZ is a citizen of and domiciled in the Republic of Turkey; (3) Defendant OZKARAMAN is a citizen of and domiciled in the Republic of Turkey; (4) Defendant AKOL is a citizen of and domiciled in the Republic of Turkey; (5) Defendant SBK TURKEY is a Turkish corporation with its principal place of business in the Republic of Turkey; (6) Defendant SBK USA is a California-corporation with its principal place of business in Commerce, California; (7) Defendant BUGARAJ is a Turkish corporation with its principal place of business the Republic of Turkey; and (8) Defendant MEGA VARLIK is a Turkish corporation with its principal place of business in the Republic of Turkey.

164.    The amount in controversy between the Plaintiff and each Defendant exceeds $75,000, exclusive of interest and costs.

165.    Dr. Ayasli's state law claims arise out of the same case or controversy as his federal law claims, as all claims in this action arise out of a common nucleus of operative fact.

Thus, this Court also has supplemental jurisdiction over Dr. Ayasli's state law claims under 28 U.S.C. § 1367.

166.    Venue is proper in the District of New Hampshire under 28 U.S.C. § 1391 and N.H. RSA § 510:4 because a substantial part of the actions, events or omissions giving rise to the claims occurred in the State of New Hampshire, and the Defendants committed acts that were experienced, in whole or in part, in the State of New Hampshire.

## PERSONAL JURISDICTION

### Defendant Sezgin Baran Korkmaz

167.    Exercise of jurisdiction over Defendant KORKMAZ is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I.  Defendant KORKMAZ purposely availed himself of the forums of New Hampshire and the United States by intentionally directing his illegal conduct at Dr. Ayasli, who Defendant KORKMAZ knew was a citizen and resident of New Hampshire and the United States.

168.    Defendant KORKMAZ has served as the leader and mastermind of the RICO Enterprise's scheme to defraud Dr. Ayasli and to extort money from him, and has worked closely with other RICO Defendants in pursuit of these actions.

169.    Defendant KORKMAZ directed mail and wire communications, threats, and other illegal conduct at Dr. Ayasli in New Hampshire.

170.    Defendant KORKMAZ intended the effects of his conduct to be felt, and the effects of his conduct were, in fact, felt in the United States and in the State of New Hampshire.

171.    But for Defendant KORKMAZ's conduct in and directed at the United States and the State of New Hampshire, Dr. Ayasli would not have suffered the injuries described herein.

172.     The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's RICO claims.

173.     Alternatively, exercise of jurisdiction over Defendant KORKMAZ is proper pursuant to Fed. R. Civ. P. 4(k)(2).  Defendant KORKMAZ purposely availed himself of the laws of the United States by intentionally and purposefully directing his illegal conduct at Dr. Ayasli, who Defendant KORKMAZ knew was a citizen and resident of the United States.

174.     Defendant KORKMAZ intended his conduct to be felt in the United States, and but for Defendant KORKMAZ's illegal conduct in and directed at the United States, Dr. Ayasli would not have suffered the injuries described herein.

**Defendant Feridun Ozkaraman**

175.     Exercise of jurisdiction over Defendant OZKARAMAN is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I, and 18 U.S.C. § 1965(b) and (d).

176.     Defendant OZKARAMAN purposely availed himself of the forums of New Hampshire and the United States by intentionally directing his illegal acts at Dr. Ayasli, who Defendant OZKARAMAN knew to be a citizen and resident of New Hampshire and the United States.

177.     Defendant OZKARAMAN was an active participant in the meetings with Defendant AKOL that led to the sale of BoraJet to Defendant BUGARAJ.

178.     Defendant OZKARAMAN targeted Dr. Ayasli in New Hampshire by making direct threats to Dr. Ayasli's business associates in an effort to obtain their false testimony in support of the RICO Enterprise's sham civil litigations and criminal complaints against Dr. Ayasli.

179.    Defendant OZKARAMAN intended the effects of his conduct to be felt, and the effects of his conduct were, in fact, felt in the State of New Hampshire and the United States.

180.    But for Defendant OZKARAMAN's conduct in or directed at the State of New Hampshire and the United States, Dr. Ayasli would not have suffered the injuries described herein.

181.    The ends of justice require application of 18 U.S.C. § 1965(b) because (1) there is no district in which all of the RICO Defendants could otherwise be tried together; (2) judicial economy is best served by trying all of the Defendants together; and (3) the Plaintiff resides in and suffered injury in New Hampshire.

182.    The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's claims under 18 U.S.C. § 1962.

183.    Alternatively, the exercise of jurisdiction over Defendant OZKARAMAN is proper pursuant to Fed. R. Civ. P. 4(k)(2).  Defendant OZKARAMAN purposely availed himself of the laws of the United States by intentionally directing his illegal acts at Dr. Ayasli, who Defendant OZKARAMAN knew was a citizen of and resident of the United States.

184.    Defendant OZKARAMAN intended his conduct to be felt in the United States, and but for Defendant OZKARAMAN's illegal acts directed at the United States, Dr. Ayasli would not have suffered the injuries described herein.

**Defendant Fatih Akol**

185.    Exercise of jurisdiction over Defendant AKOL is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I, and 18 U.S.C. § 1965(b) and (d).

186.    Defendant AKOL purposely availed himself of the forums of New Hampshire and the United States by intentionally directing his illegal acts at Dr. Ayasli, who Defendant AKOL knew to be a citizen and resident of New Hampshire and the United States.

187.    Defendant AKOL was BoraJet's General Manager at the time BoraJet was wholly owned by Dr. Ayasli.

188.    In his capacity as BoraJet's General Manager, Defendant AKOL assumed primary responsibility for the sale of BoraJet to Defendant BUGARAJ, and in that capacity, called, emailed and texted Dr. Ayasli in New Hampshire to repeatedly advocate that Dr. Ayasli sell BoraJet to Defendant BUGARAJ.

189.    Accordingly, Defendant AKOL intended the effects of his conduct to be felt, and the effects of his conduct were, in fact, felt in the United States and the State of New Hampshire.

190.    But for Defendant AKOL's conduct in or directed at the State of New Hampshire and the United States, Dr. Ayasli would not have suffered the injuries described herein.

191.    The ends of justice require application of 18 U.S.C. § 1965(b) because (1) there is no district in which all of the RICO Defendants could otherwise be tried together; (2) judicial economy is best served by trying all of the Defendants together; and (3) the Plaintiff resides in and suffered injury in the State of New Hampshire.

192.    The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's claims under 18 U.S.C. § 1962.

193.    Alternatively, exercise of jurisdiction over Defendant AKOL is proper pursuant to Fed. R. Civ. P. 4(k)(2).  Defendant AKOL purposely availed himself of the laws of the United

States by intentionally directing his illegal acts at Dr. Ayasli, who Defendant knew to be a citizen and resident of the United States.

194.    Defendant AKOL intended his conduct to be felt in the United States, and but for Defendant AKOL's tortious conduct in and directed at the United States, Dr. Ayasli would not have suffered the injuries described herein.

### Defendant SBK Turkey

195.    Exercise of jurisdiction over Defendant SBK TURKEY is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I, and 18 U.S.C. § 1965(b) and (d).  Defendant SBK TURKEY conducts extensive business activities throughout the United States such that it is "at home" in the United States.

196.    Defendant SBK TURKEY maintained an office at 150 South Rodeo Drive Suite 260, Beverly Hills, California.

197.    Defendant SBK TURKEY shared this business address and office space with Defendant SBK USA.

198.    Defendant SBK TURKEY advertised this United States business address on its website.[8]

199.    Defendant SBK TURKEY hired American legal counsel and sent legal and "settlement" correspondence to Dr. Ayasli in New Hampshire.

200.    Defendant SBK TURKEY also received millions of dollars of proceeds of the RICO Enterprise's U.S.-based money laundering activities.

---

[8] Defendant SBK TURKEY's website was located at http://www.sbkholding.com.tr:80/en-US/management_centres/86/94.  This website has since been disabled.  Plaintiff retained screenshots of this website which were archived on October 8, 2016.

201.    Defendant SBK TURKEY then used those laundered funds to commit further unlawful activity and predicate acts against Dr. Ayasli in New Hampshire, the United States and Turkey, all of which injured Dr. Ayasli in the State of New Hampshire.

202.    Defendant SBK TURKEY purposely availed itself of the forums of New Hampshire and the United States by intentionally directing its illegal acts at Dr. Ayasli, who Defendant SBK TURKEY knew to be a citizen of and resident of New Hampshire and the United States.

203.    Defendant SBK TURKEY intended the effects of its conduct to be felt, and the effects of its conduct were, in fact, felt in the United States and the State of New Hampshire.

204.    But for Defendant SBK TURKEY's conduct in or directed at New Hampshire and the United States, Dr. Ayasli would not have suffered the injuries described herein.

205.    The ends of justice require application of 18 U.S.C. § 1965(b) because (1) there is no district in which all of the RICO Defendants could otherwise be tried together; (2) judicial economy is best served by trying all of the Defendants together; and (3) the Plaintiff resides in and suffered injury in New Hampshire.

206.    Alternatively, the exercise of jurisdiction over Defendant SBK TURKEY is proper pursuant to Fed. R. Civ. P. 4(k)(2).  Defendant SBK TURKEY conducts extensive business activities throughout the United States such that it is "at home" in the United States.

207.    Defendant SBK TURKEY purposely availed itself of the laws of the United States by intentionally directing its illegal acts at Dr. Ayasli, who Defendant SBK TURKEY knew was a citizen and resident of the United States.

208.     Defendant SBK TURKEY intended its conduct to be felt in the United States, and but for Defendant SBK TURKEY's illegal acts in and directed at the United States, Dr. Ayasli would not have suffered the injuries described herein.

209.     The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's claims under 18 U.S.C. § 1962.

**<u>Defendant Bugaraj</u>**

210.     Exercise of jurisdiction over Defendant BUGARAJ is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I, and 18 U.S.C. § 1965(b) and (d).

211.     Defendant BUGARAJ, though the actions of its officers, executives, employees, agents and/or affiliates, and as part of the RICO Enterprise's overall scheme, extorted and defrauded Dr. Ayasli out of his ownership in BoraJet.

212.     Defendant BUGARAJ intended that the effects of its illegal conduct be felt, and the effects of its conduct were, in fact, felt by Dr. Ayasli in the State of New Hampshire and in the United States.

213.     Defendant BUGARAJ also hired American legal counsel and sent legal and "settlement" correspondence to Dr. Ayasli in New Hampshire.

214.     Defendant BUGARAJ purposely availed itself of the forums of New Hampshire and the United States by intentionally directing its illegal acts at Dr. Ayasli, who Defendant BUGARAJ knew was a citizen and resident of New Hampshire and the United States.

215.     But for Defendant BUGARAJ's conduct in or directed at the State of New Hampshire and the United States, Dr. Ayasli would not have suffered the injuries described herein.

216.    The ends of justice require application of 18 U.S.C. § 1965(b) because (1) there is no district in which all of the RICO Defendants could otherwise be tried together; (2) judicial economy is best served by trying all of the Defendants together; and (3) the Plaintiff resides in and suffered injury in New Hampshire.

217.    Alternatively, the exercise of jurisdiction over Defendant BUGARAJ is proper pursuant to Fed. R. Civ. P. 4(k)(2).  Defendant BUGARAJ purposely availed itself of the laws of the United States by intentionally directing its illegal acts at Dr. Ayasli, who Defendant BUGARAJ knew was a citizen and resident of the United States.

218.    Defendant BUGARAJ intended its conduct to be felt in the United States, and but for Defendant BUGARAJ's illegal acts in and directed at the United States, Dr. Ayasli would not have suffered the injuries described herein.

219.    The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's claims under 18 U.S.C. § 1962.

**Defendant SBK USA**

220.    Exercise of jurisdiction over Defendant SBK USA is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I, and 18 U.S.C. § 1965(b) and (d).

221.    Defendant SBK USA received millions of dollars of proceeds of the RICO Enterprise's U.S.-based money laundering activities from a number of U.S. and foreign entities including WASHAKIE, Defendant SBK TURKEY, and Isanne S.A.R.L., a Luxembourg-based private equity fund with which J.KINGSTON was involved.

222.     Defendant SBK USA subsequently sent millions of dollars of proceeds of the RICO Enterprise's U.S.-based money laundering activities to entities in Turkey, including Defendant SBK TURKEY.

223.     Defendant SBK USA purposely availed itself of the New Hampshire forum by conspiring with members of the RICO Enterprise to intentionally direct illegal acts at Dr. Ayasli, who Defendant SBK USA knew to be a citizen of and resident of New Hampshire.

224.     Defendant SBK USA intended the effects of its conduct to be felt, and the effects of its conduct were, in fact, felt in the State of New Hampshire.

225.     But for Defendant SBK USA's conduct in or directed at New Hampshire, Dr. Ayasli would not have suffered the injuries described herein.

226.     The ends of justice require application of 18 U.S.C. § 1965(b) because (1) there is no district in which all of the RICO Defendants could otherwise be tried together; (2) judicial economy is best served by trying all of the Defendants together; and (3) the Plaintiff resides in and suffered injury in New Hampshire.

227.     The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's claims under 18 U.S.C. § 1962.

### Defendant Mega Varlik

228.     Exercise of jurisdiction over Defendant MEGA VARLIK is proper pursuant to 18 U.S.C. § 1965(a) and N.H. Rev. Stat. Ann. 510:4, I, or 18 U.S.C. § 1965(b) and (d).

229.     Defendant MEGA VARLIK caused financial injury to Dr. Ayasli in New Hampshire and in the United States by (1) purchasing a loan and other debt of Dr. Ayasli's from Turkish banks; (2) unlawfully accelerating the maturity dates of this debt; (3) calling for the

immediate payment in full of this debt and making payment demands on Dr. Ayasli in New Hampshire; and (4) subsequently causing Dr. Ayasli to transfer funds to Defendant MEGA VARLIK from his New Hampshire-based bank accounts.

230.    J.KINGSTON, a U.S. citizen and resident of the State of Utah, is the co-founder, Chairman of the Board, and 99% shareholder of Defendant MEGA VARLIK.

231.    ALPTEKIN was a Board Member of Defendant MEGA VARLIK from October 2016 through April 2017—at all times relevant to the RICO Enterprise's BoraJet acquisition and Defendant MEGA VARLIK's unlawful acceleration of loans and other debt guaranteed by Dr. Ayasli.

232.    Defendant MEGA VARLIK purposely availed itself of the forums of the State of New Hampshire and the United States by intentionally directing its illegal conduct at Dr. Ayasli, who Defendant MEGA VARLIK knew was a citizen and resident of New Hampshire and the United States.

233.    Defendant MEGA VARLIK intended its conduct to be felt, and its conduct was, in fact, felt in the State of New Hampshire and the United States.

234.    But for Defendant MEGA VARLIK's conduct in or directed at the State of New Hampshire and the United States, Dr. Ayasli would not have suffered the injuries described herein.

235.    The ends of justice require application of 18 U.S.C. § 1965(b) because (1) there is no district in which all of the RICO Defendants could otherwise be tried together; (2) judicial economy is best served by trying all of the Defendants together; and (3) the Plaintiff resides in and suffered injury in New Hampshire.

236.    Alternatively, exercise of jurisdiction over Defendant MEGA VARLIK is proper pursuant to Fed. R. Civ. P. 4(k)(2).  Defendant MEGA VARLIK purposely availed itself of the laws of the United States by intentionally directing its illegal acts at Dr. Ayasli, who Defendant MEGA VARLIK knew to be a citizen and resident of the United States.

237.    Defendant MEGA VARLIK intended its conduct to be felt in the United States, and but for Defendant MEGA VARLIK illegal acts in and directed at the United States, Dr. Ayasli would not have suffered the injuries described herein.

238.    The exercise of pendant jurisdiction over Dr. Ayasli's state law claims is appropriate because each claim arises from the same nucleus of operative fact as Dr. Ayasli's claims under 18 U.S.C. § 1962.

## FACTUAL BASIS FOR CLAIMS

### A. BACKGROUND

#### 1.  Plaintiff Dr. Ayasli's Scientific Background and Accomplishments

239.    Dr. Ayasli was born in Ankara, Turkey in 1946.

240.    He received his Bachelor of Science degree from Middle East Technical University's ("METU") Department of Electrical Engineering in 1968.

241.    Dr. Ayasli then came to the United States for graduate studies, where he earned his MSEE and Sc.D. degrees from the Massachusetts Institute of Technology ("MIT") in 1973.

242.    After graduating from MIT, Dr. Ayasli returned to his native Turkey for six years where he worked as a faculty member and Deputy Department Chair in the Electrical Engineering Department at METU.

243.    Dr. Ayasli returned to the United States in 1979 when he joined Raytheon, Inc., where he engaged in theoretical and applied research of microwave monolithic integrated circuit techniques, GaAs field effect transistors, and related equipment.

244.    In 1985, Dr. Ayasli left Raytheon and founded Hittite Microwave Corporation ("Hittite Microwave"), a Chelmsford, Massachusetts-based company which designed and produced components used in mobile phones, medical instruments, advanced weaponry, and aerospace technology.

245.    Dr. Ayasli is a Fellow of the Institute of Electrical and Electronics Engineers ("IEEE"). [9]

246.    Dr. Ayasli is the developer and holder of 15 U.S. patents in his field of expertise.

247.    In connection with Hittite's production of circuitry for advanced weaponry and aerospace technology, Dr. Ayasli has held security clearances from the United States government for many years.

248.    Dr. Ayasli took Hittite Microwave public in 2005, where it was listed on the NASDAQ exchange.

249.    Dr. Ayasli served as Hittite's CEO and Chairman of the Board for over 20 years until his retirement in 2005.  Dr. Ayasli maintained a significant number of shares in Hittite after his retirement from the company.

250.    Hittite Microwave was acquired by Analog Devices, Inc. for $2.5 billion USD in 2014.

---

[9] A nominee for this fellowship must "have accomplishments that have contributed importantly to the advancement or application of engineering, science and technology, bringing the realization of significant value to society."

251.    Dr. Ayasli is married to Dr. Serpil Ayasli, who is also a distinguished scientist. She earned her B.S. in Electrical Engineering, M.S. and Ph.D. degrees in Physics from METU. She conducted research as a post-doctoral fellow in astrophysics at MIT between 1979 and 1982.

252.    Dr. Serpil Ayasli is a Fellow of the IEEE and a former Associate Group Leader at MIT Lincoln Laboratory, a U.S. Department of Defense research facility with a focus on applying technology to national security problems.

253.    In connection with her work, Dr. Serpil Ayasli likewise held various security clearances from the United States government for 23 years.

254.    She was the recipient of the 2008 Warren D. White Award for Excellence in Radar Engineering for her "extensive innovation and leadership in ultra-wideband radar technology for ground and foliage penetration."[10]

255.    Dr. Yalcin Ayasli and Dr. Serpil Ayasli have three adult children, all of whom live within the United States.

## 2.  Dr. Ayasli's Charitable Organizations

256.    Following his success in science and business, Dr. Ayasli became a well-known philanthropist focused on two primary areas—scientific research and development, and the promotion of cultural exchanges and friendly relations between the United States and Turkey.

257.    In the pursuit of scientific research and development, Dr. and Mrs. Dr. Ayasli underwrote the construction of a new research building and laboratories at the Middle East Technical University ("METU"), and the construction of a new laboratory and conference room at MIT.

---

[10] This award, granted by the IEEE Aerospace and Electronics Systems Society (AESS), was established to recognize a radar engineer for outstanding achievements due to a major technical advance, or a series of advances over time, in the art of radar engineering.

258.     The Ayaslis have also endowed educational and research grants at Harvard University, the University of Chicago, and the University of Utah.

259.     In their pursuit of increased cultural exchange between, and friendly relations among, the United States and Turkey, the Ayaslis founded two public charitable organizations— the Turkish Cultural Foundation ("TCF") in 2000, and the Turkish Coalition of America ("TCA") in 2007.

260.     Both the TCF and the TCA actively promote and educate the general public in the United States and abroad concerning Turkish culture, history, and current affairs.

261.     Dr. Ayasli donated more than $60 million USD of his Hittite stock holdings to these two charities.

### a.  The Turkish Coalition of America

262.     TCA has facilitated educational tours of Turkey for 180 United States Congressmen and their chiefs of staff, 13 state attorneys general, and dozens of influential Americans at every level.

263.     TCA has also helped young Turkish-Americans to secure internships in Congress and at various think tanks.  Since 2007, TCA has provided 167 internship opportunities, 87 of them in Congressional offices.

264.     TCA also has a long history of fostering ties with African-American and Native American communities in the United States through the promotion of cultural and educational exchanges.  Since 2008, TCA has awarded 488 scholarships to American students of African, Armenian, Bosnian, Filipino, Hispanic, Macedonian, and Native American heritage to study abroad in Turkey, the Turkish Republic of Northern Cyprus, and Bosnia and Herzegovina.

265.     TCA has also provided 281 Study Tour Grants, giving young Americans the opportunity to travel and study in Turkey through programs in their American universities.

266.    Dr. Ayasli also founded the Turkish-American Legal Defense Fund in 2009 as an extension of the TCA.

267.    The Turkish-American Legal Defense Fund has undertaken legal work in many parts of the world preserving the civil rights of those who would otherwise face discrimination or censure for *inter alia*, their ethnicity, promoting Turkish culture or  promoting friendly Turkey-U.S. relations.

268.    The Turkish American Legal Defense Fund has also advanced several cases seeking to preserve the right of academicians to debate the delicate question of whether the civilian deaths of Ottoman Armenians during World War I constituted genocide.  Because of Dr. Ayasli's staunch support for this work, Dr. Ayasli and his family have frequently been targeted by the Armenian lobby in the media.

### b.  The Turkish Cultural Foundation

269.    TCF's purpose is to increase knowledge of Turkey's tangible and intangible cultural heritage and highlight Anatolia's contributions to world culture and humanity, while building people-to-people cultural bridges.

270.    TCF is one of a few cultural non-governmental organizations ("NGOs") worldwide to be awarded the privilege of official relations with UNESCO.[11]

271.    TCF and Armaggan, a Turkish luxury brand of natural dyed textiles and other goods founded by Dr. Ayasli, jointly established the Cultural Heritage Preservation and Natural Dyes Laboratory[12] in Istanbul.

---

[11] "The United Nations Educational, Scientific and Cultural Organization may make suitable arrangements for consultation and cooperation with non-governmental international organizations concerned with matters within its competence, and may invite them to undertake specific tasks." *See Turkish Cultural Foundation*, UNESCO, https://en.unesco.org/partnerships/non-governmental-organizations/turkish-cultural-foundation, (Nov. 3, 2017 11:54 AM).

[12] *The World's Most Extensive Collection of Natural Dye Plants and Dye Insects*, CULTURAL HERITAGE PRESERVATION AND NATURAL DYES LABORATORY, http://www.tcfdatu.org/, (last visited February 18, 2019).

272.     The Cultural Heritage Preservation and Natural Dyes Laboratory work to preserve and promote Turkey's textile heritage through research and development.  It also holds the most extensive collection of natural dye materials in the world and provides free analytical services to museums in Turkey and elsewhere assisting in efforts to preserve historical textiles.

273.     TCF has facilitated cultural tours of Turkey for 600 United States high school teachers, including thirteen teachers from schools in New Hampshire.

274.     TCF has conferred 195 fellowships to support interactions between artists to build artistic, cultural, and scholarly exchanges across the globe.

275.     TCF has also focused on educating the world about Turkish culture through online content.  The TCF websites on Turkish culture, music, and cuisine are among the most visited portals on Turkish culture on the Internet and have been accessed by millions of visitors from across the globe.

276.     TCF also provided free public education on Turkish culture by leading experts and scholars through lectures at its Istanbul office (now closed because of threats made by Defendant Korkmaz) and at prestigious institutions worldwide.  Thousands have attended these conferences over the years, and thousands more from all over the world have accessed its content online through via the online TCF Video Gallery.

277.     In addition to implementing its own programs, TCF is also one of the largest private providers of grants and other financial support for projects by other organizations and individuals celebrating Turkish culture.  Since 2000, TCF has contributed a total of $5,238,780 in grants supporting Turkish music, art festivals and exhibitions around the world.

### 3.  Dr. Ayasli's Investments in Turkey

278.     Dr. Ayasli has invested more than $390 million USD in various business interests in Turkey including: (1) his former holdings in BoraJet and its affiliates (Aydin Jet and BoraJet

Bakim); (2) Armaggan, a retailer which produces and promotes Turkish natural-dyed fabrics, crafts and cuisine; (3) the critically-acclaimed Nar Restaurant in Istanbul; (4) Nar Gourmet, which produces, promotes, and sells Turkish cuisine and natural products in Istanbul; and (5) Bora Turizm, a Turkish-based travel agency.

279.    Dr. Ayasli and Mrs. Dr. Ayasli have meticulously restored several buildings of historic significance in the Ortakoy, Nurosmaniye and Kandilli districts of Istanbul where the Ayaslis now have prominent and historical real estate holdings valued at more than $100 million USD.

### a. Dr. Ayasli's Establishment of BoraJet

280.    In 2007, with the intent to conduct regional flights to expand international tourism beyond the reach of traditional carriers in Turkey, Dr. Ayasli acquired Ovaair Ucak Bakim Onarim ve Havacilik Ticaret Ltd. Sti ("Ovaair").

281.    Ovaair had a license to conduct short-range flights.

282.    After the acquisition, Dr. Ayasli changed the name of the company to BoraJet.

283.    BoraJet Bakim, a separate corporate entity, was established after the restructuring of BoraJet in 2014 to manage and operate the aircraft maintenance aspect of the business.

284.    Dr. Ayasli established Aydin Jet in 2015, a separate corporate entity created for the purchase and operation of a Global XRS aircraft, a large-cabin private business jet manufactured by Bombardier Aerospace.

285.    BoraJet began operating in underutilized state-owned airports across Turkey in 2007, and became the only regional airline in Turkey.

286.    BoraJet entered into codeshare agreements with Turkish Airlines ("THY") to permit BoraJet aircraft with BoraJet crews to fly certain routes under the banner of THY

subsidiary AnadoluJet, giving BoraJet significant prestige in the Turkish and international commercial aviation market.

287.    Prior to the commencement of the RICO Enterprise's attacks on Dr. Ayasli and BoraJet, in early 2016, BoraJet owned (1) two commercial airline hangars (one at Ankara Esenboğa International Airport and the other at Istanbul Atatürk Airport); (2) designated gates at both Istanbul airports and several others; (3) a fleet of 12 Embraer 190 airliners with seating for up to 110 passengers each; and (4) a Bombardier Global XRS jet aircraft for business and executive travel (through its affiliate Aydin Jet).

288.    Although BoraJet was not yet profitable, its fleet was flying a full schedule of domestic and international routes, ridership was growing, and Dr. Ayasli and the BoraJet Board of Directors were advancing a strategic plan, bankrolled by Dr. Ayasli, to further expand and modernize BoraJet's service and operations.

289.    To that end, BoraJet also negotiated and executed a service contract to use its aviation maintenance licenses to perform maintenance on passenger aircraft belonging to the Turkish Navy stationed at the Topel Naval Air Station in Kocaeli (Turkey).

290.    BoraJet was also engaged in expansion plans in anticipation of the opening of Istanbul's third international airport.[13]  BoraJet was moving to expand its fleet of commercial aircraft to 45 planes, and to shift its business model from its existing fleet of entirely leased aircraft to a fleet where it wholly owned 35 of its 45 aircraft.  In furtherance of those plans, on October 16, 2015, BoraJet, through an affiliated entity, signed a letter of intent with Embraer for the purchase of 30 additional jet aircraft worth $991,700,000 USD.

---

[13] On November 2, 2018, the Istanbul Airport opened and was promoted as the beginning of "The golden age of Turkish Aviation Industry." *See* Press Release dated Nov. 2, 2018 at https://www.igairport.com/en/press-releases/the-golden-age-of-turkish-aviation-ndustry-is-coming-on-the-95th-anniversary-of-the-foundation-of-the-republic (last visited on February 18, 2019).

291.    In 2016, BoraJet had also just entered into a significant marketing sponsorship arrangement with Istanbul-based sports club Fenerbahce.  As part of this comprehensive sponsorship arrangement, BoraJet transported the internationally known Fenerbahce soccer team to its matches, and the soccer team wore BoraJet's logo on its jerseys.[14]  The marketing deal led to the creation of a documentary film about the team's BoraJet plane.[15]

292.    On April 27, 2016, just prior to the start of the RICO Enterprise's media campaign against Dr. Ayasli and BoraJet, BoraJet engaged Ata Invest, a financial consulting firm, to help solicit investment in BoraJet from individual and corporate investors to fully fund BoraJet's intended expansion.

293.    In furtherance of that effort to attract new investment, Ata Invest analyzed BoraJet's valuation as a going concern, based on different valuation methodologies.  The benchmarking method placed BoraJet's value between $335 million and $358 million USD, while the discounted cash flow method yielded a median value of $865 million USD between the most pessimistic scenario and the most optimistic scenario.

**4.    The July 15, 2016 Coup d'Etat Attempt in Turkey**

294.    The Republic of Turkey declared a state of emergency after the failed *coup d'état* attempt ("coup attempt") on July 15, 2016.

295.    After the coup attempt failed, the Turkish government accused deposed Turkish cleric Fethullah Gulen and FETO of masterminding the coup attempt.

296.    Gulen is a Turkish national who has resided in the United States since 1999.

297.    Following the coup attempt, Turkish authorities responded by cracking down on anyone alleged to have ties or connections to FETO.  In furtherance of this effort, the Turkish

---

[14] https://www.youtube.com/watch?v=Wd7cHO3jbDk (last visited February 18, 2019)
[15] https://www.youtube.com/watch?v=zQplkQ1MQeU (last visited February 18, 2019)

government detained thousands of people. Thousands more were arrested, terminated from government employment, or had their businesses or property confiscated by the government, in some cases, based on alleged connections or allegiances to FETO.[16]

298.     In addition, a number of judges and prosecutors have been arrested, removed or reassigned based on their rulings in such cases.  This increased level of government scrutiny has created an atmosphere of fear among judges and prosecutors that they too could suffer consequences for failing to deal strictly with individuals suspected of FETO involvement.

## B.  FORMATION OF THE RICO ENTERPRISE

### 1.  The RICO Enterprise Defrauds the United States Government and Secures Funding for Its Other Activities

299.     From at least 2011 to 2016, members of the RICO Enterprise fraudulently obtained over $511 million USD from the United States Department of Treasury through a renewable fuel tax credit scheme, funneled proceeds of that effort through U.S.-based companies, and ultimately laundered a substantial portion of these proceeds through Turkish-based bank accounts controlled by members of the RICO Enterprise.

300.     In connection with this scheme, three members of the RICO Enterprise were indicted and charged with a number of criminal offenses in the United States District Court for the District of Utah (the "Utah Proceeding").[17]  *See* **Exhibit A.**

---

[16] *See* U.S. Dept. of State, Bureau of Democracy, Human Rights and Labor, Turkey 2017 Human Rights Report.

[17] On January 17, 2019, a grand jury in the United States District Court for the District of Utah issued a second superseding indictment charging Jacob Kingston, Isaiah Kington, Lev Aslan Dermen, and Rachel Ann Kingston and Sally Louise Kingston. ***See* Exhibit A.** The indictment charges the following offenses: conspiracy to commit mail fraud (contrary to 18 U.S.C. § 1349;  aiding in the preparation and filing of a false claims (contrary to 26 U.S.C. § 7206(2); conspiracy to commit concealment money laundering offenses (contrary to 18 U.S.C. § 1956(h)); conspiracy to commit international concealment and expenditure money laundering offenses (contrary to 18 U.S.C. § 1956(h));  various other money laundering offenses (contrary to 18 U.S.C. §§ 1956, 1957); conspiracy to commit obstruction of justice offenses (contrary to 18 U.S.C. § 1512(k)); destroying and concealing records and objects (contrary to 18 U.S.C. § 1512(c)(1)); and attempted force or threat of force (contrary to 18 U.S.C. § 1512(a)(2) in *United States v. Kingston, et al*, 18-CR-00365-JNP-BCW ("Utah Proceeding"). *Id.*

301.    As outlined by the Department of Justice in the Utah Proceeding, J.KINGSTON, I.KINGSTON and DERMEN fraudulently obtained over $511 million in renewable fuel tax credits from the Internal Revenue Service (IRS).

302.    From 2010 through 2016, J.KINGSTON, I.KINGSTON and DERMEN, as part of their fraud to obtain the fuel tax credits, falsified production records and paperwork accompanying qualifying renewable fuel transactions.

303.    To make it appear that qualifying renewable fuel transactions were occurring, J.KINGSTON, I.KINGSTON and DERMEN, on behalf of the RICO Enterprise, rotated fuel throughout the western United States, Mexico and Panama ostensibly to convert ordinary fuel into qualifying renewable fuel to obtain fuel tax credit dollars from the U.S. Government.

304.    The RICO Enterprise then laundered a substantial portion of the proceeds of this scheme through entities in the United States and Turkey owned or controlled by the RICO Enterprise.

305.    On March 8, 2013, and in furtherance of this overall scheme, the RICO Enterprise formed Defendant SBK TURKEY.

306.    Nine months later, on December 6, 2013, and in furtherance of this overall scheme, the RICO Enterprise formed SBK USA.

307.    From August 2013 to February 2016, WASHAKIE "moved more than one billion dollars in a circle," transferring approximately $400 million through a chain of related companies before transferring $397 million back to WASHAKIE.

308.    These transactions, coupled with the falsified production records and other paperwork, made it appear that WASHAKIE was engaged in legitimate biodiesel fuel conversion transactions.

309.    J.KINGSTON, I.KINGSTON and DERMEN went to great lengths in furtherance of this fraud, generating false invoices purporting to show purchases and sales and creating foreign and domestic entities through which to launder money.  They chartered an oceangoing tanker, rented a series of shore tanks at fuel terminals, and purchased actual blended fuel products to move around, all to give their efforts the appearance of legitimacy.

310.    In one instance, for example, the KINGSTONS shipped 3.3 million gallons of blended fuel to Panama, offloaded it onto trucks, drove it around, and then loaded it back onto a vessel the next day to ship back to the United States. WASHAKIE then claimed and subsequently fraudulently obtained $6.6 million in biodiesel fuel tax credits in connection with this shipment.

311.    During the scheme, the KINGSTONS and DERMEN, through their U.S.-based businesses WASHAKIE, Defendant SBK USA and NOIL ENERGY, and other U.S.-based entities directly controlled by members of the RICO Enterprise, including Speedy Lion (DERMEN) and GT Energy (George "G.T." TERMENDZHYAN), used the U.S. wires to launder at least $210 million USD into the bank accounts of Turkish companies directly controlled by the RICO Enterprise.

312.    As outlined in the Utah Proceeding, these proceeds flowed either (1) directly into the Turkish bank accounts of Defendant SBK TURKEY (controlled by Defendant KORKMAZ and Defendant OZKARAMAN); (2) into Turkish bank accounts controlled by other corporate members of, or agents of the RICO Enterprise, including KOMAK (controlled by Defendant KORKMAZ), BLANE (controlled by J.KINGSTON), Isanne SARL (controlled by Defendant KORKMAZ and J.KINGSTON) and a Turkish-based bank account of U.S. company

WASHAKIE (controlled by J.KINGSTON); or (3) into Turkish bank accounts held by individual members of the RICO Enterprise, including DERMEN and J.KINGSTON.

313.    WASHAKIE also paid $450,000 to Turkish-based travel agent Doga Dogan, allegedly to arrange travel for representatives of U.S.-based WASHAKIE to travel to and from Turkey.

314.    At least $63 million USD of this money flowed back into the United States as part of the racketeering activity.

315.    These proceeds flowed either (1) directly into the U.S.-based bank accounts of Defendant SBK USA (controlled by DERMEN); (2) into U.S.-based bank accounts controlled by other corporate members of, or agents of the RICO Enterprise, including SPEEDY LION (controlled by DERMEN), and GT Energy (controlled by George "G.T." TERMENDZHYAN); or (3) into U.S. bank accounts held by individual members of the RICO Enterprise, including DERMEN.

316.    Plaintiff's current understanding of the extent of these money laundering transactions is demonstrated in the chart below.

| Date | Payor | Payee | Amount |
|---|---|---|---|
| September 9, 2013 | WASHAKIE | KOMAK | $4,000,000 |
| September 9, 2013 | WASHAKIE | KOMAK | $5,000,000 |
| September 12, 2013 | KOMAK | SPEEDY LION (USA) | $4,999,964 |
| September 17, 2013 | KOMAK | SPEEDY LION (USA) | $1,999,964 |
| September 19, 2013 | KOMAK | SPEEDY LION (USA) | $1,999,964 |
| November 13, 2013 | WASHAKIE | SBK TURKEY | $10,000,000 |
| December 31, 2013 | WASHAKIE | KOMAK | $13,000,000 |
| January 14, 2014 | WASHAKIE | Doga Dogan | $100,000 |
| January 21, 2014 | KOMAK | SPEEDY LION (USA) | $9,000,000 |
| January 24, 2014 | WASHAKIE | Doga Dogan | $50,000 |
| March 5, 2014 | WASHAKIE | DERMEN (Garanti) | $483,000 |
| March 12, 2014 | WASHAKIE | J. KINGSTON (Garanti) | $10,000,000 |
| March 24, 2014 | WASHAKIE | BLANE | $4,055,700 |
| March 24, 2014 | WASHAKIE | BLANE | $5,000,000 |
| May 9, 2014 | WASHAKIE | BLANE | $2,000,000 |
| July 22, 2014 | WASHAKIE | Doga Dogan | $200,000 |
| September 5, 2014 | WASHAKIE | Doga Dogan | $100,000 |
| April 28, 2015 | WASHAKIE | Garanti Bank (Turkey) | $15,000,000 |

| May 19, 2015 | WASHAKIE | ISANNE SARL (Garanti) | $35,000,000 |
|---|---|---|---|
| May 27, 2015 | WASHAKIE | ISANNE SARL (Garanti) | $21,300,000 |
| May 27, 2015 | WASHAKIE | ISANNE SARL (Garanti) | $21,300,000 |
| June 11, 2015 | WASHAKIE | Garanti Bank (Turkey) | $200,000 |
| July 3, 2015 | ISANNE SARL (Garanti) | SBK USA | $15,000,000 |
| September 23, 2015 | KORKMAZ (Garanti) | DERMEN (BOA) | $6,000,000 |
| October 16, 2015 | KORKMAZ (Garanti) | DERMEN (BOA) | $4,000,000 |
| November 3, 2015 | Alptekin Yilmaz | GT ENERGY | $19,999,950 |
| December 14, 2015 | WASHAKIE | J. KINGSTON (Garanti) | $2,100,000 |
| December 28, 2015 | WASHAKIE | J. KINGSTON (Garanti) | $6,900,000 |
| December 28, 2015 | SBK USA | SBK TURKEY | $14,000,000 |
| February 17, 2016 | NOIL ENERGY | SBK TURKEY | $3,885,135 |
| March 22, 2016 | NOIL ENERGY | KOMAK | $3,810,000 |
| March 25, 2016 | SBK USA | SBK TURKEY | $458,000 |
| September 28, 2016 | NOIL ENERGY | SBK TURKEY | $11,000,000 |
| October 21, 2016 | SBK USA | SBK TURKEY | $6,000,000 |
| November 8, 2016 | SBK USA | SBK TURKEY | $15,000,000 |
| November 8, 2016 | SBK USA | SBK TURKEY | $265,000 |

317.     On September 9, 2016, only a few weeks after the coup attempt and in the resultant social, political and economic chaos in Turkey, the Turkish Prime Ministry Investment Agency ("ISPAT") published a press release, promoted and/or ghostwritten by Defendant KORKMAZ, describing NOIL ENERGY, WASHAKIE, and Defendant SBK TURKEY's creation of an alleged "$450 million equity fund" for investment in Turkey.  *See* **Exhibit C.**

318.     The press release explicitly referenced investments from J.KINGSTON and "the Kingston Family."  *See* **Exhibit C.**

319.     The press release also promoted NOIL ENERGY as being an "active player in industry and commerce in the USA for nearly 200 years," and represented that NOIL ENERGY "manages its highest business stakes today in the form of investments in the energy industry." These statements are demonstrably false.  *See* **Exhibit C.**

320.     The press release further provides that NOIL ENERGY's partnership with Defendant SBK TURKEY dates back to 2013, that its investments in Turkey totaled over $500 million USD, and that the proposed $450 million equity fund "for the new investments… is poised to flow into Turkey until the end of 2016."  *See* **Exhibit C.**

321.    The press release represented that the group of businesses—primarily consisting of members of the RICO Enterprise—intended to invest in Turkey an amount in excess of $950 million USD.  *See* **Exhibit C.**

322.    After the press release was issued, J.KINGSTON and Defendant KORKMAZ met personally with Turkish President Erdogan, who may have been unaware of the true sources of these investments.

323.    Photographs of this meeting were published in Turkish news articles touting this "exciting investment" of funds in Turkey.  These photos have been republished many times in the Turkish media, giving viewers the false impression that Defendant KORKMAZ and J.KINGSTON have a personal relationship with the Turkish President and that President Erdogan "protects" their interests and investments in Turkey.

## C.  THE RICO ENTERPRISE'S EXTORTION SCHEME TO ACQUIRE BORAJET

### 1.  The RICO Enterprise's Defamatory Media Campaign to Disparage Dr. Ayasli and BoraJet

324.    In the spring of 2016—prior to the coup attempt—DERMEN began bragging in California about his group's plans to "take over an airline in Turkey."

325.    DERMEN later specifically identified this airline as BoraJet.

326.    DERMEN stated he and his business associates had "around $200 million USD in cash" to invest in Turkey and that they had a plan ready to implement, but were waiting for the right "opportunity."

327.    The July 15, 2016 coup attempt provided the RICO Enterprise with just that opportunity.  Within weeks of the coup attempt, the RICO Enterprise launched its extortion scheme—with the first phase aimed squarely at devaluing BoraJet through a defamatory media

campaign against Dr. Ayasli that would result in the RICO Enterprise purchasing BoraJet at a fire sale price.

328.     After the coup attempt, but prior to the publication of defamatory media articles, DERMEN specifically bragged that the RICO Enterprise would take advantage of the post-coup chaos in Turkey.

329.     Capitalizing on this highly-charged, chaotic political environment, the RICO Enterprise used its influence and connections in the Turkish media to (1) slander, libel and defame Dr. Ayasli; (2) disparage Dr. Ayasli's business reputation; and (3) disparage BoraJet's commercial reputation in order to (a) falsely connect Dr. Ayasli to terrorism and the coup; (b) throw Dr. Ayasli's business relationships and reputation into chaos; and (c) force Dr. Ayasli to sell his interests in BoraJet at a fire sale price.

330.     In furtherance of its scheme, in August 2016, the RICO Enterprise began a systematic defamation campaign that took dead aim at Dr. Ayasli by seeking to falsely connect him to the coup attempt and FETO.

331.     Defendant KORKMAZ and ALPTEKIN used the RICO Enterprise's connections in the Turkish media to plant a series of defamatory media stories about Dr. Ayasli, BoraJet, and his charities.

332.     These fabricated media stories, aimed at destroying Dr. Ayasli's business and personal reputations and casting doubt on the reliability of BoraJet as a commercial airline, constituted the RICO Enterprise's first strategic step in their ultimate goal to acquire BoraJet.

333.     At the direction of the RICO Enterprise, Turkish "journalists" Bulent Baskoy, Ergün Diler, Ersin Ramoğlu, Mahmut Övür, Soner Yalçın and Turkish newspapers *Takvim*,

*Sabah*, *Gazeteport*, *Cumhuriyet*, *Hurriyet*, and *Haberturk* began publishing false news reports and "investigative stories" about Dr. Ayasli, BoraJet, and Dr. Ayasli's charitable organizations.

334.    These "news reports" and "investigative stories" were also posted to these newspapers' websites, where they were directly accessed by the Turkish community in New Hampshire, the United States and across the world.

335.    These "news reports" and "investigative stories" were also re-published on other Turkish websites, as well as on various social media, where they were directly accessed by the Turkish community in New Hampshire, the United States and across the world.

### a.  ALPTEKIN Recently Indicted in the U.S. for Similar Conduct

336.    On December 12, 2018, ALPTEKIN was indicted by Special Counsel Robert Mueller in the United States District Court for the Eastern District of Virginia in *United States v. Rafiekian*, No. 1:18-CR-47 (AJT).  *See* **Exhibit B.**  In the indictment, the U.S. Government alleges, among other conduct, that ALPTEKIN helped orchestrate a campaign to characterized by feeding stories to the media to support criminal referrals against a suspect.  *Id.*

337.    The charges against ALPTEKIN in the Eastern District of Virginia demonstrate a pattern of conduct by ALPTEKIN similar to the media campaign that he and the RICO Enterprise waged against Dr. Ayasli in this case, as set forth below.

### b.  False information published in *Takvim*[18]

338.    The RICO Enterprise first spread false information to Turkish journalists that linked Dr. Ayasli to alleged FETO leaders and two alleged FETO plots: (1) the "17–25 December Operation"—a bribery and wiretapping scheme allegedly executed by FETO operatives on December 17–25, 2013—and later (2) the July 15, 2016 failed coup attempt allegedly organized by FETO.

---

[18] In all block quotes provided in the text of the complaint, capitalization was in original.

339.    In August 2016, at Defendant KORKMAZ's direction, ALPTEKIN initiated the RICO Enterprise's defamatory media campaign by meeting with Ergün Diler, a columnist from the national Turkish newspaper *Takvim*, which has a daily print circulation of 150,000 to 200,000 copies and is also accessible online in New Hampshire and the United States via the Internet.[19]

340.    ALPTEKIN, at the direction of Defendant KORKMAZ and on behalf of the RICO Enterprise, made false statements to Diler regarding Dr. Ayasli's alleged connections to FETO with knowledge of their falsity, and aided, abetted, and encouraged Diler to libel, defame, and disparage Dr. Ayasli and BoraJet as part of the RICO Enterprise's campaign to connect Dr. Ayasli to FETO and deposed cleric Fethullah Gulen.

341.    Following his meeting with ALPTEKIN, Diler published a series of columns in *Takvim* in which he alleged, among other things, (1) that Dr. Ayasli had close relations with alleged high-ranking FETO members Faruk Bayindir and Halil Ibrahim Koca; (2) that Dr. Ayasli and his associates used BoraJet planes to secretly transport alleged FETO members into and out of Turkey; (3) that using his technical background, Dr. Ayasli designed a cellphone application that FETO members allegedly used to secretly communicate; and (4) that Dr. Ayasli's close associates were agents for the U.S. Central Intelligence Agency ("CIA") operating in Turkey.

342.    On September 2, 2016, Diler published a column titled "Has Gulen Come Back?" alleging that Dr. Ayasli played a treasonous role in two of Turkey's most infamous terrorist plots attributed to FETO: (1) 17-25 December anti-corruption operation that targeted senior members of the Turkish government; and (2) the coup attempt in July 2016.

---

[19] *Takvim's* internet site is located at https://www.takvim.com.tr (most recently accessed on January 30, 2019).

343.   Diler falsely reported that (1) Dr. Ayasli had ties to FETO; (2) Dr Ayasli was a partner in Tarkim Aviation (which he was not); and (3) Dr. Ayasli used BoraJet aircraft to help FETO members flee after the 17-25 December Operation:

> Nobody had that jet.  It was GLOBAL EXPRESS XRS. After it takes off, it can fly to USA without refueling.  That was important. It was said that BAYINDIR bought it but the boss was YALCIN AYASLI.  He paid the money.  He had a purpose!  Bayindir and Ayasli were partners in TARKIM AVIATION.  Then in BORAJET.  It was weird that they paid cash somehow […] Why was AYASLI interested in AVIATION?  Let's talk about this.  For example, when the 17-25 December Operations started, some businessmen called Faruk Bayindir to get the jets ready.  24 hours!

344.   In the same article, Diler made the false claim that Dr. Ayasli helped individuals, including Fethullah Gulen, enter and exit Turkey undetected by the Turkish government by using a "special" customs-free hangar.

345.   The article also falsely claimed (1) that Dr. Ayasli was an owner of the TARKIM special hangar (he was not); and (2) that the Borajet XRS plane was hangared there (it was not). Dr. Ayasli did not own, and had no connection whatsoever to the TARKIM special hangar, and, as such, has no knowledge of anything that happened there.

> Ayasli and Bayindir owned the most special hangar in the ATATURK AIRPORT.  IT HAD TWO ENTRIES.  The law enforcement and customs officers were not there.  VERY SPECIAL GUESTS USED THAT HANGAR AND THEY BOARD FROM THERE AND THEY FLY WHEREVER THEY WANT.  Most of them were foreigners.  Many Americans board from there.   NO MANIFEST, [no] document listing the passengers.  More importantly, they landed with full of money without any explanation.  Nobody had that privilege.  The $58 million dollar plane was special because the hangar was SPECIAL. People from the U.S. or somewhere else came to Turkey without any RECORD and leave the country from there.  For example, if Fethullah Gulen came to Turkey and held his meetings in Istanbul, nobody would have known it.  He would have left freely.  Many people did that.  No records.

346.     The next day, on September 3, 2016, Diler published an article entitled: "It is not the Akinci Base,[20] it is the Hangar!" That article continued to falsely link Dr. Ayasli to FETO, and implied that BoraJet was simply a "front" for FETO.  Again, Diler continued to make false and totally unsubstantiated claims that Dr. Ayasli helped individuals linked to FETO enter and leave Turkey undetected by the Turkish government:

> Yalcin Ayasli generally spent his summers in Istanbul. He used to visit his hangar with foreigners.  It had a SPECIAL GATE! Nobody had to show IDs or passports.  We didn't know whether a CIA agent, Graham Fuller, or Henry Barkey came here.  The visitors came and went.  No police officers, no security, and no customs officer!  FETO AIRPORT!  This hangar hosted many foreigners.  Generally at nights.  When they held their SECRET MEETINGS, nobody was there except selected two or three staff members.  Everybody left except the ones who needed to stay there. Many people came to there.  Because no paperwork was needed, they would have brought some money or GOLD […] Who was taken from the HANGAR? Did the people wanted by the government leave from there?

347.     In the same column, Diler also questioned how BoraJet could be losing money but "somehow" still afford to sponsor Fenerbahce, the prominent Istanbul soccer team, implying that BoraJet was getting secret payments from a clandestine source.

348.     On September 7, 2016, Diler wrote another column entitled "The Hangar Mood" in which he again falsely accused Dr. Ayasli of illicit dealings.  Questioning the source of Dr. Ayasli's wealth, Diler stated:

> Yalcin Ayasli is a scientist graduated from ODTU.  He moved to the U.S. and made a lot of money with patents.  It is possible! However, his businesses lost a lot of money, which arouses suspicion regarding how he made this wealth.  For example, Borajet is a company, which reported losses.  The aircrafts are on

---

[20] During the July 15, 2016 coup attempt, the Akinci Air Base located in Ankara was used as the "command center" for the pro-coup (FETO) military.  The Turkish Chief of the General Staff, Hulusi Akar, was taken hostage by pro-coup soldiers and transported to Akinci Air Force Base where he was detained.  Akinci Air Force Base was eventually carpet bombed by the Turkish government in an effort to put down the coup.

the ground. After my article, they released a statement. The statement was about their goals. I laughed at it.

349.    Two days later, on September 9, 2016, Diler again drew false connections between Dr. Ayasli and FETO in an article entitled "The Hangar Door." In that article, Diler reported that Dr. Ayasli had (1) confronted him and the *Takvim* legal affairs department about the falsity of Diler's articles linking Dr. Ayasli and BoraJet to FETO; and (2) requested a retraction.

350.    Diler and *Takvim* did not provide any such retraction and continued the defamatory media campaign against Dr. Ayasli and BoraJet.

351.    Dr. Ayasli was in Turkey on business at the time that these defamatory articles were being read all over the world.

352.    Due to the completely false and reckless allegations being made by Diler and other corrupt Turkish journalists, however, Dr. Ayasli began to fear for his safety and became concerned that the Turkish government would detain him based on these falsities.

353.    The defamatory articles targeting Dr. Ayasli and BoraJet continued unabated. In the wake of the July 2016 coup attempt, Turkish authorities claimed that FETO members had used a mobile phone encryption application known as ByLock to secretly communicate and transmit plans about the coup. Accordingly, during the days and weeks following the coup, Turkish authorities deemed an individual's use of ByLock as evidence of that individual's membership in FETO. [21]

---

[21] It is widely reported that in the months following the coup attempt, the Turkish government arrested approximately 75,000 people simply on the basis that each had downloaded an encrypted messaging application called ByLock. It was also reported that Turkey's chief prosecutor said, "using ByLock remains one of the biggest indications of collaboration with the plotters of the failed putsch in which 250 people were killed." *See* Reuters, *Turkey Begins Freeing Suspects Linked to App Used by Coup Plotters*, published December 29, 2017, https://www.reuters.com/article/us-turkey-security-app/turkey-begins-freeing-suspects-linked-to-app-used-by-coup-plotters-media-idUSKBN1EN1B9 (last visited February 18, 2019).

354.    On October 6, 2016, Diler published an entire column in *Takvim* entitled "Here is the BayLock [sic]" falsely associating Dr. Ayasli with the ByLock designers:

> FURTHERMORE, YALCIN AYASLI WAS INTERESTED IN SOFTWARE. How long has SOFTWARE been our secret headline? Yes! After July 15! Because we found out that the FETO putschists were communicating via the application called ByLock. The putschists created the application and communicated via this special software that Turkey couldn't create. It was stated that 215,000 people used it. The people related to FETO gave ORDERS and follow orders through this application. That's how the ATTEMPT started … THE TEAM OF TURKS AND AMERICANS, WHICH CREATED THIS SOFTWARE, WAS TRAVELLING WITH YALCIN'S [AYASLI's] AIRPLANE!

355.    In conjunction with this front page story, a photograph of a man with a caption identifying him as "Yalcin Ayasli" was splashed across the front page of *Takvim* accompanied by the headline "Here is the ByLock." *See* **Exhibit D.** The man pictured in the photograph was *not* Dr. Ayasli.

356.    The RICO Enterprise's relentless media campaign against Dr. Ayasli and BoraJet continued on October 25, 2016 in an article entitled, "The Bay [sic] Lock Story," when, referring to Dr. Ayasli's relationship with alleged FETO members Faruk Bayindir and Halil Ibrahim Koca, Diler wrote: "I ask about BORAJET… I ask about who decided to create this partnership…"

357.    In another article entitled, "Strange Relationships" published on November 18, 2016, Diler turned his attacks to Dr. Ayasli's business and philanthropic activities in the United States through his charities TCA and TCF. In that article, Diler falsely reported that United States Congressman Dan Burton and Senator Richard Lugar were "FETO sympathizers" working through TCA and TCF to advance FETO's objectives.

358.    Diler also falsely claimed, in that article, that Dr. Ayasli's former company, Hittite Microwave, had surreptitiously sold secret United States military technology to Israel, China, and India.

### c.   False information published in other media outlets

359.    The RICO Enterprise's defamatory media campaign also involved other Turkish newspapers.  The campaign caused similar false information to be published in several columns in *Sabah*, a national Turkish newspaper that also publishes its content for free online and is read by people of Turkish descent in New Hampshire, the United States and across the world.[22]

360.    On August 21, 2016, journalist Mahmut Ovur published a column in *Sabah* titled "FETO is Everywhere."  In his column, Ovur connected Dr. Ayasli and BoraJet to alleged FETO affiliates.

361.    Ovur is a friend and close associate of Defendant KORKMAZ and has had many meetings with Defendant KORKMAZ and DERMEN.

362.    On August 23, 2016, Ovur again published a column in *Sabah* entitled "Who Introduced these Names to American Ayasli?" falsely claiming that (1) Faruk Bayindir was the owner of Borajet; and (2) that Dr. Ayasli maintained a current business partnership both with him and with Halil Koca, drawing false connections between Dr. Ayasli and FETO.  Dr. Ayasli terminated his business relationships with Faruk Bayindir and Halil Koca well before December 17, 2013, the date considered to be the birth of the FETO terror organization:

> As investigations into FETO get deeper, we will see what sort of an insidious organization has us besieged and we will be surprised by how many people who have little chance of coming together can easily come together.  Perhaps that is exactly the secret.  Two days ago, I wrote about the secretive business life of Ibrahim Faruk Bayindir, the owner of BoraJet…. and I mentioned two interesting

---

[22] *Sabah's* internet site is located at https://www.sabah.com.tr (most recently accessed on January 30, 2019).

names.  One is ODTU graduate Dr. Yalcin Ayasli who lives in the
US and the other is lawyer Halil Ibrahim Koca.  The three names
have a business partnership but they also have another thing in
common.  That is their relationship to FETO leader Gulen….

363.     On September 4, 2016, another *Sabah* journalist, Ersin Ramoglu, published a

column falsely claiming that Dr. Ayasli was connected to FETO.  The article, entitled "Did

Fethullah Gulen Come to Istanbul?" claimed that BoraJet aircraft were used to help FETO

members flee Turkey and further "developed" Diler's earlier reporting in *Takvim* that Dr. Ayasli

and BoraJet helped Fetullah Gulen enter and exit Turkey secretly in planning the coup:

> It is entirely possible that Faruk Bayindir brought terrorist leader
> Fetullah [sic] Gulen with a private jet, through his private hangar
> that isn't subject to customs oversight. Their planes can do this.
> Faruk Bayindir and Yalcin Ayasli are partners of Bora Jet. They
> have a private jet worth 58 million USD that no one else has in
> Turkey.  The plane can reach USA without refueling… Who
> knows the people they've helped flee through that hangar which is
> not controlled by the police or the customs officials? And the ones
> they brought in and out! Naturally FETO might have visited.
> Wasn't it the man's greatest wish to come back to the country as a
> caliph? That's why he attempted the coup!

364.     The RICO Enterprise also spread its lies through a third national media outlet in

Turkey when Turkish journalist Soner Yalcin published an article in *Sozcu Gazetesi*[23] on

September 23, 2016.  *Sozcu* is a print publication distributed throughout Turkey that, like *Sabah*,

also provides free access to its content online and is widely read by people of Turkish descent in

New Hampshire, the United States and across the world.

365.     Yalcin's column, entitled "I Wish Mucahit Arslan would Talk" repeated the

misinformation spread by the RICO Enterprise falsely connecting Dr. Ayasli to FETO.

---

[23] Sozcu's internet site is located at https://www.sozcu.com.tr (most recently accessed on January 30, 2019).

### d.  Credible Threats of Violence Against TCA's Office in Istanbul

366.    The RICO Enterprise's defamatory media campaign aimed to destroy Dr. Ayasli's personal and business reputation in Turkey.

367.    In doing so, it also targeted the reputations of his two charities—the Turkish Cultural Foundation (TCF) and the Turkish Coalition of America (TCA)— in the United States.

368.    The RICO Enterprise took aim at TCF and TCA because Defendant KORKMAZ knew that Dr. Ayasli had committed a tremendous amount of his personal wealth, time, emotion, and energy into the growth and success of these charities.  Defendant KORKMAZ knew that these charities contributed to Dr. Ayasli and Mrs. Dr. Ayasli's positive reputations in the United States, including among his peers and members of the U.S. Government, and that Dr. Ayasli intended these charities to be his living legacy.

369.    Accordingly, the RICO Enterprise knew that by implicating these charities as "fronts" for FETO, it would (a) cause the employees of these charities to quit out of fear; (b) threaten not just the reputation of, but the very *survival* of these charities; and (c) thus increase the pressure on Dr. Ayasli to capitulate to the RICO Enterprise's demands in order to preserve the viability of these organizations.

370.    The RICO Enterprise's scheme was effective.  After this initial press coverage, multiple credible threats of violence were made against TCA's Istanbul office.

371.    The TCA Istanbul office subsequently received a safety warning from the U.S. Embassy in Ankara.

372.    The TCA office also received verbal warnings by phone from the U.S. Consulate in Istanbul.

373.    At first, TCA staff responded to these warnings by removing the street-facing signs from their office.  Doing so, however, did not stop the threats.

374.    TCA staff was then forced, out of fear for their personal safety, to move TCA's Istanbul operations to undisclosed and decentralized locations across the city.

375.    After that proved to be untenable, the TCA's Istanbul office was shuttered for good in December 2016.

### 2.   BoraJet's Financial Distress Resulting from the RICO Enterprise's Defamatory Media Campaign

376.    As intended by the RICO Enterprise, the withering defamatory media campaign against Dr. Ayasli inflicted continuous, repeated and irreparable damage to Dr. Ayasli's personal and business reputation in Turkey.  This media campaign accomplished its purpose by imposing immense pressure on Dr. Ayasli.

377.    The constant drumbeat of negative press made it impossible for Dr. Ayasli or BoraJet to enter into new business deals or to obtain new or additional financing from Turkish banks.

378.    It also crippled BoraJet's reputation with the flying public in Turkey, threatening BoraJet's viability as a going concern.

379.    On September 2, 2016, the same day Diler published his first article against Dr. Ayasli and BoraJet in *Takvim*, Zahide Uner, the Chief Financial Officer for Dr. Ayasli's businesses in Turkey, received calls from several of Dr. Ayasli's banks and creditors expressing serious concerns about the *Takvim* article.

380.    Less than a week later, on September 9, 2016, Turkish Airlines ("THY") suddenly and without warning terminated its supply agreement to purchase products developed by NAR Gourmet for distribution on board Turkish Airlines aircraft.

381.    As a result of this cancelled agreement, NAR Gourmet lost one of its largest and most reliable sources of revenue.

382.     Three weeks later, on September 28, 2016, Turkish Airlines cancelled its "wet lease" agreement with Bora Jet.[24]

383.     Two weeks after that, on October 11, 2016, Turkish Airlines terminated its codeshare agreement with BoraJet for six BoraJet aircraft flying under the THY/AnadoluJet banner.

384.     The combination of the sudden and unanticipated cancellations of these contracts by Turkish Airlines financially crippled BoraJet.

385.     Turkish banks suddenly began refusing to lend money and to deny the financing and credit sought by Dr. Ayasli and BoraJet.

386.     For example, on September 18, 2016, Seker Bank refused to extend a requested $33 million USD additional credit line to Borajet that BoraJet intended to use to acquire additional BoraJet aircraft.

387.     At the time that Seker Bank refused to extend this credit line, BoraJet was negotiating agreements to expand its operations through the acquisition of nearly $1 billion USD worth of new aircraft in anticipation of the opening of the new international airport in Istanbul.

388.     Dr. Ayasli's and BoraJet's loss of access to this anticipated credit from Seker Bank thwarted BoraJet's expansion plans.

389.     Ata Invest, BoraJet's financial consultants, had simultaneously been working to help market BoraJet to potential corporate and individual investors, and to solicit investor funding for BoraJet's expansion.

---

[24] A "wet lease" is a leasing arrangement whereby one airline provides an aircraft, complete crew, maintenance, and insurance to another airline which pays by hours operated.  A wet lease is conventionally used by the lessor airline to cover demand in peak travel seasons, or to allow the major carrier to begin flying new routes or to reach smaller airports or airfields where larger planes cannot land or operate economically.

390. The RICO Enterprise's defamatory media campaign also crippled these efforts, causing formerly interested corporate and individual investors to back out of anticipated partnerships with Dr. Ayasli and/or BoraJet out of fear that either or both was, in fact, involved with FETO.

391. Given this sudden and unanticipated contraction of available bank financing, coupled with Ata Invest's sudden inability to attract corporate and individual investment, Dr. Ayasli was forced to self-fund BoraJet to cover operating expenses, capital improvements, payments on contracts, and the airline's rapidly mounting losses due to its lost codeshare routes and plummeting ridership.

392. During this period, Dr. Ayasli was forced to make the following financial transfers *from his New Hampshire-based financial accounts* in order to counteract the increasing financial pressure on BoraJet and his other Turkish-based businesses arising from the defamatory media campaign:

| Date | Amount | From |
| --- | --- | --- |
| September 8, 2016 | $9,000,000 | Fidelity (NH) |
| September 29, 2016 | $1,000,000 | Fidelity (NH) |
| October 4, 2016 | $4,000,000 | Fidelity (NH) |
| October 31, 2016 | $4,000,000 | Fidelity (NH) |
| November 7, 2016 | $3,300,000 | Fidelity (NH) |
| November 29, 2016 | $3,000,000 | Fidelity (NH) |
| December 15, 2016 | $2,000,000 | Fidelity (NH) |
| December 23, 2016 | $1,000,000 | Fidelity (NH) |
| **TOTAL** | $27,300,000 | |

393. Meanwhile, on December 2, 2016, TCA was scheduled to host a panel discussion in Washington D.C. for the *Sabah* Columnist Club to discuss the coup attempt. At the last

minute, however, the Club cancelled the event claiming that going forward with the event would undermine their colleague Mr. Diler since *Takvim* (the Turkish newspaper where Diler worked) was owned by the same company that owned *Sabah*.

394.    This incident highlights the effectiveness of the RICO Enterprise's defamatory media campaign and the resulting reputational damage that Dr. Ayasli and TCA suffered in the United States.

395.    As the financial pressure continued to mount, and the RICO Enterprise's withering media campaign continued unabated, Dr. Ayasli emailed Defendant AKOL, BoraJet's General Manager, on December 1, 2016, that Dr. Ayasli could not continue to send millions of dollars monthly to fund BoraJet's operations, and that he no longer had the "desire or energy" to try and save BoraJet given "everything that has been written in the news recently."

396.    On December 9, 2016, YDA, a Turkish company, approached Defendant AKOL, and offered to acquire a badly damaged BoraJet.

397.    A few days later, YDA presented an offer to acquire BoraJet for $35 million USD (of which $5 million was to be paid at the closing and another $30 million paid out of future profits).  As part of this acquisition, YDA was also willing to assume $35 million USD of BoraJet's debt and release Dr. Ayasli from all of his personal guarantees on that debt. Accordingly, the YDA offer was worth at least $70 million USD in overall value to Dr. Ayasli.

398.    Not coincidentally, in the midst of the firestorm of bad press, cancelled contracts, financing denials and investors backing out, Defendant KORKMAZ, representing the RICO Enterprise, appeared as a "white knight" and inquired about Dr. Ayasli's interest in selling BoraJet.

399.     Defendant AKOL, the Chairman of BoraJet's Board of Directors, bypassed Ata Invest's ongoing efforts to secure investors and YDA's more favorable offer, and instead began direct negotiations with Defendant KORKMAZ and Defendant SBK TURKEY.

400.     Upon information and belief, Defendant AKOL was threatened and/or bribed by Defendant KORKMAZ and the RICO Enterprise to help facilitate the RICO Enterprise's acquisition of BoraJet from Dr. Ayasli.

401.     After meeting with Defendant KORKMAZ on several occasions, Defendant AKOL implored Dr. Ayasli to immediately agree to terms with Defendant SBK TURKEY.

402.     In making his "pitch" to Dr. Ayasli to sell to Defendant SBK TURKEY, Defendant AKOL claimed only that Defendant SBK TURKEY would be "favored" by the Turkish Ministry of Transportation—the agency that regulates air travel in Turkey—and that Defendant KORKMAZ's offer was "better, faster and safer" than YDA's offer and "would not bring [BoraJet] any additional costs."

403.     Defendant AKOL represented that Defendant SBK TURKEY's intentions were to expand BoraJet and then sell it at a profit.

404.     At the time of these meetings, Dr. Ayasli had never met Defendant KORKMAZ, was not familiar with Defendant SBK TURKEY, and had no knowledge that either Defendant KORKMAZ or Defendant SBK TURKEY was a member of the RICO Enterprise that had organized the defamatory media campaign that had systematically devalued BoraJet.

**3.   The RICO Enterprise Concludes its Extortion Scheme by Acquiring BoraJet for No Monetary Consideration**

405.     On December 29, 2016, faced with insurmountable (and still increasing) debt stemming from the RICO Enterprise's defamatory media campaign, Dr. Ayasli, at the urging of Defendant AKOL, signed an agreement ("Agreement") to transfer all of the assets of BoraJet and

BoraJet Bakim, as a going concern, to Defendant BUGARAJ, a member of the RICO Enterprise and subsidiary entity of Defendant SBK TURKEY.

406.     This made good on the RICO Enterprise's stated goal, voiced earlier that year, that they intended to "take over an airline in Turkey."

407.     Defendant AKOL agreed during the purported negotiations to transfer ownership of Aydın Jet, the holding company for the Bombardier Global XRS aircraft, in the deal for BoraJet.  As a result, the RICO Enterprise gained possession of not only BoraJet's entire fleet of commercial airliners, but also the executive jet.[25]

408.     Defendant KORKMAZ and Defendant AKOL, directly, privately, and exclusively negotiated the terms of the Agreement.  Dr. Ayasli and his close business associates, including his CFO Zahide Uner were, at Defendant AKOL's insistence, excluded from the key negotiation meetings.

409.     In the months prior to the sale, as a result of BoraJet's downward spiral and the banks' declination of credit caused by the RICO Enterprise's defamatory media campaign, Dr. Ayasli had been forced to repay many of BoraJet's loans.  As of December 29, 2016, BoraJet's balance sheet showed that BoraJet owed $37 million USD to Dr. Ayasli personally, and another $22 million USD to Ayasli LLC ($59 million USD total) in connection with these loan repayments.

410.     Some of BoraJet's trade payables had also been previously secured by letters of credit from Dr. Ayasli personally.

---

[25] A few months after the sale of BoraJet, on August 10, 2017, state law enforcement agencies in California executed a search warrant at a business owned by DERMEN.  Before the search, a corrupt law enforcement official notified DERMEN of the pending search warrant and DERMEN boarded the XRS Global and fled to Turkey. Customs and Border Patrol agents reported that they had observed the tail of the XRS Global aircraft decorated with a logo reading "SBK."

411.    The Agreement negotiated by Defendant AKOL allocated BoraJet's outstanding debts between Defendant BUGARAJ and Dr. Ayasli.   Pursuant to that Agreement, Dr. Ayasli agreed to assume BoraJet's obligation to repay certain outstanding bank loans and non-aircraft-related financial leasing obligations, and Defendant BUGARAJ agreed to assume all of BoraJet's remaining debt, including all trade payables incurred prior the date of transfer.

412.    Dr. Ayasli was given one year to repay the outstanding bank loans assigned to him under the Agreement.

413.    Despite YDA's recent offer to acquire BoraJet at a substantially higher total value, Defendant AKOL pressured Dr. Ayasli to enter into the Agreement with Defendant SBK Turkey.

414.    Accordingly, in reliance on Defendant AKOL, on December 29, 2016, Dr. Ayasli transferred BoraJet, BoraJet Bakim and Aydin Jet to Defendant BUGARAJ for *no monetary consideration*, obtaining only a contingent promise that Defendant BUGARAJ would pay Dr. Ayasli 25% of any profit obtained in the event that BoraJet was subsequently sold by Defendant BUGARAJ to a third party.

415.    Immediately following the closing of the transaction, and despite having no formal training in the airline industry, Defendant KORKMAZ was appointed as Chairman of BoraJet.

416.    On February 1, 2017, as collateral for Dr. Ayasli's surviving obligations and debts, Defendant BUGARAJ, a member of the RICO Enterprise, placed a TRY (Turkish Lira) 220,000,000.00 (approximately $56 million USD) attachment on one of Dr. Ayasli's commercial real estate buildings in Turkey.

### D. THE RICO ENTERPRISE'S POST ACQUISITION EXTORTION SCHEME

417.    Having acquired BoraJet and its affiliates for nothing more than its commercial obligations, the RICO Enterprise initiated the second act of its extortionate campaign: the post-sale extortion scheme to unlawfully divest Dr. Ayasli of all of his real estate holdings in Turkey.

**1. The RICO Enterprise's Mismanagement of and Failure to Flip BoraJet**

418.    After the RICO Enterprise's acquisition of the BoraJet entities was completed, Defendant KORKMAZ gave an interview to the Turkish daily newspaper *Hurriyet* in which he claimed, falsely, that he had "purchased BoraJet for $260 million dollars USD."

419.    Under Defendant KORKMAZ's management, BoraJet almost immediately defaulted on payroll and loan repayment obligations.

420.    Meanwhile, Defendant KORKMAZ failed to consummate the quick sale of BoraJet that the RICO Enterprise had anticipated.

421.    After Defendant BUGARAJ's acquisition of BoraJet, and without the cash infusions previously provided by Dr. Ayasli, BoraJet was unable to operate and, in April 2017, Borajet ceased all commercial flight operations.

422.    Rebuffed in his plan to flip the commercial airline portion of the company, Defendant KORKMAZ then targeted Dr. Ayasli anew.

**2. The RICO Enterprise's Unlawful Acceleration of Dr. Ayasli's Retained Debt**

423.    The first phase of the RICO Enterprise's post-sale extortion scheme was to influence banks to call Dr. Ayasli's loans prematurely—which would then permit the RICO Enterprise to liquidate Dr. Ayasli's collateralized real estate holdings.

424.    Notwithstanding the negotiated one-year term for the repayment of BoraJet's bank loans established in the Agreement, Defendant KORKMAZ, acting on behalf of the RICO Enterprise, met with a number of banks including (1) Akbank T.A.S. ("Akbank"); (2) Denizbank

T.A.S. ("Denizbank"); (3) Turk Ekonomi Bankasi T.A.S. ("Turk Ekonomi"); (4) Odea Bank A.S. ("Odea Bank"); and (5) Turkiye Garanti Bankasi A.S. ("Garanti"), all of which had provided credit to BoraJet secured by letters of credit or personal guaranties from Dr. Ayasli.

425.    Defendant KORKMAZ, on behalf of the RICO Enterprise, then used personal connections to influence those banks to close BoraJet's existing lines of credit without cause, and to make immediate demand for repayment of BoraJet's loans personally guarantied by Dr. Ayasli.

426.    Pursuant to these efforts by the RICO Enterprise, on February 28, 2017, Odea Bank sent a notice to BoraJet, and to Dr. Ayasli as joint guarantor, demanding immediate payment of all of BoraJet's outstanding loans held by the bank.  Odea Bank demanded payment in full on all of these outstanding loans, including an outstanding loan of TRY 21,070,603.45 (approximately $5.3 million USD), within *one day*.

427.    Dr. Ayasli requested a one-week extension from Odea Bank to pay off the loan, advising Odea Bank that he needed this time in order to permit him to liquidate the assets needed to make the payment.

428.    Despite its longstanding relationship with Dr. Ayasli, Odea Bank, without any explanation, refused Dr. Ayasli's request for even this modest one-week extension.

429.    Dr. Ayasli's loan was *not* in default when he failed to pay off the $5.3 million loan balance with Odea Bank *within 24 hours* as Odea Bank demanded.

430.    Nevertheless, the next day, March 6, 2017, Odea Bank assigned the debt (which Dr. Ayasli had personally guarantied) to Defendant MEGA VARLIK, another member of the RICO Enterprise.

431.   Defendant MEGA VARLIK then immediately obtained an order from the Turkish Execution Office, which initiates collection proceedings against debtors, including a bank's right to seize a debtor's real property used to collateralize loans.  The order permitted Defendant MEGA VARLIK to make demand on the loan directly from the guarantor, Dr. Ayasli.

432.   In the world of Turkish finance, it is unheard of for a bank to accelerate a loan that is not in default.

433.   It is even more extraordinary for a bank to accelerate a loan not in default and to then immediately assign that debt to a third party rather than attempt to collect it directly from the debtor—particularly from a debtor like Dr. Ayasli, who (1) was previously known to the bank; (2) was known to the bank to have the assets required to pay off the debt; and (3) had already indicated to the bank that he simply needed a few days to liquidate the assets needed to pay off the debt.

434.   After purchasing the BoraJet debt from Odea Bank, rather than attempting to collect the debt from the actual debtor (Defendant BUGARAJ), Defendant MEGA VARLIK demanded payment on the loan directly from the *guarantor*, Dr. Ayasli.

435.   Defendant MEGA VARLIK then immediately commenced enforcement proceedings against Dr. Ayasli, without a judgment on the debt, and in connection with those enforcement proceedings, attached all of Dr. Ayasli's property and bank accounts in Turkey.

436.   Dr. Ayasli was then forced to make immediate payment of TRY 23,161,907.94 (approximately $5.8 million USD)—at least $500,000 USD *more* than the Odea Bank debt he had guarantied—in order to get Defendant MEGA VARLIK's attachments on his real estate and bank accounts released.

71

437.    Although Dr. Ayasli foiled this first attempt by the RICO Enterprise to attach and liquidate all of his real estate holdings in Turkey, other banks holding BoraJet loans then also began to prematurely call BoraJet's debt and demand immediate payment in full from Dr. Ayasli.

438.    In an effort to evade further attempts by the RICO Enterprise to prematurely call his loans and attempt to execute on his properties, Dr. Ayasli was forced to proactively obtain a personal loan for $20 million USD from Garanti, collateralized by various properties owned by him.

439.    As a prerequisite for providing this loan, however, Garanti required Dr. Ayasli to prepay all of BoraJet's leasing debts that had been underwritten by Garanti and assigned to him in the Agreement, whether those debts were due or not.  These debts amounted to TRY 487,607 (approximately $123,000 USD).

440.    Dr. Ayasli used this $20 million USD loan from Garanti to clear all of BoraJet's bank debt in Turkey that had been unlawfully accelerated and that he had personally guarantied.

441.    Dr. Ayasli took this proactive step in order to evade the RICO Enterprise's ongoing efforts to attach and execute on Dr. Ayasli's bank accounts and real estate holdings in Turkey.

442.    Defendant BUGARAJ then defaulted on BoraJet's trade debts assigned to it under the Agreement because Defendant BUGARAJ knew that Dr. Ayasli had letters of credit or other personal guaranties in place to secure those debts.

443.    Accordingly, after Defendant BUGARAJ deliberately defaulted on these debts, Dr. Ayasli saw an additional TRY 12,500,000 (approximately $3.2 million USD) of his letters of credit or personal guarantee called, notwithstanding provisions in the Agreement making clear that these debts were to remain the obligation of Defendant BUGARAJ.

444.     Dr. Ayasli was then forced to pay those additional sums of TRY 12,500,000 (approximately $3.2 million USD) on his unreleased letters of credit or personal guaranties, notwithstanding the fact that this debt had not been assigned to him under the Agreement.

445.     In total, within less than a month, Dr. Ayasli was forced to transfer over $28 million USD from his New Hampshire-based financial account to pay off loans and lines of credit improperly accelerated or intentionally defaulted on by the RICO Enterprise.

446.     Of the $28 million USD transferred from New Hampshire by Dr. Ayasli, $7 million USD was wired to his lawyer's, Burhan Safak's, client trust account in Turkey due to Dr. Ayasli's fear that if the money was wired into Dr. Ayasli's account at one of the Turkish banks under the RICO Enterprise's influence, Defendant KORKMAZ would attach the funds.

447.     Safak then used the $7 million USD he received from Dr. Ayasli to pay off portions of the accelerated debt on Dr. Ayasli's behalf.

### 3.   The RICO Enterprise's WhatsApp Threats and Intimidation Directed at Dr. Ayasli in the United States

448.     On February 25, 2017, Defendant KORKMAZ drove into Dr. Ayasli's Kandilli, Istanbul property in a Ferrari, where he was intercepted by one of Dr. Ayasli's security guards and captured on security cameras.  *See* **Exhibit E.**

449.     On this date and several other days around this time, Defendant KORKMAZ also knowingly, intentionally, and repeatedly called Dr. Ayasli's mobile phone in New Hampshire, frequently in the middle of the night, until Dr. Ayasli blocked the incoming number.

450.     On February 25, 2017, the same day Defendant KORKMAZ appeared at Dr. Ayasli's Kandilli property unannounced, Defendant KORKMAZ also knowingly, intentionally and repeatedly sent a long series of threatening text messages to Dr. Ayasli's mobile phone through the WhatsApp cellphone text messaging application.

451.    Most of these text messages were received while Dr. Ayasli was located in New Hampshire.

452.    Defendant KORKMAZ's text messages sent to Dr. Ayasli in New Hampshire directly threatened Dr. Ayasli, his family, and his business associates.

453.    The following were among the threats Defendant KORKMAZ made in the WhatsApp text messages he sent to Dr. Ayasli:

> *"I will put you in jail"*
>
> *"Fatih [AKOL] and Zahide first"*
>
> *"Mr. Fatih [AKOL] deserved everything I have done to him"*
>
> *"That whore Zahide [Uner] vouched for you but now she's disappeared"*
>
> *"You and your wife will look for a place to hide"*
>
> *"Your lawyer daughter … will pay"*
>
> *"I will disgrace you before the eyes of the whole world."*
>
> *"I will finish that disgraceful lawyer Burhan's [Safak] career."*
>
> *"Don't think that crook of an attorney Burhan [Safak] will be able to escape from me easily.  That crook Zahide either"*
>
> *"Ayasli be patient, you won't be waiting for much longer…"*
>
> *"I will show all the donations you made to FETO"*

454.    Dr. Ayasli did not respond to a single one of Defendant KORKMAZ's WhatsApp text messages, but they kept on coming at all hours of the day and night.

455.    After Dr. Ayasli blocked all calls and messages from KORKMAZ's phone number, Defendant KORKMAZ began sending threatening and offensive messages to Dr. Ayasli through Dr. Ayasli's business associates and lawyers in Turkey.

456.    During this intimidation and extortion campaign, Defendant KORKMAZ sent at least 137 text messages to Dr. Ayasli from February 25, 2017, until July 26, 2017.

457.    Dr. Ayasli never responded to a single one of these messages.

458.    Within this thread of threatening and intimidating WhatsApp text messages, Defendant KORKMAZ sent Dr. Ayasli photographs of non-public investigative records that Defendant KORKMAZ had acquired related to a closed out tax audit involving one of Dr. Ayasli's old business transactions.  Although it is unclear how Defendant KORKMAZ acquired these records, Defendant KORKMAZ *used* these investigative records to threaten Dr. Ayasli and imply that he (Defendant KORKMAZ) had influence over prosecutors and tax authorities in Turkey and could convince them to re-open the audit.

459.    On July 30, 2017, Defendant KORKMAZ, again driving a Ferrari, returned to Dr. Ayasli's Kandilli property where he was again intercepted by Dr. Ayasli's security personnel. This time, Defendant KORKMAZ told Dr. Ayasli's security guard that he (Defendant KORKMAZ) had "already purchased" the house and would be "moving in in a few days."  ***See Exhibit E.***

460.    Finally, on September 22, 2017, Defendant KORKMAZ sent Dr. Ayasli a copy of a grand jury subpoena issued to Defendant KORKMAZ related to U.S. Department of Justice Special Counsel Robert S. Mueller III's investigation into Russian interference with the 2016 Presidential election and related matters ("the Mueller Investigation").

461.    Defendant KORKMAZ sent this document to Dr. Ayasli in an effort to further intimidate Dr. Ayasli and give him the false impression that Defendant KORKMAZ was politically connected to the Mueller Investigation and as such, could exert political influence over Dr. Ayasli in the United States as well as in Turkey.

**4.  The RICO Enterprise's Sham Commercial and Criminal Litigation in Turkey**

462.    In addition to unlawfully coercing Dr. Ayasli's creditors to accelerate his loans and threatening and intimidating Dr. Ayasli through phone calls and WhatsApp messages, Defendant KORKMAZ and other members of the RICO Enterprise opened up a new front in their extortion scheme by filing sham commercial and criminal litigation in Turkey.

463.    Thus far, Defendant KORKMAZ and the RICO Enterprise have filed three separate commercial cases against Dr. Ayasli and three separate criminal complaints against Dr. Ayasli and his business associates.

464.    To date, the RICO Enterprise's sham criminal complaints have resulted in (1) multiple indictments against Dr. Ayasli and his CFO, Zahide Uner deriving from two separate criminal complaints; and (2) have also caused Turkish prosecutors to commence a third, "sealed investigation," accusing Dr. Ayasli and Zahide Uner of FETO-related terrorism and acts against the Turkish government.

465.    The RICO Enterprise's sham litigation in the Turkish courts began with a commercial case.  On March 13, 2017, Defendant BUGARAJ, on behalf of the RICO Enterprise and at the direction of Defendant KORKMAZ, filed suit against Dr. Ayasli in the Istanbul 3rd Commercial Court of First Instance, demanding the payment of TRY 253,305,035 (approximately $72 million USD) in damages.

466.    Even though Dr. Ayasli had previously provided an attachment on certain of his properties as part of the Agreement, Defendant BUGARAJ requested a superfluous attachment from the Court on *all* of Dr. Ayasli's real estate in Turkey.

467.    Defendant BUGARAJ's request for this attachment was found to be "groundless" by the 3rd Commercial Court of First Instance.

468.     The RICO Enterprise appealed that ruling, and the 12th Chamber of the Istanbul Regional Court of Appeals affirmed.

469.     In April and May 2017, however, Defendant BUGARAJ, on behalf of the RICO Enterprise, presented additional "evidence" after strong-arming, bribing or threatening former BoraJet employees or other business associates of Dr. Ayasli's into providing false testimony supporting these claims.

470.     For example, beginning on April 28, 2017, Defendant OZKARAMAN, on behalf of the RICO Enterprise, contacted Zahide Uner in an effort to "encourage" her to provide testimony supportive of Defendant BUGARAJ's claims against Dr. Ayasli.

471.     Over the next few weeks, Defendant OZKARAMAN repeatedly called and texted Ms. Uner, insisting on meeting with her at her office.

472.     After Ms. Uner refused to respond, Defendant OZKARAMAN appeared at Ms. Uner's office unannounced and insisted on a meeting with her.  Ms. Uner continued to refuse to meet with Defendant OZKARAMAN.

473.     In a series of text messages that followed Ms. Uner's rejection of that meeting, Defendant OZKARAMAN reminded Ms. Uner that the commercial case against Dr. Ayasli was now also "being handled by the public prosecutor's office."

474.     Defendant OZKARAMAN then threatened Ms. Uner, telling her that he called to "talk and show my support."

475.     Defendant OZKARAMAN also instructed Ms. Uner to "remind" Dr. Ayasli that "the matter is being handled by the public prosecutor's office and that he [Dr. Ayasli] can be facing a difficult legal process as a result of this and that it would be helpful to his own benefit [if] he could please meet with [Defendant KORKMAZ]."

476.     When these efforts were unsuccessful, Defendant OZKARAMAN, on behalf of the RICO Enterprise, threatened Ms. Uner again, suggesting what they "expect [her] to tell the Prosecutor" and informing her that they "have no outstanding issue with [her] other than this one."

477.     Ms. Uner interpreted Defendant OZKARAMAN's calls and messages as an attempt to intimidate her and influence her testimony about Dr. Ayasli in the commercial case.

478.     Ms. Uner hired an armed security guard because she feared for her safety.

479.     Ms. Uner, however, still refused to engage in any way with Defendant OZKARAMAN.  A few days later, Defendant OZKARAMAN sent a series of new threatening text messages to Ms. Uner, including the following one:

> Hello, you need to give a statement at the Public Prosecutor's Office, it may be an issue for you later if you don't show up.  I would like to let you know that you should tread carefully with this matter.  Please keep me posted after you are done with giving the statement.

480.     Ms. Uner still refused to provide the demanded false testimony on behalf of the RICO Enterprise.

481.     The RICO Enterprise made good on its threats against Ms. Uner.  Defendant KORKMAZ and the RICO Enterprise pressed bogus, trumped up criminal charges against both Dr. Ayasli and Ms. Uner and subsequently obtained an indictment against both Dr. Ayasli and Ms. Uner.

482.      Defendant KORKMAZ and the RICO Enterprise also caused prosecutors to commence a separate "sealed investigation" accusing Dr. Ayasli and Ms. Uner of FETO-related terrorism offenses punishable by life imprisonment.

483.    This investigation remains ongoing, and has resulted in a "travel ban" being imposed against Ms. Uner, precluding her from leaving Turkey.

484.    Additionally, Tolga Uzumcu, a witness in the criminal case, testified in a July 4, 2018 criminal hearing that Defendant KORKMAZ's Turkish legal counsel, Gorkem Gokce, (1) intimidated him into believing that he was compelled to provide testimony to the Public Prosecutor without a subpoena; (2) concealed the fact that this was a criminal proceeding and the relevance of his testimony thereto; (3) continued to intimidate Uzumcu at the proceeding where he provided testimony; and (4) directed the actual content of the testimony Uzumcu provided.

485.    On November 21, 2017, Defendant BUGARAJ filed another commercial case against Dr. Ayasli in the Istanbul 2nd Commercial Court of First Instance.  In connection with its filing of this case, Defendant BUGARAJ, on behalf of the RICO Enterprise, *again* attempted to place attachments on Dr. Ayasli's real estate.

486.    On December 29, 2017, the Turkish Court consolidated Defendant BUGARAJ's two commercial cases.

487.    The RICO Enterprise continues to aggressively litigate this consolidated commercial case hoping that the threat of attachment on Dr. Ayasli's real estate provides sufficient leverage to extort a monetary "settlement" out of Dr. Ayasli.

488.    On November 22, 2018, Defendant KORKMAZ filed yet a *third* commercial case against Dr. Ayasli.  That case seeks non-pecuniary damages.  The specifics of the allegations are unknown at the time of this filing as Defendant KORKMAZ has not effectuated service on Dr. Ayasli.

5.   **The RICO Enterprise's Intimidation, Assault and Bribery of Dr. Ayasli's Lawyers and Business Associates**

489.     In connection with his filing of the sham commercial lawsuits in Turkey, Defendant KORKMAZ repeatedly and systematically threatened Dr. Ayasli, his family and his business associates with both physical and reputational harm.  Defendant KORKMAZ intended to (1) intimidate Dr. Ayasli, his family, and potential witnesses; and (2) extort a monetary "settlement" out of Dr. Ayasli.

490.     Defendant KORKMAZ punctuated his extortion campaign against Dr. Ayasli in New Hampshire by directly threatening Dr. Ayasli's employees, business associates, and attorneys at their offices in Turkey.

491.     For example, during a meeting on or around February 22, 2017, at Defendant SBK Turkey's offices in Istanbul, Defendant KORKMAZ violently and aggressively threatened to rape and then murder Ms. Uner.

492.     A few weeks later, on March 18, 2017, Defendants KORKMAZ, OZKARAMAN and AKOL and RICO Enterprise member ALPTEKIN went to Dr. Ayasli's lawyer, Burhan Asaf Safak's office, in Istanbul.

493.     There, in a meeting with Safak and Ms. Uner, Defendant KORKMAZ once again became incensed, this time smashed and shattered Safak's glass conference table, threw a tea glass at her from across the table, and then sprung out of his chair in an effort to attack Ms. Uner, pointing his finger at her and yelling "You can't escape me, I will fuck you, and then I will kill you!"

494.     Fortunately, Safak and others physically were able to restrain Defendant KORKMAZ before he could reach Ms. Uner.

495.     During the same episode, Defendant KORKMAZ directly threatened Dr. Ayasli, his wife, and his son and daughter.

496.     Shortly after that meeting, RICO Enterprise member ALPTEKIN stepped down from the board of directors of Defendant MEGA VARLIK and claimed to have "disassociated himself" from Defendant KORKMAZ.

497.     At a later meeting, again at Safak's office, Defendant KORKMAZ showed a photograph to Safak depicting a badly beaten and bloodied Defendant AKOL.

498.     While showing Safak this photograph, Defendant KORKMAZ admitted to Safak that he (KORKMAZ) had bashed Defendant AKOL's face in with an iron ashtray, and then bragged to Safak, "I have beaten many people in my life," in a threatening manner in an effort to intimidate Safak.

499.     By further example, on May 10, 2017, after Defendant OZKARAMAN's efforts to influence Ms. Uner to provide false testimony to the Public Prosecutor had failed, Defendant KORKMAZ called her office in Istanbul and, without identifying himself, demanded to speak to Ms. Uner.

500.     Ms. Gulhan Ozkan, an executive assistant, informed Defendant KORKMAZ that Ms. Uner was "not in the office."  Defendant KORKMAZ, still concealing his identity, inquired of Ms. Ozkan of Ms. Uner's whereabouts.

501.     When Defendant KORKMAZ did not get the information he was seeking about Ms. Uner's whereabouts from Ms. Ozkan, Defendant KORKMAZ announced himself, threatened to stalk and sexually violate Ms. Ozkan, and then made a series of "heavy threats" to Ms. Ozkan, knowing that Ms. Ozkan would report the incident to both Ms. Uner and Dr. Ayasli.

502.    A few months later, on October 5, 2017, Defendant KORKMAZ directly threatened another one of Dr. Ayasli's lawyers during a court appearance in Turkey.

503.    Specifically, Defendant KORKMAZ attacked attorney Hamdi Tolga Danışman, a partner in the prominent Istanbul law firm Herguner Bilgen outside the courtroom after a hearing before the Istanbul 3rd Commercial Court of First Instance.  There, Defendant KORKMAZ told Danışman:  "I will finish you.  You will see what I can do.  I know you are pro-FETO and I will bring this to light.  I am following you and watching you and reading all of your correspondence. I will embarrass you publicly."

504.    The next day, October 6, 2017, Attorney Danışman filed a criminal complaint against Defendant KORKMAZ with the Office of the Chief Public Prosecutor of Istanbul.

505.    The Office of the Chief Public Prosecutor chose not to investigate the matter and dismissed Attorney Danışman's complaint on November 7, 2017.

506.    On November 24, 2017, the Herguner Bilgen firm, on behalf of Dr. Ayasli, filed a criminal complaint against Defendant KORKMAZ (and others) with the Office of the Chief Public Prosecutor of Istanbul asserting charges of perjury and attempt to influence a fair trial.

507.    After Dr. Ayasli's criminal complaint was filed against Defendant KORKMAZ, Defendant KORKMAZ sent a threatening message to the senior partner of the Herguner Bilgen firm, Umit Herguner.  Defendant KORKMAZ sent Herguner a picture of the just-filed criminal complaint and stated: "You will face the consequences for these kinds of games."

508.    A few days later, on November 28, 2017, Defendant KORKMAZ threatened Dr. Ayasli through Attorney Safak: "Tell Ayasli to stop talking negatively about me [Korkmaz]" unless he wanted to face a "re-ignition of the FETO allegations."

509.    Defendant KORKMAZ had earlier attempted to bribe Attorney Safak, offering him $5 million USD to misuse his power of attorney to transfer all of Dr. Ayasli's real estate in Turkey to Defendant KORKMAZ.

510.    On New Year's Eve 2018, while speaking to Dr. Ayasli's lawyer Muhlis Arvas, Defendant KORKMAZ made violent threats against Dr. Ayasli's daughter.  Defendant KORKMAZ told Attorney Arvas to tell Dr. Ayasli that he (Defendant KORKMAZ) had "discovered her address in New York" and that "he would never let this go."

511.    On February 14, 2019, thirty armed police officers from the Chief Public Prosecutor's Office of Terror and Organized Crime Investigation Bureau raided the Istanbul offices of Herguner Bilgen.  These officers searched Attorney Tolga Danisman's office, and seized his laptop computer, mobile devices, flash drives, documents, and other items, likely including privileged documents and other communications from undersigned counsel and belonging to Dr. Ayasli.

512.    Attorney Danisman was detained on suspicion of FETO affiliation.

513.    Most recently, on or around February 14, 2019, Necla Zarakol was arrested on FETO-related allegations.  Ms. Zarakol owns Zarakol PR, an Istanbul-based public relations firm that Dr. Ayalsi engaged to combat the RICO Enterprise's defamatory media campaign. Defendant KORKMAZ had previously threatened Ms. Zarakol to refrain from providing support Dr. Ayasli.

6.  **The RICO Enterprise Makes False Claims to Turkish Prosecutors to Open Sham Criminal Investigations and Prosecutions**

514.    On May 5, 2017, after all of these threats failed to produce a monetary "settlement" from Dr. Ayasli, the RICO Enterprise stepped up the pressure and filed a sham criminal complaint against Dr. Ayasli.  Based on this criminal complaint and using its influence,

on October 4, 2017, the RICO Enterprise obtained an indictment against Dr. Ayasli, based on false evidence, charging Dr. Ayasli with fraud, tax evasion, and falsifying financial filings in connection with the sale of BoraJet (the "Criminal Fraud Case").

515.    Ms. Uner—who repeatedly defied the RICO Enterprise's threats made against her in an effort to obtain her false testimony in support of these charges—was indicted by the Office of the Chief Public Prosecutor of Istanbul along with Dr. Ayasli in the Criminal Fraud Case.

516.    Additionally, on May 17, 2017, as Defendant KORKMAZ, had claimed would be done in his messages, the Public Prosecutor's Office opened a sealed FETO investigation of Dr. Ayasli.  The RICO Enterprise's complaint that gave rise to this sealed investigation included a whole series of false allegations including that Dr. Ayasli (1) was a member of and funded FETO; (2) designed ByLock as a way for FETO members to secretly communicate with one another; (3) had advance knowledge of the planned coup against the Turkish government; (4) committed espionage against the Turkish government; and (5) was involved in arms trafficking and money laundering (the "Terrorism Investigation").

517.    The Criminal Fraud Case remains ongoing with the next hearing scheduled for February 25, 2019.

518.    The crimes alleged against Dr. Ayasli and Ms. Uner in the Terrorism Investigation fall into the most serious category of crimes in Turkey.   Prosecutors in Turkey often charge accused FETO members and FETO supporters with attempting to change the constitutional regime by terroristic force, a crime that is punishable by life in prison.

519.    The RICO Enterprise continues its unrelenting efforts to (1) pressure Ms. Uner into providing false testimony in the Criminal Fraud Case and sham commercial cases; and (2) pressure Dr. Ayasli into paying a monetary "settlement."

520.     In connection with the Criminal Fraud Case, the RICO Enterprise successfully obtained an order prohibiting Ms. Uner, who travels frequently, from travelling outside of the Republic of Turkey for any reason.

521.     Additionally, the RICO Enterprise convinced a prosecutor to name Ms. Uner as a target in the ongoing Terrorism Investigation.  As a result, the RICO Enterprise-was able to obtain a second court order imposing a second travel ban on Ms. Uner, prohibiting her from leaving Turkey for any reason.

522.     On February 13, 2019, Zahide Uner was arrested at Dalaman Airport in Southwest Mugla Province in the Republic of Turkey.

523.     Ms. Uner is being described in Turkish media as a "FETO suspect" and "an aide to alleged FETO fugitive and former BoraJet owner Yalcin Ayasli."

524.     Although these allegations are false and entirely without evidentiary support, Ms. Uner is currently being held in the "Terror Unit" in Istanbul on allegations that she was unlawfully fleeing the country.

525.     Ms. Uner had expressed fears as a result of Defendant KORKMAZ's threats of extreme physical violence against her and the RICO Enterprise's false allegations tying her to FETO.

526.     On December 24, 2018, the day before the most recent hearing in Ms. Uner's criminal case, Defendant KORKMAZ had confronted Dr. Ayasli's close business associate, Armaggan NAR CEO Samir Bayraktar, in the lobby of Dr. Ayasli's lawyers' office building. There, Defendant KORKMAZ directly threatened Mr. Bayraktar, telling him that "new surprises" would befall Dr. Ayasli and all who help him.

527.    Defendant KORKMAZ made good on those threats by effectuating the raid on Attorney Danisman's office and the arrest of Ms. Uner.

**7.   The RICO Enterprise Blackmails Kadir Peker**

528.    Prior to Defendant AKOL taking over, Kadir PEKER was the General Manager of BoraJet.

529.    PEKER left BoraJet in April 2014—more than *two years* prior to the RICO Enterprise commencing its extortion scheme against Dr. Ayasli and BoraJet.

530.    At the time of his departure, PEKER held Dr. Ayasli in high regard.

531.    Nevertheless, the RICO Enterprise was able to "get to" PEKER.  Specifically, Defendant KORKMAZ threatened and then blackmailed PEKER into making a number of false written statements about Dr. Ayasli and BoraJet in support of the RICO Enterprise's sham civil litigations and criminal complaints.

532.    Defendant KORKMAZ blackmailed PEKER by threatening to call PEKER's outstanding personal debt to BoraJet, and convinced Turkish banks to place attachments on PEKER'S residence and personal property.

533.    On or about May 8, 2017, Defendant KORKMAZ sent a WhatsApp message to Dr. Ayasli threatening to blackmail PEKER.  The message stated, "I am sure the former general manager, Kadir PEKER, will also talk once the execution office is at his door."

534.    In the face of this imminent threat from Defendant KORKMAZ and the RICO Enterprise, PEKER reached out to Dr. Ayasli in a series of WhatsApp messages stating:

> Hello Yalcin Bey.  I did not want to bother you, but things here have gone way beyond what I can deal with on my own.  I need to ask your opinion.  I would like to talk if you are available. Regards, Kadir Peker

> Yalcin Bey, I cannot get a response from you or your lawyers.  My house, my salary, everything I own has now been attached.  I am in shame.  But no one cares.
>
> I have no more strength to stand this.  I will go to the Prosecutor's office tomorrow if my problem is not solved.

535.    Defendant KORKMAZ and the RICO Enterprise followed through on these threats, obtaining an attachment on PEKER's residence.

536.    When Dr. Ayasli was not able to offer counter-assistance to PEKER, because PEKER was a witness in the pending cases in Turkey, PEKER yielded to the blackmail.

537.    Defendant KORKMAZ pressured and blackmailed PEKER into submitting a series of letters and complaints to the Public Prosecutor's Office, each made by PEKER under duress, alleging that Dr. Ayasli (1) conspired to violate the US trade embargo against Iran by attempting to establish BoraJet routes to and from Iran; (2) along with Ms. Uner, falsified BoraJet corporate records to hide this activity; (3) maintained close relations with high-ranking FETO members; and (4) financed terrorism.

538.    Defendant KORKMAZ explicitly threatened Dr. Ayasli that he would use PEKER in this manner, and has since used PEKER's testimony to apply additional pressure on Dr. Ayasli in furtherance of the RICO Enterprise's extortion scheme.

539.    A few weeks after blackmailing PEKER into providing this bogus testimony, on October 4, 2017, Defendant KORKMAZ, using a New York City law firm that he retained on behalf of Defendants SBK TURKEY and BUGARAJ, mailed a demand letter captioned "Settlement Communication" to Dr. Ayasli's home in New Hampshire.  The letter informed Dr. Ayasli that Defendant SBK TURKEY learned that BoraJet, a Turkish company wholly owned by a joint Turkish and United States citizen, had operated a handful of test flights into Iran in 2013 in violation of the U.S.-Iran trade embargo.  Accordingly, the letter explained that Defendant

BUGARAJ had filed an initial notification of voluntary self-disclosure with the United States Department of Treasury, Office of Foreign Asset Control ("OFAC").

540.    Although likely unbeknownst to Defendant SBK TURKEY's U.S.-based legal counsel, this demand letter and disclosure to OFAC were sent to support the RICO Enterprise's relentless extortion campaign and defamatory accusations regarding Dr. Ayasli's alleged treasonous ties to FETO and terrorism.

541.    Based on these allegations that BoraJet had intentionally violated the Iran embargo, Dr. Ayasli voluntarily shared all relevant BoraJet flight information with OFAC and received a "no action" letter.

8.    **The Continuation of the RICO Enterprise's Defamatory Media Campaign**

542.    In early August 2017, ALPTEKIN and Defendant KORKMAZ hosted a gathering for Turkish reporters at a posh waterfront villa on the Bosporus in Istanbul.

543.    That Bosporus villa is owned by J. KINGSTON's Turkish company, Defendant MEGA VARLIK, a member of the RICO Enterprise.

544.    Defendant KORKMAZ publicly introduced the villa to the press as his own – further demonstrating the personal and financial interrelationship between J. KINGSTON, Defendant KORKMAZ and Defendant MEGA VARLIK.

545.    During this event, ALPTEKIN and Defendant KORKMAZ defamed Dr. Ayasli to journalists from news outlets including *Hurriyet* and *Haberturk* and encouraged these journalists to continue to print or run stories in their newspapers exposing Dr. Ayasli's fraudulent actions in connection to the BoraJet sale and his continuing allegiance to FETO and deposed Turkish cleric Fethullah Gulen.

546.    "Journalists" who printed or ran such stories were promised all-expenses paid European vacations paid for by Defendant KORKMAZ.

88

547.    Following this event, Turkish newspapers *Hurriyet*, *Haberturk* and *Aksam* published stories exactly like those requested by Defendant KORKMAZ at the August 2017 Bosporus gathering.

548.    On August 15, 2017, for example, the Turkish newspaper *Hurriyet* published a one-sided article describing the commercial dispute between Dr. Ayasli and Defendant BUGARAJ, and prominently featuring Defendant BUGARAJ's claims of fraud against Dr. Ayasli.

549.    On August 17, 2017, the Turkish newspaper *Habeturk* published an article accusing BoraJet of having improperly flown domestic routes in Iran, stating:

> BoraJet, which was created as a regional airline company, made an effort to fly to problematic countries in the region. Borajet, the regional airline company that was expected to increase its activities through cross flights in Turkey, made 22 connecting flights in Iran in 2013. It is very interesting. Isn't it interesting that Borajet, a Turkish company with American capital in a way, made domestic flights between cities in Iran?

> The current status: after the case was filed with respect to the disputes of Borajet, the related person has applied for a preliminary injunction and the court has issued a warrant for Yalcin Ayasli regarding his testimony before the authorities.

550.    On December 7, 2017, the Turkish national newspaper *Aksam* published an article in print and online that precisely parroted the false information disseminated by the RICO Enterprise at the Bosporus villa. In its article entitled "The Embargo did not Affect Gulenist Ayasli," an *Aksam* "journalist" wrote that Dr. Ayasli was affiliated with FETO and that Dr. Ayasli violated the United States embargo on Iran by conducting BoraJet flights into Iran.

551.    On December 27, 2017, *Patronlar Dunyasi* published another article parroting the false claims disseminated by the RICO Enterprise at the Bosporus villa. In his article, "The Armenian Lobby is an Excuse, the Dirty Alliance is Brilliant," *Patronlar Dunyasi* asserted that

Dr. Ayasli is a "Gulenist," that Dr. Ayasli associated closely with alleged FETO leaders, and that Dr. Ayasli conspired to violate the United States' embargo on Iran using BoraJet.

552.    The RICO Enterprise's purpose for this continuing post-sale defamation campaign was to extort a further monetary "settlement" out of Dr. Ayasli.

553.    Most recently, on December 20, 2018, the Turkish newspaper *Hurriyet* published an article entitled "FETO's Justice Cleric was Found on the 'Jet,'" identifying Dr. Ayasli, Zahide Uner, and a few others as "suspects of the FETO investigation."

554.    Given the RICO Enterprise's relentless defamatory media campaign, extortion scheme, and direct threats made against Dr. Ayasli's family, business associates and attorneys, Dr. Ayasli has been unable to return to Turkey out of fear for his safety.  As a result, the RICO Enterprise has prevented Dr. Ayasli from managing his businesses, attending to his real estate and rental properties, and, most importantly, visiting with his family, friends and business associates.

### 9.    The RICO Enterprise Visits and Threatens Professor Hakun Yavuz in Salt Lake City, Utah

555.    The RICO Enterprise's relentless extortion scheme continued in February 2018 when Defendant KORKMAZ travelled from Turkey to Salt Lake City, Utah to confront, threaten, and attempt to bribe University of Utah Professor Hakan Yavuz into pressuring Dr. Ayasli to "surrender" and pay a monetary "settlement" to the RICO Enterprise.

556.    Yavuz is a tenured professor in the Department of Political Science at the University of Utah's Middle East Center.

557.    Yavuz is a Turkish citizen and currently lives in Salt Lake City, Utah.

558.    Yavuz has extensively studied and written several books about the Gulen movement.

559. Since the July 2016 coup attempt, Yavuz has consulted with various government officials on matters related to the Gulen movement and the FETO organization.

560. During high level meetings with various government officials in Turkey, Yavuz advised those officials that the RICO Enterprise's campaign linking Dr. Ayasli to FETO was baseless and false.

561. Yavuz sought these meetings because he was extremely concerned that the RICO Enterprise's false and defamatory media campaign had been so successful among the citizens, businesspeople and banks in Turkey, that it might actually have also successfully fooled officials in the government about Dr. Ayasli's allegiance to Turkey.

562. On or about February 22, 2018, Defendant KORKMAZ appeared at Yavuz's campus office in Salt Lake City unannounced, uninvited and accompanied by an unidentified American, believed to be J. KINGSTON.

563. Defendant KORKMAZ insisted on an immediate meeting with Yavuz.

564. Yavuz felt threatened and intimidated, and believed that he had no choice but to meet with Defendant KORKMAZ.

565. Defendant KORKMAZ informed Yavuz that he was aware that Yavuz had family living in Turkey and that Defendant KORKMAZ "knew where they lived."

566. Yavuz interpreted Defendant KORKMAZ's statement as a direct threat against his family.

567. Defendant KORKMAZ then confronted Yavuz and informed him that Yavuz's meetings with the Erdogan administration in Ankara debunking Dr. Ayasli's alleged FETO ties as advanced by the RICO Enterprise had done "great damage" to Defendant KORKMAZ's interests in Turkey.

568.     Defendant KORKMAZ warned Yavuz to "be careful" and threatened Yavuz against "getting involved in these matters again" - referring specifically to Yavuz's statements exonerating Dr. Ayasli from any involvement with Gulen or FETO.

569.     During his meeting with Yavuz, Defendant KORKMAZ admitted that he knew that Dr. Ayasli and Ms. Uner had no connections to FETO, that he (Defendant KORKMAZ) had, in fact, fabricated the FETO allegations against Dr. Ayasli and Ms. Uner, and that he did so because Dr. Ayasli "gave me a lot of trouble and put us in a tight corner."

570.     Defendant KORKMAZ explained to Yavuz that the KINGSTONS and DERMEN were his business partners.

571.     Defendant KORKMAZ also claimed in his meeting with Yavuz that "there is no justice in Turkey anymore" and that "everything is about money."

572.     Yavuz understood that statement to be a reference to Defendant KORKMAZ's belief that he can corrupt the judicial process in Turkey.

573.     Defendant KORKMAZ also bragged to Yavuz about his (Defendant KORKMAZ's) role in the Mueller Investigation as an indication of his "high level connections" in the United States Government.

574.     Defendant KORKMAZ also bragged to Yavuz about what he had done to Defendant AKOL and showed Yavuz the photograph of Defendant AKOL with his face bashed in and bloodied—the same photograph that Defendant KORKMAZ had earlier brandished in front of Attorney Safak.

575.     Defendant KORKMAZ demanded that Yavuz contact Dr. Ayasli in an effort to set up a face-to-face meeting between Defendant KORKMAZ and Dr. Ayasli.

576.     Yavuz felt threatened by Defendant KORKMAZ and immediately informed Dr. Ayasli of the details surrounding Defendant KORKMAZ's unannounced visit to his office.

**10. <u>The RICO Enterprise Visits New Hampshire to Confront Dr. Ayasli</u>**

577.     On or around March 26, 2018, Defendant KORKMAZ reengaged Dr. Ayasli via a WhatsApp text message.  Defendant KORKMAZ sought an immediate "settlement" from Dr. Ayasli, claiming that BoraJet was facing an exigent impending license suspension.

578.     Defendant KORKMAZ threatened that if Dr. Ayasli did not settle with him in the next nine days, Defendant KORKMAZ would increase his demand in the Turkish commercial case and seek over $150 million USD in damages against Dr. Ayasli.

579.     This time, and for the first time ever, Dr. Ayasli engaged Defendant KORKMAZ by WhatsApp text messaging.

580.     During the WhatsApp text conversation, Defendant KORKMAZ: (1) confirmed that he visited Professor Yavuz in Utah; (2) confirmed that he showed Attorney Safak a picture of Defendant AKOL with his face covered in blood; (3) admitted that he had, in fact, bashed Defendant AKOL's face in with "an iron ashtray;" and (4) acknowledged to Dr. Ayasli during this conversation that "you are not FETO."

581.     Additionally, when Dr. Ayasli confronted Defendant KORKMAZ about the RICO Enterprise's false FETO allegations and its defamatory media campaign against him, Defendant KORKMAZ *admitted* his involvement, stating: "But think about all the things you have done to me."

582.     Defendant KORKMAZ insisted on travelling to the United States to meet with Dr. Ayasli to negotiate a "settlement" man-to-man, without attorneys present.

583.     Defendant KORKMAZ informed Dr. Ayasli that he was scheduled to be in Boston for a few days, and offered to come to meet Dr. Ayasli in person in New Hampshire.

584.     On April 9, 2018, at the appointed time, Defendant KORKMAZ appeared at the designated restaurant in Portsmouth, New Hampshire where he was scheduled to meet with Dr. Ayasli.

585.     Just prior to the scheduled meeting time, however, Dr. Ayasli developed serious second thoughts about meeting with Defendant KORKMAZ and cancelled the meeting via WhatsApp.

**11. <u>The RICO Enterprise Threatens a U.S.-based Journalist</u>**

586.     On February 12, 2019, Razi Canikligil, U.S.-based Turkish correspondent for *DHA News*, wrote an article published in Turkey reporting that the KINGSTONS and DERMEN allegedly engaged in a biofuel tax scam and laundered at least $134 million of the proceeds to Turkey.

587.     Canikligil reported that the government in *USA v. Kingston et al.* alleged that SBK TURKEY was a joint venture formed by J.KINGSTON, DERMEN, and KORKMAZ.

588.     On February 13, 2019 KORKMAZ commented by Twitter, and targeted Razi Canikligil. KORKMAZ posted the following tweets in response to Canikligil:

> "The day you pay will come, don't you worry."[26]

> "Don't you worry, I am aware of your games, and plots against me."[27]

---

[26] Available at https://twitter.com/sbarankorkmaz/status/1095788925640159238?s=12) (last visited February 18, 2019).
[27] Available at https://twitter.com/sbarankorkmaz/status/1095788925640159238?s=12) (last visited February 18, 2019).

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violations of RICO, 18 U.S.C. §§ 1962(c), 1964(c))
### (Against All Defendants)

589.    Plaintiff re-alleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full herein.

590.    At all times relevant to this Complaint, Dr. Ayasli was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

591.    At all times relevant to this Complaint, each RICO Defendant was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### The RICO Enterprise

592.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common or shared purpose of carrying out the ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely through an international, multi-faceted campaign of lies, fraud, threats, extortion and official corruption with the specific goal to first devalue and then acquire the Turkish regional airline BoraJet from its sole owner, Dr. Ayasli, at a fire sale price, and then to continue to pressure and coerce Dr. Ayasli, by threats of physical, reputational, or economic harm, into paying millions of additional dollars to the RICO Defendants and their co-conspirators.

593.    As demonstrated both by the allegations made in this Complaint, and those of the related criminal indictments of members of the RICO Enterprise referenced in this Complaint, this RICO Enterprise demonstrates continuity of both structure and personnel.

594.    The pattern of racketeering activity engaged in by this RICO Enterprise began with the fraudulent fuel credit scheme against the United States Government, dating back to at

least 2011, that the RICO Enterprise used to obtain its operational funding, and continues to this day through the "investment" by the RICO Enterprise of these fraudulently-obtained funds, in media and government campaigns to devalue the RICO Enterprise's targeted assets, acquisition of these "distressed" companies, and related extortionate activity.

595.    The RICO Defendants and their co-conspirators have organized their operation into a cohesive group with assigned responsibilities and a command structure, operating in the United States and Turkey, funded by fuel tax credit dollars fraudulently obtained from the United States Government, and subsequently laundered through one or more companies until being directed into Turkey from the United States and, at times, back again.

596.    While the organization of the criminal enterprise has evolved over time and its members have held different roles at different times, the criminal enterprise has been structured to operate as a unit in order to accomplish the goals of their criminal scheme as follows:

a. **Defendant KORKMAZ** has been responsible for oversight of the scheme to defraud and extort Dr. Ayasli, and has directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise including but not limited to (1) spreading lies and defamatory statements to the media and buying off Turkish journalists in order to conduct a massive public pressure campaign implicating Dr. Ayasli as a member of FETO, sympathizer of deposed cleric Fethullah Gulen, and supporter of the July 2016 coup attempt in Turkey; (2) engaging in a defamatory media campaign against BoraJet with the specific intent of devaluing BoraJet so that the RICO Enterprise could acquire it for pennies on the dollar; (3) laundering money fraudulently obtained by the RICO Enterprise in the United States through Defendant SBK TURKEY and using the laundered money to buy influence in Turkey, and to fund various other "investments" for the RICO Enterprise in Turkey and the United States; (4) initiating sham criminal investigations and charges against Dr. Ayasli, his business associates and his lawyers in Turkey; (5) bringing sham commercial suits against Dr. Ayasli and BoraJet in Turkey and manufacturing evidence suggesting Dr. Ayasli's and BoraJet's liability in those suits; (6) threatening, coercing, intimidating and/or pressuring witnesses in those criminal and civil proceedings; (7) threatening, intimidating, and/or pressuring Dr. Ayasli, his wife and his children to capitulate to the

RICO Enterprise's monetary demands; (8) physically assaulting at least two witnesses to these proceedings; and (9) threatening to rape and murder Dr. Ayasli's CFO.

b. **Defendant SBK USA,** formed on December 6, 2013, is a company that bears the initials of Defendant KORKMAZ and that Defendant KORKMAZ caused to be opened in the United States as the U.S.-based arm of Defendant SBK TURKEY.  Defendant SBK USA's CEO Daniel McDyre, WASHAKIE CEO JACOB KINGSTON (currently under related federal indictment and incarcerated), LEV DERMEN (currently under related federal indictment and incarcerated) and his son GEORGE TERMENDZHYAN were all members of the Board of Directors of Defendant SBK USA.  Defendant SBK USA has been primarily responsible for acting as the U.S.-based conduit for money fraudulently obtained by the RICO Enterprise in the United States using their sham fuel tax credit scheme through which they obtained more than $500 million dollars in credits from the U.S. Government.  Money derived from this scheme was subsequently laundered through a number of U.S.-based companies including Defendant SBK USA, and then transferred out of the United States, in part, to Defendant SBK TURKEY where a portion of that money was used to help fund the activities of the RICO Enterprise described herein, as well as to purchase "distressed properties" and "distressed businesses" in Turkey for members of the RICO Enterprise.

c. **Defendant SBK TURKEY**, formed on March 8, 2013, is a company that bears the initials of Defendant KORKMAZ and for which Defendant KORKMAZ is the sole owner and Board Member. Defendant KORKMAZ caused Defendant SBK TURKEY to be opened in the Republic of Turkey as the repository for funds laundered by the RICO Enterprise in the United States using their sham fuel tax credit scheme through which they obtained more than $500 million dollars in credits from the U.S. Government.  Money derived from this scheme was subsequently laundered through a number of U.S.-based companies including Defendant SBK USA, and then received, in part, by SBK TURKEY where a portion of that money was used to help fund the activities of the RICO Enterprise described herein, as well as to purchase "distressed properties" and "distressed businesses" in Turkey for members of the RICO Enterprise.

d. **Defendant AKOL** was the General Manager and Chairman of the Board of Directors of BoraJet until February 2017.  Taking advantage of the fact that Dr. Ayasli was not widely familiar with the Turkish transportation industry, Defendant AKOL, who was assaulted by Defendant KORKMAZ, and upon information and belief, bribed by the RICO Enterprise, used his position of trust with Dr. Ayasli to influence Dr. Ayasli to sell BoraJet to an entity controlled by the RICO

Enterprise.   Defendant AKOL accomplished this by informing Dr.
Ayasli that Defendant SBK TURKEY would be the buyer "preferred"
by the Turkish Ministry of Transportation due to SBK TURKEY's close
personal ties to the Ministry.   Defendant AKOL recommended that
Ayasli sell BoraJet to SBK TURKEY notwithstanding the fact that there
were other companies and individuals interested in acquiring BoraJet
after its destabilization by the RICO Enterprise and willing to pay more
money and/or total value for BoraJet.   Defendant AKOL and Defendant
KORKMAZ conducted all material negotiations to effectuate the sale of
BoraJet, BoraJet Bakim, and Aydin Jet to BUGARAJ on December 29,
2016.

e.   **Defendant BUGARAJ** is the corporate subsidiary created by
Defendant SBK TURKEY used to acquire BoraJet from Dr. Ayasli.
Defendant BUGARAJ's ownership is shielded through several shell
entities.   Defendant BUGARAJ is wholly owned by an entity known as
Bukombin Bilisim ve Teknoloji Anonim Sirketi ("Bukombin").
Bukombin, in turn, is wholly owned by Defendant SBK TURKEY.   The
Board of Directors for these entities includes Defendant KORKMAZ
and Defendant OZKARAMAN. After the sale of Borajet, Defendant
BUGARAJ continued to unlawfully participate in the RICO Enterprise
by intentionally defaulting on company loans and credit lines personally
guarantied by Dr. Ayasli.   It did so knowing that these defaults would
force Dr. Ayasli to pay on those guaranties and put him under financial
pressure so that he could be extorted by other members of the RICO
Enterprise, including Defendant KORKMAZ, the Board Member
directing Defendant BUGARAJ's actions.

f.   **Defendant MEGA VARLIK** was formed on June 11, 2015 by RICO
Enterprise member J. KINGSTON, and at times relevant to this
Complaint, had both RICO Enterprise members J. KINGSTON and
ALPTEKIN on its three-person Board of Directors.   Defendant MEGA
VARLIK participated in the RICO Enterprise by buying up BoraJet's
loans and other debt personally guaranteed by Dr. Ayasli, calling those
loans and then aggressively enforcing the debt against Dr. Ayasli to
extort money from him.

g.   **Defendant OZKARAMAN** frequently accompanies Defendant
KORKMAZ as his "henchman" or "dustbuster."   By way of example,
Defendant OZKARAMAN was at Defendant KORKMAZ's side when
Defendant KORKMAZ physically assaulted Dr. Ayasli's CFO, Zahide
Uner.   On a different occasion, Defendant OZKARAMAN showed up
unannounced at Ms. Uner's office to threaten and intimidate her into
providing false testimony against Dr. Ayasli in various judicial
proceedings in Turkey.   When she did not accommodate him, Defendant
OZKARAMAN responded with incessant calls and texts threatening
Ms. Uner if she did not capitulate to Defendant KORKMAZ's demands.

Defendant OZKARAMAN is also frequently installed by Defendant KORKMAZ as a Board Member after the RICO Enterprise purchases a "distressed company."

597.    The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to herein as the "RICO Enterprise."

598.    Each of the RICO Defendants participated in the operation and/or management of the RICO Enterprise in such a way as to directly or indirectly play a part in directing the affairs of the RICO Enterprise.

599.    Each RICO Defendant has engaged in the pattern of racketeering activity alleged herein.

600.    Each RICO Defendant's association with the RICO Enterprise has facilitated or contributed to his commission of the acts of racketeering.

601.    The RICO Defendants' commission of these predicate acts of racketeering has had a direct or indirect effect on the RICO Enterprise.

602.    At all relevant times, the RICO Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity**

603.    The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management or operation of the RICO Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c) as demonstrated below.

604.    In this case, the Plaintiff has demonstrated the RICO Defendants' "racketeering activity" by alleging the RICO Defendants' engagement in multiple and repeated qualifying predicate acts, including violations of (1) the Hobbs Act, 18 U.S.C. § 1951 (extortion); (2) 18

U.S.C. §1956(a)(1)(A) and (a)(2)(A) (money laundering); (3) 18 U.S.C. § 1343 (wire fraud); and (4) 18 U.S.C. § 1961(1)(A) (state law extortion).

605.    In this case, the Plaintiff has demonstrated the RICO Defendants' *pattern* of "racketeering activity" by demonstrating that the RICO Defendants' engaged in *multiple* and *repeated* qualifying predicate acts, including violations of (1) the Hobbs Act, 18 U.S.C. § 1951 (extortion); (2) 18 U.S.C. §1956 (money laundering); and (3) 18 U.S.C. § 1343 (wire fraud), within ten years of each other.

606.    The RICO Defendants' predicate acts of racketeering activity were sufficiently connected to each other by a common scheme, plan, or motive to constitute a "pattern."

607.    The RICO Defendants' predicate acts of racketeering activity were related to each other.  These were not isolated, disconnected events, but instead, events connected by shared participants, shared recipients, and shared methods of commission so as to establish a sufficient interrelationship evidencing a common, overarching purpose.

608.    The RICO Defendants' predicate acts of racketeering activity were both sufficient in number and extended over a sufficient period of time to establish closed-ended continuity.

609.    The RICO Defendants' predicate acts of racketeering activity continue to this day, and as such, are capable of indefinite repetition into the future sufficient to establish open-ended continuity.

### Predicate Acts of Hobbs Act Extortion, 18 U.S.C. § 1951 and 18 U.S.C. §1961(1)(A) (state law extortion)

610.    At all times relevant to this Complaint, Dr. Ayasli, through his ownership of BoraJet and his other companies, charities and real estate holdings, was engaged in interstate or foreign commerce and in industries that affect interstate and foreign commerce.

611.    As described herein, the RICO Defendants have engineered a wide-ranging, long lasting and relentless campaign to extort money from Dr. Ayasli by: (1) launching public attacks against Dr. Ayasli and BoraJet based on false and defamatory statements; (2) filing trumped up criminal and civil charges and imposing the threat of bogus criminal and civil judgments stemming from those charges; (3) initiating baseless investigations by government agencies based on false charges; (4) threatening and intimidating Dr. Ayasli, his wife and children, his CFO and other business associates, his charitable organizations, his attorneys, and third parties who have defended Dr. Ayasli's reputation in the media; (5) in at least two cases, actually assaulting Dr. Ayasli's business associates; and (6) engaging in relentless and ongoing harassment, disparagement and disruption of Dr. Ayasli's business operations both in Turkey and the United States; all for the purpose of extorting the payment of millions of dollars from Dr. Ayasli and causing Dr. Ayasli a reasonable fear of economic loss.

612.    As described herein, the RICO Defendants have spread baseless lies, bribed journalists and witnesses, and manufactured false evidence against Dr. Ayasli.

613.    The RICO Defendants rely on those lies and manufactured evidence in the ongoing sham criminal and civil litigations in Turkey in perpetuating the fallacy that Dr. Ayasli is a FETO terrorist for the purpose of extorting money from Dr. Ayasli and/or cause him a reasonable fear of economic loss.

614.    As described herein, the RICO Defendants have conspired with certain Turkish journalists and others to advance baseless criminal charges against Dr. Ayasli and his business associates in order to extort payment from Dr. Ayasli and/or cause him a reasonable fear of economic loss.

615.    The RICO Defendants knowingly and willfully extorted money and other things of value from Dr. Ayasli.

616.    The RICO Defendants' actions were intended to induce fear in Dr. Ayasli that the RICO Defendants will, among other things, (1) continue to pursue a scheme of lies, bribes and manufactured evidence to the greatest possible harm of Dr. Ayasli and his charitable organizations unless and until Dr. Ayasli "settles" the pending "cases" in Turkey and pays the RICO Enterprise millions of dollars; (2) continue to conspire with Turkish journalists and others to have Dr. Ayasli and his business associates threatened or criminally prosecuted on trumped up charges; (3) continue their civil litigations against Dr. Ayasli in Turkey until they are able to seize his more than $100 million USD in Turkish real estate holdings, secure a fraudulent multi-million dollar judgment against Dr. Ayasli, and then file lawsuits in the United States and other foreign jurisdictions seeking recognition and enforcement of the Turkish judgment(s); and (4) continue their criminal litigations against Dr. Ayasli and his business associates in Turkey on terrorism and fraud charges with the hope of convincing corrupt Turkish judges to issue life prison sentences against Dr. Ayasli and his business associates, which would likewise permit the seizure of all of Dr. Ayasli's real estate holdings and bank accounts in Turkey.

617.    These actions, as described herein, have caused Dr. Ayasli to credibly and reasonably fear economic harm.

618.    Accordingly, the RICO Defendants have attempted to obstruct, delay and affect, and have, in fact, unlawfully obstructed, delayed and affected commerce, through use of actual or threatened force, violence or fear, or under color of official right, as referenced in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in §1951, in that the RICO Defendants attempted to induce Dr. Ayasli to consent

to relinquish his property through the wrongful use of actual and threatened force, violence, and fear, including fear of economic harm.

**Predicate Acts of Money Laundering in Violation of 18 U.S.C. §1956(a)(2)(A)**

619.     As described above, the RICO Defendants have on multiple occasions, knowingly caused (1) the transportation, transmission and/or transfer of unlawfully obtained funds from the United States to Turkey (and vice versa); (2) with the intent that those funds be used to promote the carrying on of unlawful activity, including but not limited to (a) violations of 18 U.S.C. §1951 (Hobbs Act Extortion); (b) 18 U.S.C. § 1343 (wire fraud); (c) the funding of the RICO Defendants' pressure campaigns against Dr. Ayasli and his business colleagues; and (d) collusion with Turkish journalists and officials in order to facilitate the RICO Enterprise's racketeering activity.

**Predicate Acts of Wire Fraud in Violation of 18 U.S.C. § 1343**

620.     On many occasions, the RICO Defendants, either individually or collectively with one or more of the other RICO Defendants or RICO Enterprise members (or both), engaged in a massive and multifaceted scheme or artifice with the intent to defraud Dr. Ayasli.

621.     The ultimate objective of the RICO Defendants' scheme was to obtain BoraJet, money, and real estate from Dr. Ayasli by means of these false pretenses, false representations, and knowing concealment of material facts or matters in order to defraud Dr. Ayasli for the benefit of the individual RICO Defendants and the RICO Enterprise as a whole.

622.     It was reasonably foreseeable to the RICO Defendants that the U.S. wires would be used to effectuate this scheme.

623.     In furtherance of their scheme, and as described herein, the RICO Defendants and members of the RICO Enterprise transmitted, or caused to be transmitted, by means of wire

communication in interstate or foreign commerce, writings, signs, signals, pictures and sounds, including but not limited to the following:

    a. emails and website postings incorporating false and misleading statements about Dr. Ayasli, and/or his business associates and/or his charities and/or BoraJet;

    b. wire transmissions between and among the RICO Defendants, RICO Enterprise members, Dr. Ayasli, and Dr. Ayasli's business associates and lawyers concerning (1) the RICO Enterprise's efforts to launder money from the United States into Turkey; (2) efforts to threaten, intimidate and coerce Dr. Ayasli, his wife and children, his business colleagues and his lawyers; (3) efforts to tamper with witnesses relevant to the sham legal proceedings initiated by the RICO Enterprise in Turkey; and (4) efforts to collude with journalists and government officials to perpetuate the RICO Enterprise's false international media campaign; and

    c. funds transferred by SBK USA and other U.S.-based RICO Defendants and RICO Enterprise Members to Defendant KORKMAZ, SBK TURKEY, and other RICO Defendants and RICO Enterprise Members with the intent that those funds be used to promote the continuation of the RICO Defendants' and RICO Enterprise Members' criminal activities (such as the BoraJet acquisition).

624. Dr. Ayasli incorporates by reference the attached Appendix A, which sets forth particular uses of wire communications in furtherance of the RICO Defendants' scheme to defraud and extort Dr. Ayasli that constitute violations of 18 U.S.C. § 1343.

625. On each such occasion, the RICO Defendant(s) participated in the scheme knowingly, willfully, and with the specific intent to deceive and/or defraud Dr. Ayasli to sell BoraJet at a fire sale price and to pay additional cash from his bank accounts in New Hampshire to the RICO Defendants and the RICO Enterprise as a whole.

626. Each statement that the RICO Defendants transmitted over the wires related to a fact material to the allegations made in this Complaint, and were either (a) known by the RICO Defendants to be untrue either directly or by omission; or (b) made with reckless indifference to

their truth or falsity; or (c) although not itself deceptive, was sent with the purpose of assisting, carrying out, furthering or perpetuating the fraud.

627. The RICO Defendants false and misleading statements communicated over the wires have caused Dr. Ayasli substantial damages in an amount to be shown at trial.

## Defendant KORKMAZ

### *Hobbs Act Extortion – 18 U.S.C. §1951*

628. Defendant KORKMAZ, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which he knew he was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

629. Defendant KORKMAZ, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant KORKMAZ knew he was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

### *Money Laundering – 18 U.S.C. §§1956(a)(2)(A)*

630. In addition, Defendant KORKMAZ did knowingly transmit or transfer funds, that is, the wire transfers set forth in **Appendix B**, from a place in the United States, either California, Utah or Nevada, as set forth in Appendix B, to a place outside the United States, that is, Turkey, with the intent to promote the carrying on of specified unlawful activity, that is the RICO Enterprise's extortion scheme against Dr. Ayasli as described above.

*Wire Fraud – 18 U.S.C. §1343*

631.     In addition, Defendant KORKMAZ has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant KORKMAZ knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme, Defendant KORKMAZ caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used.  Defendant KORKMAZ's specific acts of wire fraud are set forth in Appendix A.

*18 U.S.C. §1961(1)(A) (State law extortion)*

632.     Defendant KORKMAZ obtained or exercised unauthorized control over Dr. Ayasli's property.

633.     Defendant KORKMAZ did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit him but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

634.     Defendant KORKMAZ acted with a purpose to deprive Dr. Ayasli of the property.

635.     Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

**Defendant SBK USA**

*Hobbs Act Extortion – 18 U.S.C. §1951*

636.    Defendant SBK USA, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which it knew it was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

637.    Defendant SBK USA, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant SBK USA knew it was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

*Money Laundering – 18 U.S.C. §§1956(a)(2)(A)*

638.    In addition, Defendant SBK USA did knowingly transmit or transfer funds, that is, the wire transfers set forth in Appendix B, from a place in the United States, either California, Utah or Nevada, as set forth in Appendix B, to a place outside the United States, that is, Turkey, with the intent to promote the carrying on of specified unlawful activity, that is the RICO Enterprise's extortion scheme against Dr. Ayasli as described above.

*Wire Fraud – 18 U.S.C. §1343*

639.    In addition, Defendant SBK USA has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant SBK USA knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme,

Defendant SBK USA caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used.  Defendant SBK USA's specific acts of wire fraud are set forth in Appendix A.

### 18 U.S.C. §1961(1)(A) (State law extortion)

640.    Defendant SBK USA obtained or exercised unauthorized control over Dr. Ayasli's property.

641.    Defendant SBK USA did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit it but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

642.    Defendant SBK USA acted with a purpose to deprive Dr. Ayasli of the property.

643.    Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

### Defendant SBK TURKEY

### Hobbs Act Extortion – 18 U.S.C. §1951

644.    Defendant SBK TURKEY, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which it knew it was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

645.    Defendant SBK TURKEY, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant SBK TURKEY knew it

was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

### Money Laundering – 18 U.S.C. §§1956(a)(2)(A)

646.   In addition, Defendant SBK TURKEY did knowingly transmit or transfer funds, that is, the wire transfers set forth in Appendix B, from a place in the United States, either California, Utah or Nevada, as set forth in Appendix B, to a place outside the United States, that is, Turkey, with the intent to promote the carrying on of specified unlawful activity, that is the RICO Enterprise's extortion scheme against Dr. Ayasli as described above.

### Wire Fraud – 18 U.S.C. §1343

647.   In addition, Defendant SBK TURKEY has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant SBK TURKEY knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme, Defendant SBK TURKEY caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used. Defendant SBK TURKEY's specific acts of wire fraud are set forth in Appendix A.

### 18 U.S.C. §1961(1)(A) (State law extortion)

648.   Defendant SBK TURKEY obtained or exercised unauthorized control over Dr. Ayasli's property.

649.     Defendant SBK TURKEY did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit it but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

650.     Defendant SBK TURKEY acted with a purpose to deprive Dr. Ayasli of the property.

651.     Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

### Defendant OZKARAMAN

### *Hobbs Act Extortion – 18 U.S.C. §1951*

652.     Defendant OZKARAMAN, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which he knew he was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

653.     Defendant OZKARAMAN, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant OZKARAMAN knew he was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

### *Money Laundering – 18 U.S.C. §§1956(a)(2)(A)*

654.     In addition, Defendant OZKARAMAN did knowingly transmit or transfer funds, that is, the wire transfers set forth in Appendix B, from a place in the United States, either California, Utah or Nevada, as set forth in Appendix B, to a place outside the United States, that

is, Turkey, with the intent to promote the carrying on of specified unlawful activity, that is the RICO Enterprise's extortion scheme against Dr. Ayasli as described above.

### Wire Fraud – 18 U.S.C. §1343

655.    In addition, Defendant OZKARAMAN has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant OZKARAMAN knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme, Defendant OZKARAMAN caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used. Defendant OZKARAMAN's specific acts of wire fraud are set forth in Appendix A.

### 18 U.S.C. §1961(1)(A) (State law extortion)

656.    Defendant OZKARAMAN obtained or exercised unauthorized control over Dr. Ayasli's property.

657.    Defendant OZKARAMAN did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit him but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

658.    Defendant OZKARAMAN acted with a purpose to deprive Dr. Ayasli of the property.

659.   Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

## Defendant AKOL

### Hobbs Act Extortion – 18 U.S.C. §1951

660.   Defendant AKOL, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which he knew he was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

661.   Defendant AKOL, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant AKOL knew he was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

### Wire Fraud – 18 U.S.C. §1343

662.   In addition, Defendant AKOL has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant AKOL knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme, Defendant AKOL caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used.  Defendant AKOL's specific acts of wire fraud are set forth in Appendix A.

*18 U.S.C. §1961(1)(A) (State law extortion)*

663.     Defendant AKOL obtained or exercised unauthorized control over Dr. Ayasli's property.

664.     Defendant AKOL did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit him but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

665.     Defendant AKOL acted with a purpose to deprive Dr. Ayasli of the property.

666.     Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

## Defendant MEGA VARLIK

*Hobbs Act Extortion – 18 U.S.C. §1951*

667.     Defendant MEGA VARLIK, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which it knew it was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

668.     Defendant MEGA VARLIK, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant MEGA VARLIK knew it was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

### Wire Fraud – 18 U.S.C. §1343

669.    In addition, Defendant MEGA VARLIK has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant MEGA VARLIK knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme, Defendant MEGA VARLIK caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used. Defendant MEGA VARLIK's specific acts of wire fraud are set forth in Appendix A.

### 18 U.S.C. §1961(1)(A) (State law extortion)

670.    Defendant MEGA VARLIK obtained or exercised unauthorized control over Dr. Ayasli's property.

671.    Defendant MEGA VARLIK did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit it but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

672.    Defendant MEGA VARLIK acted with a purpose to deprive Dr. Ayasli of the property.

673.    Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

## Defendant BUGARAJ

### *Hobbs Act Extortion – 18 U.S.C. §1951*

674.    Defendant BUGARAJ, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained BoraJet and its affiliates—property to which it knew it was not legally entitled—from Dr. Ayasli by means of extortion, in a manner that affected interstate or foreign commerce.

675.    Defendant BUGARAJ, by the wrongful use of actual or threatened force, violence, or fear, knowingly and willfully obtained the benefit of Dr. Ayasli paying down additional BoraJet debts after the sale—property to which Defendant BUGARAJ knew it was not legally entitled—by means of extortion, in a manner that affected interstate or foreign commerce.

### *Wire Fraud – 18 U.S.C. §1343*

676.    In addition, Defendant BUGARAJ has committed numerous acts of wire fraud by engaging in a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses.  The scheme involved (a) the misrepresentation or concealment of material facts; and/or (b) a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.  Defendant BUGARAJ knowingly and willfully participated in this scheme with the intent to defraud.  For the purpose of executing the scheme or in furtherance of the scheme, Defendant BUGARAJ caused an interstate or foreign wire communication to be used, or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme, an interstate or foreign wire communication would be used.  Defendant BUGARAJ's specific acts of wire fraud are set forth in Appendix A.

*18 U.S.C. §1961(1)(A) (State law extortion)*

677.  Defendant BUGARAJ obtained or exercised unauthorized control over Dr. Ayasli's property.

678.  Defendant BUGARAJ did so through extortion in that he threatened to (1) accuse Dr. Ayasli and Ms. Uner of a crime or to expose them to hatred, contempt or ridicule; and (2) engage in other acts which did not substantially benefit it but which substantially harmed both Dr. Ayasli and Ms. Uner's health, safety, business, calling, career, financial condition, reputation and personal relationships.

679.  Defendant BUGARAJ acted with a purpose to deprive Dr. Ayasli of the property.

680.  Dr. Ayasli's property at issue had a value of more than $1000.00 USD.

\*\*\*

681.  Each of the RICO Defendants has engaged in multiple predicate acts, as described above.  The conduct of each of the RICO Defendants described above constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

682.  Dr. Ayasli was injured in his business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c).  The injuries to Dr. Ayasli caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to (1) the loss of Dr. Ayasli's initial $300 million investment in BoraJet; (2) the difference between that initial investment, and the appraised value of BoraJet at the time the RICO Enterprise began its extortion and devaluation campaign against Dr. Ayasli and BoraJet; (3) all additional monies paid by Dr. Ayasli to corrupt banks or other lending institutions in connection with the activities of the RICO Enterprise; (4) damage to Dr. Ayasli's reputation and goodwill; (5) the impairment of Dr. Ayasli's and BoraJet's interest in executed contracts or contracts being negotiated; (6) disruption

of Dr. Ayasli's other business interests in Turkey resulting from his inability to travel to Turkey for fear of arrest and incarceration as a result of the RICO Enterprise's fraudulent media campaign and filing of sham criminal litigation; (7) the substantial loss of time and diversion of time of key personnel in dealing with these sham allegations; (8) expenses of responding to and dealing with the political and public relations effect of the RICO Enterprise's activities; and (9) all attorney's fees and costs incurred by Dr. Ayasli to defend himself in the objectively baseless, improperly motivated sham criminal and civil litigations in Turkey.

683.    These injuries to Dr. Ayasli were a but for, direct, proximate, and reasonably foreseeable result of the RICO Enterprise's many, continuous and ongoing violations of 18 U.S.C. § 1962(c).

684.    Dr. Ayasli is the ultimate victim of the RICO Defendants' unlawful Enterprise.

685.    Dr. Ayasli has been and will continue to be injured and damaged in his business and property, in a final amount well in excess of this Court's jurisdictional minimum and to be determined at trial, until the ongoing activities of the RICO Enterprise are forced to stop.

686.    Pursuant to 18 U.S.C. § 1962(c), Dr. Ayasli is entitled to recover treble damages, costs, attorney's fees, and both prejudgment and postjudgment interest from the RICO Defendants.

687.    Dr. Ayasli's recovery of damages under RICO is joint and several against one or more of the RICO Defendants.

## SECOND CLAIM FOR RELIEF

**(Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(c))**
**Against all RICO Defendants**

688.    Dr. Ayasli realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

689.    The RICO Defendants have unlawfully, knowingly and willfully agreed to join together, themselves and with others, to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

690.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common or shared purpose of carrying out the ongoing criminal enterprise (the "RICO Enterprise") as described *supra*.

691.    The RICO Enterprise engaged in, or had some effect on, interstate or foreign commerce.

692.    Each RICO Defendant knowingly became a member of a conspiracy by indicating, through his/its words or actions, his/its agreement to participate in the affairs of the RICO Enterprise.

693.    Each RICO Defendant knew: (1) that he/it was engaged in a conspiracy to commit the predicate acts; (2) that the predicate acts were a part of such racketeering activity; and (3) that their agreement to participate and participation was necessary to perform this pattern of racketeering activity.

694.    This conduct, on the part of each RICO Defendant, constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

695.    Each of the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) constituting two or more predicate offenses of extortion, money laundering and/or wire fraud.

696.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to acquire BoraJet, money and property from Dr. Ayasli.

697.    It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit the pattern of racketeering activity described herein in the conduct of the affairs of the RICO Enterprise, including the acts of racketeering and other overt acts taken in furtherance of the conspiracy as specifically set forth in the above paragraphs as well as in Appendices A and B attached hereto.

698.    As a direct, proximate, and reasonably foreseeable result of the RICO Defendants' conspiracy, the acts of racketeering activity committed by the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Dr. Ayasli has been injured in his business and property by (1) the loss of Dr. Ayasli's initial investment in BoraJet; (2) the difference between his initial investment and the appraised value of BoraJet immediately before the RICO Enterprise began its extortion and devaluation campaign against Dr. Ayasli and BoraJet; (3) all additional monies paid by Dr. Ayasli to corrupt banks or other lending institutions in connection with the extortionate activities of the RICO Enterprise; (4) damage to Dr. Ayasli's reputation and goodwill; (5) the impairment of Dr. Ayasli's and BoraJet's interest in executed contracts or contracts being negotiated; (6) disruption of Dr. Ayasli's other business interests in Turkey resulting from his inability to travel to Turkey; (7) the substantial loss of time and diversion of time of key personnel in dealing with these sham

allegations; (8) expenses of responding to and dealing with the political and public relations effect of the RICO Enterprise's activities; and (9) all attorney's fees and costs incurred by Dr. Ayasli to defend himself in the objectively baseless, improperly motivated sham criminal and civil litigations in Turkey.

699.    Dr. Ayasli is the ultimate victim of the RICO Defendants' unlawful Enterprise.

700.    Dr. Ayasli has been and will continue to be injured and damaged in his business and property, in a final amount well in excess of this Court's jurisdictional minimum and to be determined at trial, until the ongoing activities of the RICO Enterprise are forced to stop.

701.    Pursuant to 18 U.S.C. § 1962(c), Dr. Ayasli is entitled to recover treble damages, costs, attorney's fees, and both prejudgment and postjudgment interest from the RICO Defendants.

702.    Dr. Ayasli's recovery of damages under RICO is joint and several against one or more of the RICO Defendants.

## THIRD CLAIM FOR RELIEF

**(Violations of RSA 358:A)**
**(Against All Defendants)**

703.    Dr. Ayasli repeats and incorporates his allegations contained in the preceding paragraphs of this Complaint.

704.    Defendants are natural persons and/or legal entities and are therefore "persons" as defined under the New Hampshire Consumer Protection Act.   See RSA 358-A:1, I (2004) ("'Person' shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity").

705.    Defendants acted in trade or commerce by seeking to acquire assets owned by a resident of the State of New Hampshire, and by doing so, participated in trade or commerce

directly or indirectly affecting a New Hampshire citizen. See RSA 358-A:1, II ("'Trade' and 'commerce' shall include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state.")

706.    Defendants committed acts in violation of 358-A:2 by causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association with another. See 358-A:2(III).

707.    Defendants committed acts in violation of 358-A:2 by representing that that a person (Dr. Ayasli) has a status, affiliation or connection (with FETO) that Dr. Ayasli does not have. See 358-A:2(V).

708.    Defendants committed acts in violation of 358-A:2 by disparaging Dr. Ayasli's businesses by false or misleading representations of fact.  See 358-A:2(VIII).

709.    Defendants committed acts in violation of 358-A:2 that are both unlawful and offends public policy as established by statutes and common law such that it is within the penumbra of established concepts of unfairness.

710.    Defendants' conduct was objectionable and attained a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

711.    Dr. Ayasli suffered actual damages as the result of Defendants' acts and conduct.

712.    Because Defendants' acts and conduct were willful and knowing, Dr. Ayasli is entitled to multiplication of his damages. 358-A:10

713.    Dr. Ayasli is also entitled to his reasonable attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF

### (Fraudulent Misrepresentation)
### (Against Defendants KORKMAZ, AKOL, OZKARAMAN, SBK TURKEY, BUGARAJ)

714.    Dr. Ayasli repeats and incorporates his allegations contained in the preceding paragraphs of this Complaint.

715.    Defendants made false representations to Dr. Ayasli and his agents in connection with the Defendants' acquisition of BoraJet.

716.    Defendants made these representations knowing that they were false or with a conscious indifference to their truth.

717.    Defendants made these representations with the intent to induce Dr. Ayasli to sell BoraJet to an entity controlled by the Defendants.

718.    Dr. Ayasli justifiably relied on Defendants' representations.

719.    Dr. Ayasli suffered actual damages as a result of his reliance on Defendants' representations.

## FIFTH CLAIM FOR RELIEF

### (Defamation)
### (Against Defendant KORKMAZ)

720.    Dr. Ayasli repeats and incorporates his allegations contained in the preceding paragraphs of this Complaint.

721.    Defendant KORKMAZ made false and defamatory statements of fact about Dr. Ayasli.

722.    Defendant KORMAZ published those statements of fact regarding Dr. Ayasli by (1) planting false stories with journalists at multiple Turkish media outlets and (2) making false complaints against Dr. Ayasli to Turkish prosecutors.

723.     Defendant KORKMAZ's statements are slanderous *per se* because Defendant KORKMAZ accused Dr. Ayasli of crimes including: (1) affiliation with a terrorist organization (FETO); (2) involvement with the organization of a coup attempt in Turkey; (3) committing espionage against the Turkish government; (4) involvement in arms trafficking; and (5) money laundering.

724.     Defendant KORKMAZ's statements are slanderous *per se* because they injured Dr. Ayasli in his trade or business.

725.     Defendant KORKMAZ failed to exercise reasonable care in publishing these defamatory statements to third parties.

726.     Dr. Ayasli suffered both economic harm and special harm as a result of Defendant KORKMAZ's false and defamatory statements, including but not limited to reputational harm.

## SIXTH CLAIM FOR RELIEF

### (Invasion of Privacy—Intrusion into Physical and Mental Solitude)
### (Against Defendant KORKMAZ)

727.     Dr. Ayasli repeats and incorporates his allegations contained in the preceding paragraphs of this Complaint.

728.     Defendant KORKMAZ's harassing conduct, including but not limited to making repeated, unrelenting, and threatening telephone calls and text/WhatsApp messages to Dr. Ayasli at inappropriate times of day and night, intruded upon Dr. Ayasli's solitude and seclusion.

729.     Defendant KORKMAZ acted intentionally and maliciously when he intruded upon Dr. Ayasli's privacy.

730.     Defendant KORKMAZ's conduct would be highly offensive to a reasonable person.

731.    Dr. Ayasli is entitled to damages for Defendant KORKMAZ's conduct because Dr. Ayasli suffered emotional distress and personal humiliation of a kind and extent that normally results from such an invasion.

732.    Dr. Ayasli is also entitled to enhanced compensatory damages because Defendant KORKMAZ acted with malice.

## SEVENTH CLAIM FOR RELIEF

**(Invasion of Privacy—Publicity Placing Plaintiff in a False Light)**
**Against Defendant KORKMAZ**

733.    Dr. Ayasli repeats and incorporates his allegations contained in the preceding paragraphs of this Complaint.

734.    Defendant KORKMAZ gave publicity to matters concerning Dr. Ayasli, including but not limited to claiming that Dr. Ayasli was (1) affiliated with a terrorist organization (FETO); (2) involved with the organization of a coup attempt in Turkey; (3) involved in committing espionage against the Turkish government; (4) involved in arms trafficking; and (5) involved in money laundering, that placed Dr. Ayasli in a false light before the public.

735.    A reasonable person would consider false association with any of these situations highly offensive.

736.    Defendant KORKMAZ knew of, or acted in reckless disregard to, the falsity of his claims.

737.    Defendant KORKMAZ knew of, or acted in reckless disregard to, the false light in which Dr. Ayasli would be placed as a result of Defendant KORKMAZ's false claims.

738.     Dr. Ayasli is entitled to damages for Defendant KORKMAZ's conduct because Dr. Ayasli suffered emotional distress and personal humiliation of a kind and extent that normally results from such an invasion.

739.     Dr. Ayasli is entitled to special damages cause by Defendant KORKMAZ'S conduct, including but not limited to, actual injury to his commercial interests.

740.     Dr. Ayasli is also entitled to enhanced compensatory damages because Defendant KORKMAZ acted with malice.

Respectfully submitted,

**DR. YALCIN AYASLI**

By His Attorneys,

**SHEEHAN PHINNEY BASS & GREEN, PA**

By: _____/s/_____
    Robert H. Miller, Esq. (NH Bar #13881)
    Patrick. J. Queenan, Esq. (NH Bar #20127)
    Chloe F. Golden, Esq. (NH Bar #268036)
    1000 Elm Street, 17th Floor
    Manchester, NH 03110
    603-668-0300
    rmiller@sheehan.com
    pqueenan@sheehan.com
    cgolden@sheehan.com

**JONES DAY**

Steven T. Cottreau, Esq. (VA Bar #46215)
*Pro hac vice* – application pending
51 Louisiana Ave., NW
Washington, DC 20001
202-879-3939
scottreau@jonesday.com

## **VERIFICATION**

I, Yalçin Ayasli, declare under penalty of perjury that the following is true and correct:

1.      I am the Plaintiff in the present case and a citizen of the United States of America.

2.      I have carefully reviewed each and every paragraph of the foregoing complaint, and hereby declare that the foregoing is true and correct to the best of my knowledge and belief.


Executed on February 18, 2019


_____
Yalçin Ayasli

119