JOHN W. HUBER, United States Attorney (#7226)
ARTHUR J. EWENCZYK, Special Assistant United States Attorney (NY #5263785)
LESLIE A. GOEMAAT, Special Assistant United States Attorney (MA# 676695)
RICHARD M. ROLWING, Special Assistant United States Attorney (OH #0062368)
JOHN E. SULLIVAN, Senior Litigation Counsel, Tax Division (WP# 1018849)
Attorneys for the United States of America
111 South Main Street, #1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: arthur.j.ewenczyk@usdoj.gov
  leslie.a.goemaat@usdoj.gov
  richard.m.rolwing@usdoj.gov
  john.e.sullivan@usdoj.gov

FILED
U.S. DISTRICT COURT

UTAH

DEPUTY CLERK

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. NO. 2:18-CR-00365-JNP-BCW |
| Plaintiff, | **SECOND SUPERSEDING INDICTMENT** |
| v. | Viols. |
| JACOB ORTELL KINGSTON, (01) | 1: 18 U.S.C. § 1349 |
| ISAIAH ELDEN KINGSTON, (02) | 2 thru 22: 26 U.S.C. § 7206(2) |
| LEV ASLAN DERMEN, | 23 thru 25: 18 U.S.C. § 1956(h) |
| a/k/a Levon Termendzhyan, (03) | 26 thru 32: 18 U.S.C. § 1956(a)(1)(B)(i) |
| RACHEL ANN KINGSTON, and (04) | 33 thru 43: 18 U.S.C. § 1957 |
| SALLY LOUISE KINGSTON, (05) | 44: 18 U.S.C. § 1512(k) |
| Defendants. | 45: 18 U.S.C. § 1512(c)(1) |
| | 46: 18 U.S.C. § 1512(a)(2) |
| | FORFEITURE ALLEGATIONS |

## Table of Contents, Charges and Defendants

| Page | Count | Defendants Charged |
|------|-------|--------------------|
| 8 | **Count 1:**<br>18 U.S.C. § 1349<br>(Conspiracy to commit mail fraud) | JACOB KINGSTON<br>ISAIAH KINGSTON<br>LEV DERMEN<br>RACHEL KINGSTON<br>SALLY KINGSTON |
| 20 | **Counts 2 thru 20:**<br>26 U.S.C. § 7206(2)<br>(Aiding in the preparation and filing of a false claim) | JACOB KINGSTON |
| 22 | **Counts 21 and 22:**<br>26 U.S.C. § 7206(2)<br>(Aiding in the preparation and filing of a false return) | ISAIAH KINGSTON |
| 24 | **Count 23:** 18 U.S.C. § 1956(h)<br>(Conspiracy to commit concealment money laundering offenses) | JACOB KINGSTON<br>ISAIAH KINGSTON<br>SALLY KINGSTON<br>RACHEL KINGSTON |
| 26 | **Count 24:** 18 U.S.C. § 1956(h)<br>(Conspiracy to commit international, concealment, and expenditure money laundering offenses) | JACOB KINGSTON<br>ISAIAH KINGSTON<br>LEV DERMEN |
| 31 | **Count 25:** 18 U.S.C. § 1956(h)<br>(Conspiracy to commit concealment and expenditure money laundering offenses) | JACOB KINGSTON<br>ISAIAH KINGSTON |
| 33 | **Counts 26 thru 30:**<br>18 U.S.C. § 1956(a)(1)(B)(i)<br>(Money laundering (conceal/disguise)) | LEV DERMEN<br>JACOB KINGSTON (Counts 27-29 only) |
| 35 | **Count 31:**<br>18 U.S.C. § 1956(a)(1)(B)(i)<br>(Money laundering (conceal/disguise)) | JACOB KINGSTON<br>ISAIAH KINGSTON |
| 35 | **Count 32:**<br>18 U.S.C. § 1956(a)(1)(B)(i)<br>(Money laundering (conceal/disguise)) | JACOB KINGSTON<br>LEV DERMEN |

| Page | Count | Defendants Charged |
|---|---|---|
| 38 | **Count 33:**<br>18 U.S.C. § 1957<br>(Money laundering (expenditure)) | JACOB KINGSTON<br>ISAIAH KINGSTON |
| 40 | **Counts 34 thru 38:**<br>18 U.S.C. § 1957<br>(Money laundering (expenditure)) | JACOB KINGSTON<br>ISAIAH KINGSTON |
| 43 | **Counts 39 thru 41:**<br>18 U.S.C. § 1957<br>(Money laundering (expenditure)) | JACOB KINGSTON<br>RACHEL KINGSTON (Counts 40-41 only)<br>ISAIAH KINGSTON |
| 44 | **Count 42:**<br>18 U.S.C. § 1957<br>(Money laundering (expenditure)) | JACOB KINGSTON<br>ISAIAH KINGSTON<br>LEV DERMEN |
| 45 | **Count 43:**<br>18 U.S.C. § 1957<br>(Money laundering (expenditure)) | LEV DERMEN |
| 46 | **Count 44:**<br>18 U.S.C. § 1512(k)<br>(Conspiracy to commit obstruction of justice offenses) | JACOB KINGSTON<br>ISAIAH KINGSTON |
| 50 | **Count 45:**<br>18 U.S.C. § 1512(c)(1)<br>(Destroying and concealing records and objects) | JACOB KINGSTON<br>ISAIAH KINGSTON<br>RACHEL KINGSTON |
| 51 | **Count 46:**<br>18 U.S.C. § 1512(a)(2)<br>(Attempted force or threat of force) | JACOB KINGSTON<br>ISAIAH KINGSTON |
| 56 | **Forfeiture Allegations** | |

The Grand Jury charges:

At times relevant to this Indictment:

### Defendants and Their Companies

1.    Defendant JACOB ORTELL KINGSTON ("JACOB KINGSTON") was a resident of Utah and owned 50% of Washakie Renewable Energy, LLC ("Washakie"). He was the chief executive officer of Washakie.

2.    Defendant ISAIAH ELDEN KINGSTON ("ISAIAH KINGSTON") was a resident of Utah and owned 50% of Washakie. He was the chief financial officer of Washakie.

3.    Washakie was a limited liability company with corporate offices in Salt Lake City, Utah. As of January 7, 2013, Washakie described itself on its website as "Utah's largest producer of clean burning and sustainable biodiesel." As of November 10, 2013, Washakie described itself on its website as "the largest producer of biodiesel and chemicals in the intermountain west."

4.    United Fuel Supply ("UFS") was a limited liability company with corporate offices in Salt Lake City, Utah. UFS was controlled by Defendants JACOB KINGSTON and ISAIAH KINGSTON.

5.    Defendant RACHEL ANN KINGSTON ("RACHEL KINGSTON") was a resident of Utah, the mother of Defendants JACOB KINGSTON and ISAIAH KINGSTON, and the "Special Projects Manager" at Washakie.

6.    Defendant SALLY LOUISE KINGSTON ("SALLY KINGSTON") was a resident of Utah, the wife of Defendant JACOB KINGSTON, and the "IRS Regulatory Permit Specialist" or "Compliance Manager" at Washakie.

7.    Defendant LEV ASLAN DERMEN, a/k/a Levon Termendzhyan ("LEV

DERMEN"), was a resident of California. He had an interest in or controlled several fuel-related

companies in the United States, including:

> Noil Energy Group Inc., a corporation with offices in California
> ("Noil Energy Group");
>
> Noil USA Inc.;
>
> Speedy Lion Renewable Fuel Investments LLC
> (formerly Speedy Lion Renewable Fuel Investments Inc.);
>
> Speedy Fuel Inc.;
>
> Lion Tank Line Inc.;
>
> Viscon International Inc.; and
>
> G.T. Energy LLC.

8.     SBK Holdings, Inc., later SBK Holdings USA, Inc., was a corporation formed in

California in December 2013 initially owned by Defendants JACOB KINGSTON and LEV

DERMEN. Defendant DERMEN had control over SBK Holdings USA, Inc.'s bank accounts

and became the sole owner of the entity in or around September 2014.

9.     SBK Holding AS was a corporation formed in the Republic of Turkey ("Turkey")

in or about March 2013 by Defendants JACOB KINGSTON and LEV DERMEN and a Turkish

businessman ("the Turkish businessman"), who used SBK Holding AS to make investments in

other companies. Defendants JACOB KINGSTON and LEV DERMEN and the Turkish

businessman and the Turkish businessman's associates used bank accounts located in several

countries, including Turkey, Luxembourg, and the United States, to conduct financial

transactions relating to SBK Holding AS and its investments.

### Other Persons and Entities

10.     Co-conspirators, not named as defendants herein, participated as co-conspirators

in various offenses charged herein and performed acts and made statements in furtherance thereof. Among these co-conspirators, one had an interest in or controlled the following entities:

Skinny Crow Music, Inc. ("SCM")
    (a/k/a Skinny Crow Inc.);

Catan Trading Corporation ("Catan");

Xena Trading Inc. ("Xena"); and had influence over

"Company B" ("Co. B").

11.     Defendants JACOB KINGSTON, ISAIAH KINGSTON, RACHEL KINGSTON, and SALLY KINGSTON were members of the The Davis County Cooperative Society, also known as "the Order" primarily located in Utah. Numerous entities were associated with the Order, including, among others:

A-Fab Engineering Inc. ("A-Fab Engineering");

Fidelity Funding Inc. ("Fidelity Funding");

Latter Day Church of Christ;

Equitable Funding Inc. ("Equitable Funding");

Alliance Investments Solutions LLC ("Alliance Investments"); and

Standard Industries Inc. ("Standard Industries").

These entities are hereinafter collectively referred to as "Order-related entities."

## Law and Industry

12.     The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States. The IRS administered tax credits designed to increase the amount of renewable fuel used and produced in the United States. These renewable fuel tax credits were refundable regardless of whether the taxpayer owed other taxes, and were paid by U.S. Treasury check.

13.     Biodiesel was a type of renewable fuel derived from plant or animal matter that met certain IRS and Environmental Protection Agency ("EPA") standards. Agri-biodiesel was a type of biodiesel. Biodiesel was referred to as "B100" in the fuel industry if it was not mixed with diesel fuel. Renewable diesel was another type of renewable fuel, derived from biomass, that met certain IRS and EPA standards. Renewable diesel was referred to as "R100" in the fuel industry if it was not mixed with diesel fuel. "Feedstock" was a generic term for raw material used to produce various kinds of renewable fuel.

14.     Biodiesel mixture was produced by blending B100 with at least .1% of diesel fuel. After blending, the mixture of B100 and diesel was referred to as "B99" in the fuel industry. The biodiesel mixture credit was a refundable renewable fuel tax credit available to blenders of biodiesel mixture who used the mixture as a fuel or sold it for use as a fuel. The amount of the credit was $1.00 for every gallon of B100 that was used to produce the biodiesel mixture. The market value of B100 was higher than the market value of B99 because the $1.00 per gallon biodiesel mixture credit could be obtained by blending the B100 with diesel fuel.

15.     Renewable diesel mixture was produced by blending R100 with at least .1% of diesel fuel. After blending, the mixture of R100 and diesel was referred to as "R99" in the fuel industry. The renewable diesel mixture credit was a refundable renewable fuel tax credit available to blenders of renewable diesel mixture who used the mixture as a fuel or sold it for use as a fuel. The amount of the credit was $1.00 for every gallon of R100 that was used to produce the renewable diesel mixture. The market value of R100 was higher than the market value of R99 because the $1.00 per gallon renewable diesel mixture credit could be obtained by blending the R100 with diesel fuel.

16.     Liquid fuel derived from biomass was an alternative fuel, or a type of renewable

fuel that did not meet the IRS and EPA requirements for biodiesel or renewable diesel.

      a.     The alternative fuel mixture credit was a $.50 per gallon refundable renewable fuel tax credit available to registered producers of alternative fuel mixtures who used the mixture as fuel in the producer's trade or business or sold it for use as fuel. It was no longer refundable after December 31, 2011.

      b.     The alternative fuel credit was a $.50 per gallon refundable renewable fuel tax credit available to registered alternative fuelers who sold for use, or used, alternative fuel as a fuel in a motor vehicle or motorboat.

     17.     IRS Form 8849, Claim for Refund of Excise Taxes, was used to claim renewable refundable fuel tax credits for biodiesel mixtures, agri-biodiesel mixtures, renewable diesel mixtures, and liquid fuel derived from biomass.

### Count 1
### 18 U.S.C. § 1349
### (Conspiracy to Commit Mail Fraud)

     18.     Paragraphs 1-10 and 12-17 are incorporated by reference and re-alleged as though fully set forth herein.

     19.     From in or about 2010, and continuing up to at least May 2017, in the Central Division of the District of Utah and elsewhere,

**JACOB KINGSTON,**
**ISAIAH KINGSTON,**
**LEV ASLAN DERMEN,**
**a/k/a Levon Termendzhyan,**
**RACHEL KINGSTON, and**
**SALLY KINGSTON,**

defendants herein, together with others known and unknown to the Grand Jury, did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate and agree to knowingly devise and intend to devise a scheme and artifice to defraud the United States, and to obtain

money and property from the United States by materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341, that is, by, among other things, scheming to fraudulently obtain government benefits, including Renewable Identification Numbers ("RINs"), as well as U.S. Treasury checks through the filing and submission of false claims to the government, including Forms 8849, Claims for Refund of Excise Taxes, submitted to the IRS for and on behalf of Washakie and UFS, which forms falsely claimed refundable renewable fuel tax credits that Washakie and UFS were not entitled to receive, and, for the purpose of executing said scheme and artifice to defraud, did cause mailings and things to be sent via the United States Postal Service and private and commercial interstate carriers, including, but not limited to, at least 37 U.S. Treasury checks totaling $511,842,773 that were mailed on or about the following dates in the following amounts:

| Para. Num. | Date | False Item(s) Claimed on Form 8849 | Treasury Check Amount |
|---|---|---|---|
| A. | 02/17/11 | Agri-biodiesel mixtures and liquid fuel derived from biomass | $3,174,387 |
| B. | 04/01/11 | Biodiesel mixtures | $1,905,114 |
| C. | 04/05/11 | Liquid fuel derived from biomass | $3,654,952 |
| D. | 04/25/11 | Liquid fuel derived from biomass | $486,000 |
| E. | 05/23/11 | Biodiesel mixtures and liquid fuel derived from biomass | $1,755,693 |
| F. | 05/26/11 | Biodiesel mixtures | $1,984,000 |
| G. | 06/29/11 | Biodiesel mixtures | $1,142,891 |
| H. | 07/19/11 | Liquid fuel derived from biomass | $840,000 |
| I. | 08/03/11 | Biodiesel mixtures and liquid fuel derived from biomass | $3,500,000 |
| J. | 09/20/11 | Biodiesel mixtures | $2,500,000 |
| K. | 10/19/11 | Renewable diesel mixtures | $1,000,000 |
| L. | 10/24/11 | Biodiesel mixtures | $2,000,000 |

| Para. Num. | Date | False Item(s) Claimed on Form 8849 | Treasury Check Amount |
|---|---|---|---|
| M. | 10/24/11 | Biodiesel mixtures and renewable diesel mixtures | $4,250,000 |
| N. | 10/28/11 | Biodiesel mixtures | $2,000,000 |
| O. | 11/03/11 | Renewable diesel mixtures | $522,970 |
| P. | 11/10/11 | Biodiesel mixtures | $723,000 |
| Q. | 11/18/11 | Renewable diesel mixtures | $1,495,250 |
| R. | 12/28/11 | Renewable diesel mixtures and liquid fuel derived from biomass | $2,785,648 |
| S. | 01/31/12 | Liquid fuel derived from biomass | $1,350,808 |
| T. | 02/28/13 | Biodiesel mixtures | $3,901,235 |
| U. | 03/19/13 | Biodiesel mixtures | $640,959 |
| V. | 03/20/13 | Liquid fuel derived from biomass | $20,283,659 |
| W. | 03/21/13 | Biodiesel mixtures and liquid fuel derived from biomass | $4,406,041 |
| X. | 04/05/13 | Biodiesel mixtures and liquid fuel derived from biomass | $8,859,520 |
| Y. | 05/21/13 | Liquid fuel derived from biomass | $11,872,884 |
| Z. | 05/31/13 | Biodiesel mixtures | $11,700,000 |
| AA. | 06/13/13 | Biodiesel mixtures | $11,400,000 |
| BB. | 08/07/13 | Agri-biodiesel mixtures | $25,800,000 |
| CC. | 08/22/13 | Biodiesel mixtures | $16,200,000 |
| DD. | 09/09/13 | Biodiesel mixtures | $35,008,437 |
| EE. | 10/18/13 | Agri-biodiesel mixtures | $33,465,236 |
| FF. | 11/05/13 | Biodiesel mixtures | $33,581,899 |
| GG. | 11/27/13 | Biodiesel mixtures | $38,078,529 |
| HH. | 12/19/13 | Biodiesel mixtures | $33,578,660 |
| II. | 01/10/14 | Biodiesel mixtures | $21,789,321 |
| JJ. | 03/12/15 | Biodiesel mixtures | $82,102,840 |
| KK. | 03/12/15 | Biodiesel mixtures | $82,102,840 |
| | | **Total** | **$511,842,773** |

**Manner and Means**

20.     Among the manner and means by which the defendants and their co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.      They bought and resold, and caused others to buy and resell on their behalf, B99 and other products that were not eligible for a refundable fuel tax credit.

b.      They falsified and caused others to falsify purchase invoices and contracts.

c.      They falsified and caused others to falsify production records, blending tickets, bills of lading, and other paperwork routinely created in qualifying renewable fuel transactions.

d.      They falsified and caused others to falsify sales invoices.

e.      They falsified and caused others to falsify accounting records.

f.      They involved numerous companies in their transactions.

g.      They falsified paperwork to disguise purchases of B99 as B100 or feedstock.

h.      They falsified paperwork to disguise other products as qualifying liquid fuel.

i.      They rotated, or moved, and caused others to move, liquid products between various places in the United States and elsewhere, including India and Panama, to make it falsely appear that transactions involving the purchase and sale of feedstock, B100, B99, and other fuel products, were taking place.

j.      They used "burner phones," facsimile machines, thumb drives, and other covert means to communicate among themselves and with others in the scheme.

k.      They filed and caused to be filed false Forms 8849 with the IRS, falsely

claiming the $1.00 per gallon credit for biodiesel mixtures, agri-biodiesel mixtures, and renewable diesel mixtures.

l.     They filed and caused to be filed false Forms 8849 with the IRS, falsely claiming the $.50 per gallon credit for liquid fuel derived from biomass.

m.     By filing these false Forms 8849, they caused the U.S. Treasury to pay more than $511 million to Washakie by sending, via the mails, U.S. Treasury checks, as listed in paragraphs 19A to 19KK, to Washakie's offices in Salt Lake City, Utah.

n.     They deposited, and caused to be deposited, the $511 million in proceeds into bank accounts in the name of Washakie.

o.     They falsely claimed that certain businesses were "toll processors" of biodiesel and other renewable fuels on behalf of Washakie or UFS.

p.     They used backdated and altered records and agreements.

q.     They engaged in fraudulent financial transactions between bank accounts with their co-conspirators to make it appear that biodiesel and related products had been bought and sold.

r.     They made false statements to agents of the IRS in order to conceal the fraud and perpetuate the scheme.

s.     They submitted fake, false, and fraudulent documents to agents of the IRS in order to conceal the fraud and perpetuate the scheme.

t.     They submitted fake, false and fraudulent documents to the grand jury investigating their conduct.

u.     They intimidated, and attempted to intimidate co-conspirators and witnesses to not talk to law enforcement.

   v.  They destroyed and attempted to destroy and remove records and data that they believed would be subject to search warrants.

   w.  They paid money to an intermediary for the purposes of bribing high ranking law enforcement officials.

   x.  They paid money to an intermediary for the purposes of paying an enforcer to intimidate and harm co-conspirators and witnesses.

### Conduct in Furtherance

  21.  The defendants and their co-conspirators engaged in conduct in furtherance of the mail fraud conspiracy, including the following:

   a.  On or about the following dates, they filed, and caused to be filed, Forms 8849 with the IRS, including at least 39 Forms 8849 reporting 1,216,942,203 gallons of fuel and claiming $1,166,792,650 of renewable fuel tax credits based on the type of fuel set forth below:

| Para. Num. | Date | Type of Fuel Claimed on Form 8849 | Gallons Reported | Amount Claimed |
|---|---|---|---|---|
| A. | 12/21/10 | Line 2a – Biodiesel mixtures | 5,578,700 | $5,578,700 |
| B. | 02/03/11 | Line 2b – Agri-biodiesel mixtures | 2,584,726 | $2,584,726 |
| C. | 03/21/11 | Line 2a – Biodiesel mixtures | 1,905,114 | $1,905,114 |
| D. | 03/15/11 | Line 3f – Liquid fuel derived from biomass | 7,309,905 | $3,654,952 |
| E. | 04/11/11 | Line 3f – Liquid fuel derived from biomass | 972,000 | $486,000 |
| F. | 04/18/11 | Line 2a – Biodiesel mixtures | 1,984,000 | $1,984,000 |
| G. | 05/06/11 | Line 2a – Biodiesel mixtures | 1,145,807 | $1,145,807 |
| H. | 06/10/11 | Line 2a – Biodiesel mixtures | 1,142,891 | $1,142,891 |
| I. | 07/01/11 | Line 3f – Liquid fuel derived from biomass | 1,680,000 | $840,000 |

| Para. Num. | Date | Type of Fuel Claimed on Form 8849 | Gallons Reported | Amount Claimed |
|---|---|---|---|---|
| J. | 07/19/11 | Line 2a – Biodiesel mixtures<br>Line 3f – Liquid fuel derived from biomass | 3,000,000<br>1,000,000 | $3,000,000<br>$500,000 |
| K. | 09/02/11 | Line 2a – Biodiesel mixtures | 2,500,000 | $2,500,000 |
| L. | 09/30/11 | Line 2c – Renewable diesel mixtures | 1,000,000 | $1,000,000 |
| M. | 10/07/11 | Line 2a – Biodiesel mixtures | 2,000,000 | $2,000,000 |
| N. | 10/12/11 | Line 2a – Biodiesel mixtures<br>Line 2c – Renewable diesel mixtures | 3,250,000<br>1,000,000 | $4,250,000 |
| O. | 10/19/11 | Line 2a – Biodiesel mixtures | 2,000,000 | $2,000,000 |
| P. | 10/27/11 | Line 2c – Renewable diesel mixtures | 522,970 | $522,970 |
| Q. | 11/02/11 | Line 2a – Biodiesel mixtures | 723,000 | $723,000 |
| R. | 11/09/11 | Line 2c – Renewable diesel mixtures | 1,495,250 | $1,495,250 |
| S. | 12/20/11 | Line 2c – Renewable diesel mixtures<br>Line 3f – Liquid fuel derived from biomass | 1,685,648<br>2,200,000 | $1,685,648<br>$1,100,000 |
| T. | 01/20/12 | Line 3f – Liquid fuel derived from biomass | 2,701,616 | $1,350,808 |
| U. | 02/13/13 | Line 2a – Biodiesel mixtures | 3,901,235 | $3,901,235 |
| V. | 02/25/13 | Line 2a – Biodiesel mixtures | 640,959 | $640,959 |
| W. | 03/11/13 | Line 3f – Liquid fuel derived from biomass | 40,567,319 | $20,283,659 |
| X. | 03/12/13 | Line 2a – Biodiesel mixtures<br>Line 3f – Liquid fuel derived from biomass | 806,041<br>7,200,000 | $806,041<br>$3,600,000 |
| Y. | 03/27/13 | Line 2a – Biodiesel mixtures<br>Line 3f – Liquid fuel derived from biomass | 2,398,274<br>12,922,493 | $2,398,274<br>$6,461,246 |
| Z. | 04/17/13 | Line 3f – Liquid fuel derived from biomass | 23,745,769 | $11,872,884 |
| AA. | 05/20/13 | Line 2a – Biodiesel mixtures | 11,700,000 | $11,700,000 |

| Para. Num. | Date | Type of Fuel Claimed on Form 8849 | Gallons Reported | Amount Claimed |
|---|---|---|---|---|
| BB. | 06/03/13 | Line 2a – Biodiesel mixtures | 11,400,000 | $11,400,000 |
| CC. | 07/29/13 | Line 2b – Agri-biodiesel mixtures | 25,800,000 | $25,800,000 |
| DD. | 08/13/13 | Line 2a – Biodiesel mixtures | 16,200,000 | $16,200,000 |
| EE. | 09/05/13 | Line 2a – Biodiesel mixtures | 35,008,437 | $35,008,437 |
| FF. | 09/30/13 | Line 2b – Agri-biodiesel mixtures | 33,465,236 | $33,465,236 |
| GG. | 10/20/13 | Line 2a – Biodiesel mixtures | 33,581,899 | $33,581,899 |
| HH. | 11/17/13 | Line 2a – Biodiesel mixtures | 38,078,529 | $38,078,529 |
| II. | 12/09/13 | Line 2a – Biodiesel mixtures | 33,579,440 | $33,579,440 |
| JJ. | 12/24/13 | Line 2a – Biodiesel mixtures | 21,789,321 | $21,789,321 |
| KK. | 02/11/15 | Line 2a – Biodiesel mixtures | 170,302,364 | $170,302,364 |
| LL. | 01/20/16 | Line 2a – Biodiesel mixtures | 322,900,000 | $322,900,000 |
| MM. | 02/04/16 | Line 2a – Biodiesel mixtures | 321,573,260 | $321,573,260 |
| | | **Totals** | **1,216,942,203** | **$1,166,792,650** |

b.      In or about August 2010, they emailed a co-conspirator with documents and instructions to provide backdated and false records.

c.      In or about April 2011, they exchanged false information via email with a co-conspirator.

d.      In or about October 2011, they exchanged false documents via email with a co-conspirator.

e.      In or about February 2012, they created a false document, asked a co-conspirator to sign it, and then provided it to an IRS revenue agent conducting an audit of Washakie's claims for refund.

f.      In or about February 2012, they met with a co-conspirator in Salt Lake City, Utah, to discuss the execution of the conspiracy.

g.  In or about April 2012, in Los Angeles, California, they recruited others into the conspiracy.

h.  In or about April 2012, in an email entitled "The Plan," they set forth the false paperwork necessary to further execute the conspiracy.

i.  In or about April 2012, and thereafter, consistent with "The Plan," they caused false paperwork to be created.

j.  In or about May 2012, they sent text messages about creating false records to provide to an IRS auditor.

k.  In or about June 2012, they created and sent false Lion Tank Lines invoices.

l.  In or about September 2012, they provided false information to an IRS auditor.

m.  In or about October 2012, they requested false records from a co-conspirator and provided them to an IRS auditor.

n.  In or about November 2012, they created false records regarding B99 that Washakie bought from others.

o.  In or about late 2012, they instructed a Washakie employee to empty railcars filled with water and refill them with water so that false paperwork could be prepared claiming that the railcars had been filled with renewable fuel or related products.

p.  In or about late January 2013, they met in Los Angeles, California, and recruited others into the conspiracy.

q.  In or about January 2013, they began a new project with co-conspirators to further the conspiracy.

r.    In or about February 2013, they emailed other co-conspirators about creating and sharing false documents and rotating payments.

s.    In or about May 2013, they and others met in Los Angeles, California, in person and by phone, to reconcile funds expended in furtherance of the conspiracy.

t.    In or about June 2013, they leased tanks in various terminals in Texas.

u.    In or about July 2013, and thereafter, they hired barges to transfer renewable fuel and related products from tank to tank in Texas, to create the appearance that Washakie was engaged in qualifying fuel transactions.

v.    In or about late July 2013, they met with co-conspirators in Salt Lake City, Utah, to further plan the execution of the conspiracy.

w.    In or about late July 2013, they exchanged a false invoice via email.

x.    In or about August 2013, they exchanged a document via email which they used to keep track of the transfer of products from tank to tank in Texas.

y.    In or about August 2013, they leased additional tanks at terminals in Louisiana.

z.    In or about August 2013, they met in Panama to execute their project to rotate the same liquid products from Texas to Panama and back to Texas.

aa.    On or about September 30, 2013, they shared the updated document which they used to keep track of the transfer of products from tank to tank in Texas, Louisiana and Panama by fax.

bb.    In or about late 2013, they made false entries in the books and records of Washakie.

cc.    In or about December 2013, they created false invoices and documents for

17

the purchase, sale and delivery of renewable fuel and related products.

   dd. In or about December 2013, they met in Utah to discuss their respective shares of the fraud proceeds.

   ee. In or about December 2013, they met in Utah and exchanged the updated document which they used to keep track of the transfer of products from tank to tank in Texas, Louisiana, and Panama.

   ff. In or about February 2014, they met in Utah and exchanged the updated document which they used to keep track of the transfer of products from tank to tank in Texas, Louisiana, and Panama.

   gg. In or about March 2014, they instructed a co-conspirator to be prepared to leave the country to avoid prosecution.

   hh. In or about April 14, 2014, they provided, or caused to be provided, a "burner" phone to a co-conspirator.

   ii. In or about June 2014, they created false invoices for the purchase and sale of renewable fuel and related products.

   jj. In or about late 2014, they made false entries in the books and records of Washakie.

   kk. In or about October 2014, they provided false and fraudulent records to the grand jury in response to subpoenas.

   ll. In the years 2011 through 2016, they engaged in financial transactions with co-conspirators to make it falsely appear that legitimate business transactions had taken place.

   mm. In or about December 2015, they met in Utah and planned further

financial transactions with co-conspirators to make it falsely appear that legitimate business transactions had taken place.

nn. In or about December 2015, they communicated with the intermediary about bribing high ranking law enforcement officials.

oo. In or about December 2015, they created and altered, or caused to be created and altered, false invoices.

pp. In or about February 2016, they destroyed or removed records from Suite 300, 670 East 3900 South, Salt Lake City, Utah.

qq. In or about November 2016, they paid cash to an intermediary for the purposes of paying an enforcer to harm and intimidate witnesses.

rr. In or about January 2017, they paid cash to an intermediary for the purposes of paying an enforcer to harm and intimidate witnesses and of bribing high ranking law enforcement officials and judges.

ss. On or about March 15, 2017, they filed and caused to be filed a false Form 1065, U.S. Return of Partenership Income, for and on behalf of Washakie, for calendar year 2013, which falsely overstated Washakie's gross receipts or sales and cost of goods sold, as well as other material matters, to further create the appearance that Washakie was engaged in qualifying fuel transactions.

tt. On or about October 12, 2017, they filed and caused to be filed a false Form 1065, U.S. Return of Partenership Income, for and on behalf of Washakie, for calendar year 2014, which falsely overstated Washakie's gross receipts or sales and cost of goods sold, as well as other material matters, to further create the appearance that Washakie was engaged in qualifying fuel transactions.

22.    The scheme described herein in Paragraphs 19-21 is hereinafter referred to as the "Mail Fraud Scheme."

All in violation of Title 18 United States Code § 1349.

## Counts 2 thru 20
## 26 U.S.C. § 7206(2)
## (Willfully Aiding and Assisting in the Filing of a False Claim)

23.    Paragraphs 1-7 and 12-17 are incorporated by reference and re-alleged as though fully set forth herein.

24.    On or about the dates set forth below, in the Central Division of the District of Utah and elsewhere,

## JACOB KINGSTON,

defendant herein, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the IRS of the following Forms 8849, Claims For Refund of Excise Taxes, for and on behalf of Washakie and UFS, which were false and fraudulent as to the material matters referenced in the chart below, in that each Form 8849 falsely represented that Washakie was entitled to claim refundable renewable fuel tax credits in the amounts set forth below, whereas, as Defendant JACOB KINGSTON then and there knew, Washakie was not entitled to the credits in the amounts claimed:

| Count | Date | Filer | False Item(s) Claimed | Amount of Credit Claimed |
|-------|------|-------|----------------------|--------------------------|
| 2 | 02/13/13 | Washakie | Line 2a – Biodiesel mixtures | $3,901,235 |
| 3 | 02/25/13 | Washakie | Line 2a – Biodiesel mixtures | $640,959 |
| 4 | 03/11/13 | Washakie | Line 3f – Liquid fuel derived from biomass | $20,283,659 |

| Count | Date | Filer | False Item(s) Claimed | Amount of Credit Claimed |
|-------|------|-------|----------------------|--------------------------|
| 5 | 03/12/13 | Washakie | Line 2a – Biodiesel mixtures<br>Line 3f – Liquid fuel derived from biomass | $806,041<br><br>$3,600,000 |
| 6 | 03/27/13 | Washakie | Line 2a – Biodiesel mixtures<br>Line 3f – Liquid fuel derived from biomass | $2,398,274<br><br>$6,461,246 |
| 7 | 04/17/13 | Washakie | Line 3f – Liquid fuel derived from biomass | $11,872,884 |
| 8 | 05/20/13 | Washakie | Line 2a – Biodiesel mixtures | $11,700,000 |
| 9 | 06/03/13 | Washakie | Line 2a – Biodiesel mixtures | $11,400,000 |
| 10 | 07/29/13 | Washakie | Line 2b – Agri-biodiesel mixtures | $25,800,000 |
| 11 | 08/13/13 | Washakie | Line 2a – Biodiesel mixtures | $16,200,000 |
| 12 | 09/05/13 | Washakie | Line 2a – Biodiesel mixtures | $35,008,437 |
| 13 | 09/30/13 | Washakie | Line 2b – Agri-biodiesel mixtures | $33,465,236 |
| 14 | 10/20/13 | Washakie | Line 2a – Biodiesel mixtures | $33,581,899 |
| 15 | 11/17/13 | Washakie | Line 2a – Biodiesel mixtures | $38,078,529 |
| 16 | 12/09/13 | Washakie | Line 2a – Biodiesel mixtures | $33,579,440 |
| 17 | 12/24/13 | Washakie | Line 2a – Biodiesel mixtures | $21,789,321 |
| 18 | 02/11/15 | Washakie | Line 2a – Biodiesel mixtures | $170,302,364 |
| 19 | 01/20/16 | Washakie | Line 2a – Biodiesel mixtures | $322,900,000 |
| 20 | 02/04/16 | UFS | Line 2a – Biodiesel mixtures | $321,573,260 |

All in violation of Title 26, United States Code, Section 7206(2).

**Count 21**
**26 U.S.C. § 7206(2)**
**(Willfully Aiding and Assisting in the Filing of a False Return)**

25.    Paragraphs 1-7 and 12-17 are incorporated by reference and re-alleged as though fully set forth herein.

26.    On or about March 15, 2017, in the Central Division of the District of Utah and elsewhere,

**ISAIAH KINGSTON,**

defendant herein, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the IRS of a U.S. Return of Partnership Income, Form 1065, for and on behalf of Washakie, for calendar year 2013. The return was false and fraudulent as to the material matters and amounts reported set forth below, whereas, as Defendant ISAIAH KINGSTON then and there knew, said amounts were overstated and Washakie was not entitled to report fraudulently-obtained fuel tax credits as "tax-exempt income":

| Para. Num. | False and Fraudulent Matters | Amount Reported |
|---|---|---|
| (a) | Line 1a – Gross receipts or sales | $659,130,380 |
| (b) | Line 2 – Cost of goods sold | $844,306,523 |
| (c) | Page 5, Schedule L, Line 2a – Trade notes and accounts receivable | $385,195,525 |
| (d) | Page 5, Schedule L, Line 15 – Accounts payable | $444,782,588 |
| (e) | Federal Statements, Statement 4 – Form 1065, Schedule K, Line 18b – Other Tax-Exempt Income – "Exempt Fuel Tax Refundable Credit" | $310,566,382 |

All in violation of Title 26, United States Code, Section 7206(2).

**Count 22**
**26 U.S.C. § 7206(2)**
**(Willfully Aiding and Assisting in the Filing of a False Return)**

27.     Paragraphs 1-7 and 12-17 are incorporated by reference and re-alleged as though

fully set forth herein.

28.     On or about October 12, 2017, in the Central Division of the District of Utah and

elsewhere,

**ISAIAH KINGSTON,**

defendant herein, did willfully aid and assist in, and procure, counsel, and advise the preparation

and presentation to the IRS of a U.S. Return of Partnership Income, Form 1065, for and on

behalf of Washakie, for calendar year 2014.  The return was false and fraudulent as to the

material matters and amounts reported set forth below, whereas, as Defendant ISAIAH

KINGSTON then and there knew, said amounts were overstated and Washakie was not entitled

to report fraudulently-obtained fuel tax credits as "tax-exempt income":

| Para. Num. | False and Fraudulent Matters | Amount Reported |
|---|---|---|
| (a) | Line 1a – Gross receipts or sales | $546,664,042 |
| (b) | Line 2 – Cost of goods sold | $643,820,036 |
| (c) | Page 5, Schedule L, Line 2a – Trade notes and accounts receivable | $825,149,137 |
| (d) | Page 5, Schedule L, Line 15 – Accounts payable | $739,753,058 |
| (e) | Federal Statements, Statement 2 – Form 1065, Schedule K, Line 18b – Other Tax-Exempt Income – "Exempt Fuel Tax Credits" | $164,196,562 |

All in violation of Title 26, United States Code, Section 7206(2).

**Count 23**
**18 U.S.C. § 1956(h)**
**(Conspiracy to Commit Money Laundering Offenses)**

29.    Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

### The Conspiracy

30.    From in or about August 2013, and continuing at least through in or about June 2016, in the Central Division of the District of Utah and elsewhere,

**JACOB KINGSTON,**
**ISAIAH KINGSTON,**
**RACHEL KINGSTON, and**
**SALLY KINGSTON,**

defendants herein, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, 1956(a)(1)(B)(i), and that while conducting or attempting to conduct such transactions, knew that the property involved in the transactions represented the proceeds of some form of unlawful activity.

### Manner and Means

31.    Among the manner and means by which the defendants and their co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.    They cycled the proceeds with a co-conspirator and his entities, that is they transferred the same funds between the bank accounts of Washakie, UFS, and the co-

24

conspirator's entities, to make it appear that Washakie and UFS were making and collecting payments to and from those entities.

        b.     They created fake and false invoices to make it appear that Washakie had legitimately spent the proceeds.

        c.     They created fake and false invoices to make it appear that Washakie had legitimately received payments from others that were not the same proceeds that they had "spent."

        d.     They entered, and caused to be entered, the fake and false invoice amounts into the books and records of Washakie.

        e.     They communicated with each other, through various means including "burner" phones, regarding how much of the funds should be transferred between entities and returned to Washakie.

        f.     They transferred, and caused to be transferred, funds between Washakie, Catan, SCM, UFS, Xena, and Co. B.

        g.     During the time periods set forth below, they conducted, and attempted to conduct, at least 305 financial transactions totaling approximately $3.26 billion between the entities set forth below, as summarized in the following table:

| Time Period | Entities Involved | Number of Transactions | Approx. Value of Transactions |
|---|---|---|---|
| 8/19/13 thru 3/11/14 | Washakie, Catan, and SCM | 147 | $1.2 billion |
| 9/08/14 thru 10/30/14 | Washakie, Catan, and SCM | 46 | $299 million |
| 4/03/15 thru 4/24/15 | Washakie, Catan, and SCM | 45 | $1.7 billion |
| 11/27/15 thru 1/27/16 | Washakie, Catan, and SCM | 36 | $40 million |

| Time Period | Entities Involved | Number of Transactions | Approx. Value of Transactions |
|---|---|---|---|
| 11/25/15 thru 6/29/16 | Washakie, UFS, Xena, and Co. B | 31 | $27 million |
| | **Totals** | **305** | **$3.26 billion** |

All in violation of Title 18, United States Code, Section 1956(h).

### Count 24
### 18 U.S.C. § 1956(h)
### (Conspiracy to Commit Money Laundering Offenses)

32.    Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

### The Conspiracy

33.    From in or about April 2013, and continuing through at least November 2016, in the Central Division of the District of Utah and elsewhere,

**JACOB KINGSTON,**
**ISAIAH KINGSTON, and**
**LEV ASLAN DERMEN,**
**a/k/a Levon Termendzhyan,**

defendants herein, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, that is:

a.    to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341, from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i), knowing that the funds involved in the

26

transportation, transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity; and

b.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, 1956(a)(1)(B)(i), and that while conducting or attempting to conduct such transactions, knew that the property involved in the transactions represented the proceeds of some form of unlawful activity; and

c.     to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, in violation of Title 18, United States Code, Section 1957, such property having been derived from specified unlawful activity, that is the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341.

### Manner and Means

34.     Among the manner and means by which the defendants and their co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.     They transferred, and caused to be transferred, Defendant DERMEN's share of proceeds of the Mail Fraud Scheme from Washakie's bank accounts to Defendant DERMEN by transferring proceeds to him personally and to and from entities that Defendant

DERMEN controlled, including Noil Energy Group, Viscon International Inc., and SBK Holdings USA, Inc.

      b.      They transferred, and caused to be transferred, proceeds of the Mail Fraud Scheme from Washakie's bank accounts to and from the bank accounts of SBK Holdings USA, Inc. in the United States.

      c.      They transferred, and caused to be transferred, their share of proceeds of the Mail Fraud Scheme from Washakie's bank accounts to bank accounts located in Turkey as well as other countries, which were commingled with others' funds.

      d.      They transferred, and caused to be transferred, a portion of Defendant DERMEN's share of proceeds of the Mail Fraud Scheme from bank accounts in Turkey and other countries to bank accounts in the United States controlled by Defendant DERMEN.

      e.      They transferred, and caused to be transferred, proceeds of the Mail Fraud Scheme from Washakie's bank accounts in the United States to bank accounts in Turkey and other countries, and from bank accounts in Turkey and other countries to bank accounts in the United States, including at least 20 transfers totaling $148,005,592 on the dates and in the amounts set forth in the table below between the listed sender and recipient:

| Para. Num. | Date | Sender (Country) | Recipient (Destination) | Amount Sent to Turkey | Amount Sent to USA |
|---|---|---|---|---|---|
| A. | 09/09/13 | Washakie (USA) | Komak Isi Yalitim Sistamleri Sanayi (Turkey) | $4,000,000 | |
| B. | 09/09/13 | Washakie (USA) | Komak Isi Yalitim Sistamleri Sanayi (Turkey) | $5,000,000 | |
| C. | 09/12/13 | Komak Isi Yalitim Siste (Turkey) | Speedy Lion Renewable Fuel Investments LLC (USA) | | $4,999,964 |
| D. | 09/17/13 | Komak Isi Yalitim Siste (Turkey) | Speedy Lion Renewable Fuel Investments LLC (USA) | | $1,999,964 |

| Para. Num. | Date | Sender (Country) | Recipient (Destination) | Amount Sent to Turkey | Amount Sent to USA |
|---|---|---|---|---|---|
| E. | 09/19/13 | Komak Isi Yalitim Siste (Turkey) | Speedy Lion Renewable Fuel Investments LLC (USA) | | $1,999,964 |
| F. | 11/13/13 | Washakie (USA) | SBK Holding Turkiye (Turkey) | $10,000,000 | |
| G. | 12/31/13 | Washakie (USA) | Komak Isi Yalitim Sistamleri Sanayi (Turkey) | $13,000,000 | |
| H. | 01/14/14 | Washakie (USA) | Dogadogan (Turkey) | $100,000 | |
| I. | 01/21/14 | Komak Isi Yalitim Siste (Turkey) | Speedy Lion Renewable Fuel Investments LLC (USA) | | $9,000,000 |
| J. | 01/24/14 | Washakie (USA) | Dogadogan (Turkey) | $50,000 | |
| K. | 03/24/14 | Washakie (USA) | Teknoloji Sistemleri San Ve Tic (Turkey) | $4,055,700 | |
| L. | 03/24/14 | Washakie (USA) | Teknoloji Sistemleri San Ve Tic (Turkey) | $5,000,000 | |
| M. | 05/09/14 | Washakie (USA) | Teknoloji Sistemleri San Ve Tic (Turkey) | $2,000,000 | |
| N. | 07/22/14 | Washakie (USA) | Doga Dogan Bahcelievler Subesi (Turkey) | $200,000 | |
| O. | 09/05/14 | Washakie (USA) | Doga Dogan Bahcelievler Subesi (Turkey) | $100,000 | |
| P. | 04/28/15 | Washakie (USA) | Turkiye Garanti Bankasi A.S. (Turkey) | $15,000,000 | |
| Q. | 05/19/15 | Washakie (USA) | Isanne SARL (Luxembourg) | $35,000,000 | |
| R. | 05/27/15 | Washakie (USA) | Isanne SARL (Luxembourg) | $21,300,000 | |
| S. | 06/11/15 | Washakie (USA) | Turkiye Garanti Bankasi A.S. (Turkey) | $200,000 | |
| T. | 07/03/15 | Isanne SARL (Luxembourg) | SBK Holdings USA, Inc. (USA) | | $15,000,000 |
| | | | **Totals** | **$115,005,700** | **$32,999,892** |

      f.      They transferred, and caused to be transferred, proceeds of the Mail Fraud

Scheme to and through bank accounts maintained in the name of Washakie and Noil Energy

Group for the purposes of buying the personal residence of Defendant JACOB KINGSTON.

        g.    They transferred, and caused to be transferred, a portion of Defendant DERMEN's share of proceeds of the Mail Fraud Scheme from Washakie's bank accounts to Defendant DERMEN's bank account in Turkey for a "VAT" associated with a residence in Turkey.

        h.    They transferred, and caused to be transferred, other portions of Defendant DERMEN's share of proceeds of the Mail Fraud Scheme from Washakie's bank accounts to third parties in the forms of "loans" that were to be repaid to Defendant DERMEN, or to entities that he controlled.

        i.    They transferred, and caused to be transferred, other portions of Defendant DERMEN's share of proceeds of the Mail Fraud Scheme from Washakie's bank accounts for the purchase of a 2010 Bugatti Veyron as a purported "gift" for Defendant DERMEN, and in exchange for the "gift" of, among other things, a chrome Lamborghini to Defendant JACOB KINGSTON.

All in violation of Title 18, United States Code, Section 1956(h).

## Count 25
### 18 U.S.C. § 1956(h)
### (Conspiracy to Commit Money Laundering Offenses)

35.     Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

### The Conspiracy

36.     From in or about April 2013, and continuing through at least December 2015, in the Central Division of the District of Utah and elsewhere,

### JACOB KINGSTON and
### ISAIAH KINGSTON,

defendants herein, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, that is:

a.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, 1956(a)(1)(B)(i), and that while conducting or attempting to conduct such transactions, knew that the property involved in the transactions represented the proceeds of some form of unlawful activity; and

b.     to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is the proceeds of the Mail Fraud Scheme, in violation of Title

18, United States Code, Section 1341, in violation of Title 18, United States Code, Section 1957.

### Manner and Means

37.    Among the manner and means by which the defendants and their co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.    They transferred, and caused to be transferred, Mail Fraud Scheme proceeds from Washakie's bank accounts to various bank accounts, including UFS's bank accounts and accounts in their own names, including investment accounts at Merrill Lynch.

b.    They transferred, and caused to be transferred, Mail Fraud Scheme proceeds from Washakie's bank accounts to the bank accounts of Order-related entities.

c.    They transferred, and caused to be transferred, Mail Fraud Scheme proceeds by cycling funds through and from the bank accounts of Order-related entities back to Washakie's bank accounts.

d.    They caused the funds that were cycled from the bank accounts of Order-related entities back to Washakie's bank accounts to be falsely characterized as draws or loans.

e.    They transferred, and caused to be transferred, Mail Fraud Scheme proceeds from Washakie's bank accounts to third parties for the purposes of (1) buying assets, such as real estate or delivery trucks, (2) making financial investments on behalf of Washakie, (3) promoting the business and name of Washakie, and (4) expanding and building out Washakie's facilities in Plymouth, Utah.

All in violation of Title 18, United States Code, Section 1956(h).

**Counts 26 thru 30**
**18 U.S.C. § 1956(a)(1)(B)(i)**
**(Money Laundering)**

38.     Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

**$11.2 Million Loan to Borrower X**

39.     In June 2013, Defendants JACOB KINGSTON and LEV DERMEN used proceeds of the Mail Fraud Scheme to make an $11.2 million loan from Washakie to Borrower X, a California businessman, who was instructed to repay the loan to DERMEN, as follows:

        a.      On or about June 10, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $11,700,000, to be deposited into Washakie account #4874 at the Bank of Utah;

        b.      On or about June 17, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $11,400,000, to be deposited into Washakie account #4874;

        c.      On or about June 21, 2013, Defendants JACOB KINGSTON and DERMEN caused a wire transfer in the amount of $11,226,211 to be sent from Washakie account #4874 to a third party account in Florida for the purpose of making a loan to Borrower X of that amount;

        d.      On or about February 4, 2015, Defendant DERMEN executed, and caused Borrower X to execute, a promissory note for $12,000,000 to document the loan to Borrower X, which made the loan payable to SBK Holdings USA, Inc. instead of to Washakie, the source of the loan.  Borrower X made principal and interest payments on this loan, as directed by Defendant Dermen, to accounts controlled or directed by Defendant DERMEN; and

e.   As a result of the foregoing, Defendants JACOB KINGSTON and DERMEN disguised the criminally derived proceeds fraudulently obtained from the United States as payments related to a loan payable to SBK Holdings USA, Inc.

**Statutory Allegations**

40.   On or about the dates set forth in the table below, in the Central Division of the District of Utah and elsewhere, the defendants set forth in the table below, did knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, that is, causing the making of principal and interest payments on the $11,226,211 loan made to Borrower X, which transactions involved the proceeds of specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting or attempting to conduct such transactions, knew that the property involved in the transactions represented the proceeds of some form of unlawful activity, with each of the following financial transactions constituting a separate count:

| Count | Defendants | Date | Financial Transaction |
|---|---|---|---|
| 26 | **LEV DERMEN** | 06/04/14 | $1,000,000 withdrawal from an account related to Borrower X to a Noil Energy Group account |
| 27 | **JACOB KINGSTON LEV DERMEN** | 02/20/15 | $210,000 wire transfer for the benefit of SBK Holdings USA, Inc., representing an interest payment on Borrower X's loan |
| 28 | **JACOB KINGSTON LEV DERMEN** | 03/16/15 | $70,000 wire transfer for the benefit of SBK Holdings USA, Inc., representing an interest payment on Borrower X's loan |

| Count | Defendants | Date | Financial Transaction |
|-------|-----------|------|----------------------|
| 29 | **JACOB KINGSTON LEV DERMEN** | 4/15/15 | $70,000 wire transfer for the benefit of SBK Holdings USA, Inc., representing an interest payment on Borrower X's loan |
| 30 | **LEV DERMEN** | 04/23/15 | $1,000,000 withdrawal from an account related to Borrower X to an SBK Holdings USA, Inc. account |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### Counts 31 and 32
### 18 U.S.C. § 1956(a)(1)(B)(i)
### (Money Laundering)

41.     Paragraphs 1-4, 7-8, 12-17, and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

### Purchase of Real Property at 2072 East Creek Road

42.     In August 2013, Defendants JACOB KINGSTON, ISAIAH KINGSTON, and LEV DERMEN used proceeds of the Mail Fraud Scheme to purchase the real property at 2072 East Creek Road, Sandy, Utah, as follows:

a.     On or about April 8, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $8,859,520, to be deposited into Washakie account #4874 at the Bank of Utah;

b.     On or about May 24, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $11,872,884, to be deposited into Washakie account #4874;

c.     On or about May 28, 2013, Defendant JACOB KINGSTON caused $15 million to be transferred from Washakie account #4874 to Merrill Lynch account #2117;

d.     On or about June 5, 2013, Defendant JACOB KINGSTON issued and

signed a $3 million check payable to Noil Energy Group from loan account #1352 at Merrill Lynch, which account was secured by account #4821 at Merrill Lynch;

       e.    On or about June 7, 2013, Defendant JACOB KINGSTON caused $15,000,123 to be transferred from Merrill Lynch #2117 to Defendant JACOB KINGSTON's personal account #4821 at Merrill Lynch;

       f.    On or about June 10, 2013, Defendant DERMEN caused a $3 million check from Defendant JACOB KINGSTON's Merrill Lynch account #1352 to be deposited into Noil Energy Group account #8583 at Bank of America;

       g.    On or about June 10, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $11,700,000, to be deposited into Washakie account #4874;

       h.    On or about June 13, 2013, Defendant JACOB KINGSTON caused $10 million to be transferred from Washakie account #4874 to Defendant JACOB KINGSTON's personal account #4821 at Merrill Lynch;

       i.    On or about June 17, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $11,400,000, to be deposited into Washakie account #4874;

       j.    On or about July 3, 2013, Defendant JACOB KINGSTON used $3,024,393 of funds from his personal account #4821 at Merrill Lynch to pay off the outstanding balance on his loan account #1352 at Merrill Lynch;

       k.    On or about July 29, 2013, Defendant JACOB KINGSTON signed a purchase contract listing "Noil Energy" as the buyer of the real property at 2072 East Creek Road, Sandy, Utah;

l.      On or about August 1, 2013, Defendants JACOB KINGSTON and

ISAIAH KINGSTON caused Washakie to wire transfer $50,000 from Washakie account #4874

to Meridian Title Company for the purchase of the real property at 2072 East Creek Road,

Sandy, Utah;

m.      On or about August 2, 2013, Defendants JACOB KINGSTON and

ISAIAH KINGSTON caused Washakie to wire transfer $675,034 from Washakie account #4874

to Meridian Title Company for the purchase of the real property at 2072 East Creek Road,

Sandy, Utah; and

n.      On or about August 5, 2013, Defendants JACOB KINGSTON and LEV

DERMEN caused $3,160,000 to be wire transferred from Noil Energy Group account #8583 to

Meridian Title Company for the purchase of the real property at 2072 East Creek Road, Sandy,

Utah.

### Statutory Allegations

43.      On or about the following dates, in the Central Division of the District of Utah

and elsewhere, defendants set forth in the table below, did knowingly conduct and attempt to

conduct financial transactions affecting interstate commerce, that is, causing funds to be wire

transferred in connection with the purchase of the real property at 2072 East Creek Road, Sandy,

Utah, which transactions involved the proceeds of specified unlawful activity, that is, the

proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341,

knowing that the transactions were designed in whole or in part to conceal and disguise the

nature, location, source, ownership, and control of the proceeds of said specified unlawful

activity, and that while conducting or attempting to conduct such transactions, knew that the

property involved in the transactions represented the proceeds of some form of unlawful activity,

with each of the following financial transactions constituting a separate count:

| Count | Defendant | Date | Financial Transaction |
|-------|-----------|------|-----------------------|
| 31 | JACOB KINGSTON ISAIAH KINGSTON | 08/02/13 | $675,034 wire transfer from Washakie to Meridian Title Company in connection with the purchase of the real property at 2072 East Creek Road |
| 32 | JACOB KINGSTON LEV DERMEN | 08/05/13 | $3,160,000 wire transfer from Noil Energy Group to Meridian Title Company in connection with the purchase of the real property at 2072 East Creek Road |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### Count 33
### 18 U.S.C. § 1957
### (Money Laundering)

The Grand Jury further charges:

44.    Paragraphs 1-4, 7-8, 12-17, and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

### Purchase of 2010 Bugatti Veyron

45.    In August 2013, Defendants JACOB KINGSTON and ISAIAH KINGSTON used proceeds of the Mail Fraud Scheme to purchase a 2010 Bugatti Veyron as follows:

a.    On or about March 27, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $20,283,659, to be deposited into Washakie account #4874 at the Bank of Utah;

b.    On or about March 27, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $4,406,041, to be deposited into Washakie account #4874;

c.    On or about April 8, 2013, Defendant JACOB KINGSTON caused funds representing fraud proceeds, that is, a U.S. Treasury check in the amount of $8,859,520, to be

deposited into Washakie account #4874;

        d.      On or about April 15, 2013, $10 million was transferred from Washakie account #4874 to UFS account #3850 at the Bank of Utah;

        e.      On or about April 15, 2013, Defendant ISAIAH KINGSTON caused the transfer of $10 million from UFS account #3850 to Merrill Lynch account #4805;

        f.      On or about July 23, 2013, $9,651,443 was transferred from Merrill Lynch account #4805 to UFS account #3850;

        g.      On or about July 25, 2013, $280,509 was transferred from Merrill Lynch account #4805 to UFS account #3850;

        h.      On or about July 29, 2013, Defendant ISAIAH KINGSTON caused $100,000 to be wire transferred from UFS account #3850 to Car Company A; and

        i.      On or about August 5, 2013, Defendant ISAIAH KINGSTON caused $1,720,000 to be wire transferred from UFS account #3850 to Car Company A.

### Statutory Allegations

    46.    On or about August 5, 2013, in the Central Division of the District of Utah and elsewhere,

### JACOB KINGSTON and
### ISAIAH KINGSTON,

defendants herein, did knowingly engage, and did aid, abet, counsel, command, induce, procure, and cause the engaging in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such transaction involving the wire transfer of $1,720,000 from UFS account #3850 at the Bank of Utah to Car Company A, in connection with the purchase of a 2010 Bugatti Veyron

automobile, such property having been derived from a specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341.

All in violation of Title 18, United States Code, Sections 1957 and 2.

### Counts 34 thru 38
### 18 U.S.C. § 1957
### (Money Laundering)

47.     Paragraphs 1-4, 7-8, 11-17, and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

### Laundering of Proceeds through Accounts of Order-Related Entities

48.     In December 2013, Defendants JACOB KINGSTON and ISAIAH KINGSTON transferred $6,208,906.72 of proceeds of the Mail Fraud Scheme to A-Fab Engineering. The Mail Fraud Scheme proceeds were cycled through and between the bank accounts of Order-related entities and $4,500,000 was returned to Washakie as follows:

    a.      On or about October 20, 2013, Defendant JACOB KINGSTON filed and caused to be filed a false Form 8849 claiming the biodiesel mixture tax credit in the amount of $33,581,899.

    b.      On or about November 12, 2013, Defendant JACOB KINGSTON caused funds representing proceeds of the Mail Fraud Scheme, that is, a U.S. Treasury check in the amount of $33,581,899, to be deposited into Washakie account #4874 at the Bank of Utah.

    c.      On or about November 17, 2013, Defendant JACOB KINGSTON filed and caused to be filed a false Form 8849 claiming the biodiesel mixture tax credit in the amount of $38,078,529.

    d.      On or about November 18, 2013, Defendant ISAIAH KINGSTON signed nine checks, totaling $6,208,906.72, made payable to A-Fab Engineering and drawn on

Washakie account #4874.

     e.     On or about November 20, 2013, one of the checks described above in (d), signed by ISAIAH KINGSTON, in the amount of $563,121.55, drawn on Washakie account #4874, was deposited into A-Fab Engineering account #5323 at the Bank of Utah.

     f.     On or about November 25, 2013, three of the checks described above in (d), signed by ISAIAH KINGSTON, totaling $1,480,645.52, drawn on Washakie account #4874, were deposited into A-Fab Engineering account #5323.

     g.     On or about November 29, 2013, $802,776.27 was transferred, by two checks, from A-Fab Engineering account #5323 to Standard Industries account #6282 at the Bank of Utah.

     h.     On or about December 2, 2013, Defendant JACOB KINGSTON caused funds representing proceeds of the Mail Fraud Scheme, that is, a U.S. Treasury check in the amount of $38,078,529, to be deposited into Washakie account #4874.

     i.     On or about December 2, 2013, five of the nine checks described above in (d) signed by ISAIAH KINGSTON totaling $4,165,139.65, drawn on Washakie account #4874, were deposited into A-Fab Engineering account #5323.

     j.     On or about December 9, 2013, $3,909,202.72 was transferred, by check, from A-Fab Engineering account #5323 to Fidelity Funding account #1212 at the Bank of Utah.

     k.     On or about December 9, 2013, $3,891,773.79 was transferred, by check, from Fidelity Funding account #1212 to Latter Day Church of Christ account #4777 at the Bank of Utah.

     l.     On or about December 9, 2013, $802,776.27 was transferred, by check, from Standard Industries account #6282 to Latter Day Church of Christ account #4777.

m. On or about December 10, 2013, $4,500,509.23 was transferred, by wire, from Latter Day Church of Christ account #4777 to Equitable Funding account #1541 at the Nevada State Bank.

n. On or about December 10, 2013, $4,500,000 was transferred, by check, from Equitable Funding account #1541 to Washakie account #4874.

o. In or about December 2013, the $4,500,000 deposit to Washakie account #4874 from Equitable Funding account #1541 was recorded on the books of Washakie as funds received from Alliance Investments.

### Statutory Allegations

49. On or about the date set forth below, in the Central Division of the District of Utah and elsewhere,

### JACOB KINGSTON and
### ISAIAH KINGSTON,

defendants herein, did knowingly engage, and did aid, abet, counsel, command, induce, procure, and cause the engaging in the following monetary transactions by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such transaction involving the following transfers, withdrawals, and deposits of funds, such property having been derived from a specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341, each such monetary transaction constituting a separate count of this Indictment:

| Count | Defendant | Date | Monetary Transaction |
|-------|-----------|------|----------------------|
| 34 | JACOB KINGSTON ISAIAH KINGSTON | 12/02/13 | $734,629.62 check deposit from Washakie account #4874 to A-Fab Engineering account #5323, both at the Bank of Utah |
| 35 | JACOB KINGSTON ISAIAH KINGSTON | 12/02/13 | $792,558.34 check deposit from Washakie account #4874 to A-Fab Engineering account #5323, both at the Bank of Utah |
| 36 | JACOB KINGSTON ISAIAH KINGSTON | 12/02/13 | $834,873.73 check deposit from Washakie account #4874 to A-Fab Engineering account #5323, both at the Bank of Utah |
| 37 | JACOB KINGSTON ISAIAH KINGSTON | 12/02/13 | $845,693.29 check deposit from Washakie account #4874 to A-Fab Engineering account #5323, both at the Bank of Utah |
| 38 | JACOB KINGSTON ISAIAH KINGSTON | 12/02/13 | $957,384.67 check deposit from Washakie account #4874 to A-Fab Engineering account #5323, both at the Bank of Utah |

All in violation of Title 18, United States Code, Sections 1957 and 2.

### Counts 39 through 41
### 18 U.S.C. § 1957
### (Money Laundering)

50.     Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

51.     On or about the date set forth below, in the Central Division of the District of Utah and elsewhere, defendants set forth in the table below, did knowingly engage, and did aid, abet, counsel, command, induce, procure, and cause the engaging in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such transaction involving the following transfers of funds, such property having been derived from a specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341:

| Count | Defendant | Date | Monetary Transaction |
|-------|-----------|------|----------------------|
| 39 | JACOB KINGSTON ISAIAH KINGSTON | 3/12/14 | $10,000,000 wire transfer to Jacob Kingston account at Garanti Bank, Turkey |
| 40 | JACOB KINGSTON ISAIAH KINGSTON RACHEL KINGSTON | 12/14/15 | $2,100,000 wire transfer to Jacob Kingston account at Garanti Bank, Turkey |
| 41 | JACOB KINGSTON ISAIAH KINGSTON RACHEL KINGSTON | 12/28/15 | $6,900,000 wire transfer to Jacob Kingston account at Garanti Bank, Turkey |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Count 42
## 18 U.S.C. § 1957
## (Money Laundering)

52.  Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

53.  On or about the date set forth below, in the Central Division of the District of Utah and elsewhere,

**JACOB KINGSTON,**
**ISAIAH KINGSTON, and**
**LEV ASLAN DERMEN,**
**a/k/a Levon Termendzhyan,**

defendants herein, did knowingly engage, and did aid, abet, counsel, command, induce, procure, and cause the engaging in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such transaction involving the following transfers of funds, such property having been derived from a specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341:

44

| Count | Defendant | Date | Monetary Transaction |
|-------|-----------|------|----------------------|
| 42 | JACOB KINGSTON ISAIAH KINGSTON LEV ASLAN DERMEN | 03/05/14 | $483,000 wire transfer to Levon Termendzhyan account at Garanti Bank, Turkey for "VAT of the waterside house (mansion)" |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Count 43
### 18 U.S.C. § 1957
### (Money Laundering)

54.      Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

55.      On or about the date set forth below, in the Central Division of the District of Utah and elsewhere,

### LEV ASLAN DERMEN,
### a/k/a Levon Termendzhyan,

defendant herein, did knowingly engage, and did aid, abet, counsel, command, induce, procure, and cause the engaging in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such transaction involving the following transfers of funds, such property having been derived from a specified unlawful activity, that is, the proceeds of the Mail Fraud Scheme, in violation of Title 18, United States Code, Section 1341:

| Count | Defendant | Date | Monetary Transaction |
|-------|-----------|------|----------------------|
| 43 | LEV DERMEN | 3/26/15 | $3,520,085 wire from SBK Holdings USA, Inc. to Title 365 Company for the purchase of a residence at 16572 Somerset Lane, Huntington Beach, California |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Count 44
## 18 U.S.C. § 1512(k)
## (Conspiracy to Commit Obstruction of Justice Offenses)

56.     Paragraphs 1-17 and 19-22 are incorporated by reference and re-alleged as though fully set forth herein.

57.     Starting no later than in or about October 2014, Defendants JACOB KINGSTON and ISAIAH KINGSTON, and co-conspirators known and unknown to the grand jury, learned that a federal grand jury investigation had been initiated in the District of Utah.

58.     On or about February 4, 2016, Special Agents of the Internal Revenue Service assigned to the federal grand jury investigation of Washakie, applied for and obtained warrants, signed by a U.S. Magistrate Judge of the District Court of Utah, which authorized the agents to search the premises of the following locations, as well as other locations related to the Order:

    a.    the Washakie/UFS offices located at

        i.  Suite 100 at 3950 South 700 East, Salt Lake City, Utah;

        ii.  Suites 200/202 at 3950 South 700 East, Salt Lake City, Utah;

        iii.  Suite 300, 670 East 3900 South, Salt Lake City, Utah; and

    b.    the residence of Jacob Kingston located at 2072 East Creek Rd., Sandy, Utah; and

    c.    the Century Office building located at 10 and 20 W. Century Park Way, Salt Lake City, Utah.

The warrants also authorized the agents to seize various types of evidence relevant to, among other things, the investigation into the Claims for Refund, Forms 8849, filed by Washakie, and the refunds of renewable fuel tax credits that were paid to Washakie by the IRS.

59.     On or about February 8, 2016, Special Agents of the Environmental Protection Agency assigned to the federal grand jury investigation of Washakie applied for and obtained warrants, signed by a U.S. Magistrate Judge of the District Court of Utah, which authorized the

agents to search the same premises listed above in Paragraphs 58(a) and 58(b), and one other location, and to seize numerous and various types of evidence relevant to, among other things, the investigation into the Claims for Refund, Forms 8849, filed by Washakie, and the refunds of renewable fuel tax credits that were paid to Washakie by the IRS.

60.     On February 10, 2016, Special Agents of the Internal Revenue Service and the Environmental Protection Agency both executed their respective warrants.

### The Conspiracy

61.     From at least in or about October 2014 through at least in or about May 2017, in the Central Division of the District of Utah, and elsewhere,

### JACOB KINGSTON and ISAIAH KINGSTON,

defendants herein, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to:

a.      use physical force or the threat of physical force, with the intent to influence, delay, or prevent the testimony of any person in an official proceeding; cause or induce any person to withhold testimony and withhold documents from an official proceeding or be absent from an official proceeding to which that person had been summoned; and hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission or possible commission of a Federal offense, in violation of 18 U.S.C. § 1512(a)(2); and

b.      corruptly alter, destroy, mutilate and conceal, a record, document, and other object, with the intent to impair the object's integrity and availability for use in an official proceeding in violation of 18 U.S.C. § 1512(c)(1); and

c.      corruptly obstruct, influence, and impede any official proceeding, in

violation of 18 U.S.C. § 1512(c)(2).

## Manner and Means

62.    Among the manner and means by which the defendants and their co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.    They provided fake and false records in response to grand jury subpoenas.

b.    They informed other co-conspirators of the upcoming execution of the search warrants and advised them to get prepared.

c.    They discussed code words to be used in the event of a search warrant.

d.    They falsely told Washakie and UFS employees they had uncovered a mold problem at Washakie's offices at Suite 300, 670 East 3900 South, Salt Lake City, Utah.

e.    They instructed employees of both Washakie and UFS not to report to work at Suite 300 and to instead report to Suite 100 at 3950 South 700 East, Salt Lake City, Utah.

f.    They accessed Suite 300 when other employees were not present.

g.    They removed the hard drives of computers in Suite 300.

h.    They replaced the hard drives of computers in Suite 300.

i.    They destroyed and removed records and data from Suite 300 that they believed would be subject to the search warrants.

j.    They caused records, documents, computers and objects to be altered, destroyed, concealed, and mutilated at the Century Office building at 10 W. Century Park Way, Salt Lake City, the business location of many of the Order-related entities.

k.    They used the agreed-upon code words to alert co-conspirators on the day the search warrants were executed by federal agents.

l.    They instructed co-conspirators not to talk to government agents.

m.    They provided "burner" phones to other co-conspirators to discuss the government investigation.

n.    They used "burner" phones to discuss the government investigation.

o.    They communicated via text messages using "Whatsapp," an end-to-end encrypted messaging service.

p.    They solicited information regarding the ongoing grand jury investigation from Individual #1, whom they believed had contacts within the United States government.

q.    They communicated in code with Individual #1 about bribing government officials to destroy evidence and to interfere with an ongoing investigation.

r.    They withdrew cash from various bank accounts for the purpose of paying cash bribes.

s.    They paid cash to Individual #1 for the purpose of bribing "Commissioner Gordon," aka "CG," whom Individual #1 claimed to be a high-level Department of Justice official.

t.    They paid cash to Individual #1 for the purpose of bribing other law enforcement agents, attorneys and judges.

u.    They communicated with Individual #1 about his and others' purported review of investigative records, destruction of evidence, and "erasing" of the investigation.

v.    They communicated in code with Individual #1 about hiring enforcers to harm and intimidate witnesses.

w.    They directed Individual #1 to hire "Beto" aka "OTEB" and others to intimidate, threaten, and physically injure at least three witnesses.

x.      They paid cash to Individual #1 for the purpose of paying "Beto" aka "OTEB" and associates to intimidate, threaten, and physically injure at least three witnesses.

y.      They provided Individual #1 with the home address of at least one witness for the purpose of intimidating, threatening, and physically injuring the witness.

All in violation of Title 18, United States Code, Sections 1512(k).

**Count 45**
**18 U.S.C. § 1512(c)(1)**
**(Destroying and Concealing Records and Objects)**

63.     Paragraphs 1-5 and 57-60 are incorporated by reference and re-alleged as though fully set forth herein.

64.     On or about February 10, 2016, in the Central Division of the District of Utah and elsewhere,

**JACOB KINGSTON,**
**ISAIAH KINGSTON, and**
**RACHEL KINGSTON,**

defendants herein, did corruptly alter, destroy, mutilate or conceal, a record, document, or other object, and attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, to wit, by removing, or causing to be removed, the hard drives from their computers located at Suite 300, 670 East 3900 South, Salt Lake City, Utah, the offices of UFS and Washakie employees.

All in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

**Count 46**
**18 U.S.C. § 1512(a)(2)**
**(Tampering with a Witness)**

65.     Paragraphs 1-4 and 57-60 are incorporated by reference and re-alleged as though fully set forth herein.

66.     In or about November, 2016 through in or about January 2017, in the Central Division of the District of Utah and elsewhere,

**JACOB KINGSTON and**
**ISAIAH KINGSTON,**

defendants herein, did intentionally attempt to use physical force or the threat of physical force against a witness with the intent to:

        a.      influence, delay, or prevent the testimony of that witness in an official proceeding; and

        b.      cause or induce that witness to (i) withhold testimony or withhold documents from an official proceeding; or (ii) be absent from an official proceeding; or (iii) hinder, delay, or prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a Federal offense;

67.     Defendants JACOB KINGSTON and ISAIAH KINGSTON did commit this crime by, among other things, doing the following:

        a.      On or about November 3, 2016, defendant ISAIAH KINGSTON withdrew cash from a Washakie bank account at a Wells Fargo branch in the Olympus Hills section of Salt Lake City.

        b.      On or about November 4, 2016, Defendant JACOB KINGSTON sent a text message using WhatsApp to Individual #1 regarding a potential government witness: "Let's get Beto up his ass. See how he likes that."

    c.     On or about November 6, 2016, Defendant JACOB KINGSTON paid cash, or caused cash to be paid to Individual #1.

    d.     On or about November 13, 2016, Individual #1 sent a message via WhatsApp to Defendant JACOB KINGSTON: "And our friend in Fl has a meeting in front of you know who on Dec 5."

    e.     On November 18, 2016, JACOB KINGSTON told Person 1: "Send oteb where ever he needs to be. I'll cover you separate for that."

    f.     On November 18, 2016, Defendant JACOB KINGSTON sent a text message using WhatsApp to Individual #1 regarding a potential government witness: "Bird needs a visit too."

    g.     On or about November 20, 2016, Defendant JACOB KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
| --- | --- |
| Individual #1: | OTEB is leaving at 5 am to imaim |
| JACOB KINGSTON: | Ok. Pics? |
| Individual #1: | ?? |
| JACOB KINGSTON: | Of the bird. |
| Individual #1: | I told him |
| Individual #1: | He is getting his own paisanos to do it |
| JACOB KINGSTON: | Ok |

    h.     On or about November 23, 2016, Defendant JACOB KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
|---|---|
| JACOB KINGSTON: | How is bird? |
| Individual #1: | Working on it. |

     i.     On or about November 26, 2016, Defendant JACOB KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
|---|---|
| Individual #1: | OTEB finally his paisanos located the bird |
| Individual #1: | I need to send hi after to meet the dog lover. And his trainer. |
| JACOB KINGSTON: | Nice |

     j.     On or about November 28, 2016, Defendant JACOB KINGSTON sent a text message using WhatsApp to Individual #1 "How's bird?"

     k.     On or about December 1, 2016, Defendant JACOB KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
|---|---|
| JACOB KINGSTON: | Does the bird still fly? |
| Individual #1: | Don't think so OTEB is calling me at 1 |
| Individual #1: | Thank you for believing in me and for trusting me and most important for saving our asses and being able to get this off the ground tomorrow. Get ready. |
| JACOB KINGSTON: | Thanks for saving mine |

     l.     On or about December 2, 2016, Defendant JACOB KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
|---|---|
| JACOB KINGSTON: | Any news on bird? |
| Individual #1: | Bird is taken care of |
| JACOB KINGSTON: | How bad? |
| Individual #1: | Bad as in he can't make Monday's thingy thingy |
| JACOB KINGSTON: | He can't or won't? |
| Individual #1: | Won't period |
| JACOB KINGSTON: | Does he know why? |
| Individual #1: | Dude I am pretty sure they don't give details just make it very clear that if the bird sings it's very bad next time he falls will be for good |
| JACOB KINGSTON: | Hmm. That's a shame. :/ |

     m.     On or about January 25, 2017, Defendant JACOB KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
|---|---|
| JACOB KINGSTON: | I left 10lb of dog food w Isaiah |
| | . . . |
| Individual #1: | Did you only leave that? 10lbs that's what was owed from the delivery of the birdcage plus he has to buy the dog food for the dog lover. Plus CG needs me to take care of the UT guys. And that I will ask him because I don't know and do not want to insult him. |

     n.     On or about January 26, 2017, Defendant ISAIAH KINGSTON met and paid cash to Individual #1.

     o.     On or about January 26, 2017, Defendant ISAIAH KINGSTON had the following WhatsApp exchange in text messages with Individual #1:

| Sender | Message |
|---|---|
| Individual #1: | Isaiah did you talk to Jacob i have to take care of OTEB by 4 let me know please. We should be done by 230 here. Thank you nice to see you again. |
| ISAIAH KINGSTON: | I havnt yet. Did he ever respond to you? |
| ISAIAH KINGSTON: | How much food do they need? |
| Individual #1: | Yes he thought it was 2 but it's 3 and OTEB |
| Individual #1: | I have to say that I felt so bad about your mom dude I will talk to the CG to get her out of this crap she doesn't need this BS so much hate tell her I said hello |
| ISAIAH KINGSTON: | I will. Thank you so much for all you do. |
| ISAIAH KINGSTON: | So you need 1or 2 more? |
| Individual #1: | 2 more I will have him work on Your moms thing what's the full name |
| ISAIAH KINGSTON: | Rachel Ann Kingston |

All in violation of Title 18, United States Code, Sections 1512(a)(2) and 2.

## NOTICE OF INTENT TO SEEK FORFEITURE

The Grand Jury further charges:

1.      Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of

any offense in violation of 18 U.S.C. § 1349, as set forth in this Indictment, the Defendants

JACOB KINGSTON, ISAIAH KINGSTON, LEV ASLAN DERMEN, a/k/a Levon

Termendzhyan, RACHEL KINGSTON, and SALLY KINGSTON shall forfeit to the United

States of America any property, real or personal, that constitutes or is derived from proceeds

traceable to the conspiracy.  The property to be forfeited includes, but is not limited to, the

following:

      a.      The physical plant once known as Washakie Renewable Energy, LLC,

located at 7550 W 24000 N Plymouth, Utah, and all the equipment installed therein, and affixed

thereto;

      b.      Real property located at:

       i. 2072 East Creek Road, Sandy, UT;
       ii. 16572 Somerset Lane, Huntington Beach, CA;
       iii. 4400 S 700 E, Salt Lake City, UT;
       iv. 4829 S. 3960 W., Taylorsville, UT;
       v. 4271 South 1300 East, Salt Lake City, UT;
       vi. 1415 W. Crystal Ave., Salt Lake City, UT;
       vii. 13 Acres FM 511 @ FM 1847, Brownsville, TX;
       viii. Parcel #07-090-0002 Box Elder County, UT;
       ix. Parcel #07-037-0001 Box Elder County, UT;
       x. Parcel #08-041-0004 Box Elder County, UT;
       xi. Parcel #08-041-0019 Box Elder County, UT;
       xii. Parcel #08-041-0020 Box Elder County, UT;
       xiii. Parcel #08-041-0025 Box Elder County, UT;
       xiv. Parcel #08-041-0026-28 Box Elder County, UT;
       xv. Parcel #08-042-0018 Box Elder County, UT
       xvi. Parcel #08-045-0005 Box Elder County, UT;
       xvii. Parcel #08-052-0008 Box Elder County, UT;
       xviii. 2973 W Mackay Meadows PL, Salt Lake City, UT;
       xix. 2338 S 1360 W, Salt Lake City, UT;

    c.     2010 Bugatti Veyron with the following Vehicle Identification Number

("VIN") VF9SC2C23AM795205;

    d.     2015 Lamborghini Aventador with the following VIN:

ZHWUR1ZD2FLA03759;

    e.     2008 Lamborghini Murcielago with the following VIN:

ZHWBU37S78LA02905;

    f.     2007 Ferrari 599 with the following VIN: ZFFFC60A070156760;

    g.     Six Kenworth T660 trucks with the following VINs:

      i.  1XKAD49X9EJ418286;
     ii.  1XKAD49X9EJ418287;
    iii.  1XKAD49X9EJ418406;
    iv.  1XKAD49X9EJ418407;
     v.  1XKAD49X9EJ417967;
    vi.  1XKAD49X9EJ423229;

    h.     Any and all investments made using proceeds, and any gains from those

investments, including investments in Mobstar, Vision Financial Markets, LLC, Set-App, and

Biopharma, including investments by SBK Holdings USA, Inc., and SBK Holding AS in Turkey,

and including investments through accounts at Merrill Lynch;

    i.     The outstanding balance of the loan owed by Borrower X to SBK

Holdings USA, Inc.; and

      i.  Any and all interest payments made or owed by Borrower X

     ii.  Any and all principal payments made or owed by Borrower X; and

    j.     A MONEY JUDGMENT equal to the value of any property, real or

personal, constituting or derived from proceeds traceable to the conspiracy and not available for

forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons

listed in 21 U.S.C. § 853(p).

2.      Pursuant to 21 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. §§ 1956 and 1957, the Defendants JACOB KINGSTON, ISAIAH KINGSTON, LEV ASLAN DERMEN, a/k/a Levon Termendzhyan, RACHEL KINGSTON, and SALLY KINGSTON shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

      a.      The physical plant once known as Washakie Renewable Energy, LLC, located at 7550 W 24000 N Plymouth, Utah, and all the equipment installed therein, and affixed thereto;

      b.      Real property located at:

      i.      2072 East Creek Road, Sandy, UT;
      ii.      16572 Somerset Lane, Huntington Beach, CA;
      iii.      4400 S 700 E, Salt Lake City, UT;
      iv.      4829 S. 3960 W., Taylorsville, UT;
      v.      4271 South 1300 East, Salt Lake City, UT;
      vi.      1415 W. Crystal Ave., Salt Lake City, UT;
      vii.      13 Acres FM 511 @ FM 1847, Brownsville, TX;
      viii.      Parcel #07-090-0002 Box Elder County, UT;
      ix.      Parcel #07-037-0001 Box Elder County, UT;
      x.      Parcel #08-041-0004 Box Elder County, UT;
      xi.      Parcel #08-041-0019 Box Elder County, UT;
      xii.      Parcel #08-041-0020 Box Elder County, UT;
      xiii.      Parcel #08-041-0025 Box Elder County, UT;
      xiv.      Parcel #08-041-0026-28 Box Elder County, UT;
      xv.      Parcel #08-042-0018 Box Elder County, UT
      xvi.      Parcel #08-045-0005 Box Elder County, UT;
      xvii.      Parcel #08-052-0008 Box Elder County, UT;
      xviii.      2973 W Mackay Meadows PL, Salt Lake City, UT;
      xix.      2338 S 1360 W, Salt Lake City, UT;

      c.      2010 Bugatti Veyron with the following Vehicle Identification Number ("VIN") VF9SC2C23AM795205;

      d.      2015 Lamborghini Aventador with the following VIN:

ZHWUR1ZD2FLA03759;

      e.     2008 Lamborghini Murcielago with the following VIN:

ZHWBU37S78LA02905;

      f.     2007 Ferrari 599 with the following VIN: ZFFFC60A070156760;

      g.     Six Kenworth T660 trucks with the following VINs:

        i.   1XKAD49X9EJ418286;
       ii.   1XKAD49X9EJ418287;
     iii.   1XKAD49X9EJ418406;
     iv.   1XKAD49X9EJ418407;
      v.   1XKAD49X9EJ417967;
     vi.   1XKAD49X9EJ423229;

      h.     Any and all investments made using proceeds, and any gains from those investments, including investments in Mobstar, Vision Financial Markets, LLC, Set-App, and Biopharma, including investments by SBK Holdings USA, Inc., and SBK Holding AS in Turkey, and including investments through accounts at Merrill Lynch;

      i.     The outstanding balance of the loan owed by Borrower X to SBK Holdings USA, Inc.; and

        i.   Any and all interest payments made or owed by Borrower X

       ii.   Any and all principal payments made or owed by Borrower X; and

      j.     A MONEY JUDGMENT equal to the value of all property involved in the money laundering and not available for forfeiture for one or more of the reasons listed in 21 U.S.C. § 853(p) as a result of any act or omission of the defendant(s).

## SUBSTITUTE ASSETS

     If any of the property described above, as a result of any act or omission of the defendant(s):

a.     cannot be located upon the exercise of due diligence,

b.     has been transferred or sold to, or deposited with, a third party,

c.     has been placed beyond the jurisdiction of the court,

d.     has been substantially diminished in value, or

e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p) and 18 U.S.C. § 982(b).

GRAND JURY'S PROBABLE CAUSE FINDING REGARDING FORFEITURE

The grand jury finds probable cause to believe that the listed defendants have committed the crimes specified in the above forfeiture notice and that the above properties listed for forfeiture 1) constitute or are derived from proceeds traceable to the mail fraud conspiracy, or 2) are connected to the money laundering crimes as property involved in such crimes or property traceable to the property involved in such crimes.

A TRUE BILL:

_____/S_____

FOREPERSON OF THE GRAND JURY

APPROVED:

JOHN W. HUBER
United States Attorney

_Richard M. Rolwing_

RICHARD M. ROLWING
Special Assistant United States Attorney