## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| YALCIN AYASLI,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>SEZGIN BARAN KORKMAZ, KAMIL<br>FERIDUN OZKARAMAN, FATIH AKOL,<br>SBK HOLDINGS ANONIM SIRKETI, SBK<br>HOLDINGS, USA, INC., BUGARAJ<br>ELEKTRONIK TICARET VE BILISIM<br>HIZMETLERI ANONIM SIRKETI, and<br>MEGA VARLIK YONETIM ANONIM<br>SIRKETI,<br><br>　　　　　Defendants. | Civil Action No. 19-cv-00183-JL |

DEFENDANTS SEZGIN BARAN KORKMAZ, SBK HOLDING A.S., AND BUGARAJ
ELEKTRONIK TICARET VE BILISIM HIZMETLERI A.S.'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS FOR *FORUM NON CONVENIENS* AND LACK OF
PERSONAL JURISDICTION

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     THE ALLEGATIONS IN THE COMPLAINT.................................................4

III.    THE LITIGATION IN TURKEY .....................................................................7

        A.      Ayasli's Criminal Complaint Against The Korkmaz Defendants..................9

IV.     THE BORAJET AGREEMENT'S FORUM SELECTION CLAUSE IS VALID
        AND ENFORCEABLE.....................................................................................11

        A.      The BoraJet Agreement's Forum-Selection Clause Is Mandatory ...............11

        B.      The Scope Of The BoraJet Agreement  Covers The Claims In This Lawsuit ...........14

        C.      The BoraJet Agreement's Forum Selection Clause Satisfies The *Bremen*
                Factors.........................................................................................17

V.      THE *FORUM NON CONVENIENS* ANALYSIS.........................................19

        A.      The Traditional *Forum Non Conveniens* Analysis ....................................19

        B.      The *Atlantic Marine* Analysis .............................................................20

VI.     *ATLANTIC MARINE*'S STREAMLINED *FORUM NON CONVENIENS*
        ANALYSIS REQUIRES DISMISSAL OF THIS CASE...................................21

VII.    THE TRADITIONAL *FORUM NON CONVENIENS* ANALYSIS ALSO
        REQUIRES DISMISSAL OF THIS CASE.....................................................24

        A.      Ayasli's Choice of Forum Is Due No Deference..........................................24

        B.      Turkey Is An Available Alternative Forum ..............................................26

        C.      The Private Interest Factors Favor Turkey ..............................................27

VIII.   THE COURT HAS NO PERSONAL JURISDICTION OVER THE KORKMAZ
        DEFENDANTS...............................................................................................29

        A.      There Is No General Jurisdiction Over The Korkmaz Defendants.............30

        B.      There Is No Specific Jurisdiction Over The Korkmaz Defendants Under
                RICO Or The New Hampshire Long Arm Statute.......................................31

                1.      Ayasli's Alleged Harm Does Not Arise Out Of Or Relate To
                        Korkmaz's New Hampshire-Related Conduct..................................32

2.      Korkmaz Did Not Purposefully Direct His Conduct Into New Hampshire................................................................................................34

C.      There Is No Specific Jurisdiction Over The Korkmaz Defendants Under Rule 4(k)(2) ....................................................................................................37

D.      Requiring the Korkmaz Defendants To Appear In Court In New Hampshire Would Offend Fair Play And Substantial Justice............................................38

IX.     CONCLUSION ..............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Corp. v. All Am. Plumbing, Inc.,*
    812 F.3d 54 (1st Cir. 2016) ......................................................................... 34, 36

*Adams v. Raintree Vacation Exch., LLC,*
    702 F.3d 436 (7th Cir. 2012)............................................................................... 11

*Androb Jewelry Serv., Inc. v. Malca-Amit USA, LLC,*
    No. 16-CV-5171 (AJN), 2017 WL 4712422 (S.D.N.Y. Sept. 25, 2017)...........17

*Argueta v. Banco Mexicano, S.A.,*
    87 F.3d 320 (9th Cir. 1996).................................................................................18

*Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas,*
    571 U.S. 49 (2013)...............................................................................11, 20, 21, 24

*Autoridad de Energia Electrica de Puerto Rico v. Vitol S.A.,*
    859 F.3d 140 (1st Cir. 2017) ................................................................... 12, 14, 15

*Black Hills Truck & Trailer, Inc. v. MAC Trailer Mfg., Inc.,*
    No. CIV. 13-4113-KES, 2014 WL 5782452 (D.S.D. Nov. 6, 2014) .................11

*Blixseth v. Disilvestri,*
    No. 11-22459-CIV, 2013 WL 12063940 (S.D. Fla. Jan. 31, 2013)....................16

*BNSF Ry. Co. v. Tyrrell,*
    137 S. Ct. 1549 (2017) .......................................................................................30

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty.,*
    137 S.Ct. 1773 (2017)........................................................................................32

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)...................................................................................... 31, 39

*Calder v. Jones,*
    465 U.S. 783 (1984)............................................................................................36

*Cameron v. X-Ray Prof'l Ass'n,*
    No. 16-CV-343-LM, 2017 WL 680388 (D.N.H. Feb. 21, 2017).......... 11, 17, 19

*Chase v. Dorais,*
    122 N.H. 600 (1982) ...........................................................................................19

*Ciro Energy Partners, LLC v. Torres-Torres,*
    No. CIV. 12-1917 GAG, 2013 WL 6628139 (D.P.R. Dec. 12, 2013)................................16

*Claudio-De Leon v. Sistema Universitario Ana G. Mendez,*
    775 F.3d 41 (1st Cir. 2014) ........................................................................ 11, 18

*Cossaboon v. Maine Med. Ctr.,*
    600 F.3d 25 (1st Cir. 2010) ........................................................................ 31, 36

*CR Assocs. L.P. v. Sparefoot, Inc.,*
    No. CV 17-10551-LTS, 2018 WL 988056 (D. Mass. Feb. 20, 2018) ................................16

*Crescent Int'l, Inc.,*
    857 F.2d 943 (3d Cir. 1988) .................................................................................16

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014)............................................................................................30

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London,*
    940 F. Supp. 528 (S.D.N.Y. 1996) ......................................................................28

*Fla. Polk Cty. v. Prison Health Servs., Inc.,*
    170 F.3d 1081 (11th Cir. 1999) ..........................................................................13

*Flanagan v. Midstream Partners, L.P.,*
    No. 17-CV-315-GKF-JFJ, 2017 WL 4324535 (N.D. Okla. Sept. 28, 2017) ...................16

*Flynn v. Nat'l Asset Mgmt. Agency,*
    42 F. Supp. 3d 527 (S.D.N.Y. 2014)...........................................................22, 25, 27

*GDG Acquisitions, LLC v. Gov't of Belize,*
    749 F.3d 1024 (11th Cir. 2014) ...........................................................................11

*Get In Shape Franchise, Inc. v. Caldwell,*
    No. CV 15-13118-NMG, 2016 WL 11002219 (D. Mass. Feb. 18, 2016) .........................20

*Howe v. Goldcorp Investments, Ltd.,*
    946 F.2d 944 (1st Cir. 1991) .........................................................................25, 27, 29

*Huffington v. T.C. Grp., LLC,*
    637 F.3d 18 (1st Cir. 2011) ...........................................................15, 16, 18, 19

*Imamura v. Gen. Elec. Co.,*
    371 F. Supp. 3d 1 (D. Mass. 2019) ................................................................27, 29

*In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,*
    311 F.3d 488, 498 (2d Cir. 2002) ........................................................................24

*Interface Partners Int'l Ltd. v. Hananel,*
  575 F.3d 97 (1st Cir. 2009) ........................................................................*passim*

*Iragorri v. Int'l Elevator, Inc.,*
  203 F.3d 8 (1st Cir. 2000) ......................................................................... 19, 24

*Keeton v. Hustler Magazine, Inc.,*
  465 U.S. 770 (1984) ................................................................................................32

*In re Lac Megantic Train Derailment Litig.,*
  210 F. Supp. 3d 218 (D. Me. 2016) ........................................................... 22, 23

*Lambert v. Kysar,*
  983 F.2d 1110 (1st Cir. 1993) ..................................................................... 15, 17

*LaSala v. Bank of Cyprus Public Co. Ltd.,*
  510 F. Supp. 2d 246 (2007) .................................................................. 22, 27, 28

*Lazare Kaplan Int'l Inc. v. KBC Bank N.V.,*
  337 F. Supp. 3d 274 (S.D.N.Y. 2018) ...............................................16, 22, 24, 26

*LFC Lessors, Inc. v. Pac. Sewer Maint. Corp.,*
  739 F.2d 4 (1st Cir. 1984) ...............................................................................14

*Lipcon v. Underwriters at Lloyd's, London,*
  148 F.3d 1285 (11th Cir. 1998) ...................................................................19

*Lueck v. Sundstrand Corp.,*
  236 F.3d 1137 (9th Cir. 2001) ....................................................................27

*M/S Bremen v. Zapata Off-Shore Co.,*
  407 U.S. 1 (1972) .................................................................................... 11, 17

*MARPOR Corp. v. DFO, LLC,*
  No. CIV. 10-1312 PG, 2010 WL 4922693 (D.P.R. Dec. 2, 2010) ....................18

*Martinez v. Bloomberg LP,*
  740 F.3d 211 (2d Cir. 2014) ...................................................................... 12, 14

*Mercier v. Sheraton Int'l, Inc.,*
  981 F.2d 1345 (1st Cir. 1992) ..................................................................*passim*

*In re Mercurio,*
  402 F.3d 62 (1st Cir. 2005) .............................................................................18

*MSPA Claims 1, LLC v. Covington Specialty Ins. Co.,*
  No. 18-CV-830-JL, 2019 WL 1300860 (D.N.H. Mar. 21, 2019) (LaPlante, J.).....................15, 26

*Noonan v. Winston Co.,*
    135 F.3d 85 (1st Cir. 1998) ...................................................................................36

*Philipps v. Talty,*
    555 F. Supp. 2d 265 (D.N.H. 2008) ............................................................... 23, 28

*Phillips Exeter Acad. v. Howard Phillips Fund,*
    196 F.3d 284 (1st Cir. 1999) ........................................................................... 28, 31

*Platten v. HG Bermuda Exempted Ltd.,*
    437 F.3d 118 (1st Cir. 2006) ...............................................................................38

*Plixer Int'l, Inc. v. Scrutinizer GmbH,*
    905 F.3d 1 (1st Cir. 2018) ............................................................................... 29, 30

*PT United Can Co. v. Crown Cork & Seal Co.,*
    138 F.3d 65 (2d Cir. 1998) .......................................................................... 29, 30, 31

*Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.,*
    No. 11-CV-05801 DLI VVP, 2012 WL 3746220 (E.D.N.Y. Aug. 27, 2012) ...................23

*Revis v. Tustin Constr. Servs., LLC,*
    322 F. Supp. 3d 58 (D.D.C. 2018) .......................................................................17

*Rivera v. Centro Medico de Turabo, Inc.,*
    575 F.3d 10 (1st Cir. 2009) ............................................................................ 12, 13

*Rolls-Royce Commercial Marine, Inc. v. N.H. Ins. Co.,*
    2010 WL 5067608 ..............................................................................................26

*Sawtelle v. Farrell,*
    70 F.3d 1381 (1st Cir. 1995) .......................................................................... 30, 34

*Scottsdale Capital Advisors Corp. v. The Deal, LLC,*
    887 F.3d 17 (1st Cir. 2018) ............................................................................ 32, 38

*Sebascodegan Enters., LLC v. Petland, Inc.,*
    647 F. Supp. 2d 71 (D. Me. 2009) .......................................................................15

*Shaffer v. Interbank FX,*
    No. 3:12-CV-231, 2013 WL 53979 (E.D. Tenn. Jan. 3, 2013) .................................16

*SkyWi, Inc. v. Qwest Corp.,*
    No. CV 08-01122, 2009 WL 10665521 (D.N.M. Feb. 25, 2009) ..............................16

*Snofrost AB v. Hakansson,*
    353 F. Supp. 3d 99 (D. Mass. 2018) ....................................................22, 24, 26, 28

*Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund,*
    589 F.3d 417 (7th Cir. 2009) ...........................................................................27

*Sussman v. Bank of Israel,*
    801 F. Supp. 1068 (S.D.N.Y. 1992) ..................................................22, 25, 40

*Sybac Solar AG v. Sybac Solar, LLC,*
    No. 8:12-CV-1218-T-17TGW, 2012 WL 6814193 (M.D. Fla. Oct. 22, 2012) ..............................14

*Ticketmaster-New York, Inc. v. Alioto,*
    26 F.3d 201 (1st Cir. 1994) ........................................................................ 38, 39

*Travelers Indem. Co. v. S/S Alca,*
    710 F. Supp. 497 (S.D.N.Y. 1989), *aff'd,* 895 F.2d 1410 (2d Cir. 1989)..............................22, 23, 28

*Turedi v. Coca Cola Co.,*
    460 F. Supp. 2d 507 (S.D.N.Y. 2006)
    *aff'd sub nom. Turedi v. Coca-Cola Co.,* 343 F. App'x 623 (2d Cir. 2009) ..............................27

*In re Union Elec. Co.,*
    787 F.3d 903 (8th Cir. 2015)...........................................................................11

*United States v. Swiss Am. Bank, Ltd.,*
    274 F.3d 610 (1st Cir. 2001) ............................................................... 34, 36, 37

*Walden v. Fiore,*
    571 U.S. 277 (2014)...................................................................................*passim*

*Weber v. PACT XPP Techs., AG,*
    811 F.3d 758 (5th Cir. 2016)...........................................................................11

*Williams v. Aire Serv, LLC,*
    No. 1:18-CV-099-NT, 2018 WL 4955198 (D. Me. Oct. 12, 2018)...........................18

*Yavuz v. 61 MM, Ltd.,*
    465 F.3d 418 (10th Cir. 2006) ................................................................ 12, 14

**Statutes**

18 U.S.C. §§ 1961 *et seq.*.................................................................................*passim*

28 U.S.C. § 1404(a) ............................................................................................20

Turkish Code of Obligations Article 36 .............................................................27

Turkish Code of Obligations Article 38 .............................................................27

Turkish Code of Obligations Article 49 .............................................................27

**Rules**

Fed. R. Civ. P. 4(k)(2) ....................................................................................................29, 30, 37, 38

Fed. R. Civ. P. 9 ....................................................................................................................12

**Other Authorities**

Federal Court Management Statistics, Data Table
    (12-month period ending on June 30, 2019),
    https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcompari
    son0630.2019.pdf ..........................................................................................................21

Hakan Pekcanitez, *Civil Procedural Law* 314 (15th ed. 2017) ....................................12

U.S. Const. amend. V .........................................................................................................37

U.S. Const. amend. XIV ....................................................................................................32

WhatsApp.com, FAQs: Is it free to send messages over WhatsApp?,
    https://faq.whatsapp.com/en/general/20965922/?category=5245246
    (last visited Aug. 24, 2019 ............................................................................................35

I.     **INTRODUCTION**

Following extensive legal proceedings before Turkish civil and criminal tribunals, Plaintiff Yalcin Ayasli ("Ayasli") brought this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") in New Hampshire, basing his claims of wrongdoing and damages on the 2016 sale of his Turkish regional airline, BoraJet.  Ayasli sold the airline to Defendant, Bugaraj Elektronik Ticaret ve Bilisim Hizmetleri A.S. ("Bugaraj"), a Turkish company.  Defendant, Sezgin Baran Korkmaz ("Korkmaz") is a Turkish citizen, domiciled in the Republic of Turkey ("Turkey").  SBK Holding A.S. ("SBK Holding") is a Turkish corporation, with its principal place of business in Turkey.  Korkmaz and SBK Holding are indirect owners of Bugaraj (collectively, the "Korkmaz Defendants").  Ayasli claims Korkmaz is the leader of a RICO enterprise, which includes Bugaraj, SBK Holding, and Korkmaz.

The RICO allegations are principally two-fold.  Ayasli claims that the Korkmaz Defendants first devalued BoraJet through a defamation campaign and then acquired the airline at a "fire sale price."  Ayasli contends that the Korkmaz Defendants then conspired to use the BoraJet sale as a springboard to divest him of his Turkish real estate holdings.  Specifically, Ayasli alleges that the Korkmaz Defendants were able to co-opt Turkish journalists into writing articles linking Ayasli to the failed coup attempt in Turkey in 2016, which devalued BoraJet and forced Ayasli to sell it cheaply to Bugaraj.  He also maintains that the Korkmaz Defendants used their influence with various Turkish banks to call loans that Ayasli assumed in the BoraJet sale prematurely, and filed "sham" lawsuits in Turkey—all with the aim of usurping Ayasli's Turkish real estate through attachment orders.  All of this alleged conduct took place in Turkey.

The Complaint is loaded in its 127 pages with various salacious allegations relating to criminal acts of persons that have nothing to do with the BoraJet sale and the damages that Ayasli

claims arose from it.  There are in fact no criminal charges or threats of criminal prosecution relating to the Korkmaz Defendants in the United States or Turkey.

Ayasli's claims and allegations of a RICO enterprise and wrongdoing have evolved as a defense to litigation brought against him by Bugaraj.  That litigation commenced in Turkey in 2017 alleging that Ayasli defrauded Bugaraj out of at least $70 million by failing to properly record BoraJet's liabilities on its books and failing to disclose the disrepair of BoraJet's planes at the time of sale.  Ayasli has defended that lawsuit in the Turkish courts, has retained esteemed counsel in that action, and continues to be an active participant in that legal dispute.  The extensive history and details of that litigation will be set out in support of this Motion.  To date, the rulings in that case as to Ayasli's misconduct and liability have, for the most part, been in Bugaraj's favor.  In June 2019, a court-appointed panel of seven independent experts with accounting, legal, and airplane-related expertise issued a report to the Turkish court substantially supporting Bugaraj's claims (and in fact calculating damages higher than Bugaraj originally requested).

Ayasli's 127-page Complaint is perhaps most remarkable for failing to advise the Court of critical facts regarding the BoraJet sale and Ayasli's claims in the Turkish legal system.  The BoraJet sale was consummated by a "Share Transfer and Profit Sharing Agreement" dated  December 29, 2016, executed by Ayasli and Bugaraj (the "BoraJet Agreement").  The BoraJet Agreement contains a mandatory forum selection clause where the parties established that disputes arising out of the transaction will be adjudicated in the Turkish courts.  In addition, the parties agreed that Turkish law will govern such disputes and, as noted, Ayasli has actively participated in Turkish courts for several years with no contention that they do not have proper jurisdiction over matters related to the case.

Not only has Ayasli litigated the BoraJet sale in the Turkish courts, he also presented, under Turkish procedures, a criminal complaint seeking to establish the existence of a "criminal organization" and criminal actions by the Korkmaz Defendants in stealing his airline, destroying his

2

reputation in the press, causing Turkish banks to call his debt prematurely, suggesting that he was involved in or supported the 2016 coup, and all the rest.  This Motion will provide the Court with a detailed comparison of the allegations in Ayasli's Turkish criminal complaint with the allegations in this RICO Complaint.  The substance, content, theories, allegations, and implications all track from one to the other.  In fact, Ayasli even refers to the conduct of the alleged "criminal organization" as "racketeering."  The Turkish criminal complaint is functionally the first launch of the RICO Complaint.

After an extensive investigation, the Turkish Public Prosecutor refused to indict, finding insufficient evidence to substantiate either the alleged criminal organization or the alleged wrongdoing Ayasli asserted against the Korkmaz Defendants.  The Prosecutor found it was essentially a commercial dispute.  The Prosecutor further indicated that Ayasli could file a civil suit as a plaintiff, making his same allegations in the Turkish courts.

But determined to restyle these allegations as a RICO action, Ayasli filed here, seeking a second bite at the apple.  In doing so, he asks this Court to ignore or countermand the findings made in Turkey, where the parties agreed to bring legal actions that might arise between them.  He also seeks to immerse this Court in the "geopolitical background" of a coup attempt and serves up a series of irrelevant prosecutions or allegations involving other people that have no relationship to the BoraJet sale that is the essence of his Complaint.

This Motion rests on well-established authority that the forum-selection clause and choice of law agreement of the parties must be enforced.  Even apart from the mandatory contract language, this is the clear case for application of *forum non conveniens*.  While Ayasli's strategy in filing this action is surely forum-shopping, it goes further.  It seeks to reverse a ruling of Turkish authorities who carefully examined and rejected Ayasli's theory of a criminal organization or conspiracy.

Finally, under well-established jurisdictional principles, there can be no serious argument that the allegations of the Complaint meet due process requisites for this action to be brought in New Hampshire, or any other state in the United States.  The claims of communications by messaging service or cell phone to New Hampshire, the possibility of persons in New Hampshire reading Turkish articles in the press, an aborted meeting in Portsmouth, and other strained efforts on the part of Ayasli to suggest that this matter should be resolved here do not begin to meet constitutional requirements.

The Complaint must be dismissed and the parties can continue to resolve their business disputes as they agreed—in Turkey.

## II.    THE ALLEGATIONS IN THE COMPLAINT

The sale of a "regional Turkish airline called BoraJet" is at the center of this dispute. (Compl. ¶ 4.)  Ayasli claims that the Korkmaz Defendants first "devalue[d] BoraJet through a defamatory media campaign" that enabled Bugaraj to purchase BoraJet at a "fire sale price." (Compl. ¶ 327.)  Ayasli contends that the Korkmaz Defendants next used the BoraJet sale as a springboard to "divest . . . [him] of all of his real estate holdings in Turkey." (Compl. ¶ 417.)

*The Alleged Defamatory Media Campaign.*  Ayasli claims that sometime in the spring of 2016, the Korkmaz Defendants set their sights on "tak[ing] over" BoraJet once the "right 'opportunity'" arose. (Compl. ¶¶ 324, 326.)  According to Ayasli, the failed July 15, 2016, coup attempt in Turkey—which the Turkish government blamed on an exiled Muslim cleric living in Pennsylvania and his FETO organization—presented "just that opportunity." (Compl. ¶ 327.)

To make the seemingly far-fetched link between the sale of an airline and a failed putsch, Ayasli gives a lesson on Turkish geopolitics (his version).  Ayasli explains that the post-coup environment in Turkey was "highly-charged" and "chaotic," with the Turkish government "cracking down on anyone alleged to have ties or connections to FETO." (Compl. ¶¶ 297, 329.)  He claims

4

that the Korkmaz Defendants seized on this opportunity to "use their influence and connections in the Turkish media" to plant articles in various Turkish newspapers linking Ayasli and BoraJet to the coup and FETO.  (Compl. ¶¶ 18, 329-30.)  Ayasli identifies 11 such articles: (1) seven articles between September 2016 and November 2016 by journalist Ergun Diler in the Turkish newspaper *Takvim*; (2) two articles in August 2016 by journalist Mahmut Ovur in the Turkish newspaper *Sabah*; (3) one article in September 2017 by journalist Ersin Ramoglu also in *Sabah*; and (4) one article in September 2016 by journalist Soner Yalcin in the Turkish newspaper *Sozcu.*  (Compl. ¶¶ 338-365.)

According to Ayasli, the alleged defamation campaign was effective: it "crippled BoraJet's reputation with the flying public"; scared off lenders and investors; and caused Turkish Airlines (Turkey's national carrier) to cancel a supply agreement with NAR Gourmet (one of Ayasli's companies) and wet lease and codeshare agreements with BoraJet. (Compl. ¶¶ 278, 376-86.)

With funding drying up, Ayasli claims that he began to "self-fund" BoraJet, but soon ran out of "the 'desire or energy'" to do so, and decided to sell the airline. (Compl. ¶¶ 391, 395.)

*The Sale of BoraJet.*  Ayasli alleges that once he decided to sell BoraJet, Korkmaz appeared as a "white knight." (Compl. ¶ 398.)  Despite the existence of other suitors, Ayasli claims that BoraJet's then-general manager, Defendant Fatih Akol ("Akol") (who he now thinks may have been cahoots with Korkmaz), pressed him to proceed with Korkmaz's offer because it "would be 'favored' by the Turkish Ministry of Transportation." (Compl. ¶¶ 399-402.)

Ayasli listened to Akol.  After a quick negotiation that Ayasli claims was exclusively between Akol and Korkmaz (although Ayasli owned BoraJet), the parties agreed to a deal.  (Compl. ¶ 408.)

*The BoraJet Agreement's Choice-of-Law And Forum-Selection Clauses.*  On December 29, 2016, Ayasli and Bugaraj—a Turkish company indirectly owned by Korkmaz and SBK Holding—entered into the BoraJet Agreement (which Ayasli does not attach to the Complaint).  (Compl. ¶¶ 64-66, 77-78, 405, 414, 596(c),(e); Decl. of Sezgin Baran Korkmaz ("Korkmaz Decl.") ¶¶ 5, 9.)  As part of the

deal, Ayasli "assumed BoraJet's obligation to repay certain outstanding bank loans and non-aircraft-related financial leasing obligations" and Bugaraj "assumed all of BoraJet's remaining debt, including all trade payables incurred prior to the date of the transfer." (Compl. ¶ 411; Decl. of Nafiz Cekirge ("Cekirge Decl.") Ex. 1.) Bugaraj also agreed to pay Ayasli "25% of any profit" if Bugaraj sold BoraJet to a third party. (Compl. ¶ 411; Cekirge Decl. Ex. 1.)

The BoraJet Agreement has a forum-selection clause making the courts of Istanbul, Turkey the mandatory forum for the parties' disputes:

> 7.2 Parties have accepted in advance that the Courts of Istanbul and Enforcement Offices shall have competent jurisdiction in case of a dispute.

(Cekirge Decl. Ex. 1.) The BoraJet Agreement also has a choice-of-law provision in Paragraph 7.2 selecting Turkish law as governing the contract. (Cekirge Decl. Ex. 1.)

Ayasli's lawyers prepared the BoraJet Agreement, including the choice of law and forum-selection clauses. (Declaration of Sinan Gorkem Gokce ("Gokce Decl.") Decl. ¶¶ 2-3.) Bugaraj's counsel had no input on either clause. (Gokce Decl. ¶¶ 2-3.)

*The Alleged Post-BoraJet Sale Extortion Campaign.* Ayasli claims that after Bugaraj acquired BoraJet, the Korkmaz Defendants "initiated the second act of [their] extortionate campaign . . . to unlawfully divest Dr. Ayasli of all of his real estate holdings in Turkey." (Compl. ¶ 417.) According to Ayasli, the Korkmaz Defendants sought to accomplish this through attachments obtained by threatening Ayasli and his associates, influencing "corrupt" banks to call "prematurely" the BoraJet debt that Ayasli assumed after the BoraJet sale (these banks happen to be some of Turkey's most venerable institutions), and "filing sham commercial and criminal litigation in Turkey" based on the BoraJet Agreement. (Compl. ¶¶ 417, 423-588, 692, 698.)

III.    **THE LITIGATION IN TURKEY**

After it acquired BoraJet, Bugaraj came to believe that Ayasli defrauded it by cooking

BoraJet's books and concealing the fact that most of its aircraft were not airworthy.  Consequently, it

sued Ayasli and filed a criminal complaint against him.  Ayasli has been defending the suits zealously

and filed a criminal complaint of his own.  Both parties have been represented by top-tier Turkish

lawyers; Ayasli has characterized his counsel, the law firm of Herguner Bilgen Ozeke, as a

"prominent Istanbul law firm."  (Compl. ¶ 503.)

*Bugaraj's Civil Lawsuit Against Ayasli.*  Bugaraj's civil lawsuit against Ayasli has mostly gone

Bugaraj's way, culminating in a finding by a court-appointed panel of seven independent experts

consisting of aeronautical engineers, lawyers, and financial professionals in favor of Bugaraj in the

amount of approximately $80 million (plus approximately $40 million in contingent damages); this

was about $5 million more than Bugaraj originally sought.  (Gokce Decl. ¶ 23, Exs. 14-15.)  In the

Turkish legal system, courts give expert reports great deference and rarely depart from their findings.

(Gokce Decl. ¶ 23.)  The following is a chronology of certain significant events in Bugaraj's lawsuit

against Ayasli.

| Chronology of Bugaraj's Lawsuit Against Ayasli | |
|---|---|
| 1 | On March 13, 2017, Bugaraj commenced an action in the Istanbul 3rd Commercial Court of First Instance for violations of the BoraJet Agreement, seeking approximately $72 million in damages and a cautionary attachment.  The trial court rejected Bugaraj's attachment request as premature.  On June 15, 2017, an appeals court affirmed the denial of the attachment request.  (Gokce Decl. ¶¶ 8-9, 13 Exs. 3-4.) |
| 2 | On April 3, 2017, Ayasli responded to the Bugaraj's complaint.  (Gokce Decl. ¶ 10, Ex. 5.) |
| 3 | On May 22, 2017, Bugaraj responded to Ayasli's answer.  (Gokce Decl. ¶ 11, Ex. 6.) |
| 4 | On June 14, 2017, Ayasli answered Bugaraj's May 22, 2017, answer.  In it, he claimed ties between Bugaraj and others who are part of the alleged RICO enterprise in the RICO Complaint.  He also alleged, as he does in the RICO Complaint, that Bugaraj caused banks to call prematurely the BoraJet debt that Ayasli assumed after the BoraJet sale with the "malicious intent . . . to seize" his assets  (Gokce Decl. ¶ 12, Ex. 7.) |
| 5 | On August 23, 2017, the court denied Bugaraj's attachment request on the same ground as before.   (Gokce Decl. ¶ 14.) |
| 6 | On November 21, 2017, Bugaraj commenced a second suit in the Istanbul 12th Commercial Court of First Instance against Ayasli and two other Turkish companies affiliated with Ayasli; |

| | |
|---|---|
| | this case was consolidated with the first case.  (Gokce Decl. ¶¶ 15-16, Ex. 8.) |
| 7 | On January 15, 2018, Ayasli filed an answer in the consolidated case.  As his defense, he asserted that same wrongdoing that he alleges in the RICO Complaint, including the alleged defamation campaign, Akol's potential collusion with Korkmaz, the premature calling of the BoraJet debt Ayasli assumed after the BoraJet sale, and the abuse of the Turkish legal system to pressure Ayasli to make payments.  (Gokce Decl. ¶ 17, Ex. 9.) |
| 8 | In an undated document, Bugaraj requested another attachment, which relied on a study by Ayasli's own auditor that concluded that Bugaraj suffered damages between 38 and 372 million Turkish Liras at Ayasli's hands.  The same document contained e-mails in which the auditor recommended that Ayasli settle and Ayasli agreed.  On February 23, 2018, Ayasli responded by cross-referencing his response to a criminal complaint against him, which set out the same alleged scheme against him in the RICO Complaint.  He also said that his auditor's report was a draft.  On March 2, 2018, the court rejected Bugaraj's attachment request.  (Gokce Decl. ¶¶ 18-20, Exs. 10-11.) |
| 9 | On March 7, 2018, Bugaraj answered to Ayasli's January 15, 2018, answer.  On June 8, 2018, Ayasli filed an answer to Bugaraj's answer, again referencing the allegedly prematurely called debt.  (Gokce Decl. ¶¶ 21-22, Exs. 12-13.) |
| 10 | On February 17, 2019, and June 10, 2019, a court-appointed panel of seven independent experts consisting of aeronautical engineers, lawyers, and financial professionals issued expert and supplemental expert reports.  They concluded that Ayasli damaged Bugaraj to the tune of approximately $80 million (plus approximately $40 million in contingent damages); this was about $5 million more than Bugaraj originally sought.  (Gokce Decl. ¶ 23, Exs. 14-15.) |
| 11 | On February 25, 2019, the court granted Bugaraj's attachment request based on the February 17, 2019, expert report.  (Gokce Decl. ¶ 24, Ex. 16.) |
| 12 | On March 11, 2019, Bugaraj filed a response to the expert report.  On June 26, 2019, Ayasli filed a response to the expert reports.  (Gokce Decl. ¶¶ 25-26, Exs. 17-18.) |
| 13 | On June 27, 2019, Bugaraj requested that its original damages claim be increased per the expert reports.  (Gokce Decl. ¶ 27, Ex. 19.) |

*Bugaraj's Criminal Complaint Against Ayasli.*  On May 5, 2017, Bugaraj filed a criminal complaint with the Istanbul Chief Public Prosecutor's Office alleging that Ayasli defrauded Bugaraj by, among other things, understating BoraJet's debt and concealing that most of BoraJet's aircraft were not airworthy.  (Gokce Decl. ¶ 30, Ex. 20.)  On October 4, 2017, the Prosecutor's office issued an indictment.  (Gokce Decl. ¶ 31, Ex. 21.)  On October 10, 2017, Ayasli objected to the indictment on the ground that Bugaraj's complaint was a "commercial dispute that is highly complicated, not a criminal matter"; he also denied responsibility for Bugaraj's charges because, among other things, he was not personally involved in the BoraJet sale negotiations.  (Gokce Decl. ¶ 32, Ex. 22.)  On

October 23, 2017, the Istanbul 2nd High Criminal Court accepted the indictment.  (Gokce Decl. ¶ 33, Ex. 23.)

### A.    Ayasli's Criminal Complaint Against The Korkmaz Defendants

On November 24, 2017, Ayasli filed a criminal complaint against the Korkmaz Defendants with the Istanbul Chief Public Prosecutor's Office.  (Gokce Decl. ¶ 34, Ex. 24; Compl. ¶ 506.)  The Turkish criminal complaint is virtually the same as this RICO Complaint: Ayasli contends that the Korkmaz Defendants worked as part of a "criminal organization," which had as its members the same individuals as the RICO enterprise in the RICO Complaint, to first devalue BoraJet through a defamation campaign, and then extort Ayasli based on intimidation tactics, prematurely-called debt, and sham lawsuits in Turkey.  (Gokce Decl. ¶ 34, Ex. 24.)  In fact, Ayasli even refers to the conduct of the alleged "criminal organization" as "racketeering."  (Gokce Decl. ¶ 34, Ex. 24, at 19 ¶ 72.)  A side-by-side analysis of the allegations and structure of the two complaints shows the similarities.

| Ayasli's Criminal Complaint (Gokce Decl. Ex. 24.) | RICO Complaint |
|---|---|
| P. 2 & ¶¶ 84-89 allege that a "criminal organization" consisting of the Korkmaz Defendants and others who are part of the alleged RICO enterprise in the RICO Complaint committed aggravated fraud, perjury, threats, and attempts to influence a fair trial in connection with the BoraJet sale.  ¶¶ 31-45 give more detail on the alleged "criminal organization," including Jacob Kingston, Levon Termendzhyan, and SBK Holdings USA, Inc.'s supposed roles in it.[1] | *Compare* ¶¶ 1, 37, 589-687. |
| ¶¶ 1-7 provide background on Ayasli's education, professional accomplishments, philanthropic activities, and investments in Turkey. | *Compare* ¶¶ 239-79. |
| ¶¶ 8-9 describe Ayasli's purchase of BoraJet in 2007 and BoraJet's operations, | *Compare* ¶¶ 280- |

---

[1]    Ayasli finds inspiration for his RICO allegations in a criminal indictment in the United States District Court for the District of Utah charging five individuals named Jacob Kingston, Isaiah Kingston, Sally Kingston, Rachel Kingston, and Levon Termendzhyan with fraudulently obtaining renewable fuel tax credits and then laundering these proceeds through investments in Turkey. (Compl. ¶¶ 299-323, Ex. A.)  The Kingstons have pleaded guilty.  (Cekirge Decl. Ex. 2.)  Ayasli contends that this tax credit scam was carried out by a RICO enterprise and the Korkmaz Defendants were the enterprise's Turkish arm.  (Compl. ¶¶ 1, 39.)  This is not true.  Indeed, the Government never indicted the Korkmaz Defendants.  (Compl. ¶¶ 299-323, Ex. A.)  Moreover, neither the Kingstons nor Termendzhyan have any involvement in BoraJet.  (Korkmaz Decl. ¶ 9.) In fact, the Government has not sought forfeiture of BoraJet. (Cekirge Decl. Ex. 2.)

| | |
|---|---|
| and expansion plans. | 93. |
| ¶¶ 11 and footnote 2 identify the same news articles in the Complaint that were part of the alleged defamation campaign against BoraJet. | *Compare* ¶¶ 338-65. |
| ¶¶ 12-13 allege that the defamatory media campaign crippled BoraJet financially by causing third parties, including Turkish Airlines and certain banks, to refuse to do business with BoraJet.  It further alleges that Ayasli was forced to self-fund BoraJet for a while, until he was ultimately forced to sell the company. | *Compare* ¶¶ 376-92. |
| ¶¶ 14-15 allege that despite better offers than Korkmaz's for BoraJet, the airline's then-chairman of the board Akol took advantage of Ayasli's unfamiliarity with the matter, urged Ayasli to proceed with Korkmaz's offer because it would be favored by the Turkish Ministry of Transportation, and exclusively negotiated the BoraJet sale with Korkmaz. | *Compare* ¶¶ 399-402, 405, 408. |
| ¶¶ 16-18 describe the terms of the BoraJet Agreement. | *Compare* ¶¶ 411, 414. |
| ¶ 16 alleges that Korkmaz misstated BoraJet's purchase price as $260 million. | *Compare* ¶ 418. |
| ¶¶ 18-19, 21 allege that Korkmaz improperly influenced (1) Akbank T.A.S.; (2) Denizbank T.A.S.; (3) Turk Ekonomi Bankasi A.S.; (4) Odea Bank, A.S.; and (5) Garanti Bankasi A.S. to call Ayasli's assumed BoraJet debt prematurely. | *Compare* ¶ 424-25. |
| ¶ 19 alleges that Odea Bank improperly gave Ayasli one day to pay his assumed BoraJet debt even though it had not yet become due; refused to grant Ayasli a one-week extension for repayment; and sold the debt to Mega Varlik A.S. (an alleged member of the criminal organization and RICO enterprise), which in turn obtained an attachment that forced Ayasli to pay off a sum larger than the original debt to release the attachment. | *Compare* ¶¶ 426-36. |
| ¶ 21 alleges that in an effort to foil further attempts to place liens on his real estate, Ayasli obtained a $20 million loan from Garanti Bankasi collateralized by his property in Turkey to pay off all of BoraJet's existing Turkish debt.  It further alleges that to obtain that loan, he had to pay off existing BoraJet debt to Garanti Bankasi in the amount of $487,607. | *Compare* ¶¶ 438-39. |
| ¶¶ 23-27, 31 describe the allegedly sham commercial and criminal complaints Bugaraj commenced against Ayasli.  ¶ 31 alleges that although "the lawsuits filed by Bugaraj and the investigations seem like a mere exercise of . . . rights . . ., they are actually actions that aim to obtain an unfair advantage through baseless claims, to damage [Ayasli's] reputation and to confiscate his assets . . . ." | *Compare* ¶¶ 462-483, 514-41. |
| ¶¶ 56-62, 55-64, 67-68, 72, 75-76, 78-79, 81-83 describe Korkmaz's alleged: (1) threats against Ayasli via WhatsApp; (2) threatening visits to Ayasli's Kandili property on February 25, 2017, and June 30, 2017; (3) threats against Ayasli's business associates Zahide Uner and Burhan Safak, (4) coercion of Kadir Peker's and others' testimony, (5) sham civil and criminal complaints; and (6) a meeting in August 2017 with Turkish journalist to further slander Ayasli. | *Compare* ¶¶ 448-59, 469-501, 528-54. |

After a thorough investigation, including by the Istanbul Branch Directorate for Combatting

Financial Crimes, the Prosecutor's Office found that: (1) there was no wrongdoing in the BoraJet

sale on the part of the Korkmaz Defendants; (2) the Korkmaz Defendants did not "establish[ ] a

criminal organization [or] act in unity" with the individuals Ayasli identified (or anyone else); (3) the dispute was "commercial" in nature; and (4) that Ayasli could pursue his claims in civil court. (Gokce Decl. ¶ 35, Ex. 24, at 3-5.)

## IV.   THE BORAJET AGREEMENT'S FORUM SELECTION CLAUSE IS VALID AND ENFORCEABLE

The threshold question in this case is whether the BoraJet Agreement's forum-selection clause is valid and enforceable because it will determine whether the Court should apply: (1) the streamlined *forum non conveniens* analysis announced in *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49 (2013) or (2) the traditional *forum non conveniens* analysis.[2]

A forum-selection clause is valid and enforceable if: (1) it is mandatory; (2) its scope covers the claims asserted in the suit; and (3) the factors announced in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) do not militate against enforcement.[3]  *See Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 46-49 (1st Cir. 2014).

### A.   The BoraJet Agreement's Forum-Selection Clause Is Mandatory

A forum-selection clause is mandatory if it "contain[s] clear language indicating that jurisdiction and venue are appropriate exclusively in the designated forum."  *Id.* at 46 (internal quotations and citation omitted).  When the contract in question has a choice-of-law provision, it is

---

[2]      Although only Bugaraj signed the BoraJet Agreement, Korkmaz and SBK Holding can avail themselves of its forum-selection clause because all three parties are allegedly in "cahoots."  *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 438 (7th Cir. 2012).  *See also Cameron v. X-Ray Prof'l Ass'n*, No. 16-CV-343-LM, 2017 WL 680388, at *5 (D.N.H. Feb. 21, 2017).  (Compl. ¶¶ 39, 596-602.)

[3]      *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49 (2013) "presuppose[d] a contractually valid forum-selection clause," 571 U.S. 49, 62 n.5, but gave no guidance as to when it "should be deemed invalid," *In re Union Elec. Co.*, 787 F.3d 903, 906-07 (8th Cir. 2015).  Post-*Atlantic Marine* decisions have held "valid" to mean "enforceable."  *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 767, 773 (5th Cir. 2016); *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1029 (11th Cir. 2014); *Black Hills Truck & Trailer, Inc. v. MAC Trailer Mfg., Inc.*, No. CIV. 13-4113-KES, 2014 WL 5782452, at *4 (D.S.D. Nov. 6, 2014).

unclear in the First Circuit if the contractually-selected law or federal law governs whether the forum-selection clause is mandatory.  Without analysis, the First Circuit has looked to federal precedent notwithstanding the presence of a choice-of-law provision.  *See Autoridad de Energia Electrica de Puerto Rico v. Vitol S.A.*, 859 F.3d 140, 144, 146 (1st Cir. 2017) [hereinafter, *Vitol*].  Other circuits have held that the parties' chosen law governs.  *See, e.g., Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014) ("[I]f we are called upon to determine whether a particular forum selection clause is mandatory or permissive . . ., we apply the law contractually selected by the parties."); *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 431 (10th Cir. 2006) (same).

Given the uncertainty in the First Circuit and the choice of Turkish law in the BoraJet Agreement, we will demonstrate that the BoraJet Agreement's forum-selection clause is mandatory based on Turkish and federal law.  (Cekirge Decl. Ex. 1 ¶ 7.1.)

*Turkish Law.*  Under Turkish law, a forum-selection is mandatory unless it expressly states otherwise.  (Gokce Decl. ¶¶ 4-6, Ex. 2, Baki Kuru, *Civil Procedure Law* § 9 ("Unless otherwise agreed by the parties in the authorization agreement, the lawsuit is filed only in the courts specified in the authorization agreement; in other words, the authorization agreement is the exclusive authorization agreement." (citation omitted)), Ex. 1, Hakan Pekcanitez, *Civil Procedural Law* 314 (15th ed. 2017).).

*Federal Law.*  Under federal law, whether a forum-selection clause is mandatory is a case-specific analysis.  *See Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 17 (1st Cir. 2009).  Terms like "'shall,' 'exclusive,' 'only,' or 'must'" typically indicate that the forum-selection clause is mandatory.  *Id.* at 17 n.5.  Language that the parties agree to a forum's jurisdiction over a dispute (or certain kind of dispute) as opposed to an unqualified submission to jurisdiction also indicates a mandatory clause.  *See id.* at 18 ("[T]he 'expressly agree to submit' language is preceded and informed by a qualifying phrase: '*In the event that by act or omission I consider that physical, emotional or economic damages have been caused to me*, I expressly agree to submit . . . .''  In contrast, [when there is a] lack[ ] [of] a similar

introductory phrase, the signatories consent[ ] to the exercise of jurisdiction over themselves as defendants in order to avoid the personal jurisdiction analysis that would otherwise be required for out-of-state defendants." (second alteration in original) (emphasis in original)).  Context is also important; for instance, if both parties are already subject to jurisdiction in a forum, it does not make "sense" that the forum-selection clause is permissive.  *Id.* at 17.

Here, all indicators are that the BoraJet Agreement's forum-selection clause is mandatory.  It states that Istanbul courts "shall have competent jurisdiction in case of a dispute," thus using the typical mandatory term "shall," and indicating that the parties intended not to simply submit to jurisdiction in Istanbul but rather to have their disputes litigated there.  (Cekirge Decl. Ex. 1 ¶ 7.2.)

In addition, the parties inarguably expected the forum-selection clause to be mandatory.  When they entered into the BoraJet Agreement, they expected Turkish law to govern the contract; Paragraph 7.1 said as much and the transaction was entirely Turkish.  (Cekirge Decl. Ex. 1.)  If the parties wanted the forum-selection not to be mandatory, Turkish law required them to say so. (Gokce Decl. ¶ 4, Exs. 1-2.)   They did not.  *See Rivera*, 575 F.3d at 17 (examining the drafters' perspective when determining whether the forum-selection clause is mandatory).

Further, reading the forum-selection clause as a permissive jurisdictional clause would render it superfluous because there is no question that the Istanbul courts had jurisdiction over both Bugaraj and Ayasli; in fact, the parties have been litigating their dispute over the BoraJet Agreement in Istanbul for years without any objection to jurisdiction.  (Gokce Decl. ¶ 29.)  *See also Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1350 (1st Cir. 1992) ("Turkish courts competent to hear disputes over contracts made or to be performed in Turkey").  *See also Fla. Polk Cty. v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1083–84 (11th Cir. 1999) (holding that reading the forum-selection clause as permissive would render it meaningless because the parties could sue in that forum anyway).

13

Moreover, reading the BoraJet Agreement's forum-selection clause as permissive in light of the contract's choice of law provision challenges common sense. "The notion that the parties agreed that [Turkish] law governs the contract, but that lawsuits regarding the contract could be filed in a different country is anomalous. . . .  [It] would require [foreign] courts to translate, interpret and apply [Turkish] law.  It is hard to conclude that the parties intended such a result." *Sybac Solar AG v. Sybac Solar, LLC*, No. 8:12-CV-1218-T-17TGW, 2012 WL 6814193, at \*4 (M.D. Fla. Oct. 22, 2012).

Lastly, even if there is any ambiguity regarding whether the BoraJet Agreement's forum-selection clause is mandatory, it must be resolved against Ayasli because his lawyer drafted the clause.  (Gokce Decl. ¶ 3.)  *See LFC Lessors, Inc. v. Pac. Sewer Maint. Corp.*, 739 F.2d 4, 7–8 (1st Cir. 1984) (holding that ambiguous forum-selection clauses should be construed against the drafter).

**B.    The Scope Of The BoraJet Agreement  Covers The Claims In This Lawsuit**

The same question of whether Turkish or federal law governs exists with respect to the scope of the BoraJet Agreement's forum-selection clause as well.  *Compare  Vitol*, 859 F.3d at 146 (applying federal precedent notwithstanding choice-of-law clause) *with Martinez*, 740 F.3d at 218 (apply law contractually-selected by parties); *Yavuz*, 465 F.3d at 431 (same).  The BoraJet Agreement's forum-selection clause covers Ayasli's claims under both bodies of law.

*Turkish Law*.  Under Turkish law, unless otherwise specified, the forum-selection clause "covers all types of lawsuits to be filed in relation with that dispute."  (Gokce Decl. ¶ 5 Ex. 1, Pekcanitez at 314.)  Here, all of Ayasli's claims relate to the BoraJet Agreement.  As discussed above, he has alleged the same facts that form the basis of his claims in this lawsuit as a defense in Bugaraj's lawsuits in Turkey, which he concedes arose out of the BoraJet Agreement.  (Gokce Decl. ¶¶ 12, 17 Ex. 7, at 2, Ex. 9 ¶ 11.)  If Ayasli's allegations in this case were unrelated to the Bugaraj Agreement, he would not have asserted them as defenses in the Turkish proceedings.

*Federal Law.*  Under federal law, "[f]orum selection clauses using embracing language . . . have usually been construed broadly," *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 23 (1st Cir. 2011), to include "statutory and common-law tort claims" relating to the contract, *Vitol*, 859 F.3d at 146 (internal quotations and citation omitted), as well as claims relating to contract "*formation*," *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir. 1993) (emphasis in original).  Here, all of Ayasli's claims are covered by the BoraJet Agreement's broad forum-selection clause.

*RICO claims.*  The most significant facets of Ayasli's RICO allegations relate to the BoraJet Agreement.  For instance, Ayasli claims that the Korkmaz Defendants engaged in wrongful conduct relating to the formation of the BoraJet Agreement—*i.e.*, the alleged defamatory campaign that devalued BoraJet and thus induced Ayasli to execute the BoraJet Agreement to sell the airline to Bugaraj at a "fire sale price."  (Compl. ¶ 327, 405, 414.)  Under First Circuit precedent, the BoraJet Agreement's forum-selection clause covers this kind of "tortious conduct relating to the *formation*" the contract.  *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir. 1993) (emphasis in original).  *See also Sebascodegan Enters., LLC v. Petland, Inc.*, 647 F. Supp. 2d 71, 75 (D. Me. 2009) (holding that forum-selection clause covers "claims concerning the manner in which entry into the Agreement was induced").

Ayasli also claims that the Korkmaz Defendants engaged in a post-BoraJet sale extortion campaign that involved calling Ayasli's assumed BoraJet debt before the repayment deadline "established in the [BoraJet] Agreement" and filing "sham" lawsuits based on the BoraJet Agreement.  (Compl. ¶¶ 417, 423-47, 462-488, 514-41.)  These allegations necessarily require the Court to interpret: (1) Paragraph 3.6 of the BoraJet Agreement to determine whether the Korkmaz Defendants influenced banks to call Ayasli's debt prematurely; and (2) the BoraJet Agreement generally to determine whether Bugaraj's contract claims in the Turkish suits are a sham.  (Cekirge

Decl. Ex. 1.)  Because these claims "implicate [the BoraJet Agreement's] terms," they are covered by the contract's forum-selection clause.  *Crescent Int'l, Inc.*, 857 F.2d 943, 944 (3d Cir. 1988).

Moreover, much of Ayasli's claimed RICO damages would not have occurred but for the BoraJet Agreement (*e.g.*, the loss of his "initial $300 million investment in BoraJet" and "attorney's fees and costs" to defend the allegedly sham Turkish litigation).  (Compl. ¶¶ 682, 698.)  Because these RICO losses "flow" from the BoraJet Agreement and acquisition, they are covered by the agreement's forum-selection clause.  *Huffington*, 637 F.3d at 22.

Also telling is the fact that Ayasli has asserted the same RICO allegations as a defense to Bugaraj's suit in Turkey, which Ayasli concedes is based on the BoraJet Agreement.  (Gokce Decl. ¶¶ 12, 17 Ex. 7, at 2, Ex. 9 ¶ 11.)  If the RICO allegations did not relate to the BoraJet Agreement; his assertion of these allegations in Bugaraj's Turkish suit would make no sense.  *See also Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 292 (S.D.N.Y. 2018) (holding that RICO claims relating to the contract are covered by forum-selection clause); *Flanagan v. Midstream Partners, L.P.*, No. 17-CV-315-GKF-JFJ, 2017 WL 4324535, at *2 (N.D. Okla. Sept. 28, 2017) (same); *Ciro Energy Partners, LLC v. Torres-Torres*, No. CIV. 12-1917 GAG, 2013 WL 6628139, at *2 (D.P.R. Dec. 12, 2013) (same); *Blixseth v. Disilvestri*, No. 11-22459-CIV, 2013 WL 12063940, at *14 (S.D. Fla. Jan. 31, 2013) (same); *Shaffer v. Interbank FX*, No. 3:12-CV-231, 2013 WL 53979, at *3 (E.D. Tenn. Jan. 3, 2013) (same); *SkyWi, Inc. v. Qwest Corp.*, No. CV 08-01122, 2009 WL 10665521, at *3 (D.N.M. Feb. 25, 2009) (same).[4]

*The Remaining Claims*. Ayasli's third claim for violation of the New Hampshire Consumer Protection Act, fourth claim for fraudulent misrepresentation, and seventh claim for false light invasion of privacy all relate to the Korkmaz Defendants' alleged defamation campaign.  (Compl. ¶¶

---

[4]    Even if some aspects of Ayasli's RICO claims are independent of the BoraJet Agreement, the Court should not retain them because judicial economy disfavors such claim-splitting.  *See CR Assocs. L.P. v. Sparefoot, Inc.*, No. CV 17-10551-LTS, 2018 WL 988056, at *6 (D. Mass. Feb. 20, 2018).

707-08, 723, 734.)  Again, because these claims "relat[e] to the *formation*" of the BoraJet Agreement, they are covered by its forum-selection clause.  *Lambert*, 983 F.2d at 1121 (emphasis in original).

Ayasli's sixth claim for intrusion into solitude invasion of privacy relates to Korkmaz's alleged "harassing conduct."  (Compl. ¶ 728.)  At bottom, the alleged conduct relates to the Korkmaz Defendants' attempt to collect their perceived damages in the BoraJet sale; thus they relate to the BoraJet Agreement and are covered by its forum-selection clause.  (Compl. ¶¶ 448-61, 577-85.)  *See Cameron v. X-Ray Prof'l Ass'n*, No. 16-CV-343-LM, 2017 WL 680388, at *4 (D.N.H. Feb. 21, 2017) (holding that invasion of privacy claims resulting from an employment relationship governed by an employment agreement are covered by the employment agreement's forum-selection clause).

Finally, because the RICO claims—which take up 702 of the Complaint's 740 paragraphs (that is 95% of the leviathan)—are covered by the BoraJet's forum-selection clause, so should the ancillary state law claims.  *See Revis v. Tustin Constr. Servs., LLC*, 322 F. Supp. 3d 58, 62 (D.D.C. 2018) ("[I]t would be inefficient and wasteful to bifurcate Plaintiff's claims, transfer only some, and have this dispute be litigated in two separate forums"); *Androb Jewelry Serv., Inc. v. Malca-Amit USA, LLC*, No. 16-CV-5171 (AJN), 2017 WL 4712422, at *9 (S.D.N.Y. Sept. 25, 2017) (holding that all claims should be transferred even when "the forum selection clause . . . governs half of the claims in this case, and . . . the remaining claims are factually related to those four claims").

**C.** **The BoraJet Agreement's Forum Selection Clause Satisfies The *Bremen* Factors**

A forum-selection clause is enforceable under *Bremen* unless the party opposing enforceability makes a "strong showing" that: (1) the clause was the product of fraud or overreaching; (2) enforcement would be unreasonable and unjust; (3) proceedings in the contractual forum will be so gravely difficult and inconvenient that the party challenging the clause will for all practical purposes be deprived of his day in court; or (4) enforcement would contravene a strong

public policy of the forum in which suit is brought, whether declared by statute or by judicial decision. *Claudio-De Leon*, 775 F.3d at 48-49. Ayasli cannot make such a showing.

*The BoraJet Agreement Was Not A Product Of Fraud Or Overreaching.* This prong requires showing that "the inclusion of th[e] [forum-selection] clause . . . was the product of fraud or coercion," not that the contract itself was. *Huffington*, 637 F.3d at 24. Ayasli cannot make such a showing because his lawyer inserted the forum-selection clause into the BoraJet Agreement. (Gokce Decl. ¶ 3.)

*Enforcement Is Not Unreasonable Or Unjust.* This prong requires a showing that the party opposing the forum-selection clause did not have "notice of the forum selection . . . [or] the option not to enter the contract," *Williams v. Aire Serv, LLC*, No. 1:18-CV-099-NT, 2018 WL 4955198, at *5 (D. Me. Oct. 12, 2018), or that the forum-selection clause "was inserted in bad faith," *MARPOR Corp. v. DFO, LLC*, No. CIV. 10-1312 PG, 2010 WL 4922693, at *4 (D.P.R. Dec. 2, 2010). Again, Ayasli cannot make such a showing because his lawyer inserted the forum-selection clause into BoraJet Agreement. (Gokce Decl. ¶ 3.)

*Ayasli Can Have His Day In Court In Turkey.* This prong requires a showing that the forum-selection clause would deprive the party challenging enforcement "his day in court." *Claudio-De Leon*, 775 F.3d at 49. "[T]he mere inconvenience of traveling to litigate in a different, even faraway foreign jurisdiction" is not enough to satisfy *Bremen*'s third prong. *In re Mercurio*, 402 F.3d 62, 66 (1st Cir. 2005). Nor is a "party's subjective fear of persecution," especially if he can prosecute his claims without being present in the forum. *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 325, 327 (9th Cir. 1996). *Cf. Mercier*, 981 F.2d at 1350 (1st Cir. 1992) (holding that plaintiff's personal difficulties, such as "risk of arrest," did not render Turkey and inadequate forum). Ayasli cannot make this showing because there is no bar against him bringing his claims against the Korkmaz Defendants in Turkey (he already brought a criminal complaint). (Gokce Decl. ¶¶ 34-35, 39.)

18

*Public Policy Bar Does Not Bar Enforcement Of The BoraJet Agreement's Forum-Selection Clause.*

Neither New Hampshire nor United States public policy prevents enforcement of the BoraJet Agreement's forum-selection clause. *See Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 n.20 (11th Cir. 1998) (holding that enforcing forum-selection clause with respect to RICO claims does not violate public policy); *See Huffington*, 637 F.3d at 21-22 (holding that misrepresentation and Massachusetts consumer protection laws covered by forum-selection clause); *Cameron v. X-Ray Prof'l Ass'n*, No. 16-CV-343-LM, 2017 WL 680388, at *4 (D.N.H. Feb. 21, 2017) (holding that invasion of privacy claims covered by forum-selection clause).[5]

For all these reasons, the BoraJet Agreement's forum-selection clause is enforceable.

## V.   THE *FORUM NON CONVENIENS* ANALYSIS

### A.   The Traditional *Forum Non Conveniens* Analysis

The thrust of a *forum non conveniens* motion is that "convenience would be better served by litigating in another country's courts." *Interface Partners Int'l Ltd. v. Hananel*, 575 F.3d 97, 102 n.9 (1st Cir. 2009) (internal quotations and citation omitted). To prevail on such a motion, the defendant must show that: (1) an adequate alternative forum exists; and (2) considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum. *See id.* at 101 (internal quotations and citation omitted).

The first condition requires a showing that "the alternative forum addresses the types of claims that the plaintiff has brought and that the defendant is amenable to service of process there." *Id.* at 101 (internal quotations and citation omitted).

The second condition requires a showing that the "balance . . . [of] private and public interests[ ] . . . justifies dismissal." *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 15 (1st Cir. 2000).

---

[5]   Because of the similarities of the statutes, New Hampshire courts can rely on Massachusetts precedent relating to the consumer protection laws. *See Chase v. Dorais*, 122 N.H. 600, 602 (1982).

The public interest factors include: (1) the administrative difficulties resulting from court congestion in the plaintiff's chosen forum; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a case conducted in a forum that is at home with the governing law; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of imposing jury duty on citizens in an unrelated forum  *See Interface Partners Int'l Ltd.*, 575 F.3d at 101.  Courts also look to judicial economy as a public interest factor.  *See id.* at 106.

The relevant private interest factors include: (1) the comparative convenience of the parties' access to sources of proof; (2) the availability of compulsory process and the cost of securing the attendance of witnesses; (3) an evaluation of all other practical problems that make trial of a case easy, expeditious and inexpensive.  *See id.*

Moreover, the "degree of deference for [the plaintiff's] original choice of forum" guides the *forum non conveniens* analysis.  *Id.* (internal quotations and citation omitted).  Although a plaintiff's original choice of forum "enjoys some degree of deference," the deference is not "automatic" even if the plaintiff has chosen his home forum.  *Id.* (internal quotations and citation omitted).  "[T]he less deference the plaintiff's choice commands . . . the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts."  *Interface Partners Int'l Ltd.*, 575 F.3d at 102 n.9 (internal quotations and citation omitted).

**B.     The *Atlantic Marine* Analysis**

If a valid forum selection clause exists, the traditional "*forum non conveniens* 'calculus'" changes "significantly."[6]  *Get In Shape Franchise, Inc. v. Caldwell*, No. CV 15-13118-NMG, 2016 WL 11002219,

---

[6]     Although *Atlantic Marine* involved a 28 U.S.C. § 1404(a) transfer motion, the decision expressly held that the streamlined analysis applies to *forum non conveniens* motions as well.  *See Atl. Marine*, 571 U.S. at 66 n.8.

at *3 (D. Mass. Feb. 18, 2016). In such a case, because the parties have agreed to the forum that they want to litigate in as part of their business deal, courts must give no deference to the plaintiff's choice of forum and disregard private interest factors; *only* public interest factors come into play. *See Atl. Marine*, 571 U.S. at 64. The purpose of this truncated analysis is simple: because public interest factors "rarely defeat a [*forum non conveniens*] motion," it will facilitate the federal policy of enforcing valid forum-selection clauses "in all but the most exceptional cases." *Id.* at 61, 64 (internal quotations and citation omitted).

Because the BoraJet Agreement's forum-selection is valid, this Court should grant the Korkmaz Defendants' motion to dismiss for *forum non conveniens* under *Atlantic Marine*'s streamlined test. But even if the BoraJet Agreement's forum-selection clause were not valid (it is valid), the traditional *forum non conveniens* analysis would also require dismissal.

## VI.    *ATLANTIC MARINE*'S STREAMLINED *FORUM NON CONVENIENS* ANALYSIS REQUIRES DISMISSAL OF THIS CASE

Under *Atlantic Marine*'s truncated *forum non conveniens* analysis, the balancing of the public interest factors require dismissal of this case.

*Court Congestion.* A "*comparative* determination of where the case can most quickly be resolved" favors the Istanbul trial courts over this Court. *Mercier*, 981 F.2d at 1358 (emphasis in original) (internal quotations and citation omitted). In the Istanbul trial courts, a case like this would take approximately three years to complete through trial. (Gokce Decl. ¶ 38.)

Federal Court Management Statistics do not provide the median time from filing through the end of trial in this Court over the last 12-month period. *See* Federal Court Management Statistics, Data Table (12-month period ending on June 30, 2019), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0630.2019.pdf But a highly complex case like this, where the key defendants are in Turkey, the documentary

evidence is in Turkey and in Turkish and thus requires translation, and the witnesses are in Turkey and mostly speak only Turkish, would likely take far longer than three years to complete.

*Interest In Hearing Localized Controversies*.  This prong involves a comparison of which jurisdiction has a "greater interest" in the litigation.  *Snofrost AB v. Hakansson*, 353 F. Supp. 3d 99, 110 (D. Mass. 2018).  If the "center of gravity for th[e] dispute" is in the foreign jurisdiction, this prong favors the foreign jurisdiction.  *Id.  See also Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 303 (S.D.N.Y. 2018) (holding that the controversy is localized to the foreign jurisdiction because "the brunt of the alleged misconduct took place" there); *In re Lac Megantic Train Derailment Litig.*, 210 F. Supp. 3d 218, 233 (D. Me. 2016) (same); *Flynn v. Nat'l Asset Mgmt. Agency*, 42 F. Supp. 3d 527, 539 (S.D.N.Y. 2014) (same); *LaSala v. Bank of Cyprus Public Co. Ltd.*, 510 F. Supp. 2d 246, 263 (2007) (same); *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1074 (S.D.N.Y. 1992) (same); *Travelers Indem. Co. v. S/S Alca*, 710 F. Supp. 497, 501 (S.D.N.Y. 1989) (holding that Turkey has a greater interest in the litigation because the underlying facts transpired in Turkey), *aff'd*, 895 F.2d 1410 (2d Cir. 1989).

In this case, Turkey has a greater interest in this lawsuit because the center of gravity for the dispute is Turkey: (1) BoraJet is a Turkish regional airline; (2) its sale was negotiated in Turkey and the purchaser, Bugaraj, is a Turkish company; (3) the alleged defamation campaign that supposedly devalued BoraJet and induced Ayasli to sell took place in Turkey in Turkish newspapers; (4) Turkish banks allegedly prematurely called Ayasli's assumed BoraJet debt; (5) the alleged threats to Ayasli's business associates and witnesses occurred in Turkey, and (6) the alleged "sham" lawsuits are in Turkey.  (Compl. ¶¶ 4, 18, 77, 324-65, 376-417, 459-554.)  Therefore, this prong favors Turkey.

*Unfairness To Juries*.  Given that this controversy is localized to Turkey, it would be unfair to New Hampshire juries to force them to grapple with uniquely Turkish issues, including evidence in Turkish; the geopolitical landscape relating to a Turkish coup; defamation in the Turkish papers;

potential corruption in the Turkish banking system that allowed the Korkmaz Defendants to call Ayasli's assumed BoraJet debt prematurely; and the legitimacy of Bugaraj's Turkish lawsuits. (Compl. ¶¶ 4, 18, 77, 324-65, 376-417, 459-554.)  *See In re Lac Megantic Train Derailment Litig.*, 210 F. Supp. 3d at 233 ("[T]rying a case of this magnitude, a great deal of which would be conducted in a foreign language and which would address a major calamity that occurred in a foreign country, would impose a significant burden on U.S. citizens serving as jurors in the United States."); *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, No. 11-CV-05801 DLI VVP, 2012 WL 3746220, at *5 (E.D.N.Y. Aug. 27, 2012) ("If this action were to go to trial, local jurors thus would be tasked unnecessarily with reviewing the propriety of this English Noteholders' meeting that was part of a wider plan to stabilize the Irish banking system that was battered by the ongoing European debt crisis."); *Philipps v. Talty*, 555 F. Supp. 2d 265, 271 (D.N.H. 2008) (LaPlante, J.) (holding that the fact that "a New Hampshire trial would be heard by jurors that have no relation at all to the action" tips the "jury burden" prong in favor of the foreign forum).

      *Governing Law/Conflict of Laws.*  Turkish law will apply to at least some aspect of this dispute. Namely, a central aspect of Ayasli's RICO claim is that Bugaraj filed "sham" lawsuits against him. (Compl. ¶ 462.)  Because the Bugaraj Agreement has a Turkish choice of law provision, determining whether these contract suits are a "sham" will require assessing the viability of the lawsuits under Turkish law.  (Cekirge Decl. Ex. 1 ¶ 7.1.)  The "difficulty of applying Turkish law" is one of the public interest factors that "counsel[s] dismissal" under this prong.  *Mercier*, 981 F.2d at 1357, 1357 n.10.  *See also Travelers Indem. Co.*, 710 F. Supp. At 501-02 ("Turkish law will govern, at least in part[ ] . . . .  The need to apply foreign law points towards dismissal of this action.").

      *Judicial Economy.*  Given that Ayasli makes the same RICO allegations that he makes here as part of his defense in Burgaraj's Turkish lawsuits and given that he already filed a criminal complaint in Turkey, judicial economy supports dismissal of this suit for *forum non conveniens*.  (Gokce Decl. ¶¶

12, 17, 34-35, Ex. 7, at 2, Ex. 9 ¶ 11, Ex. 24.)  *See Interface Partners Int'l Ltd.*, 575 F.3d at 106 (judicial economy favors dismissal for *forum non conveniens* because of parallel litigation in Israel); *Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 287, 304 (holding that judicial economy favors *forum non conveniens* dismissal because plaintiff had filed counterclaims and a criminal complaint on the same allegations in the foreign forum).

In sum, this case does not present the "extraordinary circumstance[ ]" under which this Court should decline to enforce the BoraJet Agreement's forum-selection clause based on public interest factors.  *Atl. Marine,* 571 U.S. at 62.

## VII.  THE TRADITIONAL *FORUM NON CONVENIENS* ANALYSIS ALSO REQUIRES DISMISSAL OF THIS CASE

Even if the BoraJet Agreement's forum-selection clause were unenforceable (it is not), the traditional *forum non conveniens* analysis also militates towards dismissal.  As discussed above, to prevail on this analysis, the Korkmaz Defendants must first show what level of deference Ayasli's choice of forum deserves.  *See In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 498 (2d Cir. 2002).  With that level of deference in the "background," *Snofrost AB*, 353 F. Supp. 3d 109, they must then show that: (1) the Korkmaz Defendants are amenable to service in Turkey; (2) Turkey provides an adequate forum for Ayasli to prosecute his claims; and (3) the balance of the private (discussed below) and public interest factors (discussed above) favors Turkey, *see Interface Partners Int'l Ltd.*, 575 F.3d at 101; *Iragorri*, 203 F.3d at 15, with their burden becoming "easier" as the deference due Ayasli's choice is diminished, *Interface Partners Int'l Ltd.*, 575 F.3d at 109 n.9 (internal quotations and citation omitted).

### A.    Ayasli's Choice of Forum Is Due No Deference

The deference due a plaintiff's choice of home forum is not "automatic."  *Id.* at 103.  For instance, if the plaintiff's choice of his home forum is not his "*initial* forum choice," the choice is accorded no deference.  *Id.* (emphasis in original) (internal quotations and citation omitted).  In

addition, "the more it appears that the plaintiff's choice was motivated by forum-shopping reasons[ ]
. . . the less deference the plaintiff's choice commands."  *Id.* at 102 n.9 (internal quotations and
citation omitted).  Further, if a plaintiff conducts business abroad, he cannot rely on his choice of
home forum to always defeat a *forum non conveniens* motion.  *See Howe v. Goldcorp Investments, Ltd.*, 946
F.2d 944, 951-55 (1st Cir. 1991) (holding that dismissal of American plaintiff's choice of American
forum was improper when the lawsuit involved a Canadian investment); *Sussman*, 801 F. Supp. at
1073 ("Where an American plaintiff chooses to invest in a foreign country and then complains of
fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a
talisman against forum non conveniens dismissal is diminished.").

Here, Ayasli's choice of this Court (even though it is his home forum) commands no
deference because he filed a substantially similar criminal complaint with the Istanbul Public
Prosecutor's office before he filed this action.  *See Interface Partners Int'l Ltd.*, 575 F.3d at 102 n.8.

Ayasli's choice of forum also deserves no deference because it was motivated by forum-
shopping.  In response to Bugaraj's criminal complaint, Ayasli acknowledged that the dispute was a
"commercial dispute that is highly complicated"—not a RICO suit.  (Gokce Decl. ¶ 32, Ex. 22.)
Moreover, in rejecting Ayasli's criminal complaint, the Istanbul Chief Public Prosecutor's Office
found no organized crime and advised Ayasli to file a civil suit because this was a "commercial"
dispute.  (Gokce Decl. ¶ 34, Ex. 24.)  Other courts have been skeptical when a party files a RICO
suit in the United States for a business dispute that has its locus in a foreign country—especially
when the party has already filed a claim in the foreign jurisdiction (as Ayasli has with his criminal
complaint).  *See Flynn*, 42 F. Supp. 3d at 536-37 ("[P]laintiff's heavy reliance on RICO as a reason to
retain the action here suggests a desire to benefit from whatever *in terrorem* effect that statute has. . . .
[I]n light of [plaintiff's] institution in Ireland of the first of the lawsuits relating to this controversy,
the Court concludes that the institution of this case in the United States was at least as much a result

of forum shopping as it was of any substantial concern with convenience."); *Lazare Kaplan Int'l Inc.*, 337 F. Supp. 3d at 299 ("[T]his case presents a plausible inference that Plaintiff's choice of forum was motivated by [forum-shopping]. Plaintiff had threatened [defendant] with a 'high visibility' RICO suit in the United States. The parties were already litigating essentially the same issues in Belgium before this case was filed."). *See also MSPA Claims 1, LLC v. Covington Specialty Ins. Co.*, No. 18-CV-830-JL, 2019 WL 1300860, at *3 (D.N.H. Mar. 21, 2019) (LaPlante, J.) ("[Plaintiff] has alleged few connections between this case and New Hampshire. . . . Most importantly, [plaintiff] previously brought a similar lawsuit against [defendant] in Florida, which was dismissed for lack of standing. [Plaintiff] . . . has not provided any compelling reasoning for bringing this new suit in New Hampshire, rather than Florida. This unquestionably suggests forum shopping, which renders the plaintiff's choice of little weight.").

With the "diminished" deference due Ayasli's choice of forum in the "background," we now move to the traditional *forum non conveniens* analysis. *Snofrost*, 353 F. Supp. 3d 109

### B.    Turkey Is An Available Alternative Forum

Turkey is both an available and adequate forum. First, the forum is available because the Korkmaz Defendants are amenable to service there. *See Interface Partners Int'l Ltd.*, 575 F.3d at 101. They are Turkish citizens, the conduct at issue occurred in Turkey, the BoraJet Agreement was consummated in Turkey and has a forum-selection clause pointing to Turkey, and Bugaraj has already commenced suits in Turkey. (Compl. ¶ 40, 64,77.) *See Mercier*, 981 F.2d at 1350 (observing that Turkish courts have jurisdiction over claims relating to contracts made or to be performed in Turkey and torts committed in Turkey); *Rolls-Royce Commercial Marine, Inc. v. N.H. Ins. Co.*, 2010 WL 5067608, at *9 ("[T]he ongoing litigation in the UK clears up many of the uncertainties involved with a typical forum non conveniens analysis. It makes clear there are no problems with personal jurisdiction . . . .").

Second, Turkey is an adequate forum because it provides Ayasli with an avenue for "obtaining [a] remedy for the alleged wrong[s]" in the Complaint. *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 422 (7th Cir. 2009). This is demonstrated by the fact that Ayasli already filed a virtually identical complaint with the Istanbul Chief Public Prosecutor's Office. (Gokce Decl. ¶34, Ex. 24.) *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir. 2001) (holding that the alternative foreign forum need not provide a civil remedy); *Imamura v. Gen. Elec. Co.*, 371 F. Supp. 3d 1, 8 (D. Mass. 2019) (same).

Moreover, Ayasli can bring his claims under Articles 36-38 of the Turkish Code of Obligations (relating to contracts induced by deception and intimidation) and Article 49 (relating to torts and fraud) to obtain relief for the RICO and state law claims. (Gokce Decl. ¶¶ 39-44, Ex. 25.) It is of no consequence that Turkey does not have the exact equivalent of a civil RICO statute (most jurisdictions do not); the critical issue is whether he has redress for the alleged wrongs under some cause of action. *See Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 525 (S.D.N.Y. 2006) (finding that Turkey provides an adequate alternative forum for RICO claims) *aff'd sub nom. Turedi v. Coca-Cola Co.*, 343 F. App'x 623, 626 (2d Cir. 2009); *Flynn*, 42 F. Supp. 3d at 537 (stating that it is well-established that for an alternative forum to be adequate, it need not have a civil RICO; the existence of a fraud cause of action, which most jurisdictions have, is adequate). *See also Howe*, 946 F.2d at 952 (holding that Canada is an adequate alternative forum despite "some differences between Canadian and American law").

### C.     The Private Interest Factors Favor Turkey

*Comparative Convenience Of Parties' Access To Sources Of Proof.* This prong focuses on the "convenience to the parties" *vis-à-vis* accessing the relevant evidence. *LaSala*, 510 F. Supp. 2d at 259. For this reason, this factor almost always favors the foreign forum when "the majority of evidence resides there," *id.* at 258, given the burdens of transporting witnesses, *see Imamura*, 371 F. Supp. 3d at

27

11-12; *Snofrost AB*, 353 F. Supp. 3d at 107-08; *LaSala*, 510 F. Supp. 2d at 259; *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 940 F. Supp. 528, 538 (S.D.N.Y. 1996); the costs and time consumption of translating documents, *see Phillips*, 555 F. Supp. 2d at 271 (LaPlante, J.); *Traveler's Indem. Co.*, 710 F. Supp. at 501; and the "considerable" difficulties foreign-language testimony presents to the assessment of witness credibility and the smooth flow of the proceedings, *LaSala*, 510 F. Supp. 2d at 259.

As described above, the lion's share of the conduct forming the basis of this suit took place in Turkey: (1) BoraJet is a Turkish regional airline; (2) its sale was negotiated in Turkey and the purchaser, Bugaraj, is a Turkish company; (3) the alleged defamation campaign that supposedly devalued BoraJet and induced Ayasli to sell took place in Turkey in Turkish newspapers; (4) Turkish banks allegedly prematurely called Ayasli's assumed BoraJet debt; (5) the alleged threats to Ayasli's business associates and witnesses occurred in Turkey, and (6) the alleged "sham" lawsuits are in Turkey.  (Compl. ¶¶ 4, 18, 77, 324-65, 376-417, 459-554.)

Therefore, the overwhelming majority of the evidence in this action is in Turkey, including witnesses with knowledge of and documents relating to: (1) Ayasli's alleged fraudulent practices at BoraJet (Bugaraj's lawyers identified Tolga Uzumcu, Olcay Ozbay, Ceylan Topal, and Akol as four witnesses with knowledge of this issue; Ayasli's claims they were threatened or are being untruthful; they will need to testify here), (Gokce Decl. Ex. 6 at 8); (2) the BoraJet sale, (Compl. ¶¶ 405-14); (3) the Korkmaz Defendants' alleged defamation campaign, (Compl. ¶¶ 324-65); (4) the Korkmaz Defendants alleged collusion with "corrupt" Turkish banks to call prematurely Ayasli's assumed BoraJet debt (this will involve a number of Turkish bank officials), (Compl. ¶¶ 423-47, 682, 698); and (5) the Korkmaz Defendants' alleged abuse of the legal process in Turkey, (Compl. ¶¶ 462-88, 514-42).  In contrast, there is virtually no relevant evidence in New Hampshire or the United States. The burdens of transporting these witnesses and documents to this forum and translating the

testimony and documents would be enormous and far outweigh the convenience to Ayasli of pursuing the suit here.  Just to give the Court an example, for this motion alone, it cost the Korkmaz Defendants in excess of $40,000 to obtain the needed translations.  (Cekirge Decl. ¶ 3.)  Under these circumstances, this prong favors dismissal of this suit.

Compulsory Process.  Given that most of the documents and key witnesses (*e.g.* allegedly corrupt journalists and bank officials and former BoraJet employees identified by the Korkmaz Defendants whose veracity Ayasli challenges) are in Turkey and beyond the Court's subpoena power, the "compulsory process" prong also favors Turkey.  (Gokce Decl. Ex. 6 at 8, Compl. ¶¶ 324-65, 682, 698.)  *See Mercier*, 981 F.2d at 1356 (holding that the court's inability to compel testimony of key Turkish witness favored dismissal); *Howe*, 946 F.2d at 952 ("Compulsory process would seem especially important where, as here, fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor evidence essential to a fair trial."); *Imamura*, 371 F. Supp. 3d at 12 ("The Court's inability to compel the production of documents or other key physical evidence from sources in Japan increases the evidentiary problems with litigating this case in Massachusetts.").

For all these reasons, the Court should dismiss this case for *forum non conveniens*.

## VIII.   THE COURT HAS NO PERSONAL JURISDICTION OVER THE KORKMAZ DEFENDANTS

A non-resident defendant must have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (internal quotations and citation omitted).  This is true whether the grounds for jurisdiction are RICO, the New Hampshire Long-Arm Statute, or Federal Rule of Civil Procedure 4(k)(2) ("Rule 4(k)(2)").  *See Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 6 (1st Cir. 2018) (holding that defendant must have minimum contacts with the United States); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998) ("A civil RICO action can

29

only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."); *Sawtelle v. Farrell*, 70 F.3d 1381, 1388 (1st Cir. 1995) (holding that jurisdiction under the New Hampshire Long Arm Statute requires minimum contacts with new Hampshire).

The Fourteenth Amendment's Due Process requirements guide the minimum contacts analysis under RICO and the New Hampshire Long-Arm Statute. *See PT United Can Co.*, 138 F.3d at 71; *Sawtelle v. Farrell*, 70 F.3d at 1388. The Fifth Amendment's Due Process requirements guide the minimum contacts analysis under Rule 4(k)(2). *Plixer*, 905 F.3d at 6.

Whether analyzed under the Fifth or Fourteenth Amendments, personal jurisdiction comes in two variants: general and specific. *See BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017). Neither type of jurisdiction applies here.

A.     **There Is No General Jurisdiction Over The Korkmaz Defendants**

General or all-purpose jurisdiction allows a court to hear all claims against defendants when "their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Id.* (internal quotations and citation omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Daimler AG v. Bauman*, 571 U.S. 117, 1377 (2014) (internal quotations and citation omitted). For corporate defendants, "the 'paradigm' forums. . . are the corporation's place of incorporation and its principal place of business." *BNSF*, 137 S. Ct. at 1558. Neither situation applies in this case.

General personal justification is not proper because Korkmaz is not domiciled in either New Hampshire or the United States. (Korkmaz Decl. ¶¶ 2-4.) Similarly, SBK Holding and Bugaraj are

Turkish companies with no places of business in either New Hampshire or the United States.[7]

(Korkmaz Decl. ¶¶ 6, 10.)

### B.     There Is No Specific Jurisdiction Over The Korkmaz Defendants Under RICO Or The New Hampshire Long Arm Statute

The Fourteenth Amendment's minimum contacts analysis for specific jurisdiction requires three elements to be satisfied: (1) the litigation must "arise out of or relate to" the defendants in-forum activities; (2) the defendant must have purposefully directed his activities into the forum, or "purposefully availed himself of the benefits and protections of" the forum; and (3) the exercise of personal jurisdiction must not otherwise offend the "concept of fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-78 (1985) (internal quotations and citation omitted). "Questions of specific jurisdiction are always tied to the particular claims asserted," and courts must analyze a particular defendant's in-forum contacts on a claim-by-claim basis. *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999).

Aside from a few conclusory statements, the Complaint does not allege any New Hampshire conduct by SBK Holding, Bugaraj or any other defendant. (*See generally* Compl.)  Personal jurisdiction as to SBK Holding and Bugaraj is easily defeated.  Also, because no defendant has any contacts with New Hampshire, RICO does not provide a basis for proceeding with the suit either. *PT United Can Co.*, 138 F.3d at 71.

This leaves Korkmaz.  The Complaint alleges three types of contacts with New Hampshire as to him: (1) sending communications to Ayasli in New Hampshire, including mail, phone calls and

---

[7]     The Complaint does not allege that Bugaraj had any offices in the United States.  Although it alleges that SBK Holding "maintained an office at 150 South Rodeo Drive Suite 260, Beverly Hills, California," this is inaccurate.  (Compl. ¶¶ 196, 198; Korkmaz Decl. ¶ 6.)  A website listing of an American address for a non-existent office, without more, is irrelevant to a general jurisdiction analysis. *Cossaboon v. Maine Med. Ctr.*, 600 F.3d 25, 35 (1st Cir. 2010) ("It is clear that the mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum." (internal quotation and citation omitted)).

WhatsApp text messages; (2) colluding with Turkish reporters to plant defamatory news reports in Turkish newspapers in the Turkish language, which were republished on these papers' websites and read by members of the Turkish community in New Hampshire; and (3) showing up in New Hampshire to engage in face-to-face settlement negotiations, which, at the last minute, Ayasli unilaterally cancelled.  As discussed below, none of these categories of conduct meet the Due Process requirements under the Fourteenth Amendment.  (Compl. ¶ 334-35, 449, 452-54, 582-85.)

> **1.     Ayasli's Alleged Harm Does Not Arise Out Of Or Relate To Korkmaz's New Hampshire-Related Conduct**

Recent U.S. Supreme Court decisions have focused heavily on the "relatedness" prong of the specific jurisdiction analysis.  *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty.*, 137 S.Ct. 1773, 1779 (2017) ("The primary focus of [the Supreme Court's] personal jurisdiction inquiry is the defendant's relationship to the forum State."); *Walden*, 571 U.S. at 284 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").  The key is the *defendant's conduct and relationship* to the forum, not the plaintiff's.  Therefore: (1) "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State"; and (2) a court must look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 284-85 (emphasis in original). *See also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) ("In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." (internal quotations and citations omitted)).  For intentional torts, courts "look to whether the plaintiff has established cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)."  *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20–21 (1st Cir. 2018).

Korkmaz's alleged New Hampshire connections do not meet the relatedness prong, and so fail the minimum contacts requirement. First, although the Complaint alleges that jurisdiction is proper because Korkmaz traveled to New Hampshire on April 9, 2018, to participate in a settlement meeting with Ayasli, this meeting never occurred. (Compl. ¶¶ 582-85.) Its non-occurrence cannot be a cause-in-fact or legal cause of Ayasli's alleged injuries. Ayasli does not argue otherwise. Even if, theoretically, such a non-event could cause an injury, in this case the aborted meeting occurred in April 2018, *after* Ayasli's alleged injuries in the Complaint. For this meeting—which Ayasli aborted—to be a basis for jurisdiction, Ayasli would have to argue that a non-event, which "occurred" after the alleged injuries, was a "but-for" cause of those injuries. Such an argument defies both logic and physics and cannot be used to justify personal jurisdiction over Korkmaz.

The Complaint further alleges that Korkmaz's counsel mailed a settlement letter to Ayasli in New Hampshire as part of the "relentless extortion campaign and defamatory accusations." (Compl. ¶ 540.) But the Complaint does not allege that this mailing gave rise to or is related to Ayasli's harm. In fact, according to the Complaint, when Ayasli "voluntarily shared all relevant BoraJet information" with the relevant United States entity, he received a "no action" letter. (Compl. ¶ 541.) It is unclear how the identified settlement letter gave rise to Ayasli's harm, when the United States government, upon reviewing all relevant information, decided it was not going to do anything.

Although the Complaint alleges that Ayasli withdrew funds from New Hampshire banks to "to counteract the increasing financial pressure on BoraJet and his other Turkish-based businesses arising out of [the Korkmaz Defendants'] defamatory media campaign" in Turkey and to "to pay off loans and lines of credit improperly accelerated or intentionally defaulted on by" the Korkmaz Defendants in Turkey, the fact that Ayasli withdrew funds from his New Hampshire bank account is irrelevant to the personal jurisdiction analysis; these alleged acts were in Turkey and he did not

create a connection with New Hampshire. (Compl. ¶¶ 392, 445-46.) *See Walden*, 571 U.S. at 284-85. Instead, Ayasli himself decided to withdraw the money from a New Hampshire bank. The fact that Ayasli's action in New Hampshire may have been foreseeable carries no weight because the action was Ayasli's own and not Korkmaz's. *Id.* at 289 (holding that defendant's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections").

An argument that Ayasli suffered the "effects" of Korkmaz's out-of-state actions in New Hampshire fares no better. *See Sawtelle*, 70 F.3d at 1390-91 (holding that there was no jurisdiction over legal malpractice claim, where the alleged malpractice occurred out of state, even though the defendant had communicated the misconceived advice to the plaintiff in New Hampshire and the plaintiff suffered harm in the state).

### 2. Korkmaz Did Not Purposefully Direct His Conduct Into New Hampshire

The second element of specific jurisdiction, "purposeful availment," requires a level of intentionality on the part of the defendant in directing his conduct into the forum state. *See Walden*, 571 U.S. at 286 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."); *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 624 (1st Cir. 2001) ("This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts."). It is not enough to "rely on a defendant's 'random, fortuitous, or attenuated contacts,' or on the 'unilateral activity' of a plaintiff." *Walden*, 571 U.S. at 286 (internal quotations and citation omitted). *See also A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016) ("[W]e focus on the defendant's intentionality, and the cornerstones of purposeful availment-voluntariness and foreseeability. . . . [T]he proper question is not where the plaintiff experienced a

34

particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." (internal quotations and citation omitted)).

The Complaint alleges that Korkmaz threatened Ayasli in a series of phone calls and text messages, but it does not allege that Korkmaz purposefully and voluntarily directed these phone calls and texts into New Hampshire.  (Compl. ¶¶ 450-54.)  Although it is unclear from the Complaint, Korkmaz only communicated with Ayasli through the WhatsApp mobile application.[8] (Korkmaz Decl. ¶¶ 7-8.)  The mobile number that Ayasli associated with his WhatsApp account did not have a New Hampshire area code (*i.e.*, 603) but rather a Massachusetts code (*i.e.*, 781). (Korkmaz Decl. ¶ 8.)   In fact, the only connection that these calls and messages had to New Hampshire is that Ayasli allegedly received the calls and read some of the messages in New Hampshire.  But the fact that Ayasli received the calls or read the messages in New Hampshire is "random" and "fortuitous," and due to the unilateral actions of Ayasli, not Korkmaz.  *Walden*, 571 U.S. at 286 (internal quotations and citation omitted).  Due to the mobile nature of WhatsApp (users can receive phone calls and text messages anywhere their mobile phone has an Internet or Wi-Fi connection), it is just as likely that Ayasli would have received the calls or read the messages in any other state or country as he would have in New Hampshire.  The fact that Ayasli alleges he then suffered harm in New Hampshire is clearly insufficient to constitute purposeful availment.  *See*

---

[8] WhatsApp.com, FAQs: Is it free to send messages over WhatsApp?, https://faq.whatsapp.com/en/general/20965922/?category=5245246 (last visited Aug. 24, 2019) ("WhatsApp uses your phone's Internet connection (4G/3G/2G/EDGE or Wi-Fi, as available) to send and receive messages to your friends and family. You don't have to pay for every message. As long as you haven't exceeded your data limit or you're connected to a free Wi-Fi network, your carrier shouldn't charge you extra for messaging over WhatsApp.")  Thus, WhatsApp is a mobile application that allows users from all over the world to call and send text messages to each other for free using a mobile phone's Internet connection.  To use WhatsApp, a user must create an account and provide his or her mobile number.  The user can then use the application to connect with people in her or his mobile phone contacts, or others.  Although a user's WhatsApp account is associated with the user's mobile number, the user can send or receive messages anywhere the user has access to a cellular signal or Wi-Fi.

*Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum."); *A Corp.*, 812 F.3d at 60.   Ayasli cannot meet the second prong of personal jurisdiction.

Ayasli's defamation claims likewise fail to meet the purposeful availment requirement because there is no allegation that Korkmaz's allegedly defamatory statements were directed to New Hampshire.  In the seminal jurisdictional case dealing with defamation, *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court found that jurisdiction over a non-resident reporter was proper when the forum state was the "focal point both of the story and the harm suffered."  *Id.* at 788–89.  As made clear by that decision, and subsequently, jurisdiction is only proper when the defendant makes contacts with the forum, and "not just with the plaintiff."  *Walden*, 571 U.S. at 287; *Calder*, 465 U.S. at 788-89.[9]

From the Complaint, it is obvious that the allegedly defamatory comments were not intended for New Hampshire, but rather an audience in Turkey.  The comments were made by Turkish news outlets, in the Turkish language, and published on Turkish websites.  (Compl. ¶¶ 338-65.)  Their effect was meant to be felt in Turkey, so that the Turkish airline BoraJet would be devalued, and Korkmaz could come in as a "white knight" and buy the company at a "fire sale price" in Turkey.  (Compl. ¶¶ 327, 398.)   The fact that Turks in New Hampshire may have read the news articles was mere happenstance due to the world-wide nature of the Internet.  This alleged ancillary effect of the defamation campaign is insufficient to justify the exercise of jurisdiction in New Hampshire.  *Cossaboon v. Maine Med. Ctr.*, 600 F.3d at 35 (finding that a Maine hospital's "user-friendly and interactive website," accessible in New Hampshire, as well as the rest of the world, does not grant jurisdiction over the hospital, since the website "does not sell or render services online," or otherwise "target New Hampshire residents in particular"); *Noonan v. Winston Co.*, 135 F.3d 85, 91

---

[9]      The First Circuit has noted that in *Calder*, "the actual tort or injury, not just its consequences, occurred within the forum."  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 624 (1st Cir. 2001).

(1st Cir. 1998) (rejecting plaintiff's argument that "the defendants' intent to reach Massachusetts can be inferred from the placement of advertisements in publications with international circulations").

### C.   There Is No Specific Jurisdiction Over The Korkmaz Defendants Under Rule 4(k)(2)

Personal jurisdiction over the Korkmaz Defendants based on Fed. R. Civ. P. 4(k)(2) is not proper because: (1) their nationwide contacts did not give rise to and were not related to Ayasli's harm; and (2) they did not purposefully direct those actions into the United States.  Under Rule 4(k)(2), service of process establishes personal jurisdiction when three elements are met: (1) the claim "arises under federal law"; (2) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"; and (3) "exercising jurisdiction is consistent with the United States Constitution and laws."  Rule 4(k)(2) effectively "functions 'as a species of federal long-arm statute,'" and like state long-arm statutes, jurisdiction must comport with the Due Process Clause, albeit under the Fifth rather than Fourteenth Amendment.  *Swiss Am. Bank*, 274 F.3d at 618.  Therefore, to the extent that Rule 4(k)(2) applies, it only applies to Ayasli's two federal claims (*i.e.* violations of RICO (Count 1) and Conspiracy to Violate RICO (Count 2)).

The Fifth Amendment Due Process analysis focuses on defendants' nationwide contacts. The First Circuit analyzes nationwide contacts under the Fifth Amendment using the same framework developed for state contacts under the Fourteenth Amendment.  *See id.* at 620-21 (analyzing whether the defendant has minimum nationwide contacts under Rule 4(k)(2) using the same "relatedness," "purposeful availment" and "reasonableness" factors under the Fourteenth Amendment analysis).

The Korkmaz Defendants' *de minimis* contacts with the United States as a whole are not sufficient to allow the Court to exercise jurisdiction over Ayasli's RICO claims.  As discussed above, the Complaint does not allege any United States contacts on the part of SBK Holding or Bugaraj, and jurisdiction as to them under Rule 4(k)(2) is easily defeated.

As to Korkmaz, the Complaint only alleges that Korkmaz traveled to Utah to "confront, threaten and attempt to bribe University of Utah professor Hakan Yavuz into pressuring [Ayasli] to 'surrender' and pay a monetary 'settlement' to the RICO Enterprise." (Compl. at ¶ 555.) The Complaint does not assert that this alleged meeting with Professor Yavuz gave rise to, or is related to the harm suffered by Ayasli. The Complaint alleges that Professor Yavuz informed Ayasli of his discussion with Korkmaz, but it does not allege that Ayasli suffered any harm as a result. (Compl. at ¶ 576.) The First Circuit has made clear that even in a case involving civil RICO claims, plaintiffs must establish proximate cause between defendants' wrongful conduct and plaintiff's injuries. *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 132 (1st Cir. 2006); *see also Scottsdale Capital*, 887 at 20–21 (noting that under the relatedness prong of the specific jurisdiction analysis, courts "look to whether the plaintiff has established cause in fact . . . and legal cause"). Additionally, this meeting happened in the beginning of 2018, *after* the majority of the claimed harm had already occurred. As a result, the alleged meeting between Korkmaz and Professor Yavuz urging settlement could not be a cause of Ayasli's harm, because, according to the Complaint, that harm had already occurred. For all of these reasons, jurisdiction under Rule 4(k)(2) is not proper and Ayasli's federal claims against the Korkmaz Defendants should be dismissed.

### D.   Requiring the Korkmaz Defendants To Appear In Court In New Hampshire Would Offend Fair Play And Substantial Justice

Hauling the Korkmaz Defendants into a New Hampshire court would violate traditional notions of "fair play and substantial justice," since the majority of Ayasli's claims arise out of business transactions in Turkey, involving a large number of Turkish individuals and entities, which are already the subject of nearly identical litigation in Turkey. Recognizing that mechanical application of the "relatedness" and "purposeful availment" prongs of the specific jurisdiction analysis does not guarantee that a defendant's due process rights are protected, courts balance these first two prongs with certain "reasonableness factors." *See Ticketmaster-New York, Inc. v. Alioto*, 26

38

F.3d 201, 212 (1st Cir. 1994) ("Relatedness and purposeful availment are cogs in this analytic machinery.  The gestalt factors comprise the machinery's fail-safe device.")

These "Gestalt factors" include: the extent of defendant's "purposeful" interjection; the burden on defendant in defending in the forum; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in adjudicating the dispute; the most efficient judicial resolution of the controversy; the importance of the forum to plaintiff's interest in convenient and effective relief; and the existence of an alternative forum.  *See Burger King*, 471 U.S. at 476-477.  These Gestalt factors are especially important when a plaintiff has made a weak showing on the first two prongs.  *See Ticketmaster*, 26 F.3d at 212 (finding that a court cannot exercise personal jurisdiction when there is "only the most tenuous showings of relatedness and purposefulness" and "forcing the defendant to defend in the forum would be plainly unreasonable").

In this case, the "reasonableness" factors weigh in favor of the Korkmaz Defendants.  Some of these factors are discussed at length above in the Korkmaz Defendants' discussion on *forum non conveniens* and that discussion is incorporated herein.  In summary, this case would be more efficiently resolved in Turkey, where an alternative forum not only already exists, but is presently being utilized by the parties.  To the extent that New Hampshire has an interest in adjudicating a Turkish business dispute—which the Korkmaz Defendants contest—that interest must be weighed against the Parties' expressed intent, as evidenced by their forum-selection clause, that any resulting litigation would take place in Turkey.  *See Burger King*, 471 U.S. at 472 n. 14 ("Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process.") (internal citation omitted).  Moreover, Ayasli's convenience in pursuing litigation in New Hampshire must be balanced with the significant burden on the Korkmaz Defendants in defending the case here.  The Korkmaz Defendants would be significantly burdened by the geographical distance from New Hampshire and by the fact that

almost all of the necessary documents and fact witnesses in this case reside in Turkey.  As a result, the Korkmaz Defendants ability to mount an adequate defense would be seriously threatened.  The Complaint does not allege that the Turkish courts or legal system would not be a fair alternative forum or that they present any "fundamental obstacles" to Ayasli's recovery.  *Sussman*, 801 F. Supp. at 1076.  Absent such evidence, in accordance with international comity, an American court cannot presume that a foreign court would not be a competent alternative forum.  *Id.* at 1076-79.

Considering the totality of circumstances, the Court should dismiss this action for lack of personal jurisdiction.

## IX.   <u>CONCLUSION</u>

This is a Turkish dispute with no relationship to New Hampshire or the United States.  A forum-selection clause requires disputes to be litigated in Istanbul.  All convenience factors point to this case being litigated in Turkey (where extensive litigation already exists).  And the Court has no personal jurisdiction over the Korkmaz Defendants.  The Court should dismiss this action.

<div style="margin-left: 40%;">

Respectfully submitted,

SEZGIN BARAN KORKMAZ,
SBK HOLDINGS A.S., and BUGARAJ
ELEKTRONIK TICARET VE BILISIM
HIZMETLERI A.S.
By their Attorneys,

McLANE MIDDLETON,
PROFESSIONAL ASSOCIATION

</div>

Dated:  September 4, 2019                    */s/ Bruce W. Felmly*
                                             Bruce W. Felmly (NH Bar No. 787)
                                             Michael A. Delaney (NH Bar No. 10504)
                                             Andrew R. Hamilton (NH Bar No. 265245)
                                             900 Elm Street, P.O. Box 326
                                             Manchester, NH 03105-0326
                                             Direct: (603) 628-1448
                                             Facsimile: (603) 625-5650
                                             bruce.felmly@mclane.com
                                             michael.delaney@mclane.com
                                             andrew.hamilton@mclane.com

-and-

BRYAN CAVE LEIGHTON
PAISNER LLP

Nafiz Cekirge (*pro hac vice*)
H. Alper Tosun (*pro hac vice*)
1290 Avenue of the Americas
New York, NY 10104-3300
Telephone: (212) 541-2000
nafiz.cekirge@bclplaw.com
alper.tosun@bclplaw.com

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify on this fourth day of September, 2019, this document was filed through the Electronic Case Filing System of the United States District Court for the District of New Hampshire and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic Filing (NEF).

                                        */s/ Bruce W. Felmly*
                                        Bruce W. Felmly

114286\14898631.v1