

**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Anders Ekholm, hereby certify that the attached document is to the best of my knowledge and belief, a true and accurate translation from Turkish into English.

_____
Anders Ekholm

Sworn to before me this
August 23, 2019

_____
Signature, Notary Public

AURORA ROSE LANDMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LA6380858
Qualified in New York County
My Commission Expires 09-17-2022

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

Hergüner Bilgen Özeke
Attorney Partnership          [bilingual text]

Büyükdere Caddesi 199 Levent 34394 Istanbul TURKEY
T +90 212 310 18 00 F +90 212 310 18 99
E info@herguner.av.tr W www.herguner.av.tr

Att. Piraye Kuranel Başol
Att. Ayşe Hergüner Bilgen
Att. İsmet Bozoğlu
Att. S. Aslı Budak
Att. H. Tolga Danışman
Att. Serkan Gül
Att. Ümit Hergüner
Att. Senem İşmen

Att. Nazım O. Kurt
Att. M. Mert Oğuzalp
Att. Yeşim F. Api Şamlı
Att. Deniz Tuncel
Att. Kayra Üçer
Att. Ufuk Yalçın
Att. Bige Yücel

**DUPLICATIO PETITION**
**June 14, 2017**

**FOR THE ATTENTION OF THE HONORABLE PRESIDENCY OF**
**ISTANBUL 3ʳᴰ COMMERCIAL COURT OF FIRST INSTANCE,**

| | |
|---|---|
| **FILE NO.** : | **2017/242 Case** |
| **DEFENDANT SUBMITTING THE**<br>**DUPLICATIO PETITION** : | **Yalçın Ayaslı ("Transferor")** |
| **ATTORNEYS** : | Att. Ayşe Hergüner Bilgen – Att. H. Tolga Danışman<br>(*Address is provided in the letterhead*) |
| **PLAINTIFF** : | **Bugaraj Elektronik Ticaret ve Bilişim Hizmetleri A.Ş.**<br>*Maslak Mah. Dereboyu Cad. Zağra İş Merkezi No: 14/C*<br>*Sarıyer / Istanbul* |
| **ATTORNEY** : | Att. Sinan Görkem Gökçe<br>*Abide-i Hürriyet Caddesi, No: 158 K: 2 Şişli / Istanbul* |
| **SUBJECT** : | The subject matter is comprised of the submission of our responses to |

the unjustified and baseless claims of the Plaintiff that were included in the rejoinder petition dated May 22, 2017 and notified to us on June 05, 2017 and our declarations with regards to the scope of the file in general and in our capacity as the new attorneys and our request for the **dismissal of the unjustified action.**

## OUR STATEMENTS

The case before the court subject to the dispute was filed by the Plaintiff Bugaraj Elektronik Ticaret ve Bilişim Hizmetleri A.Ş. on March 13, 2017 with a cautionary attachment request. (*Plaintiff Company will be referred to as "Bugaraj" or "Transferor" hereinafter within the petition*).

As a result of the review conducted by your Honorable Court, cautionary attachment request was dismissed on March 13, 2017. The statement of claims was delivered on March 17, 2017 and an extension was requested for the response period with the petition dated March 20, 2017. After the extension request was accepted by your Honorable Court, a reply petition dated April 03, 2017 was submitted to the file within the designated period.

On the other hand, Plaintiff's attorneys filed an appeal against your Honorable Court's decision with regards to the dismissal of the cautionary attachment request dated March 13, 2017 with their petition dated March 29, 2017. The appeal process still continues with the file before Istanbul Regional Court 12ᵗʰ Civil Chamber numbered 2017/360 Case.

[signature]

Plaintiff Company Bugaraj and Defendant Client have executed a Share Transfer and Profit-Sharing Contract dated December 29, 2016 for the transfer of the shares of (1) Bora Jet Havacılık Taşımacılık Uçak Bakım Onarım ve Ticaret Anonim Şirketi (**"Borajet"** or "**Company**"), (2) Bora Jet Bakım Onarım ve Ticaret Anonim Şirketi owned by Borajet and where it is a full subsidiary (**"Borajet Bakım**" [Maintenance]) and (3) Aydın Jet Havacılık Anonim Şirketi ("**Aydın Jet**") (collectively referred to as "**Companies**" or "**Transferred Companies**") by Bugaraj to our Client ("**Share Transfer Contract**" and/or "**Contract**"). [**APPENDIX 1- Share Transfer Contract**]

The file before the Court was filed by the Plaintiff to request the collection of 71,978,016 US Dollars (TRY 253,305,035 as of the action date) from the Client based on the aforementioned Share Transfer Contract. Moreover, Plaintiff Party added a new request to the rejoinder petition that was not included in the statement of claims and requested loss of profit.

<h3 style="text-align:center">A. MATERIAL FACTS</h3>

**1. About our Client**

Our Client Yalçın Ayaslı was born in Ankara in ███, he is a Turkish/American citizen, he has been living in the United States of America for the past forty three years, he completed his undergraduate studies at METU Electrical Engineering department and worked there as a faculty member for a while and he is an academician who completed his master's degree and PhD at the Massachusetts Institute of Technology in Boston. Within the scope of various scientific studies that he conducted at the research department of a firm in the United States of America, he has been awarded 15 patents. Apart from his investments in the USA, he also relied on the Treaty on Extradition and Mutual Assistance in Criminal Matters between the United States of America and the Republic of Turkey that was signed on December 03, 1985 and he made an investment in the amount of approximately 400,000,000 US Dollars in Turkey until present day. Our Client who is a member of the Global Turkish Business Council High Advisory Board, has established Turkish Cultural Foundation and Turkish Coalition of America which have offices in Boston, Washington DC and Istanbul to introduce the Turkish culture to the world. He conducted and continues to conduct studies in the United States of America, Switzerland and France over the foundation that he established against the Armenian genocide claims named Turkish American Legal Defense Fund. [**APPENDIX 2 – Certain News Reports Published in the Press About the Client**]

**2. About the Plaintiff Company**

Plaintiff Company Bugaraj was established in Istanbul on August 10, 2015 with a capital of TRY 1,000,000. Its only official is the executive board chairman Cüneyt Özen who is also an attorney registered with Istanbul Bar Association. The only shareholder of the company named Bugaraj is Bukombin Bilişim ve Teknoloji Anonim Şirketi ("**Bukombin**"). [**APPENDIX 3- Trade Registry Gazette Copies for Bugaraj**]

Bukombin was founded on July 15, 2015 in Istanbul with a capital of TRY 1,000,000. Its only shareholder is SBK Holding A.Ş. ("**SBK Holding Turkey**"). The only executive board member of Bukombin is Sezgin Baran Korkmaz who is authorized to act on behalf of SBK Holding Turkey. [**APPENDIX 4- Trade Registry Gazette Copies for Bukombin**]

According to Trade Registry Gazette records, SBK Holding was founded in Istanbul, Turkey on March 08, 2013 with a capital of TRY 10,000,000 and its only and founder shareholder as well as its only board of directors' member is Sezgin Baran Korkmaz. Put differently, the definitive owner of the Plaintiff Bugaraj is Sezgin Baran Korkmaz within the holding structure explained above.

2 [signature]

Sezgin Baran Korkmaz is also the signatory of the Share Transfer Agreement on behalf of Bugaraj as its Guarantor. [**APPENDIX 5 – Trade Registry Gazette Copies for SBK Holding Turkey**]

The articles published in the press **indicate that the field of activity of Plaintiff Company's definitive owner SBK Holding Turkey whose Executive Board Chairman and owner is Sezgin Baran Korkmaz, is *"purchasing companies that have declared bankruptcy and are subject to enforcement proceedings, that cannot carry out any production activities or pay the salaries of their employees and that are in crisis"***. We hereby submit the sections in the article in question published within Hürriyet Newspaper and that are included on the website of SBK Holding Turkey which are based on the statements of Sezgin Baran Korkmaz below for the consideration of the Honorable Court:

> *"As it was stated by Korkmaz, these companies that are bankrupt or are on the verge of bankruptcy are purchased for a 'very low price' and their debts to the banks are paid off. The salaries are paid to the employees and they are brought to a status where they can start production again. Following this, they are sold as an active company. SBK Holding Executive Board Chairman Sezgin Baran Korkmaz stated that they continued their path by purchasing bankrupt companies with American investment funds afterwards in this business which they started in 1988 as a domestic company. Korkmaz also explained that they reached an agreement with a British investment fund for the first time the other night, and that they are planning to invest in those companies which are in crisis either by purchasing these companies or by becoming a major shareholder. Sezgin Baran Korkmaz and Ana Cukic Armstrong who is the CEO of the British fund AIM that he collaborates with, came together with the members of the press in Istanbul during a conversation meeting."* [**APPENDIX 6**]

> *"With the successful projects that it develops and through its result-oriented approach and innovative platform, it invests in those companies that conduct business in Turkey, that cannot achieve financial growth with their own equities even though they add value to the society and to the economy and it ensures that these companies become leaders in their own industries."* [**APPENDIX 7**]

Furthermore, there is another company named SBK Holdings USA, Inc. ("**SBK Holding USA**") that is located in California which has an organic link with SBK Holding Turkey. This company was founded on December 06, 2013 and its shareholders include Levon Termendzhyan, Edgar Sargsyan and George Termendzhyan. [**APPENDIX 8 – Trade Registry Record of SBK Holdings USA**]

The information that was available on SBK Holding Turkey's website in the past also indicate that Levon Termendzhyan, Jacob Ortell Kingston and Sezgin Baran Korkmaz who are also the shareholders of the company with the same tradename and that is located abroad, are the members of the board of directors of SBK Holding USA. [**APPENDIX 9 – Relevant Section of SBK Holding's Website**]

As we will explain in the following sections of our petition that it is connected with the events subject to the case before the court, SBK Holding USA's executive board member Jacob Ortell Kingston is the founding partner of a fund [management] company established in Istanbul on June 11, 2015 with a capital of TRY 20,000,000 named Mega Varlık Yönetim Anonim Şirketi ("**Mega Varlık**") and owns shares that are worth TRY 19,999,996 at this company. The company named Mega Varlık increased its capital to TRY 50,000,000 on August 09, 2016 and TRY 49,999,996 of this capital belongs to Jacob Ortell Kingston. [**APPENDIX 10 – Trade Registry Gazette Copies for Mega Varlık**]

It must also be highlighted here that Mega Varlık where Jacob Ortell Kingston is a principal partner and also a former executive board member of SBK Holding USA established in California by the aforementioned individuals, takes over bank loans and collects payments for these loans from the debtors through various methods. With regards to Mega Varlık Yönetim A.Ş., Soner Yalçın stated the following in his article dated March 31, 2017 published in Sözcü Newspaper and titled "Masquerade":

> *"These companies are called vultures in the west; they constitute a legal version of the mafia. They take over the non-performing loans of financial institutions and they start chasing the debtors. Our vulture lastly purchased*

*Bodrum Kervansaray Hotel. Mega Varlık's actual owner is a US national named Jacob Ortel Kingston. Isn't it strange for the credit rating institution JCR which has decreased Turkey's score to have increased this vulture company's score to A in such a short period of time? No, it is not. It is Global Solidarity!".*

We do not have any information with regards to the accuracy of this article. [**APPENDIX 11 – Relevant Article**]

In light of the foregoing information, there are also other news reports published in the press which indicate that there is an organic link between SBK Holding Turkey and Mega Varlık. For example, news reports dated March 2017 and published on a website named Parliament News stated, "*SBK Holding and Mega Varlık Yönetim A.Ş. which has an organic link with SBK Holding use the power that they obtain from foreign capital and **they deal the death blow to those domestic companies which are in a difficult situation and are trying to pull themselves together and they cause these companies to go bankrupt as a result of which, they acquire their equities and immovable properties for very low prices.** Several factories, plants and hotels owned by domestic industrialists and businessmen conducting business within the tourism sector have already been sold to foreign nationals through Mega Varlık Yönetim A.Ş. through this method".* Apart from this, certain relevant news reports are also provided as an annex to this petition. [**APPENDIX 12- Relevant News Reports**]

**3. Matter in Dispute and Share Transfer Contract**

One of the investments made by our Client in Turkey was in the aviation sector. In connection with the activities carried out to promote the Turkish culture within the international arena and as he was determined to continue his investments in Turkey, our Client decided to purchase the company named Ovaair Uçak Bakım Onarım ve Havacılık Ticaret Ltd. Şti. which can go to relatively less known spots across Turkey and which holds a license to carry our short distance flights considering the opportunity to introduce Turkey to those guests who come from abroad, to organize promotional trips for the US Congress members that he brought to Turkey and to organize short distance flights including air taxi.

As a result of this, he took over 1996 out of 2000 shares of the company named Ovaair as of December 2007 and has become a shareholder of said company. At the same time, company changed its tradename and it has become Bora Jet Havacılık Taşımacılık Uçak Bakım Onarım ve Ticaret Limited Şirketi. With the type change procedure that was carried out two months later, company was converted from a limited company to an incorporated company and it has given its current tradename which is Bora Jet Havacılık Taşımacılık Uçak Bakım ve Onarım Ticaret A.Ş.

As Bora Jet was restructured in 2014, Bora Jet Bakım was established through a partial demerger where Bora Jet was the only shareholder. Our Client also founded Aydın Jet in 2015 independent of the structure explained above.

The current case before the court was filed with the request to collect TRY 253,305,035 from the Client based on the Share Transfer Contract dated December 29, 2016 signed by and between our Client and Plaintiff Company for the transfer of the shares of Borajet (and therefore Borajet Bakım) and Aydın Jet.

As it would be appreciated by the Honorable Court, the Share Transfer Contract which forms the basis of the action is a unique share transfer contract and it is based on a different trade agreement than a classic share transfer contract where a company's shares are sold over a specific price.

According to Article 2 of the Share Transfer Contract titled "Subject Matter of the Contract and Price", Plaintiff Company **has acknowledged to pay all of the existing debts** except those debts owed to the banks specified in the Trial Balance Sheet

4 [signature]

of the Transferred Companies which was annexed to this contract and reviewed and mutually accepted by the parties. [**APPENDIX 13 – Trial Balance Sheets Annexed to the Share Transfer Contract**]

Within the scope of the Share Transfer Contract, Plaintiff Company also agreed that 25% of the net profit that will be derived if the shares or assets of the Transferred Companies are transferred to third parties or if the Transferred Companies in question are taken over by third parties through other means or a merger is realized with third parties, would be paid to the Defendant Client.

Article 2.2 of the Share Transfer Contract explicitly and clearly states that **the shares of the transferred Companies were taken over with all of their rights and <u>obligations</u>**:

> *2.2.     <u>The Transferee will purchase and take over all of the shares at the Transferor's Companies subject to this Contract together with all rights and obligations. The Transferor will sell and transfer all of its shares at the Companies together with all of their rights and obligations to the Transferee in exchange for the following:</u>*
>
> ***a. <u>Transferee will take over all of the debts owed by the Companies except their Bank Debts (as identified in Article 3.6 of the Contract);</u>*** *and*
>
> *b. Transferee will pay 25% (twenty five percent) of the net price (as identified in Article 4.2 of the Contract) to the Transferor if the Companies' shares or assets are transferred to 3rd parties or if the Companies are taken over by 3rd parties through any other means or if a merger is realized with 3rd parties, within 15 (fifteen) days as of the realization date of the aforementioned transactions in cash and in full and as a net amount to be transferred to the account that will be notified by the Transferor. Additionally, if the shares of the Companies are listed publicly then a calculation will be made based on the formula provided in Article 4.2. of the Contract on the date that the transaction is realized and the shares of the Company corresponding to the relevant amount will be given to the Transferor.*

Furthermore, it must be noted that **the "Transferred Companies" subject to the Contract were actually taken over by the Transferee without paying any transfer or sales fee to our Client.**

The **Contract** which is the basis of the claims subject to the action **stipulated that the Companies' liabilities would be shared between the transferee and the transferor, in other words it was transferred against the Company's debts** and the Transferred Companies' assets were not promised or assets were not shared in any way or form.

In order to ensure that the spirit of the Contract signed by and between the Parties can be understood, we would like to reiterate that the <u>Plaintiff Company DID NOT MAKE ANY PAYMENTS to the Client</u> in exchange for the Transferred Companies. It was agreed that the transfer in question would take place through the **division of liabilities of** Transferred **Companies** and parties' obligations were specified in the Contract. According to this, our Client's obligations within the framework of the Contract are specified in the 3rd article of the Contract titled "Transferor's Obligations";

> *3.1. **The debts** and the receivables of the companies whose shares have been transferred as of the Execution Date, are specified in the **balance sheet and action list annexed to the Contract** except for the new operational invoices that will be received in December 2016. Transferor acknowledges and confirms that the Companies do not owe any*

5 [signature]

*debts except those specified in the balance sheets within Appendix I and action list within Appendix 2 except new operational invoices to be received in December 2016 arising from any contract or unjust action or regardless of the legal basis.*

*3.2. For 2 years as of the signature date, in the event that a warning letter is drawn, an executive proceeding is started, a lawsuit is filed against the company for any reason due to all legal, commercial, financial disputes that might have arisen before the share transfer date and the debts that might have arisen from these disputes or if the companies are compelled to pay such a debt except the new operational invoices to be received in December 2016, then all kinds of responsibilities will be borne by the transferor provided that these are not included in the current books and records of the Companies and annexes of the Contract. In this sense, the amount that may be claimed by the transferee shall be paid to the Transferee by the Transferor immediately without having to send a warning notice, to start a proceeding or to file a lawsuit.*

According to Article 3.5. of the Share Transfer Contract, if a payment is made by the Transferred Companies due to the lawsuits other than those actions specified in the attached list of actions filed against the Transferred Companies as of the transfer date of the shares of Transferred Companies, then these sums will be repaid to the Plaintiff Company by the Client.

Moreover, our Client has acknowledged to pay his debts arising from the bank loans and their interests indicated in Appendix-3 (List of Bank Loans in the Original Currency) of the Share Transfer Contract as well as the financial leasing debts (Leasing List) other than airplane leasing sums specified in Appendix-4 (collectively referred to as "**Bank Debts**" hereinafter) to the creditors latest within 1 year within the scope of the Contract.

*3.6. Among those debts recorded in the balance sheet attached herein, debts arising from the bank loans and their interests indicated in Appendix-3 (List of Bank Loans in the Original Currency) of the Share Transfer Contract as well as the financial leasing debts (Leasing List) other than airplane leasing sums specified in Appendix-4 (collectively referred to as "**Bank Debts**" hereinafter) will be paid to the creditors by the Transferor latest within 1 (one) year. It is such that, more specifically, the debt owed to Credit Suisse among the aforementioned debts will be paid by the Transferor within 45 (forty-five) days as of the Execution Date together with all accessories to the relevant bank and this debt will be closed off. Transferor does not owe any debts to the Transferee and/or Companies other than the amount specified in this sub-paragraph.*

*3.7. Transferor will establish a principal amount lien (hereinafter referred to as the lien) in the amount of USD 50,000,000.00 (Fifty million US Dollars) on the masonry construction building with full shares located in the Republic of Turkey, the city of Istanbul, district of Fatih, Molla Feneri Mah. Nuru Osmaniye Mevkii, Section 34, Block 294, Parcel 15 (hereinafter referred to as the Real Estate Property) which belongs to him as specified in the mortgage deed annexed herein in favor of the Transferee as a guarantee for his Bank Debts. Along with this, if any other debts arise from this Contract except the Bank Debts of the Transferor before the lien is cancelled, then the lien will be cancelled after an equivalent amount of guarantee is provided.*

It is possible to list the obligations of the Client and the Plaintiff Company within the scope of the Share Transfer Contract as follows:

| | Client's Obligations | Plaintiff Company's Obligations |
|---|---|---|
| *1* | In the event that a warning letter is drawn, an executive proceeding is started, a lawsuit is filed against the company for any reason due to the debts arising from all legal, commercial, financial disputes that might have arisen before December 29, 2016 or if the companies are | In the event that a warning letter is drawn, an executive proceeding is started, a lawsuit is filed against the company for any reason due to the debts arising from all legal, commercial, financial disputes that might have arisen before December 29, |

| | | |
|---|---|---|
| | compelled to pay such a debt except the new operational invoices to be received in December 2016, then these payments to the extent that they can be proven and provided that they are not included in the Companies' current commercial books and records and annexes to the Contract | 2016 or if the companies are compelled to pay such a debt, then requesting these payments from the Client provided that they are not included in the Companies' current commercial books and records and annexes to the Contract |
| 2 | Payments made by the Companies due to the actions filed against the Companies on the transfer date except the actions specified in the list of actions annexed herein | Payment of all kinds of debts that the Client is not responsible for and that are owed by the Companies |
| 3 | Among those debts recorded in the balance sheet attached to the Share Transfer Contract, payment of the debts arising from the bank loans and their interests indicated in the List of Bank Loans in the Original Currency) annexed to the Share Transfer Contract, and again the financial leasing debts other than airplane leasing sums no later than in one year<br><br>[*It is indicated that an agreement has been reached for the payment of the debt owed to Credit Suisse by the Transferor within 45 (forty-five) days as of the Execution Date together with all accessories by making a payment to the relevant bank and that all payments to be made to banks without any distinction as per the Mortgage Deed detailed below no later than in one year*]. | Payment of 25% of the net price within the framework of Article 4 of the Share Transfer Contract to the Client if the Companies' shares or assets are transferred to 3rd parties or if the Companies are taken over by 3rd parties through any other means or if a merger is realized with 3rd parties after informing the Client about these transactions, in cash and in full and as a net amount and the debt arising from the development of the Transferred Companies indirectly as per the Share Transfer Contract and within the framework of this obligation |
| 4 | In order to guarantee the debts specified under the 3rd item above, establishing a principal sum lien in the amount of USD 50,000,000 on the real estate property identified within the Share Transfer Contract and owned by the Client in favor of the Transferee | |

Apart from the foregoing, we would like to bring the last sentence of the provision included in Article 3.6 of the Share Transfer Contract to the attention of the Honorable Court. The relevant sentence <u>explicitly and clearly indicates that the Client does not owe any other debts except those mentioned in this sub-paragraph.</u>

> *3.6. ... **Transferor does not owe any debts to the Transferee and/or Companies other than the amount specified in this sub-paragraph.***

7 [signature]

Therefore, it is obvious that the Client does not owe any debts to the Plaintiff except certain bank debts and financial leasing debts other than airplane leasing sums that he has acknowledged to pay in 3.6. as well as the claims of third parties undertaken in article 3.2. and that may become due under certain circumstances and this matter is also acknowledged by the Plaintiff himself through the Contract.

## 4. Plaintiff Company's Obligations within the scope of the Mortgage Deed

The Client has undertaken the loan debts owed to the banks including Borajet's loan debt to Credit Suisse and financial leasing debts other than airplane leasing sums within the framework of Article 3.6. of the Share Transfer Contract; and in this regard, a lien has been established on the immovable property located in the city of Istanbul, district of Fatih, Molla Feneri Mah. Nuru Osmaniye Mevkii, Section 24, Block 294, Parcel 15 which belonged to the Client on February 01, 2017 in favor of the Plaintiff for an amount of TRY 220,000,000 (equivalent to USD 50,000,000) ("**Lien**"). This lien was established as a principal sum lien that is to be used as a guarantee for the principal sum and interest if the debts owed to the banks and leasing company as specified within the lien agreement table by the Transferred Companies as of December 29, 2016 are paid by the Plaintiff and the amount that is paid is not repaid to the Plaintiff.

Article 2 of the official deed dated February 01, 2017 ("**Mortgage Deed**") indicates that a principal sum lien was established to be used as a guarantee if these debts are not paid by the Client together with the interest that will be calculated over 2.5 points to be added to the bank's loan interest rate that will be incurred as of the date that the bank loan in question is paid by the Plaintiff Company that has received the lien until the amount in question is repaid and to be used for the repayment of the receivables that is valid until it is notified as cancelled. [**APPENDIX 14 – Mortgage Deed**] In fact, Plaintiff Party indicated that it prefers to pay these debts itself in reality due to the relevant interest clause.

Mortgage Deed also states that the Companies owe 43,834,108 US Dollars in total to Akbank T.A.Ş., Deniz Bank A.Ş., Garanti Bankası A.Ş., Odea Bank A.Ş., Türkiye Ekonomi Bankası A.Ş., Yapı ve Kredi Bankası A.Ş. and Credit Suisse and they owe TRY 579,910 to Garanti Leasing and if the aforementioned companies have taken any other loans and owe other sums to other banks that are not listed in the Mortgage Deed as of December 29, 2016 then these loans will also be repaid under the conditions specified in the Mortgage Deed.

Within the framework of Article 2 of the Mortgage Deed, it is indicated that the Plaintiff Company will make a payment if the Client fails to make such payment and if the amount paid by the Plaintiff Company to the banks within the limits of the lien is requested from him, then it will pay these sums immediately on the day that they are requested without putting forward any defense, raising any objections or exceptions and if it fails to make the payment in question, the debt will become due on the same date and lien may be converted to actual sums.

## 5. Current Status Regarding the Performance of the Obligations

As he agreed and confirmed with the Share Transfer Contract, Client repaid his loans and continues to pay the sums owed to Credit Suisse within the legal limits of his acknowledgement specified in the Contract. The Plaintiff's claim at this point that the Defendant did not fulfill its obligations arising from the Contract is completely baseless and malicious. Within this scope:

(i) First of all, we must underline that even though the Plaintiff indicated in the warning letter that was served to the Client on February 15, 2017 that the Client must repay its credit debt to Credit Suisse and that it has gone into default in this regard, it is essentially the Plaintiff which did not and does not fulfill its obligations within the scope of the Contract in a malicious manner. In fact, one-year repayment term has been foreseen for its credit debt to Credit Suisse AG within the scope of the Mortgage Deed.

8 [signature]

In fact, this matter that the Plaintiff does not pay its debts to the third parties and suppliers contrary to its obligations arising from the Contract, that it failed to perform its obligations in accordance with its acknowledgements within the scope of the Contract and the mortgage agreement and therefore the debts owed to the bank mentioned in the mortgage agreement and company debts specified in the appendix to the Contract must be paid on time, was notified to the Plaintiff by the Client with the response notice dated February 16, 2017 served via Beyoğlu 17th Public Notary. **[APPENDIX 15 – Warning Notice]** As the Plaintiff failed to perform its obligations that it has previously undertaken within the scope of the Contract, Client decided not to pay off its debt owed to Credit Suisse at once. For example, the Client has learned from third parties that Borajet failed to repay some of the debts that the company owed to the financial advisor after the share transfer along with some of the sums owed to GE Engine Services LLC and Embraer Aviation International SAS. In spite of these, we would like to highlight that the credit debt owed to Credit Suisse AG is being repaid every month on a regular basis and on time as the total sum of the principal amount and the interest and there is no reason for Plaintiff Company to go into default because of the debt owed to the bank or to suffer from a loss.

On the other hand, the VIP airplane worth approximately 27,000,000 US Dollars on which a mortgage has been established as a loan collateral within the scope of the Mortgage Agreement dated October 07, 2015 signed by and between Credit Suisse AG and Aydın Jet, and that was transferred to the Plaintiff Company within the scope of the Share Transfer Contract, belongs to Aydın Jet and the Plaintiff **does** not perform the requirements of the mortgage intentionally through its failure to have the maintenance works carried out on the airplane. Credit Suisse AG indicated that the airplane's value dropped to 23,000,000 US Dollars and therefore, the debt had to be restructured and an additional payment in the amount of 87,000 US Dollars had to be made by the Client. Moreover, Plaintiff Company failed to pay legal fees in the amount of approximately 155,000 US Dollars within the scope of the loan that was taken from Credit Suisse AG and that was under its responsibility as a result of which Credit Suisse AG officials sent a warning notice to the Client. In this context, Plaintiff puts the Client who repays his credit debt in a difficult position. It is actually the Plaintiff Company that fails to perform its obligations arising from the Contract and the debts that it has undertaken.

(ii) By failing to perform its obligations arising from the Mortgage Deed, the Plaintiff Company caused certain banks such as Akbank T.A.Ş., Denizbank T.A.Ş., Türk Ekonomi Bankası A.Ş., Odea Bank A.Ş., Garanti Bankası A.Ş. to issue account [break-off] warning letters without any reason.

In fact, Odea Bank A.Ş. sent a warning letter to Borajet and to the Client in his capacity as the joint guarantor on February 28, 2017 and requested the payment of all loans which have/have not become due within 1 day and asked the payment of the loan debt in the amount of TRY 21,070,603.45; even though 1 week extension was requested to make the payment, this period was not granted. Following this, Odea Bank A.Ş. assigned the entire credit debt subject to the warning letter mentioned above to Mega Varlık which has an organic link with the Plaintiff and the Plaintiff's definitive main shareholder, SBK Holding Turkey, with a contract signed on March 06, 2017. As a result of this assignment, Mega Varlık initiated an enforcement proceeding without a judgment within the scope of the file before Istanbul 22nd Enforcement Office numbered 2017/6669 C. Within the scope of this proceeding, the Client had to pay TRY 23,161,907.94 on March 10, 2017 as the debt owed within the context of the file. Afterwards a lawsuit was filed by the Client against Odeabank due to these processes before 18th Commercial Court of First Instance with the file numbered 2017/239 C. which is still pending a decision.

In a similar manner, Akbank T.A.Ş. sent a warning notice to Borajet and the Client Yalçın Ayaslı as he is the joint guarantor on March 02, 2017 and requested the repayment of the credit debt in the amount of TRY 6,740,000 within 1 day.

Garanti Bankası A.Ş. sent a warning notice to Borajet Bakım [Maintenance] and Borajet and Client which were shown as the joint guarantors on March 15, 2017 and requested the repayment of the sums of TRY 8,325,17, 4,604,059.11 US Dollars

9 [signature]

and TRY 9,837.40 in total. Garanti Bankası A.Ş. sent a second warning notice to Borajet and the Client who is its joint guarantor on the same date and requested the repayment of TRY 25,463,669.96 in cash and TRY 2,093,235.76, 3,706,000 US Dollars, 70,600 Euro and TRY 24,942.07 to be allocated in cash.

As the Plaintiff failed to perform its obligations that it has undertaken within the scope of the Share Transfer Contract and pay off the debts that it is required to pay off as Borajet, an account break-off warning was sent with regards to other loans taken on behalf of Borajet before the transfer date and where Client had given a personal guarantee along with guarantees by other companies such as Nar Doğal Ürünler Turizm Tic. ve San. A.Ş. and Armaggan Kültür Turizm Tic. ve San. A.Ş. owned by the Client.

After similar situations occurred with the other banks, Client was left in a difficult position and he had to establish a lien on various real estate properties that he owns in order to pay off his credit debts completely, and he had taken out a total loan of approximately USD 20,000,000 and repaid all of his debts owed to the other banks except the debt owed within the scope of the credit agreement signed with Credit Suisse. As of today, total amount of loan debts that were paid off is TRY 67,216,407.35 + USD 964,000.69. [**APPENDIX 16 – Warning Notices and Table and Documents Regarding the Debts that were Paid Off**] Moreover, as one of the prerequisites of the loan allocation established by Garanti Bank within the scope of this loan taken out from Garanti Bank, was paying off all leasing debts owed to the bank, Client had to pay off all leasing debts that have and have not become due in the amount of TRY 487,607 on March 22, 2017. [**APPENDIX 17 – Documents Related to the Repayment of the Leasing Debts**]

**(iii)** Moreover, Client realized the establishment of the Lien which served as a guarantee for its debts specified above directly without violating its obligations arising from the scope of the Share Transfer Contract. However, while the Defendant Company was obliged to repay the debts that the Client did not pay within the framework of the Mortgage Deed and to request these from the Client where it could have converted the Mortgage provided by the Client into cash if the Client did not respond to its requests, it did not follow this procedure causing the Companies to go into default and therefore, not only did it take advantage of the guarantee provided by the Client but it also holds the Mortgage in its possession in a malicious manner.

(iv) <u>In the event that a warning letter is drawn, an executive proceeding is started, a lawsuit is filed against the company for any reason due to all legal, commercial, financial disputes that might have arisen before December 29, 2016 and the debts that might have arisen from these disputes or if the companies are compelled to pay such a debt, then all kinds of responsibilities will be borne by the Client arising from Article 3.2 of the Share Transfer Contract and it will reimburse these payments upon the request of the Plaintiff Company. However, the Plaintiff Company has also violated its obligation arising from the Share Transfer Contract by not making such a request.</u>

(v) Finally, we would like to highlight that certain letters of guarantee and external guarantees were converted into cash due to the Plaintiff's failure to perform its obligations that it has undertaken after the share transfer (non-payment of certain supplier debts), our Client who had acted as a personal guarantor, had to make the following payments as of the date of this petition even though it was not obliged to make them within the scope of the Share Transfer Contract:

| Description | Total Sum Paid |
|---|---|
| With the conversion of three letters of guarantee submitted to Aldus Portfolio Limited in the amount of USD 760,000 and the external guarantee for the amount of USD 760,000 submitted to SMBC Aviation Capital Limited into cash | 3,040,000 US Dollars |

| With the conversion of the letter of guarantee related to the rent that must be paid to Istanbul World Trade Center into cash | TRY 73,000 |
| With the conversion of the letter of guarantee related to the rent and service fees that must be paid to Sabiha Gökçen Airport into cash | EUR 35,600 (TRY 138,829.32) |
| Supplier and credit card payments within the scope of Garanti Bank | TRY 109,585.09 |
| Credit card payments | 7,137.91 US Dollars |

**Even though our Client is not responsible for these payments, he had to pay these sums because the Plaintiff party violated the Share Transfer Contract. Therefore, the equivalent in Turkish Lira of the total sum paid by the Client as of the date of this petition is TRY 11,047,339.85 [APPENDIX 18 – Relevant Receipts]**

**HOWEVER,** Plaintiff Company claims that the trial balance sheets annexed to the Contract with this lawsuit do not reflect the truth, they discovered irregularities on the commercial books and documents during the review that they conducted; and it has filed this lawsuit as an action of debt by claiming that some of the sums shown as company's receivables within this scope are not actually receivables but a balance had been formed because the concerned party failed to issue invoices that were supposed to be issued beforehand, maintenance fees for the rental airplanes were shown under the assets even though they had to be shown under the liabilities section of the financial statement, an exchange rate difference had been formed, expenses had to be incurred to ensure that those airplanes which were not active could fly again, airplane maintenance expenses that should have been entered as an expense were capitalized. These matters being disputed with this lawsuit indicates malicious intent and not only are the Plaintiff's claims in question baseless, but their requests are also contrary to the letter and spirit of the Share Transfer Contract as well as the law and therefore they must be dismissed. It is such that;

## B. LEGAL BASIS

### (I) OUR OBJECTIONS REGARDING PROCEDURE

### 1. THE CASE BEFORE THE COURT CANNOT BE FILED AS AN ACTION OF UNQUANTIFIED DEBT.

While the Plaintiff Company requested the collection of an amount of TRY 253,305,035 in its statement of claims, it has changed this request in its rejoinder petition and described the loss of profit that it has claimed to have suffered from as "unquantified debt" and requested the calculation of the relevant sum by your Honorable Court.

First of all, it must be noted that as per Article 107/1 of the Code of Civil procedure, an action for unquantified debt can be filed only in those circumstances where it is not possible to determine the amount of the debt that is owed or its value exactly and fully on the date that the action is filed:

*CODE OF CIVIL PROCEDURE ARTICLE 107*
*(1) An action for unquantified debt can be filed only under those circumstances where it cannot be expected, or it is not possible to determine the amount of the debt that is owed or its value exactly and fully on the date that the action is filed by specifying the legal relationship and a minimum amount or value.*

11 [signature]

Based on this provision and as it is acknowledged in the doctrine, the result of the request cannot be expected to be determined objectively by the plaintiff.[1] While none of the claims put forth with regards to the violation of the contract are accepted, there is no objective obstacle which prevents the plaintiff to calculate the loss of profit that it has suffered from on the basis of these claims.

In addition to the foregoing, Plaintiff Company claimed an unquantified debt only it is rejoinder petition and did not mention this request in its statement of claims at all. The doctrine says:

> *"The law does not mention that it can be decided whether the file an action for unquantified debt after the defendant responds. On the contrary, it has been sought that the plaintiff should be in a situation where it cannot determine the result of the claim while filing a lawsuit. The matters that are not foreseen with the Law cannot be considered for an action of unquantified debt."[2]*

and it has been highlighted that this is a violation of the law. Despite the foregoing, this request which has been submitted afterwards to cause your Honorable Court to make a procedural error must be dismissed on the basis of the lack of legal benefit as it is also argued in the doctrine.[3]

**2. WHILE THE STATEMENT OF CLAIMS INDICATES THAT EVIDENCES HAVE BEEN SUBMITTED, THE EVIDENCES HAVE NOT BEEN SUBMITTED. THE EVIDENCES SUBMITTED WITHIN THE SCOPE OF THE OBJECTION RAISED AGAINST THE CAUTIONARY ATTACHMENT DECISION ARE NOT IN TURKISH THEREFORE WE REQUEST THESE EVIDENCES NOT TO BE TAKEN INTO ACCOUNT BY THE HONORABLE COURT.**

Even though the Plaintiff Company indicated that it submitted its evidences as an annex to the statement of claims, when the case file was reviewed, it was discovered that these evidences were not annexed to the statement of claims. On the other hand, several invoices and contracts submitted to the case file as an annex by the Plaintiff are in a foreign language and Turkish translations of these documents were not submitted to the case file and they were not delivered to us. The evidences that were not annexed to the statement of claims, were submitted to the COURT OF APPEAL as an appendix to the petition for the objection raised against the cautionary attachment decision as if they were already submitted to the file.

However, as per Article 223 of the Code of Civil Procedure;

> (l) *The party that relies on a document written in a foreign language must submit its translation to the court as well.*

In spite of this explicit provision of the Law, these evidences used as a basis by the Plaintiff who did not submit the Turkish translation of the documents prepared in a foreign language must not be taken into account by your Honorable Court. This matter is regarded as a cause for reversal within the established case law of the Court of Cassation.

According to a decision adopted by Court of Cassation's 15th Civil Chamber with the Case number 2014/1683 and Decision number 2014/4876 and dated 07/10/2014;

> *"Then the translation of the documents prepared in a foreign language submitted by the defendant and contractor plaintiff of the consolidated file within the list of evidences annexed as "Appendix 9" must be requested by the court, and after the translated documents are annexed, expert witnesses must prepare an additional report to respond to the technical objections raised by the plaintiff sub-contractor to the additional expert witness report and in an auditable manner and a ruling must be adopted in accordance with the result that will be reached. The*

---

[1] Pekcanıtez, Civil Procedure Law Volume 11, 15th Edition 2017, p. 1031
[2] Pekcanıtez, Civil Procedure Law Volume 11, 15th Edition 2017, p. 1031
[3] Pekcanıtez, Civil Procedure Law Volume 11, 15th Edition 2017, p. 1054

> *decision that is adopted based on an incomplete review without taking these matters into account is contrary to the procedure and the law and the ruling must have been reversed."*

Based on the foregoing, we hereby request your Honorable Court not to take the relevant evidences into account and even if they are translated after this stage, they would be contrary to the ban on the expansion of the claims as stipulated in Article 141 of the Code of Civil Procedure, and we do not accept this situation under any circumstances therefore we request a decision to be adopted for the dismissal of the case based on the aforementioned reasons and since the conditions of proof could not be fulfilled for this case in this context.

## (II) OUR OBJECTIONS REGARDING MERITS

## 1. PLAINTIFF COMPANY DID NOT ACT AS A PRUDENT, CAUTIOUS AND FORESIGHTED MERCHANT.

In order for the Client to be responsible for the debts within the scope of the Share Transfer Contract, **it has been foreseen that** *"They are not included in the current commercial books and records of the Companies and annexes to the Contract".* However, majority of the claims put forwards by the Plaintiff are included in the trial balance sheet annexed to the Contract as well as the company records which it has reviewed or it must have reviewed as a prudent merchant prior to the execution of this Contract.

The trial balances which are signed by the parties and that belong to the Transferred Companies, are provided separately as an annex to the Share Transfer Contract. All of these balance sheets were prepared in accordance with the Tax Procedure Law ("**VUK**") and the relevant secondary legislation and there are no irregularities or unlawfulness within these balance sheets. Plaintiff's claims otherwise are unjustified. In fact, Transferred Companies are subject to audits through independent auditor organizations regularly within the scope of the sector where they operate. **The fact that the financial status of the Companies is bad, can be clearly seen from these trial balance sheets annexed to the Contract.** In fact, the Plaintiff accepts and confirms this in its rejoinder petition dated May 22, 2017.

As it is already known by the Honorable Court, Share Transfer Contract is ultimately a sales contract. Within the framework of the provisions related to the guarantees against defects in sales contracts signed by and between merchants, the buyer party is obliged to review the goods within eight days after it has received them and it is obliged to notify this situation to the seller within this period of time. Prof. Dr. Sabih Arkan discusses this matter within the doctrine as follows:

> *"If it is not possible to understand whether the sold goods are defective or not during delivery then the buyer is obliged to inspect the goods within eight days after it has received them and it is also obliged to notify this situation to the seller again within this period. If this notice is not made within the eight-day period, then the buyer will be deemed as having accepted the good with the defect."* **[APPENDIX 19 – Prof. Dr. Sabih Arkan, Commercial Enterprise Law, 2014, p. 160]**

While it does not mean the acknowledgement of the claims regarding damages in any way, Plaintiff which has indirectly stated that it did not carry any inspections before the purchase, **also failed to perform its obligation to inspect and to notify with regards to the explicit claim about a defect in the assets of the Transferred Companies.** Under these circumstances, it is obvious that the Plaintiff's claims are malicious and intend to obtain a unfair advantage against the Client.

Moreover, we would like to highlight that as a customary practice worldwide, majority of the companies are purchased with the help of professional consultancy organizations to avoid the defect discussions. Within this scope, the experts firstly determine critical aspects of the company that will be taken over such as its assets, business models, profitability, financial

tables, tax related obligations and legal status in detail, prepare reports, and the buyer party decides whether to purchase the company in question or not in light of the findings.

In light of the foregoing, there is no doubt about the Plaintiff's obligation to act as a prudent, precautious and foresighted merchant. In fact, this matter was clearly stated in the Code of Commerce ("TTK") in a clear and explicit manner. Article 18/2 of the Turkish Code of Commerce states, "*All merchants must act like a prudent businessman in all of their activities related to their business*". Within the doctrine, Prof. Dr. Sabih Arkan states the following in this regard:

> *"The obligation to act as a prudent businessman actually **introduces an objective criteria of diligence** and it highlights that the merchant must show **the due diligence expected from a precautious, foresighted merchant conducting business within the same field of trade rather than the diligence that may be expected from him/her based on his/her own skills and means in the activities related to the merchant's business enterprise.** [APPENDIX 20 - Prof. Dr. Sabih Arkan, Commercial Enterprise Law, 2014 p. 137 – 138]*

In fact, the judgement adopted by Court of Cassation 11th Civil Chamber dated March 27, 2014 and numbered C. 2012/19104 – D. 2014/5976 also states:

> " *(...) Within the scope of Article 20 of the Turkish Code of Commerce, while the plaintiffs must have acted as a prudent merchant and reviewed the public records when making such a purchase, not doing this and claiming that the defendants did not provide this information during the tender process within the information rooms or that they were misled does not have any legal merit and in fact, within the scope of the physical boundaries of the immovable property that can be seen on the ground, it will be claimed that they acquired this immovable property and will use it like that, the claim regarding the changes in the zoning plan does not have any effect on the result, zoning plans are public and they can be reviewed at any time, changes in the zoning plan were announced on 01/04/2007 and it was observed that the plaintiff E. who is included in the same zoning plan raised an objection with regards to the immovable properties in Gebze that belong to A.Ş. on 02/02/2007 and then filed a lawsuit before the administrative court, therefore it must be acknowledged that they were aware of the changes to the zoning plan, even if otherwise it must be concluded that the plaintiffs did not show the necessary diligence as per Article 20 of the Code of Obligations, it is not possible to hold the defendants liable for this situation, considering that the share transfer*
>
> > *contract was signed on 06/08/2007 which is after the zoning plan was announced and that the share transfer and relevant payment was made on 07/17/2007, it is concluded that the plaintiffs were actually aware of the changes in the zoning plan, it did not come up after the contract was signed therefore the lawsuit was dismissed based on the grounds that the defendant party knew about the changes to the zoning plan when the contract was executed within the scope of Article 197 of the Code of Obligations, and the contract was signed even though it was aware of this situation, buyer is not responsible to provide a guarantee for the seller due to a defect that is known to it.*
> >
> > *The plaintiffs' attorney filed an appeal against the ruling.*
> >
> > *The appeal objections raised by the plaintiffs' attorney are not acceptable based on the fact that there is nothing contrary to the procedure or the law within the justification of the court decree according to the information and documents within the case file and in the discussion and assessment of the evidences that were provided as a justification."*

and having said this, it was highlighted **that within the scope of Article 20 of the Turkish Code of Commerce, when Plaintiffs make such a purchase as a prudent merchant, they should have reviewed the records and there is no legal**

14 [signature]

**justification for their claims that they were not informed or misled during the sales process when they did not do the due diligence.**

In the incident subject to the dispute before the court, when it is considered that the transferred companies are airline companies, as precautious and foresighted merchant, Plaintiff must have also conducted detailed studies about the Transferred Companies with regards to their legal, financial, tax related and technical status, it must have had reports prepared and it must have made a decision for the purchase within this framework.

**The plaintiff acted to the contrary of this obligation.** In this context, the Share Transfer Contract and its annexes that are comprised of the general provisions with regards to the review of the company that will be taken over, were signed and the transfer procedure has been realized. <u>The fact that a share transfer price is not mentioned within the Share Transfer Contract and additionally, as the Client has undertaken the debts owed to the banks and those additional debts that may arise from service purchases from the period prior to December 29, 2016 except those operational invoices for December within the framework of the contracts specified in the contract, these are explicit statements that the Transferred Companies were also transferred with the debts anyway and in this sense, they were already defective.</u> Nowadays, it cannot be accepted for a profit-making aviation company to be sold under these conditions. In fact, there are already news reports published in the press with regards to the financial status of the Transferred Companies and this is known by the public opinion [**APPENDIX 21 – News reports regarding Borajet's financial status**]

Under these circumstances, even though the Plaintiff actually knew about the financial status of Transferred Companies, it has made such requests months after the Share Transfer Contract was signed which clearly shows that it acts with malicious intent. In fact, Plaintiff acknowledges and confirms that the Transferred Companies are in financial hardship within its rejoinder petition. In this context, first paragraph of Article 222 of the Turkish Code of Obligations also provides guidance.

*3. Defects known by the buyer*
*ARTICLE 222 – Seller is not responsible for the defects known by the buyer at the time that the sales contract was executed.*

The matters that are even known by the public to be disregarded and to be claimed against the Client after the transfer as if it has been deceived, shows malicious intent. In fact, SBK Holding Turkey which is the definitive owner of the Plaintiff is a company engaged in "*purchasing companies that have declared bankruptcy and are subject to enforcement proceedings, that cannot carry out any production activities or pay the salaries of their employees and that are in crisis*" and it is obvious that the Plaintiff's objective is purchase a company that is already in financial hardship and to invest in this company. The news reports published in the press with regards to this matter are presented in appendix numbered 18 annexed to this petition. In fact, Article 2.2.(b) of the Share Transfer Contract clearly stipulates that if the Companies are transferred to third parties, then the Client will be given 25% dividend. This matter was also mentioned in the rejoinder petition dated May 22, 2017 and accepted by the Plaintiff himself as the Contract executed for "*Bugaraj to pay the debts included in the Trial Balance Sheet and that are under its responsibility within the scope of the Contractual relationship and <u>to rescue Borajet from the financial bottleneck</u> within the scope of the financial resources that the Company will provide*".

In that case, Plaintiff's claims that the Client acted in a fraudulent manner are baseless and completely contrary to the law. Such a claim is even contrary to the ordinary course of life. On the contrary, **it is obvious that the Plaintiff** who did not carry out the necessary due diligence and review as a precautious and foresighted merchant during the negotiations under current conditions **aims to achieve an unfair advantage and acts maliciously when claiming that it was deliberately**

15 [signature]

**deceived and cheated with fraud** and that the Plaintiff acted as if it did not know about the conditions which it has accepted and knew about and as if it was deceived and claimed damages in the amount of tens of millions of dollars from the Client in order to obtain an additional advantage to the detriment of the Client.

Under these circumstances,

- While it has been clearly stated in the Contract that Transferred Companies owe certain sums,
- This can be clearly seen with the trial balance sheets annexed to the Contract and prepared in accordance with the Tax Procedures Law, and
- The share transfer procedure was carried out by sharing the liabilities of the Transferred Companies between the transferor and the transferee,

Considering that the debts owed to the Bank and that were undertaken by the Client within the scope of the Contract, were paid off and continue to be paid off, then the transferor Client did not only perform its actual obligation arising from the contract by transferring those shares that it has undertaken with the Share Transfer Contract but it has also performed other obligations that it has undertaken. The Plaintiff's claim that the Client did not fulfill its obligation is baseless and contrary to the law and it does not have any justifications.

**2. THE FACT THAT THE PLAINTIFF COMPANY DID NOT ACT AS A PRUDENT MERCHANT DID NOT CAUSE THE PLAINTIFF COMPANY TO SUFFER BUT RATHER THE CLIENT. THE CLIENT RESERVES ITS RIGHT TO CLAIM AND TO SUE FOR THE COMPENSATION OF THESE DAMAGES THAT INCREASE EVERY DAY.**

The Plaintiff Company not only failed to perform its own obligations but it also tried to obtain an unfair advantage through baseless claims that the Client failed to perform its obligations and it is putting the Client in a difficult position every day due to those obligations that it personally failed to perform.

The fact that the Plaintiff Company caused certain banks such as Akbank T.A.Ş., Denizbank T.A.Ş., Türk Ekonomi Bankası A.Ş., Odea Bank A.Ş., Garanti Bankası A.Ş. to issue account break-off warning letters without any reason, and the Client had to pay the debts which would have been paid over a term of one year within a very short period of time due to the warning letters, enforcement proceedings and attachments issued by the banks for the reasons that we explained above in detail, resulted in a loss for the Client. It has not only caused the Client to lose its reputation before the banks, but it has also had a negative impact on the operations of other companies owned by the Client, and due to the enforcement proceedings and payment of additional fees and charges, they have caused the Client to suffer from a loss while these enforcement proceedings have also put the Client in a difficult position as a result of the foregoing.

On the other hand, certain letters of guarantee and external guarantees were converted into cash due to the Plaintiff's failure to perform its payment obligations that it has undertaken after the share transfer (non-payment of certain supplier debts), our Client who had acted as a personal guarantor, had to make a payment in the amount of TRY 11,047,339.85 as of the date of this petition even though it was not obliged to make these payments. All of these sums caused the Client to suffer from a loss as it was compelled to make a payment for the sums that it did not owe.

Moreover, the Plaintiff Company which has failed to have the maintenance works carried out for the VIP airplane within the scope of the Mortgage Deed dated October 07, 2015 signed by and between Credit Suisse AG and Aydın Jet and

16 [signature]

which has failed to pay the legal fees that it has undertaken, puts the Client in a difficult position in its relations with the relevant bank

Therefore, it is the Client who actually suffered from a loss and who was intentionally damaged by the Plaintiff. Plaintiff's claims regarding damages are not only baseless but they are also malicious.

Under these circumstances, if it is considered that the Company's liabilities are divided and no payment was made in exchange for the transfer and if it is taken into account that the Client performed all of its obligations within the scope of the Share Transfer Contract and even though it was not obliged to do so, it was compelled to pay the performance bonds and the external guarantees that were converted into cash, then it becomes clear that the Plaintiff's claims and requests were baseless and they were contrary to the law completely aimed at obtaining an unfair advantage. While the Plaintiff Company was responsible for the operation of Borajet and the financial consequences of this operation as of December 29, 2016 when it has taken over the company, it did not perform its relevant obligations and make the expenditures that it is obliged to make in this regard, and it tried to include these within the scope of the Client's liabilities and thus it attempted to obtain an unfair advantage that lacks legal merit.

Moreover, with regards to the period where the Client was a shareholder, approximately TRY 208,000,000 is owed to the Client due to TRY 129,774,024 of the funds being transferred to Borajet by him personally and TRY 78,098,545 of the funds being transferred over Ayaslı LLC and we hereby declare that all kinds of rights that the client is entitled to in this regard as well as the right to claim the damages that the client has suffered from due to the actions taken/not taken by the Plaintiff company and principal company as well as the affiliated companies including those specified above.

**3- THE ITEMS OF DEBT THAT ARE NOT SHOWN ON THE CONTRACT AND ITS APPENDICES EVEN THOUGH THEY EXIST AS CLAIMED BY THE PLAINTIFF HAVE NOT BEEN PROVEN. IT IS NOT POSSIBLE TO CLAIM THOSE ITEMS WHICH COULD NOT BE PROVEN.**

Plaintiff claims that there is an extra debt owed by the Company in the amount of 29,588,845 US Dollars even though they were not shown on the Contract and its appendices.

Within this scope, Plaintiff claims that (i) it owed 4,909,318 US Dollars that were revealed to exist afterwards even though they were not shown in the account numbered 320 of the trial balance sheet annexed to the Contract and that it submitted the invoices to the Court within this scope, (ii) it owed 5,742,791 US Dollars that were revealed afterwards even though they were not shown in the account numbered 381 of the trial balance sheet annexed to the Contract, (iii) that there were maintenance costs and expenses related to missing parts in the amount of 13,673,910 US Dollars within the airplanes even though they were not shown in the Contract and the trial balance sheet annexed to it and indicates in a baseless manner this sum was hidden from him, (iv) that a difference in the amount of TRY 13,467,947.2 (3,826,991 US Dollars) was formed due to the low exchange rate that was applied.

Within this scope, we had previously indicated that the majority of the documents submitted by the Plaintiff are prepared **in foreign languages** and their Turkish translations were not even submitted. Moreover, **it is not even known what these invoices are and in what respect they were issued; whether the goods and services subject to the invoices were actually purchased; their terms; whether an objection has been raised and whether their consent has been taken or not.** The invoices within this scope must be examined one by one and it must be determined whether they can be claimed or not.

Moreover, in order for the sums that are claimed to be paid by the Client, we had indicated that the Defendant Client would be responsible as per Article 3.2 of the Share Transfer Contract if *"a warning letter is drawn against the company, an*

17        [signature]

*enforcement proceeding is initiated, a lawsuit is filed* or ***if the Companies play such a debt"***. Did the plaintiff pay such a sum so that it claims its receivables are due? If that is not the case, then there are no sums which have been proven as of yet.

The Plaintiff grounds the costs for the airplane maintenance and missing parts in the amount of 13,673,910 US Dollars that it has claimed and requested on the report prepared by Tolga Üzümcü, Mehmet Olcay Özbay and Uğur Özkan dated December 31, 2016. As we also indicated above and without having to mean acceptance under any circumstances, the trial balance sheet and other financial tables annexed to the Share Transfer Contract were also prepared by Tolga Üzümcü. Under these circumstances, it is not comprehensible how these reports prepared by the same individuals two days apart could be so different. Moreover, some of these individuals testified just as the Plaintiff wanted within the scope of the investigation currently being carried out as specified above. When these are evaluated together, it is clearly understood that the Plaintiff put forward some claims with malicious intent and while doing this, it used individuals such as Tolga Üzümcü, Mehmet Olcay Özbay, Uğur Özkan and Fatih Akol who have personally prepared the appendices such as the Trial Balance Sheet, Action List, List of Bank Loans Specified in the Original Currency and Leasing List which are annexed to the Share Transfer Contract.

Moreover, we would like to highlight that even if it is assumed that the airplanes which could not fly caused certain expenses to be incurred as claimed and without meaning acceptance in any way, there were no debts that the Plaintiff had to pay due to these costs. We would like to bring the fact that the Plaintiff could not submit any evidences that would prove this to the attention of the Honorable Court. Borajet has 10 airplanes in total and all of these airplanes are leased via financial leasing within the scope of leasing contracts. Plaintiff, on the other hand, claims that it does not know about the status of 10 airplanes in total in a completely malicious manner. As it would be appreciated by the Honorable Court, this claim put forward by the Plaintiff cannot be true and rational under any circumstances. There is a transfer of the shares of a company that is engaged in activities within the aviation field in question and it is unthinkable for the Plaintiff not to know about the status of the airplanes that belong to the aviation company it has undertaken during such a large scale share transfer. Within this scope, Plaintiff is obliged to conduct a detailed study about the Transferred Companies, to have reports prepared and to give a purchase decision within this framework as a cautious and foresighted merchant while acting in a prudent manner as per the relevant legislation and primarily the Turkish Code of Commerce.

In fact, there is no article in the Contract, or any declarations and acknowledgements made by the Client with regards to the airplanes. While it does not mean acceptance in any way, this matter is a technical matter and it is not possible to resolve this matter with an approximate valuation. The question of whether there are any maintenance costs and/or expenses requires a review by an expert witness. Within this framework, while the Plaintiff's claims in this regard are baseless, they are also unacceptable.

**On the other hand,** Plaintiff's request for a difference of TRY 13,467,947.2 (3,826,991 US Dollars) based on the claim that this sum arises from a previous low exchange rate applied to the loans taken in a foreign currency is also contrary to the Law. It is not possible to accept the Plaintiff's claim in this regard and in fact, Plaintiff must have known that the majority of the suppliers are foreign companies as a prudent merchant and aware of the fact that it has purchased an airline company and that the loans would be taken in a foreign currency. In fact, Plaintiff is in a status to know that the loans were taken in a foreign currency and their amounts as well. In fact, all these sums are provided in TRY within the trial balance sheet. Under these circumstances, and since the Plaintiff accepted the trial balance sheet annexed to the Contract and the sums provided therein with a mutual consensus, this request is nothing more than an effort to obtain an unfair advantage. The Plaintiff who acts as a prudent merchant or who should have acted as a prudent merchant signed the Contract after it has

18 [signature]

seen, understood and accepted the trial balance sheet annexed to the Share Transfer Contract therefore it cannot make such claims months after the share transfer. This situation is contrary to legal rules.

**4- THE PLAINTIFF'S REQUEST FOR THE SUMS THAT IT DID NOT OR WILL NOT PAY AND ITS CLAIMS THAT IT HAS SUFFERED FROM A LOSS ARE CLEARLY CONTRARY TO THE LAW. IN FACT, THE FACT THAT THESE ITEMS WERE WRITTEN UNDER LIABILITIES OR ASSETS DOES NOT CAUSE ANY DEBTS FOR THE COMPANY OR ANY RIGHTS FOR THE COMPANY TO CLAIM RECEIVABLES WITH THE LAWSUIT BEFORE THE COURT.**

In its rejoinder petition, the Plaintiff claims that the Company is still owed 31,939,555 US Dollars and it divides this sum into 5 sub-categories. Without having to mean acceptance in any way, the Honorable Court will appreciate that these sums which are claimed, are not paid or will not be paid by the Plaintiff therefore they cannot be accepted under any circumstances. In fact, even if these sums placed under assets within the trial balance sheet are transferred to the liabilities, there will not be any debts that the Plaintiff will be obliged to pay.

Plaintiff requests payment for (i) maintenance reserve deposit in the amount of 26,821,852 US Dollars by claiming that it was Borajet's receivable in the long-term even though it was not an asset that could be claimed back, (ii) 4,315,638 US Dollars which it claimed to be shown as an investment for the future even though it is relevant to previous periods, (iii) unpaid receivables in the amount of 200,120 that it claims to have been shown as receivables owed by the personnel even though it was actually acquitted, (iv) 457,347 US Dollars which it claims to be recognized as "Other Trade Receivables" even though they should have been recognized as "Doubtful Receivables" since they are actually impossible to collect and (v) 144,598 US Dollars which were shown as a current receivable in the Trial Balance Sheet and the Contract even though they were settled as claimed by the Plaintiff. Moreover, it claimed that the Client deceived the Plaintiff Company by showing in the Contract and the Balance Sheet as different than the actual situation that Borajet had additional assets in the amount of 3,824,008 US Dollars to show that the company's value is higher and additionally claimed damages for 6,625,607 US Dollars.

For example, the sums such as maintenance reserve deposits indicated by the Plaintiff were shown and allocated within the balance sheet in accordance with the Tax Procedures Law. In fact, the Trial Balance Sheet annexed to the Share Transfer Contract was prepared in accordance with the Tax Procedures Law based on the previous balance sheets. Moreover, these items refer to the sums paid before the transfer of the shares and there is no payment that must be made by Bugaraj. These items having been written as liabilities or assets, does not lead to any additional costs/debts before the Plaintiff. Under these circumstances, when these are requested, the sums that have actually been paid will be paid a second time and it is not possible to accept a repetitive payment. Since there is no loss in question, there is no amount to be compensated and/or requested.

Moreover, Plaintiff's claims related to a receivable from the company that went bankrupt such as Öger Tour, for example, that the Plaintiff has provided as an example are not accurate. If the bankruptcy is not closed off, then the ability to collect the receivable is not eliminated and there is nothing wrong in showing these sums under the receivables section. In fact, showing a receivable under the doubtful receivables is not an obligation as per the Tax Procedure Law but it is an elective right.

In fact, since an acknowledgement is not provided with regards to the assets within the Share Transfer Contract, the Plaintiff Company's claims that assets were not fully declared are contrary to the law. Balance Sheets were prepared in accordance with the Tax Procedure Law and they were also acknowledged by the Plaintiff

19 [signature]

Party. Plaintiff's claims as such are abstract and malicious claims.

The claims that the Plaintiff had an additional loss of 6,625,607 US Dollars are based on completely abstract assumptions. When there is no issue that is determined or that can be determined, Plaintiff claims that it has suffered incremental losses. In fact, its claim within this scope is based on the report dated December 31, 2016 prepared by Tolga Üzümcü (together with a couple of other people) who has also prepared the financial documents annexed to the Share Transfer Contract. We believe it is not possible for a report that is prepared by the same person exactly with 2 days apart, can include such significant differences, and this reveals that there is malicious intent.

As it has been indicated on numerous occasions, claims regarding the items within this scope are contrary to the law and to the letter and spirit of the Share Transfer Contract and they must be dismissed.

**5 – THERE IS NO LEGAL BASIS TO JUSTIFY THE CLAIM REGARDING THE LOSS OF PROFIT WHEN NO PAYMENT HAS BEEN MADE AGAINST THE SHARE TRANSFER CONTRACT AND THE DEBTS OF THE TRANSFERRED COMPANIES HAVE ALREADY BEEN TAKEN OVER.**

The Plaintiff's claim that it suffered from a loss of profit due to the inability to obtain the financial value that Borajet would have otherwise reached is completely ridiculous and lacks all kinds of legal merit. As it is already known by the Honorable Court, there must be a loss that exists if we were to talk about the compensation of that loss. However, Plaintiff's claim for the compensation of a loss that does not exist with a completely abstract claim such as "Borajet not reaching the value that it is supposed to reach" is legally and materially impossible.

First of all, we would like to bring once again to the attention of the Honorable Court that no share transfer price was paid by the Plaintiff within the scope of the Share Transfer Contract, and share transfer was carried out by sharing liabilities. **Moreover, there is no declaration or acknowledgement with regards to the financial value that the Transferred Companies are anticipated to reach within the scope of the Share Transfer Contract.** Under these circumstances, there is no basis for the Plaintiff's claim that Borajet did not reach the anticipated financial value. It is not possible to compensate a claim for loss that is abstract and that is not proven and in fact that does not exist. The Plaintiff's claim regarding a loss arising from the loss of economic gain, the relevant and the amount of which is unknown, cannot be accepted under any circumstances.

As the plaintiff also confirmed, it has purchased the shares of an aviation company however it has taken over this company WITHOUT MAKING ANY PAYMENTS. It is obvious that this share transfer was made through the division of company's debts and liabilities. Plaintiff Bugaraj signed the Share Transfer Contract **with knowledge about the financial status of the Companies and by undertaking their debts except the debts owed to the Banks.** Under these circumstances, Plaintiff's claim that it was deceived about the financial status of the Transferred Companies and that it did not review the company books before the transfer as a prudent merchant which must act in a foresighted and precautious manner, and its claims regarding a debt in the amount of millions of US Dollars in a baseless manner do not conform with the concept of a prudent merchant that is expected to act in a foresighted manner and it reveals that the Plaintiff acted in a malicious manner in order to obtain an unfair advantage against the Client.

In fact, Plaintiff essentially acknowledged within the Share Transfer Contract that it will pay the Client 25% dividend from the profit that will be derived if the companies are transferred to a third party. Under these circumstances, as it is already

20 [signature]

acknowledged by the Plaintiff, it has taken over these companies that are in financial hardship intentionally and plans to invest in these companies. Client did not provide any guarantees to the Plaintiff. Plaintiff's claims regarding the loss of profit are not acceptable.

**6- THE PLAINTIFF COMPANY DID NOT SUFFER FROM A LOSS. THE ITEMS THAT HAVE BEEN CLAIMED WERE NOT PROVEN. IN FACT, WITHOUT HAVING TO MEAN ACCEPTANCE, EVEN IF THERE IS A LOSS THEN THIS LOSS MUST NOT BE CLAIMED FROM THE CLIENT BUT THE INDIVIDUALS WHO LED TO THIS LOSS IN THE FIRST PLACE.**

Even though the Plaintiff Company did not specify the legal grounds for the sums that are claimed explicitly, it is understood that it claimed its loss arising from the Share Transfer Contract in general based on the claim that it was deceived with fraud.

As per Article 112 of the Turkish Code of Obligations, "*If the obligation is not performed at all or as required, then the debtor is obliged to compensate the losses arising from this and suffered by the creditor unless it proves that it cannot be responsible for any defects.*" The doctrine indicates that when the phrase loss is used on its own, it refers to financial loss and financial loss is the reduction of someone's assets without their consent. In that case, as it is explicitly stated by Prof. Dr. Kemal Oğuzman and it is clearly understood from the provision of the law that, "***in order for the creditor to claim damages from the debtor due to the non-performance of the obligation at all or as required, it must have suffered from a loss because of this.***" **[APPENDIX 22 – Oğuzman & Öz, Code of Obligations General Provisions Volume-1, 11th Edition, 2013, p. 395]**

This matter was also indicated in the judgement of the Court of Cassation 6th Civil Chamber dated November 11, 2014 and numbered C. 2014/8455 D. 2014/12229 which states:

> As per Article 96 (Turkish Code of Obligations 112) of the Code of Obligations numbered 818 that was in force at the time of the action, in order for the creditor to claim damages from the debtor due to the non-performance of the obligation at all or as required, it must have suffered from a loss because of this non-performance. The losses arising from the Contract can be both positive and negative losses.

**At the same time, it is an explicit legal rule that these claims regarding the losses must be proven by the claimant. As it is also stated in the doctrine:**

> *"In order for a compensation ruling to be adopted against the debtor, creditor must prove the loss that it has suffered from due to the violation of the obligation."* **[APPENDIX 23 – Oğuzman & Öz, Code of Obligations General Provisions Volume-1, 11th Edition, 2013, p. 403 et al.]**

> *"As in the case of tortious acts, the obligation to prove the loss (violation of the obligation) specified here is also undertaken by the plaintiff which files a lawsuit for the compensation of the damages or by the "claimant".* **[APPENDIX 24 – Kılıçoğlu, Code of Obligations General Provisions, 19th Edition, 2015, p. 659]**

However, while it is obvious that there is no negligence which can be attributed to the Client in the current case, it is also clear that the Plaintiff Company does not suffer from any losses due to these items. The Plaintiff could not prove its claims regarding a loss either. In fact, Companies were transferred together with their debts anyway and Plaintiff did not make any payments to the Defendant Client during the transfer.

21 [signature]

When all of the aforementioned matters are considered, it is understood that the Plaintiff Company's claim that it has suffered from a loss is fictitious and it aims to obtain an unfair advantage from the Client.

In fact, our Client has undertaken the credit debt and some of the leasing debts owed by the Transferred Companies to the banks within the scope of the Share Transfer Contract. Under these circumstances, the sum that is indicated under the liabilities section that the Transferred Companies were compelled to pay turn into a positive value every day due to the payments made by a third party in favor of the Companies. As of today, our Client has made a payment in the amount of approximately TRY 78,263,747.2 + 964,000.69 US Dollars in total[4] on behalf of the Companies as of today as a result of which the debts owed by the Companies decreased in sum and this was positively reflected in the equities within this context.

Whether they are within the scope of the Share Transfer Contract or not, positive changes have occurred in the balance sheets of the Companies owing to the payments made by our Client. Plaintiff does not mention this matter in a malicious manner.

Additionally, when it is considered that the Plaintiff's claims are mostly with regards to its deception, we assume that it requests a compensation rather than reneging on the contract as per Article 36 et al. of the Turkish Code of Obligations. Within this context, relevant article states:

> II. Deception
>
> ARTICLE 36 – If one of the parties signed an agreement pursuant to the deception of the other party, then that party will not be bound by the contract even if the deception (fraud) is not substantial.
>
> The party that signs a contract as a result of the deception of a third party is not bound by the contract if the other party knows or is in a situation to know about the deception at the time that the contract is executed.

and the foregoing provisions have been introduced.

The doctrine defines deception as follows:

> *"Deception is someone **deliberately** causing to form an erroneous opinion, to confirm or maintain that opinion in order to ensure that the **other individual in question makes a statement of intent with this action.**"* **[APPENDIX 25 – Prof. Dr. Kemal Oğuzman, Prof. Dr. Turgut Öz, Code of Obligations, General Provisions, Istanbul, 2009, p. 92 et al.]**

Again, as stated by Prof. Dr. Kemal Oğuzman:

> **"The party that deceives or a third party is obliged to compensate the losses that the victim of deception has suffered from whether the contract was cancelled due to deception or not."**

**In other words, the party that deceives is obliged to compensate this loss due to the provisions related to tort.**

---

[4] TRY 67,216,407.35 + 964,000.69 US Dollars + TRY 11,047,339.85 = TRY 78,263,747.2 + 964,000.69 US Dollars

**Even we do not accept the amount of the loss that has occurred in this context,** if a loss can be proven, then that loss must be compensated by the individual who caused the loss and who deceived the other party. **However, Client did not act in any way that would constitute fraud/deception.** If there is a deception in question, then this was either realized with the misdirection of the Client by Fatih Akol or by the collusion of the Plaintiff Company and Fatih Akol who is still rendering consultancy services for the Plaintiff Company in order to cause harm to the Client.

Company's general manager Fatih Akol personally conducted the negotiations for the Share Transfer Contract subject to the dispute and he has managed the process. He had also participated in the meetings held with the Plaintiff during this process. Within this scope, we would like to highlight that the Defendant Client was in the US when the aforementioned negotiations took place. The Client has been living in the US for the past forty-three years. Plaintiff tried to create the impression in its petitions that the financial documents and accounts were personally prepared by the Defendant Client Yalçın Ayaslı and this is not in question, it is not even possible. Defendant is only a shareholder of the Transferred Companies and he is not even a member of the board of directors or authorized signatory.

**Even though these matters were personally known by the Plaintiff, the fact that the claims before the court are being put forward against the Client who is not a member of the board of directors, who does not have any signatory powers and who is only a shareholder at the Companies, shows that the Plaintiff acted with malicious intent.**

In conclusion, there is no loss that the Plaintiff Company suffered from and items that are claimed herein could not be proven. While it does not mean acceptance in any way, even if they can be proven, our Client is not the addressee of these claims.

**7- WHILE IT WAS NOT SUBJECT TO A CLAIM IN THE CURRENT CASE BEFORE THE COURT, PLAINTIFF'S CLAIM THAT THE VALUE OF BORAJET BAKIM ONARIM VE TİCARET A.Ş. WAS SHOWN HIGH IN A FICTITIOUS MANNER CANNOT BE ACCEPTED AS IN THE CASE OF OTHER BASELESS CLAIMS.**

Plaintiff Company indicated the fact that "*Even though **Borajet's** subsidiary **Borajet Bakım's** [Maintenance] equities went down to a negative balance, it was sold as if its value was **29,500,000** US Dollars and an inflated value has been shown on the Trial Balance Sheet annexed to the Contract*" was not subject to the lawsuit.

As a prudent merchant, Plaintiff Company must know that the company named Borajet Bakım was demerged from the company and its only owned is Borajet as it may be clearly determined from the Trade Registry Gazette. This company reached a value of 29,500,000 US Dollars over time and while the shares were first transferred to Yalçın Ayaslı and then to Borajet, valuations made by independent audit companies were taken into account. Therefore, Plaintiff's claims otherwise are baseless.

We would like to highlight here that a company valuation was not carried out for any of the Transferred Companies by the Plaintiff Company and the share transfer that was carried out was not realized over the company's value. In that case, Plaintiff's claims regarding the value of the Transferred Companies within the scope of the entire petition lack legal merit. In fact, Client did not make any commitments with regards to the value of the companies either. In light of this, there is nothing contrary to the laws or to the procedure here and it is not possible to accept the Plaintiff party's claims.

In the same section of the rejoinder petition, Plaintiff Company once again made certain baseless claims without including these in its requests. At this point as they are not included in the requests, our right to make a detailed statement and to raise

23 [signature]

an objection is reserved, and we would like to highlight that for example, the item related to the sums returned for the flight tickets to the passengers in the amount of 1,465,666.24 US Dollars as these flight tickets were sold but the flights could not be made, is completely claimed with malicious intent. In fact, no documents were added to the petition to prove this amount. While the Client does not have any obligations with regards to these sums, the fact that these claims being put forward without an explanation and a basis and where it is not known when, how and to whom these sums were paid and completely random statements are included in the claims, shows malicious intent. Additionally, other claims that the Plaintiff Company put forward but did not include in the matter in dispute, are also baseless and they were added to the petition to create a negative impression before the Honorable Court.

## 8- PLAINTIFF PARTY ACTS WITH MALICIOUS INTENT IN ORDER TO SEIZE THE ASSETS OF OUR DEFENDANT CLIENT.

In its statement of claims, Plaintiff stated that the Defendant liquidated its assets and requested a cautionary attachment to be imposed on the Client's assets. This request was dismissed by the Honorable Court in a well-directed manner as the necessary conditions for imposing a cautionary attachment have not been formed. In this regard, we would like to bring to the attention of the Court once again that the Plaintiff's claims and requests are completely unjustified and contrary to the law and Plaintiff tries to obtain an unfair advantage against the Client and seize his assets merely in a malicious manner.

As it is explained above, banks have sent a warning regarding the closure of the credit accounts after the Plaintiff Company failed to perform its obligations arising from the Mortgage Deed and some banks have even initiated enforcement proceedings. Client met with certain banks to pay off all his loans and reached an agreement with Garanti Bankası A.Ş. to take out a loan in the amount of approximately 20,000,000 US Dollars in total and he has paid off all of his debts owed to the banks. In fact, as the Plaintiff has found out about this, they sent a warning letter to Garanti Bankası A.Ş. on March 13, 2017 and indicated that the Defendant is trying to smuggle his assets and the request for the loan must be refused, otherwise they would file a criminal complaint against the bank officials for complicity. [**APPENDIX 26 – Warning letter dated March 13, 2017**]

As it will be appreciated by the Honorable Court, Plaintiff party's claim that our Client liquidated his assets by establishing a lien on all of his assets with the loan taken out from the banks is completely baseless and malicious. As it will be detailed below, **Plaintiff's objective in filing a criminal complaint with baseless accusations about the Client *in an intentional and malicious manner* is to have a cautionary attachment established on his assets. When the entire process is taken into consideration, it will be seen that the Plaintiff has its eyes on the Client's assets.**

## 9- OUR STATEMENTS REGARDING THE INVESTIGATION
Plaintiff filed a criminal complaint regarding the Client before Istanbul Chief Public Prosecutor's Office. First of all, we hereby point out for the attention of the Honorable Court that the criminal complaint was filed after the cautionary attachment request was dismissed by the Honorable Court in a well-directed and legal manner in order to seize the Client's assets and to obtain an unfair advantage against the Client and in a completely malicious manner. In fact, even though the Plaintiff knew that the required criteria could not have been fulfilled, it has requested a cautionary attachment to be imposed on the Client's immovable properties with baseless claims however when this request was rejected, this time it has filed a criminal complaint with untrue and completely unfounded accusations with the request to impose an attachment on the Client's assets. In our opinion, Plaintiff also coerced some of the witnesses to ensure that they gave statements that would overlap exactly with the claims that it has put forward within the scope of this dispute therefore these statements must not be taken into account and Plaintiff's explicit malicious intent must not be protected from a legal perspective. In fact, majority of these witnesses continued to work at the

24 [signature]

Transferred Companies after the share transfer and they still work at these companies. On the other hand, even though Plaintiff Company mentioned that an arrest warrant has been issued about the Client, this is not an arrest warrant that was issued to prevent the Client from fleeing. Even though the Plaintiff party knows that the Client has lived abroad for more than forty years, it has indicated that the Client lives at the address in Turkey and after the Client could not be found at this address, the arrest warrant was issued to get his statement.

**The fact that witness statements which completely overlap with the matters claimed in the case before the Court were given after** the case currently before the Court and a criminal complaint were filed, **is very astonishing and suspicious in our opinion.** This statement and these declarations could have been given under pressure and with a prejudice and as they are untrue, they should not be taken into consideration. In fact, it is also underlined that Tolga Üzümcü's statement must not be taken into consideration within the investigation file before the Public Prosecution Office. This statement and Plaintiff Company's claims in the case before the court include completely identical sentences as if they were written by the same person. In fact, as it may be understood from his title, Tolga Üzümcü worked as the chief financial officer of Borajet. Moreover, he is the one who prepared the trial balance and the financial tables annexed to the Share Transfer Contract. The claim that the trial balance sheets annexed to the Contract under "Financial Analysis Report" which were prepared and signed by Tolga Üzümcü on 12/31/2016, only 2 days after December 29, 2016 which is the date when the Share Transfer Contract was signed, and which the Plaintiff relies on in this case clearly show that the Client is faced with an organized conspiracy and it is attempted to obtain an unfair advantage against the Client.

In the same manner, as we indicated to the Prosecution Office before, the statements given by other witnesses should not be taken into account either. Witnesses Olcay Özbay and Mehmet Ceylan Topal still serve at senior positions at the Plaintiff's Company. Fatih Akol, on the other hand, has served as the chairman of the board of directors and authorized signatory director of Borajet and other companies that were transferred named Borajet Bakım [Maintenance] and Aydınjet. Subsequent to the share transfer, Fatih Akol served as a member of the board of directors of Transferred Companies until he resigned at the end of February 2017 and according to the rumors that we heard, he is still providing consultancy services to these companies. [**APPENDIX 27 – Copies of the Trade Registry Gazette**]

Even though these foregoing matters were personally known by the Plaintiff, it has put forward these claims before the court against the Client who is not a member of the board of directors at the Companies, who does not even have signatory powers and who is only a shareholder which reveals that the Plaintiff acted solely with malicious intent. It is also self-evident that the COMPLETE OVERLAP between the witness statements and Plaintiff's statement of claims cannot be a coincidence, these were given under the influence of the Plaintiff and in order to reach its malicious target.

Within this scope, we would like to also submit for the information and bring to the attention of the Honorable Court that the Plaintiff Company's executive board chairman Sezgin Baran Korkmaz waited in front of the door at the court house when the witnesses gave their statements according to the rumors that we heard and witness statements were given on the same date.

Moreover, it has been established with the Witness Zahide Üner's statement that Sezgin Baran Korkmaz coerced and threatened the witnesses. In the same manner, the threats made by this individual against the Client continued since the beginning of the dispute. All kinds of legal rights that the Client is entitled to are reserved in this regard.

**WHEN ALL OF THE FOREGOING MATTERS THAT WE MENTIONED IN OUR PETITION ARE CONSIDERED ALTOGETHER:**

25 [signature]

Considering that;

     - Share transfer was realized through the division of the liabilities of the Companies and without THE PAYMENT OF ANY SUMS;

     - The assets of the Companies were not acknowledged in any way within the framework of the Contract;

     - Plaintiff was aware of the financial status of the Companies and this matter was established with the Contract and its appendices;

     - The items written under liabilities or assets within the scope of the balance sheet technique did not lead to any debts that must be paid by the Plaintiff and if these are requested, then the sums that have already been paid will be paid repetitively and in fact, trial balance sheets were prepared in accordance with the Tax Procedure Law,

     - Essentially, Plaintiff violated its obligation to act as a prudent and cautious merchant,

     - Plaintiff acts solely with malicious intent and attempts to obtain an unfair advantage against the Client,

     - With regards to the supplier debts that were claimed, it must be determined one by one whether the goods/services subject to the invoices were actually provided or not, whether there is an agreement or not, whether an objection has been raised and the term that they are relevant to;

     - Certain documents prepared in a foreign language and relevance of which are unknown were submitted as an annex to the statement of claims;

     - The debts undertaken by the Client were agreed to be paid when the conditions stipulated in the Contract were realized and when settlements were received;

     - Client showed good faith by performing its obligations within the framework of the Contract and by closing off its debts to the banks;

     - Plaintiff tried to obtain an unfair advantage against the Client in bad faith and with claims that cannot be proven,

     - Plaintiff has taken over the shares with knowledge about the current and physical status of the Companies as of the Share Transfer Contract,

**it is obvious** that the Plaintiff Company cannot claim the information provided to it about the Transferred Companies do not reflect the truth or similar claims, it cannot make any requests based on any actual or legal reason within the scope of the effective legislation and primarily provisions related to guarantees against defects and seizure after the shares are transferred, **if the Plaintiff suffered from a loss then it has caused this loss due to its failure to act in a foresighted manner.** Plaintiff's unjustified and unlawful claims must be dismissed.

**CONCLUSION AND REQUEST:** Within the scope of the reasons provided and explained above and with all kinds of rights that we are entitled to in relation to the submission of declarations, counter declarations, evidences and additional evidences are reserved, we hereby request and claim a decision to be adopted for,

1- The evidences for which Turkish translations are not submitted at this stage not to be taken into account by the Honorable Court as they would constitute a violation of the ban on the expansion of the claims within the framework of Article 141 of the Code of Civil Procedure, and the case which cannot be proven in this context to be **DISMISSED**,

2- **ALL REQUESTS WITHIN THE SCOPE OF THE LAWSUIT** filed with malicious and baseless claims in an unjustified and unlawful manner **TO BE DISMISSED**,

3- All trial costs and attorney fees to be borne by the Plaintiff party.

                                          Sincerely,

                            Defendant Yalçın Ayaslı's

                                          Attorney

                            Att. Ayşe Hergüner Bilgen

                                      [signature]



# Hergüner Bilgen Özeke
Avukatlık Ortaklığı                    Attorney Partnership

Büyükdere Caddesi 199 Levent 34394 Istanbul TURKEY
T +90.212.310 18 00   F +90.212 310 18 99
E info@herguner.av.tr  W www.herguner.av.tr

Av. Piraye Kuranel Başol | Av. Nazım O. Kurt
Av. Ayşe Hergüner Bilgen | Av. M. Mert Oğuztülgen
Av. Ismet Bozoğlu | Av. Yeşim F. Api Şamlı
Av. S. Aslı Budak | Av. Deniz Tuncel
Av. H. Tolga Danışman | Av. Kayra Üçer
Av. Serkan Gül | Av. Ufuk Yalçın
Av. Ümit Hergüner | Av. Bige Yücel
Av. Senem İşmen

**DÜPLİK DİLEKÇESİ**
**14 Haziran 2017**

**İSTANBUL 3. ASLİYE TİCARET MAHKEMESİ**
**SAYIN BAŞKANLIĞI'NA,**

**DOSYA NO.** _____ **: 2017/242 Esas**

**DÜPLİK DİLEKÇESİ**
**SUNAN DAVALI** _____ **: Yalçın Ayaslı ("Devir Eden")**

**VEKİLLERİ** _____ **:** Av. Ayşe Hergüner Bilgen - Av. H. Tolga Danışman
                              *(Adres antettedir)*

**DAVACI** _____ **: Bugaraj Elektronik Ticaret ve Bilişim Hizmetleri A.Ş.**
                              *Maslak Mah. Dereboyu Cad. Zağra İş Merkezi No: 14/C*
                              *Sarıyer/İstanbul*

**VEKİLİ** _____ **:** Av. Sinan Görkem Gökçe
                              *Abide-i Hürriyet Caddesi No: 158 Kat: 2 Şişli/İstanbul*

**KONU** _____ **:** Davacı'nın 5 Haziran 2017 tarihinde tarafımıza tebliğ edilen
22 Mayıs 2017 tarihli cevaba cevap dilekçesinde yer alan haksız ve mesnetsiz iddialarına
cevaplarımız ve genel olarak dosya kapsamına ilişkin olarak yeni vekil sıfatıyla
beyanlarımızın sunulması ve **haksız davanın reddi** talebimizden ibarettir.

## AÇIKLAMALAR

Huzurdaki uyuşmazlığa konu dava 13 Mart 2017 tarihinde Davacı Bugaraj Elektronik Ticaret
ve Bilişim Hizmetleri A.Ş. tarafından ihtiyati haciz talepli olarak ikame edilmiştir. *(Davacı
Şirket dilekçe içerisinde "Bugaraj" veya "Devir Alan" olarak da anılacaktır).*

Sayın Mahkemeniz tarafından yapılan inceleme sonucu 13 Mart 2017 tarihinde ihtiyati haciz
talebi reddedilmiştir. Dava dilekçesi 17 Mart 2017 tarihinde tebellüğ edilmiş ve 20 Mart 2017
tarihli dilekçe ile cevap süresinin uzatılması talep edilmiştir. Süre uzatım talebinin Sayın
Mahkemeniz tarafından kabul edilmesini takiben süresi içerisinde 3 Nisan 2017 tarihli cevap
dilekçesi dosyaya ibraz edilmiştir.

Beri yandan, Davacı vekilleri 13 Mart 2017 tarihli ihtiyati haciz talebinin reddine dair Sayın
Mahkemenizin kararına karşı 29 Mart 2017 tarihli dilekçeleri ile istinaf yoluna
başvurmuşlardır. İstinaf süreci İstanbul Bölge Adliye Mahkemesi 12. Hukuk Dairesi'nin
2017/360 Esas sayılı dosyasından devam etmektedir.



Davacı Şirket Bugaraj ile Davalı Müvekkil arasında münakit 29 Aralık 2016 tarihli, (1) Bora Jet Havacılık Taşımacılık Uçak Bakım Onarım ve Ticaret Anonim Şirketi ("**Borajet**" veya "**Şirket**"), (2) Borajet'in sahibi ve tam iştiraki olduğu Bora Jet Bakım Onarım ve Ticaret Anonim Şirketi ("**Borajet Bakım**") ve (3) Aydın Jet Havacılık Anonim Şirketi'nin ("**Aydın Jet**") (hep birlikte "**Şirketler**" veya "**Devredilen Şirketler**" olarak anılacaktır) hisselerinin Bugaraj tarafından Müvekkilimizden devralınmasına ilişkin Hisse Devir ve Kar Paylaşım Sözleşmesi mevcuttur ("**Hisse Devri Sözleşmesi**" ve/veya sadece "**Sözleşme**"). **[EK 1- Hisse Devri Sözleşmesi]**

Huzurdaki dava, Davacı tarafından yukarıda bahsi geçen Hisse Devir Sözleşmesi'ne dayanılarak 71.978.016 ABD Doları (Dava tarihi itibariyle 253.305.035 TL) tutarın Müvekkil'den tahsil edilmesi talebi ile ikame edilmiştir. Ayrıca, Davacı Taraf cevaba cevap dilekçesinde dava dilekçesinde yer vermediği yeni bir talep daha ilave ederek kar kaybı talebinde de bulunmuştur.

## A. MADDİ VAKIALAR

### 1. Müvekkilimiz Hakkında

Müvekkilimiz Yalçın Ayaslı ███ yılında Ankara'da doğmuş, Türk/Amerikan vatandaşı olarak kırk üç yıldır Amerika'da yaşamakta olan, lisans eğitimini ODTÜ Elektrik Mühendisliği bölümünde tamamladıktan sonra, bir süre orada akademisyenlik yapıp, ardından Boston'da Massachusetts Teknoloji Enstitüsü'nde master ve doktora eğitimini tamamlamış olan bir akademisyendir. Amerika'daki bir firmanın araştırma bölümünde yaptığı çeşitli bilimsel çalışmalar kapsamında, 15 adet patente sahip olmuştur. ABD'deki yatırımlarının yanında, 3 Aralık 1985 tarihinde akdedilen Türkiye Cumhuriyeti ve Amerika Birleşik Devletleri Arasında Yatırımların Karşılıklı Teşviki ve Korunmasına Dair Antlaşma'ya da güvenerek, şu ana kadar Türkiye'de yaklaşık 400.000.000 ABD Doları tutarında yatırım yapmıştır. Dünya Türk İş Konseyi Yüksek İstişare Kurulu üyesi olan Müvekkilimiz, Türk kültürünü dünyaya tanıtma amacıyla Boston, Washington DC ve İstanbul'da ofisleri bulunan Turkish Cultural Foundation (Türk Kültür Vakfı) ve Turkish Coalition of America (Amerika-Türk Koalisyonu)'nu kurmuştur. Ermeni soykırımı iddialarına karşı kurucusu olduğu Turkish American Legal Defense Fund (Türk Amerikan Hukuki Savunma Fonu) isimli vakıf üzerinden de Amerika, İsviçre ve Fransa'da çalışmalar yapmıştır ve yapmaya devam etmektedir. **[EK 2- Müvekkil Hakkında Basında Yer Alan Kimi Haberler]**

### 2. Davacı Şirket Hakkında

Davacı Şirket Bugaraj 10 Ağustos 2015 tarihinde İstanbul'da 1.000.000 TL sermaye ile kurulmuştur. Tek yetkilisi ise yönetim kurulu başkanı Cüneyt Özen'dir. Bugaraj şirketinin tek pay sahibi ise Bukombin Bilişim ve Teknoloji Anonim Şirketi'dir ("**Bukombin**"). **[EK 3- Bugaraj'a ait Ticaret Sicil Gazeteleri]**

Bukombin şirketi ise 15 Temmuz 2015 tarihinde yine İstanbul'da 1.000.000 TL sermaye ile kurulmuştur. Tek pay sahibi SBK Holding A.Ş.'dir ("**SBK Holding Türkiye**"). Bukombin'in tek Yönetim Kurulu Üyesi ise SBK Holding Türkiye adına hareket etmeye yetkili olan Sezgin Baran Korkmaz'dır. **[EK 4- Bukombin'e ait Ticaret Sicil Gazeteleri]**

Ticaret Sicil Gazetesi kayıtlarına göre SBK Holding Türkiye 8 Mart 2013 tarihinde 10.000.000 TL sermaye ile İstanbul'da kurulmuş olup, tek ortağı ve kurucu hissedarı, tek yönetim kurulu üyesi Sezgin Baran Korkmaz'dır. Diğer bir ifade ile yukarıda izah edilen holding yapısı içerisinde <u>Davacı Bugaraj şirketinin nihai sahibi Sezgin Baran Korkmaz'dır.</u>

2



Sezgin Baran Korkmaz aynı zamanda Hisse Devri Sözleşmesi'ni Davacı Şirket adına garantör olarak imzalayan kişidir. **[EK 5 - SBK Holding Türkiye'ye ait Ticaret Sicil Gazeteleri]**

Basında yer alan haberlerde **Davacı Şirket'in nihai sahibi olan ve Yönetim Kurulu Başkanı ve sahibi Sezgin Baran Korkmaz olan SBK Holding Türkiye'nin faaliyet konusunun *"iflasta ve icrada olan, üretim yapamayan ya da işçisine maaş ödeyemeyen krizdeki şirketleri satın almak"* olduğu belirtilmiştir.** Sezgin Baran Korkmaz'ın ifadelerine göre Hürriyet Gazetesi'nde yayınlanan söz konusu haberde ve ayrıca SBK Holding Türkiye'nin kendi internet sitesinde yer alan kesitleri Sayın Mahkemenizin dikkatine sunarız:

> *"Korkmaz'ın deyimiyle 'ölü fiyatına' satın aldığı bu batık veya batışın eşiğindeki şirketler önce bankalara olan borçlarından arındırılıyor, işçiye maaşları ödeniyor ve tekrar üretime geçiriliyor. Ardından da faal bir şirket olarak satılıyor. SBK Holding Yönetim Kurulu Başkanı Sezgin Baran Korkmaz 1998 yılında yerli şirket olarak başladıkları bu işte daha sonra Amerikalı yatırım fonlarıyla batık şirketleri alarak yollarına devam ettiklerini söyledi. Korkmaz önceki akşam ise ilk defa bir İngiliz yatırım fonuyla anlaştıklarını, satın alma veya büyük ortak olmak suretiyle krizdeki şirketlere yatırım yapacaklarını açıkladı. Sezgin Baran Korkmaz ve işbirliği yaptığı İngiliz fonu AIM CEO'su Ana Cukic Armstrong ile birlikte İstanbul'da gazetecilerle sohbet toplantısında biraraya geldi. "* **[EK 6]**

> *"Geliştirdiği başarılı projeler ile sonuç odaklı yaklaşımı yenilikçi bir platformda Türkiye'de faaliyet gösteren topluma ve ekonomiye değer katan, finansal olarak büyümeyi kendi öz kaynakları ile sağlayamayan firmalara yatırımlar yaparak bu firmaların kendi sektörlerinde lider konuma gelmelerini sağlamıştır. "* **[EK 7]**

Ayrıca, SBK Holding Türkiye ile organik bağı olan Kaliforniya'da olan SBK Holdings USA, Inc. (**"SBK Holding ABD"**) adında bir şirket daha bulunmaktadır. Bu şirket 6 Aralık 2013 tarihinde kurulmuş olup, hissedarları Levon Termendzhyan, Edgar Sargsyan ve George Termendzhyan'dır. **[EK-8 – SBK Holdings USA, Inc Sicil Kaydı]**

SBK Holding Türkiye'nin bir dönem internet sitesinde yer alan bilgilerde de yurtdışındaki aynı unvanlı şirketin ortaklarından olan Levon Termendzhyan, Jacob Ortell Kingston ve Sezgin Baran Korkmaz'ın SBK Holding ABD yönetim kurulu üyeleri olduğu belirtilmiştir. **[EK 9- SBK Holding Web Sitesi'nin İlgili Kısmı]**

Huzurdaki dava konusu olaylarla da bağlantılı olduğunu dilekçemizin ilerleyen bölümlerinde açıklayacağımız üzere, SBK Holding ABD yönetim kurulu üyesi Jacob Ortell Kingston, Mega Varlık Yönetim Anonim Şirketi (**"Mega Varlık"**) adında İstanbul'da 11 Haziran 2015 tarihinde 20.000.000 TL sermaye ile kurulmuş olan bir fon şirketinin 19.999.996 TL'lik hissesine sahip kurucu ortağıdır. Mega Varlık şirketi 9 Ağustos 2016 tarihinde sermayesini 50.000.000 TL'ye çıkartmış olup, sermayenin 49.999.996 TL'si Jacob Ortell Kingston'a aittir. **[EK 10- Mega Varlık'a Ait Ticaret Sicil Gazeteleri]**

Burada ayrıca dikkat çekmek gerekir ki, Kaliforniya'da yukarıda belirtilen kişilerce kurulmuş SBK Holding ABD'nin eski yönetim kurulu üyesi olduğu belirtilen Jacob Ortell Kingston'ın ana ortağı olduğu Mega Varlık banka kredilerini devir alarak, bu kredileri borçlularından çeşitli yöntemlerle tahsil etmektedir. Mega Varlık için Soner Yalçın'ın Sözcü Gazetesi'nde 31 Mart 2017 tarihli ve Maskeli Balo başlıklı yazısında:

> *"Batıda bu şirketlere akbaba deniyor, çek senet mafyasının yasal hali. Banka finans kuruluşlarının batık kredilerini alıp borçluların boğazına yapışıyorlar. Bizim akbaba*

3



*en son Bodrum Kervansaray Oteli aldı. Mega Varlık asıl sahibi ABD'li Jacob Ortel Kingston idi. Türkiye'nin notunu düşüren kredi derecelendirme kuruluşu JCR'nin bu akbaba şirketin notunu kısa sürede A'ya kadar yükseltmesi tuhaf mı? Değil. Küresel Dayanışma!"*

ifadeleri yer almaktadır. Bu yazının içeriğinin doğruluğuna ilişkin bir malumatımız yoktur. **[EK 11- İlgili Haber]**

Bu bilgiler ışığında, ayrıca basında SBK Holding Türkiye ile Mega Varlık arasında bir organik bağ olduğuna ilişkin kimi haberlere de rastlanmaktadır. Örneğin, Parlemento Haber isimli bir internet sitesinde yayınlanan Mart 2017 tarihli haberlerde *"SBK Holding ve organik bağı olan Mega Varlık Yönetim A.Ş. arkasındaki yabancı sermayenin gücü ile **zor durumda olup toparlanmaya çalışan yerli şirketlerimize son darbeyi indirerek batmalarına sebebiyet vermekte ve öz kaynakları ile taşınmazlarını çok ucuza ellerine geçirmektedir.** Bu yöntemle yerli sanayici ve turizmcilerimizin elinde bulunan birçok fabrika, tesis ve otel şimdiden Mega Varlık Yönetim A.Ş. vasıtasıyla yabancıların eline geçmeye başlamıştır"* denilmektedir. Bunun yanında yine kimi ilgili haberler işbu dilekçemiz ekinde sunulmaktadır. **[EK 12- İlgili Haberler]**

## 3. Dava Konusu Uyuşmazlık ve Hisse Devir Sözleşmesi

Müvekkilimizin Türkiye'de yaptığı yatırımlardan biri de havacılık sektöründe olmuştur. Türkiye'de yatırımlarını sürdürmeye devam etme gayesinde olan Müvekkilimiz, Türk kültürünün uluslararası alanda tanıtılması faaliyetleri ile de bağlantılı olarak, yurtdışından gelen misafirlerin Türkiye'yi tanıyabilmesi, Türkiye'ye getirdiği Amerikan Kongresi üyelerinin tanıtım gezilerinin yapılabilmesi, hava taksi de dahil kısa mesafeli uçuşların yapılabilmesi gibi imkanları da değerlendirerek, Türkiye'nin nispeten az bilinen yerlerine gidebilen, kısa mesafeli uçuş yapabilecek lisansa sahip Ovaair Uçak Bakım Onarım ve Havacılık Ticaret Ltd. Şti.'ni (**"Ovaair"**)satın alma kararı almıştır.

Bunun sonucu olarak Aralık 2007 itibariyle 2000 payı olan Ovaair şirketinin 1996 hissesini devralarak, söz konusu şirketin hissedarı olmuştur. Aynı tarihte şirket unvan değişikliğine giderek Bora Jet Havacılık Taşımacılık Uçak Bakım Onarım ve Ticaret Limited Şirketi olmuştur. İki ay sonrasında da tür değişikliği işlemi ile limited şirketten anonim şirkete dönüştürülmüş ve bugünkü ticaret unvanı olan Bora Jet Havacılık Taşımacılık Uçak Bakım Onarım ve Ticaret A.Ş. unvanını almıştır.

Bora Jet'in 2014 senesinde yeniden yapılanmaya gitmesi sonucu kısmi bölünme yoluyla, Bora Jet'in tek pay sahibi olduğu Bora Jet Bakım şirketi kurulmuştur. Müvekkilimiz 2015 yılında ise, yukarıdaki yapıdan bağımsız olarak Aydın Jet'i kurmuştur.

Huzurdaki dava ise Müvekkilimiz ile Davacı Şirket arasındaki Borajet (ve dolayısıyla Borajet Bakım) ile Aydın Jet hisselerinin devralınmasına ilişkin akdedilen 29 Aralık 2016 Hisse Devri Sözleşmesi'ne dayanarak 253.305.035 TL tutarın Müvekkil'den tahsil edilmesi talebi ile ikame edilmiştir.

Davaya dayanak yapılan Hisse Devir Sözleşmesi, Sayın Mahkeme'nin de takdir edeceği üzere, nevi şahsına münhasır bir hisse devir sözleşmesi olup, bir şirketin belli bir bedel üzerinden hisselerinin satışını düzenleyen klasik hisse devir sözleşmelerinden farklı bir ticari anlaşma üzerine kurulmuştur.

Hisse Devir Sözleşmesi'nin "Sözleşmenin konusu ve Bedeli" başlıklı 2. maddesine göre Davacı Şirket, Devraldığı Şirketlerin işbu sözleşmenin ekinde yer alan ve taraflarca karşılıklı

4



olarak incelenerek kabul edilmiş olan Mizanda belirtilen banka borçları hariç, mevcut **borçlarının tümünü ödemeyi üstlenmiştir.** **[EK 13 – Hisse Devir Sözleşmesi Ekinde Yer Alan Mizanlar]**

Hisse Devir Sözleşmesi kapsamında Davacı Şirket ayrıca Devredilen Şirketlerin hisseleri veya malvarlıkları üçüncü şahıslara devredildiğinde veya söz konusu Devredilen Şirketlerin diğer bir yolla üçüncü şahıslar tarafından devralınması durumunda ya da üçüncü şahıslar ile birleşme gerçekleştiğinde, elde edilecek net bedelin %25'i tutarında kar payını Davalı Müvekkil'e ödemeyi taahhüt etmiştir.

Hisse Devir Sözleşmesi'nin 2.2. maddesinde **devralanın Şirketlerdeki hisseleri tüm hak ve borçlarıyla devraldığı** açık ve net bir şekilde ifade edilmiştir:

> *2.2. Devir Alan, işbu Sözleşmeye tabi olarak Devir Edenin Şirketlerdeki hisselerinin tamamını tüm hak ve borçlarıyla satın ve devralacaktır. Devir Eden, aşağıdakilerin karşılığında, Şirketlerdeki hisselerinin tamamını tüm hak ve borçlarıyla birlikte, Devir Alana satacak ve devir edecektir:*

> *a. Devir Alan, Şirketlerin Banka Borçları (Sözleşmenin 3.6. maddesinde tanımlandığı üzere) hariç, borçlarının tümünü üstlenecektir; ve*

> *b. Devir Alan, Şirketlerin hisseleri veya malvarlıkları 3. şahıslara devredildiğinde veya diğer bir yolla 3.şahıslar tarafından Şirketler devralındığında ya da 3.şahıslar ile birleşme gerçekleştiğinde, elde edilecek net bedelinin (Sözleşmenin 4.2.maddesinde tanımlandığı üzere) %25'ini (yüzde yirmibeş) Devir Edene, anılan işlemlerin gerçekleşme tarihinden itibaren 15 (onbeş) gün içinde, Devir Eden tarafından bildirilecek hesaba, net olarak, nakden ve defaten ödeyecektir. Bununla birlikte, Şirketlerin hisselerinin halka arz edilmesi durumunda, işlemin gerçekleştiği tarihte, Sözleşmenin 4.2.maddesindeki formül paralelinde hesaplama yapılarak ilgili tutara isabet eden Şirketlerin hisseleri Devir Edene verilecektir.*

Bununla birlikte belirtmek gerekir ki, **Sözleşme'ye konu Devredilen Şirketler aslında Devir Alan tarafından Müvekkilimize hiçbir devir veya satış bedeli ödenmeksizin devralınmıştır.**

Dava konusu taleplerin dayanağı olan **Sözleşme, aslında Şirketlerin pasiflerinin devreden ve devralan arasında paylaşılması suretiyle, yani Şirket'in borçlarına karşılık devredilmiş** olup, herhangi bir şekil veya surette Devredilen Şirketler'in aktifi taahhüt edilmemiş ya da aktifler paylaşılmamıştır.

Taraflar arasındaki Sözleşmenin ruhunun anlaşılması adına bir kez daha tekrar etmek isteriz ki; Devredilen Şirketler karşılığında Davacı Şirket Müvekkil'e HİÇBİR ÖDEME YAPMAMIŞTIR. Söz konusu devrin, Devredilen **Şirketler'in pasiflerinin bölüşülmesi** şeklinde gerçekleştirileceği kararlaştırılmış olup, tarafların yükümlendikleri borçlar da Sözleşme'de belirtilmiştir. Buna göre, Müvekkilimizin Sözleşme çerçevesindeki yükümlülükleri Sözleşmenin "Devir edenin Yükümlülükleri" başlıklı 3. maddesinde düzenlenmiştir;

> *3.1. Hisseleri devredilen Şirketlerin İmza Tarihi itibariyle; Aralık 2016'da yeni gelecek operasyonel faturalar hariç, **Sözleşmeye ekli mizanda ve dava listesinde belirtilen borçları** ve alacakları bulunmaktadır. Devir Eden, Şirketlerin Ek l'deki mizanlarda ve Ek 2'deki dava listesinde belirtilen dışında, Aralık 2016'da yeni gelecek*

5



*operasyonel faturalar hariç, herhangi bir sözleşmeden, haksız fiilden kaynaklı veya hukuki gerekçesi ne olursa olsun hiçbir borcu olmadığını kabul ve ikrar eder.*

*3.2. İmza Tarihi'nden itibaren 2 (iki) yıl boyunca, Aralık 2016'da yeni gelecek operasyonel faturalar hariç, Şirketlerin mevcut ticari defter ve kayıtlarında ve Sözleşmenin eklerinde yer almaması kaydıyla, hisse devri tarihinden önce doğmuş olan tüm hukuki, ticari, mali uyuşmazlıkları ve işbu uyuşmazlıklardan doğacak olan borçları nedeni ile herhangi bir sebeple şirket aleyhine ihtarname keşide edilmesi, icra takibi yapılması, dava açılması veya Şirketlerin böyle bir borcu ödemesi durumunda tüm sorumluluk Devir Edende olacaktır. Bu anlamda Devir Alan tarafından talep edilecek miktar Devir Eden tarafından hiçbir ihtara, takibe veya davaya gerek kalmadan derhal Devir Alana ödenecektir.*

Hisse Devir Sözleşmesi'nin 3.5. maddesine göre, Devredilen Şirketlerin hisselerinin devir tarihi itibarı ile, Devredilen Şirketler aleyhine açılmış olan ekli dava listesinde belirtilen davalar dışındaki davalardan ötürü, Devralan Şirketler tarafından herhangi bir ödeme yapılması halinde, bu ödemeler, Müvekkil tarafından Davacı Şirket'e geri ödenecektir.

Ayrıca, Sözleşme kapsamında, Müvekkilimiz Hisse Devir Sözleşmesi'nin Ek-3'ünde belirtilen (Orijinal Para Cinsinden Banka Kredi Listesi) toplam 43.834.108 ABD Doları tutarındaki banka kredisi ve faizi borçları ve Ek-4'ünde belirtilen uçak leasingleri dışındaki finansal leasing borçlarını (Leasing Listesi) (birlikte **"Banka Borçları"** olarak anılacaktır) en geç 1 yıl içerisinde alacaklılara ödemeyi taahhüt etmiştir.

*3.6.    Ekli mizana kayıtlı borçlardan, Ek 3'te belirtilen (Orijinal Para Cinsinden Belirtilen Banka Kredisi Listesi) banka kredisi ve faizi borçları ve Ek 4'te belirtilen uçak leasingleri dışındaki finansal leasing borçları (Leasing Listesi) (bundan sonra Banka Borçları anılacaktır), en geç 1 (bir) yıl içerisinde Devir Eden tarafından alacaklılara ödenecektir. Şu kadar ki, spesifik olarak, bu Banka Borçlarından Credit Suisse'e ait olan borç bütün ferileriyle birlikte İmza Tarihi'nden itibaren 45 (kırkbeş) gün içerisinde Devir Eden tarafından ilgili bankaya ödeme yapılarak bu borç sona erdirilecektir. Devir Edenin, Devir Alana ve/veya Şirketlere karşı işbu bentte bahsedilen miktar dışında herhangi bir borcu bulunmamaktadır.*

*3.7.    Devir Eden Banka Borçlarını teminen Devir Alan lehine, kendisinin mülkiyetinde bulunan, ekli tapu senedinde belirtilen, Türkiye Cumhuriyeti, İstanbul ili, Fatih ilçesi, Molla Fenari Mahallesi, Nuru Osmaniye Mevkii, 34 Pafta, 294 Ada, 15 Parsel üzerinde bulunan, kargır matbaa niteliğindeki tam hisseli bina (bundan sonra Gayrimenkul olarak anılacaktır) üzerine 50.000.000,00-USD (Elli milyon Amerikan Doları) ana para ipoteği (bundan sonra İpotek olarak anılacaktır) tesis edecektir. Bununla birlikte, İpotek kaldırılmadan önce, Devir Edenin Banka Borçları hariç işbu Sözleşmeden kaynaklanan başka bir borcu çıkması halinde, bu borç bedeli kadar teminat gösterilerek ipotek kaldırılacaktır.*

Hal böyle iken Müvekkil ile Davacı Şirket'in Hisse Devir Sözleşmesi kapsamındaki yükümlülüklerini aşağıdaki şekilde özetle listelemek mümkündür:

| Müvekkil'in yükümlülükleri | Davacı Şirket'in Yükümlülükleri |
|---|---|
| *1* Şirketlerin mevcut ticari defter ve kayıtlarında ve Sözleşmenin eklerinde yer almaması kaydıyla, Aralık ayında gelecek operasyonel faturalar hariç, 29 | Şirketlerin mevcut ticari defter ve kayıtlarında ve Sözleşmenin eklerinde yer almaması kaydıyla, 29 Aralık 2016 tarihinden önce doğmuş olan tüm hukuki, ticari, mali |

6



|   | Aralık 2016 tarihinden önce doğmuş olan tüm hukuki, ticari, mali uyuşmazlıklardan doğacak olan borçlar nedeni ile herhangi bir sebeple şirket aleyhine ihtarname keşide edilmesi, icra takibi yapılması, dava açılması veya Şirketlerin böyle bir borcu ödemesi durumunda bu ödemeler | uyuşmazlıklardan doğacak olan borçlar nedeni ile herhangi bir sebeple şirket aleyhine ihtarname keşide edilmesi, icra takibi yapılması, dava açılması veya Şirketlerin böyle bir borcu ödemesi durumunda bu ödemelerin Müvekkil'den talep edilmesi |
|---|---|---|
| 2 | Devir tarihinde Şirketler aleyhine açılmış olan ekli dava listesinde belirtilen davalar dışındaki davalardan ötürü, Şirketler tarafından yapılan ödemeler | Şirketlere ait Müvekkil'in sorumluluğunda olmayan her türlü borcun ödenmesi |
| 3 | Hisse Devir Sözleşmesi'ne ekli mizana kayıtlı borçlardan, Hisse Devir Sözleşmesi ekindeki Orijinal Para Cinsinden Belirtilen Banka Kredisi Listesinde belirtilen banka kredisi ve faizi borçları ve yine Hisse Devir Sözleşmesi ekinde yer alan uçak leasingleri dışındaki finansal leasing borçlarının en geç bir yıl içerisinde kapatılması<br><br>*[Bunlardan Credit Suisse'e ait olan borç bütün ferileriyle birlikte İmza Tarihi'nden itibaren 45 (kırkbeş) gün içerisinde Devir Eden tarafından ilgili bankaya ödeme yapılarak bu borç sona erdirileceği kararlaştırılmış olmakla beraber, aşağıda hakkında ayrıntılı olarak bilgi verilecek olan İpotek Senedi uyarınca böyle bir ayrım yapılmaksızın tüm bankalara yapılacak ödemelerin bir yıl içerisinde kapatılacağı belirtilmiştir].* | Hisse Devir Sözleşmesi'nin 4. maddesi çerçevesinde Şirketlerin hisseleri veya malvarlıkları 3. şahıslara devredildiğinde veya diğer bir yolla 3. şahıslar tarafından devralındığında ya da 3. şahıslar ile birleşme gerçekleştiğinde Müvekkil'e bilgi verme ve elde edilecek net bedelin %25'ini Müvekkil'e net, nakden ve defaten ödeme ve bu yükümlülük çerçevesinde Hisse Devir Sözleşmesi'nin lafzı gereği dolaylı olarak ortaya çıkan Devredilen Şirketleri iyileştirme borcu |
| 4 | Yukarıda 3'ün altında belirtilen borçları teminen Devir Alan lehine, Müvekkil'in mülkiyetinde bulunan, Hisse Devir Sözleşmesi'nde tanımlı gayrimenkul üzerine 50.000.000 ABD Doları ana para ipoteği tesisi | |

Bunların yanında, Hisse Devir Sözleşmesi'nin 3.6. maddesinde yer alan hükmün son cümlesine de Sayın Mahkeme'nin dikkatini çekmez isteriz. İlgili cümlede, <u>Müvekkil'in bu bentte bahsedilenler dışında herhangi bir borcunun bulunmadığı açık ve net bir şekilde ifade edilmiştir.</u>

> *3.6. ... <u>**Devir Edenin, Devir Alana ve/veya Şirketlere karşı işbu bentte bahsedilen miktar dışında herhangi bir borcu bulunmamaktadır**</u>.*



Dolayısıyla, Müvekkil'in 3.6.'da ödemeyi kabul ettiği kimi banka borçları ve uçak leasingleri dışındaki finansal leasing borçları ve 3.2. maddede taahhüt ettiği ve belirli şartlarla ödenebilecek üçüncü tarafların talepleri dışında Davacı'ya karşı bir borcu bulunmadığı açık olup, bu husus Sözleşme <u>ile bizzat Davacı'nın da kabulündedir.</u>

## 4. İpotek Senedi Kapsamında Davacı Şirket'in Yükümlülükleri

Müvekkil, Hisse Devir Sözleşmesi'nin 3.6. maddesi çerçevesinde, Borajet'in Credit Suisse'e olan kredi borcu dâhil, bankalara olan kredi borçları ile uçak leasingi dışındaki finansal leasing borçlarını üstlenmiş; bununla ilgili olarak 1 Şubat 2017 tarihinde Davacı lehine Müvekkil'e ait İstanbul ili, Fatih İlçesi, Molla Fenari Mah. Nuru Osmaniye Mevkii, 34 Pafta, 294 Ada 15 Parsel'de kain gayrimenkulü üzerinde (50.000.000 ABD Doları karşılığı) 220.000.000 TL tutarında ipotek tesis edilmiştir. ("**İpotek**") İşbu İpotek, Devredilen Şirketlerin 29 Aralık 2016 tarihi itibarıyla ipotek akit tablosunda yer alan bankalara ve leasing şirketine olan borçlarının Davacı tarafından ödenmesi ve ödenen miktarın Davacı'ya iade edilmemesi halinde anapara ve faizinin teminatı olarak kullanılmak üzere, anapara ipoteği olarak tesis edilmiştir.

1 Şubat 2017 tarihli resmi senedin ("**İpotek Senedi**") 2. maddesinde bu borçların Müvekkil tarafından ödenmemesi halinde, banka kredisinin ipotek alan Davacı Şirket tarafından ödendiği günden itibaren tahsil anına kadar işleyecek banka kredi faiz oranına ilave edilecek 2,5 puan üzerinden hesaplanacak faizi ile birlikte garantisini oluşturmak ve alacağın temininde kullanılmak ve fekki bildirilinceye kadar geçerli olmak üzere anapara ipoteği tesis edildiği belirtilmiştir. **[EK 14- İpotek Senedi]** Nitekim Davacı Taraf ilgili faiz hükmü sebebiyle fiiliyatta bu borçları kendisi ödemeyi tercih ettiğini belirtmiştir.

İpotek Senedi'nde Şirketlerin Akbank T.A.Ş., Deniz Bank A.Ş., Garanti Bankası A.Ş., Odea Bank A.Ş., Türkiye Ekonomi Bankası A.Ş., Yapı ve Kredi Bankası A.Ş., Credit Suisse'e toplam 43.834.108 ABD Doları ve Garanti Leasing'e 579.910 TL borcu olduğu ve anılan şirketlerin İpotek Senedi'nde ismi geçmeyen diğer bankalara da 29 Aralık 2016 tarihi itibarıyla başkaca kredi borcu olması halinde, bu borçların da İpotek Senedi'nde belirtilen şartlarda ödeneceği ifade edilmiştir.

İpotek Senedi'nin 2. maddesi çerçevesinde Müvekkil'in ödeme yapmaması halinde, Davacı Şirket'in ödeme yapacağı, İpotek limiti dâhilinde Davacı Şirket'in bankalara ödediği tutarı kendisinden talep etmesi halinde, talep edilen günde, savunma, itiraz veya defi ileri sürmeden derhal ödeyeceği, ödemediği takdirde borcun aynı gün muaccel olacağı ve ipoteğin paraya çevrilebileceği düzenlenmiştir.

## 5. Yükümlülüklerin Yerine Getirilmesi Bakımından Mevcut Durum

Müvekkil Hisse Devir Sözleşmesi'nde kararlaştırıldığı ve taahhüt ettiği üzere, kredi borçlarını ödemiş ve Credit Suisse'e olan borcu da Sözleşmede yer alan taahhüdünün hukuki sınırları içinde ödemeye devam etmektedir. Burada Davacı'nın Davalı Müvekkil'in Sözleşme kapsamındaki borçlarını ifa etmediği iddiası tamamen asılsız ve suiniyetlidir. Bu kapsamda:

**(i)** Öncelikle belirtmek isteriz ki, her ne kadar Davacı 15 Şubat 2017 tarihinde Müvekkil'e gönderdiği ihtarname ile Müvekkil'in Credit Suisse'e olan kredi borcunu ödemesi gerektiğini, bu konuda temerrüde düştüğünü ihtar ettiğini belirtse de, esasen <u>Davacı'nın kendisi, Sözleşme kapsamındaki yükümlülüklerini kötü niyetli bir şekilde ifa etmemiştir ve etmemektedir.</u> Kaldı ki İpotek Senedi çerçevesinde Credit Suisse AG'ye olan kredi borcu için de bir yıllık ödeme süresi öngörülmüştür.

8



Nitekim bu husus Müvekkil tarafından, Davacı'nın Sözleşme kapsamındaki yükümlülüklerine aykırı olarak üçüncü şahıs ve tedarikçi borçlarını ödemediği, Sözleşme ve ipotek sözleşmesi kapsamındaki taahhütlerine uygun olarak yükümlülüklerini yerine getirmediğinden bahisle, Sözleşme ekinde bulunan şirket borçları ile ipotek sözleşmesinde anılan banka borçlarının aksatılmadan ödenmesi gerektiği belirtilerek Davacı'ya Beyoğlu 17. Noterliği'nden gönderilen 16 Şubat 2017 tarihli cevabi ihtarname ile ihtar edilmiştir. **[EK 15- İhtarname]** Müvekkil, Davacı bizzat Sözleşme kapsamında yükümlendiği borçları ifa etmediğinden Credit Suisse'e olan borcunu tek seferde kapatmama kararı almıştır. Örnek olarak belirtmek gerekirse, Müvekkil'in üçüncü şahıslardan öğrendiği üzere Borajet hisse devri sonrası şirketin mali müşavire olan borçlarını, GE Engine Services LLC ve Embraer Aviation Internation SAS'a olan kimi borçlarını ödememektedir. Tüm bunlara rağmen vurgulamak isteriz ki, Credit Suisse AG'ye olan kredi borcu ana para ve faiz toplamı şeklinde her ay düzenli olarak vadesinde ödenmekte olup, Davacı Şirket'in banka nezdindeki borcunda herhangi bir temerrüt hali veya bir zarara uğraması durumu söz konusu değildir.

Öte yandan Credit Suisse AG ile Aydın Jet arasında yapılan 7 Ekim 2015 tarihli İpotek Sözleşmesi kapsamında kredi teminatı olarak üzerinde ipotek tesis edilen ve Hisse Devir Sözleşmesi kapsamında Davacı Şirket'e devredilen yaklaşık 27.000.000 ABD Doları değerinde VIP uçak Aydın Jet'e ait olup, Davacı uçağın bakımlarını yaptırmayarak, ipotek gerekliliklerini yerine kasten getirme**me**ktedir. Credit Suisse AG uçağın değerinin 23.000.000 ABD Dolarına düştüğünü belirtmiştir ve bu sebeple borcun yeniden yapılandırılarak Müvekkil tarafından 87.000 ABD Doları ek ödeme yapılması gerekmiştir. Ayrıca Davacı Şirket, Borajet olarak kendi sorumluluğunda bulunan ve Credit Suisse AG'den alınan kredi kapsamında yaklaşık 155.000 ABD Doları tutarında hukuki masrafları ödemediğinden, Credit Suisse AG yetkilileri Müvekkil'e uyarıda bulunmaktadır. Bu kapsamda ise, Davacı kredi borcunu ödeyen Müvekkil'i zor durumda bırakmaktadır. Sözleşme tahtındaki yükümlülüklerini ve üstlendiği borçları yerine getirmeyen esasen Davacı Şirket'tir.

**(ii)** Davacı Şirket, İpotek Senedi kapsamında kendi üzerine düşen borçları ifa etmeyerek Akbank T.A.Ş., Denizbank T.A.Ş., Türk Ekonomi Bankası A.Ş., Odea Bank A.Ş., Garanti Bankası A.Ş. gibi bir kısım bankaların, nedensiz olarak hesap kat ihtarında bulunmalarına sebebiyet vermiştir.

Nitekim Odea Bank A.Ş. 28 Şubat 2017 tarihinde Borajet'e ve müteselsil kefil sıfatıyla Müvekkil'e ihtarname göndererek 1 gün içerisinde vadesi gelmiş/gelmemiş tüm kredilerin tahsilatını ve 21.070.603,45 TL'lik kredi borcunun ödenmesini talep etmiş; 1 hafta süre istenilmesine rağmen bu süre verilmemiştir. Akabinde Odea Bank A.Ş. anılan ihtarnameye konu kredi alacağının tamamını 6 Mart 2017 tarihli sözleşme ile yukarıda Davacı ve Davacı'nın nihai ana hissedarı SBK Holding Türkiye ile organik bağını açıklamış olduğumuz Mega Varlık'a devretmiştir. Bu devrin neticesinde Mega Varlık İstanbul 22. İcra Müdürlüğü'nün 2017/6669 E. sayılı dosyası kapsamında ilamsız takip başlatmıştır. Bu takip kapsamında 10 Mart 2017 tarihinde dosya borcu olarak 23.161.907,94 TL Müvekkil tarafından ödenmiştir. Daha sonra Odeabank aleyhine bu işlemleri nedeniyle Müvekkil tarafından 18. Asliye Ticaret Mahkemesi'nin 2017/239 E. sayılı dosyasından halen derdest bir dava açılmıştır.

Benzer şekilde, Akbank T.A.Ş. 2 Mart 2017 tarihinde Borajet'e ve müteselsil kefil sıfatıyla Müvekkil Yalçın Ayaslı'ya ihtarname göndererek 1 gün içerisinde toplam 6.740.000 TL kredi borcunun ödenmesini talep etmiştir.

Garanti Bankası A.Ş. de 15 Mart 2017 tarihinde Borajet Bakım'a ve müteselsil kefil sıfatıyla Borajet'e ve Müvekkil'e ihtarname göndererek, 8.325,17 TL, 4.604.059,11 ABD Doları ve

9



9.837,40 TL tutarlarının ödenmesini talep etmiştir. Garanti Bankası A.Ş. aynı tarihte, Borajet'e ve müteselsil kefil sıfatıyla Müvekkile ikinci bir ihtarname göndererek, 25.463.669,96 TL'nin nakden ödenmesini; 2.093.235,76 TL, 3.706.000 ABD Doları, 70.600 EUR ve 24.942,07 TL'nin nakden depo edilmesini ihtar etmiştir.

Davacı, Hisse Devir Sözleşmesi tahtında kendi yükümlendiği taahhütleri yerine getirmeyip Borajet unvanı ile ifa etmek durumunda olduğu borçları ifa etmediğinden, Borajet adına devir tarihinden önce alınan ve Müvekkil'in şahsi kefaleti ile Nar Doğal Ürünler Turizm Tic. Ve San. A.Ş. ile Armaggan Kültür Turizm Tic. ve San. A.Ş. gibi Müvekkil'in sahibi olduğu diğer şirketlerinin kefaleti de bulunan kimi kredilere ilişkin olarak da hesap kat ihtarında bulunulmuştur.

Diğer bankalar ile de benzer durumlar yaşanması üzerine, zor durumda bırakılan Müvekkil tüm kredi borçlarını ödeyebilmek adına Garanti Bankası'ndan çeşitli gayrimenkullerini ipotek göstererek toplamda yaklaşık 20.000.000 ABD Doları tutarında kredi çekmiş ve Credit Suisse ile yapılan kredi sözleşmesi kapsamındaki borç hariç diğer banka borçlarını kapatmıştır. Bugün itibariyle kapatılan kredi borçlarının toplam tutarı 67.216.407,35 TL + 964.000,69 ABD Doları'dır. **[EK 16 - İhtarlar ve Kapatılan Borçlara İlişkin Tablo ve Belgeler]** Ayrıca Garanti Bankası'ndan alınan bu kredi kapsamında Garanti Bankası'nın kredi tahsisinin ön koşullarından biri de banka nezdindeki leasing borçlarının kapatılması olduğundan, Müvekkil vadesi gelmiş ve gelmemiş 487.607 TL tutarındaki tüm leasing borçlarını ödemek durumunda kalmıştır. **[EK 17 – Leasing Borçlarının Kapatıldığına Dair Belgeler]**

**(iii)** Ayrıca Müvekkil yukarıda belirtmiş olduğumuz üzere borçlarının teminatını oluşturan İpotek tesisini Hisse Devir Sözleşmesi kapsamındaki yükümlülüklerini ihlal etmeden doğrudan gerçekleştirmiştir. Ancak Davalı Şirket İpotek Senedi çerçevesinde Müvekkil'in ödemediği borçları ödemek ve Müvekkil'den talep etmekle, Müvekkil tarafından taleplerine yanıt verilmemesi halinde Müvekkil'in sağladığı İpoteği paraya çevirmek suretiyle alacağını tahsil etmekle yükümlü iken, bu şekilde ilerlemeyip Şirketleri temerrüde düşürmüş ve dolasıyla hem Müvekkil'in verdiği kefaletten faydalanmış, hem de İpoteği kötü niyetli olarak elinde tutmaktadır.

**(iv)** Müvekkil Hisse Devir Sözleşmesi'nin 3.2 maddesindeki yükümlülüklerini 29 Aralık 2016 tarihinden önce doğmuş olan tüm hukuki, ticari, mali uyuşmazlıklardan doğacak olan borçlar nedeni ile herhangi bir sebeple şirket aleyhine ihtarname keşide edilmesi, icra takibi yapılması, dava açılması veya Şirketlerin böyle bir borcu ödemek durumunda kalması durumunda bu ödemeleri Davacı Şirket'in talebi üzerine ödemekle yükümlüdür. Ancak Davacı Şirket herhangi bir talepte bulunmayarak da Hisse Devir Sözleşmesi tahtındaki yükümlülüğünü ihlal etmiştir.

**(v)** Son olarak belirtmek isteriz ki, hisse devrini müteakip Davacı'nın üzerine aldığı ödeme yükümlülüklerini yerine getirmemesi nedeniyle (çeşitli tedarikçi borçlarını ödememesi gibi) bir kısım teminat mektupları ve harici garantiler de nakde çevrilmiş olup, şahsi kefaleti bulunması nedeniyle işbu dilekçemiz tarihi itibariyle Müvekkilimiz Hisse Devir Sözleşmesi kapsamında ödemekle yükümlü olmadığı aşağıdaki ödemeleri yapmak durumunda kalmıştır:

| Açıklama | Ödenen Tutar |
|---|---|
| Aldus Portfolio Limited'a verilmiş 760.000 ABD Doları tutarında üç teminat mektubu ve SMBC Aviation Capital Limited'a verilen 760.000 ABD Doları harici garantinin nakde çevrilmesi ile | 3.040.000 ABD Doları |



| İstanbul Dünya Ticaret Merkezi'ne ödenmesi gereken kira bedeline ilişkin teminat mektubunun nakde çevrilmesi ile | 73.000 TL |
|---|---|
| Sabiha Gökçen Havalimanı'na ödenmesi gereken kira ve hizmet bedellerine ilişkin teminat mektubunun nakde çevrilmesi ile | 35.600 AVRO (138.829,32 TL) |
| Garanti Bankası kapsamındaki tedarikçi ve kredi kartı ödemeleri | 109.585,09 TL |
| Kredi kartı ödemeleri | 7.137,91 ABD Doları |

**Bu ödemeler Müvekkilimizin sorumluluğunda olmamasına rağmen Davacı tarafın Hisse Devir Sözleşmesi'ni ihlal etmesi sebebi ile Müvekkilimiz bunları ödemek durumunda kalmıştır. Dolayısıyla işbu dilekçemiz tarihi itibariyle Müvekkil'in sorumluluğunda olmadığı halde ödediği toplam tutarın Türk Lirası karşılığı 11.047.339,85 TL'dir. [EK 18 – İlgili Dekontlar]**

**ANCAK** Davacı Şirket, işbu dava ile Sözleşme'ye ekli mizanların gerçeği yansıtmadığını, ticari defter ve belgeler üzerinde yapılan incelemede usulsüzlük tespit ettiklerini iddia etmekte; bu kapsamda şirket alacağı olarak görülen bazı bedellerin alacak olmayıp muhatap tarafından önceden kesmesi gereken faturaları kesmemesi nedeniyle bakiye verdiğini, kiralık alınan uçakların bakım ücretlerinin mali tablonun pasif kısmında yer alması gerekirken aktif kısmında gösterilmiş olduğunu, kur farkı oluştuğunu, aktif olmayan uçakların tekrar uçabilir hale gelmesi için yapılması gereken harcama tutarı bulunduğunu, gider yazılması gereken uçak bakım giderlerinin aktifleştirildiğini ileri sürmekte ve alacak talebinde bulunarak işbu davayı açmıştır. Bu hususların işbu dava ile talep konusu yapılması suiniyetli olup, Davacı'nın söz konusu iddiaları mesnetsiz olduğu gibi, talepleri de gerek Hisse Devir Sözleşmesi'nin lafzına ve ruhuna gerekse de hukuka aykırı olup reddedilmesi gerekmektedir. Şöyle ki;

## B. HUKUKİ DAYANAK

### (I) USULE İLİŞKİN İTİRAZLARIMIZ

### 1. HUZURDAKİ DAVA BELİRSİZ ALACAK DAVASI OLARAK AÇILAMAZ.

Davacı Şirket dava dilekçesinde yalnızca 253.305.035 TL tutarın Müvekkil'den tahsilini talep etmiş iken, cevaba cevap dilekçesinde bu talebini değiştirmiş ve yaşamış olduğunu iddia ettiği kar mahrumiyetini "belirsiz alacak" olarak nitelendirmiş ve ilgili tutarın Sayın Mahkemeniz tarafından hesaplanmasını talep etmiştir.

Öncelikle belirtmek gerekir ki, HMK m.107/1 hükmü uyarınca belirsiz alacak davası ancak davanın açıldığı tarihte alacağın miktarının yahut değerinin tam ve kesin olarak belirlenmesinin mümkün olmadığı hallerde açılabilir:

*HMK MADDE 107*

*(1) Davanın açıldığı tarihte alacağın miktarını yahut değerini tam ve kesin olarak belirleyebilmesinin kendisinden beklenemeyeceği veya bunun imkânsız olduğu hâllerde, alacaklı, hukuki ilişkiyi ve asgari bir miktar ya da değeri belirtmek suretiyle belirsiz alacak davası açabilir.*

11



Bu hükümden hareketle ve doktrinde de kabul edildiği üzere talep sonucunun objektif olarak belirlenmesinin davacıdan beklenemeyecek olması gerekir.[1] Sözleşmenin ihlal edilmesine yönelik ileri sürülen iddiaların hiçbirini kabul etmemekle birlikte, davacının bu iddiaları temelinde kar mahrumiyetini hesaplamasını engelleyecek hiçbir objektif imkânsızlık sebebi bulunmamaktadır.

Bu hususa ek olarak, Davacı Şirket ancak cevaba cevap dilekçesinde bir belirsiz alacak talebi öne sürmüş, dava dilekçesinde ise bu talebine hiç değinmemiştir. Doktrinde:

> *"Kanun'da davalının cevap vermesinden sonra belirsiz alacak davasının açılıp açılmayacağına karar verilebileceğinden söz edilmemiştir. Aksine dava açarken davacının talep sonucunu belirleyemeyecek durumda olması aranmıştır. Kanun'un öngörmediği bir husus belirsiz alacak davası için düşünülemez."[2]*

denilmek suretiyle de bu hususun hukuka aykırı olduğuna işaret edilmiştir. Tüm bunlara rağmen, Sayın Mahkemenizi usuli bir hataya sürüklemek amacıyla sonradan ileri sürülen bu talebin doktrinde de ileri sürüldüğü üzere hukuki yarar yokluğu sebebiyle reddi gerekmektedir.[3]

## 2. DAVA DİLEKÇESİ EKİNDE DELİLLERİN SUNULDUĞU BELİRTİLMİŞ OLMAKLA BİRLİKTE DELİLLER SUNULMAMIŞTIR. İHTİYATİ HACİZ KARARINA İTİRAZ KAPSAMINDA SUNULAN DELİLLER DE TÜRKÇE DİLİNDE OLMADIĞINDAN SAYIN MAHKEMECE NAZARA ALINMAMASINI TALEP EDERİZ.

Davacı Şirket dava dilekçesi ekinde delillerini sunmuş olduğunu ifade etmişse de, dava dosyası incelendiğinde bu delillerin dava dilekçesi ekinde sunulmadığı tespit edilmiştir. Öte yandan, Davacının, dava dosyasına dilekçesi ekinde sunduğu birçok fatura ve sözleşme yabancı dilde olup bu belgelerin Türkçe tercümesi ne dava dosyasına ibraz edilmiş, ne de tarafımıza tebliğ edilmiştir. Dava dilekçesi ekinde sunulmayan deliller, sanki sunulmuşçasına, ihtiyati hacze itiraz dilekçesi ekinde İSTİNAF MAHKEMESİNE sunulmuştur.

Oysa ki, HMK m.223 uyarınca;

> *(1) Yabancı dilde yazılmış belgeye dayanan taraf, tercümesini de mahkemeye sunmak zorundadır.*

Kanun'un bu açık hükmüne rağmen yabancı dildeki belgelerin hiçbirinin Türkçe tercümesini ibraz etmeyen Davacı'nın dayanmış olduğu bu delillerin Sayın Mahkemeniz tarafından dikkate alınmaması gerekir. Bu husus Yargıtay'ın oturmuş içtihatlarında da bir bozma nedeni sayılmıştır.

Gerçekten de Yargıtay 15. Hukuk Dairesi'nin 2014/1683 Esas, 2014/4876 Karar sayılı ve 10.07.2014 tarihli kararına göre;

> *"O halde mahkemece davalı ve birleşen dosya davacısı yüklenicinin delil listesi ekinde "Ek 9" olarak sunduğu yabancı dilde yazılmış belgelerin tercümesi istenerek, tercüme belgeler de eklendikten sonra bilirkişilerden davacı taşeronun ek bilirkişi raporuna yaptığı teknik nitelikteki itirazları cevaplandırır biçimde ve denetime elverişli ek rapor alınması, oluşacak sonuca uygun hüküm kurulması gerekir. Bu hususlar üzerinde*

---

[1] Pekcanıtez, Medeni Usul Hukuku Cilt II, 15. Bası 2017, s.1031
[2] Pekcanıtez, Medeni Usul Hukuku Cilt II, 15. Bası 2017, s.1031
[3] Pekcanıtez, Medeni Usul Hukuku Cilt II, 15. Bası 2017, s.1054

*durulmadan eksik incelemeyle verilen karar usul ve yasaya aykırı olmuş, kararın bozulması gerekmiştir. "*

Hal böyleyken, ilgili delillerin Sayın Mahkemece nazara alınmamasını, bu aşamadan sonra tercüme edilse dahi, ek bir iddiada bulunulmasının HMK'nın 141. maddesinde yer alan iddiaların genişletilmesi yasağına aykırılık teşkil edeceğini, bu durumu hiçbir şekilde muvafakatimizin olmadığını ve bu bağlamda ispat koşulları sağlanmamış olan davanın öncelikle bu nedenlerle reddini talep ederiz.

## (II) ESASA İLİŞKİN İTİRAZLARIMIZ

## 1. DAVACI ŞİRKET BASİRETLİ, TEDBİRLİ VE ÖNGÖRÜLÜ BİR TACİR GİBİ HAREKET ETMEMİŞTİR.

Hisse Devir Sözleşmesi kapsamındaki borçlardan Müvekkil'in sorumlu olabilmesi için *"Şirketlerin mevcut ticari defter ve kayıtlarında ve Sözleşmenin eklerinde yer almaması"* **şartı öngörülmüştür**. Hâlbuki Davacı'nın iddia ettiği hususların büyük çoğunluğu, gerek Sözleşme'nin eki olan mizanda gerek de işbu Sözleşme'yi imzalamadan önce incelemiş olduğu ya da basiretli bir tacir olarak incelemiş olması gereken şirket kayıtlarında yer almaktadır.

Hisse Devir Sözleşmesi'nin ekinde taraflarca imzalanan ve Devredilen Şirketlere ait mizanlar ayrı ayrı yer almaktadır. Bu mizanların hepsi Vergi Usul Kanunu ("**VUK**") ve ilgili tali mevzuata göre hazırlanmış olup, bu mizanlarda herhangi bir usulsüzlük ya da aykırılık bulunmamaktadır. Davacı'nın aksi yöndeki iddiaları yersizdir. Kaldı ki, Devredilen Şirketler bulundukları sektör kapsamında da düzenli olarak bağımsız denetim kuruluşları eliyle incelemelere tabi tutulmaktadır. **Şirketlerin mali durumunun kötü olduğu borçlarının bulunduğu Sözleşme'ye ekli bu mizanlardan da açıkça görülebilmektedir.** Kaldı ki Davacı 22 Mayıs 2017 tarihli cevaba cevap dilekçesi ile de bu durumu kabul ve ikrar etmektedir.

Sayın Mahkeme'nin de malumu olduğu üzere, Hisse Devir Sözleşmesi netice itibariyle bir satım sözleşmesidir. Tacirler arasında yapılan satım sözleşmelerinde ayıba karşı tekeffül hükümleri çerçevesinde alıcı tarafın malı teslim aldıktan sonra sekiz gün içinde incelemek ve yine bu süre içerisinde durumu satıcıya ihbar etmek yükümlülüğü bulunmaktadır. Bu husus doktrinde de Prof. Dr. Sabih Arkan tarafından aşağıdaki şekilde belirtilmiştir:

> *"Satılanın ayıplı olduğunu teslim sırasında anlamak mümkün değilse, alıcı, malı, teslim aldıktan sonra sekiz gün içinde incelemek ve gene bu süre içerisinde durumu satıcıya ihbar etmekle yükümlüdür. Bu ihbar sekiz günlük süre içinde yapılmazsa, alıcı, malı ayıp ile birlikte kabul etmiş sayılır."* **[EK 19 - Prof. Dr. Sabih Arkan, Ticari İşletme Hukuku, 2014, s.160]**

Zarar iddiasını hiçbir şekilde kabul anlamına gelmemek kaydıyla, bu durumda satın almadan önce herhangi bir inceleme yapmadığını dolaylı olarak ifade eden Davacı **Devredilen Şirketlerin malvarlığı hakkındaki açık ayıp iddiası bakımından muayene ve ihbar yükümlülüğünü de yerine getirmemiştir.** Şu halde Davacı'nın taleplerinin Müvekkil'e karşı haksız menfaat elde etmek amacıyla kötü niyetli olduğu ortadadır.

Ayrıca belirtmek isteriz ki, dünya genelinde mutat bir uygulama olarak, ayıp tartışmalarına girmemek adına şirketlerin büyük bir kısmı profesyonel danışmanlık kuruluşları yardımı ile satın alınmaktadır. Bu kapsamda öncelikle ayrıntılı olarak devralınacak şirketin varlıkları, iş



yapış modelleri, karlılığı, mali tabloları, vergisel yükümlülükler ve hukuki durumu gibi kritik unsurlar uzmanlarca tespit edilmekte, raporlar hazırlanmakta, alıcı taraf da söz konusu bulgular ışığında söz konusu şirketi alıp almayacağına karar vermektedir.

Davacı'nın basiretli, tedbirli ve öngörülü bir tacir gibi davranma yükümlülüğünün bulunduğu konusunda herhangi bir şüphe bulunmamaktadır. Nitekim bu husus Ticaret Kanunu'nda ("**TTK**") açık ve net bir şekilde ifade edilmiştir. TTK m.18/2 "*Her tacirin, ticaretine ait bütün faaliyetlerinde basiretli bir iş adamı gibi hareket etmesi gerekir.*" hükmünü amirdir. Doktrinde de Prof. Dr. Sabih Arkan bu hususta şöyle demektedir:

> "*Basiretli iş adamı gibi davranma yükümü aslında **objektif bir özen ölçüsü** getirmekte ve tacirin ticari işletmesiyle ilgili faaliyetlerinde, kendi yetenek ve imkânlarına göre ondan beklenebilecek özeni değil, aynı ticaret dalında faaliyet gösteren **tedbirli, öngörülü bir tacirden beklenen özeni göstermesinin gerekli olduğunu vurgulamaktadır.*" [EK 20 - Prof. Dr. Sabih Arkan, Ticari İşletme Hukuku, 2014, s.137-138]

Nitekim Yargıtay 11. Hukuk Dairesi'nin 27 Mart 2014 tarihli E. 2012/19104 - K. 2014/5976 numaralı ilamında da:

> "*(...) TTK 20.maddesi kapsamında davacıların basiretli bir tacir gibi bu şekilde bir alım yaparken herkese açık bulunan kayıtları incelemeleri gerekirken bunu yapmayıp ihale sürecinde bilgi odalarında davalılar tarafından bu bilginin verilmediği veya yanıltıldıklarını ileri sürmelerinin hiçbir hukuki dayanağının olmadığı, kaldı ki taşınmazın zemindeki görülen fiziki sınırlarının satımdan önce ve sonrada aynı şekilde bulunduğu, alıcıların gördükleri fiziki sınırlar kapsamında bu taşınmazı edindikleri ve bu şekilde kullanımlarının söz konusu olacağı, imar planı değişikliği iddiasının da sonuca etkili olmadığı, imar planlarının da aleni olup her zaman için incelenebileceği, imar planı değişikliğinin 4.1.2007 tarihinde askı ilanına çıkarıldığı ve aynı imar planında bulunan davacılardan E.. A.Ş.'ne ait olan Gebze'deki taşınmazları bakımından 2.2.2007 tarihinde itirazda bulunup daha sonra idare mahkemesinde dava açtıkları, dolayısıyla imar planı değişikliğinden haberdar olduklarının kabulü gerektiği, aksi durumda dahi davacıların BK. 20.maddesi uyarınca gerekli özeni göstermedikleri, bu durumdan davalıların sorumlu tutulmasının mümkün bulunmadığı, pay devir sözleşmesinin imar planının askıya çıkmasından sonra 8.6.2007 tarihinde imzalandığı, pay devrinin ve bedel ödemesinin de 17.7.2007 de yapıldığı nazara alındığında, esasında davacıların imar planı değişikliğini bildikleri sonucuna varıldığı, sözleşmenin yapılmasından sonra ortaya çıkan bir durum olmadığı, dolayısıyla BK 197.madde kapsamında sözleşmenin yapıldığı esnada davalı tarafça imar planı değişikliğinin bilindiği ve bu durumun bilinmesine rağmen sözleşmenin akdedildiği, alıcının bildiği ayıptan dolayı satıcının tekeffül sorumluluğu altında bulunmadığı, gerekçesiyle davanın reddine karar verilmiştir.*
>
> *Kararı davacılar vekili temyiz etmiştir.*
>
> *Dava dosyası içerisindeki bilgi ve belgelere, mahkeme kararının gerekçesinde dayanılan delillerin tartışılıp, değerlendirilmesinde usul ve yasaya aykırı bir yön bulunmamasına göre, davacılar vekilinin tüm temyiz itirazları yerinde değildir.*"

denilmek suretiyle, <u>**TTK 20.maddesi kapsamında Davacıların basiretli bir tacir gibi bu şekilde bir alım yaparken kayıtları incelemeleri gerekirken bunu yapmayıp satım**</u>

14



**sürecinde Müvekkil tarafından bilgi verilmediği veya yanıltıldıklarını ileri sürmelerinin hiçbir hukuki dayanağının olmadığı** vurgulanmıştır.

Huzurdaki uyuşmazlık konusu olayda da, devredilen şirketlerin havayolu şirketi olduğu da göz önüne alındığında tedbirli ve öngörülü bir tacir olarak Davacı'nın kendisinin de Devredilen Şirketler hakkında ayrıntılı olarak hukuk, finans, vergi ve teknik konularla ilgili çalışmalar yapması, raporlar hazırlatması ve bu çerçevede alıma karar veriyor olması gerekmektedir.

**Davacı ise bu yükümlülüğün tam aksine hareket etmiştir.** Bu bağlamda devralınacak şirketin incelenmesine ilişkin hiçbir adım atılmadan genel hükümlerden ibaret olan Hisse Devir Sözleşmesi ve ekleri imzalanarak devir işlemi gerçekleştirilmiştir. Hisse Devir Sözleşmesi'nde bir hisse devir bedeli olmaması ve bununla birlikte Müvekkil'in banka borçlarını ödemeyi üstlenmesi ve sözleşmede belirtilen şartlar çerçevesinde Aralık ayı operasyonel faturaları hariç 29 Aralık 2016 öncesine ait hizmet alımlarından doğan ek borçlar çıkması halinde bunları da tazmin edeceğine dair taahhütte bulunması, Devredilen Şirketler'in zaten borçları ile devredildiği ve bu anlamda ayıplı olduklarına dair açık bir beyan niteliğindedir. Günümüz koşullarında, kar eden bir havayolu şirketinin bu koşullar altında satılması zaten beklenemez. Kaldı ki, basında da devir öncesi Devredilen Şirketler'in mali durumlarının nasıl olduğuna dair haberler bulunmakta olup, durum kamuoyunca bilinmektedir. **[EK 21 - Borajet'in mali durumuna yönelik haberler]**

Şu halde, Davacı'nın Devredilen Şirketlerin mali durumunu aslında biliyor olmasına rağmen, Hisse Devir Sözleşmesi imzalandıktan aylar sonra bu şekilde taleplerde bulunması kötü niyetli hareket ettiğini gözler önüne sermektedir. Nitekim Davacı cevaba cevap dilekçesinde, Devredilen Şirketlerin mali darboğazda olduğunu kabul ve ikrar etmektedir. Bu bağlamda Türk Borçlar Kanunu'nun 222. maddesinin ilk fıkrası da yol göstericidir.

> *3. Alıcının bildiği ayıplar*

> *MADDE 222- Satıcı, satış sözleşmesinin kurulduğu sırada alıcı tarafından bilinen ayıplardan sorumlu değildir.*

Burada da kamuoyunca dahi bilinen hususların göz ardı edilerek devirden sonra adeta aldatılmışçasına Müvekkil'e karşı ileri sürülmesi suiniyetlidir. Nitekim Davacı'nın nihai sahibi olan SBK Holding Türkiye *"iflasta ve icrada olan, üretim yapamayan ya da işçisine maaş ödeyemeyen krizdeki şirketleri satın almak"* konusunda iştigal eden bir şirket olup, Davacı'nın amacının, zaten mali durumu kötü olan bir şirketi satın alarak ona yatırım yapmak olduğu ortadadır. Bu konuda basında yer alan haberler de işbu dilekçemizin 18 numaralı ekinde sunulmuştur. Nitekim Hisse Devir Sözleşmesi'nin 2.2.(b) maddesinde de Şirketlerin üçüncü kişilere devredilmesi halinde Müvekkil'e %25 kar payı verileceği açıkça taahhüt edilmiştir. Bu husus Davacı'nın da bizzat kabulünde olup, 22 Mayıs 2017 tarihli cevaba cevap dilekçesinde Sözleşme kurgusunu *"Bugaraj'ın Mizan'da yer alan ve Sözleşme ilişkisi kapsamında kendi sorumluluğu altındaki borçları ödemesi ve bu yolla Şirket'e sağlayacağı mali kaynak kapsamında Borajet'in mali darboğazdan kurtarılması"* olarak kendisi açıklamıştır.

Şu halde, Davacı'nın Müvekkil'in hileli davranışlarda bulunduğu yönündeki iddiaları asılsız ve hukuka tamamen aykırıdır. Böyle bir iddia hayatın olağan akışına dahi aykırıdır. Aksine, tüm bu koşullar altında müzakereler sırasında tedbirli ve öngörülü bir tacir olarak gerekli araştırma ve incelemeyi yapmamış olan ya da yapmış olması gereken **Davacı'nın hileli davranışlar ile kasten aldatıldığı ve kandırıldığı iddiasının kötü niyetli ve haksız**

15



**menfaat sağlama amaçlı olduğu** ve bu noktada esasen kabul ettiği ve bildiği koşulları sonradan bilmiyormuş ve aldatılmış gibi davranarak, Müvekkil'den on milyonlarca dolarlık taleplerde bulunmakla Müvekkil aleyhine ek menfaat sağlamaya çalıştığını gözler önüne sermektedir.

Şu halde,

- Sözleşme'de Devredilen Şirketlerin borçlarının bulunduğu açıkça ifade edilmişken,
- Sözleşme ekinde yer alan ve VUK'a göre hazırlanan mizanlarla da bu durum açıkça görülebilmekteyken, ve
- Hisse devri işlemi Devredilen Şirketler'in pasiflerinin devreden ve devralan arasında paylaşılması suretiyle gerçekleştirilmişken,

Müvekkil'in Sözleşme kapsamında taahhüt ettiği Banka borçlarının ödendiği ve ödenmeye devam olunduğu da göz önüne alındığında, söz konusu Hisse Devir Sözleşmesi ile devreden Müvekkil taahhüt ettiği hisseleri devretmek suretiyle sözleşmeden doğan esas yükümlülüğünü yerine getirmekle kalmamış, üstlendiği diğer borçları da yerine getirmiştir. Davacı'nın Müvekkil'in borcunu ifa etmediği iddiası mesnetten yoksun ve hukuka aykırı olup herhangi bir dayanağı bulunmamaktadır.

## 2. DAVACI ŞİRKET'İN BASİRETLİ BİR TACİR OLARAK HAREKET ETMEMESİ DAVACI ŞİRKET'İ DEĞİL MÜVEKKİL'İ ZARARA UĞRATMIŞTIR. HER GEÇEN GÜN ARTAN BU ZARARIN MÜVEKKİLE TAZMİNİNİ TALEP VE DAVA ETMEK HAKKI SAKLI TUTULMAKTADIR.

Davacı Şirket kendi yükümlülüklerini yerine getirmediği gibi, Müvekkil'in yükümlülüklerini yerine getirmediğine yönelik asılsız iddialar ile haksız menfaat elde etmeye çalışırken, Müvekkil'i bizzat kendi ifa etmediği yükümlülükleri sebebiyle her geçen gün biraz daha zarara sokmaktadır.

Davacı Şirket'in İpotek Senedi kapsamında kendi üzerine düşen borçları ifa etmeyerek Akbank T.A.Ş., Denizbank T.A.Ş., Türk Ekonomi Bankası A.Ş., Odea Bank A.Ş., Garanti Bankası A.Ş. gibi bir kısım bankaların, nedensiz olarak hesap kat ihtarında bulunmalarına sebebiyet vermesi, ve Müvekkil'in yukarıda ayrıntılı olarak açıkladığımız sebeplerle, aslında bir yıl içerisinde ödemeyi taahhüt ettiği borçları, bankalardan gelen ihtarlar, icra takipleri ve hacizler sebebiyle çok kısa sürelerde ödemek zorunda kalması Müvekkil'i zarara sokmuştur. Hem bankalar nezdinde Müvekkil'in sahip olduğu itibarın kaybına yol açmış, hem Müvekkil'in sahip olduğu diğer şirketlerin operasyonlarını negatif etkilemiş, hem icra takipleri dolayısıyla ek harç ve ücretler ödenmesi suretiyle Müvekkil'in zararına sebep olmuş, hem de hacizler dolayısıyla Müvekkil'in zorlanmasına sebep olmuştur.

Öte yandan, hisse devrini müteakip Davacı'nın üzerine aldığı ödeme yükümlülüklerini yerine getirmemesi nedeniyle (çeşitli tedarikçi borçlarını ödememesi gibi) bir kısım teminat mektupları ve harici garantiler de nakde çevrilmiş olup, şahsi kefaleti bulunması nedeniyle işbu dilekçemiz tarihi itibariyle Müvekkil işbu dilekçemiz tarihi itibariyle yukarıda ayrıntılı olarak açıkladığımız üzere sorumluluğunda olmadığı halde 11.047.339,85 TL ödeme yapmak durumunda kalmıştır. Tüm bu bedeller de Müvekkil'i borçlanmadığı hususlar bakımından ödeme yapmak durumunda bırakarak zarara sokmuştur.

Ayrıca, Credit Suisse AG ile Aydın Jet arasında yapılan 7 Ekim 2015 tarihli İpotek Sözleşmesi kapsamında VIP uçağın bakımını yapmayan ve sorumluluğundaki hukuk



masraflarını ödemeyen Davacı Şirket Müvekkil'i ilgili banka ile ilişkilerinde de zora sokmaktadır.

Dolayısıyla, burada asıl zarara uğrayan ve Davacı tarafından bilinçli olarak zarara uğratılan Müvekkil'dir. Davacı'nın zarar iddiaları mesnetsiz olduğu gibi tamamen suiniyetlidir.

Şu halde, Şirketlerin pasiflerinin bölüşüldüğü ve devir karşılığında herhangi bir meblağ ödenmediği dikkate alındığında, Müvekkil'in Hisse Devir Sözleşmesi tahtında bütün yükümlülüklerini yerine getirdiği ve hatta yükümlülüğü olmadığı halde nakde dönen teminat ve harici garantileri de ödemek durumunda kaldığı göz önünde bulundurulduğunda, Davacı'nın bütün iddia ve taleplerinin dayanaktan yoksun olduğu ve tamamen haksız menfaat teminine yönelik hukuktan uzak talepler olduğu açıktır. Davacı Şirket Borajet'i devraldığı 29 Aralık 2016 tarihinden sonra söz konusu şirketin tüm işletmesi ve bunun mali sonuçlarından sorumlu iken bu konudaki yükümlülüklerini ve yapması gereken harcamaları yapmayıp bunları da Müvekkilin sorumluluk kapsamına dahil etmeye çalışmakta ve böylece kendisine haksız ve hukuki temelden yoksun menfaat sağlamaya çalışmaktadır.

Ayrıca Müvekkil'in hissedar olduğu döneme ilişkin olarak; Borajet'e 129.774.024 TL'si bizzat kendisi tarafından, 78.098.545 TL'si Ayaslı LLC üzerinden aktarılmış olan yaklaşık 208.000.000 TL'lik alacağı bulunmakta olup, bu konudaki tüm hakları ile yukarıda bahsi geçenler de dâhil olmak üzere Davacı Şirket'in ve ana şirketi ile bağlı şirketlerinin aldığı/almadığı aksiyonlar sebebiyle Müvekkil'in uğradığı tüm zararların tazmini hakkını saklı tuttuğumuzu beyan ederiz.

## 3- DAVACI'NIN SÖZLEŞME VE EKLERİNDE GÖSTERİLMEYEN ANCAK VAR OLDUĞUNU İDDİA ETTİĞİ BORÇ KALEMLERİ HİÇBİR ŞEKİLDE İSPATLANMIŞ DEĞİLDİR. İSPATLANAMAMIŞ OLAN KALEMLERİN DE TALEP EDİLMESİ MÜMKÜN DEĞİLDİR.

Davacı Sözleşme ve eklerinde gösterilmemesine rağmen Şirket'in fazladan 29.588.845 ABD Doları borcunun ortaya çıktığını iddia etmektedir.

Bu kapsamda Davacı (i) Sözleşme'ye ekli mizanın 320 nolu hesabında hiç gösterilmemesine rağmen mevcudiyeti sonradan ortaya çıkan 4.909.318 ABD Doları borç olduğunu ve bu kapsamda faturaları Mahkeme'ye sunduğunu, (ii) Sözleşme'ye ekli mizanın 381 nolu hesabında hiç gösterilmemesine rağmen mevcudiyeti sonradan ortaya çıkan 5.742.791 ABD Doları borç olduğunu, (iii) Davacı Sözleşme'de ve ekli mizanda gösterilmediği halde uçaklarda 13.673.910 ABD Doları tutarında bakım maliyeti ve eksik parça maliyeti bulunduğunu ve asılsız bir şekilde bu meblağın kendisinden gizlendiğini, (iv) düşük kur uygulamasından 13.467.947,2 TL (3.826.991 ABD Doları) değerinde fark oluştuğunu belirtmektedir.

Bu kapsamda, Davacı'nın sunduğu belgelerin birçoğunun **yabancı dilde belgeler** olduğu ve Türkçe tercümeleri dahi sunulmamış olduğunu belirtmiştir. Ayrıca Mahkeme'ye sunulan **faturaların ne olduğu ve neye ilişkin olduğu; faturalara konu mal ve hizmetlerin gerçekten alınıp alınmadığı; bunların dönemi; faturalara itiraz edilip edilmediği; mutabakatlarının alınıp alınmadığı dahi belli değildir.** Bu kapsamdaki faturaların tek tek incelenerek talep edilip edilemeyeceğinin belirlenmesi gerekmektedir.

Ayrıca talep edilen miktarların Müvekkil tarafından ödenebilmesi için Hisse Devir Sözleşmesi'nin 3.2. maddesi uyarınca, "*şirket aleyhine ihtarname keşide edilmesi, icra takibi yapılması, dava açılması veya **Şirketlerin böyle bir borcu ödemesi durumunda***" talep etmesi

17



üzerine sorumluluğun Davalı Müvekkil'de olacağı belirtilmiştir. Davacı, bu miktarı ödemiş midir ki iddia ettiği alacağın muaccel olduğunu ileri sürmektedir? Böyle bir durum da söz konusu olmadığından, ortada varlığı ispat edilmiş hiçbir meblağ bulunmamaktadır.

Davacı iddia ve talep ettiği 13.673.910 ABD Doları uçak bakım maliyeti ve eksik parça maliyetini Tolga Üzümcü, Mehmet Olcay Özbay ve Uğur Özkan tarafından hazırlanan 31 Aralık 2016 tarihli rapora dayandırmaktadır. Yukarıda da belirttiğimiz üzere ve hiçbir şekilde kabul anlamına gelmemek kaydıyla, Hisse Devir Sözleşmesi'ne ek yapılan mizan ve diğer mali tablolar da bizzat Tolga Üzümcü tarafından hazırlanmıştır. Şu halde aynı kişilerin hazırladığı ve arasında iki gün olan raporlar arasında bu derece nasıl fark olabilir anlaşılabilmiş değildir. Ayrıca ismi anılan bu kişilerin bir kısmı, yukarıda da belirtildiği üzere yürütülmekte olan soruşturma kapsamında tam da Davacı'nın istediği şekilde ifade vermişlerdir. Bütün bunlar birlikte değerlendirildiğinde Davacı'nın kötü niyetli olarak ortaya iddialar attığı ve bunu yaparken de Hisse Devir Sözleşmesi'nin eki olan Mizan, Dava Listesi, Orijinal Para Cinsinden Belirtilen Banka Kredisi Listesi ve Leasing Listesi gibi ekleri bizzat hazırlamış olanlardan Tolga Üzümcü, Mehmet Olcay Özbay, Uğur Özkan ve Fatih Akol gibi kişileri kullandığı apaçık ortaya çıkmaktadır

Ayrıca belirtmek isteriz ki, iddia edildiği şekilde uçamayan uçakların neden olduğu bir maliyet olduğu varsayılsa dahi, hiçbir şekilde kabul anlamına gelmemek kaydıyla, maliyet sebebiyle Davacı'nın ödemek zorunda kaldığı bir borç söz konusu değildir. Davacı'nın buna yönelik ispatı sağlayan herhangi bir delil sunmamış olduğunu Sayın Mahkeme'nin dikkatine getiririz. Borajet'in toplam 10 adet uçağı bulunmakta olup, bu uçakların tamamı leasing sözleşmeleri kapsamında, finansal kiralama yöntemleri ile kiralanmaktadır. Davacı ise tamamen suiniyetle, toplam 10 adet uçağın durumunu bilmediğini ileri sürmektedir. Sayın Mahkeme de takdir edecektir ki Davacı'nın bu iddiası gerçeklikle ve mantıkla bağdaşabilir nitelikte değildir. Ortada havacılık alanında faaliyet gösteren bir şirketin hisselerinin devri mevzubahis olup, böylesine büyük kapsamlı bir hisse devri sırasında Davacı'nın devir aldığı havayoluna şirketinin uçaklarının durumunu bilmiyor olması düşünülemez. Bu kapsamda Davacı'nın TTK başta olmak üzere ilgili mevzuat uyarınca basiretli bir tacir olarak hareket etmesi, tedbirli ve öngörülü bir tacir olarak Devredilen Şirketler hakkında ayrıntılı bir çalışma yapması, rapor hazırlatması ve bu çerçevede alım kararı vermesi yükümlülükleri bulunmaktadır.

Kaldı ki, Sözleşme'de uçaklara ilişkin hiçbir madde ya da Müvekkil'den alınmış bu yönde bir beyan ve taahhüt de bulunmamaktadır. Hiçbir şekilde kabul anlamına gelmemek kaydıyla, bu husus teknik bir husus olup, yaklaşık bir değerlendirme ile yapılması da mümkün değildir. Herhangi bir bakım gideri ve/veya maliyet olup olmadığı hususu bilirkişi incelemesi gerektirir niteliktedir. Bu çerçevede de Davacı'nın bu iddiaları asılsız olduğu gibi, kabulü mümkün değildir.

**Öte yandan** Davacı'nın, döviz borçlarına ilişkin eski tarihli düşük kur uygulamasından kaynaklandığı iddiasıyla 13.467.947,2 TL (3.826.991 ABD Doları) tutarında fark talep etmesi de hukuka aykırıdır. Davacı'nın bu talebinin kabulü de mümkün değildir, zira Davacı'nın basiretli bir tacir olarak ve bir havayolu şirketi satın aldığının bilincinde olarak tedarikçilerin büyük kısmının yabancı olduğunu ve borçların döviz cinsinde olduğunu bilmesi gerekmektedir. Davacı borçların döviz cinsinden olduğunu ve tutarlarını bilebilecek durumdadır. Nitekim, tüm bu tutarlar mizanda TL cinsinden yer almaktadır. Hal böyleyken ve Sözleşme'ye ekli mizanı ve oradaki tutarları üzerinde karşılıklı mutabakat ile kabul eden Davacı'nın bu talebi de salt haksız menfaat temin etme gayesinden öteye gidemez. Basiretli bir tacir gibi hareket eden veya etmesi gereken Davacı, Hisse Devir Sözleşmesi ekindeki

18



mizanı görerek, bilerek ve kabul ederek Sözleşme'yi imzalamış olduğundan, hisse devrinin üzerinden aylar geçtikten sonra bu şekilde talepler ileri süremez. Bu durum hukuk kurallarıyla bağdaşmamaktadır.

**4- DAVACI'NIN ÖDEMEDİĞİ YA DA ÖDEMEYECEĞİ MİKTARLARI TALEP ETMESİ VE ZARARA UĞRADIĞI İDDİALARI HUKUKA AÇIKÇA AYKIRILIK TEŞKİL ETMEKTEDİR. ZİRA BU KALEMLERİN PASİF VEYA AKTİF KALEME YAZILMIŞ OLMASI ŞİRKET NEZDİNDE HİÇBİR BORÇ YA DA DAVACI ŞİRKETE HUZURDAKİ DAVA İLE TALEP EDİLEBİLİR BİR ALACAK HAKKI DOĞURMAMAKTADIR.**

Davacı cevaba cevap dilekçesinde Şirketin 31.939.555 ABD Doları eksik alacağı çıktığını iddia etmekte ve bu meblağı 5 alt kategoriye ayırmaktadır. Hiçbir şekilde kabul anlamına gelmemek kaydıyla, Sayın Mahkeme de takdir edecektir ki, iddia olunan bu meblağlar Davacı'nın ödediği ya da ödeyeceği bir meblağ olmadığından hiçbir şekilde kabul edilemez. Nitekim mizanda aktifte yer alan bu tutarlar pasife alınsa bile Davacı'nın ödeyeceği bir borç söz konusu olmamaktadır.

Davacı (i) esasında geri alınması mümkün olmayan bir gider olmasına rağmen sanki uzun dönemde Borajet'in alacağıymış gibi gösterildiğini söyleyerek 26.821.852 ABD Doları değerindeki bakım rezervi depozitosunu, (ii) esasında geçmiş dönemlere ait bir gider olmasına rağmen gelecek döneme yönelik yapılmış bir yatırım gibi gösterildiğini iddia ettiği 4.315.638 ABD Doları, (iii) esasında ibralaşılmasına rağmen hala personelden alacakmış gibi gösterildiğini iddia ettiği 200.120 ABD Doları eksik alacağı, (iv) esasında tahsil kabiliyeti kalmadığı için "Şüpheli Alacaklar" olarak muhasebeleştirilmesi gerekirken "Diğer Ticari Alacak" olarak muhasebeleştirildiğini iddia ettiği 457.347 ABD Doları tutarı ve (v) esasında takas edilmesine rağmen Mizan'da ve Sözleşme'de hala mevcut bir alacakmış gibi gösterildiğini söylediği 144.598 ABD Doları miktarı talep etmektedir. Ayrıca Müvekkil'in Sözleşme ve Mizan'da, gerçek durumdan farklı olarak ilave 3.824.008 ABD Doları malvarlığı varmış gibi göstererek Borajet'in değerini daha yüksek göstermek suretiyle Davacı Şirket'i aldattığını iddia etmiş, buna ek olarak 6.625.607 ABD Doları tutarındaki ek zarar iddiasında bulunmuştur.

Örneğin bakım rezervi depozitoları gibi tutarların içinde yer aldığı, Davacı'nın belirttiği tutarların bilançoda gösteriliş şekli ve tasnifi VUK'a göre yapılmıştır. Zira, Hisse Devir Sözleşmesi'ne ek Mizan VUK'a uygun olarak hazırlanmış bilançolara dayanmaktadır. Ayrıca, bu kalemler hisse devrinden önce ödenmiş meblağlar olup, Davacı Bugaraj tarafından yapılması gereken herhangi bir ödeme de söz konusu değildir. Bu kalemlerin pasif veya aktif kısma yazılmış olması, Davacı nezdinde herhangi bir ek maliyet/borç doğurmamaktadır. Şu halde bunlar talep edildiği zaman, aslında ödenmiş olan tutarların ikinci bir kere ödenmesi söz konusu olacaktır ki mükerrer ödemenin kabul edilmesi mümkün değildir. Ortada zarar olmadığına göre, tazmin ve/veya talep edilecek bir meblağ da bulunmamaktadır.

Ayrıca, Davacı'nın misal olarak verdiği Öger Tur gibi örneğin iflas eden şirketten olan bir alacak ile ilgili olarak iddiaları da doğru değildir. İflas kapanmadığı sürece alacağın tahsil kabiliyeti ortadan kalkmaz ve bu miktarların alacakta gösterilmesi bakımından bir yanlışlık yoktur. Kaldı ki Vergi Usul Kanunu uyarınca bir alacağı şüpheli alacak hesabında göstermek bir yükümlülük değil, seçimlik bir haktır.

Kaldı ki, Hisse Devir Sözleşmesi'nde aktif bir malvarlığı taahhüdünde bulunulmadığından, Davacı Şirket'in eksik malvarlığı beyanında bulunulduğu yönündeki iddiaları da hukuka aykırıdır. Mizanlar Vergi Usul Kanunu'na göre hazırlanmış olup, Davacı tarafça da kabul



edilmiştir. Davacı'nın bu iddiaları soyut ve kötü niyetli ortaya atılmış iddialar olarak kalmaktadır.

Davacı'nın 6.625.607 ABD Doları tutarında ek zarar bulunduğu iddiaları da tamamen soyut varsayımlara dayanmaktadır. Ortada belirlenmiş ya da belirlenebilir herhangi bir husus yokken, Davacı fahiş tutarlarda zarara uğradığını iddia etmektedir. Nitekim bu kapsamdaki iddiasını da, Hisse Devir Sözleşmesi ekindeki finansal belgeleri hazırlamış olan Tolga Üzümcü'nün (diğer birkaç kişi ile birlikte) hazırlamış olduğu 31 Aralık 2016 tarihli rapora dayandırmaktadır. Aradan <u>sadece 2 gün geçtikten sonra, bizzat aynı kişi tarafından hazırlanan raporda bu derece farkın oluşmuş olması kanaatimizce mümkün olmayıp</u>, ortada kötü niyetin olduğunu gözler önüne serici niteliktedir.

Defaatle de belirtildiği üzere, bu kapsamdaki kalemlerin talep edilmesi hukuka ve Hisse Devir Sözleşmesi'nin lafzına ve ruhuna aykırı olacaktır ve reddedilmesi gerekmektedir.

## 5- HİSSE DEVİR SÖZLEŞMESİ KARŞILIĞINDA HİÇBİR BEDEL ÖDENMEMİŞKEN VE ZATEN DEVREDİLEN ŞİRKETLERİN BORÇLARI DEVRALINMIŞKEN KAR KAYBI TALEBİNDE BULUNULMASININ HUKUKİ MANTIĞI YOKTUR.

Davacı'nın Borajet'in ulaşacağı maddi değerin elde edilmemesi nedeniyle kar kaybına uğradığı iddiası ise adeta gülünç ve hukuktan uzaktır. Sayın Mahkeme'nin de malumu olduğu üzere, bir zararın tazmininden bahsedebilmek için öncelikle ortada bir zararın varlığı gerekmektedir. Ne var ki Davacı'nın "Borajet'in ulaşacağı değere ulaşmaması" gibi tamamen soyut bir iddia ile var olmayan bir zararın tazminini talep etmesi hukuken de madden de mümkün değildir.

Öncelikle <u>Hisse Devir Sözleşmesi kapsamında Davacı tarafından herhangi bir hisse devir bedeli ödenmemiş olduğunu,</u> hisse devrinin pasiflerin paylaşılması şeklinde gerçekleştirilmiş olduğunu bir kez daha Sayın Mahkeme'nin dikkatine getirmek isteriz. **Ayrıca, Hisse Devir Sözleşmesi kapsamında Devredilen Şirketler'in ulaşması öngörülen maddi değere ilişkin bir beyan veya taahhüt de bulunmamaktadır.** Şu halde Davacı'nın Borajet'in öngörülen maddi değere ulaşmadığı iddiasının hiçbir temeli bulunmamaktadır. Hukuken soyut ve ispatlanmamış ve hatta var olmayan bir zarar iddiasının tazmini mümkün değildir. Davacı'nın neye ilişkin olduğu ve ne kadar olduğu belli olmayan ekonomik kazançtan mahrum kaldığı iddiasıyla zararının olduğunu ileri sürmesi hiçbir şekilde kabul edilemez.

Davacı, kendisi de kabul ettiği üzere bir havayolu şirketinin hisselerini satın almıştır, ancak bunu **HİÇBİR BEDEL ÖDEMEDEN** almıştır. Bu hisse devrinin şirket borçlarının ve pasiflerinin taraflar arasında bölüşülmesi suretiyle yapıldığı ortadadır. Davacı Bugaraj, **Şirketlerin mali durumunu bilerek ve Banka Borçları hariç borçlarını üstlenerek** Hisse Devir Sözleşmesi'ni imzalamıştır. Şu halde Davacı'nın öngörülü ve tedbirli davranması gereken basiretli bir tacir olarak, şirket defterlerini devirden önce incelememiş olduğunu ve Devredilen Şirketler'in finansal durumu konusunda kandırıldığını iddia ederek milyonlarca ABD doları tutarında borç miktarını mesnetsiz bir şekilde ortaya atması tedbirli, öngörülü davranması beklenen basiretli tacir kavramıyla bağdaşmadığı gibi Davacı'nın Müvekkil aleyhine haksız menfaat elde etmek amacıyla suiniyetli hareket ettiğini gözler önüne sermektedir.

Kaldı ki, esasen Davacı Hisse Devir Sözleşmesi'nde şirketlerin üçüncü bir kişiye devredilmesi halinde elde edilecek kârdan devreden Müvekkil'e %25 oranında kâr payı vereceğini taahhüt etmiştir. Şu halde Davacı'nın da ikrarında olduğu gibi Davacı mali durumu



kötü olan bu şirketleri bilerek almakta ve yatırım yapmayı planlamaktadır. Müvekkil'in Davacı'ya bir taahhüdü bulunmamaktadır. Davacı'nın kar kaybı iddialarından hiçbiri kabul edilemez.

## 6- ORTADA DAVACI ŞİRKETÇE UĞRANILAN BİR ZARAR BULUNMAMAKTADIR. TALEP EDİLEN KALEMLER İSPAT EDİLMEMİŞTİR. KALDI Kİ, HİÇ BİR KABUL ANLAMINA GELMEMEK KAYDIYLA, ZARAR BULUNSA DAHİ BU ZARAR MÜVEKKİL'DEN DEĞİL, ZARARA SEBEP OLAN KİŞİLERDEN TALEP EDİLMELİDİR.

Her ne kadar Davacı Şirket talep tutarlarının hukuki temellerini açıkça belirtmemiş olsa da, genel anlamda Hisse Devir Sözleşmesi'nden doğan zararını hile ile aldatıldığı esası ile talep ettiği anlaşılmaktadır.

TBK m.112 uyarınca *"Borç hiç veya gereği gibi ifa edilmezse borçlu, kendisine hiçbir kusurun yüklenemeyeceğini ispat etmedikçe, alacaklının bundan doğan zararını gidermekle yükümlüdür."* Öğretide zarar deyiminin tek başına kullanıldığında maddi zararı ifade ettiği ve maddi zararın bir kimsenin malvarlığında rızası dışında meydana gelen azalma olduğu belirtilmektedir. Şu halde Prof. Dr. Kemal Oğuzman'ın da açıkça ifade ettiği ve kanun hükmünden de açıkça anlaşıldığı üzere *"**alacaklının borçludan, borcun hiç veya gereği gibi ifa edilmemesi sebebiyle tazminat isteyebilmesi için, bu yüzden bir zarara uğramış olması şarttır**."* **[EK 22- Oğuzman&Öz, Borçlar Hukuku Genel Hükümler Cilt-1, 11. Bası, 2013, s.395]**

Bu husus Yargıtay 6. Hukuk Dairesinin 11 Kasım 2014 tarih ve E. 2014/8455 K. 2014/12229 sayılı ilamında da:

> *Dava tarihinde yürürlükte bulunan 818 sayılı Borçlar Yasasının 96. (TBK.112) maddesine göre alacaklının, borçludan borcun hiç veya gereği gibi ifa edilmemesi nedeniyle tazminat isteyebilmesi için, bu yüzden bir zarara uğramış olması gerekir. Sözleşmeden kaynaklanan zarar müspet zarar olacağı gibi, menfi zarar da olabilir.*

denilmek suretiyle belirtilmiştir.

**Aynı zamanda bu zarar iddialarının da iddia eden tarafından ispat edilmiş olması gerekliliği açık bir hukuk kuralıdır. Doktrinde de belirtildiği üzere:**

> *"Borçlunun tazminata mahkûm edilebilmesi için kural olarak alacaklı borca aykırılık yüzünden uğradığı zararı ispatla yükümlüdür."* **[EK 23- Oğuzman&Öz, Borçlar Hukuku Genel Hükümler Cilt-1, 11. Bası, 2013, s.403 vd.]**

> *"Haksız fiillerde olduğu gibi, burada da (borca aykırılık) zararı ispat yükümlülüğü "müddeiye", yani tazminat davasını açan davacı alacaklıya aittir."* **[EK 24- Kılıçoğlu, Borçlar Hukuku Genel Hükümler, 19.Bası 2015, s.659]**

Ancak somut olayda Müvekkil'e atfedilebilecek herhangi bir kusur olmadığı açık olduğu gibi, anılan kalemlerin hiç biri Davacı Şirket'i zarara uğratmamaktadır. Davacı zarar iddiasını kanıtlayabilmiş de değildir. Kaldı ki, Şirketler zaten borçlarıyla birlikte devredilmiş olup, Davacı devir sırasında Davalı Müvekkil'e herhangi bir ödeme de yapmamıştır.

21



Tüm bu hususlar göz önünde bulundurulduğunda Davacı Şirket'in zarara uğradığı hususu bir kurgudan ibaret olup, haksız şekilde Müvekkil'den menfaat elde etme amacı taşımaktadır.

Kaldı ki; Müvekkilimiz Hisse Devir Sözleşmesi kapsamında Devredilen Şirketler'in bankalara olan kredi borcunu ve bir kısım leasing borcunu üstlenmiştir. Söz konusu ödemeleri de yapmış ve bir kısmını da halen yapmaktadır. Bu durumda ise Devredilen Şirketler'in ödemek zorunda olduğu borçlar hanesindeki rakam Şirketler lehine üçüncü kişi tarafından yapılan ödemeler sayesinde her geçen gün artı değere dönüşmektedir. Bugün itibariyle Müvekkilimizin Şirketler adına yaptığı toplam yaklaşık 78.263.747,2 TL + 964.000,69 ABD Doları tutarında [4] ödeme sayesinde Şirketler'in borçları azalmış ve bu bağlamda öz kaynaklarında olumlu bir yansıma gerçekleşmiştir.

Hisse Devir Sözleşmesi kapsamında olsun veya olmasın Müvekkilimiz tarafından yapılmış olan ödemeler sayesinde olumlu anlamda Şirketlerin bilançolarında değişiklikler meydana gelmiştir. Davacı bu konuya kötü niyetli olarak hiç değinmemektedir.

Bunların yanında Davacı'nın iddialarının aldatıldığı noktasında toplandığı göz önünde bulundurulduğunda, Davacı'nın Türk Borçlar Kanunu'nun 36. maddesi vd. uyarınca sözleşmeden dönmek yerine tazminat talebinde bulunduğunu varsaymaktayız. Bu bağlamda ilgili maddede:

> II. Aldatma
>
> MADDE 36- Taraflardan biri, diğerinin aldatması sonucu bir sözleşme yapmışsa, yanılması esaslı olmasa bile, sözleşmeyle bağlı değildir.
>
> Üçüncü bir kişinin aldatması sonucu bir sözleşme yapan taraf, sözleşmenin yapıldığı sırada karşı tarafın aldatmayı bilmesi veya bilecek durumda olması hâlinde, sözleşmeyle bağlı değildir.

hükmü getirilmiştir.

Doktrinde hile aşağıdaki şekilde tanımlanmıştır:

> *"Hile, bir kimsenin; davranışı ile diğer şahsı irade beyanında bulunmaya sevk etmek için o şahısta hatalı bir fikrin doğumuna veya teyidine ya da devamına kasten sebebiyet vermesidir."* **[EK 25 - Prof. Dr. Kemal Oğuzman, Prof. Dr. Turgut Öz, Borçlar Hukuku, Genel Hükümler, İstanbul, 2009, s. 92 vd.]**

Yine Prof. Dr. Kemal Oğuzman'ın ifadelerine göre:

> **"Aldatan veya üçüncü kişi sözleşme ister aldatma sebebiyle iptal edilmiş olsun, ister iptal edilmiş olmasın, aldatmaya maruz kalanın bu yüzden uğradığı zararı tazmine mecburdur."**

**Yani, bu zararın tazminine aldatan haksız fiil hükümlerine göre katlanmak durumundadır.**

---

[4] 67.216.407,35 TL + 964.000,69 ABD Doları + 11.047.339,85 TL = 78.263.747,2 TL + 964.000,69 ABD Doları



**Bu bağlamda her ne kadar zarar oluştuğunu hiçbir surette kabul etmesek de,** bir zarar oluştuğunun ispatlanabilir olduğu durumlarda, talep edilen tazminatın da zarara sebep olan ve hile yapan kişi tarafından karşılanması gerekmektedir. **Oysa Müvekkil'in hile/aldatma teşkil eden hiçbir hareketi olmamıştır.** Ortada bir aldatma durumu var ise, bu ya Müvekkil'in Fatih Akol tarafından yanlış yönlendirilmesi suretiyle gerçekleştirilmiş veya Davacı Şirket ile halen danışmanlığını almakta olduğu Fatih Akol'un birlikte hareket ederek Müvekkil'i zarara uğratmaları ile gerçekleşmiş olabilir.

Şirket genel müdürü Fatih Akol uyuşmazlığa konu Hisse Devir Sözleşmesi müzakerelerini bizzat yürütmüş ve yönetmiş olan kişidir. Kendisi bu süreçte Davacı ile yapılan toplantılara bizzat katılmıştır. Bu kapsamda vurgulamak isteriz ki Davalı Müvekkil, anılan müzakerelerin gerçekleştiği sırada ABD'de bulunmaktadır.  Müvekkil kırk üç yıldır ABD'de ikamet etmektedir. Davacı, dilekçelerinde adeta finansal belgeleri ve hesapları Davalı Müvekkil Yalçın Ayaslı bizzat hazırlıyormuş gibi yansıtmış olup, böyle bir durum söz konusu değildir, olması mümkün dahi değildir. Davalı Devredilen Şirketlerin sadece hissedarı olup, yönetim kurulu üyesi ya da imza yetkilisi dahi değildir.

**Bütün bu hususlar Davacı tarafından da bizzat biliniyor olmasına rağmen, Şirketlerde yönetim kurulu üyesi olmayan, imza yetkisi dahi bulunmayan ve sadece hissedar olan Müvekkil'e karşı huzurdaki taleplerin yöneltilmesi, Davacı'nın ne derece suiniyetli hareket ettiğini gözler önüne sermektedir.**

Netice itibariyle ortada Davacı Şirket tarafından uğranılmış bir zarar yoktur, iddia edilen kalemler ispatlanamamıştır. Hiçbir şekilde kabul anlamına gelmemekle birlikte, ispatlanabilmiş olsalar dahi, bu iddiaların muhatabı Müvekkilimiz değildir.

## 7- HUZURDAKİ DAVADA TALEP KONUSU EDİLMEMİŞ OLMAKLA BİRLİKTE, DAVACI'NIN BORAJET BAKIM ONARIM VE TİCARET A.Ş.'NİN DEĞERİNİN FİKTİF OLARAK YÜKSEK GÖSTERİLDİĞİ İDDİASI DA DİĞER ASILSIZ İDDİALAR GİBİ KABUL EDİLEMEZ.

Davacı Şirket *"Borajet'in iştiraki olan Borajet Bakım'ın esasında öz sermayesinin eksiye düşmesine rağmen Sözleşme'ye ekli Mizan'da 29.500.000 ABD Doları değere sahipmiş gibi satılmasından kaynaklanan şişirilmiş değeri"* dava konusu etmediğini belirtmiştir.

Davacı Şirket tarafından, basiretli bir tacir olarak, Ticaret Sicil Gazetesinden rahatlıkla tespit olunabildiği üzere, Borajet Bakım şirketinin bölünmeyle ayrıldığı ve tek sahibinin Borajet olduğu bilinmelidir. Bu şirket zamanla 29.500.000 ABD Doları değere ulaşmış; hisseler Yalçın Ayaslı'ya ve sonrasında Borajet'e devredilirken bağımsız denetim şirketlerince yapılan değerlemeler esas alınmıştır. Dolayısıyla, Davacı'nın aksi iddiaları asılsızdır.

Burada ayrıca belirtmek isteriz ki, Davacı Şirket tarafından Devredilen Şirketlerin hiçbirisi için bir şirket değerlemesi yapılmamış ve yapılan hisse devri şirketin değeri üzerinden gerçekleştirilmemiştir. Şu halde Davacı'nın tüm dilekçe kapsamında Devredilen Şirketler'in değerine ilişkin iddiaları dayanaktan yoksun kalmaktadır. Nitekim, Müvekkil de şirketlerin değerine yönelik olabilecek hiçbir taahhütte bulunmamıştır. Şu halde bunun yasalara ya da usule aykırı hiçbir tarafı bulunmamakta olup, Davacı tarafın iddialarının kabulü mümkün değildir.

Davacı Şirket yine cevaba cevap dilekçesinin aynı bölümünde, talep konusu yapmamış olmakla birlikte bir takım asılsız iddialarda bulunmuştur. Bu aşamada talep konusu yapılmamış olduklarından, ayrıntılı beyan ve itiraz hakkımız saklı kalmak üzere belirtmek

23



isteriz ki, *örneğin*, 1.465,666,24 ABD Doları tutarındaki satışı yapılıp uçuş yapılamadığı için kişilere iade edilen uçak biletleri tutarlarına ilişkin kalem de tamamen kötü niyetlidir. Zira, bu tutarın ispatı için dilekçeye hiçbir belge eklenmemiştir. Bu tutarlara ilişkin Müvekkil'in hiçbir yükümlülüğü olmamakla birlikte, ne zaman, ne şekilde, kime ödendiği belli olmayan, afaki beyanlarla ileri sürülen bu iddiaların da tek tek dayanakları ile açıklanmadan ileri sürülmesi kötü niyetlidir. Bunlar gibi Davacı Şirket'in ileri sürüp talep konusu yapmadığı diğer iddiaları da aslında temeli olmamakla birlikte dilekçeye eklenerek Sayın Mahkeme'de olumsuz bir kanaat oluşturulması saiki taşımaktadır.

## 8- DAVACI TARAF, DAVALI MÜVEKKİLİMİZİN MAL VARLIĞINI ELE GEÇİRMEK GAYESİYLE KÖTÜ NİYETLİ OLARAK HAREKET ETMEKTEDİR.

Davacı, dava dilekçesi ile Davalı'nın mal varlığını tasfiye ettiği iddiasıyla Müvekkil'in mal varlığı üzerinde ihtiyati haciz talebinde bulunmuş, Sayın Mahkeme tarafından ihtiyati haczin şartları oluşmadığından isabetli bir şekilde bu talep reddedilmiştir. Bu konuda Davacı'nın iddia ve taleplerinin ne derece haksız ve hukuka aykırı olduğunu ve Davacı'nın salt suiniyetle Müvekkil aleyhine haksız menfaat elde etmeye çalıştığı ve mal varlığını ele geçirmeye çalıştığını bir kez daha Mahkeme'nin dikkatine getirmek isteriz.

Yukarıda da izah edildiği üzere, Davacı Şirket'in İpotek Senedi'nde yer alan yükümlülüklerini yerine getirmemesi sebebiyle bankalar kredi hesaplarının kat edildiği ihtarında bulunmuş ve hatta bazı bankalar icra takibine başlamıştır. Müvekkil, bütün kredi borçlarını kapatmak amacıyla çeşitli bankalarla görüşmüş ve Garanti Bankası A.Ş. ile anlaşarak toplamda yaklaşık 20.000.000 ABD Doları tutarında kredi çekerek banka borçlarını kapatmıştır. Nitekim bunu öğrenen Davacı, 13 Mart 2017 tarihinde Garanti Bankası A.Ş.'ye ihtarname göndererek, Davalı'nın mallarını kaçırmaya çalıştığını ve kredi talebini reddetmesi gerektiğini, aksi halde banka görevlileri hakkında suça iştirakten suç duyurusunda bulunulabileceğini söylemiştir. **[EK 26- 13 Mart 2017 tarihli ihtarname]**

Sayın Mahkeme de takdir edecektir ki Davacı tarafın Müvekkilimizin tüm malvarlığının üzerinde bankalardan kredi çekerek ipotek tesis ettirerek malvarlığını tasfiye ettirdiği iddiası tamamen mesnetsiz ve suiniyetlidir. Böylesine kötü niyetli hareketlerin hukuk düzenince korunması düşünülemez. Aşağıda ayrıntılarını belirteceğimiz üzere **Davacı'nın Müvekkil hakkında asılsız ithamlar ile *kasıtlı ve kötü niyetli olarak* cezai şikâyette bulunmuş olmasının amacı da mal varlığı üzerinde ihtiyati haciz tesis ettirmektir. Bütün bu süreç göz önüne alındığında, Davacı'nın Müvekkil'in mal varlığı göz dikmiş olduğu görülecektir.**

## 9- SORUŞTURMAYA YÖNELİK BEYANLARIMIZ

Davacı, İstanbul Cumhuriyet Başsavcılığı nezdinde Müvekkil hakkında suç duyurusunda bulunmuştur. Öncelikle suç duyurusunun Sayın Mahkemece isabetli ve hukuka uygun bir şekilde ihtiyati haciz talebinin reddedilmesi üzerine, Müvekkil'in mal varlığının ele geçirilmesi ve Müvekkil aleyhine haksız kazanç elde edilmesi amacıyla ve tamamen suiniyetle yapılmış olduğunu Sayın Mahkemenizin dikkatine sunarız. Nitekim Davacı, şartların oluşmadığını biliyor olmasına rağmen asılsız iddialarla Müvekkil'in taşınmazları üzerine ihtiyati haciz tesis edilmesini talep etmiş; ancak bu talebi reddedilince, bu sefer yine Müvekkil'in mal varlığı üzerine haciz konulması talebiyle asılsız ve gerçeğe tamamen aykırı isnatlarla suç duyurusunda bulunmuştur. Davacı ayrıca, kanımızca baskıda bulunarak işbu uyuşmazlık kapsamında ileri sürdüğü iddialar ile birebir örtüşecek nitelikte bir kısım tanık ifadeleri verilmesini temin etmiş olup, bu beyanlara itibar edilmemesi ve Davacı'nın açık kötü niyetinin hukuken himaye edilmemesi gerekmektedir. Zira, bu tanıkların çoğu hisse devri

24



sonrası Devredilen Şirketlerde çalışmaya devam etmiştir ve etmektedir. Öte yandan Davacı Şirket Müvekkil hakkında yakalama kararı verildiğinden bahsetmişse de, bu Müvekkil'in kaçma şüphesi ile verilmiş bir yakalama kararı değildir. Davacı tarafın Müvekkil'in kırk yılı aşkın süredir yurt dışında mukim olmasını bilmesine rağmen, Türkiye adresinde mukim olduğunu belirtmesi ve Müvekkil'in bu adreste bulunamaması üzerine salt ifadesinin alınması için çıkartılmıştır.

Huzurdaki dava açıldıktan **sonra** suç duyurusunda bulunulup, **huzurdaki davadaki iddia olunan hususlarla birebir örtüşecek şekilde tanık beyanı verilmiş olması bizce çok şaşırtıcı ve düşündürücüdür**. Bu ifade ve beyanlar etki ve baskı altında verilmiş olabileceğinden ve gerçekle örtüşmediğinden itibar edilmemelidir. Nitekim, Savcılık nezdindeki soruşturma dosyasına da Tolga Üzümcü'nün ifadesine itibar edilmemesi gerektiği belirtilmiştir. Bu ifade ile huzurdaki davada Davacı Şirket'in iddiaları aynı kalemden çıkmışçasına aynı söylemleri içermektedir. Kaldı ki, Tolga Üzümcü, pozisyonu unvanından da anlaşılacağı üzere Borajet'in mali işler başkanı olarak çalışmıştır. Ayrıca Hisse Devir Sözleşmesi'nin ekinde yer alan mizan ve finansal tabloları da hazırlamış olan kişidir. Hisse Devir Sözleşmesi'nin imzalandığı 29 Aralık 2016 tarihinden sadece 2 gün sonra, 31.12.2016 tarihinde yine Tolga Üzümcü'nün hazırlayıp imzaladığı ve Davacı'nın işbu davada dayandığını belirttiği "Mali Analiz Raporu" altında Sözleşme ekindeki mizanların gerçeği yansıtmadığı iddiası, Müvekkil'in organize bir kumpas ile karşı karşıya kaldığını, Müvekkil aleyhine haksız yarar elde edilmeye çalışıldığını gözler önüne serer niteliktedir.

Aynı şekilde, Savcılığa da belirttiğimiz üzere Sayın Mahkemece diğer tanıkların beyanlarına da itibar edilmemelidir. Tanıklardan Olcay Özbay ve Mehmet Ceylan Topal, halen Davacı Şirket nezdinde üst pozisyonlarda çalışmaktadır. Fatih Akol ise, Borajet'in ve devredilen diğer Borajet Bakım ve Aydın Jet şirketlerinin yönetim kurulu başkanlığı ve imzaya yetkili genel müdürlüğünü yapmıştır. Fatih Akol hisse devrini müteakip Şubat 2017 sonundaki istifasına kadar bir süre boyunca da Devredilen Şirketlerin yönetim kurulu üyeliğini yapmış olup, duyumlarımız uyarınca halen bu şirketlere danışmanlık vermektedir. **[EK 27- Ticaret Sicil Gazetesi kopyaları]**

Bütün bu hususlar Davacı tarafından da bizzat biliniyor olmasına rağmen, Şirketlerde yönetim kurulu üyesi olmayan, imza yetkisi dahi bulunmayan ve sadece hissedar olan Müvekkil'e karşı huzurdaki taleplerin yöneltilmesi, Davacı'nın ne derece suiniyetli hareket ettiğini gözler önüne sermektedir. Tanık beyanlarının da Davacı'nın dilekçelerindeki talepleri ile BİREBİR ÖRTÜŞÜYOR OLMASININ bir tesadüf olamayacağı, Davacı'nın etkisi altında ve onun kötü niyetli amacına ulaşmak gayesiyle ileri sürülmüş olduğu ise izahtan varestedir.

Bu kapsamda ayrıca tanık beyanlarının nerdeyse aynı tarihlerde verilmiş olduğunu, duyumlarımız uyarınca Davacı Şirket'in yönetim kurulu başkanı Sezgin Baran Korkmaz'ın tanıklar ifadelerini verirken adliyede kapı önünde beklediğini Sayın Mahkeme'nin bilgi ve dikkatine sunarız.

Ayrıca, Sezgin Baran Korkmaz'ın tanıklar üzerinde baskı ve tehdit uyguladığı hususu Tanık Zahide Üner'in ifadesi ile de sabittir. Yine bu kişinin Müvekkil aleyhine tehditleri de uyuşmazlığın başından itibaren devam etmiştir. Bu kapsamda ise, Müvekkilin her tür yasal hakkı saklıdır.

## DİLEKÇEMİZDE BELİRTTİĞİMİZ TÜM BU HUSUSLAR BİR ARADA DEĞERLENDİRİLDİĞİNDE:



- Hisse devrinin Şirketlerin pasiflerinin bölüşülmesi suretiyle ve HİÇBİR BEDEL ÖDENMEKSİZİN gerçekleştirildiği;
- Sözleşme tahtında Şirketlerin aktif varlığının hiçbir şekilde taahhüt edilmediği;
- Davacı'nın Şirketlerin mali durumunun farkında olduğu ve bu hususun Sözleşme ve ekleriyle sabit olduğu;
- Bilanço tekniği kapsamında pasif veya aktife yazılan kalemlerin Davacı nezdinde herhangi bir borç doğurmadığı; bunların talep edilmesi halinde aslında ödenmiş olan tutarların mükerrer ödemesinin söz konusu olacağı; kaldı ki mizanların VUK'a göre hazırlandığı,
- Esasında Davacı'nın tedbirli ve basiretli tacir olarak hareket etme yükümlülüğünü ihlal ettiği;
- Davacı'nın taleplerinde tamamen kötü niyetli olduğu ve Müvekkil aleyhine haksız menfaat elde etmeye çalıştığı;
- Talep edilen tedarikçi borçları ile ilgili olarak, tek tek faturalara konu mal/hizmetlerin gerçekten verilip verilmediği, mutabakatlarının olup olmadığı, itiraz edilip edilmediği, hangi döneme ilişkin olduklarının tespit edilmesi gerektiği;
- Dava dilekçesi ekinde neye ilişkin olduğu belli olmayan, yabancı dilde birtakım belgelerin sunulmuş olduğu;
- Müvekkil'in taahhüt ettiği borçların Sözleşme uyarınca anılan şartlar gerçekleştiğinde ve mutabakatlar alındığında ödeneceğinin kararlaştırıldığı;
- Müvekkil'in Sözleşme tahtındaki yükümlülüklerini ifa ederek ve bankalara olan borçları kapatarak niyetini göstermiş olduğu;
- Davacı'nın ispatı mümkün olmayan iddialarla ve kötü niyetle Müvekkil aleyhine haksız kazanç elde etmeye çalıştığı
- Davacı'nın, Şirketlerin Hisse Devir Sözleşmesi tarihi itibariyle mevcut ve fiziki durumunu bilerek hisseleri devir ve teslim aldığı,

hususları göz önüne alındığında ve Davacı Şirket'in Devredilen Şirketler hakkında kendisine verilen bilgilerin gerçek durumu yansıtmadığı veya benzer iddiaları ileri süremeyeceği, hisselerin devrinin gerçekleşmesinin ardından, ayıba ve zapta karşı tekeffül hükümleri başta olmak üzere yürürlükteki mevzuat kapsamında herhangi bir fiili veya hukuki nedene dayanarak talepte bulunamayacağı, **Davacı'nın bir zararı var ise buna kendisinin öngörülü davranmaması nedeniyle sebebiyet verdiği açıktır.** Davacı'nın haksız ve hukuka aykırı taleplerinin reddedilmesi gerekmektedir.

**NETİCE VE TALEP:** Yukarıda arz ve izah olunan sebepler muvacehesinde, her tür beyan, karşı beyan, delil ve ek delil ikamesi hakkımız saklı kalmak kaydıyla,

1- Bu aşamada Türkçeleri sunulmamış olan delillerin HMK'nın 141. maddesi çerçevesinde iddiaları genişletme yasağına aykırılık teşkil edeceği sebebiyle Sayın Mahkemece nazara alınmamasına ve bu bağlamda ispat olunamayan davanın **REDDİNE,**

2- Haksız ve hukuka aykırı olarak, kötü niyetli ve mesnetsiz iddialar ile ikame edilmiş **DAVA KAPSAMINDAKİ TÜM TALEPLERİN REDDİNE,**

3- Yargılama giderleri ile vekalet ücretinin Davacı tarafça karşılanmasına

karar verilmesini arz ve talep ederiz.

Saygılarımızla,
Davalı **Yalçın Ayaslı**
Vekili
Av. Ayşe Hergüner Bilgen