UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Yalcin Ayasli,<br><br>Plaintiff,<br><br>vs.<br><br>Sezgin Baran Korkmaz, Kamil Feridun Ozkaraman, Fatih Akol, SBK Holdings A. S., SBK Holdings, USA, Inc., Bugaraj Elektronik Ticaret ve Bilisim Hizmetleri A.S., and Mega Varlik Yonetim A.S.,<br><br>Defendants. | **Case No. 1:19-cv-00183-JL** |

PLAINTIFF'S SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO TRANSFER

In response to the Court's Margin Order of June 16, 2020, Dr. Ayasli submits that he has alleged a prima facie case of personal jurisdiction against the Korkmaz Defendants as a result of the Utah Confrontation (defined below) (as well as by virtue of tag jurisdiction and on the basis of the facts uncovered in the Dermen criminal trial, *see* Dkt. Nos. 19 at 33–34; 50-1 at 9–10; 60 at 4–12). In short, that confrontation establishes elements critical to Dr. Ayasli's substantive and conspiracy RICO claims, including predicate acts and a pattern of racketeering (including the continuity requirement), that caused Dr. Ayasli harm to his property in the United States.

## I.  FACTS RELEVANT TO THE "UTAH CONFRONTATION"

Professor Yavuz is "a prominent Turkish scholar" at the University of Utah, "who has studied the Gulenist movement intensely," and "knows that Yalcin Ayasli is not connected to FETO." App. 126.[1] To try to put a stop to the continuing harm that Dr. Ayasli has been suffering as a result of the RICO Enterprise's orchestrated FETO smear, Yavuz "traveled to Ankara and Istanbul to meet with high-ranking officials of the Turkish government." *Id.* Yavuz sought to assure officials "that Dr. Ayasli was not FETO." *Id.* Yavuz "was not able to clear Dr. Ayasli's name" on that initial visit because the effects of the RICO Enterprise's FETO smear campaign had become widespread. App. 126–27.

On February 22, 2018, shortly after Yavuz had returned from Turkey, Defendant Sezgin Baran Korkmaz ("Korkmaz") showed up unannounced and uninvited at the door of Yavuz's office on the campus of the University of Utah (the "Utah Confrontation"). App. 127; Compl. ¶ 562. Professor Yavuz "had not previously met Mr. Korkmaz." App. 127. Korkmaz stated that he was "aware" of Yavuz's meetings with high-ranking members of the Turkish government, and that Korkmaz had been "harmed greatly" by Yavuz's efforts to clear Dr. Ayasli's name. *Id.*

---

[1] Appendix to Plaintiff's Consolidated Opposition to the Motions to Dismiss of Defendants Fatih Akol & Mega Varlik Yonetim A.S., Dkt. No. 60-3.

Korkmaz recounted "his legal dispute with Dr. Ayasli in Turkey relating to BoraJet," and explained to Yavuz that co-conspirators Jacob Kingston and Lev Dermen were his business partners and "that he was investing their money in Turkey." *Id.* Korkmaz then admitted to Yavuz that "I know Ayasli is not a member of FETO," but that he (Korkmaz) "had to make the accusations against Dr. Ayasli because he was in a tight corner" and knew that the FETO smear tactic would be "the way to force Dr. Ayasli to negotiate." *Id.*

Korkmaz then showed Professor Yavuz "a bloody photo of Fatih Akol on his phone," and explained to Yavuz that Akol "needed to be 'massaged' in order to be convinced to cooperate with Mr. Korkmaz and his associates." *Id.* Yavuz believed that Korkmaz showed him this photo to intimidate him and "to deliver a message … that Mr. Korkmaz could harm [him]." App. 127–28. Yavuz noted that "it was clear that Mr. Korkmaz had studied [him], and seemed to know [his] comings and goings, which made [him] quite anxious." App. 128.

Korkmaz then told Professor Yavuz in a threatening manner (1) that he knew where Yavuz's family lived in Turkey; and (2) that he had also learned where Dr. Ayasli's children lived in the United States. *Id.* Korkmaz warned Yavuz to "stay away from these matters" because getting involved in them "would bring [him] nothing but trouble." *Id.* Korkmaz ended the conversation with Yavuz by telling him "to be careful about the Gulen matter," that there was no rule of law in Turkey, and that everything was controlled by money. *Id.* Yavuz "clearly understood" that the purpose of Korkmaz's visit "was to intimidate [him] to prevent [him] from helping Dr. Ayasli clear his name in Turkey from the FETO allegations that were made against him," and the experience left him in fear. *Id.*

Professor Yavuz promptly called Dr. Ayasli to inform him of the confrontation with Korkmaz and the threats Korkmaz made against both of their families. Compl. ¶ 576;

2

Declaration of Yalcin Ayasli in Support of Plaintiff's Supplemental Brief in Support of Motion to Transfer ("Decl.") ¶ 3. Dr. Ayasli was concerned that Korkmaz could show up at his doorstep unannounced as he had done with Yavuz. As a result, Dr. Ayasli had a home security system immediately installed at his home in Nashua, New Hampshire. Decl. ¶ 5.

Consistent with Korkmaz's threats, after Korkmaz discovered that Professor Yavuz had submitted a declaration in this case (Dkt. No. 60-3), Korkmaz's intimidation of Yavuz and his family intensified. In the past few weeks, Korkmaz has been actively sharing Professor Yavuz's declaration with sources in Turkey who can further damage Dr. Ayasli. Decl. ¶ 19. Korkmaz also had Yavuz's declaration translated and delivered to the Turkish Prosecutor's office responsible for criminal FETO investigations in an effort to claim that its statements were antagonistic to the Turkish government and judiciary and therefore proof of Dr. Ayasli's FETO ties. Decl. ¶¶ 19–20. As with the smear campaign against Dr. Ayalsi, an article last week suspiciously appeared in the Turkish press branding Professor Yavuz as a FETO sympathizer, and warning Yavuz and others like him that "if you come to Turkey after this, your place is the prison" and "it is my job to monitor traitors like you and inform the society about what you do." Decl. ¶ 20, Ex. A.

## II. ARGUMENT

### A. LEGAL STANDARD

When a court finds a want of personal jurisdiction, it "shall, if it is in the interest of justice, transfer such action … to any other such court … in which the action … could have been brought at the time it was filed." 28 U.S.C. § 1631. The First Circuit has not articulated the standard that applies to the transferor court's consideration of personal jurisdiction at this stage. In a multiple defendant case, one court has required that a movant make "an initial showing that there may be jurisdiction over at least *some* of the … defendants in [the transferee forum]." *In re*

3

*Ski Train Fire in Kaprun, Aus.*, 257 F. Supp. 2d 717, 734 (S.D.N.Y. 2003) (emphasis added).

Under this standard, this Court ***need not decide*** personal jurisdiction of the transferee court over the Korkmaz Defendants because jurisdiction lies against other co-defendants. Even if a prima facie standard of personal jurisdiction applied to the Korkmaz Defendants, the Court must take the plaintiff's "properly documented evidentiary proffers as true and construe them in the light most favorable to [plaintiff's] jurisdictional claim." *A Corp. v. All Am. Plumbing*, 812 F.3d 54, 58 (1st Cir. 2016). "[I]t is appropriate when considering jurisdictional issues to look beyond the pleadings to any evidence before the Court." *MGM Studios v. Grokster, Ltd.*, 243 F. Supp. 2d 1073, 1082 (C.D. Cal. 2003). The court must also "resolve[] all disputed facts in favor of the plaintiff." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

**B. THE NINTH CIRCUIT APPLIES A BROAD VERSION OF A "BUT FOR" TEST OF RELATEDNESS TO ESTABLISH PERSONAL JURISDICTION**

"For due process to be satisfied, a defendant, if not present in the forum, must have 'minimum contacts' with the forum … such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 1155 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 315 (1945)). This requirement is satisfied where the defendant has (1) "'purposefully directed' his activities toward the forum," (2) the Plaintiff's claim "arises out of or results from the defendant's forum-related activities," and (3) "the exercise of jurisdiction is reasonable." *Id.* (internal quotation marks omitted). The Court has directed the parties to address the second, "relatedness," factor with respect to the Utah Confrontation.

"The Ninth Circuit adopts a broad, 'but for' test of relatedness." *MGM Studios*, 243 F. Supp. 2d at 1085; *see also Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1021 (9th Cir. 2002). This "'but for' test should not be narrowly applied; rather, the requirement is merely designed to

confirm that there is ***some nexus between the cause of action and defendant's contact*** with the forum." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 945 F. Supp. 1355, 1368 (D. Or. 1996) (emphasis added) (citing *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991)).

As the First Circuit has explained, the Ninth Circuit's test has "in itself ***no limiting principle***; ***it literally embraces every event*** that hindsight can logically identify in the causative chain." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 715 (1st Cir. 1996) (emphasis added).

C. **KORKMAZ'S CONFRONTATION OF PROFESSOR YAVUZ IN UTAH SATISFIES THE "BUT FOR" TEST OF RELATEDNESS.**

1. **The Utah Confrontation Is Related to Dr. Ayasli's RICO Conspiracy Claim**

RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [section 1962]." 18 U.S.C. § 1962(d). "It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy. The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774 (9th Cir. 2002) (citation omitted).

In support of the conspiracy claim, the Complaint alleges that the Defendants "unlawfully, knowingly and willfully agreed to join together, themselves and with others, to violate 18 U.S.C. § 1962(c)." Compl. ¶ 689. The Utah Confrontation is a critical aspect of Korkmaz's participation in an illegal agreement to violate section 1962(c). A key component of the RICO conspiracy claim is "that the RICO Defendants and their co-conspirators would commit the pattern of racketeering activity described [in the Complaint] … , including the acts of

racketeering and other overt acts," Compl. ¶ 697, such as "rely[ing] on … lies and manufactured evidence in the ongoing sham criminal and civil litigations in Turkey in perpetuating the fallacy that Dr. Ayasli is a FETO terrorist for the purpose of extorting money from Dr. Ayasli and/or cause him a reasonable fear of economic loss," *id.* ¶ 613.

The Utah Confrontation proves Korkmaz's "inten[t] to further [that] endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 653 (N.D. Cal. 2019). The Utah Confrontation establishes that Korkmaz, by his own admissions to Yavuz, **knew** that Dr. Ayasli was not a member of FETO and had **fabricated that fact** in order to obtain favorable outcomes in the sham litigations he brought against Dr. Ayasli in Turkey and "to force Dr. Ayasli to negotiate" in the U.S. App. 127; *see also* Compl. ¶ 569. Korkmaz's behavior and admissions to Professor Yavuz demonstrate that he had, in fact, entered into an agreement with co-conspirators Jacob Kingston and Lev Dermen to perpetuate the conspiracy, including by taking these (and other) actions in the United States. App. 127; *see also* Compl. ¶ 570.

A reasonable jury certainly could conclude that Korkmaz threatening Professor Yavuz in Utah was critical to maintaining the conspiracy to extort Dr. Ayasli. First, the Utah Confrontation had the intended effect of instilling fear in Dr. Ayasli. Immediately after learning of the incident, Dr. Ayasli had a security system installed at his home in Nashua, New Hampshire, because he feared Korkmaz would also appear unannounced at his home and could do him harm as he did to Akol. Decl. ¶ 5.

Second, by Korkmaz's own admission, Professor Yavuz's efforts were threatening to thwart the conspiracy's objectives, and thus shutting down those efforts was essential to inflicting continuing harm on Dr. Ayasli. Korkmaz told Professor Yavuz that he (Korkmaz) "had

been 'harmed greatly' by [Professor Yavuz's] actions to try to clear Dr. Ayasli's reputation as a FETO member." App. 127; *see also* Compl. ¶ 567. If Professor Yavuz continued to advocate effectively on Dr. Ayasli's behalf and cleared Dr. Ayasli of the false FETO ties, Korkmaz would have lost the leverage he had over Dr. Ayasli—and thus, would have had to abandon his extortion efforts that have been harming Dr. Ayasli. A jury could (and should) conclude, on these facts, that "but for" the Utah Confrontation, the injuries Dr. Ayasli suffered after February 2018 would have been mitigated or avoided completely. *See infra* Section II(C)(3).

### 2. The Utah Confrontation Is Related to Dr. Ayasli's Substantive RICO Claim

To establish a "pattern of racketeering activity" for purposes of proving a substantive RICO violation under 18 U.S.C. § 1962(c), a plaintiff must establish "at least two" predicate acts of racketeering activity, 18 U.S.C. § 1961(5), and "that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). A reasonable jury could conclude that the Utah Confrontation is a predicate act, and that it is essential to establishing the continuity requirement.

#### a. A Reasonable Jury Could Conclude that the Utah Confrontation Establishes a RICO Predicate Act.

**i. Predicate Acts: Conspiracy to Commit Hobbs Act and State Law Extortion.** For the reasons described above in Section II(C)(1), the Utah Confrontation establishes Korkmaz's participation in a conspiracy to extort Dr. Ayasli through threats and intimidation and "to force Dr. Ayasli to negotiate" claims made in the Turkish Proceedings. App. 127. Conspiracy to commit extortion is a predicate RICO act under 18 U.S.C. § 1961(1)(A). *US v. Pungitore*, 910 F.2d 1084, 1135 (3d Cir. 1990) ("[§]1961(1)(A) clearly encompasses predicate conspiracies").

7

**ii. Predicate Acts: Hobbs Act and State Law Extortion.** A reasonable jury could also find that the Utah Confrontation is critical to establishing the predicate acts of Hobbs Act and state law extortion. As alleged in the Complaint, Korkmaz has "threaten[ed] and intimidate[ed] … third parties who have defended Dr. Ayasli's reputation in the media, … for the purpose of extorting the payment of millions of dollars from Dr. Ayasli and causing Dr. Ayasli a reasonable fear of economic loss." Compl. ¶ 611. The Utah Confrontation, and Korkmaz's continuing actions against Professor Yavuz, are key event establishing the predicate acts of extortion.

### b. The Utah Confrontation Establishes Continuity

The Complaint alleges both closed-ended and open-ended continuity. Compl. ¶¶ 608–09. For purposes of establishing open-ended continuity, "the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. The Utah Confrontation reveals that Korkmaz's acts of intimidation and threats against Dr. Ayasli and his business associates alleged in the Complaint were not isolated incidents—they represent Korkmaz's, and the RICO Enterprise's, "regular way of doing business." They show that the RICO Enterprise will continue to use threats, intimidation, and bribery to pursue its extortion campaign against Dr. Ayasli. Korkmaz's most recent actions taken against Professor Yavuz after he filed his declaration in this case demonstrate that these acts of threats and intimidation continue to this day.

### 3. Dr. Ayasli Suffered Injuries After February 2018 that Were Caused by the RICO Claims and Exacerbated by the Utah Confrontation.

After February 2018, Dr. Ayasli "was injured in his business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c)," Compl. ¶ 682; and he suffered injuries

8

as a "direct, proximate, and reasonably foreseeable result of the RICO Defendants' conspiracy," Compl. ¶ 698. Such injuries include the following:[2]

    i. **Attorney's fees and costs.** Dr. Ayasli incurred substantial attorney's fees and costs after February 2018 "to defend himself in the objectively baseless, improperly motivated sham criminal and civil litigations in Turkey." Compl. ¶ 698; Decl. ¶¶ 6–15. Attorney's fees and costs are cognizable injuries under RICO. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988) (holding that plaintiff-creditor had asserted cognizable RICO injury for legal fees incurred in a debtor's fraudulently-initiated frivolous lawsuits and debtor's bribery of judge to prevent creditor from collecting a debt, including "legal fees and other expenses incurred in fighting defendants' frivolous lawsuits" and "in overcoming bribe-induced decisions").[3]

    ii. **Damage to reputation and goodwill**. Dr. Ayasli also suffered additional damages to reputation and goodwill (Compl. ¶¶ 682, 698) as a result of the Utah Confrontation, which are cognizable under RICO. *See Guerrero v. Gates*, 110 F. Supp. 2d 1287, 1293 (C.D. Cal. 2000) ("[D]amage to professional reputation [has] been held to constitute [a] cognizable injur[y] to

---

[2] Dr. Ayasli need only establish that he was "injured … by reason of a violation of Section 1962," that is, by a pattern of racketeering; not that his injury rose directly from a single act of racketeering. *Marshall & Ilsley Trust v. Pate*, 819 F.2d 806, 809–10 (7th Cir. 1987) ("Once a pattern is proven, … a plaintiff must show only an injury 'resulting' from the violation. It would be illogical to require a plaintiff to show that all the acts adding up to a 'pattern' injured him, especially in view of the fact that many such acts may be somewhat distinct and separate in time."). Dr. Ayasli's injuries derive from the pattern. *Bascuñán v. Elsaca*, 874 F.3d 806, 820–21 (2d Cir. 2017) (holding that [w]here the injury is to tangible property, ... absent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed."); *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1094 (7th Cir. 2018) ("It is well understood that a party experiences or sustains injuries to its intangible property at its residence.").

[3] *See also, e.g.*, *Chevron Corp. v. Donziger,* 833 F.3d 74, 135 (2d Cir. 2016) (holding in the context of payment of legal fees to defend against proceedings in Ecuador that such "legal fees may constitute RICO damages when they are proximately caused by a RICO violation" (citation omitted)); *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035 (N.D. Cal. 2004) ("Legal expenses are concrete financial losses … and are thus recoverable under RICO." (internal quotation marks omitted)).

business or property for purposes of RICO, so long as the injur[y] [was] proximately caused by a pattern of racketeering activity.").

    iii. **Public relations expenses**. Dr. Ayasli incurred "expenses … responding to and dealing with the political and public relations effect of the RICO Enterprise's activities," Compl. ¶ 698, including expenses incurred for the work done on his behalf by a public relations firm after the Utah Confrontation. Decl. ¶ 11. "[M]oney … paid out as a result of racketeering activity" constitutes an injury under RICO. *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1310 (9th Cir. 1992), *abrogated on other grounds recognized by Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1055 (9th Cir. 2008); *see also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 569 (E.D.N.Y. 1999) ("Money constitutes 'property' within the meaning of RICO.").

    iv. **$85 million judgment debt**. After the Utah Confrontation, a Turkish court imposed an approximately $85 million judgment debt on October 24, 2019, in the sham civil proceedings that resulted from the RICO violations—including the perpetuation of the FETO lie and the intimidation of Dr. Ayasli's witnesses (including Professor Yavuz). Dkt. No. 26-4 at 4, 17–18. As the Second Circuit held in *Chevron Corp. v. Donziger*, a "judgment debt" imposed abroad as a result of the conduct of a RICO enterprise "constitutes an injury to one's business or property." 833 F.3d 74, 135 (2d Cir. 2016).

**III.**     **CONCLUSION**

    For the foregoing reasons, the Court should conclude that Korkmaz's visit to Utah in February 2018 satisfies the personal jurisdiction requirement that the contact be related to Dr. Ayasli's claims, and grant the Plaintiff's motion to transfer under 28 U.S.C. § 1631.

        Respectfully submitted,

        YALCIN AYASLI
        By his attorneys,

Dated: June 23, 2020        **SHEEHAN, PHINNEY, BASS & GREEN**

        By: */s/ Robert H. Miller*
        Robert H. Miller (NH #13881)
        Patrick J. Queenan (NH Bar #20127)
        Chloe F. Golden (NH Bar #268036)
        1000 Elm St.,17th Floor
        Manchester, NH 03101
        (603) 627-8145
        rmiller@sheehan.com
        pqueenan@sheehan.com
        cgolden@sheehan.com

        -and-

        **JONES DAY**

        Steven T. Cottreau, *p.h.v.* (VA Bar #46215)
        51 Louisiana Ave., NW
        Washington, DC 20001
        (202) 879-3939
        scottreau@jonesday.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record by filing same using the Court's ECF system.

Dated: June 23, 2020                                             By:/s/ *Patrick J. Queenan*