**MCGUIREWOODS LLP**
Kevin M. Lally, Esq. (CA Bar No. 226402)
355 South Grand Avenue, Suite 4200
Los Angeles, CA 90071
213-457-9862
klally@mcguirewoods.com

**SHEEHAN PHINNEY, PA**
Robert H. Miller, Esq. (Admitted Pro Hac Vice)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8145
rmiller@sheehan.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Yalcin Ayasli, | CASE NO. 2:20-cv-09388-CAS-PD |
| Plaintiff, | |
| v. | **VERIFIED FIRST AMENDED COMPLAINT** |
| Sezgin Baran Korkmaz; Lev Aslan Dermen; Jacob Ortell Kingston; Isaiah Elden Kingston; Fatih Akol; Kamil Feridun Ozkaraman; Washakie Renewable Energy, LLC; SBK Holdings A. S., Inc.; SBK Holdings USA, Inc.; Bugaraj Elektronik Ticaret ve Bilisim Hizmetleri A.S.; Mega Varlik Yonetim A.S.; Alptekin Yilmaz; Olessia Zoubkova; Bukombin Bilisim ve Teknoloji Anonim Sirketi; Noil Energy Group, Inc.; Speedy Lion Renewable Fuel Investments, LLC; G.T. Energy, LLC; United Fuel Supply, LLC; Isanne, Biofarma Ilac Sanayi ve Ticaret A.S.; Blane Teknoloji Sistemleri Sanayi Ve Ticaret Anonim Sirketi; Stone Isi Yalitim Sanayi Ve Ticaret Anonim Sirketi; and Komak Isi Yalitim Sistemleri; | **JURY TRIAL DEMANDED** |
| Defendants. | |

1

2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................... 1

THE PARTIES AND RELEVANT NON-PARTIES ............................................ 6

    Plaintiff ............................................................................... 6

    The RICO Enterprise ................................................................. 6

    Defendants ............................................................................ 7

        SEZGIN BARAN KORKMAZ ......................................... 7

        LEV ASLAN DERMEN ..................................................... 9

        JACOB ORTELL KINGSTON ........................................ 10

        ISAIAH ELDEN KINGSTON ......................................... 11

        FATIH AKOL ................................................................... 12

        KAMIL FERIDUN ÖZKARAMAN .............................. 12

        WASHAKIE RENEWABLE ENERGY, LLC ................. 13

        SBK TURKEY ................................................................. 14

        SBK USA .......................................................................... 15

        BUGARAJ ........................................................................ 17

        MEGA VARLIK ............................................................... 18

        ALPTEKIN YILMAZ ..................................................... 19

        OLESSIA ZOUBKOVA .................................................. 19

        BUKOMBIN ..................................................................... 20

        NOIL ENERGY ............................................................... 21

        SPEEDY LION ................................................................. 21

        GT ENERGY .................................................................... 22

        UNITED FUEL SUPPLY ................................................ 23

        ISANNE ............................................................................ 24

        BIOFARMA ...................................................................... 25

        BLANE ............................................................................. 25

        STONE ............................................................................. 26

        KOMAK ........................................................................... 27

Non-Party Co-Conspirators ................................................. 28

SUBJECT MATTER JURISDICTION AND VENUE .......................................... 29

PERSONAL JURISDICTION ................................................. 31

Defendant KORKMAZ ................................................. 31

Defendant DERMEN ................................................. 32

Defendant KINGSTON ................................................. 34

Defendant ISAIAH KINGSTON ................................................. 35

Defendant AKOL ................................................. 35

Defendant OZKARAMAN ................................................. 36

Defendant WASHAKIE ................................................. 38

Defendant SBK TURKEY ................................................. 39

Defendant SBK USA ................................................. 40

Defendant BUGARAJ ................................................. 41

Defendant MEGA VARLIK ................................................. 42

Defendant YILMAZ ................................................. 43

Defendant ZOUBKOVA ................................................. 44

Defendant BUKOMBIN ................................................. 45

Defendant NOIL ENERGY ................................................. 46

Defendant SPEEDY LION ................................................. 46

Defendant GT ENERGY ................................................. 47

Defendant UNITED FUEL SUPPLY ................................................. 48

Defendant ISANNE ................................................. 49

Defendant BIOFARMA ................................................. 50

Defendant BLANE ................................................. 51

Defendant STONE ................................................. 52

Defendant KOMAK ................................................. 53

RELEVANT FACTS ................................................. 54

    A.    THE RICO ENTERPRISE AND ITS SCHEME AND PURPOSE ................................................. 54

1. The U.S. Government's Program to Incentivize Biofuels .............................. 54

2. The RICO Enterprise Fraudulently Acquires $470 million to Fund Its Operations From The U.S. Treasury Through Its Fraudulent Tax Credit Scheme ................................ 56

    1. Defendants KINGSTON and ISAIAH KINGSTON Establish a RIN Fraud Scheme ....................................... 56

    2. Defendant DERMEN Expands the RIN Fraud Scheme .................................. 56

    3. The "Gulf Project" .................................... 57

3. The RICO Enterprise then Laundered these Illicit Tax Credit Payments through a Series of Bank Accounts and Companies Controlled by the RICO Enterprise in the United States, the Republic of Turkey, and Elsewhere ............... 60

COMPANIES FOUNDED AND/OR FUNDED USING FRAUD PROCEEDS ................................................................. 63

    SBK TURKEY ................................................. 63

    SBK USA ........................................................ 64

    BUKOMBIN ................................................... 64

    BUGARAJ ...................................................... 65

    MEGA VARLIK .............................................. 65

    ISANNE .......................................................... 66

    BIOFARMA .................................................... 66

    BLANE f/k/a SETAP ....................................... 67

    The ISPAT Press Release ............................... 67

    1. Related Criminal Proceedings Involving RICO Enterprise Members (to date) ................... 68

    1. U.S.-based Criminal Indictments ............... 68

    Defendant KINGSTON's Plea Agreement ........................ 69

    Defendant ISAIAH KINGSTON's Plea Agreement ........................ 70

Defendant DERMEN Convicted on all Ten Felony Counts at Trial ........................................................................................ 70

Defendant KORKMAZ Indicted in the United States on Related Charges ................................................................................. 71

Factual Allegations from the KORKMAZ Indictment ....................... 72

           1.    Turkey-based Criminal Indictments .......... 77

    A.    PLAINTIFF DR. YALCIN AYASLI ............................ 78

          The Turkish Coalition of America ("TCA") ................................................ 80

          The Turkish Cultural Foundation ("TCF") ................................................. 80

        1.    Dr. Ayasli's Investments in Turkey .................... 81

           1.    BoraJet ........................................ 82

            i. BoraJet Valuation .................................. 83

    B.    THE JULY 15, 2016 COUP D'ETAT ATTEMPT IN TURKEY ............................................................. 84

    C.    THE RICO ENTERPRISE'S SCHEME TO ACQUIRE BORAJET ................................................. 85

        1.    The RICO Enterprise's Media Disinformation Campaign ................................... 85

           1.    The first false FETO stories emerge .......... 87

           2.    Takvim's Ergun Diler publishes articles reinforcing the false FETO claims ...................................................... 87

           3.    Additional stories amplifying the false FETO allegations ....................................... 90

    D.    DR. AYASLI LEAVES TURKEY TO PROTECT HIS FAMILY'S SAFETY ........................................... 90

    E.    CREDIBLE THREATS OF VIOLENCE AGAINST TCA'S OFFICE IN ISTANBUL ................. 91

    F.    BORAJET'S FINANCIAL DISTRESS RESULTING FROM THE RICO ENTERPRISE'S MEDIA DISINFORMATION CAMPAIGN ................. 92

G.  THE RICO ENTERPRISE SUCCESSFULLY EXPLOITS BORAJET'S FINANCIAL DISTRESS TO TAKE OVER THE AIRLINE ................................. 95

H.  THE RICO ENTERPRISE'S SCHEME TO EXPLOIT BORAJETS ASSETS TO ACQUIRE ADDITIONAL MONEY AND PROPERTY FROM DR. AYASLI ...................................................... 99

The RICO Enterprise's Laundering of Fraud Proceeds Through BoraJet ................................. 100

1.  The RICO Enterprise Systematically Defaults on BoraJet's Financial Obligations to Exploit Dr. Ayasli's Personal Guarantees ..... 101

1.  Defendant KORKMAZ's attempts to extort money from Dr. Ayasli .................. 101

2.  The RICO Enterprise Accelerate Personally Guaranteed Bank Debt ........... 102

3.  Defendant BUGARAJ Deliberately Defaults on BoraJet's Trade Debts .......... 105

2.  The RICO Enterprise Shutters BoraJet and Proceeds with Sham Litigation To Extract Additional Money and Property From Dr. Ayasli ................................................................. 106

Initial Civil Fraud Case ...................................................... 106

The Sham Criminal Complaints ........................................ 108

The FETO-Terrorism Charges .......................................... 108

Aggravated Fraud Case .................................................... 110

1.  Defendant OZKARAMAN attempts to intimidate CFO Uner into providing false testimony against Dr. Ayasli ............................. 110

2.  Defendant Korkmaz blackmails Kadir Peker .... 112

3.  Indictment Followed By Exoneration ................ 114

OFAC  Referral .................................................................. 114

Additional Civil Fraud Case ............................................. 115

1.  Defendant KORKMAZ Re-ignites the Media Disinformation Campaign .................................. 116

2. Defendant KORKMAZ's Repeated Efforts to Directly Intimidate and Extort Dr. Ayasli ......... 117

3. Systemic acts of intimidation, assault, bribery directed at Dr. Ayasli's family and associates ............................................ 119

4. Corruption of Court Proceedings and Expert Accounting Process ........................................... 123

I. THE RICO ENTERPRISE'S CONTINUING EFFORT TO COMPLETE THE ILLICIT ACQUISITION OF DR. AYASLI'S REAL ESTATE HOLDINGS ........................................ 124

CLAIMS FOR RELIEF ........................................................................ 126

The RICO Enterprise ................................................................... 126

Pattern of Racketeering Activity ................................................ 128

Predicate Acts of Obstruction of Justice .................................... 132

Predicate Acts of Mail Fraud ..................................................... 135

Predicate Acts Involving the Enterprise's Money Laundering Conspiracy ................................................................................ 138

Predicate Acts Involving Concealment Money Laundering ........... 145

Concealment Money Laundering Targeting Dr. Ayasli's Business And Property ................................................................ 148

Scheme to Acquire BoraJet ......................................................... 149

Laundering of Fraud Proceeds Through BoraJet and Aydin Jet ....... 151

Predicate Acts Involving Promotional Money Laundering ............. 152

Using Laundered Funds to Exploit BoraJet's Assets for the Enterprise's Financial Benefit Through Further Racketeering Conduct ................................................................ 155

Predicate Acts Involving Knowing Use of Criminally Derived Property ..................................................................................... 159

Predicate Acts of Hobbs Act Extortion ...................................... 162

Predicate Acts involving Travel Act Violations ........................... 169

Predicate Acts of Wire Fraud ..................................................... 172

PRAYER FOR RELIEF ................................................................... 178

1

SECOND CLAIM FOR RELIEF ........................................................... 179

2              PRAYER FOR RELIEF ........................................................... 181

3    THIRD CLAIM FOR RELIEF .............................................................. 183

4    VERIFICATION ................................................................................. 185

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Yalcin Ayasli ("Dr. Ayasli") brings this Complaint for violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c)) ("RICO") against Defendants Sezgin Baran Korkmaz; Lev Aslan Dermen; Jacob Ortell Kingston; Isaiah Elden Kingston; Fatih Akol; Kamil Feridun Ozkaraman; Washakie Renewable Energy, LLC; SBK Holdings A. S., Inc.; SBK Holdings USA, Inc.; Bugaraj Elektronik Ticaret ve Bilisim Hizmetleri A.S.; Mega Varlik Yonetim A.S.; Alptekin Yilmaz; Olessia Zoubkova; Bukombin Bilisim ve Teknoloji Anonim Sirketi; Noil Energy Group, Inc.; Speedy Lion Renewable Fuel Investments, LLC; G.T. Energy, LLC; United Fuel Supply, LLC; Isanne, Biofarma Ilac Sanayi ve Ticaret A.S.; Blane Teknoloji Sistemleri Sanayi Ve Ticaret Anonim Sirketi; Stone Isi Yalitim Sanayi Ve Ticaret Anonim Sirketi; and Komak Isi Yalitim Sistemleri; and alleges as follows:

## **INTRODUCTION**

1.      Featuring a continuous pattern of racketeering that has endured for more than a decade, this case began with a half billion dollar fraudulent fuel tax credit scheme ("U.S.-based Fraudulent Fuel Tax Credit Scheme") perpetrated against the U.S. Government by a RICO Enterprise that was founded, and principally operated in, Los Angeles, California and Salt Lake City, Utah.

2.      The U.S.-based RICO Enterprise, led by Defendant Lev Aslan Dermen ("DERMEN," formerly known as Levon Termendzhyan), employed a sophisticated scheme involving trucks, trains, freighters, shell companies, and false invoices to fleece the U.S. Treasury out of more than $470 million in renewable fuel credits ("Fraud Proceeds") without producing any qualifying renewable fuel.

3.      The co-conspirators then laundered over $300 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme through the Turkey-based arm of the RICO Enterprise, which was led by Defendant Sezgin Baran Korkmaz ("Defendant KORKMAZ").  Defendant KORKMAZ used an elaborate network of primarily Turkish shell companies under his dominion and

control to "invest" more than $133 million in Fraud Proceeds that the Enterprise directed to remain in Turkey, or to conduct "round trip" transactions where the balance of the Fraud Proceeds were returned to the U.S. for the continued use of the RICO Enterprise.

4.      Having generated almost a half-billion dollars in just a few years' time, the RICO Enterprise then devised another scheme, similarly grand in scope, and first announced in the spring of 2016 at a Los Angeles meeting: to use funds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to conduct the takeover of BoraJet, a Turkish regional airline backed by Dr. Ayasli, a Turkish-American businessman.  In short order, this scheme would develop into a multi-staged effort to divest Dr. Ayasli of his business and property by: (1) destabilizing and devaluing BoraJet so that it could be acquired greatly below its market value; (2) forcing Dr. Ayasli to use his personal funds to pay off more than $28 million of BoraJet's existing debt; and (3) extracting tens of millions of dollars in additional payments from Dr. Ayasli through manufactured claims of fraud and acquiring liens on Dr. Ayasli's commercial and residential real estate interests in Turkey valued at approximately $150 million through which it could then acquire or liquidate these properties.

5.      In July 2016, a failed coup attempt, since tied to exiled cleric Fetullah Gulen, was launched against the government of Turkey.  In the aftermath, the Turkish government quickly, forcefully, and publicly cracked down on individuals and businesses within Turkey associated in any manner with Gulen or his "FETO" movement, with tens of thousands people arrested -- many of whom were imprisoned and stripped of their property.

6.      Seizing the opportunity presented by the attendant chaos and media frenzy, and using the nearly limitless Fraud Proceeds available to it from the U.S.-based Scheme, the RICO Enterprise executed its plan to acquire BoraJet and to target Dr. Ayasli's broader wealth.  Led by Defendant KORKMAZ, the RICO

Enterprise conducted a relentless and devastatingly effective media disinformation campaign, advanced by journalists operating under Defendant KORKMAZ's influence, that falsely, repeatedly, and prominently tied Dr. Ayasli and BoraJet to Gulen, FETO and the coup attempt.

7.      Meanwhile, Defendant KORKMAZ, using Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme, curried favor with individuals at the highest levels of Turkish business and government, both through political and charitable donations and by publicly touting his association with what he falsely identified as a U.S.-based investment team (*i.e.*, Defendants DERMEN and KINGSTON, the leaders of the RICO Enterprise) that was investing hundreds of millions of dollars of Fraud Proceeds into Turkish companies.

8.      Unable to return to Turkey to properly defend himself, his business, or his property, Dr. Ayasli watched in disbelief from the United States as the withering media disinformation campaign waged against him caused the value of BoraJet to plummet from an appraised value in the hundreds of millions of dollars to nearly nothing in under four months.  During this time, Turkish Airlines cancelled its codeshare and wet lease agreements with BoraJet, wanting nothing to do with a FETO-tainted brand.  Banks called their loans and terminated lines of credit for the same reason.  Dr. Ayasli was placed under significant financial duress, forced to spend tens of millions of dollars of his own savings to try to keep BoraJet operational and satisfy the company's financial obligations.

9.      After placing Dr. Ayasli and BoraJet under sufficient duress, Defendant KORKMAZ, through Defendant BUGARAJ, and, aided by others including BoraJet's General Manager, Defendant Fatih AKOL, fraudulently caused Dr. Ayasli to sell BoraJet, as well as Dr. Ayasli's private long-range XRS Global executive aircraft, held by Aydin Jet, to the RICO Enterprise.

10.      As first demonstrated through its U.S.-based Fraudulent Fuel Tax Credit Scheme, the brazenness through which the Enterprise pursued additional

funds increased exponentially with each success.  Almost immediately after acquiring BoraJet, it subsequently targeted Dr. Ayasli's broader wealth through a series of sham criminal and civil lawsuits.  Most notably, Defendant KORKMAZ filed a criminal terrorism complaint alleging that Dr. Ayasli was a FETO member and principal coup-plotter.  Other cases advanced trumped-up criminal and civil fraud charges.  The RICO Enterprise aggressively pursued these cases utilizing Fraud Proceeds from the U.S.-based Scheme to hire lawyers; file complaints; bribe witnesses, experts, and others; pursue liens on Dr. Ayasli's more than $150 million in Turkish real estate holdings; and attempt to coerce Dr. Ayasli into paying tens of millions of additional dollars from his U.S.-based accounts to settle these sham suits.

11.    As was the case with its mail fraud scheme, the RICO Enterprise's initial efforts proved successful. Under Defendant KORKMAZ's influence and representations, the Turkish anti-terror police raided the offices of Dr. Ayasli's legal counsel, seized computers and documents, and detained his lawyers.  Dr. Ayasli's CFO was arrested and imprisoned.  Travel bans were imposed.  At a hearing in which Dr. Ayasli was neither present nor represented by counsel, a Turkish court imposed a substantial damage award and granted liens to Defendant BUGARAJ on all of Dr. Ayasli's commercial and residential properties in Turkey. While the decision granting those liens was (and remains) on appeal in Turkey, Defendant BUGARAJ commenced auctions on some of the most commercially prominent or personally meaningful properties as the Enterprise brazenly sought to pillage Dr. Ayasli's residential properties of their substantial collections of period furniture and artwork and fought to secure financial windfalls by breaking Dr. Ayasli's spirit.

12.    The artifice of the RICO Enterprise, however, is now crumbling.  Its three founding members, Defendants DERMEN, KINGSTON, and ISAIAH KINGSTON, were arrested by federal authorities in the District of Utah in August

2018 on sweeping fraud, money laundering, and obstruction of justice charges.  The KINGSTONS subsequently pled guilty to three dozen felony counts.  Defendant DERMEN proceeded to a jury trial where he was convicted in March 2020 of the ten counts of money laundering and mail fraud with which he was charged. Defendant KORKMAZ was charged in a companion indictment, captured while hiding in Austria after fleeing Turkey, and recently extradited to the United States. He presently awaits trial in the District of Utah on an indictment that alleges multiple counts of conspiracy to commit money laundering, wire fraud, and obstruction of justice and that expressly references how the Enterprise's Fraud Proceeds were used to invest in the companies that "acquire[d] a Turkish airline called BoraJet and an aviation company in Turkey named Aydin Jet, which later changed to SBK Air."

13.     The Turkish government also indicted Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON, and other members of the RICO Enterprise, on parallel money laundering charges based on these Defendants laundering Fraud Proceeds to, and through, Turkey.

14.     Dr. Ayasli, however, remains the victim of this whole affair. The RICO Enterprise defrauded him out of BoraJet, in which he invested over $240 million and which had been valued as a going concern just before the coup attempt at more than $300 million. It also fraudulently acquired his XRS executive jet and liquidated one of Dr. Ayasli's significant properties, worth tens of millions of dollars, while attempting to liquidate others.  It now holds restrictive liens on the remainder of Dr. Ayasli's Turkish commercial and residential properties, valued at more than $150 million, and it repeatedly has targeted Dr. Ayasli's broader wealth through extortion. Dr. Ayasli brings this suit in an effort to recover damages for those losses.

## THE PARTIES AND RELEVANT NON-PARTIES

### Plaintiff

15.     **Plaintiff Dr. Yalcin Ayasli ("Dr. Ayasli")**, an individual, is a dual United States and Turkish citizen.[1]

16.     Dr. Ayasli is domiciled, and maintains his primary residence, in Concord, Massachusetts.[2]

### The RICO Enterprise

17.     The RICO Enterprise is comprised of a number of individuals and business entities, some of whom/which are named in this Complaint as Defendants, and others who are included in the Complaint as non-party co-conspirators.

18.     The members and associates of the RICO Enterprise include, but are not limited to, Defendants Sezgin Baran Korkmaz ("**KORKMAZ**"), Lev Aslan Dermen (f/k/a Levon Termendzhyan) ("**DERMEN**"), Jacob Ortell Kingston ("**KINGSTON**") and Isaiah Kingston ("**ISAIAH KINGSTON**") (and collectively "**the KINGSTONS**"), Fatih Akol ("**AKOL**"), Kamil Feridun Özkaraman ("**OZKARAMAN**")[3], Washakie Renewable Energy, LLC ("**WASHAKIE**"), SBK Holdings, A.S. ("**SBK TURKEY**"), SBK Holdings USA, Inc. ("**SBK USA**")[4], Bugaraj Elektronik Ticaret ve Billisim Hizmetleri A.S. ("**BUGARAJ**"), Mega Varlik Yonetim A.S. ("**MEGA VARLIK**")[5], Alptekin Yilmaz ("**YILMAZ**"),

---

[1] In cases of dual citizenship, only the U.S. citizenship is recognized in the diversity analysis. See 15-102  Moore's Federal Practice Civil §§ 102.70, 102.37.

[2] Dr. Ayasli's full address is not provided herein due to legitimate concerns for his safety and the safety of his family members given specific threats made against him and his family by members of the RICO Enterprise.

[3] OZKARAMAN defaulted in the United States District Court for the District of New Hampshire.

[4] SBK USA defaulted in the United States District Court for the District of New Hampshire.

[5] MEGA VARLIK was dismissed from this case without prejudice in the United States District Court for the District of New Hampshire due to that Court's lack of personal jurisdiction. The Plaintiffs subsequently discovered the substantial nexus that Defendant MEGA VARLIK has with the United States, justifying MEGA VARLIK being added as a Defendant in this

Olessia Zoubkova ("**ZOUBKOVA**"), Bukombin Bilisim ve Teknoloji Anonim Sirketi ("**BUKOMBIN**"), Noil Energy Group, Inc. ("**NOIL ENERGY**"), Speedy Lion Renewable Fuel Investments, LLC ("**SPEEDY LION**"), G.T. Energy, LLC ("**GT ENERGY**"), United Fuel Supply, LLC ("**UNITED FUEL SUPPLY**"), Isanne ("**ISANNE**"), Biofarma Ilac Sanayi ve Ticaret A.S. ("**BIOFARMA**"), Blane Teknoloji Sistemleri Sanayi ve Ticaret Anonim Sirketi ("**BLANE**"), Stone Isi Yalitim ("**STONE**"), Komak Isi Yalitim Sistemleri Sanayi ve Ticaret Limited Sirketi ("**KOMAK**"), and non-defendant co-conspirators George Termendzhyan ("**TERMENDZHYAN**"), Cuneyt Ozen ("**OZEN**"), Umut Uygun ("**UYGUN**"), and Caglar Sendil ("**SENDIL**").

## Defendants

### SEZGIN BARAN KORKMAZ

19.     **Defendant Sezgin Baran Korkmaz ("KORKMAZ")**, an individual, is a citizen of the Republic of Turkey ("Turkey") and is domiciled in Turkey.

20.     Defendant KORKMAZ's initials, "SBK", form the names of two of the most prominent of his many affiliated companies, SBK TURKEY and SBK USA, both of which were central to these affairs, and both of which are described further below.

21.     Defendant KORKMAZ is the leader of the RICO Enterprise's Turkish operations and, at all times relevant to this Complaint, either actually controlled or maintained a controlling financial interest in Turkey-based Defendants SBK TURKEY, BUKOMBIN, BUGARAJ, MEGA VARLIK, KOMAK, BLANE, and STONE, and Luxembourg-based ISANNE.

22.     Defendant KORKMAZ was initially named as an "unindicted co-conspirator" in the 2018 criminal indictment of Defendants DERMEN, KINGSTON, ISAIAH KINGSTON, and others in the United States District Court jurisdiction.

---

for the District of Utah, No. CR 18-365-JNP-BCW (hereinafter the "Dermen/Kingston Criminal Proceeding").

23.    On December 4, 2020, Defendant KORKMAZ fled the Republic of Turkey.

24.    On December 31, 2020, Turkish prosecutors issued an arrest warrant for Defendant KORKMAZ for his role in laundering money in connection with the $470 million U.S.-based Fraudulent Fuel Tax Credit Scheme established in the Dermen/Kingston Criminal Proceeding.

25.    On April 1, 2021, Defendant KORKMAZ was indicted on one count of conspiring to commit money laundering and one count of obstruction of justice in the United States District Court for the District of Utah, No. CR 21-140-JNP (hereinafter the "Korkmaz Criminal Proceeding") based on Defendant KORKMAZ's laundering of funds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme that were the centerpiece of the Dermen/Kingston Criminal Proceeding.

26.    On April 14, 2021, Defendant KORKMAZ was indicted in Turkey on one count of "Laundering Assets Derived from Criminal Activity."  Defendants DERMEN, KINGSTON, OZKARAMAN, YILMAZ, and ZOUBKOVA were all similarly charged.  Defendants SBK HOLDING, MEGA VARLIK, BLANE, ISANNE, and KOMAK, among other companies, were also named and implicated in the Turkish criminal indictment as "Financially Liable" entities ("the Korkmaz/Dermen/Kingston Turkish Indictment"). The conduct underlying these indictments involved the receipt of funds derived from, and conduct tied directly to, the operation of the U.S.-based Fraudulent Fuel Tax Credit Scheme. [6]

---

[6] On April 1, 2021, while a fugitive from both U.S. and Turkish authorities, Defendant KORKMAZ was convicted in absentia in the Turkish 4th Major Crimes Court, arising from a scheme in which Defendant KORKMAZ and several other individuals, forged a promissory note for 12 million liras and then attempted to extort that amount from the victim whose name had been forged. Defendant KORKMAZ was sentenced to 70 months imprisonment. The case

27.     On April 28, 2021, Defendant KORKMAZ was indicted in the United States, in a First Superseding Indictment, which added ten counts of wire fraud to the initial two count indictment in the Korkmaz Criminal Proceeding. The First Superseding Indictment expressly references how laundered funds from the U.S.-based Fraudulent Fuel Tax Credit Scheme were used in the acquisition of BoraJet and Aydin Jet.

28.     Defendant KORKMAZ, who had remained a fugitive since fleeing Turkey, was arrested by authorities in Austria on June 19, 2021 at the request of the United States Department of Justice in connection with the First Superseding Indictment.

29.     Defendant KORKMAZ was extradited to the United States on July 15, 2022.  He pleaded "not guilty" at his arraignment and remains detained as a flight risk pending trial.

30.     Defendant KORKMAZ has retained U.S.-based counsel.

31.     Defendant KORKMAZ is an individual existing separate and distinct from the RICO Enterprise.

### LEV ASLAN DERMEN

32.     **Defendant Lev Aslan DERMEN ("DERMEN") f/k/a Levon Termendzhyan,**[7] an individual, is a U.S. citizen who, at all times relevant to this Complaint, was domiciled in Beverly Hills, California.

33.     Defendant DERMEN is the leader of the RICO Enterprise, and, at all times relevant to this Complaint, either actually controlled or maintained a

---

currently is on appeal.

[7] DERMEN changed his name from Levon Termendzhyan in mid-2017, after the sale of BoraJet to the RICO Enterprise.  DERMEN chose "Aslan," which means "lion" in Turkish, as his new middle name, while his last name Dermen is nearly identical to the common Turkish surname Dermen.  According to testimony from the Dermen/Kingston Criminal Proceeding, Dermen was arrested while attempting to flee to Turkey.

controlling financial interest in U.S.-based Defendants SBK USA, NOIL ENERGY, SPEEDY LION, GT ENERGY, and UNITED FUEL SUPPLY.

34. On March 16, 2020, after a jury trial in the United States District Court for the District of Utah, Defendant DERMEN was convicted at trial of nine felony counts of money laundering and one felony count of conspiracy to commit mail fraud in the Dermen/Kingston Criminal Proceeding.

35. Defendant DERMEN is incarcerated and awaiting sentencing on those charges.

36. On April 14, 2021, Defendant DERMEN was indicted in Turkey on one count of "Laundering Assets Derived from Criminal Activity" as part of the Korkmaz/Dermen/Kingston Turkish Indictment.  The conduct underlying this indictment involved the receipt of funds derived from, and conduct tied directly to, the operation of the U.S.-based Fraudulent Fuel Tax Credit Scheme.

37. Defendant DERMEN is an individual existing separate and distinct from the RICO Enterprise.

### JACOB ORTELL KINGSTON

38. **Defendant Jacob Ortell Kingston ("KINGSTON")**, an individual, is a United States citizen who, at all times relevant to this Complaint, was domiciled in Utah.

39. Defendant KINGSTON held an ownership interest in U.S. and Turkey-based businesses tied to the RICO Enterprise, including Defendants WASHAKIE, SBK USA, UNITED FUEL SUPPLY, MEGA VARLIK, BLANE and KOMAK.

40. Defendant KINGSTON was the signatory on many of the wire transfers used to launder Fraud Proceeds from Defendant WASHAKIE (1) to Defendant SBK USA in the United States; (2) from Defendant WASHAKIE to Defendants SBK TURKEY, MEGA VARLIK, BLANE and KOMAK in Turkey; and (3) from Defendant WASHAKIE to Defendant ISANNE in Luxembourg.

41.     Defendant KINGSTON, as part of a cooperation plea agreement, pled guilty to more than three dozen felony counts of mail fraud, money laundering, conspiracy and obstruction of justice in the Dermen/Kingston Criminal Proceeding.

42.     Defendant KINGSTON is incarcerated and awaiting sentencing in the Dermen/Kingston Criminal Proceeding.

43.     On April 14, 2021, Defendant KINGSTON was indicted in Turkey on one count of "Laundering Assets Derived from Criminal Activity" as part of the Korkmaz/Dermen/Kingston Turkish Indictment.  The conduct underlying this indictment involved the receipt of funds derived from, and conduct tied directly to, the operation of the U.S.-based Fraudulent Fuel Tax Credit Scheme.

44.     Defendant KINGSTON is an individual existing separate and distinct from the RICO Enterprise.

## ISAIAH ELDEN KINGSTON

45.     **Defendant Isaiah Elden Kingston ("ISAIAH KINGSTON")**, an individual, is a United States citizen domiciled in Utah.

46.     Defendant ISAIAH KINGSTON was the signatory on many of the wire transfers used to launder Fraud Proceeds from Defendant WASHAKIE to Defendant SBK TURKEY and other Turkey-based entities controlled by the RICO Enterprise.

47.     Defendant ISAIAH KINGSTON, as part of a cooperation plea agreement, pled guilty to 19 felony counts of mail fraud, money laundering, and obstruction of justice.

48.     Defendant ISAIAH KINGSTON is incarcerated and awaiting sentencing in the Dermen/Kingston Criminal Proceeding.

49.     Defendant KINGSTON is an individual existing separate and distinct from the RICO Enterprise.

## FATIH AKOL

50.    **Defendant Fatih Akol ("AKOL")**, an individual, is a Turkish citizen domiciled in the State of New Jersey.

51.    Defendant AKOL was the General Manager and Chairman of the Board of Directors of BoraJet, the airline owned by Dr. Ayasli, from April 2014 until the sale of BoraJet in December 2016.

52.    Defendant AKOL served as BoraJet's sole negotiator in the fraudulent and coerced sale of BoraJet and its affiliates, BoraJet Bakim and Aydin Jet, to Defendant BUGARAJ in December 2016.

53.    Defendant AKOL remained employed as BoraJet's General Manager, working for Defendant KORKMAZ and his associates, until February 2017.

54.    Defendant AKOL also serves as the Founder and Chairman of RoboAir, Inc., a California-based Internet travel booking service founded in August 2018 with a principal place of business at 530 Lytton Avenue, Palo Alto, CA 94301.

55.    Defendant AKOL is an individual existing separate and apart from the RICO Enterprise.

## KAMIL FERIDUN ÖZKARAMAN

56.    **Defendant Kamil Feridun Özkaraman ("OZKARAMAN")**, an individual, is a Turkish citizen domiciled in the Republic of Turkey.

57.    Defendant OZKARAMAN is a certified public accountant.

58.    Defendant OZKARAMAN is a close business associate of Defendant KORKMAZ.

59.    Defendant OZKARAMAN laundered Fraud Proceeds from the U.S.-based Tax Credit Fraud Scheme through accounts in Turkey and the United States on behalf of various entities in the RICO Enterprise.

60.     Defendant OZKARAMAN acted on behalf of Defendant SBK TURKEY, Defendant BUKOMBIN, and Defendant BUGARAJ in helping those entities fraudulently acquire BoraJet from Dr. Ayasli on December 29, 2016.

61.     On April 14, 2021, Defendant OZKARAMAN was indicted in Turkey on one count of "Laundering Assets Derived from Criminal Activity" as part of the Korkmaz/Dermen/ Kingston Turkish Indictment.  The conduct underlying this indictment involved the receipt of funds derived from, and conduct tied directly to, the operation of the U.S.-based Fraudulent Fuel Tax Credit Scheme.

62.     Defendant OZKARAMAN is an individual existing separate and distinct from the RICO Enterprise.

## WASHAKIE RENEWABLE ENERGY, LLC

63.     **Defendant WASHAKIE** is a Utah limited liability company with a principal place of business at 624 N. 300 W, Salt Lake City, UT, 84103-1308.

64.     As of January 7, 2013, Defendant WASHAKIE described itself on its website as  "Utah's largest producer of clean burning and sustainable biodiesel."

65.     As of November 10, 2013, Defendant WASHAKIE described itself on its website as "The largest producer of biodiesel and chemicals in the intermountain west."

66.     Defendant KINGSTON was the Chief Executive Officer and 50% shareholder in Defendant WASHAKIE.

67.     Defendant ISAIAH KINGSTON was the Chief Financial Officer and 50% shareholder in Defendant WASHAKIE.

68.     Defendants DERMEN, KINGSTON and ISAIAH KINGSTON devised a scheme to fraudulently obtain U.S. Treasury checks from the IRS by filing false claims for refundable, renewable fuel tax credits (the "U.S.-based Fraudulent Fuel Tax Credit Scheme").

69.     As a result of the Defendants' U.S.-based Fraudulent Fuel Tax Credit Scheme, the IRS issued U.S. Treasury checks to Defendant WASHAKIE totaling

approximately $470 million that Defendant WASHAKIE was not lawfully entitled to receive.

70. Defendants KORKMAZ and DERMEN then directed Defendants KINGSTON and ISAIAH KINGSTON, through Defendant WASHAKIE, to launder approximately $367 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme through a series of wire transfers between RICO Enterprise-controlled bank accounts in the United States, Turkey and Luxembourg, including to Defendants SBK USA, SBK TURKEY, MEGA VARLIK, and ISANNE.

71. Defendant WASHAKIE also received $7.1 million in laundered Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant SBK USA.

### SBK TURKEY

72. **Defendant SBK TURKEY** is a Turkish "distressed asset management" corporation formed on March 8, 2013, with its principal place of business at Sarıyer Reşitpaşa Mah. Eski Büyükdere Cad. No: 14 K: 9 / B Maslak, Istanbul, Turkey.

73. Defendant SBK TURKEY was funded on November 13, 2013 by a $10 million wire transfer of Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant WASHAKIE. Prior to receiving this seed capital, Defendant SBK TURKEY had no viable operations.

74. At all times relevant to this Complaint, Defendant KORKMAZ was the President and sole shareholder of SBK TURKEY, and the only individual authorized to act for or bind SBK TURKEY.

75. Defendants OZKARAMAN and YILMAZ acted as "corporate representatives" of Defendant SBK TURKEY, but always at the direction of Defendant KORKMAZ.

76.     Defendant SBK TURKEY served as the principal conduit through which the RICO Enterprise laundered Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme in Turkey, receiving at least $80 million in Fraud Proceeds including wire transfers from Defendants WASHAKIE, SBK USA and NOIL ENERGY.

77.     Defendant SBK Turkey then further disbursed the Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme by "investing" those proceeds in other companies in Turkey and Luxembourg.

78.     Defendant SBK TURKEY is the parent company of Defendants BUKOMBIN and BUGARAJ, the corporate entities used to fraudulently acquire BoraJet from Dr. Ayasli.

79.     Defendant KORKMAZ, through Defendant SBK TURKEY, similarly controlled all of the other Turkey-based corporate members of the RICO Enterprise, including Defendants MEGA VARLIK, BLANE and KOMAK, as well as Luxembourg-based Defendant ISANNE.

80.     Defendant SBK TURKEY was named as a "financially liable" entity in the Korkmaz/Dermen/Kingston Turkish Indictment.

81.     Defendant SBK TURKEY is a business entity existing separate and distinct from the RICO Enterprise.

**SBK USA**

82.     **Defendant SBK USA** is a California corporation with its principal place of business at 5801 Randolph Street, Commerce, CA, 90040.

83.     On December 6, 2013, in coordination with Defendant KORKMAZ, Defendants DERMEN and KINGSTON founded and became 50% shareholders of Defendant SBK USA.

84.     Defendant SBK USA is the U.S.-based affiliate of Defendant SBK TURKEY.  Both entities are named for, and bear the initials of Defendant (**S**ezgin **B**aran) **K**ORKMAZ.

85.     Defendant SBK USA purported to be "a commercial and residential real estate investment firm" and was described on its website as a "short-term lender" focusing on commercial bridge loans and construction loans.

86.     As was the case with Defendant SBK TURKEY, Defendant SBK USA was initially funded by a $10 million wire transfer of Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant WASHAKIE on January 17, 2014.  Defendant SBK TURKEY had no operating capital or ongoing operations prior to receiving this seed capital.

87.     At all times relevant to this Complaint, Defendant DERMEN was the Chief Financial Officer and director of Defendant SBK USA.

88.     For a period of time relevant to this Complaint, Edgar Sargsyan served as the President and CEO of Defendant SBK USA.

89.     At no time relevant to this Complaint did Defendant SBK USA hold the California Finance Lender's License required to underwrite commercial loans.

90.     Similarly, at no time relevant to this Complaint was Defendant SBK USA registered at the California Department of Business Oversight as a Financial Institution, Money Transmitter, or Financial Service Provider.

91.     Similarly, at no time relevant to this Complaint was Defendant SBK USA registered as a Mortgage Loan Originator with the Nationwide Mortgage Licensing System.

92.     Similarly, at no time relevant to this Complaint was Defendant SBK USA registered as a Dealer or Broker with the Financial Industry Regulatory Authority ("FINRA").

93.     Defendant SBK USA, as the U.S.-based affiliate of Defendant SBK TURKEY, served as one of the U.S. "fronts" for the RICO Enterprise's money laundering operations between the United States and Turkey.

94.     Defendant SBK USA laundered approximately $46,373,000 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from

accounts controlled by Defendant SBK USA into various other accounts controlled by the RICO Enterprise including accounts held by Defendants WASHAKIE and SBK TURKEY.  It also purchased a property in Huntington Beach, California in the name of Defendant DERMEN for $3,520,085.00.

95.     Defendant SBK USA also received approximately $50 million in Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by other members of the RICO Enterprise including Defendants WASHAKIE and ISANNE.

96.     Defendant SBK USA is a business entity existing separate and distinct from the RICO Enterprise.

**BUGARAJ**

97.     **Defendant BUGARAJ** is a Turkish entity founded on August 8, 2015 with a principal place of business at İnönü Cad., Hoşgör Sok. No: 3, Çeliktepe, Kağıthane, İstanbul, Turkey.

98.     Defendant BUKOMBIN was the incorporator, sole shareholder, and sole director of Defendant BUGARAJ.

99.     Defendant BUGARAJ was a subsidiary of Defendant SBK TURKEY and was one of the entities utilized by the RICO Enterprise to launder Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit scheme in Turkey.

100.    Defendant BUGARAJ was the entity used by the RICO Enterprise to fraudulently acquire BoraJet and Aydin Jet from Dr. Ayasli, to subsequently bring a number of sham lawsuits against Dr. Ayasli and his business associates in an effort to extort money from him, to acquire liens against Dr. Ayasli's properties, and to attempt to liquidate those liens to acquire more of Dr. Ayasli's personal wealth.

101.    Defendant BUGARAJ is a business entity existing separate and distinct from the RICO Enterprise.

**MEGA VARLIK**

102.   **Defendant MEGA VARLIK** is a Turkish "financial services" corporation founded on June 11, 2015 by Defendant KINGSTON at the direction of Defendants KORKMAZ and DERMEN, with its principal place of business at Beylerbeyi Mahallesi Iskele, Cad No 16/1 Beylerbeyi Uskudar, Istanbul, Turkey.

103.   As was the case with SBK Turkey in November 2013 and SBK USA in January 2014, Defendant MEGA VARLIK was initially funded by a $10,000,000 USD wire transfer of Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme in June 2015. Defendant WASHAKIE previously wired this seed capital to Defendant JACOB KINGSTON'S personal bank account at Garanti Bank in Istanbul on March 12, 2014.  Defendant MEGA VARLIK had no operating capital or operations prior to receiving these Fraud Proceeds.

104.   Defendant KORKMAZ, via his then-assistant, Umut Uygun, sent Defendant KINGSTON an email on the same date the wire was sent stating: "Please write an explanation on the transfer document 'Shareholders equity for establishment of a bank and asset management company in Turkey.'  Mr. Baran [Defendant KORKMAZ] will transfer the rest of the capital from a foreign bank when the bank and asset management Company established and [sic] have the bank account."

105.   That same day, Defendant KORKMAZ, writing on Defendant SBK TURKEY letterhead, drafted a fraudulent reference letter to the Turkish banking commission to aid in establishing Defendant MEGA VARLIK as a Turkish Bank. In providing that required reference, Defendant KORKMAZ falsely claimed to have "conducted $150 million of work" with Defendant KINGSTON's company, Defendant UNITED FUEL SUPPLY.  No such work had ever been performed.

106.   At all times relevant to this Complaint, Defendant KINGSTON was the 99% majority shareholder in Defendant MEGA VARLIK.

107.   Defendant KORKMAZ, through his close business associate Caglar Sendil, assisted Defendant KINGSTON in managing the day-to-day affairs of Defendant MEGA VARLIK.

108.   Defendant MEGA VARLIK also was named as a "financially liable" entity in the Korkmaz/Dermen/Kingston Turkish Indictment.

109.   Defendant MEGA VARLIK is a business entity existing separate and distinct from the RICO Enterprise.

## ALPTEKIN YILMAZ

110.   **Defendant Alptekin Yilmaz ("YILMAZ")**, an individual, is a Turkish citizen domiciled in the Republic of Turkey.

111.   Defendant YILMAZ acted as a corporate representative of Defendant SBK TURKEY.

112.   Defendant YILMAZ laundered Fraud Proceeds from the U.S.-based Tax Credit Fraud Scheme through accounts in Turkey and the United States on behalf of various members of the RICO Enterprise.

113.   On April 14, 2021, Defendant YILMAZ was indicted in Turkey on one count of "Laundering Assets Derived from Criminal Activity" as part of the Korkmaz/Dermen/ Kingston Turkish Indictment.  The conduct underlying this indictment involved the receipt of funds derived from, and conduct tied directly to, the operation of the U.S.-based Fraudulent Fuel Tax Credit Scheme.

114.   Defendant YILMAZ is an individual existing separate and apart from the RICO Enterprise.

## OLESSIA ZOUBKOVA

115.   **Defendant Olessia Zoubkova ("ZOUBKOVA")**, an individual, is a Turkish citizen domiciled in the Republic of Turkey.

116.   Defendant ZOUBKOVA has owned Defendant BLANE (f/k/a SetApp) since November 16, 2016 when she acquired its shares from Defendant KINGSTON.

117.   Defendant ZOUBKOVA laundered Fraud Proceeds from the U.S.-based tax credit fraud and money laundering schemes through accounts in Turkey and the United States on behalf of various entities in the RICO Enterprise.

118.   On April 14, 2021, Defendant ZOUBKOVA was indicted in Turkey on one count of "Laundering Assets Derived from Criminal Activity" as part of the Korkmaz/Dermen/ Kingston Turkish Indictment.  The conduct underlying this indictment involved the receipt of funds derived from, and conduct tied directly to, the operation of the U.S.-based Fraudulent Fuel Tax Credit Scheme.

119.   Defendant ZOUBKOVA is an individual existing separate and apart from the RICO Enterprise.

**BUKOMBIN**

120.   **Defendant BUKOMBIN** is a Turkish entity founded on July 15, 2015 with a principal place of business at Maslak Mah. Dereboyu Cad. Zagra Is Merkezi No:14/C Sisli, Istanbul, Turkey, 34398.

121.   Defendant SBK TURKEY was the incorporator, sole shareholder, and sole director of Defendant BUKOMBIN.

122.   Defendant KORKMAZ was the initial President of Defendant BUKOMBIN.

123.   On May 26, 2017, Defendant SBK TURKEY named Defendant OZKARAMAN and another Korkmaz business associate to Defendant BUKOMBIN's Board of Directors.

124.   Defendant BUKOMBIN is the parent company of Defendant BUGARAJ, and was one of the entities used by SBK TURKEY to fraudulently acquire BoraJet and Aydin Jet from Dr. Ayasli.

125.   Defendant BUKOMBIN is a business entity existing separate and distinct from the RICO Enterprise.

**NOIL ENERGY**

126.   **Defendant NOIL ENERGY** is a California corporation established in 2007 with its principal place of business at 5801 Randolph St, Commerce, California.

127.   Defendant DERMEN serves as NOIL ENERGY's Chairman of the Board.

128.   Defendant NOIL ENERGY was allegedly engaged in the production of biodiesel fuel.

129.   Defendants DERMEN, KINGSTON, KORKMAZ and ISAIAH KINGSTON used Defendant NOIL ENERGY as one of the entities involved in the U.S.-based Fraudulent Fuel Tax Credit Scheme.

130.   Defendant NOIL ENERGY laundered approximately $20 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme into various other accounts controlled by the RICO Enterprise in Turkey, including accounts held by Defendants SBK TURKEY and KOMAK.

131.   Defendant NOIL ENERGY also received approximately $1,324,670 of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant WASHAKIE.

132.   Defendant NOIL ENERGY has an affiliated Turkish company, NOİL Yatırım İnşaat Turizm Sanayi ve Ticaret A.Ş. in Turkey ("NOIL-TURKEY"). Defendant DERMEN was the Chairman of the Board of Directors, and Defendant OZKARAMAN served as NOIL-TURKEY's sole shareholder.

133.   Defendant NOIL ENERGY is a business entity existing separate and distinct from the RICO Enterprise.

**SPEEDY LION**

134.   **Defendant SPEEDY LION** is a now-dissolved California-based limited liability company with a principal place of business at 1492 South Lorena Street, Los Angeles, CA 90023.

135.   Defendant SPEEDY LION was controlled by Defendant DERMEN and his son George Termendzhyan ("Termendzhyan").

136.   Defendants DERMEN, KINGSTON, KORKMAZ, and ISAIAH KINGSTON used SPEEDY LION as one of the entities involved in the U.S.-based Fraudulent Fuel Tax Credit Scheme.

137.   Defendant SPEEDY LION sent approximately $20 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts it controlled in the Central District of California to accounts maintained by Defendant YILMAZ in Turkey.

138.   Defendant SPEEDY LION also received approximately $38 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise in Turkey, including accounts held by Defendant YILMAZ on behalf of Defendant BLANE.

139.   Defendant SPEEDY LION is a business entity existing separate and distinct from the RICO Enterprise.

**GT ENERGY**

140.   **Defendant GT ENERGY** is a Nevada-based limited liability company with a principal place of business at 5801 Randolph Street, Commerce, California, 90040.

141.   Termendzhyan was the Chief Executive Officer of Defendant GT ENERGY.

142.   Defendant GT ENERGY "operates" in both California and Nevada.

143.   Defendants DERMEN, KINGSTON, KORKMAZ, and ISAIAH KINGSTON used Defendant GT ENERGY as one of the entities involved in the U.S.-based Fraudulent Fuel Tax Credit Scheme, to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise.

144.   Defendant GT ENERGY received approximately $43 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from

accounts controlled by the RICO Enterprise, including accounts held by Defendant YILMAZ on behalf of Defendants BLANE and SBK TURKEY.

145.   Defendant GT ENERGY also laundered approximately $23 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by Defendant GT ENERGY into an account held by Defendant SBK TURKEY.

146.   Defendant GT ENERGY is a business entity existing separate and distinct from the RICO Enterprise.

## UNITED FUEL SUPPLY

147.   **Defendant UNITED FUEL SUPPLY** is a Utah-based limited liability company with a principal place of business at 3950 S 700 E #202, Salt Lake City, UT 84107.

148.   Defendant KINGSTON was the Managing Member of Defendant UNITED FUEL SUPPLY and Defendants KINGSTON and ISAIAH KINGSTON controlled Defendant UNITED FUEL SUPPLY.

149.   Defendants DERMEN, KINGSTON, KORKMAZ, and ISAIAH KINGSTON used Defendant UNITED FUEL SUPPLY as one of the entities involved in the U.S.-based Fraudulent Fuel Tax Credit Scheme and subsequent money laundering scheme.

150.   Defendant UNITED FUEL SUPPLY received at least $10 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise, including an account held by Defendant WASHAKIE.

151.   Defendant UNITED FUEL SUPPLY also laundered approximately $14 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to accounts controlled by the RICO Enterprise, including a Merrill Lynch account controlled by Defendant KINGSTON, and to accounts in Turkey controlled by Defendants KINGSTON, STONE and BLANE.

152.   Defendant UNITED FUEL SUPPLY was one of a number of entities used by the RICO Enterprise to launder money between U.S. and Turkish based entities and accounts controlled by the RICO Enterprise.

153.   Defendant UNITED FUEL SUPPLY is a business entity existing separate and distinct from the RICO Enterprise.

**ISANNE**

154.   **Defendant ISANNE** is a Luxembourg-based affiliate of Defendant SBK TURKEY with a principal place of business at 46 Avenue John F. Kennedy, Luxembourg.

155.   Defendant ISANNE is wholly-owned and controlled by Defendant KORKMAZ.

156.   Defendants DERMEN, KINGSTON, KORKMAZ, and ISAIAH KINGSTON used Defendant ISANNE as one of the entities involved in the U.S.-based Fraudulent Fuel Tax Credit Scheme and subsequent money laundering scheme.

157.   Defendant ISANNE received at least $56 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise including an account held by Defendant WASHAKIE at Garanti Bank in Turkey.

158.   Defendant ISANNE also laundered approximately $15 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to accounts controlled by the RICO Enterprise, including an account controlled by Defendant SBK USA in the Central District of California.

159.   Defendant ISANNE was one of a number of entities used by the RICO Enterprise to launder money between U.S. and Turkish based entities and accounts controlled by the RICO Enterprise.

160.   Defendant ISANNE is a business entity existing separate and distinct from the RICO Enterprise.

**BIOFARMA**

161.   **Defendant BIOFARMA**, originally founded in 1953, manufactures antibiotics, painkillers and hormonal medications.

162.   Defendant BIOFARMA is now a Turkey-based affiliate of Defendant SBK TURKEY with a principal place of business at Akpınar Mah. Osmangazi Cad. No:156, Sancaktepe, Istanbul, Turkey.

163.   Defendant BIOFARMA is a subsidiary of Defendant ISANNE.

164.   Since November 2014, Defendant SBK TURKEY has been the sole board member of Defendant BIOFARMA.

165.   On December 30, 2015, Caglar Sendil, a close business associate of Defendant KORKMAZ, was appointed Chairman of the Board of Defendant BIOFARMA.

166.   Defendant BIOFARMA was one of a number of entities used by the RICO Enterprise to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise.

167.   Defendant BIOFARMA is a business entity existing separate and distinct from the RICO Enterprise.

**BLANE**

168.   **Defendant BLANE f/k/a SETAP Teknoloji** is a Turkey-based affiliate of Defendant SBK TURKEY with a principal place of business at Inonu Cad. No:17 Kat:3 Beylerbeyi Uskudar, Istanbul, Turkey.

169.   Defendant BLANE shares the same corporate address as KOMAK.

170.   On December 17, 2013, Ayse Nil Yilmaz created SETAP TEKNOLOJI ("SETAP") and became its sole shareholder.

171.   On June 26, 2014, Defendant KINGSTON became the majority shareholder of SETAP.

172.   On June 5, 2015, Cuneyt Ozen, a close business associate of Defendant KORKMAZ, was appointed to the Board of Directors of SETAP.

173.   On July 3, 2015, SETAP changed its name to BLANE.

174.   On November 23, 2015, Defendant ZOUBKOVA became the sole shareholder of BLANE.

175.   Defendant BLANE received at least $12 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise including accounts controlled by Defendant WASHAKIE and Defendant UNITED FUEL SUPPLY.

176.   Defendant BLANE also laundered approximately $40 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to accounts controlled by the RICO Enterprise, including accounts controlled by Defendants SPEEDY LION AND GT ENERGY.

177.   Defendant BLANE was one of a number of entities used by the RICO Enterprise to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise.

178.   At some time after February 2021, Defendant BLANE acknowledged its receipt of these illicit funds and returned an undisclosed amount to the United States Government as part of the Dermen/Kingston posttrial forfeiture proceedings.

179.   Defendant BLANE is a business entity existing separate and distinct from the RICO Enterprise.

STONE

180.   **Defendant STONE** is a Turkey-based affiliate of Defendant SBK TURKEY with a principal place of business at OSB Mah. 20 Cad. 3 Odunpazari, Eskisehir, Turkey.

181.   Defendant STONE is a building products and construction materials company founded on October 22, 2015.

182.   Defendant STONE received at least $2 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled

by the RICO Enterprise including accounts controlled by Defendant UNITED FUEL SUPPLY.

183.   Defendant STONE was one of a number of entities used by the RICO Enterprise to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise.

184.   At some time after February 2021, Defendant STONE acknowledged its receipt of these illicit funds and returned an undisclosed amount to the United States Government as part of the Dermen/Kingston posttrial forfeiture proceedings.

185.   Defendant STONE is a business entity existing separate and distinct from the RICO Enterprise.

## KOMAK

186.   **Defendant KOMAK** is a Turkey-based entity manufacturing thermal insulation products, with a principal place of business at Celiktepe Mah. Inonu Cad. Hosgor Sok. No:3 Kagithane, Istanbul.

187.   Defendant KOMAK was founded on November 3, 2009 by Defendant KORKMAZ, who had a 95% ownership interest.

188.   Defendant KORKMAZ transferred his 95% interest in Defendant KOMAK to Defendant OZKARAMAN on June 29, 2012.

189.   Defendant OZKARAMAN later became the sole owner of Defendant KOMAK on December 30, 2014.

190.   Defendant KOMAK was one of a number of entities used by the RICO Enterprise to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise.

191.   Defendant KOMAK laundered at least $18 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise, including accounts controlled by Defendant WASHAKIE and Defendant NOIL ENERGY

192.   Defendant KOMAK also received at least $26 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise including accounts controlled by Defendants WASHAKIE and NOIL ENERGY.

193.   Defendant KOMAK is a business entity existing separate and distinct from RICO Enterprise.

### Non-Party Co-Conspirators[8]

194.   Certain other non-party individuals and business entities played direct or indirect roles in the scheme to defraud the United States, launder money obtained from the RICO Enterprise's fraudulent activities in the United States into Turkey and elsewhere, and to extort and defraud Dr. Ayasli.  Foremost among these individuals and business entities are the following non-party co-conspirators:

195.   **George Termendzhyan ("Termendzhyan")**, Defendant DERMEN's son, an individual, is a U.S. citizen domiciled in California.

196.   During all times relevant to this Complaint, Termendzhyan was a shareholder of Defendant SBK USA, and one of two individuals (Defendant DERMEN being the other) who had the authority to sign checks and/or transfer money between accounts held by Defendant SBK USA, from Defendant SBK USA to Defendant SBK TURKEY, and from Defendant SBK USA to other overseas entities and accounts controlled by the RICO Enterprise.

197.   TERMENDZHYAN was also the "Manager" of SPEEDY LION.

198.   **Cuneyt Ozen ("Ozen")** is a business associate of Defendant KORKMAZ.

199.   Ozen served as the sole Board Member and President of Defendant BUGARAJ at the time of the BoraJet transaction.

---

[8] The Plaintiff reserves the right to amend this Complaint to add some or all of these non-party co-conspirators as named Defendants as the case progresses.

200.   At the time of the BoraJet transaction, Ozen also had the authority to represent and bind Defendant BUGARAJ.

201.   Ozen was also appointed as President and member of the Board of Directors of Defendant BLANE on June 5, 2015 at a time that 99 percent of Defendant BLANE's shares were owned by Defendant KINGSTON.

202.   Ozen was President of Defendant BLANE during all times that Defendant KORKMAZ exercised control over Defendant BLANE's bank accounts which were used in money laundering transfers made on behalf of the RICO Enterprise.

203.   **Umut Uygun ("Uygun")** served as Defendant KORKMAZ's executive assistant, among other roles, from February 2012 until recently.

204.   Uygun provided instruction to members of the RICO Enterprise on behalf of and at the direction of Defendant KORKMAZ.

205.   In May 2015, Uygun was present when Defendants KORKMAZ, KINGSTON and DERMEN discussed the laundering of $56 million of Fraud Proceeds from Defendant WASHAKIE to Defendant ISANNE.

206.   **Caglar Sendil ("Sendil")** is a close business associate of Defendant KORKMAZ.

207.   On June 16, 2015, Sendil was installed as the CEO of Defendant MEGA VARLIK by Defendant KINGSTON, who owned 99 percent of Defendant MEGA VARLIK, at the direction of Defendant KORKMAZ and Uygun.

208.   Sendil became the Chairman of the Board of Defendant BIOFARMA in January of 2016, and, at all times relevant to this Complaint, served as its Chairman of its Board.

## SUBJECT MATTER JURISDICTION AND VENUE

209.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1332 (diversity), 18 U.S.C. § 1964(c)

(RICO jurisdictional statement); and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

210.    Dr. Ayasli's claims for civil RICO violations arise under 18 U.S.C. § 1961 et seq. and constitute federal questions.

211.    Complete diversity of citizenship between the Plaintiff and the Defendants exists pursuant to 28 U.S.C. § 1332 because (1) Dr. Ayasli is domiciled in the Commonwealth of Massachusetts; (2) Defendant KORKMAZ is a Turkish citizen domiciled in the Republic of Turkey; (3) Defendant DERMEN is a U.S. citizen domiciled in the State of California; (4) Defendant KINGSTON is a U.S. citizen domiciled in the State of Utah; (5) Defendant ISAIAH KINGSTON is a U.S. citizen domiciled in the State of Utah; (6) Defendant AKOL is a Turkish citizen domiciled in the State of New Jersey; (7) Defendant OZKARAMAN is a Turkish citizen domiciled in the Republic of Turkey; (8) Defendant WASHAKIE is a Utah limited liability company with its principal place of business in Utah; (9) Defendant SBK TURKEY is a Turkish corporation with its principal place of business in the Republic of Turkey; (10) Defendant SBK USA is a California corporation with its principal place of business in Commerce, California; (11) Defendant BUGARAJ is a Turkish corporation with its principal place of business the Republic of Turkey; (12) Defendant MEGA VARLIK is a Turkish corporation with its principal place of business in the Republic of Turkey; (13) Defendant YILMAZ is a Turkish citizen domiciled in the Republic of Turkey; (14) Defendant ZOUBKOVA is a Turkish citizen domiciled in the Republic of Turkey; (15) Defendant BUKOMBIN is a Turkish corporation with its principal place of business the Republic of Turkey; (16) Defendant NOIL ENERGY is a California limited liability company with its principal place of business in California; (17) Defendant SPEEDY LION was a California limited liability company with its principal place of business in California; (18) Defendant G.T. ENERGY is a Nevada-based limited liability company with its principal place of business in

California; (19) Defendant UNITED FUEL SUPPLY is a California corporation with its principal place of business in California; (20) Defendant ISANNE is a Luxembourg corporate entity with its principal place of business in Luxembourg; (21) Defendant BIOFARMA is a Turkish corporation with its principal place of business in the Republic of Turkey; (22) Defendant BLANE is a Turkish corporation with its principal place of business in the Republic of Turkey; (23) Defendant STONE is a Turkish corporation with its principal place of business in the Republic of Turkey; and (24) Defendant KOMAK is a Turkish corporation with its principal place of business in the Republic of Turkey.

212.   The amount in controversy between the Plaintiff and each Defendant exceeds $75,000, exclusive of interest and costs.

213.   Venue is proper in the Central District of California under 28 U.S.C. § 1391 and Cal. Code Civ. Proc § 410.10 (California Long Arm Statute) because a substantial part of the actions, events or omissions giving rise to the claims occurred in the State of California, and the Defendants committed acts that were experienced, in whole or in part, in the State of California, to include the Central District of California.

## **PERSONAL JURISDICTION**

### **Defendant KORKMAZ**

214.   Exercise of personal jurisdiction over Defendant KORKMAZ is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d); Fed.R.Civ.P. 4(k)(2), and/or via Cal. Code Civ. Proc § 410.10.

215.   Defendant KORKMAZ leads the Turkey-based operations of the RICO Enterprise, which originated in the United States and had significant, ongoing, and enduring operations in the Central District of California.

216.   Defendant KORKMAZ, through Defendant DERMEN, formed Defendant SBK USA, the U.S.-based affiliate of Defendant SBK TURKEY (both of which bear Korkmaz's "SBK" initials), as a California corporation, and

established its principal place of business in the Central District of California at 5801 Randolph Street, Commerce.

217.   Defendants KORKMAZ and DERMEN, acting on behalf of the RICO Enterprise, directed Defendant WASHAKIE to wire $10 million of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme into a bank account held by Defendant SBK USA in the Central District of California to provide the initial funding for Defendant SBK USA's operations.

218.   Defendant KORKMAZ then transacted a sufficient amount of business through Defendant SBK USA in the State of California to receive commendations from both the California State Senate, and the Beverly Hills Chamber of Commerce – a sufficient presence to trigger personal jurisdiction under 18 U.S.C. § 1965(a).

219.   Defendant KORKMAZ also directed a significant amount of mail and wire communications, threats, and other illegal conduct at Dr. Ayasli in the United States, with the understanding that the effects of his conduct would be felt by Dr. Ayasli and his family in the United States – triggering personal jurisdiction over Defendant KORKMAZ under Fed.R.Civ.P. 4(k)(2).

220.   Finally, this Court can also exercise personal jurisdiction over Defendant KORKMAZ pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant DERMEN**

221.   Exercise of personal jurisdiction over Defendant DERMEN is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d); Fed.R.Civ.P. 4(k)(2), and/or via Cal. Code Civ. Proc § 410.10.

222.   Defendant DERMEN is domiciled in the Central District of California.

223.   Defendant DERMEN is the leader of the RICO Enterprise, which originated in the United States and had significant operations in the Central District of California.

224.   Defendant DERMEN controlled multiple businesses operating within the Central District of California that facilitated the RICO Enterprise's money laundering operations, including Defendants NOIL ENERGY, SPEEDY LION, and GT ENERGY.

225.   Defendant DERMEN (and Defendant KORKMAZ) caused Defendant SBK USA, the U.S.-based affiliate of Defendant SBK TURKEY (both of which bear Korkmaz's "SBK" initials), to be formed as a California corporation, and established its principal place of business in the Central District of California at 5801 Randolph Street, Commerce.

226.   Defendant DERMEN (and Defendant KORKMAZ), acting on behalf of the RICO Enterprise, then directed Defendant WASHAKIE to wire $10 million of Fraud Proceeds from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme into a bank account held by SBK USA bank located in the Central District of California to provide initial funding for Defendant SBK USA's operations.

227.   Defendant DERMEN then appointed Defendant KINGSTON as the nominal owner of Defendant SBK USA.

228.   Defendant DERMEN and his son, co-conspirator George Termendzhyan, then used Defendant SBK USA in the business of hard-money lending, conducting that unlicensed business in the Central District of California and elsewhere with the Fraud Proceeds derived from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme.

229.   These contacts are sufficient to establish this Court's personal jurisdiction over Defendant DERMEN pursuant to 18 U.S.C. § 1965(a).

230.   Finally, this Court can also exercise personal jurisdiction over Defendant DERMEN pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant KINGSTON**

231.   Exercise of personal jurisdiction over Defendant KINGSTON is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

232.   Defendant KINGSTON is a central member, and key U.S.-based participant in the RICO Enterprise, who was at times relevant to this Complaint, domiciled in the State of Utah.

233.   Defendant KINGSTON was, however, at times relevant to this Complaint, the owner of Defendant SBK USA, which had its principal place of business in the Central District of California – first in Commerce, and later, in Beverly Hills.

234.   Defendant KINGSTON made many business trips into the Central District of California for the purpose of transacting the business of the RICO Enterprise.  Accordingly, this Court can find personal jurisdiction over Defendant KINGSTON under 18 U.S.C. § 1965(a).  Alternatively, this Court can also exercise personal jurisdiction over Defendant KINGSTON pursuant to 18 U.S.C. § 1965(b) and (d), because the Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), and the "ends of justice" require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant ISAIAH KINGSTON**

235.   Exercise of personal jurisdiction over Defendant ISAIAH KINGSTON is proper pursuant to 18 U.S.C. § 1965(b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

236.   Defendant ISAIAH KINGSTON is a U.S.-based member of the alleged RICO Enterprise who is domiciled in the State of Utah.

237.   At various times relevant to this Complaint, Defendant ISAIAH KINGSTON, transacted business and engaged in illegal conduct in the Central District of California by wiring Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant WASHAKIE into the Central District of California in furtherance of the RICO conspiracy.

238.   Because this Court already has personal jurisdiction over at least one of the RICO Defendants (Defendant DERMEN), the Court can exercise personal jurisdiction over Defendant ISAIAH KINGSTON pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant AKOL**

239.   Exercise of personal jurisdiction over Defendant AKOL is proper pursuant to 18 U.S.C. § 1965(b) and (d); pursuant to Fed.R.Civ.P. 4(k)(2), and/or via Cal. Code Civ. Proc § 410.10.

240.   Defendant AKOL is a member of the RICO Enterprise who is currently domiciled in the State of New Jersey.

241.   At various times relevant to this Complaint, Defendant AKOL was also domiciled in the State of California.

242.   In 2018, Defendant AKOL founded and became Chairman of the Board of RoboAir, Inc., a travel services company with its principal place of business in Palo Alto, California.

243.   At all times relevant to this Complaint, Defendant AKOL was BoraJet's General Manager, living in Istanbul, and managing the day-to-day operations of BoraJet for Dr. Ayasli.

244.   Defendant AKOL later assumed primary responsibility for the negotiation and subsequent sale of BoraJet to Defendant Bugaraj.

245.   In that role, Defendant AKOL made many phone calls, sent many emails, and texted Dr. Ayasli repeatedly in the United States at both Dr. Ayasli's residence in New Hampshire and his office in Massachusetts, in an effort to convince Dr. Ayasli to sell BoraJet to the RICO Enterprise.

246.   Accordingly, this Court can exercise personal jurisdiction over Defendant AKOL pursuant to Fed.R.Civ.P. 4(k)(2), because Defendant AKOL, as a foreign national, purposefully directed his illegal conduct into the United States with the understanding that the effects of his conduct would be felt in the United States.

247.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN) , the Court can also exercise personal jurisdiction over Defendant AKOL pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant OZKARAMAN**

248.   Exercise of personal jurisdiction over Defendant OZKARAMAN is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d) and via Cal. Code Civ. Proc § 410.10.

249.   Defendant OZKARAMAN is domiciled in the Republic of Turkey.

250.   Defendant OZKARAMAN is a Turkey-based member of the RICO Enterprise, a corporate representative of Defendant SBK TURKEY, and a close business associate of Defendant KORKMAZ.

251.   Defendant OZKARAMAN, representing Defendants SBK TURKEY and BUGARAJ was an active participant in the pre-transaction meetings with Defendant AKOL that led to the sale of BoraJet to Defendant BUGARAJ.

252.   Defendant OZKARAMAN later targeted Dr. Ayasli in the United States by making direct threats against Dr. Ayasli's business associates in an effort to attempt to extort money from Dr. Ayasli, and obtain the false testimony of these business associates in support of the RICO Enterprise's sham civil litigations and criminal complaints against Dr. Ayasli in Turkey.

253.   This Court can exercise personal jurisdiction over Defendant OZKARAMAN pursuant to Fed.R.Civ.P. 4(k)(2), because Defendant OZKARAMAN, as a foreign national, purposefully directed his illegal conduct into the United States with the understanding that the effects of his conduct would be felt in the United States.

254.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can exercise personal jurisdiction over Defendant OZKARAMAN pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

255.   Defendant OZKARAMAN previously defaulted in the New Hampshire forum.  The procedural default against him was transferred, with the rest of this case, to this forum to ensure that all of these matters could be handled in one jurisdiction.

**Defendant WASHAKIE**

256.   Exercise of personal jurisdiction over Defendant WASHAKIE is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

257.   Defendant WASHAKIE is a Utah limited liability company with a principal place of business at 624 N. 300 W, Salt Lake City, UT, 84103-1308.

258.   Defendant WASHAKIE, a U.S.-based member of the RICO Enterprise, was the funding source for the RICO Enterprise, receiving more than $470 million in fraudulently-obtained fuel tax credit proceeds from the U.S Government pursuant to the RICO Enterprise's U.S.-based Fraudulent Fuel Tax Credit Scheme

259.   For the purpose of laundering the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme, Defendants KORKMAZ and DERMEN directed Defendants KINGSTON and ISAIAH KINGSTON, through Defendant WASHAKIE, to wire transfer approximately $367 million of the Fraud Proceeds to various RICO Enterprise-controlled bank accounts, including bank accounts in the Central District of California controlled by Defendant SBK USA and others.

260.   Defendant WASHAKIE also received $7.1 million in laundered Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant SBK USA.

261.   Defendant WASHAKIE has sufficient contacts with the Central District of California to support a finding of personal jurisdiction under 18 U.S.C. § 1965(a).  Alternatively, however, because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can exercise personal jurisdiction over Defendant WASHAKIE pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise

be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant SBK TURKEY**

262.   Exercise of personal jurisdiction over Defendant SBK TURKEY is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d); Fed.R.Civ.P. 4(k)(2), and/or via Cal. Code Civ. Proc § 410.10.

263.   At times relevant to this Complaint, Defendant SBK TURKEY maintained an office in the Central District of California located at 150 South Rodeo Drive, Suite 260, Beverly Hills, California, subjecting it to the personal jurisdiction of this Court under 18 U.S.C. § 1965(a).

264.   Defendant SBK TURKEY shared this office and business address with Defendant SBK USA.

265.   Defendant SBK TURKEY also advertised this business address on its website.

266.   Defendant SBK TURKEY is a member of the RICO Enterprise.

267.   Defendant SBK TURKEY received wire transfers of tens of millions of dollars of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme – including several wire transfers originating from the Central District of California.

268.   Defendant SBK TURKEY then used those laundered funds to engage in further unlawful activity on behalf of the RICO Enterprise, most notably to fund a media disinformation campaign against Dr. Ayasli and BoraJet in Turkey, to provide the initial funding for Defendant BUGARAJ, the entity which then fraudulently acquired BoraJet from Dr. Ayasli, and, through Defendant BUGARAJ, to fund a number of sham lawsuits against Dr. Ayasli in Turkey

269.   Defendant SBK TURKEY has sufficient contacts with the Central District of California to support a finding of personal jurisdiction under 18 U.S.C. § 1965(a).  Alternatively, however, because this Court already has personal

jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can exercise personal jurisdiction over Defendant SBK TURKEY pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

270.   This Court can exercise personal jurisdiction over Defendant SBK TURKEY pursuant to Fed.R.Civ.P. 4(k)(2), because Defendant SBK TURKEY, as a foreign corporation, purposefully directed its illegal conduct into the United States with the understanding that the effects of its conduct would be felt in the United States.

**Defendant SBK USA**

271.   Exercise of personal jurisdiction over Defendant SBK TURKEY is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

272.   At all times relevant to this Complaint, Defendant SBK USA maintained offices in the Central District of California, first at 5801 Randolph Street in Commerce, and then at 150 South Rodeo Drive, Suite 260, in Beverly Hills.  This is sufficient to vest this Court with personal jurisdiction over Defendant SBK USA pursuant to 18 U.S.C. § 1965(a).

273.   Defendant SBK USA is a U.S.-based member of the RICO Enterprise.

274.   Defendant SBK USA received wire transfers of millions of dollars of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme into its bank accounts located in the Central District of California.

275.   Defendant SBK USA subsequently wired millions of dollars of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from its bank accounts in the Central District of California to entities in the Republic of Turkey – including its affiliate, Defendant SBK TURKEY.

1   276.   These Fraud Proceeds were subsequently used by other members of

2   the RICO Enterprise to further the RICO conspiracy and injure Dr. Ayasli in the

3   United States.

4   277.   Because this Court already has personal jurisdiction over one of the

5   RICO Defendants (Defendant DERMEN), the Court can also exercise personal

6   jurisdiction over Defendant SBK USA pursuant to 18 U.S.C. § 1965(b) and (d) as

7   the "ends of justice" would require such an outcome where (1) there is no district

8   in which all of the RICO Defendants could otherwise be tried together; and (2)

9   judicial economy would be best served by trying all of these Defendants together.

10   278.   Defendant SBK USA previously defaulted in the New Hampshire

11   forum.  The procedural default against it was transferred, with the rest of this case,

12   to this forum to ensure that all of these matters could be handled in one jurisdiction.

13   **Defendant BUGARAJ**

14   279.   Exercise of personal jurisdiction over Defendant BUGARAJ is proper

15   pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d); and via Cal. Code

16   Civ. Proc § 410.10.

17   280.   Defendant BUGARAJ, a Turkish-based member of the RICO

18   Enterprise, is a subsidiary company of Defendants SBK TURKEY and

19   BUKOMBIN – and is the entity that was used by the RICO Enterprise to

20   fraudulently acquire BoraJet from Dr. Ayasli.

21   281.   Defendant BUGARAJ was funded entirely by Fraud Proceeds derived

22   from the U.S.-based Fraudulent Fuel Tax Credit Scheme.

23   282.   Defendant BUGARAJ, through the actions of its officers, executives,

24   employees, agents and/or affiliates, and as part of the RICO Enterprise's overall

25   scheme, extorted and defrauded Dr. Ayasli out of his ownership in BoraJet, and in

26   so doing, harmed Dr. Ayasli in the United States.

27

28

283.   Defendant BUGARAJ also hired American legal counsel and sent legal and "settlement" correspondence relating directly to these matters to Dr. Ayasli in the United States.

284.   Defendant BUGARAJ, thus, subjected itself to personal jurisdiction of the United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

285.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant BUGARAJ pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant MEGA VARLIK**

286.   Exercise of personal jurisdiction over Defendant MEGA VARLIK is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d); and Cal. Code Civ. Proc § 410.10.

287.   Defendant MEGA VARLIK, a Turkey-based member of the RICO Enterprise, received its initial funding from Defendant WASHAKIE, which, acting on behalf of the RICO Enterprise and at the direction of Defendants DERMEN and KORKMAZ, wired $10 million of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to Defendant KINGSTON's personal bank account at Garanti Bank in Istanbul.

288.   Defendant KINGSTON, a U.S. citizen and resident of the State of Utah, was the co-founder, Chairman of the Board, and 99 percent majority shareholder of Defendant MEGA VARLIK.

289.   Defendant MEGA VARLIK subsequently caused direct financial injury to Dr. Ayasli in the United States by, acting in concert with and at the direction of the RICO Enterprise, (1) purchasing a loan and other debt of Dr. Ayasli's from Turkish banks; (2) unlawfully accelerating the maturity dates of this

debt; (3) calling for the immediate satisfaction of this debt (against the terms of the debt instruments) and making payment demands on Dr. Ayasli in the United States; and (4) subsequently causing Dr. Ayasli to transfer funds to Defendant MEGA VARLIK from his U.S.-based bank accounts.

290.  In so doing, Defendant MEGA VARLIK subjected itself to personal jurisdiction of the United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

291.  Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant BUGARAJ pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant YILMAZ**

292.  Exercise of personal jurisdiction over Defendant YILMAZ is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d); and via Cal. Code Civ. Proc § 410.10.

293.  Defendant YILMAZ is domiciled in the Republic of Turkey.

294.  Defendant YILMAZ is a Turkey-based member of the RICO Enterprise who, as a corporate representative of Defendant SBK TURKEY, laundered nearly $40 million of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme in the Republic of Turkey from the Republic of Turkey into bank accounts in the Central District of California controlled by Defendants SPEEDY LION and GT ENERGY.

295.  This Court can exercise personal jurisdiction over Defendant YILMAZ pursuant to Fed.R.Civ.P. 4(k)(2), because Defendant YILMAZ, as a foreign national, purposefully directed his illegal conduct into the United States with the understanding that the effects of his conduct would be felt in the United States.

296.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN) , the Court can exercise personal jurisdiction over Defendant YILMAZ pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

### Defendant ZOUBKOVA

297.   Exercise of personal jurisdiction over Defendant ZOUBKOVA is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d), and via Cal. Code Civ. Proc § 410.10.

298.   Defendant ZOUBKOVA is domiciled in the Republic of Turkey.

299.   Defendant ZOUBKOVA is a Turkey-based member of the RICO Enterprise who has owned Defendant BLANE since acquiring its shares from Defendant KINGSTON in November 2016.

300.   Defendant ZOUBKOVA subsequently used Defendant BLANE to launder more than a million dollars of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant UNITED FUEL SUPPLY into Turkey for the benefit of the RICO Enterprise.

301.   This Court can exercise personal jurisdiction over Defendant ZOUBKOVA pursuant to Fed.R.Civ.P. 4(k)(2), because Defendant ZOUBKOVA, as a foreign national, purposefully directed her illegal conduct into the United States with the understanding that the effects of her conduct would be felt in the United States.

302.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can exercise personal jurisdiction over Defendant ZOUBKOVA pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district

in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant BUKOMBIN**

303.   Exercise of personal jurisdiction over Defendant BUKOMBIN is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d);  and via Cal. Code Civ. Proc § 410.10.

304.   Defendant BUKOMBIN, a Turkish-based member of the RICO Enterprise, is a subsidiary of Defendant SBK TURKEY and the parent company of Defendant BUGARAJ – the entity that was used by the RICO Enterprise to acquire BoraJet from Dr. Ayasli.

305.   Defendant BUKOMBIN was funded entirely by Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme, and was subsequently used to advance the cause of the RICO conspiracy in Turkey that harmed Dr. Ayasli.

306.   This Court can exercise personal jurisdiction over Defendant BUKOMBIN pursuant to Fed.R.Civ.P. 4(k)(2), because Defendant BUKOMBIN, as a foreign corporation, purposefully directed its illegal conduct into the United States with the understanding that the effects of its conduct would be felt in the United States.

307.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant SBK USA pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant NOIL ENERGY**

308.   Defendant NOIL ENERGY is a California corporation with its principal place of business in the Central District of California at 5801 Randolph Street, Commerce, California.

309.   Defendant NOIL ENERGY is a U.S.-based member of the RICO Enterprise.

310.   This Court has personal jurisdiction over Defendant NOIL ENERGY pursuant to 18 U.S.C. § 1965(a).

311.   Defendant NOIL ENERGY was one of the entities involved in the U.S.-based Fraudulent Fuel Tax Credit Scheme used to launder funds for the RICO Enterprise – receiving Fraud Proceeds of more than $1.3 million from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant WASHAKIE into accounts controlled by Defendant NOIL ENERGY in the Central District of California, and subsequently wiring approximately $40 million into various other accounts controlled by the RICO Enterprise, including accounts held by Defendants SBK TURKEY and KOMAK in Turkey where the Fraud Proceeds were subsequently used to damage Dr. Ayasli in furtherance of the RICO conspiracy.

312.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant NOIL ENERGY pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant SPEEDY LION**

313.   Exercise of personal jurisdiction over Defendant SPEEDY LION is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

314.   Defendant SPEEDY LION is a now-dissolved California-based limited liability company which, at times relevant to this Complaint, had its principal place of business in the Central District of California at 1492 South Lorena Street, Los Angeles.

315.   Defendant SPEEDY LION is a U.S.-based member of the RICO Enterprise and was one of the entities used by the Defendants in the U.S.-based Fraudulent Fuel Tax Credit Scheme.

316.   Defendant SPEEDY LION received wire transfers, into its bank accounts in the Central District of California, amounting to more than $38 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise in Turkey.

317.   Accordingly, this Court has personal jurisdiction over Defendant SPEEDY LION pursuant to 18 U.S.C. § 1965(a).

318.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant SPEEDY LION pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant GT ENERGY**

319.   Exercise of personal jurisdiction over Defendant GT ENERGY is proper pursuant to 18 U.S.C. § 1965(a), (b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

320.   Defendant GT ENERGY has its principal place of business in the Central District of California at 5801 Randolph Street, Commerce.

321.   Defendant GT ENERGY is a U.S.-based member of the RICO Enterprise and was one of the entities used by the RICO Enterprise to launder

money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise in the U.S.-based Fraudulent Fuel Tax Credit Scheme.

322.   Defendant GT ENERGY received wire transfers, into its bank accounts in the Central District of California, amounting to more than $43 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise in Turkey, including accounts held by Defendant SBK TURKEY.

323.   Defendant GT ENERGY also laundered approximately $23 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from its accounts in the Central District of California into an account controlled by Defendant SBK TURKEY.

324.   Accordingly, this Court has personal jurisdiction over Defendant GT ENERGY pursuant to 18 U.S.C. § 1965(a).

325.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant GT ENERGY pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

**Defendant UNITED FUEL SUPPLY**

326.   Exercise of personal jurisdiction over Defendant UNITED FUEL SUPPLY is proper pursuant to 18 U.S.C. § 1965(b) and (d), and/or via Cal. Code Civ. Proc § 410.10.

327.   Defendant UNITED FUEL SUPPLY is a limited liability company with a principal place of business at 3950 S. 700 E. #202, Salt Lake City, Utah.

328.   Defendant UNITED FUEL SUPPLY is a U.S.-based member of the RICO Enterprise and was one of the entities used by the RICO Enterprise to

launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise in the U.S.-based Fraudulent Fuel Tax Credit Scheme.

329. Defendant UNITED FUEL SUPPLY received at least $10 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from an account controlled by the RICO Enterprise through Defendant WASHAKIE.

330. Defendant UNITED FUEL SUPPLY also laundered approximately $14 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from its accounts in the United States to accounts in Turkey controlled by the RICO Enterprise, including accounts belonging to Defendant KINGSTON.

331. Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant GT ENERGY pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

### Defendant ISANNE

332. Exercise of personal jurisdiction over Defendant ISANNE is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d);  and Cal. Code Civ. Proc § 410.10.

333. Defendant ISANNE is a Luxembourg-based member of the RICO Enterprise, and an affiliate of Defendant SBK TURKEY, with a principal place of business at 46 Avenue John F. Kennedy, Luxembourg.

334. Defendant ISANNE is wholly-owned by Defendant KORKMAZ.

335. Defendant ISANNE is a member of the RICO Enterprise and was one of the entities used by the RICO Enterprise to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise in the U.S.-based Fraudulent Fuel Tax Credit Scheme – receiving at least $56 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from

accounts controlled by the RICO Enterprise, including an account held by Defendant WASHAKIE at Garanti Bank in Turkey, and laundering at least $15 million of those Fraud Proceeds back to an account controlled by Defendant SBK USA in the Central District of California.

336. Defendant ISANNE, thus, subjected itself to personal jurisdiction of the United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

337. Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant ISANNE pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

## Defendant BIOFARMA

338. Exercise of personal jurisdiction over Defendant BIOFARMA is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d); and Cal. Code Civ. Proc § 410.10.

339. Defendant BIOFARMA is a subsidiary of Defendant ISANNE, and an affiliate of Defendant SBK TURKEY, with a principal place of business at Akpinar Mah. Ozmangazi Cad. No:156, Sancaktepe, Istanbul, Turkey.

340. Defendant SBK TURKEY is the sole board member of Defendant BIOFARMA.

341. Defendant BIOFARMA is a member of the RICO Enterprise, and was one of the entities used by the RICO Enterprise to launder money between U.S. and Turkish-based entities and accounts controlled by the RICO Enterprise in the U.S.-based Fraudulent Fuel Tax Credit Scheme.

342. Defendant BIOFARMA, thus, subjected itself to personal jurisdiction of the United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

343.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant BIOFARMA pursuant to 18 U.S.C. § 1965(b) and (d) as the "ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

### Defendant BLANE

344.   Exercise of personal jurisdiction over Defendant BLANE is proper pursuant to Fed.R.Civ.P. 4(k)(2), 18 U.S.C. § 1965(b) and (d); and via Cal. Code Civ. Proc § 410.10.

345.   Defendant BLANE is a Turkey-based affiliate of Defendant SBK TURKEY with a principal place of business at Inonu Cad. No:17 Kat:3 Beylerbeyi Uskudar, Istanbul Turkey.[9]

346.   Defendant BLANE was formerly known as SETAP TEKNOLOJI ("SETAP").  On June 26, 2014, Defendant KINGSTON became the majority shareholder of SETAP.

347.   On July 3, 2015, SETAP changed its name to BLANE.

348.   On November 23, 2015, Defendant ZOUBKOVA became the sole shareholder of BLANE.

349.   Defendant BLANE is a Turkey-based member of the RICO Enterprise, receiving at least $12 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise including those of Defendants WASHAKIE and UNITED FUEL SUPPLY, and laundering approximately $40 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to accounts controlled by the RICO Enterprise,

---

[9] Defendant BLANE shares the same corporate address as Defendant KOMAK.

1   including accounts in the Central District of California controlled by Defendants

2   SPEEDY LION and GT ENERGY.

3        350.   Defendant BLANE, thus, subjected itself to personal jurisdiction of the

4   United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

5        351.   Because this Court already has personal jurisdiction over one of the

6   RICO Defendants (Defendant DERMEN), the Court can also exercise personal

7   jurisdiction over Defendant BLANE pursuant to 18 U.S.C. § 1965(b) and (d) as the

8   "ends of justice" would require such an outcome where (1) there is no district in

9   which all of the RICO Defendants could otherwise be tried together; and (2)

10  judicial economy would be best served by trying all of these Defendants together.

11       352.   At some time after February 2021, Defendant BLANE acknowledged

12  its receipt of these illicit funds and returned an undisclosed amount to the United

13  States Government as part of the Dermen/Kingston posttrial forfeiture proceedings.

**Defendant STONE**

15       353.   Defendant STONE is a Turkey-based affiliate of Defendant SBK

16  TURKEY with a principal place of business at OSB Mah. 20 Cad. 3 Odunpazari,

17  Eskisehir, Turkey.

18       354.   Defendant STONE is a member of the RICO Enterprise, and was used

19  by the RICO Enterprise to launder money between U.S. and Turkish-based entities

20  and accounts controlled by the RICO Enterprise, receiving at least $2 million of the

21  Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from

22  accounts controlled by the RICO Enterprise including accounts controlled by

23  Defendant UNITED FUEL SUPPLY in the United States.

24       355.   Defendant STONE, thus, subjected itself to personal jurisdiction of the

25  United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

26       356.   Because this Court already has personal jurisdiction over one of the

27  RICO Defendants (Defendant DERMEN), the Court can also exercise personal

28  jurisdiction over Defendant BLANE pursuant to 18 U.S.C. § 1965(b) and (d) as the

"ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

357.   At some time after February 2021, Defendant STONE acknowledged its receipt of these illicit funds and forfeited an undisclosed amount of these Fraud Proceeds to the United States Government as part of the Dermen/Kingston posttrial forfeiture proceedings.

### Defendant KOMAK

358.   Defendant KOMAK is a Turkey-based member of the RICO Enterprise and an entity manufacturing thermal insulation products, with a principal place of business at Celiktepe Mah. Inonu Cad. Hosgor Sok. No:3 Kagithane, Istanbul.

359.   Defendant KOMAK was founded on November 3, 2009 by Defendant KORKMAZ, who later transferred his ownership interest in Defendant KOMAK to Defendant OZKARAMAN.

360.   Defendant KOMAK received at least $18 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise including from accounts controlled by Defendant NOIL ENERGY here in the Central District of California.

361.   Defendant KOMAK also received at least $26 million of the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from accounts controlled by the RICO Enterprise including accounts controlled by Defendant NOIL ENERGY here in the Central District of California.

362.   Defendant STONE, thus, subjected itself to personal jurisdiction of the United States Courts pursuant to Fed.R.Civ.P. 4(k)(2).

363.   Because this Court already has personal jurisdiction over one of the RICO Defendants (Defendant DERMEN), the Court can also exercise personal jurisdiction over Defendant BLANE pursuant to 18 U.S.C. § 1965(b) and (d) as the

"ends of justice" would require such an outcome where (1) there is no district in which all of the RICO Defendants could otherwise be tried together; and (2) judicial economy would be best served by trying all of these Defendants together.

## RELEVANT FACTS

### A.   THE RICO ENTERPRISE AND ITS SCHEME AND PURPOSE

364.   The above-mentioned constellation of RICO Defendants and non-party co-conspirators are a group of persons and entities associated together in fact for the shared purpose of carrying out the ongoing enterprise through a multi-faceted campaign of fraud, money laundering, extortion, and subversion of the legal process and institutions.

365.   The RICO Enterprise's campaign involved three main steps.  First, the RICO Enterprise used existing companies to perpetuate the U.S.-based Fraudulent Fuel Tax Credit Scheme in which it defrauded the U.S. Government by falsely claiming more than a billion dollars in tax credits, resulting in the payment of more than $470 million in Fraud Proceeds.

366.   Second, using the Fraud Proceeds to fund its operation, the RICO Enterprise then created and funded additional shell companies both in the United States and overseas, primarily in the Republic of Turkey, to launder the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme

367.   Third, using the Fraud Proceeds, the RICO Enterprise targeted Dr. Ayasli's business and property, namely, his airline, BoraJet, his XRS Global private jet, approximately 150 million dollars' worth of commercial and residential real estate that Dr. Ayasli held in Turkey, and upwards of $100 million dollars held by Dr. Ayasli in financial accounts in the United States.

### 1.   The U.S. Government's Program to Incentivize Biofuel Production

368.   A large percentage of the trucks, construction and farming equipment, and buses used in the United States have diesel engines that consume diesel fuel refined from crude oil called petroleum diesel.

369.    Diesel fuel can also be manufactured from biomass or materials derived from biomass and include biodiesel and renewable diesel.

370.    "Biodiesel" is a renewable, biodegradable liquid fuel manufactured domestically from vegetable oils, animal fats, or recycled restaurant grease that meets certain IRS and Environmental Protection Agency ("EPA") standards.

371.    In its pure form, biodiesel is referred to as *B100* – which is typically used as a blend stock that is mixed with petroleum diesel and used as transportation fuel.

372.    When *B100* biodiesel is blended with 1% petroleum diesel, the resulting biodiesel mixture is referred to as *B99*.

373.    Renewable diesel, sometimes called "green diesel," is a biofuel that is chemically the same as petroleum diesel.

374.    Renewable diesel can be produced from cellulosic biomass materials such as crop residues, wood, sawdust, and switchgrass, and is produced through various thermochemical processes.

375.    Because renewable diesel is chemically the same as petroleum diesel, it may be used in its pure form (called *R100*) or mixed/blended with petroleum diesel similar to biodiesel blending.

376.    When *R100* biodiesel is blended with 1% diesel fuel, the resulting biodiesel mixture is referred to as *R99*.

377.    A Renewable Identification Number ("RIN") is a 38-digit code generated and attached to each batch of biofuel produced by a renewable fuel producer.  RINs are the "currency" of the renewable fuel supply program used to buy, sell, and trade biofuel.

378.    The biodiesel tax credit was established in 2005 by the American Jobs Creation Act of 2004 to reduce dependence on foreign crude oil, decrease greenhouse gas emissions, and increase the amount of renewable fuel used and produced in the United States.

379. The program provided a $1.00 tax credit for every gallon of *B100* and *R100* mixed with regular, crude oil-derived diesel fuel, to create "cleaner" biodiesel and renewable diesel mixtures.

380. The U.S. Internal Revenue Service ("IRS") administered this tax credit program.

381. IRS Form 8849, Claim for Refund of Excise Taxes, was used to claim these tax credits, which were paid by U.S. Treasury check.

**2. The RICO Enterprise Fraudulently Acquires $470 million to Fund Its Operations From The U.S. Treasury Through Its Fraudulent Tax Credit Scheme**

### 1. Defendants KINGSTON and ISAIAH KINGSTON Establish a RIN Fraud Scheme

382. Defendant KINGSTON created Defendant WASHAKIE in 2007 to produce biodiesel.

383. Beginning in 2010, Defendant KINGSTON, in conjunction with Defendant ISAIAH KINGSTON, created false paperwork claiming that Defendant WASHAKIE was producing qualifying biodiesel that he knew was not actually being produced.

384. Defendants KINGSTON and ISAIAH KINGSTON also created false financial transactions substantiated by the false paperwork to establish that qualifying fuel was being produced and sold, when each well knew that qualifying fuel was not being produced or sold.

385. Defendants KINGSTON and ISAIAH KINGSTON claimed RINs, through Defendant WASHAKIE, for fuel that Defendant WASHAKIE did not produce or sell.

### 2. Defendant DERMEN Expands the RIN Fraud Scheme

386. Defendant KINGSTON met Defendant DERMEN in late 2011.

387.   Defendant DERMEN agreed to purchase B99 biodiesel that Defendant KINGSTON had purchased from third parties, and which Defendants DERMEN and KINGSTON knew was not eligible for either tax credits or RINs.

388.   Defendants DERMEN and KINGSTON then created false paperwork purporting to show that Defendant WASHAKIE had produced the B99 biodiesel for Defendant WASHAKIE to fraudulently claim RINs and renewable fuel tax credits for that batch of fuel.

389.   After achieving success with this test transaction, Defendants DERMEN and KINGSTON rapidly scaled up this fraudulent scheme, with Defendant KINGSTON purchasing additional B99 biodiesel from third parties supported by false paperwork to substantiate claims for RINs and the associated renewable fuel tax credits.

390.   During this time, Defendant DERMEN informed Defendant KINGSTON that Defendant DERMEN was "protected" by federal law enforcement and had overseas contacts, both of which would shield the scheme from discovery and enforcement.

391.   Defendants DERMEN and KINGSTON then agreed to share the future proceeds of Defendant WASHAKIE's fraudulent RINs and future renewable fuel tax credits.

### 3.    The "Gulf Project"

392.   The scheme executed by Defendants DERMEN, KINGSTON and ISAIAH KINGSTON had several components, including the creation of (1) false invoices substantiating the purchase of raw materials; (2) false documentation substantiating biofuel production by Defendant WASHAKIE; (3) false paperwork substantiating claims of biofuel production indicated by the import/export rotation of the identical gallons of fuel; and (4) the submission by Defendant WASHAKIE of false Form 8849 claim forms to the IRS to collect fuel tax credits.

393.   Defendants DERMEN and KINGSTON also directed Defendant ISAIAH KINGSTON and others at Defendant WASHAKIE to create false paperwork substantiating that Defendant WASHAKIE was purchasing *B100*, creating qualifying biodiesel, and selling *B99*, to qualify for fuel tax credits.

394.   Defendant KINGSTON also arranged for the rental of shore tanks in Houston, Texas, and for the purchase of *B99* and other products from third parties to rotate fuel between shore tanks to make it falsely appear that transactions involving the purchase and sale of *B100*, *B99*, and other fuel products were taking place.

395.   Defendant KINGSTON and a business associate then caused millions of identical gallons of fuel to be rotated, first from Houston to Panama, where it was falsely documented as a sale of *B99*, and then re-imported into the United States, falsely documented as *B100*, to support the filing of false claims for fuel tax credits.  The RICO Enterprise referred to this rotation of fuel as the "Gulf Project."

396.   Although no qualifying fuel was ever either produced or sold during this scheme, at least a hundred million gallons of mixed fuel product were rotated between tanks in Texas, Louisiana, and Panama to create the illusion that legitimate transactions had occurred.

397.   In 2013, Defendants DERMEN, KINGSTON and ISAIAH KINGSTON, through Defendant WASHAKIE, claimed over $272 million in fraudulent renewable fuel tax credits based on the false paperwork supporting these fictitious transactions.

398.   In early 2015, Defendants DERMEN and KINGSTON, through Defendant WASHAKIE, filed for another $170 million of false renewable fuel tax credits for 2014.

399.   During the Gulf Project, Defendant KINGSTON cycled funds between Defendant WASHAKIE, Defendant UNITED FUEL SUPPLY, and various other entities to fraudulently create the appearance that Defendant WASHAKIE and

1    Defendant UNITED FUEL SUPPLY were making and collecting payments related

2    to qualifying biofuel transactions.

3        400.   Defendants KINGSTON and ISAIAH KINGSTON participated in the

4    cycling of funds and creation of false invoices and other paperwork, knowing that

5    the cycling was intended to fraudulently create the appearance of qualifying fuel tax

6    credit transactions.

7        401.   At the direction of Defendant DERMEN, Defendants KINGSTON and

8    ISAIAH KINGSTON, prepared and filed, or caused to be filed, by mail at least

9    nineteen Forms 8849 falsely claiming over $1.1 billion in fuel tax credits.  Those

10   nineteen Forms 8849 were as follows:

| Count | Date | Filer | False Item(s) Claimed | Amount of Credit Claimed |
|---|---|---|---|---|
| 2 | 2/13/13 | Washakie | Line 2a – Biodiesel mixtures | $3,901,235 |
| 3 | 2/25/13 | Washakie | Line 2a – Biodiesel mixtures | $640,959 |
| 4 | 3/11/13 | Washakie | Line 3f – Liquid fuel derived from biomass | $20,283,659 |
| 5 | 3/12/13 | Washakie | Line 2a – Biodiesel mixtures Line 3f – Liquid fuel derived from biomass | $806,041 $3,600,000 |
| 6 | 3/27/13 | Washakie | Line 2a – Biodiesel mixtures Line 3f – Liquid fuel derived from biomass | $2,398,274 $6,461,246 |
| 7 | 4/17/13 | Washakie | Line 3f – Liquid fuel derived from biomass | $11,872,884 |
| 8 | 5/20/13 | Washakie | Line 2a – Biodiesel mixtures | $11,700,000 |
| 9 | 6/3/13 | Washakie | Line 2a – Biodiesel mixtures | $11,400,000 |
| 10 | 7/29/13 | Washakie | Line 2b – Agri-biodiesel mixtures | $25,800,000 |
| 11 | 8/13/13 | Washakie | Line 2a – Biodiesel mixtures | $16,200,000 |
| 12 | 9/05/13 | Washakie | Line 2a – Biodiesel mixtures | $35,008,437 |
| 13 | 9/30/13 | Washakie | Line 2b – Agr—biodiesel mixtures | $33,465,236 |
| 14 | 10/20/13 | Washakie | Line 2a – Biodiesel mixtures | $33,581,899 |
| 15 | 11/17/13 | Washakie | Line 2a – Biodiesel mixtures | $38,078,529 |
| 16 | 12/09/13 | Washakie | Line 2a – Biodiesel mixtures | $33,579,440 |
| 17 | 12/24/13 | Washakie | Line 2a – Biodiesel mixtures | $21,789,321 |
| 18 | 2/11/15 | Washakie | Line 2a – Biodiesel mixtures | $170,302,364 |
| 19 | 1/20/16 | Washakie | Line 2a – Biodiesel mixtures | $322,900,000 |
| 20 | 2/4/16 | UFS | Line 2a – Biodiesel mixtures | $321,573,260 |
|  |  |  | **TOTAL:** | **$1,125,342,784** |

402.   In turn, Defendant WASHAKIE received 20 U.S. Treasury checks by mail totaling $470,871,883 to which it was not entitled on the dates and in the amounts set forth in the table below:

| Date Paid | Payor | Payee | Amount |
|-----------|-------|-------|--------|
| 3/21/13 | U.S. Treasury | WASHAKIE | $640,959 |
| 3/27/13 | U.S. Treasury | WASHAKIE | $20,283,659 |
| 3/27/13 | U.S. Treasury | WASHAKIE | $4,408,041 |
| 4/8/13 | U.S. Treasury | WASHAKIE | $8,859,520 |
| 5/24/13 | U.S. Treasury | WASHAKIE | $11,872,884 |
| 6/10/13 | U.S. Treasury | WASHAKIE | $11,700,000 |
| 6/17/13 | U.S. Treasury | WASHAKIE | $11,400,000 |
| 8/9/13 | U.S. Treasury | WASHAKIE | $25,800,000 |
| 8/27/13 | U.S. Treasury | WASHAKIE | $16,200,000 |
| 9/16/13 | U.S. Treasury | WASHAKIE | $35,008,437 |
| 10/22/13 | U.S. Treasury | WASHAKIE | $33,465,235 |
| 11/12/13 | U.S. Treasury | WASHAKIE | $33,581,899 |
| 12/2/13 | U.S. Treasury | WASHAKIE | $38,078,529 |
| 12/26/13 | U.S. Treasury | WASHAKIE | $33,578,660 |
| 1/13/14 | U.S. Treasury | WASHAKIE | $21,789,321 |
| 3/16/15 | U.S. Treasury | WASHAKIE | $82,102,840 |
| 3/16/15 | U.S. Treasury | WASHAKIE | $82,102,840 |
| | | **TOTAL:** | **$470,871,883** |

**3.     The RICO Enterprise then Laundered these Illicit Tax Credit Payments through a Series of Bank Accounts and Companies Controlled by the RICO Enterprise in the United States, the Republic of Turkey, and Elsewhere**

403.   Beginning in 2013, Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON then devised a separate but related scheme to launder the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme through a series of transactions involving U.S.-based bank accounts and companies, Turkish-based bank accounts and companies, and other foreign entities that they, or other members of the RICO Enterprise, created or controlled.

404.   Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON participated in no fewer than 56 such transfers, laundering in excess of $367 million of Fraud Proceeds on the dates and in the amounts set forth in the table below:

| Date | Payor | Payee | Amount |
|------|-------|-------|--------|
| April 8, 2013 | WASHAKIE | NOIL ENERGY | $1,324,670 |
| April 8, 2013 | WASHAKIE | UNITED FUEL SUPPLY | $10,000,000 |
| April 15, 2013 | UNITED FUEL SUPPLY | MERRILL LYNCH #4805 | $10,000,000 |
| September 9, 2013 | WASHAKIE | KOMAK | $4,000,000 |
| September 9, 2013 | WASHAKIE | KOMAK | $5,000,000 |
| September 12, 2013 | KOMAK | SPEEDY LION | $4,999,964 |
| September 17, 2013 | KOMAK | SPEEDY LION | $1,999,964 |
| September 19, 2013 | KOMAK | SPEEDY LION | $1,999,964 |
| November 13, 2013 | WASHAKIE | SBK TURKEY | $10,000,000 |
| December 31, 2013 | WASHAKIE | KOMAK | $13,000,000 |
| January 17, 2014 | WASHAKIE | SBK USA | $10,000,000 |
| January 21, 2014 | KOMAK | SPEEDY LION | $9,000,000 |
| March 5, 2014 | WASHAKIE | DERMEN (VAT – MV mansion) | $483,000 |
| March 12, 2014 | WASHAKIE | KINGSTON (Mega Varlik's initial funding) | $10,000,000 |
| March 24, 2014 | WASHAKIE | BLANE | $4,055,700 |
| March 24, 2014 | WASHAKIE | BLANE | $5,000,000 |
| May 9, 2014 | WASHAKIE | BLANE | $2,000,000 |
| August 21, 2014 | SBK USA | WASHAKIE | $5,000,000 |
| March 20, 2015 | WASHAKIE | SBK USA | $8,550,000 |
| March 26, 2015 | SBK USA | Huntington Beach, CA property | $3,520,085 |
| April 28, 2015 | WASHAKIE | Garanti Bank (Turkey) | $15,000,000 |
| May 19, 2015 | WASHAKIE | ISANNE (Garanti) | $35,000,000 |
| May 27, 2015 | WASHAKIE | ISANNE (Garanti) | $21,300,000 |
| June 3, 2015 | WASHAKIE | SBK USA | $10,000,000 |
| June 11, 2015 | WASHAKIE | Garanti Bank (Turkey) | $200,000 |
| June 22, 2015 | WASHAKIE | SBK USA | $5,000,000 |
| June 22, 2015 | BLANE | SPEEDY LION | $6,999,950 |
| June 23, 2015 | BLANE | SPEEDY LION | $12,999,950 |
| July 3, 2015 | ISANNE (Garanti) | SBK USA | $15,000,000 |
| July 6, 2015 | WASHAKIE | SBK USA | $2,000,000 |
| September 23, 2015 | KORKMAZ (Garanti) | KORKMAZ/DERMEN JA-BOA | $6,000,000 |
| October 16, 2015 | KORKMAZ (Garanti) | KORKMAZ/DERMEN JA-BOA | $4,000,000 |

| Date | Payor | Payee | Amount |
|---|---|---|---|
| October 27, 2015 | NOIL ENERGY | SBK TURKEY/KOMAK JA-G | $6,999,950 |
| October 28, 2015 | NOIL ENERGY | SBK TURKEY/KOMAK JA-G | $12,999,950 |
| November 3, 2015 | BLANE | GT ENERGY | $19,999,950 |
| December 10, 2015 | SBK USA | WASHAKIE | $2,100,000 |
| December 14, 2015 | WASHAKIE | KINGSTON (Garanti) | $2,100,000 |
| December 28, 2015 | WASHAKIE | KINGSTON (Garanti) | $6,900,000 |
| December 28, 2015 | SBK USA | SBK TURKEY | $14,000,000 |
| February 17, 2016 | NOIL ENERGY | SBK TURKEY | $3,885,135 |
| March 22, 2016 | NOIL ENERGY | KOMAK | $3,810,000 |
| March 25, 2016 | SBK USA | SBK TURKEY | $458,000 |
| September 28, 2016 | NOIL ENERGY | SBK TURKEY | $11,000,000 |
| October 21, 2016 | SBK USA | SBK TURKEY | $6,000,000 |
| November 8, 2016 | SBK USA | SBK TURKEY | $15,000,000 |
| November 8, 2016 | SBK USA | SBK TURKEY | $265,000 |
| February 12, 2018 | WASHAKIE | KINGSTON (Garanti) | $1,000,000 |
| February 13, 2018 | WASHAKIE | KINGSTON (Garanti) | $1,000,000 |
| May 7, 2018 | UNITED FUEL SUPPLY | KINGSTON (Garanti) | $350,000 |
| May 8, 2018 | UNITED FUEL SUPPLY | KINGSTON (Garanti) | $400,000 |
| June 21, 2018 | UNITED FUEL SUPPLY | STONE | $250,000 |
| June 28, 2018 | UNITED FUEL SUPPLY | STONE | $100,000 |
| July 18, 2018 | UNITED FUEL SUPPLY | STONE | $1,500,000 |
| August 6, 2018 | UNITED FUEL SUPPLY | STONE | $100,000 |
| August 8, 2018 | UNITED FUEL SUPPLY | STONE | $100,000 |

| Date | Payor | Payee | Amount |
|---|---|---|---|
| August 15, 2018 | UNITED FUEL SUPPLY | BLANE | $1,200,000 |

## COMPANIES FOUNDED AND/OR FUNDED USING FRAUD PROCEEDS

405.   Utilizing their vast reserves of Fraud Proceeds, Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON founded and/or funded a series of companies in the United States and Turkey including Defendants SBK TURKEY, SBK USA, BUKOMBIN, BUGARAJ, MEGA VARLIK, ISANNE, BIOFARMA, BLANE, STONE and KOMAK, which would be utilized by the RICO Enterprise in its criminal operations, including its money laundering schemes.

### SBK TURKEY

406.   On March 8, 2013, and in furtherance of this overall scheme, Defendant KORKMAZ, acting on behalf of the RICO Enterprise, formed Defendant SBK TURKEY.

407.   On November 13, 2013, Defendant WASHAKIE, acting on behalf of the RICO Enterprise and at Defendant KORKMAZ's direction, wired $10 million of Fraud Proceeds from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme to provide initial funding for Defendant SBK TURKEY.

408.   Prior to receiving its initial funding from these Fraud Proceeds, Defendant SBK TURKEY had no other operating capital, and was not active.

409.   In fact, in a Turkish interview with Number 1 Star posted on YouTube, Defendant KORKMAZ notes that Defendant SBK TURKEY does "not have problems with funding, we have Mormon backers.  Our funding source is the Mormons. . . ." acknowledging his connection with the RICO Enterprise and specifically with Defendants KINGSTON and ISAIAH KINGSTON, who are part of the Mormon sect known as The Order.

410.   Defendant KORKMAZ has acknowledged, in a sworn declaration filed earlier in this case, that he has been the "sole owner and chairman of the board" of SBK TURKEY "since the formation of that company on March 8, 2013."

**SBK USA**

411.   Less than one month later, on December 6, 2013, Defendant DERMEN, acting on behalf of the RICO Enterprise, formed Defendant SBK USA.

412.   Defendant DERMEN appointed Defendant KINGSTON as the nominal "owner" of SBK USA.

413.   As was done with Defendant SBK TURKEY, Defendant WASHAKIE, acting on behalf of the RICO Enterprise and at Defendants DERMEN's and KORKMAZ's direction, wired $10 million of Fraud Proceeds from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme to provide initial funding for Defendant SBK USA on January 7, 2014.

414.   Prior to receiving its initial funding from these Fraud Proceeds, Defendant SBK USA had no other operating capital and was not active.

415.   Defendant SBK USA, although it never applied for any of the required licenses to operate, entered the business of hard-money lending, conducting that business with the Fraud Proceeds derived from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme in the Central District of California and beyond.

**BUKOMBIN**

416.   On July 15, 2015, Defendant KORKMAZ, through Defendant SBK TURKEY and acting on behalf of the RICO Enterprise, formed Defendant BUKOMBIN.

417.   Defendant KORKMAZ, through Defendant SBK TURKEY, subsequently funded Defendant BUKOMBIN using one million Turkish lira[10]

---

[10] All value designations of Turkish lira reflect approximate exchange rates existing at the

(approximately $360,000) of Defendant SBK TURKEY's funding derived from Fraud Proceeds originating in the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme.

## BUGARAJ

418.  On August 8, 2015, Defendant KORKMAZ, through Defendant SBK TURKEY and Defendant BUKOMBIN, and acting on behalf of the RICO Enterprise, formed Defendant BUGARAJ.

419.  As was done with Defendant BUKOMBIN, Defendant KORKMAZ, through Defendant SBK TURKEY, subsequently funded Defendant BUGARAJ using one million Turkish lira (approximately $360,000) of Defendant SBK TURKEY's funding derived from fraud proceeds originating in the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme.

## MEGA VARLIK

420.  On June 11, 2015, Defendant KINGSTON, at the direction of Defendants KORKMAZ and DERMEN, and on behalf of the RICO Enterprise, founded Defendant MEGA VARLIK.

421.  As was done with Defendant SBK TURKEY and Defendant SBK USA, Defendant WASHAKIE, acting on behalf of the RICO Enterprise and at Defendant DERMEN's direction, wired $10 million of Fraud Proceeds originating from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme to Defendant KINGSTON'S personal bank account at Garanti Bank in Istanbul – which Defendant KORKMAZ controlled – to provide the initial funding for Defendant MEGA VARLIK.

422.  Prior to receiving its initial funding from these Fraud Proceeds, Defendant MEGA VARLIK had no other operating capital and was not active.

time of the relevant transactions.

**ISANNE**

423.   On October 14, 2014, Defendant KORKMAZ, through Defendant SBK TURKEY, purchased all of the shares of Defendant ISANNE for approximately $639,400 using Fraud Proceeds derived from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme.

424.   On June 9, 2015, Defendant KORKMAZ, through Defendant SBK TURKEY, then caused Defendant ISANNE to issue 1,126,000 new shares of stock with a par value of $50 each, and purchased all 1,126,000 of those shares using an additional $56,300,000 of Fraud Proceeds from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme, which consisted of payments of $35,000,000 and $21,300,000 wired by Defendant Washakie on May 19, 2015 and May 27, 2015.

**BIOFARMA**

425.   According to official Turkish Commercial Gazette Records, as of July 4, 2014, Defendant ISANNE became the sole shareholder of Defendant BIOFARMA.

426.   As such, when Defendant SBK TURKEY purchased all of the outstanding shares of Defendant ISANNE on October 14, 2014, Defendant SBK TURKEY likewise became the parent company of Defendant BIOFARMA.

427.   Pursuant to a November 25, 2014 board resolution documented in the official Turkish Commercial Gazette Records, Defendant SBK TURKEY became the sole shareholder of Defendant BIOFARMA and was authorized to represent the company.  Defendant KORKMAZ signed that board resolution.

428.   On December 30, 2015, Defendant KORKMAZ's business associate and non-party co-conspirator Caglar Sendil signed a resolution on behalf of Defendant SBK TURKEY appointing himself as Chairman of the Board of Defendant BIOFARMA and vesting himself with the authority to bind the company.

429.   On December 30, 2015, Defendant KORKMAZ, acting through Defendant SBK TURKEY, increased Defendant BIOFARMA's registered capital from 115,987,750 Turkish liras (approximately $39,435,835) to 278,387,750 Turkish liras (approximately $94,651,835).

430.   In so doing, Defendant KORKMAZ, through Defendant SBK Turkey, infused Defendant BIOFARMA with an additional 162,400,000 Turkish liras, or approximately $55,216,000, of Fraud Proceeds derived from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme.

### BLANE f/k/a SETAP

431.   On December 11, 2013, Defendant KORKMAZ, on behalf of the RICO Enterprise, formed Defendant BLANE f/k/a SETAP with an initial capitalization of 5 million Turkish liras (approximately $2,450,980) of Fraud Proceeds derived from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme.

432.   Prior to receiving its initial funding from these Fraud Proceeds, Defendant BLANE had no other operating capital and was not active.

433.   In March and May 2014, Defendant KINGSTON, through Defendant WASHAKIE, transferred more than $11,000,000 of Fraud Proceeds from the RICO Enterprise's U.S.-Based Fraudulent Fuel Tax Credit Scheme to Defendant BLANE.

434.   According to the minutes of Defendant BLANE's June 12, 2014 board meeting contained in the official Turkish Commercial Gazette Records, Defendant KINGSTON obtained the majority interest in BLANE, and increased the company's registered capital to 25,000,000 Turkish lyra (approximately $9,250,000).

### The ISPAT Press Release

435.   On September 9, 2016, Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON, acting through Defendant SBK TURKEY, issued a joint press release published on the website of the Republic of Turkey's

Prime Ministry Investment Support and Promotion Agency ("ISPAT"), ("ISPAT Press Release"), touting their U.S.-based investments in various Turkish companies.

436.   The ISPAT Press Release heralds that Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON, as well as Defendants WASHAKIE, SBK USA and NOIL ENERGY, acting through Defendant SBK TURKEY, invested "$500 million" U.S. dollars in Turkish companies including Defendants BUKOMBIN, BUGARAJ, BIOFARMA and BLANE since 2013.

437.   Subsequent Turkish news articles touted this "exciting investment" of funds in Turkey and included photographs of various RICO Defendants, including Defendants KORKMAZ and KINGSTON.  These photos were republished many times in the Turkish media, giving the members of the RICO Enterprise and their affiliated companies a heightened appearance of legitimacy.

**1.     Related Criminal Proceedings Involving RICO Enterprise Members (to date)**

**1.     U.S.-based Criminal Indictments**

438.   On January 17, 2019, a grand jury in the United States District Court for the District of Utah issued a Second Superseding Indictment charging Defendants DERMEN, KINGSTON, and ISAIAH KINGSTON, among others, for their roles in conducting the U.S.-Based Fraudulent Fuel Tax Credit Scheme.

439.   The indictment charged Defendants DERMEN, KINGSTON, and ISAIAH KINGSTON with the following offenses:

(1)     conspiracy to commit mail fraud, in violation of Title 18, United States Code, Section 1349 (Count 1)

(2)     aiding in the preparation and filing of a false claim, in violation of Title 26, United States Code, Section 7206(2) (Counts 2-20);

(3)     conspiracy to commit concealment money laundering offenses, in violation of Title 18, United States Code, Section 1956(h) (Count 23)

(4)     conspiracy to commit international concealment and expenditure money laundering offenses, in violation of Title 18, United

States Code, Section 1956(h) (Count 24)

(5)   various other money laundering offenses, in violation of Title 18, United States Code, Sections 1956, 1957 (Counts 25-43)

(6)   conspiracy to commit obstruction of justice offenses, in violation of Title 18, United States Code, Sections 1512(k) (Count 44)

(7)   destroying and concealing records and objects, in violation of Title 18, United States Code, Section 1512(c)(1) (Count 45); and

(8)   threat of use of force or attempted use of force to influence a witness in an official proceeding, in violation of Title 18, United States Code, Section 1512(a)(2) (Count 46).

*United States v. Kingston, et al*, 18-CR-00365-JNP-BCW ("Dermen/Kingston Criminal Proceeding").

### Defendant KINGSTON's Plea Agreement

440.   On July 18, 2019, Defendant KINGSTON pled guilty, pursuant to a cooperation plea agreement, to each of the 35 felony counts with which he was charged:

(1)   one count of conspiracy to commit mail fraud (Count 1);

(2)   19 counts of aiding in the filing of a false claim (Counts 2-20);

(3)   three counts of conspiracy to commit money laundering (Counts 23-25);

(4)   three counts of concealment money laundering, including international concealment money laundering (Counts 27-29);

(5)   nine counts of expenditure money laundering (Count 31-42); and

(6)   three counts of obstruction of justice (Count 44-46).

441.   As part of the factual basis to the plea agreement, Defendant KINGSTON admitted to the U.S.-Based Fraudulent Fuel Tax Credit Scheme, and to laundering "over $100 million in international wire transfers designed to conceal the location and ownership of these Fraud Proceeds" through a series of accounts in Turkey.

442.   Defendant KINGSTON is incarcerated and awaiting sentencing.

**Defendant ISAIAH KINGSTON's Plea Agreement**

443. On July 18, 2019, Defendant ISAIAH KINGSTON pled guilty, pursuant to a cooperation plea agreement, to all but one of the 19 felony counts with which he was charged:

        (1)    one count of conspiracy to commit mail fraud (Count 1);

        (2)    two counts of aiding in the filing of a false claim (Counts 21-22);

        (3)    three counts of conspiracy to commit money laundering (Counts 23-25);

        (4)    one count of concealment money laundering, including international concealment money laundering (Count 31);

        (5)    nine counts of expenditure money laundering (Counts 33-42); and

        (6)    two counts of obstruction of justice (Counts 44-45).

444. As part of the factual basis to the plea agreement, Defendant ISAIAH KINGSTON admitted to the U.S.-Based Fraudulent Fuel Tax Credit Scheme, and to transferring "fraudulent proceeds of the scheme outside of the United States, including to various accounts in Turkey and Luxembourg."

445. Defendant ISAIAH KINGSTON presently is incarcerated and awaiting sentencing.

**Defendant DERMEN Convicted on all Ten Felony Counts at Trial**

446. Defendant DERMEN proceeded to trial, and on March 16, 2020, a jury found him guilty of all ten felony counts on which he was charged, including:

        (1)    conspiracy to commit mail fraud (Count 1);

        (2)    conspiracy to commit money laundering, including international concealment money laundering (Count 24);

        (3)    six counts of concealment money laundering (Counts 26-30, 32); and

        (4)    two counts of expenditure money laundering (Counts 42-43).

447.   Defendant DERMEN is presently incarcerated and awaiting sentencing.

448.   In support of its efforts to gain forfeiture of properties from Defendant DERMEN following his criminal conviction, the U.S. government sought, "Any property traceable to such property transferred to SBK Holding, AS, including the following … assets…:  The SBK Jet, Tail # TC-YYA, Bombardier Global XRS sn9356," which was Dr. Ayasli's XRS executive jet obtained by the RICO Enterprise as part of the fraudulent BoraJet transaction.

449.   In the forfeiture trial on November 19, 2021, a U.S. government witness testified that while Defendant DERMEN's homes and businesses were being searched pursuant to a state search warrant in August 2017, Defendant DERMEN fled the United States for Turkey on the "SBK Jet", the XRS Global business jet, which was obtained by the RICO Enterprise as part of the BoraJet transaction.[11]

**Defendant KORKMAZ Indicted in the United States on Related Charges**

450.   On April 28, 2021, a grand jury in the United States District Court for the District of Utah issued a First Superseding Indictment charging Defendant KORKMAZ with:

 (1) one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count 1);

 (2) ten counts of wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 2-11); and

 (3) one count of obstruction of justice, in violation of Title 18, United States Code, Section 1512 (Count 2); and

all in connection with the RICO Enterprise's fuel tax and money laundering schemes.

---

[11] At the time, Customs and Border Patrol agents reported that they had observed the tail of the XRS Global aircraft decorated with a logo reading "SBK."

451.   The indictment against Defendant KORKMAZ was unsealed on June 21, 2021 following Defendant KORKMAZ's arrest as a fugitive from justice in Austria on a warrant issued by the United States Department of Justice and Defendant KORKMAZ now is detained in Utah while pending trial.

452.   In a press release announcing Defendant KORKMAZ's extradition, the U.S. Department of Justice stated that, "Korkmaz and his co-conspirators allegedly used the biofuel fraud proceeds to acquire luxury homes and assets as well as … the Turkish airline Borajet..."

**Factual Allegations from the KORKMAZ Indictment**

453.   Among other facts, Defendant KORKMAZ's indictment alleges the following: From March 2013 through December 2020, Defendant KORKMAZ, both individually and with his co-conspirators, including Defendant DERMEN, knowingly laundered the proceeds of the U.S.-based Fraudulent Fuel Tax Credit Scheme through financial transactions transmitting the Fraud Proceeds from the United States to businesses or accounts controlled by Defendant KORKMAZ or his associates in Turkey and Luxembourg, to conceal the illicit source of the funds.

454.   Defendant KORKMAZ was the 100% owner of the following entities, and controlled bank accounts maintained in the names of these entities in the following countries:

| Name of Entity | Country |
|---|---|
| SBK Turkey | Turkey |
| Biofarma | Turkey |
| Isanne | Luxembourg |

455.   Defendant KORKMAZ also controlled, either directly or through associates, other

bank accounts in Turkey maintained by the following entities:

      a.   Defendant KOMAK

      b.   Defendant SETAP

c.    Defendant BLANE

d.    Defendant MEGA VARLIK

e.    Defendant KINGSTON

f.    Defendant YILMAZ

456.   Defendant KORKMAZ, or co-conspirators acting at his direction, transferred or caused to be transferred, Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme from Defendant WASHAKIE's bank accounts in the United States to bank accounts located in Turkey and Luxembourg.  These recipient bank accounts were held by entities controlled by Defendant KORKMAZ including Defendants SBK TURKEY, KINGSTON, KOMAK, BLANE and ISANNE, as well as an account held by Defendant KINGSTON at Garanti Bank.

457.   Defendant KORKMAZ, or co-conspirators acting at his direction, transferred or caused to be transferred Fraud Proceeds back to the United States to bank accounts in Los Angeles, California held by entities controlled by Defendant DERMEN, including Defendants SBK USA, SPEEDY LION, and GT ENERGY.

458.   Defendant KORKMAZ and his co-conspirators used bank accounts in Turkey, including bank accounts held by entities controlled by Defendant KORKMAZ in the names of Defendant BIOFARMA and Defendant YILMAZ, to transfer Fraud Proceeds for the purpose of concealing and disguising the true nature and source of the funds being transferred.

459.   Defendant KORKMAZ and his co-conspirators used bank accounts in Turkey, including bank accounts in the names of Defendant KINGSTON and companies held in Defendant KINGSTON's name, including Defendant BLANE f/k/a SETAP and Defendant MEGA VARLIK, to transfer Fraud Proceeds for the purpose of concealing and disguising the true nature and source of the funds being transferred.

460.   Defendant KORKMAZ and his co-conspirators had Defendant KINGSTON execute power of attorney forms shifting control over Defendant

KINGSTON's bank accounts and companies in Turkey to Defendant KORKMAZ and/or his associates, through which Defendant KORKMAZ controlled these accounts and companies.

461.    Defendant KORKMAZ and his co-conspirators characterized the transfers of Fraud Proceeds as loans, share purchases, and loan paybacks for the purpose of concealing and disguising the true nature and source of the funds bring transferred.

462.    Defendant KORKMAZ and his co-conspirators conducted at least 30 transfers totaling $301,315,477 on the dates and in the amounts set forth in the table below between the listed sender and recipient:

| ¶ | Date | Sender (Country) | Recipient (Destination) | Amount Sent to Turkey or Luxembourg | Amount Sent to USA |
|---|------|-------------------|--------------------------|--------------------------------------|---------------------|
| A | 9/9/13 | Washakie (USA) | Komak (Turkey) | $4,000,000 | |
| B | 9/9/13 | Washakie (USA) | Komak (Turkey) | $5,000,000 | |
| C | 9/12/13 | Komak (Turkey) | Speedy Lion (USA) | | $4,999,964 |
| D | 9/17/13 | Komak (Turkey) | Speedy Lion (USA) | | $1,999,964 |
| E | 9/19/13 | Komak (Turkey) | Speedy Lion (USA) | | $1,999,964 |
| F | 11/13/13 | Washakie (USA) | SBK Turkey (Turkey) | $10,000,000 | |
| G | 12/31/13 | Washakie (USA) | Komak (Turkey) | $13,000,000 | |
| H | 1/21/14 | Komak (Turkey) | Speedy Lion (USA) | | $9,000,000 |
| I | 3/12/14 | Washakie (USA) | Jacob Kingston (Turkey) | $10,000,000 | |
| J | 3/24/14 | Washakie (USA) | Blane (Turkey) | $4,055,700 | |
| K | 3/24/14 | Washakie (USA) | Blane (Turkey) | $5,000,000 | |
| L | 5/9/14 | Washakie (USA) | Blane (Turkey) | $2,000,000 | |
| M | 4/28/15 | Washakie (USA) | Garanti Bank (Turkey) | $15,000,000 | |
| N | 5/19/15 | Washakie (USA) | Isanne (Luxembourg) | $35,000,000 | |
| O | 5/27/15 | Washakie (USA) | Isanne (Luxembourg) | $21,300,000 | |
| P | 6/22/15 | Yilmaz (Turkey) | Speedy Lion (USA) | | $6,999,950 |
| Q | 6/23/15 | Yilmaz (Turkey) | Speedy Lion (USA) | | $12,999,950 |
| R | 7/3/15 | Isanne (Luxembourg) | SBK USA (USA) | | $15,000,000 |
| S | 10/27/15 | Speedy Lion (USA) | Yilmaz (Turkey) | $6,999,950 | |
| T | 10/28/15 | Speedy Lion (USA) | Yilmaz (Turkey) | $12,999,950 | |
| U | 11/3/15 | Yilmaz (Turkey) | G.T. Energy (USA) | | $19,999,950 |
| V | 12/14/15 | Washakie (USA) | Jacob Kingston (Turkey) | $2,100,000 | |
| W | 12/28/15 | Washakie (USA) | Jacob Kingston (Turkey) | $6,900,000 | |
| X | 2/17/16 | Noil Energy Group (USA) | SBK Turkey (Turkey) | $3,885,135 | |
| Y | 3/22/16 | Noil Energy Group (USA) | Komak (Turkey) | $3,810,000 | |
| Z | 6/9/16 | G.T. Energy (USA) | SBK Turkey (Turkey) | $23,000,000 | |

| ¶ | Date | Sender (Country) | Recipient (Destination) | Amount Sent to Turkey or Luxembourg | Amount Sent to USA |
|---|------|------------------|-------------------------|--------------------------------------|--------------------|
| AA | 6/10/16 | SBK Turkey (Turkey) | G.T. Energy (USA) | | $23,000,000 |
| BB | 10/21/16 | SBK USA (USA) | SBK Turkey (Turkey) | $6,000,000 | |
| CC | 11/8/16 | SBK USA (USA) | SBK Turkey (Turkey) | $15,000,000 | |
| DD | 11/8/16 | SBK USA (USA) | SBK Turkey (Turkey) | $265,000 | |
| | | | **TOTALS:** | **$205,315,735** | **$95,999,742** |

463.   Defendant KORKMAZ and his co-conspirators used Fraud Proceeds "to invest in various companies, including . . . BIOFARMA . . .BLANE . . .MEGA VARLIK . . . and holding companies in Turkey called BUKOMBIN and BUGARAJ," which were then used "to acquire a Turkish airline called BoraJet; and an aviation company in Turkey names Aydin Jet, which later was changed to SBK Air."

464.   Defendant KORKMAZ and his co-conspirators "used Fraud Proceeds to acquire other assets, including real property in Turkey, a hotel in Turkey, a hospital in Turkey, two hotels in Switzerland, a yacht named the *Queen Anne*, and a villa and an apartment on the Bosphorus in Istanbul, Turkey."

465.   The obstruction count stems from interviews that Defendant KORKMAZ had in April 2019 in Utah with federal prosecutors and agents investigating the underlying conduct addressed in the criminal indictments of Defendants DERMEN, KINGSTON and ISAIAH KINGSTON. During those interviews, Defendant KORKMAZ knowingly and intentionally made a number of material false statements with the intent to obstruct the Kingston/Dermen Criminal Proceeding by concealing the true scope of the RICO Enterprise's money laundering operations.

466.   Defendant KORKMAZ lied to federal prosecutors and agents in stating that Defendant KINGSTON never told him that Defendant KINGSTON was under criminal investigation.

467.   Defendant KORKMAZ lied to federal prosecutors and agents in stating that he sent funds from Defendant KOMAK in Turkey to the United States because Defendant KINGSTON called him and told him that they found "cheaper machinery" in the United States and, therefore, Defendant KINGSTON wanted Defendant KORKMAZ to send the money back to the United States.

468.   Defendant KORKMAZ lied to federal prosecutors and agents in stating that he told Defendant KINGSTON that he (Defendant KORKMAZ) was sending the funds to Defendant DERMEN to purchase "cheaper equipment."

469.   Defendant KORKMAZ lied to federal prosecutors and agents in stating that he used his own money to make a $20 million loan to Defendant DERMEN through Defendant YILMAZ in June 2015.

470.   Defendant KORKMAZ lied to federal prosecutors and agents in stating that Defendant DERMEN repaid this $20 million loan with interest three months later.

471.   Defendant KORKMAZ also lied to federal prosecutors and agents to conceal the true ownership of high value assets purchased with laundered funds when, for example, he stated that he was the sole owner of the Queen Anne yacht.[12] The First Superseding Indictment also includes a forfeiture provision seeking, among other things, "any and all investments made using proceeds, and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[12] The U.S. Government already successfully seized the *Queen Anne,* a yacht named after Defendant DERMEN's daughter, registered in the United States, and used by Defendants DERMEN and KORKMAZ.

any gains from those investments, including investments in . . . MEGA VARLIK[], including investments by SBK [TURKEY]."

### 1. Turkey-based Criminal Indictments

472.   On April 14, 2021, the Turkish Chief Public Prosecutor's Office, Terror Crimes Investigation Bureau issued an indictment against Defendants KORKMAZ, DERMEN, KINGSTON, OZKARAMAN, SBK TURKEY, MEGA VARLIK, YILMAZ, ZOUBKOVA, ISANNE, BIOFARMA, BLANE, and KOMAK.

473.   The individual Defendants were charged with "laundering assets derived from criminal activity" in connection with conduct arising out of the RICO Enterprise's laundering of Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme.  The corporate defendants were deemed "financially liable" for this conduct.

474.   While not charged in this indictment, the U.S.-based corporate Defendants WASHAKIE, SBK USA, NOIL ENERGY, SPEEDY LION, GT ENERGY and UNITED FUEL SUPPLY all were named as being "connected" to this laundering activity via the U.S.-based Fraudulent Fuel Tax Credit Scheme.

475.   An official Turkish Government Report issued in conjunction with this indictment determined that money transfers were made from the U.S.-based corporate Defendants WASHAKIE, NOIL ENERGY, SPEEDY LION, SBK USA, UNITED FUEL SUPPLY, and GT ENERGY to business accounts in Turkey controlled by corporate Defendants SBK TURKEY, MEGA VARLIK, ISANNE, KOMAK, BLANE, and BIOFARMA, as well as to accounts in Turkey controlled by Defendants KORKMAZ, DERMEN, KINGSTON, OZKARAMAN, YILMAZ, and ZOUBKOVA.

476.   The Report found that Defendants DERMEN, KINGSTON and KORKMAZ were all working with Defendant SBK TURKEY as part of the same criminal organization.

477.   The Report concluded that there is concrete evidence that the money transferred to Defendant KORKMAZ were Fraud Proceeds obtained via the U.S.-based Fraudulent Fuel Tax Credit Scheme.

478.   An arrest warrant issued in Turkey for Defendants KORKMAZ, DERMEN, KINGSTON, ISAIAH KINGSTON, OZKARAMAN, YILMAZ, and ZOUBKOVA, alleged that these individuals had committed the crime of Laundering Assets Derived from Criminal Activity as stated in Article 282 of the Turkish Criminal Code.

## A.   PLAINTIFF DR. YALCIN AYASLI

479.   Dr. Yalcin Ayasli was born in Ankara, Turkey in 1946.

480.   He received his Bachelor of Science degree from Middle East Technical University's ("METU") Department of Electrical Engineering in 1968.

481.   Dr. Ayasli then came to the United States for graduate studies, where he earned his MSEE and Sc.D. degrees from the Massachusetts Institute of Technology ("MIT") in 1973.

482.   From 1973-79, Dr. Ayasli returned to Turkey to work as a faculty member and Deputy Department Chair in the Electrical Engineering Department at METU.

483.   Dr. Ayasli returned to the United States in 1979 when he joined Massachusetts-based Raytheon, Inc.

484.   In 1985, Dr. Ayasli founded Hittite Microwave Corporation ("Hittite"), a Chelmsford, Massachusetts-based company which designed and produced components for mobile phones, medical instruments, military and aerospace technology.

485.   Dr. Ayasli served as Hittite's CEO and Chairman of the Board for over 20 years.[13]

---

[13] Dr. Ayasli is a Fellow of the Institute of Electrical and Electronics Engineers ("IEE") and is the developer and holder of 15 U.S. patents.  IIEE Fellows "have accomplishments that have

486.   In connection with Hittite's production of circuitry for military and aerospace technology, Dr. Ayasli held security clearances from the United States government.

487.   Hittite became a publicly-traded company in 2005, and was listed on the NASDAQ exchange.

488.   Dr. Ayasli retired in 2005 but maintained a significant financial stake in Hittite.

489.   In 2014, Hittite was acquired by Analog Devices, Inc. for $2.5 billion USD.

490.   Following his retirement from Hittite, Dr. Ayasli became a well-known philanthropist focused on two primary areas: (1) scientific research and development, and (2) the promotion of cultural exchanges and friendly relations between the United States and Turkey.

491.   Dr. Ayasli and his wife Dr. Serpil Ayasli have endowed educational and research grants at Harvard University, the University of Chicago, and the University of Utah, and underwrote the construction of a new laboratory at MIT, and a new research building and laboratories at METU in Turkey.

492.   In their pursuit of cultural exchange and friendly relations between the United States and Turkey, the Ayaslis founded two public charitable organizations—the Turkish Cultural Foundation in 2000, and the Turkish Coalition of America in 2007.

493.   To date, Dr. Ayasli has donated more than $60 million to these two charities.

---

contributed importantly to the advancement or application of engineering, science, and technology, bringing the realization of significant value to society."

### The Turkish Coalition of America ("TCA")

494.  The TCA's purpose is to educate the public about Turkey, Turkish culture, and Turkish history, and to promote and advance the interests of Turkey and Turkish people in the United States and abroad.

495.  Among its many activities, TCA has facilitated educational tours of Turkey for 180 United States Congressmen and their chiefs of staff, 13 state attorneys general, and dozens of influential Americans.

496.  Since 2007, TCA has provided young Turkish-Americans with 167 internship opportunities, 87 of them in Congressional offices; and nearly 500 scholarships to American students to study in Turkey.

### The Turkish Cultural Foundation ("TCF")

497.  TCF's purpose is to increase knowledge of Turkey's cultural heritage and highlight its contributions to world culture and humanity.

498.  TCF is one of a few cultural non-governmental organizations ("NGOs") worldwide to be awarded the privilege of official relations with UNESCO.[14]

499.  TCF and Armaggan, a Turkish luxury brand of natural dyed textiles and other goods founded by Dr. Ayasli, jointly established the Cultural Heritage Preservation and Natural Dyes Laboratory in Istanbul, which works to preserve and promote Turkey's textile heritage through research and development.  It holds the most extensive collection of natural dye materials in the world and provides free analytical services to museums worldwide seeking to preserve historical textiles.

---

[14] "The United Nations Educational, Scientific and Cultural Organization may make suitable arrangements for consultation and cooperation with non-governmental international organizations concerned with matters within its competence, and may invite them to undertake specific tasks." *See Turkish Cultural Foundation*, UNESCO, https://en.unesco.org/partnerships/non-governmental-organizations/turkish-cultural-foundation, (Nov. 3, 2017 11:54 AM).

500.   TCF has facilitated cultural tours of Turkey for 600 U.S. high school teachers, and has conferred 195 fellowships to build artistic, cultural, and scholarly exchanges across the globe.

501.   TCF has also focused on educating the world about Turkish culture through its web-based content, and lectures on Turkish culture by leading experts and scholars at its Istanbul office, at prestigious institutions worldwide, and via the online TCF Video Gallery.  The TCF website is among the most visited portals on Turkish culture on the Internet and has been accessed by millions of visitors from across the globe.

502.   TCF is also one of the largest private providers of financial support for projects celebrating Turkish culture – providing millions of dollars in grants supporting Turkish music, art festivals and exhibitions around the world.

**1.      Dr. Ayasli's Investments in Turkey**

503.   Beyond the amounts endowing his charitable organizations, Dr. Ayasli has invested more than $390 million in various business interests in Turkey including: (1) the regional airline BoraJet and its affiliates (Aydin Jet and BoraJet Bakim); (2) Armaggan, a luxury retailer which produces and promotes Turkish natural-dyed fabrics, crafts and cuisine; (3) the critically-acclaimed Nar Restaurant in Istanbul; (4) Nar Gourmet, a company that produces, promotes, and sells Turkish cuisine and natural products; and (5) Bora Turizm, a Turkish-based international travel agency.

504.   Dr. Ayasli has also purchased and restored several historically commercial and residential buildings in the Ortakoy, Nurosmaniye and Kandilli districts of Istanbul.

505.   Dr. Ayasli's real estate holdings in Turkey exceed $150 million.

### 1.    BoraJet

506.    In the summer of 2007, with a vision to expand international tourism beyond the reach of traditional air carriers in Turkey, Dr. Ayasli acquired Ovaair Ucak Bakim Onarim ve Havacilik Ticaret Ltd. Sti ("Ovaair").

507.    Ovaair had a license to conduct short-range commercial flights.

508.    After purchasing Ovaair, Dr. Ayasli changed the name of the company to BoraJet.

509.    BoraJet began operating in state-owned airports across Turkey in the fall of 2007, providing access to less-traveled areas of Turkey not serviced by the major international carriers.  BoraJet was the only regionally-operating airline in the Republic of Turkey.

510.    In 2014, Dr. Ayasli founded BoraJet Bakim, a separate corporate entity established to conduct aircraft maintenance.

511.    In 2015, Dr. Ayasli established Aydin Jet, a separate corporate entity created to purchase, hold, and operate a single Bombardier Global XRS aircraft - a large-cabin business jet available for long-range private business travel.

512.    On October 10, 2015, BoraJet signed a letter of intent with Embraer for the purchase of 30 additional jet aircraft worth $991,700,000 with the intent of expanding its fleet to 45 planes and moving from a leased-aircraft to an owned-aircraft business model.  Delivery of the planes was planned for the second half of 2017 in anticipation of the 2018 opening of Istanbul's third international airport.[15]

513.    In the summer of 2015, BoraJet entered into codeshare agreements with Turkish Airlines ("THY") to permit BoraJet to fly routes under the banner of

---

[15] On November 2, 2018, the Istanbul Airport opened and was promoted as the beginning of "The golden age of Turkish Aviation Industry."  *See* Press Release dated Nov. 2, 2018 at https://www.igairport.com/en/press-releases/the-golden-age-of-turkish-aviation-ndustry-is-coming-on-the-95th-anniversary-of-the-foundation-of-the-republic (last visited on Jan. 29, 2019).

THY subsidiary AnadoluJet, which provided significant prestige in the Turkish and international commercial aviation markets.

514.   In the Spring of 2016, BoraJet negotiated and executed a service contract with the Turkish government to perform maintenance on passenger aircraft belonging to the Turkish Navy stationed at the Topel Naval Air Station in Kocaeli (Turkey).

515.   In 2016, BoraJet also entered into a significant marketing sponsorship arrangement with the famed Istanbul-based sports club Fenerbahce, pursuant to which BoraJet transported the Fenerbahce soccer team to its European matches, and the soccer team wore BoraJet's logo on its jerseys.[16] The Fenerbahce marketing deal with BoraJet also led to the creation of a documentary film about the team's plane, which prominently promoted BoraJet to the Turkish public.

### i.   BoraJet's Valuation

516.   In the spring of 2016, BoraJet owned (1) two commercial airline hangars (one at Ankara Esenboğa International Airport and the other at Istanbul Atatürk Airport); (2) designated gates at both Istanbul airports and several other regional airports across Turkey; (3) a fleet of 12 Embraer 190 airliners with seating for up to 110 passengers each; (4) a pending order with Embraer for 30 new jet aircraft; (5) a Bombardier Global XRS jet aircraft for business and executive travel (through its affiliate Aydin Jet); (6) a new codeshare partnership with Turkish Airlines; and (7) a new aviation service contract with the Turkish military.

517.   By the spring of 2016, BoraJet was flying a full schedule of domestic and international routes and ridership and support from the flying public was growing steadily.

---

[16] https://www.youtube.com/watch?v=Wd7cHO3jbDk (last visited December 15, 2018)

518.   On April 27, 2016, in connection with BoraJet's expansion efforts, BoraJet engaged Ata Invest, a financial consulting firm, to help solicit international investment in BoraJet.

519.   In furtherance of that effort, Ata Invest appraised BoraJet as a going concern, based on different valuation methodologies.  The more conservative benchmarking method assessed BoraJet's value in the spring of 2016 between $335 million and $358 million USD.

**B.     The July 15, 2016 Coup d'Etat Attempt in Turkey**

520.   On July 15, 2016, the Turkish military put down an attempted *coup d'état* ("coup attempt") against the government.  The putschists strafed crowded streets from helicopter gunships and bombed the Turkish parliament building. Over 250 civilians were killed and thousands more were wounded.

521.   On July 20, 2015, the Turkish government declared a state of emergency, and accused deposed Turkish cleric Fethullah Gulen and his organization, the Fettullahci Teror Orgutu or "FETO," of masterminding the coup attempt.

522.   Gulen has lived in self-exile in rural Pennsylvania since 1999.

523.   In the aftermath of the coup attempt, Turkish authorities cracked down on businesses and individuals alleged to have ties to FETO.  More than 100,000 people were arrested, incarcerated, removed from government employment, or had their businesses or property confiscated based on their alleged connections or allegiances to FETO.[17]

524.   A significant number of judges and prosecutors also were arrested, removed, or reassigned based on suspicions that they were affiliated with or sympathetic to FETO.

---

[17] *See* U.S. Dept. of State, Bureau of Democracy, Human Rights and Labor, Turkey 2017 Human Rights Report.

525.   This heightened government scrutiny created an acute concern of adverse consequences among judges and prosecutors that ensured that allegations of FETO association would be fully investigated and severely punished if supported by any evidence.

**C.     THE RICO ENTERPRISE'S SCHEME TO ACQUIRE BORAJET**

**1.     The RICO Enterprise's Media Disinformation Campaign**

526.   In the spring of 2016—prior to the coup attempt—during a meeting held at SBK USA's offices, Defendant DERMEN discussed plans to "take over an airline in Turkey."

527.   Defendant DERMEN later specifically identified this airline as BoraJet.

528.   Defendant DERMEN stated he and his associates had "around $200 million USD in cash" to invest in Turkey and were waiting for the right opportunity.

529.   After the failed coup attempt, Defendant DERMEN specifically acknowledged, that the resulting social instability benefitted the RICO Enterprise and provided it with a unique opportunity to acquire BoraJet and other "distressed" businesses and real estate in Turkey.

530.   Within weeks of the failed coup, the RICO Enterprise, employing a well-honed organize crime practice of destabilizing a targeted asset to facilitate its acquisition, capitalized on the highly-charged political environment in Turkey by initiating a targeted disinformation campaign directed to destroy Dr. Ayasli's reputation and devalue BoraJet.

531.   Using Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme that had been laundered into Turkey, Defendant KORKMAZ paid journalists in the Turkish media to publish inflammatory stories falsely

connecting Dr. Ayasli, BoraJet, and his charities to Gulen, FETO and the coup attempt.[18]

532.  Among other things, Defendant KORKMAZ, on behalf of the RICO Enterprise, falsely claimed that (1) BoraJet planes were used to facilitate the travel of FETO members, including Gulen, into and out of Turkey; (2) coup-plotters were provided access to the BoraJet terminal where FETO leaders could engage in conspiratorial meetings to plot the coup; and (3) that Dr. Ayasli had invented the encrypted web application called ByLock, which the coup plotters used to communicate surreptitiously without discovery by the government.[19]

533.  Turkish "journalists" Bulent Baskoy, Ergün Diler, Ersin Ramoğlu, Mahmut Övür, Soner Yalçın and Turkish newspapers Takvim, Sabah, Gazeteport, Cumhuriyet, Hurriyet, and Haberturk began publishing articles and "investigative stories" about Dr. Ayasli, BoraJet, and Dr. Ayasli's charitable organizations that falsely associated each with FETO.

534.  These false FETO allegations were posted to the newspapers' internet pages, and re-published on internet sites and social media platforms within Turkey and across the world, including within California.

---

[18] This would be akin to labeling a person or a business as being associated with Al Qaeda in the immediate aftermath of the September 11, 2001 terrorist attacks in the United States. As addressed throughout this Complaint, Defendant KORKMAZ repeatedly has weaponized his manufactured FETO claims against Dr. Ayasli – and the media's amplification of such claims -- to secure competitive advantages over him in business and legal matters. Importantly, the Turkish government conducted a full investigation into these claims over the course of several years and formally absolved Dr. Ayasli of these unfounded claims.

[19] It is widely reported that in the months following the coup attempt, the Turkish government arrested approximately 75,000 people simply on the basis that each had downloaded an encrypted messaging application called ByLock.  It was also reported that Turkey's chief prosecutor said, "using ByLock remains one of the biggest indications of collaboration with the plotters of the failed putsch in which 250 people were killed."  *See* Reuters, *Turkey Begins Freeing Suspects Linked to App Used by Coup Plotters*, published December 29, 2017, https://www.reuters.com/article/us-turkey-security-app/turkey-begins-freeing-suspects-linked-to-app-used-by-coup-plotters-media-idUSKBN1EN1B9 (last visited December 13, 2018).

### 1.   The first false FETO stories emerge

535.   Reporter Mahmut Ovur, Defendant KORKMAZ's friend and associate at the national Turkish newspaper *Sabah*, published the first story falsely linking Dr. Ayasli and BoraJet to FETO through his August 21, 2016 article *FETO is Everywhere*. *Sabah* publishes its content for free online and is read by people of Turkish descent in California, the United States and across the world.[20]

536.   On August 23, 2016, Ovur published a column in *Sabah* entitled "Who Introduced these Names to American Ayasli?" and drew additional false connections between Dr. Ayasli and FETO.

### 2.   *Takvim's* Ergun Diler publishes articles reinforcing the false FETO claims

537.   In August 2016, at Defendant KORKMAZ's direction, an agent of the RICO Enterprise met with columnist Ergün Diler, of the national Turkish newspaper Takvim, which has a daily print circulation of 150,000 to 200,000 readers and is accessible online in California and throughout the United States via the internet.[21]

538.   At the direction of Defendant KORKMAZ and on behalf of the RICO Enterprise, this individual made false statements to Diler regarding Dr. Ayasli's alleged connections to FETO with knowledge of their falsity, and aided, abetted, and encouraged Diler to publish articles falsely tying Dr. Ayasli and BoraJet to FETO and Gulen.

539.   Following his meeting, Diler published a series of columns in *Takvim* in which he alleged, among other things, (a) that Dr. Ayasli and his associates used BoraJet planes to secretly transport alleged FETO members into and out of Turkey;

---

[20] *Sabah's* internet site is located at https://www.sabah.com.tr (most recently accessed on August 26, 2022).

[21] *Takvim's* internet site is located at https://www.takvim.com.tr (most recently accessed on August 26, 2022).

(b) that using his technical background, Dr. Ayasli had designed the ByLock cellphone application used by FETO members to secretly communicate their treasonous plans; and (c) that Dr. Ayasli's close associates were operatives of the U.S. Central Intelligence Agency working in Turkey.

540.   On September 2, 2016, Diler published a column titled *Has Gulen Come Back?* that claimed Dr. Ayasli helped individuals, including alleged FETO leader Fethullah Gulen, enter and exit Turkey undetected by the Turkish government in advance of the July 2016 coup attempt by using a special customs-free hangar used for private jets like Dr. Ayasli's Aydin Jet:

> Ayasli . . . owned the most special hangar in the ATATURK AIRPORT. IT HAD TWO ENTRIES. The law enforcement and customs officers were not there. VERY SPECIAL GUESTS USED THAT HANGAR AND THEY BOARD FROM THERE AND THEY FLY WHEREVER THEY WANT.   Most of them were foreigners.   Many Americans board from there.   NO MANIFEST, [no] document listing the passengers.  More importantly, they landed with full of money without any explanation.  Nobody had that privilege.  The $58 million dollar plane was special because the hangar was SPECIAL. People from the U.S. or somewhere else came to Turkey without any RECORD and leave the country from there. For example, if Fethullah Gulen came to Turkey and held his meetings in Istanbul, nobody would have known it.  He would have left freely.  Many people did that.  No records.

541.   The next day, on September 3, 2016, Diler published a follow-up article entitled "*It is not the Akinci Base,[22] it is the Hangar!*" which continued to falsely link Dr. Ayasli to FETO, and falsely implied that BoraJet was a "front" for FETO used by FETO associates to enter and leave Turkey undetected by the Turkish government:

> Yalcin Ayasli generally spent his summers in Istanbul. He used to visit his hangar with foreigners.  It had a SPECIAL GATE! Nobody had to show IDs or passports…. The visitors came and went.  No police officers, no security,

---

[22] During the July 15, 2016 coup attempt, the Akinci Air Base located in Ankara was used as the "command center" for the pro-coup (FETO) military.  The Turkish Chief of the General Staff, Hulusi Akar, was taken hostage by pro-coup soldiers and transported to Akinci Air Force Base where he was detained.

and no customs officer!  FETO AIRPORT!  This hangar hosted many foreigners.  Generally at nights.  When they held their SECRET MEETINGS….

542.   On September 7, 2016, Diler wrote another column entitled *The Hangar Mood* in which he again accused Dr. Ayasli of illicit dealings.

543.   Diler's onslaught articles targeting Dr. Ayasli and BoraJet continued. Just two days later, on September 9, 2016, Diler again drew false connections between Dr. Ayasli and FETO in an article entitled *The Hangar Door*.

544.   In that article, Diler acknowledged that Dr. Ayasli had confronted him and the Takvim legal affairs department about the falsity of Diler's articles linking Dr. Ayasli and BoraJet to FETO and demanded a retraction, which Diler refused to provide.

545.   Instead, Diler's articles targeting Dr. Ayasli and BoraJet continued unabated.  On October 6, 2016, Diler published a front-page story in *Takvim* entitled *Here is the BayLock* [sic] accompanied by a photograph identified as Dr. Ayasli, which falsely accused Dr. Ayasli of having *designed* ByLock:

FURTHERMORE, YALCIN AYASLI WAS INTERESTED IN SOFTWARE. How long has SOFTWARE been our secret headline? Yes! After July 15! Because we found out that the FETO putschists were communicating via the application called ByLock. The putschists created the application and communicated via this special software that Turkey couldn't create. It was stated that 215,000 people used it. The people related to FETO gave ORDERS and follow orders through this application. That's how the ATTEMPT started … THE TEAM OF TURKS AND AMERICANS, WHICH CREATED THIS SOFTWARE, WAS TRAVELLING WITH YALCIN'S [AYASLI's] AIRPLANE!

546.   On October 25, 2016, Diler, continuing to advance the RICO Enterprise's disinformation campaign, again repeated the fabricated ByLock claims and falsely linked BoraJet to FETO in an article entitled, *The Bay Lock Story*.

547.   On November 18, 2016, Diler elevated the false FETO allegations even further through an article entitled, *Strange Relationships*, in which Diler falsely reported that Dr. Ayasli's charities TCA and TCF were associated with

FETO and further claimed that U.S. Senators Dan Burton and Richard Lugar were "FETO sympathizers" working through TCA and TCF to advance FETO's objectives.

548.   Diler also falsely claimed in that article that Hittite surreptitiously sold secret United States military technology to Israel, China, and India while under Dr. Ayasli's leadership.

### 3.   Additional stories amplifying the false FETO allegations

549.   On September 4, 2016, Ovur's *Sabah* colleague, Ersin Ramoglu, published yet another column falsely claiming that Dr. Ayasli was connected to FETO.  The article, entitled *Did Fethullah Gulen Come to Istanbul?* claimed that BoraJet aircraft were used to help FETO members flee Turkey and reinforced Diler's earlier claims in *Takvim* that Dr. Ayasli and BoraJet helped Fetullah Gulen enter and exit Turkey secretly in planning the coup.

550.   On September 23, 2016, a third national media outlet in Turkey, *Sozcu Gazetesi,*[23]  published an article written by journalist Soner Yalcin entitled *I Wish Mucahit Arslan Would Talk*, which repeated and reinforced the false claims connecting Dr. Ayasli to FETO.  *Sozcu* is a print publication distributed throughout Turkey that, like *Sabah*, also provides free access to its content online and is widely read by people of Turkish descent in California, and across the United States and the world.

### D.   Dr. Ayasli leaves Turkey to protect his family's safety

551.   Dr. Ayasli was visiting Turkey with his family when the first series of articles falsely linking him to FETO and the failed coup were published.

552.   With each false story, the public scrutiny of Dr. Ayasli and his family magnified.

---

[23] Sozcu's internet site is located at https://www.sozcu.com.tr (most recently accessed on August 26, 2022).

553.   Dr. Ayasli had no idea where these false stories were originating from and therefore, no effective means of extinguishing the gaslighting that had been directed at him and BoraJet as his demands for retractions went unheeded.

554.   On September 13, 2016, upon the advice of several advisors that Dr. Ayasli and his family faced real threats of arrest by Turkish authorities investigating the FETO claims and assault by citizens angered by the FETO allegations, Dr. Ayasli and his family left Turkey. They have not since returned.

555.   For the past six years, Dr. Ayasli has been wholly dependent on the assistance of third parties to protect his personal, legal and business interests in Turkey. Many of these individuals either became the subject of Enterprise-directed FETO allegations and/or were threatened or assaulted by Defendant KORKMAZ because of their assistance to Dr. Ayasli.

**E.    Credible Threats of Violence Against TCA's Office in Istanbul**

556.   The danger presented to Dr. Ayasli, his family, and his business interests as a result of the onslaught of publications falsely tying Dr. Ayasli, BoraJet, TCF and TCA to FETO was real.

557.   The RICO Enterprise targeted TCF and TCA because Defendant KORKMAZ knew that Dr. Ayasli had committed a tremendous amount of his personal wealth, time, emotion, and energy into the growth and success of these charities.

558.   The RICO Enterprise knew that by implicating these charities as "fronts" for FETO, it would (a) cause the employees of these charities to quit out of fear; (b) threaten the reputation and viability of these charities; (c) perfect their claim that Dr. Ayasli was a FETO agent; and (d) thus increase the pressure on Dr. Ayasli to capitulate to the RICO Enterprise's demands when it came time for the Enterprise to proceed with its planned takeover of BoraJet.

559.   After being linked to FETO through the media disinformation campaign, multiple credible threats of violence were made against Dr. Ayasli's Istanbul-based TCA office.

560.   The TCA office subsequently received a warning from the American Embassy in Ankara about an imminent threat to the personal safety of its employees.

561.   The TCA office also received verbal warnings by phone from the American Consulate in Istanbul.

562.   At first, TCA staff responded to these warnings by removing the TCA's street-facing identifying door signs at their offices in Istanbul.  Doing so, however, did not stop the threats.

563.   TCA staff was then forced, out of fear for their safety, to move the TCA's operations to undisclosed and decentralized locations across Istanbul.

564.   After that proved to be untenable, the TCA's Istanbul operations were shuttered in December 2016. Its Turkish operations remain closed.

**F.   BoraJet's Financial Distress Resulting from the RICO Enterprise's Media Disinformation Campaign**

565.   The RICO Enterprise-directed media disinformation campaign against Dr. Ayasli and BoraJet was intended to, and did in fact, inflict continuous, repeated and irreparable damage to BoraJet.

566.   The relentless publication of FETO allegations crippled BoraJet's reputation with its core customer base – Turkish citizens -- as members of the Turkish public were fearful of being associated with an airline linked to FETO. Passenger numbers plummeted, threatening BoraJet's viability as a going concern.

567.   The pervasive and inflammatory FETO allegations advanced through these stories similarly crippled Dr. Ayasli's and BoraJet's ability to maintain existing contractual relationships.

568.   On September 2, 2016, *the same day* that Diler published his first article against Dr. Ayasli and BoraJet in *Takvim*, Zahide Uner, the Chief Financial Officer for Dr. Ayasli's businesses in Turkey ("CFO Uner," "Ms. Uner"), received calls from several of Dr. Ayasli's banks and creditors expressing serious concerns about the *Takvim* article.

569.   Less than a week later, on September 9, 2016, Turkish Airlines ("THY"), without prior warning, terminated its supply agreement to purchase products developed by NAR Gourmet for distribution on Turkish Airlines planes, causing NAR Gourmet to lose one of its largest sources of revenue.

570.   Three weeks later, on September 28, 2016, Turkish Airlines cancelled its "wet lease" agreement with Bora Jet.[24]

571.   Two weeks after that, on October 11, 2016, Turkish Airlines terminated its codeshare agreement with BoraJet for six BoraJet aircraft flying under the THY/AnadoluJet banner.

572.   The combination of already reduced ridership from adverse publicity coupled with the sudden and unanticipated cancellations of these contracts by Turkish Airlines financially crippled BoraJet.

573.   Compounding the damage, the withering media disinformation campaign significantly hindered Dr. Ayasli's and BoraJet's ability to secure new or additional financing from Turkish banks.

574.   Although Dr. Ayasli, a wealthy man with exceptional credit, had never before been denied financing or credit, Turkish banks suddenly began refusing to lend him money and denying the financing and credit sought by Dr. Ayasli and BoraJet.

---

[24] A "wet lease" is a leasing arrangement whereby one airline provides an aircraft, complete crew, maintenance, and insurance to another airline which pays by hours operated.  A wet lease is conventionally used by the lessor airline to cover demand in peak travel seasons, or to allow the major carrier to begin flying new routes or to reach smaller airports or airfields where larger planes cannot land or operate economically.

575.   For example, on September 18, 2016, Seker Bank refused to extend an additional $33 million USD credit line to Dr. Ayasli which would have been used to acquire additional aircraft as part of BoraJet's billion dollar expansion plan, causing this plan to stall.

576.   Ata Invest, BoraJet's financial consultants, had simultaneously been working to help market BoraJet to potential corporate and individual investors internationally, and to solicit investor funding for BoraJet's expansion.

577.   The RICO Enterprise's media disinformation campaign kneecapped these efforts, causing formerly interested corporate and individual investors to back out of anticipated partnerships with Dr. Ayasli and/or BoraJet out of concerns of doing business with an individual or business accused of being associated with FETO and the attendant instability to BoraJet's operations caused by these false allegations.

578.   Given this sudden and unanticipated contraction of available bank financing, coupled with Ata Invest's inability to attract outside investors, Dr. Ayasli was forced to self-fund BoraJet to cover expenses, capital improvements, payments on contracts, and the airline's rapidly mounting losses sustained due to its lost codeshare routes and plummeting ridership.

579.   To counteract the rapidly mounting financial pressure on BoraJet and his other Turkish-based businesses arising from the media disinformation campaign, Dr. Ayasli was forced to make the following financial transfers from his U.S.-based accounts in the months following the RICO Enterprise's implementation of this campaign:

| Date | Amount | From |
|---|---|---|
| September 8, 2016 | $9,000,000 | Fidelity (NH) |
| September 29, 2016 | $1,000,000 | Fidelity (NH) |
| October 4, 2016 | $4,000,000 | Fidelity (NH) |

| Date | Amount | From |
|------|--------|------|
| October 31, 2016 | $4,000,000 | Fidelity (NH) |
| November 7, 2016 | $3,300,000 | Fidelity (NH) |
| November 29, 2016 | $3,000,000 | Fidelity (NH) |
| December 15, 2016 | $2,000,000 | Fidelity (NH) |
| December 23, 2016 | $1,000,000 | Fidelity (NH) |
| **TOTAL** | **$27,300,000** | |

580.   On December 1, 2016, after having poured more than $24 million into BoraJet in just a three-month period, Dr. Ayasli emailed Defendant AKOL, BoraJet's General Manager and Chairman of the Board of Directors, advising Defendant AKOL of his inability to continue forwarding millions of dollars each month from his personal accounts to fund BoraJet's operations, and addressing the significant challenge of trying to stabilize BoraJet given "everything that has been written in the news recently."

**G.   The RICO Enterprise Successfully Exploits BoraJet's Financial Distress to Take Over the Airline**

581.   During this period, Ata Invest continued efforts to identify third party investors. This included YDA, a Turkish company with significant experience in the aviation sector including building and operating airport terminals in Turkey and abroad, and other foreign investors, including an investment group from China. Notably, in mid-December 2016, YDA presented a $70 million USD offer to purchase BoraJet.  The deal was structured to include $35 million in cash, the assumption of $35 million USD of BoraJet's outstanding debt, and a release of all of Dr. Ayasli's personal guarantees on that debt.

582.   While these efforts were ongoing, Defendant AKOL bypassed both Ata Invest's ongoing efforts to secure investors and YDA's live offer, to complete a transaction with Defendants KORKMAZ and SBK TURKEY.

583.   Dr. Ayasli had no communication with Defendant KORKMAZ during the period when Defendant AKOL negotiated the agreement on his behalf. Dr. Ayasli was entirely reliant on the representations of Defendant AKOL.

584.   Defendants KORKMAZ and AKOL first met at Defendant SBK Turkey's offices in early November 2016, at which time Defendant KORKMAZ claimed to be a purchaser of "distressed assets," and expressed interest in purchasing BoraJet.

585.   Defendant AKOL, without seeking Dr. Ayasli's prior approval, hosted Defendant KORKMAZ at BoraJet's offices the week of November 14, 2016, at which time Defendant AKOL provided a two-hour presentation addressing BoraJet's financial condition and agreed to work with Defendant KORKMAZ's due diligence team in advance of a potential purchase.

586.   In a November 19, 2016 e-mail notifying Dr. Ayasli of these past meetings, Defendant AKOL represented that Defendant KORKMAZ possessed "a well-known new investor profile in Ankara," "is recommended in Ankara" and had indicated a willingness to cover BoraJet's cash shortages in advance of a potential deal.

587.   Over the course of the next six weeks, without Dr. Ayasli's knowledge or approval, Defendant KORKMAZ, aided by access provided by Defendant AKOL, and utilizing the firm Inhera Capital, conducted a thorough due diligence review of BoraJet's financial records.

588.   Defendant AKOL prepared the financial spreadsheets setting forth BoraJet's assets and obligations.

589.   Contrary to long-established practice at BoraJet, without explanation, and without Dr. Ayasli's approval, Defendant AKOL barred CFO Uner from

having any meaningful involvement in Defendant AKOL's business negotiations with Defendants KORKMAZ and SBK TURKEY.

590.   As represented by Defendant AKOL in a December 4, 2016 email to Dr. Ayasli, Defendant KORKMAZ, on behalf of Defendant SBK TURKEY and the RICO Enterprise, offered to buy BoraJet using $36 million (of funds laundered from the U.S.-Based Fraudulent Fuel Tax Credit Scheme), and then infuse BoraJet with an additional $50 million of working capital (of Fraud Proceeds) in the form of a loan.

591.   Unlike YDA, Defendants KORKMAZ and SBK TURKEY failed to raise any question or register any concern about the negative press coverage or public perception tying BoraJet to FETO and the coup-attempt as part of the due diligence process.

592.   Defendants AKOL, KORKMAZ and SBK TURKEY arrived at the framework of an agreement in less than two months.

593.   Through a series of calls and e-mails, Defendant AKOL implored Dr. Ayasli to sell BoraJet to Defendant SBK TURKEY, parroting Defendant KORKMAZ's insistence that Defendants KORKMAZ and SBK TURKEY had established a favorable relationship with the Turkish Ministry of Transportation—the entity which regulated air travel in Turkey, and that Defendant SBK TURKEY's intentions were to infuse BoraJet with cash, expand BoraJet's operations, and then sell it at a profit, likely to Turkish Airlines.

594.   Defendant AKOL also insisted, contrary to facial appearances, that Defendant KORKMAZ's offer was "better, faster and safer" than YDA's offer, and "would not bring [BoraJet] any additional costs."

595.   Dr. Ayasli had never met or communicated with Defendant KORKMAZ, was not familiar with Defendant SBK TURKEY, and had no knowledge that Defendants KORKMAZ and SBK TURKEY were part of the RICO Enterprise that was laundering Fraud Proceeds from the U.S.-Based Fraudulent

Fuel Tax Credit Scheme in Turkey.  Dr. Ayasli similarly had no idea that Defendants KORKMAZ and SBK TURKEY had targeted BoraJet for acquisition, had organized the media disinformation campaign that devalued BoraJet and made it a "distressed asset," and intended to acquire BoraJet with laundered funds so that it could exploit BoraJet's assets, launder additional Fraud Proceeds through this business, and use it as the tool through which it could direct racketeering activity at Dr. Ayasli's money and property.

596.   Having successfully forced Dr. Ayasli into economic duress using its media disinformation campaign, on December 29, 2016, Defendants KORKMAZ, SBK TURKEY, and AKOL, in furtherance of the RICO Enterprise's interests, coerced Dr. Ayasli into signing the agreement ("December 2016 Agreement") to sell BoraJet, BoraJet Bakim, and Aydin Jet as a going concern.

597.   Defendant BUGARAJ, a subsidiary entity of Defendants BUKOMBIN and SBK TURKEY, funded by Fraud Proceeds from the U.S.-Based Fraudulent Fuel Tax Credit Scheme, and controlled by Defendant KORKMAZ, was the buyer.

598.   Claiming that it was necessary to complete the deal, Defendant AKOL included Aydin Jet, the holding company for Dr. Ayasli's XRS jet, in the deal — thereby providing the RICO Enterprise with not only BoraJet's entire fleet of commercial airplanes, but what had been Dr. Ayasli's executive aircraft.

599.   At the time of the sale, BoraJet's balance sheet showed that BoraJet owed $37 million USD to Dr. Ayasli personally, and another $22 million USD to Ayasli LLC ($59 million USD total) in connection with the loan repayments that Dr. Ayasli had made on behalf of the airline.

600.   In addition, a significant portion of BoraJet's trade payables were secured by letters of credit provided by Dr. Ayasli personally.

601.   The December 2016 Agreement negotiated by Defendant AKOL allocated BoraJet's outstanding financial liabilities between Defendant BUGARAJ and Dr. Ayasli.   Pursuant to that Agreement, Dr. Ayasli assumed BoraJet's

obligation to repay certain identified outstanding bank loans and non-aircraft-related financial leasing obligations, while Defendant BUGARAJ agreed to assume BoraJet's remaining debt, including all trade payables incurred prior to the date of transfer.

602.   Pursuant to the terms of the December 2016 Agreement, Dr. Ayasli was given one year to repay the outstanding bank loans assigned to him under the Agreement.

603.   A commercial building owned by Dr. Ayasli in Nuruosmaniye, Turkey ("Nuruosmaniye property"), which was valued at over $50 million, served as collateral for Dr. Ayasli's surviving obligations and debts.

604.   Based on Defendant KORKMAZ's representations that Defendant BUGARAJ intended to infuse BoraJet with cash, expand its operations, and subsequently attempt to sell it to a larger airline, the December 2016 Agreement provided that Defendant BUGARAJ would pay Dr. Ayasli 25% of the net profit derived from any such sale.

605.   Immediately following the closing of the transaction, and despite having no formal training in the airline industry, Defendant KORKMAZ appointed himself Chairman of the Board at BoraJet.

606.   Defendant AKOL remained employed at BoraJet as General Manager.

607.   In a post-acquisition interview with Turkish daily newspaper *Hurriyet*, Defendant KORKMAZ falsely stated that he "purchased BoraJet for $260 million dollars (USD)."

## H.   THE RICO ENTERPRISE'S SCHEME TO EXPLOIT BORAJETS ASSETS TO ACQUIRE ADDITIONAL MONEY AND PROPERTY FROM DR. AYASLI

608.   Contrary to the representations made to Dr. Ayasli, the RICO Enterprise never intended to invest money into BoraJet to stabilize and then grow the business to allow for the airline to be sold at a profit in which Dr. Ayasli would share. To the contrary, Defendants KORKMAZ and BUGARAJ, on behalf of the

RICO Enterprise, (1) used BoraJet as yet another vessel through which to launder Fraud Proceeds; and (2) exploited BoraJet's assets and liabilities, including Dr. Ayasli's financial obligations, to gain access to more of Dr. Ayasli's property and personal fortune. This ensured BoraJet's implosion and the complete loss of Dr. Ayasli's interest in the promised 25% share of the net profits from a future sale.

**The RICO Enterprise's Laundering of Fraud Proceeds Through BoraJet**

609.     Within days of the BoraJet takeover, Defendant KORKMAZ, through Defendants SBK TURKEY and BUGARAJ, and aided and abetted by Defendants OZKARAMAN and AKOL, began the first of what would be several dozen transactions through which Fraud Proceeds would be laundered through BoraJet.

| Date: | From: | To: | Amount: | Description: |
|---|---|---|---|---|
| 1/03/2017 | Bugaraj | BoraJet | 750,000 USD | Cash transfer to the Aviation account |
| 1/10/2017 | Bugaraj | BoraJet | 975,000 USD | Cash transfer to the Aviation account |
| 1/13/2017 | Bugaraj | BoraJet | 700,000 USD | Cash transfer to the Aviation account |
| 1/13/2017 | Bugaraj | BoraJet | 100,000 USD | Cash transfer to the Aviation account |
| 1/25/2017 | Bugaraj | BoraJet | 500,000 USD | Cash transfer to the Aviation account |
| 2/01/2017 | Bugaraj | Aydin Jet | 175,611 USD | Cash transfer to the Aviation account |
| 2/22/2017 | SBK Turkey | GE Commercial Aviation Funding | 500,000 USD | Direct transfer from "Holding" to GECAS |
| 2/23/2017 | Bugaraj | BoraJet | 42,916 USD | Cash transfer to the Aviation account |
| 2/27/2017 | Bugaraj | BoraJet | 124,000 USD | Cash transfer to the Aviation account |
| 3/13/2017 | Bugaraj | BoraJet | 5,700,000 TL | Checks paid to Celebi Aviation |
| 3/14/2017 | SBK Turkey | GE Commercial Aviation Funding | 500,000 USD | Direct transfer from "Holding" to GECAS |
| 3/28/2017 | Bugaraj | BoraJet | 289,000 USD | Cash transfer to the Aviation account |
| 3/31/2017 | Bugaraj | BoraJet | 184,000 USD | Cash transfer to the Aviation account |
| 4/3/2017 | Bugaraj | BoraJet | 13,000 USD | Cash transfer to the Aviation account |
| 4/3/2017 | Bugaraj | BoraJet | 55,000 USD | Cash transfer to the Aviation account |
| 4/5/2017 | Bugaraj | BoraJet | 248,200 USD | Cash transfer to the Aviation account |
| 4/12/2017 | Bugaraj | BoraJet | 107,000 USD | Cash transfer to the Aviation account |
| 4/21/2017 | Bugaraj | BoraJet | 132,000 USD | Cash transfer to the Aviation account |
| 5/4/2017 | Bugaraj | BoraJet | 370,000 TL | Checks paid to Aviation Akdeniz Petur |
| 5/8/2017 | Bugaraj | BoraJet | 11,500 USD | Cash transfer to the Aviation account |
| 5/10/2017 | Bugaraj | BoraJet | 24,000 USD | Cash transfer to the Aviation account |
| 5/12/2017 | Bugaraj | BoraJet | 8,600 USD | Cash transfer to the Aviation account |
| 5/15/2017 | Bugaraj | BoraJet | 18,500 USD | Cash transfer to the Aviation account |
| 5/16/2017 | Bugaraj | BoraJet | 74,145 TL | Checks paid to Garanti Filo |
| 5/17/2017 | Bugaraj | BoraJet | 18,000 USD | Cash transfer to the Aviation account |
| 5/26/2017 | Bugaraj | BoraJet | 14,800 USD | Cash transfer to the Aviation account |
| 6/2/2017 | Bugaraj | BoraJet | 70,000 USD | Cash transfer to the Aviation account |
| 6/5/2017 | SBK Turkey | Aydin Jet | 63,000,000 TL | Checks paid from SBK to Aydin Jet |
| 6/7/2017 | Bugaraj | BoraJet | 300,000 TL | Checks paid to Bilin Gumruk |
| 6/28/2017 | Bugaraj | BoraJet | 350,000 USD | Cash transfer to the Aviation account |
| | | Total | $6,411,127 USD + 63,744,145 TL | |

610.   Conservatively, the RICO Enterprise laundered at least $6,411,127 of Fraud Proceeds in U.S. dollars, another 63,744,145 of Fraud Proceeds in Turkish liras (approximately $17,000,000 at the time), totaling approximately $23,41,127 through BoraJet post-sale.

611.   Defendant KORKMAZ, on behalf of the RICO Enterprise, also committed additional Fraud Proceeds to rebrand Aydin Jet as "SBK Air."

1.   **The RICO Enterprise Systematically Defaults on BoraJet's Financial Obligations to Exploit Dr. Ayasli's Personal Guarantees**

1.   **Defendant KORKMAZ's attempts to extort money from Dr. Ayasli**

612.   On February 25, 2017, Defendant KORKMAZ drove into Dr. Ayasli's Kandilli, Istanbul property in a Ferrari, where he was intercepted by one of Dr. Ayasli's security guards.  This entire episode was captured on security cameras.[25]

613.   That same day, Defendant KORKMAZ sent a lengthy series of text messages through the WhatsApp text messaging application that Dr. Ayasli received at his U.S. residence and which directly threatened Dr. Ayasli, his family, and his business associates, in an effort to extract additional financial payments from Dr Ayasli.

614.   The following were among the threats Defendant KORKMAZ made to Dr. Ayasli:

> **"You have one day, either you come forward and do what is necessary or you will be responsible for what happens."**
>
> **"Fatih [AKOL] and Zahide first"**
>
> **"Fatih [AKOL] deserved what I did to him"**

---

[25] On July 30, 2017, Defendant KORKMAZ, again driving a Ferrari, returned to this property and again was intercepted by Dr. Ayasli's security personnel.  This time, Defendant KORKMAZ told Dr. Ayasli's security guard that he (Defendant KORKMAZ) had "purchased" the house and would be "moving in in a few days."

**"That bitch Zahide vouched for you but now she's disappeared"**

**"You and your wife will look for a place to hide"**

**"Your lawyer daughter or director son will pay"**

**"I will disgrace you before the eyes of the whole world"**

**"I will show all the donations you made to FETO"**

615.   Dr. Ayasli did not respond to any of Defendant KORKMAZ's WhatsApp text messages, which kept coming at all hours of the day and night.[26]

616.   On this same day and for several days thereafter, Defendant KORKMAZ also called Dr. Ayasli's mobile phone, frequently in the middle of the night, until Dr. Ayasli blocked Defendant KORKMAZ's number.

### 2.   The RICO Enterprise Accelerate Personally Guaranteed Bank Debt

617.   Notwithstanding the negotiated one-year term for the repayment of BoraJet's bank. loans established in the December 2016 Agreement, Defendant KORKMAZ and his agents, acting on behalf of the Defendant BUGARAJ and the RICO Enterprise, met with a number of banks including (1) Akbank T.A.S. ("Akbank"); (2) Deniz bank T.A.S. (Deniz bank"); (3) Turk Ekonomi Bancas T.A.S. ("Turk Ekonomi"); (4) Odea Bank A.S. ("Odea Bank"); and (5) Turkey Garanti Bancas A.S. ("Garanti"), all of which had provided credit to BoraJet secured by letters of credit or personal guarantees from Dr. Ayasli which  had not been extinguished in connection with the sale.

618.   Defendant KORKMAZ, on behalf of the RICO Enterprise, then used his influence to trigger those banks to close BoraJet's existing lines of credit

---

[26] Over the next five months, Defendant KORKMAZ sent 137 text messages to Dr. Ayasli at his U.S. residence, all of which were designed to extract additional money from Dr. Ayasli. These included screenshots from a closed tax audit into one of Dr. Ayasli's businesses and Defendant KORKMAZ's subpoena in the Mueller investigation, which were designed to show that Defendant KORKMAZ had high-level connections in the Turkish and U.S. governments who could intercede on his behalf.

without cause, and to make immediate demand for repayment of BoraJet's loans personally guaranteed by Dr. Ayasli.

619. Dr. Ayasli's loans with Odea Bank were *not in default.*

620. In the world of Turkish finance, it is unheard of for a bank to accelerate a loan that is not in default.

621. On February 28, 2017 – three days after Defendant KORKMAZ initiated the barrage of threatening text messages directed at Dr. Ayasli -- Odea Bank, without cause or justification, sent a notice to BoraJet, and to Dr. Ayasli as joint guarantor, demanding that payment on all of BoraJet's outstanding loans, totaling 21,070,603.45 liras (approximately $5.3 million USD), be made within *24 hours*.[27]

622. Despite its longstanding relationship with Dr. Ayasli, and Dr. Ayasli's sterling credit, Odea Bank refused Dr. Ayasli's request for a one-week extension to permit him time to  liquidate the assets needed to pay off the loans in an orderly fashion.

623. Lacking immediate liquidity, Dr. Ayasli could not meet Odea Bank's 24-hour payoff demand of his $5.3 million loan balance.

624. On March 6, 2017, Odea Bank assigned the debt (which Dr. Ayasli had personally guaranteed) to Defendant MEGA VARLIK, the Turkish banking entity owned by Defendant KINGSTON, controlled by Defendant KORKMAZ, and initially funded with a $10 million transfer of Fraud Proceeds from the U.S.-Based Fraudulent Fuel Tax Credit Scheme.

625. Defendant MEGA VARLIK has represented in court proceedings that it paid $5.7 million to acquire this assignment.

---

[27] Defendant BUGARAJ had an account at ODEA Bank, through which Defendant KORKMAZ regularly withdrew funds to launder through BoraJet, including one such transaction of $124,000 on February 27, 2016. Also on that date, Defendant KORKMAZ, through Defendant SBK TURKEY, withdrew $1,675,000 to cover unspecified expenses.

626.   Defendant MEGA VARLIK immediately obtained an Order from the Turkish Execution Office, which initiates collection proceedings against debtors, including a bank's right to seize a debtor's real property used to collateralize loans. That Order permitted Defendant MEGA VARLIK to foreclose on the loan directly from the guarantor (Dr. Ayasli), rather than from the debtor, BoraJet, which, of course, was then owned by Defendant BUGARAJ – another member of the RICO Enterprise.

627.   Defendant MEGA VARLIK then immediately commenced enforcement proceedings against Dr. Ayasli, and in connection with those enforcement proceedings, was permitted to attach *all* of Dr. Ayasli's other commercial and residential property and bank accounts in Turkey, totaling more than $150 million.

628.   Defendant MEGA VARLIK then demanded immediate payment of 23,161,907.94 liras (approximately $5.8 million USD)—at least $500,000 USD more than the Odea Bank debt that Dr. Ayasli had personally guaranteed.

629.   Dr. Ayasli made the demanded payment of $5.8 million USD to release Defendant MEGA VARLIK's attachments on his real estate and bank accounts.

630.   The RICO Enterprise similarly pressured other banks holding BoraJet loans to prematurely call BoraJet's debt and demand immediate payment from Dr. Ayasli.

631.   Notably, only banks holding loans that Dr. Ayasli personally guaranteed issued premature demands on BoraJet's loans.

632.   To counter these efforts, Dr. Ayasli was forced to proactively obtain a $20 million personal loan from Garanti Bank, where he maintained longstanding close business relationships.

633.   As a prerequisite for providing this loan, Garanti required Dr. Ayasli to prepay all of BoraJet's leasing debts  -- 487,607 liras (approximately $123,000

USD) -- underwritten by Garanti and assigned to him in the December 2016 Agreement, whether those debts were due or not.  Dr. Ayasli also was forced to collateralize this loan with several of his properties.

634.   Dr. Ayasli then used the $20 million loan from Garanti to clear all of BoraJet's bank debt in Turkey that he had personally guaranteed to evade the RICO Enterprise's ongoing efforts to attach and execute on Dr. Ayasli's bank accounts and real estate holdings in Turkey.

### 3.   Defendant BUGARAJ Deliberately Defaults on BoraJet's Trade Debts

635.   Rather than utilize the funds being laundered through BoraJet as investment capital, Defendant KORKMAZ, through Defendants SBK TURKEY, BUKOMBIN, and BUGARAJ and on behalf of the RICO Enterprise, quickly and intentionally defaulted on BoraJet's trade debts.

636.   This scheme had the benefit of having Dr. Ayasli use his U.S.-based wealth to extinguish outstanding obligations for which Defendant BUGARAJ would otherwise have been responsible when the RICO Enterprise scuttled BoraJet.

637.   After Defendant BUGARAJ deliberately defaulted on these debts, the affiliated banks called 12,500,000 liras (approximately $3.2 million USD) of Dr. Ayasli's letters of credit or personal guarantees, notwithstanding clear provisions in the December 2016 Agreement that these debts were the obligation of Defendant BUGARAJ.

638.   Dr. Ayasli was then forced to pay 12,500,000 liras (approximately $3.2 million USD) on these unreleased letters of credit or personal guaranties, notwithstanding the fact that this debt had not been assigned to him under the December 2016 Agreement.

639.   Within less than a month, Dr. Ayasli was forced to transfer over $9 million from his U.S.-based based personal financial accounts and enter a new $20

million loan to pay off over $29 million in loans and lines of credit improperly accelerated or intentionally defaulted on by the RICO Enterprise.

**2.** **The RICO Enterprise Shutters BoraJet and Proceeds with Sham Litigation To Extract Additional Money and Property From Dr. Ayasli**

640.   Having succeeded in forcing Dr. Ayasli to pay off each of the loans that he personally had guaranteed and having ensured the implosion of BoraJet by laundering funds through it, rather than investing funds in it, the Enterprise proceeded with the final phase of its plan.  That plan targeted Dr. Ayasli' property, to include his significant wealth in the U.S., and his equally significant commercial and residential real estate holdings in Turkey through a series of sham lawsuits alleging fraud and extensive losses in the BoraJet transaction.

641.   To enhance its leverage in these suits, the RICO Enterprise threatened and assaulted witnesses who then provided statements on its behalf, threatened and intimidated lawyers, witnesses, family members, and associates who defended Dr. Ayasli, "re-ignited" the media disinformation campaign falsely alleging Dr. Ayasli to be a FETO associate, and  filed complaints with law enforcement authorities in Turkey and the United States to trigger criminal investigations against Dr. Ayasli and his associates.

### Initial Civil Fraud Case

642.   On March 13, 2017, Defendant BUGARAJ, on behalf of the RICO Enterprise and at the direction of Defendant KORKMAZ, filed its initial civil suit against Dr. Ayasli in the Istanbul 3rd Commercial Court of First Instance, demanding the payment of 253,305,035 liras (approximately $72 million USD) in damages stemming from alleged fraud in misrepresentations of BoraJet's outstanding debt obligations.

643.   This lawsuit, like everything else that Defendant BUGARAJ did, was paid for using Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Fraud Scheme.

644.   Even though Dr. Ayasli previously had provided his Nurosmaniye property as collateral as part of the December 2016 Agreement, Defendant BUGARAJ immediately sought to attach *all* of Dr. Ayasli's real estate holdings in Turkey.

645.   The 3rd Commercial Court of First Instance found Defendant BUGARAJ's request for this attachment to be "groundless."[28]

646.   On March 18, 2017 – one week after filing this suit -- Defendants KORKMAZ, OZKARAMAN and AKOL[29] met with Dr. Ayasli's lawyer, Burhan Asaf Safak, and CFO Uner at Safak's Istanbul office to address the allegations in the lawsuit.

647.   During this meeting, Defendant KORKMAZ, in an intimidating fit of rage, smashed and shattered Safak's glass conference table, threw a glass teacup at Ms. Uner, attempted to attack Ms. Uner, and threatened her, yelling "You can't escape me, I will fuck you, and then I will kill you!"

648.   Fortunately, Defendant KORKMAZ was physically restrained by Safak and others before he could attack Ms. Uner.

649.   During the same episode, Defendant KORKMAZ directly also threatened Dr. Ayasli's wife and children, warning that he knew where each lived.

650.   In April 2017, Defendant KORKMAZ, through Defendant BUGARAJ and acting on behalf of the RICO Enterprise, shuttered BoraJet's operations.[30]

---

[28] The RICO Enterprise appealed that ruling, and the 12th Chamber of the Istanbul Regional Court of Appeals affirmed.

[29] Defendant AKOL attended this meeting with Defendant KORKMAZ despite having ceased employment at BoraJet a month before. On multiple occasions, Defendant KORKMAZ has shown photos depicting a bloodied Defendant AKOL and has claimed, both directly and indirectly, that he beat Defendant AKOL with an iron ash tray.

[30] It continued to hold and use the executive jet that had been rebranded as SBK Air.

651.   Defendant KORKMAZ withheld severance payments and otherwise exploited current and former BoraJet employees unless and until these individuals made false statements for the RICO Enterprise's use in its trumped-up civil and criminal litigation against Dr. Ayasli.

652.   In April and May 2017, Defendant KORKMAZ, through defendant BUGARAJ, supplemented its civil case with additional "evidence" obtained through strong-arming, bribing and threatening former BoraJet employees and other business associates of Dr. Ayasli's into providing false testimony supporting these claims.

**The Sham Criminal Complaints**

653.   Approximately two months after filing the initial civil fraud case, the RICO Enterprise, to increase its leverage in that case, secured the initiation of two criminal investigations into Dr. Ayasli, Ms. Uner, and their associates in Turkey. These actions threatened the liberty, livelihoods, and freedom of movement of Dr. Ayasli, Ms. Uner and others.  One such investigation even resulted in Dr. Ayasli's and Ms. Uner's indictments in Turkey. After full investigation, however, Dr. Ayasli, Ms. Uner, and their associates were exonerated in each matter – but not before a significant civil judgment was entered against Dr. Ayasli in the civil cases at a hearing when he was not present and lacked representation and not before each had suffered significant mental and psychological distress and expended significant funds in legal defense costs.

**The FETO-Terrorism Charges**

654.   On May 17, 2017, approximately two months after the filing of the initial civil case, Defendant KORKMAZ personally filed a complaint with the Chief Public Prosecutor's Office, thereby opening a FETO-based terrorism investigation of Dr. Ayasli, Ms. Uner, Tolga Danisman, the attorney who represented Dr. Ayasli in the civil fraud case, Necla Zarakol, Dr. Ayasli's public

relations assistant who led his public defense against the false FETO allegations, and BoraJet.

655.   Defendant KORKMAZ's complaint almost exactly tracked the series of false allegations made in the media disinformation campaign against Dr. Ayasli and BoraJet, including allegations that (1) Dr. Ayasli was a member of, and funded, FETO; (2) Dr. Ayasli designed ByLock as a way for FETO members to secretly communicate with one another; (3) Dr. Ayasli had advance knowledge of the planned coup; and (4) Dr. Ayasli committed espionage against the Turkish government (the "Terrorism Investigation").

656.   The crimes alleged in the Terrorism Investigation fall into the most serious category of crimes in Turkey.   Prosecutors in Turkey often charge accused FETO members and FETO supporters with attempting to change the constitutional regime by terroristic force.

657.   The maximum punishment for conviction on these charges is life imprisonment.

658.   During the pendency of the FETO-related terrorism investigation, Dr. Ayasli faced immediate arrest and imprisonment if he returned to Turkey, and Ms. Uner was subjected to a travel ban barring her from leaving Turkey for any reason.[31]

659.   Following a four-year investigation, which concluded shortly after Defendant KORKMAZ's indictment by both U.S. and Turkish authorities on various fraud and money laundering charges, each of the charged parties, including Dr. Ayasli, was exonerated when the Chief Public Prosecutor's Office, on July 12, 2021, closed the case finding "no need for prosecution" and lifted the travel ban against Ms. Uner.

---

[31] A byproduct of this spurious travel ban was that the RICO Enterprise successfully blocked Ms. Uner from travelling to the United States to participate in earlier proceedings in New Hampshire related to this civil case.

**Aggravated Fraud Case**

660. On May 5, 2017, Defendant KORKMAZ, through defendant BUGARAJ, also filed a sham criminal complaint against Dr. Ayasli alleging fraud in connection with the December 2016 Agreement.

661. The allegations in this suit largely track those raised in the civil fraud suits.

662. In advance of filing this suit, Defendants KORKMAZ and OZKARAMAN sought to intimidate former BoraJet employees, including Defendant AKOL, CFO Uner, and General Manager Kadir Peker into providing false statements to the prosecutors investigating these allegations.

**1. Defendant OZKARAMAN attempts to intimidate CFO Uner into providing false testimony against Dr. Ayasli**

663. On April 28, 2017, Defendant OZKARAMAN, on behalf of the RICO Enterprise, first contacted CFO Zahide Uner to "encourage" her to provide testimony supportive of Defendant BUGARAJ's claims against Dr. Ayasli. In so doing, Defendant OZKARAMAN began a weeks-long campaign of intimidation against Ms. Uner.

664. Ms. Uner had no prior relationship with Defendant OZKARAMAN, and had never previously met or talked with him.

665. Defendant OZKARAMAN served as Defendant KORKMAZ's "enforcer."

666. When Ms. Uner failed to respond, Defendant OZKARAMAN repeatedly called and texted her, insisting on a meeting at her office.

667. When Ms. Uner continued to refuse to respond, Defendant OZKARAMAN appeared at her office unannounced. Ms. Uner still refused to meet with Defendant OZKARAMAN.

668. In a series of text messages Defendant OZKARAMAN then sent to Ms. Uner, Defendant OZKARAMAN advised Ms. Uner that the commercial case

against Dr. Ayasli was now also "being handled by the public prosecutor's office" – implying the potential for more serious ramifications.

669.   Defendant OZKARAMAN instructed Ms. Uner to "remind" Dr. Ayasli that "the matter is being handled by the public prosecutor's office, that he [Dr. Ayasli] can be facing a difficult legal process as a result of this," and that it would be to Dr. Ayasli's benefit to agree to  meet with Defendant KORKMAZ to resolve Defendant KORKMAZ's issues with Dr. Ayasli.

670.   Defendant OZKARAMAN then escalated his threats against Ms. Uner, warning her that they expected her to talk to the prosecutor, support their position, and informed her that they "have no outstanding issue with [her] other than this one."

671.   Ms. Uner interpreted Defendant OZKARAMAN's threat as an attempt to intimidate her and influence her testimony about Dr. Ayasli.

672.   Ms. Uner then hired an armed security guard because she feared for her safety.

673.   Ms. Uner, however, still refused to engage in any way with Defendant OZKARAMAN.  A few days later, Defendant OZKARAMAN sent the following threatening text message to Ms. Uner:

> **Hello, you need to give a statement at the Public Prosecutor's Office, it may be an issue for you later if you don't show up.  I would like to let you know that you should tread carefully with this matter.  Please keep me posted after you are done with giving the statement.**

674.   On May 10, 2017, after Defendant OZKARAMAN's efforts to influence Ms. Uner to provide false testimony to the Public Prosecutor had failed, Defendant KORKMAZ called the TCF office in Istanbul, provided a false name, and asked to speak to Ms. Uner.

675.   When Ms. Gulhan Ozkan, a TCF executive assistant, refused to provide him with information about Ms. Uner, Defendant KORKMAZ angrily

identified himself, threatened to stalk and sexually violate Ms. Ozkan, and then made a series of "heavy threats" to Ms. Ozkan.

676.   Following the call, the executive director of TCF in Istanbul, closed the TCF office fearing that Defendant KORKMAZ, Defendant OZKARAMAN, or their associates would act on their threats against Ms. Uner or Ms. Ozkan.

677.   For the next two months, TCF employees worked out of a separate, unidentified office elsewhere in Istanbul.

678.   Ms. Uner continued to refuse to provide the demanded false testimony on behalf of the RICO Enterprise

**2.   Defendant Korkmaz blackmails Kadir Peker**

679.   Prior to Defendant AKOL taking over BoraJet, Kadir Peker ("Mr. Peker) was the General Manager of BoraJet.

680.   Mr. Peker left BoraJet in April 2014—more than two years prior to the RICO Enterprise commencing its scheme against Dr. Ayasli and BoraJet.

681.   Nevertheless, Defendant KORKMAZ blackmailed Mr. Peker into providing false written statements about Dr. Ayasli and BoraJet that were used to support of the criminal and civil litigation against Dr. Ayasli by threatening to call a personal loan made to Mr. Peker and carried on BoraJet's books, and by placing an attachment on Mr. Peker's personal residence and property.

682.   On or about July 13, 2017, Defendant KORKMAZ sent an extortionate WhatsApp message to Dr. Ayasli threatening to strongarm Mr. Peker, stating, "I am sure the former general manager, Kadir PEKER, will also sing once the execution office is at his door."

683.   On that same day, July 13, 2017, Mr. Peker sent Dr. Ayasli a series of WhatsApp messages, written by Defendant KORKMAZ, referencing the financial and psychological duress that Defendant KORKMAZ had caused him—stating:

> **Hello Yalcin Bey.  I did not want to bother you, but things here have gone way beyond what I can deal with**

**on my own.  I need to ask your opinion.  I would like to talk if you are available.  Regards, Kadir Peker**

**Yalcin Bey, I cannot get a response from you or your lawyers.  My house, my salary, everything I own has now been attached.  I am in shame.  But no one cares.**

**I have no more strength to stand this.  I will go to the Prosecutor's office tomorrow if my problem is not solved.**

684.   When Dr. Ayasli was not able to contact Mr. Peker (because Mr. Peker was a witness in the pending cases in Turkey), Mr. Peker yielded to the blackmail, submitting a series of letters and complaints to the Public Prosecutor's Office alleging that Dr. Ayasli along with Ms. Uner, falsified BoraJet corporate records, among other things.

685.   Mr. Peker since has acknowledged that he was coerced by Defendant KORKMAZ into providing false statements to law enforcement against Dr. Ayasli.

686.   On August 12, 2022, Mr. Peker prepared a sworn Declaration stating that he had been "threatened and then forced by Defendant KORKMAZ" to provide the "false testimony," that was later used by Defendant KORKMAZ to further criminal charges against Dr. Ayasli in Turkey.

687.   According to Mr. Peker's Declaration, "[o]n July 13, 2017, a series of WhatsApp messages[32] was sent using my phone.  They were written in my presence by Defendant Korkmaz.  I tried to object but could not, given the financial and psychological duress that Defendant Korkmaz had caused me.  I was especially fearful for the physical safety of my children…. Facing these threats, I submitted a complaint to the Turkish Public Prosecutor's office alleging that Dr. Ayasli, along with BoraJet's Chief Financial Officer Zahide Uner, falsified BoraJet corporate records and committed fraud.

---

[32] These messages are quoted in Paragraph 685.

688.   Separately, Tolga Uzumcu, a witness in the criminal case, testified in a July 4, 2018 criminal hearing that Defendant KORKMAZ's Turkish legal counsel, Gorkem Gokce, (1) intimidated him into believing that he was compelled to provide testimony to the Public Prosecutor without a subpoena; (2) concealed the fact that this was a criminal proceeding and the relevance of his testimony thereto; (3) continued to intimidate Uzumcu at the proceeding where he provided testimony; and (4) directed the actual content of the testimony Uzumcu ultimately provided.

**3.   Indictment Followed By Exoneration**

689.   On October 4, 2017, Dr. Ayasli was indicted on fraud, tax evasion, and falsifying financial filings charges in connection with the sale of BoraJet. Ms. Uner was similarly indicted.

690.   In connection with this indictment, Ms. Uner was prohibited from travelling outside of the Republic of Turkey for any reason.

691.   Notably, ***four years later***, after a full investigation, Dr. Ayasli and Ms. Uner both were exonerated when the charges were dismissed on September 14, 2021.

**OFAC  Referral**

692.   The RICO Enterprise also sought to engage U.S. law enforcement to increase its leverage over Dr. Ayasli and to extract a settlement in its civil suit.

693.   On October 4, 2017, the very same day that Turkish prosecutors returned the aggravated fraud indictment against Dr. Ayasli and Ms. Uner, Defendant KORKMAZ, using a New York City law firm that he retained on behalf of Defendants SBK TURKEY and BUGARAJ, mailed Dr. Ayasli a demand letter masquerading as a "Settlement Communication."

694.   The "Settlement Communication" informed Dr. Ayasli that Defendants SBK TURKEY and BUGARAJ, through Defendant KORKMAZ, had filed an initial notification of voluntary self-disclosure with the United States Department of Treasury, Office of Foreign Asset Control ("OFAC") advising

OFAC that BoraJet, while owned Dr. Ayasli, had operated a handful of test flights into Iran in 2013 in violation of the U.S.-Iran trade embargo.

695.   Based on this referral, Dr. Ayasli now also faced potential jeopardy in the United States.

696.   Rather than participate in this "Settlement Communication," Dr. Ayasli, through counsel, filed a response with OFAC.

697.   The U.S. government subsequently issued a "no-action" letter.

**Additional Civil Fraud Case**

698.   On November 21, 2017, Defendant BUGARAJ filed another civil case against Dr. Ayasli in the Istanbul 2nd Commercial Court of First Instance.  This case also was funded by Fraud Proceeds derived from the U.S.-based Fraudulent Fuel Tax Credit Scheme.

699.   Using this pretext, Defendant BUGARAJ, on behalf of the RICO Enterprise, *again* unsuccessfully attempted to place attachments on Dr. Ayasli's real estate.

700.   On December 29, 2017, the Turkish Court consolidated Defendant BUGARAJ's two commercial cases.

701.   At every turn, the RICO Enterprise has sought to subvert the legal process to enhance its leverage, extract a significant monetary settlement, and acquire Dr. Ayasli's commercial and residential real estate.

702.   Beyond weaponizing unfounded criminal prosecutions and intimidating witness to secure false testimony, Defendant KORKMAZ, on behalf of the RICO Enterprise, reinstituted the media disinformation campaign, corrupted the Court's expert valuation, sought to liquidate Dr. Ayasli's Turkish real estate holdings, and repeatedly acted to intimidate Dr. Ayasli, his family, his attorneys and his associates.

### 1.   Defendant KORKMAZ Re-ignites the Media Disinformation Campaign

703.   Shortly after filing the criminal complaint initiating the FETO Terrorism Investigation against Dr. Ayasli, Defendant KORKMAZ, in August 2017, hosted a gathering for Turkish reporters at a posh waterfront villa on the Bosphorus in Istanbul owned by Defendant MEGA VARLIK's.

704.   During this event, Defendant KORKMAZ hosted journalists from news outlets including *Hurriyet* and *Haberturk* and enticed them to continue publishing stories amplifying Defendant KORKMAZ's false claims that Dr. Ayasli engaged in fraudulent conduct in the BoraJet sale, continued to hold allegiance to FETO and exiled Turkish cleric Fethullah Gulen, and violated U.S. sanctions through BoraJet flights to Iran.

705.   Defendant KORKMAZ's reference to BoraJet's alleged OFAC violation was the identical issue that would be raised by Defendant BUGARAJ in its extortionate "Settlement Communication" sent to Dr. Ayasli by Defendant BUGARAJ's U.S. counsel only six weeks later.

706.   Defendant KORKMAZ promised any "journalists" who printed or ran such stories all-expenses-paid European vacations.

707.   Following this event, Turkish newspapers *Hurriyet*, *Haberturk* and *Aksam* published stories exactly like those requested by Defendant KORKMAZ at the August 2017 Bosphorus gathering.

708.   For example, on August 15, 2017, *Hurriyet* published a one-sided article prominently featuring Defendant BUGARAJ's claims of fraud against Dr. Ayasli.

709.   Two days later, *Haberturk* published an article falsely accusing BoraJet of  improperly having flown domestic routes in Iran, stating:

> **BoraJet, which was created as a regional airline company, made an effort to fly to problematic countries in the region.  BoraJet, the regional airline company that was expected to increase its activities through cross**

**flights in Turkey, made 22 connecting flights in Iran in 2013.  It is very interesting.  Isn't it interesting that BoraJet, a Turkish company with American capital in a way, made domestic flights between cities in Iran?**

**The current status: after the case was filed with respect to the disputes of BoraJet, the related person has applied for a preliminary injunction and the court has issued a warrant for Yalcin Ayasli regarding his testimony before the authorities.**

710.   On December 7, 2017, the Turkish national newspaper *Aksam* published an article that parroted the false information disseminated by Defendant KORKMAZ at the Bosphorus villa when, in its article entitled *The Embargo did not Affect Gulenist Ayasli*, an *Aksam* "journalist" wrote that Dr. Ayasli was affiliated with FETO and that he violated the United States embargo on Iran by conducting BoraJet flights into Iran.

711.   On December 27, 2017, *Patronlar Dunyasi* published another article parroting the false claims disseminated by Defendant KORKMAZ at the Bosphorus villa.  In his article, *The Armenian Lobby is an Excuse, the Dirty Alliance is Brilliant, Patronlar Dunyasi* asserted that Dr. Ayasli is a "Gulenist," that Dr. Ayasli associated closely with alleged FETO leaders, and that Dr. Ayasli conspired to violate the United States' embargo on Iran using BoraJet.

712.   Finally, on December 20, 2018, Hurriyet published an article entitled *FETO's Justice Cleric was Found on the 'Jet,'* peddling the demonstrably false claim that Dr. Ayasli had flown Fethullah Gulen to Turkey on a BoraJet plane, and identifying Dr. Ayasli, Ms. Uner, and others as "suspects of the FETO investigation," which was a "sealed" investigation that Defendant KORKMAZ had initiated.

### 2.   Defendant KORKMAZ's Repeated Efforts to Directly Intimidate and Extort Dr. Ayasli

713.   In March 2018, Defendant KORKMAZ again sought to directly engage Dr. Ayasli via WhatsApp text messaging.  Specifically, on March 26, 2018,

Defendant KORKMAZ demanded an immediate "settlement" from Dr. Ayasli, claiming that BoraJet was facing an exigent impending license suspension.

714. Dr. Ayasli, for the first time, responded to Defendant KORKMAZ by WhatsApp text messaging.

715. During the ensuing WhatsApp text conversations that occurred consistently through April 11, 2018, Defendant KORKMAZ sought to entice Dr. Ayasli to meet with him in person in Massachusetts.

716. In doing so, Defendant KORKMAZ repeatedly made misrepresentations minimizing the physical threat that Dr. Ayasli would face by attending this meeting.

717. For example, Defendant Korkmaz claimed, among other things: (1) that "I never called you a FETO supporter [to the public prosecutor];" (2) "I did not do anything to [Ms. Uner], my professor. I just got upset and slammed the cup on the table. The glass table broke." (3) that he had not beaten up Defendant AKOL as he previously represented but rather only "threw an ashtray at him," and (4) that he "never" showed a photo to Attorney Safak or Professor Yavuz depicting a bloodied Defendant AKOL.

718. Addressing BoraJet, Defendant KORKMAZ further misrepresented that: (1) "I only had one goal and that was to fly BoraJet, to grow it, and eventually sell or make it go public;" and (2) his losses from the BoraJet acquisition would be $150 million by month's end.

719. Through these knowing and intentional misrepresentations, Defendant KORKMAZ sought to extract from Dr. Ayasli a monetary settlement to which he was not entitled.

### 3. Systemic acts of intimidation, assault, bribery directed at Dr. Ayasli's family and associates

720.    Defendant KORKMAZ further elevated his campaign of pressure against Dr. Ayasli by extending his direct threats to Dr. Ayasli's employees, business associates, and attorneys.

721.    At a follow-up meeting to the March 18, 2017 meeting when Defendant KORKMAZ smashed the table at Attorney Safak's office, Defendant KORKMAZ showed Safak a photograph depicting a badly beaten and bloodied Defendant AKOL.

722.    Defendant KORKMAZ boasted to Safak that he (Defendant KORKMAZ) had bashed Defendant AKOL's face in with an iron ashtray, and bragged, "I have beaten many people in my life."

723.    On October 5, 2017, prior to a hearing before the Istanbul 3rd Commercial Court of First Instance, Defendant KORKMAZ approached Attorney Hamdi Tolga Danışman of the Istanbul law firm Herguner Bilgen.  Pulling Danışman aside, Defendant KORKMAZ told Danışman:  "I am following you, I know where you go and who you are with…" and "I will expose you as a member of FETO."[33]

724.    When the Herguner Bilgen firm, on behalf of Dr. Ayasli, filed a criminal complaint against Defendant KORKMAZ (and others) with the Office of the Chief Public Prosecutor of Istanbul in November 2017 asserting charges of perjury and attempt to influence a fair trial, Defendant KORKMAZ sent a threatening message to Umit Herguner, the senior partner of the Herguner Bilgen firm, enclosing a screenshot of the just-filed criminal complaint and stating: "You will face the consequences for these kinds of games."

---

[33] Defendant KORKMAZ previously had included Danisman in the criminal complaint he filed triggering the Terrorism Investigation.

725.   A few days later, on November 28, 2017, Defendant KORKMAZ threatened Dr. Ayasli through Attorney Safak, directing Safak to "tell Ayasli to stop talking negatively about me" unless he wants to face a "re-ignition of the FETO allegations."

726.   Defendant KORKMAZ then attempted to bribe Attorney Safak, offering him $5 million USD to misuse his power of attorney to transfer all of Dr. Ayasli's real estate in Turkey to Defendant KORKMAZ.

727.   On New Year's Eve 2018, while speaking to Dr. Ayasli's lawyer Muhlis Arvas, Defendant KORKMAZ made violent threats against Dr. Ayasli's daughter.  Defendant KORKMAZ told Attorney Arvas to tell Dr. Ayasli that he (Defendant KORKMAZ) had "discovered her address in New York," and that unless Dr. Ayasli settled up with him, "he would never let this go."

728.   In February 2018, Defendant KORKMAZ travelled from Turkey to Salt Lake City, Utah to confront, threaten, and attempt to bribe University of Utah Professor Hakan Yavuz into pressuring Dr. Ayasli to "surrender" and pay a monetary "settlement" to the RICO Enterprise.

729.   Prof. Yavuz is a Turkish citizen and currently lives in Salt Lake City, Utah.

730.   Prof. Yavuz is a tenured professor in the Department of Political Science at the University of Utah's Middle East Center.

731.   Prof. Yavuz has extensively studied and written several books about the Gulen movement.

732.   Prof. Yavuz publicly and repeatedly has denounced, both in his writings and in his online postings, the RICO Enterprise's relentless media disinformation campaign alleging that Dr. Ayasli is a member of FETO and was in any way connected to the July 2016 failed coup attempt.

733.   During high-level meetings with members of the Erdogan administration in Ankara in 2017, Dr. Yavuz advised Turkish officials that the RICO Enterprise's campaign linking Dr. Ayasli to FETO was baseless and false.

734.   Prof. Yavuz sought these meetings because he was concerned that the RICO Enterprise's disinformation campaign had been so successful among the citizens, business people and banks in Turkey, that it might actually also have influenced officials in the Turkish government against Dr. Ayasli.

735.   On February 22, 2018, Defendant KORKMAZ appeared at Prof. Yavuz's campus office in Salt Lake City unannounced, uninvited and accompanied by an unidentified American henchman, believed to be Defendant KINGSTON.

736.   Defendant KORKMAZ insisted on having an immediate meeting with Professor Yavuz.

737.   Professor Yavuz felt threatened and intimidated, and believed that he had no choice but to meet with Defendant KORKMAZ.

738.   Defendant KORKMAZ informed Professor Yavuz that he was aware that Professor Yavuz had family living in Turkey and that Defendant KORKMAZ "knew where they lived."

739.   Prof. Yavuz interpreted Defendant KORKMAZ's statement as a direct threat against his family.

740.   Defendant KORKMAZ then confronted Professor Yavuz, stating that Professor Yavuz's meetings with high ranking government officials in Ankara debunking Dr. Ayasli's alleged FETO ties had done "great damage" to Defendant KORKMAZ's interests in Turkey.

741.   Defendant KORKMAZ warned Professor Yavuz to "be careful" and threatened Professor Yavuz against "getting involved in these matters again" - referring specifically to Professor Yavuz's writings and online statements exonerating Dr. Ayasli from involvement with Gulen or FETO.

742.    During his meeting with Professor Yavuz, Defendant KORKMAZ admitted that he knew that Dr. Ayasli and Ms. Uner had no connections to FETO, that he (Defendant KORKMAZ) had, in fact, fabricated the FETO allegations against Dr. Ayasli and Ms. Uner, and that he did so because Dr. Ayasli "put us in a tight corner."

743.    Defendant KORKMAZ further admitted that Defendants DERMEN, KINGSTON and ISAIAH KINGSTON were his "business partners."

744.    Defendant KORKMAZ also told Professor Yavuz that "there is no justice in Turkey" and that "everything is about money."

745.    Defendant KORKMAZ then asserted that he had paid bribes to many people in positions of influence in Turkey, and that he had "records of everything he had given" to those individuals.

746.    By way of example, Defendant KORKMAZ showed Professor Yavuz a copy of a check for $250,000 he had sent jointly with Lev Aslan Dermen to Ibn Haldun University in Istanbul where high-ranking Turkish officials and members of prominent political families serve on the Board of Trustees.

747.    Defendant KORKMAZ also bragged to Professor Yavuz about his (Defendant KORKMAZ's) role in the Mueller Investigation and his "high level connections" in the United States Government.

748.    Defendant KORKMAZ then threatened Professor Yavuz by showing him a photograph on Defendant KORKMAZ's phone showing Defendant AKOL with his face bashed in and bloodied—the same photograph that Defendant KORKMAZ had earlier brandished in front of Attorney Safak.

749.    Defendant KORKMAZ demanded that Professor Yavuz contact Dr. Ayasli to set up a face-to-face meeting between Defendant KORKMAZ and Dr. Ayasli.

750.   Professor Yavuz felt threatened by Defendant KORKMAZ and immediately informed Dr. Ayasli of the details surrounding Defendant KORKMAZ's unannounced visit to his office.

751.   Finally, on February 14, 2019, thirty armed police officers from the Chief Public Prosecutor's Office of Terror and Organized Crime Investigation Bureau raided the Istanbul offices of Herguner Bilgen.  These officers searched Attorney Tolga Danisman's office, and seized his laptop computer, mobile devices, flash drives, documents, and other items.

752.   Attorney Danisman was detained on suspicion of FETO affiliation.  He was later released.

**4.     Corruption of Court Proceedings and Expert Accounting Process**

753.   Approximately two weeks after Mr. Danisman was arrested, there was a hearing in the consolidated civil cases to address the findings of the panel of court-appointed economic experts in Turkey assigned to evaluate the merits of these commercial cases.

754.   Dr. Ayasli was not present or represented at this hearing due to the raid on his counsel's offices and arrest of Mr. Danisman.

755.   In advance of this hearing, Defendant KORKMAZ had exerted influence over this panel. As a consequence of that influence, contrary to the commercial court's explicit instructions, the panel failed: (1) to actually examine BoraJet's books and records; (2) to visit the sites where BoraJet's aircraft were located; and (3) to correctly state the number of aircraft actually owned by BoraJet or the condition of these aircraft.

756.   The panel of experts also ignored the statement of BoraJet's President of Financial Affairs, Tolga Uzumcu, who confirmed that "many professionals" had examined and analyzed BoraJet's financials on behalf of Defendant KORKMAZ prior to Defendant BUGARAJ's purchase of BoraJet, and further ignored the three expert reports submitted by Dr. Ayasli.

757.   Relying on this tainted expert analysis and without Dr. Ayasli's counsel present to argue a counter position, the Court found in favor of Defendant BUGARAJ and awarded over $90 million in damages.

758.   At the hearing, the Court also granted the RICO Enterprise's renewed request for liens on all of Dr. Ayasli's properties in Turkey.

759.   Dr. Ayasli appealed this decision on September 12, 2019, and the decision remains pending.

760.   Dr. Ayasli further has filed a civil suit addressing Defendant KORKMAZs' exercise of influence to corrupt the panel of experts and their findings.

761.   The RICO Enterprise's continuing effort at intimidation and exerting undue influence on the judicial proceedings involving Dr. Ayasli prompted the entire Herguner firm to write and sign a letter to the Istanbul Bar Association citing their firm's exposure to "threat, intimidation and pressure," and the increasing use of the strategy of "calumniate and the stain will remain" to affect Dr. Ayasli's cases in Turkey.

I.     **The RICO Enterprise's Continuing Effort to Complete the Illicit Acquisition of Dr. Ayasli's Real Estate Holdings**

762.   In each proceeding involving Dr. Ayasli – the December 2016 Agreement, the proceedings to accelerate loans, and the civil actions -- Defendant KORKMAZ, acting on behalf of the Enterprise, has attempted to attach liens to at least one, and in most cases all, of Dr. Ayasli's commercial and residential real estate in Turkey.

763.   Defendant KORKMAZ, through Defendant BUGARAJ, and on behalf of the RICO Enterprise, repeatedly has acted to liquidate these liens and either secure clean title to the properties at a below market price or to secure the proceeds of these sales.

764.   Defendant KORKMAZ, through Defendant BUGARAJ, secured a lien on Dr. Ayasli's Nuruosmaniye property as part of the December 2016 Agreement, which attached in February 2017.

765.   As noted above, in February 2019, Defendant BUGARAJ attached liens on all of Dr. Ayasli's commercial and residential property acquired after securing a civil judgment against Dr. Ayasli at a hearing in which he was neither present nor represented by counsel.

766.   In the fall of 2020, Defendant BUGARAJ assigned these liens to Turkish loan consolidation company Armada Varlik Yonetim A.S. ("Armada") for liquidation.

767.   Armada subsequently auctioned Dr. Ayasli's Nuruosmaniye property, selling the property to Defendant BUGARAJ for over $14 million.

768.   Upon receiving correspondence from undersigned counsel indicating that the property was the subject of pending litigation in the United States, Armada subsequently returned the Nuruosmaniye property to Defendant BUGARAJ and by agreement, it was subsequently transferred to Attorney Safak, who is now holding it.

769.   In May 2021, Defendant KORKMAZ, through Defendant BUGARAJ, triggered another auction of an Ayasli family residence in Ortakoy, Turkey. As was done with Dr. Ayasli's Nuruosmaniye property, Defendant KORKMAZ, through Defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGSTON, purchased this residence, as well as personal effects and artwork, for approximately $14,160,000 in Fraud Proceeds on May 21, 2021. This purchase later was unwound when a Turkish court declared it to be a fraudulent transfer.

770.   In July 2022, Defendant KORKMAZ, through Defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGSTON, triggered an auction of six of Dr. Ayasli's properties in which Garanti Bank held the superior interest. At the August 23, 2022, auction, Defendant BUGARAJ did not purchase the

properties, instead electing to collect the portion of the sale price subject to the liens. Dr. Ayasli, through his spouse, repurchased four of his properties, which were apartments in Cumhuriyet (2) and Tefken (2) for a total price of $2,7600,000 in U.S.-based funds. The remaining two properties, buildings in Nisantasi, were purchased by Garanti Bank.

771.   Defendant BUGARAJ, through Armada, continues to hold title to all of the remaining properties, collectively totaling more than $150 million in additional value and could seek to liquidate them, with limited restrictions, at any time in the present or future.

## **CLAIMS FOR RELIEF**

## **FIRST CLAIM FOR RELIEF**

### **(Violations of RICO, 18 U.S.C. §1962(c))**

### **(Select Defendants)**

772.   Plaintiff re-alleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full herein.

773.   At all times relevant to this Complaint, Dr. Ayasli was a "person" within the meaning of Title 18, United States Code, Sections 1961(3) and 1962(c).

774.   At all times relevant to this Complaint, each RICO Defendant was a "person" within the meaning of Title 18, United States Code, Sections 1961(3) and 1962(c).

### **The RICO Enterprise**

775.   Defendants KORKMAZ, DERMEN, KINGSTON, ISAIAH KINGSTON, AKOL, OZKARAMAN, WASHAKIE, SBK TURKEY, SBK USA, BUGARAJ, and MEGA VARLIK ("RICO Defendants"),[34] and their Co-

---

[34] The term "RICO Defendants" is limited to those individuals who are alleged to have committed a Section 1962(c) violation (substantive RICO). The RICO Defendants, along with fellow Co-conspirators YILMAZ, ZOUBKOVA, BUKOMBIN, NOIL ENERGY, SPEEDY LION, GT ENERGY, UNITED FUEL SUPPLY, ISANNE, BIOFARMA, BLANE, STONE, and KOMAK, are included in the Section 1962(d) allegation (RICO conspiracy). Together, they are

conspirators, are a group of persons associated in fact and constitute an "enterprise," as defined in Title 18, United States Code, Section 1964 ("RICO Enterprise").

776.   The RICO Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purposes of: (1) enriching its members and associates, in substantial part, through the commission of sophisticated criminal conspiracies and acts, including mail fraud, wire fraud, money laundering, Hobbs Act Extortion, Travel Act violations, and obstruction of justice; (2) protecting its members and associates from external criminal and civil threats through systemic efforts of deception and concealment; and (3) preserving its illicitly secured assets from law enforcement seizures, criminal and civil judgments, or other external threats through the use of force, fear, and intimidation, as well as  through the manipulation, obstruction, and subversion of legal proceedings.

777.   The RICO Enterprise is engaged in, and its activities affect, interstate and foreign commerce through operations that demonstrate continuity of both structure and personnel.

778.   The RICO Enterprise was founded in the United States by Defendants DERMEN, KINGSTON, ISAIAH KINGSTON and WASHAKIE by no later than 2011 and continues to operate through this day.

779.   The RICO Enterprise principally operates within the United States, specifically within the Central District of California and the District of Utah.

780.   Defendant DERMEN is the leader of the RICO Enterprise.

781.   Defendant KINGSTON served as Defendant DERMEN's top U.S.-based associate, who in turn, was closely aided by Defendant ISAIAH KINGSTON.

_____

defined as the "RICO Co-conspirators."

782.   The RICO Enterprise conducts its U.S. operations through Enterprise-funded and controlled businesses, including but not limited to, Defendants WASHAKIE and SBK USA, and Co-conspirators NOIL ENERGY, SPEEDY LION, GT ENERGY and UNITED FUEL SUPPLY.

783.   To facilitate its transnational money laundering operations, the RICO Enterprise expanded its operations to Turkey, where Defendant KORKMAZ, assisted by Defendant OZKARAMAN, has overseen its operations since at least 2013. During a critical period in 2016, Defendant AKOL assisted with the RICO Enterprise's acquisition of BoraJet.

784.   As in the United States, the RICO Enterprise conducts its operations in Turkey through Enterprise-funded and controlled entities, including but not limited to, Defendants SBK TURKEY, BUGARAJ, and MEGA VARLIK and co-conspirators BUKOMBIN, ISANNE, BIOFARMA, BLANE, STONE and KOMAK.

785.   While the organization of the RICO Enterprise has evolved over time and its members have held different roles at different times, the RICO Enterprise has been structured to operate as an ongoing unit to accomplish its purpose. For example, following Defendants DERMEN and KINGSTON's 2018 indictment in the District of Utah on mail fraud, money laundering, and obstruction of justice charges (Dermen/Kingston Criminal Proceeding), Defendant KORKMAZ assumed the principal leadership role and actively pursued the RICO Enterprise's ongoing fraud, extortion, and money laundering activities, including those that have been, and continue to be, directed at Dr. Ayasli.

### Pattern of Racketeering Activity

786.   Each of the RICO Defendants conducted and participated, directly and indirectly, in the operation, management, and affairs of the RICO Enterprise through a "pattern of racketeering activity" within the meaning of Title 18, United

States Code, Section 1961(5) and in violation of Title 18, United States Code, Section 1962(c), as demonstrated below.

787.    In this case, the "pattern of racketeering activity" included multiple acts indictable under the following federal criminal statutory provisions:

      a.   Mail Fraud, in violation of Title 18, United States Code, Section 1341;

      b.   Wire Fraud, in violation of Title 18, United States Code, Section 1343;

      c.   Money Laundering Conspiracy, in violation of Title 18, United States Code, Section 1956(h);

      d.   Domestic Promotional Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

      e.   Domestic Concealment Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

      f.   Transnational Promotional Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A);

      g.   Transnational Concealment Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i);

      h.   Engaging in Monetary Transactions Using Criminally Derived Proceeds, in violation of Title 18, United States Code, Sections 1957(a), (d)(1);

      i.   United States Person Engaging in Monetary Transactions Using Criminally Derived Proceeds Outside the United States, in violation of Title 18, United States Code, Sections 1957(a), (d)(2);

      j.   Obstruction of Justice, in violation of Title 18, United States Code, Section 1512;

      k.   Hobbs Act Extortion, in violation of Title 18, United States

1   Code, Section 1951; and

2   l.   Travel Act offenses, in violation of Title 18, United States Code,

3   Section 1952.

4   788.   Each RICO Defendant has engaged in the pattern of racketeering

5   activity alleged herein.

6   789.   The RICO Defendants' commission of these predicate acts of

7   racketeering has had a direct or indirect effect on the RICO Enterprise.

8   790.   The RICO Defendants' predicate acts of racketeering activity were

9   sufficiently connected to each other by a common scheme, plan, or motive to

10   constitute a "pattern."

11   791.   The RICO Defendants' predicate acts of racketeering activity were

12   related to each other.  These were not isolated, disconnected events, but instead,

13   events connected by shared participants, shared recipients, and shared methods of

14   commission so as to establish a sufficient interrelationship evidencing a common,

15   overarching purpose.

16   792.   The RICO Defendants' predicate acts of racketeering activity were

17   both sufficient in number and have been conducted over the course of years,

18   thereby establishing closed-ended continuity.

19   793.   The RICO Defendants' predicate acts of racketeering activity continue

20   to this day, and as such, are capable of indefinite repetition into the future sufficient

21   to establish open-ended continuity.

22   794.   The RICO Enterprise has profited immensely from the totality of

23   criminal acts constituting the pattern of racketeering activity conducted by the

24   RICO Defendants.

25   795.   Initially, the RICO Enterprise obtained its operational funding through

26   its U.S.-based Fraudulent Fuel Tax Credit Scheme, a brazen mail fraud scheme

27   through which the RICO Enterprise defrauded the United States Treasury of

28   approximately $470,000,000. Supra, ¶ 366-403.

796.   The RICO Defendants and their Co-conspirators then actively laundered the illicit Fraud Proceeds through a series of sophisticated schemes involving multiple bank accounts and businesses that the RICO Enterprise created, acquired or otherwise controlled in the United States and Turkey. Through this process, the RICO Enterprise actively worked to conceal the source and location of these funds from law enforcement, while providing itself with nearly unlimited funds for use in promoting ongoing racketeering activity, acquiring goods, services, and businesses, and subverting the legal process through bribes, evidence manipulation, and sham litigation. Supra, ¶ 402-38, 442, 445, 454-80.

797.   By 2016, the RICO Enterprise's U.S.-based Fraudulent Fuel Tax Credit Scheme had run its course. The IRS had refused payment on several Enterprise-submitted claims and an investigation into the validity of these claims had been initiated.

798.   Utilizing the vast cache of laundered Fraud Proceeds, Defendants KORKMAZ, DERMEN, and KINGSTON shifted much of the Enterprise's focus, and thereby its racketeering activity, to a new half billion dollar fraud scheme: the targeting of (1) Dr. Ayasli's businesses BoraJet and Aydin Jet, including his Global XRS executive jet; and (2) multiple prized commercial properties and private residences in Turkey collectively valued at approximately $150 million; all of which were acquired and funded through Dr. Ayasli's U.S.-generated and U.S.-based wealth.  It further has sought to extract tens of millions of dollars in U.S.-held money from Dr. Ayasli through sham litigation in Turkey funded by the laundered Fraud Proceeds, multiple acts of extortion directed at Dr. Ayasli at his U.S.-residences, and concerted and repeated efforts to obstruct the United States government's investigation into the full scope of the RICO Enterprise's money laundering activities, including those directed at Dr. Ayasli.

799.   For the past six years, the RICO Enterprise, operating principally through Defendants KORKMAZ and BUGARAJ, and on behalf of Defendants

1  DERMEN, KINGSTON, ISAIAH KINGSTON and its other members, has

2  relentlessly pursued Dr. Ayasli's assets through repeated acts of racketeering

3  activity, including but not limited to obstruction of justice, money laundering,

4  Hobbs Act extortion, Travel Act violations and wire fraud.

5  **Predicate Acts of Obstruction of Justice (18 U.S.C. § 1512)**

6  800.   To protect its members, advance its interests, and hinder the efforts of

7  law enforcement to identify the full scope of its fraud and money laundering

8  operations, the RICO Enterprise, through Defendants KORKMAZ, DERMEN,

9  KINGSTON, and ISAIAH KINGSTON engaged in multiple forms of obstruction

10  of justice within the United States, and elsewhere.

11  801.   As acutely demonstrated through the federal criminal indictments

12  returned against Defendants KORKMAZ, and Defendants DERMEN, KINGSTON

13  and ISAIAH KINGSTON, the United States government is in the midst of a multi-

14  year investigation in which it has sought to define the full scope of the U.S.-based

15  Fraudulent Fuel Tax Credit Scheme and the myriad acts of money laundering

16  through which Defendants KORKMAZ, DERMEN, KINGSTON, ISAIAH

17  KINGSTON, and others at their direction, transferred the illicit Fraud Proceeds to

18  Enterprise-controlled businesses and bank accounts throughout the United States

19  and Turkey. Supra, ¶ 439-74.

20  802.   This includes the laundering of funds in connection with the RICO

21  Enterprise's fraudulent acquisition of BoraJet and Aydin Jet from Dr. Ayasli.

22  Supra, ¶ 449-50, 464-65.

23  803.   At all times relevant to this Complaint, Defendants KORKMAZ,

24  DERMEN, KINGSTON, and ISAIAH KINGSTON each well knew that the United

25  States government had initiated a criminal investigation into the RICO Enterprise's

26  mail fraud and money laundering schemes. Supra, ¶ 441-42, 444-45, 466-73.

27  804.   Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH

28  KINGSTON, acting to protect the RICO Enterprise and its members, conspired and

agreed to, and did in fact, corruptly alter, destroy and conceal records and hard drives documenting the scope of the Enterprise's illegal conduct and separately conspired and agreed, and did act, to corruptly obstruct, influence and impede this official investigation, in violation of Title 18, United States Code, Sections 1512(c)(1), (2) and (k), respectively.

805.  On April 29 and 30, 2019, Defendant KORKMAZ was interviewed in Utah by federal agents from the Internal Revenue Service and the Environmental Protection Agency as part of this investigation. Supra, ¶ 466.

806.  During this interview, Defendant KORKMAZ, acting on behalf of Defendants DERMEN, KINGSTON and ISAIAH KINGSTON, and to protect the interests of the RICO Enterprise, repeatedly lied about the true purpose underlying transnational financial transactions between Defendants KORKMAZ, DERMEN, and KINGSTON and involving Co-conspirators UNITED FUEL SUPPLY, KOMAK, and BLANE, claiming lawful reasons for each transfer of funds. Defendant KORKMAZ also lied when he concealed the ownership interest of Defendant DERMEN in Enterprise-acquired property, namely, the Queen Anne yacht. Supra, ¶ 467-73.

807.  Defendant KORKMAZ's election not to provide truthful information and instead to intentionally tell material lies designed to shield the existence and scope of the RICO Enterprise's money laundering operations deprived the U.S. government of complete clarity into the full scope of its money laundering scheme and the broader racketeering activity of the RICO Enterprise. This included the varied ways that the RICO Enterprises has used laundered Fraud Proceeds and its multi-tiered money laundering operation to target Dr. Ayasli's business and property.

808.  Based on the lies told to federal investigators during this interview, Defendant KORKMAZ stands charged in the District of Utah with Obstruction of

an Official Proceeding, in violation of Title 18, United States Code, Section 1512(c)(2). ("Korkmaz Criminal Proceeding.")

809.    Similarly, at earlier stages in the government's investigation, Defendants KINGSTON and ISAIAH KINGSTON, acting on behalf of the RICO Enterprise, to include Defendants DERMEN and KORKMAZ, repeatedly sought to obstruct the government's efforts to secure a full understanding of the scope of the criminal schemes that they had perpetuated on behalf of the RICO Enterprise, including the cross-border money laundering operations with Defendant KORKMAZ through Enterprise-controlled entities and accounts in the United States and Turkey.

810.    These efforts, which began as early as 2014 and continued through 2017, in Salt Lake City, and elsewhere, included the production of false documents to government investigators and the grand jury, the destruction of business hard drives at Defendant WASHAKIE and Co-conspirator UNITED FUEL SUPPLY, and payments made with the intent to bribe multiple government officials and to hire enforcers to conduct acts of witness intimidation.  Supra, ¶ 441-45.

811.    As part of his plea agreement, Defendant KINGSTON pled guilty to separate counts of obstruction of justice as a result of having conspired to obstruct the government's investigation, in violation of Title 18, United States Code, Section 1512(k), destroyed evidence, in violation of Title 18, United States Code, Section 1512(c)(1), and tampered with witnesses, in violation of Title 18, United States Code, Section 1512(a)(2). This included Defendant KINGSTON's admission to having unsuccessfully attempted to bribe a purported "high-level" official at the United States Department of Justice, federal agents, prosecutors, and judges and to having hired an "enforcer" to intimidate witnesses "through force or threat of force."

812.    Defendant ISAIAH KINGSTON, likewise, pled guilty to conspiring to obstruct the government's investigation, in violation of Title 18, United States

Code, Section 1512(k), and destroying evidence, in violation of Title 18, United States Code, Section 1512(c)(1), based on the same general conduct as his brother.

813.   Both independently and together, these acts of obstruction were designed to subvert the legal process and to preclude a full and honest accounting of the true scope of the RICO Enterprises' criminal activities.  This includes its transnational money laundering operation and its use of laundered funds to target Dr. Ayasli's business and property.

### Predicate Acts of Mail Fraud (18 U.S.C. § 1341)

814.   The RICO Enterprise, operating through Defendants DERMEN, KINGSTON, ISAIAH KINGSTON, and WASHAKIE conducted a massive multi-year mail fraud scheme in which they: (1) knowingly devised a scheme for obtaining money from the United States government by means of false or fraudulent pretenses, representations, or promises; (2) made material misstatements that had a natural tendency to influence, or were capable of influencing the United States government in paying the requested funds; (3) acted with the intent to defraud when submitting the fraudulent request for funds; and (4) used the mails to carry out an essential part of the scheme.

815.   Defendants DERMEN, KINGSTON, ISAIAH KINGSTON, and WASHAKIE knowingly devised, executed, implemented, and caused to be implemented a scheme to unlawfully obtain renewable fuel tax credits that the United States Treasury administered through the Internal Revenue Service ("IRS") by filing by mail IRS Form 8499 claims (Claim for Refund of Excise Taxes) in which they falsely claimed refundable renewable fuel tax credits to which they knew they were not entitled.  Supra, ¶ 384-405.

816.   Rather than produce or sell fuel that lawfully would qualify for a refundable renewable fuel tax credit, Defendants DERMEN, KINGSTON and ISAIAH KINGSTON falsified, or caused others to falsify, invoices, contracts, production records, bills of lading, sales invoices, and accounting records to create

the false appearance that legitimate business was being conducted and to conceal their unlawful conduct for federal regulators and law enforcement. .

817.    Despite not having produced or sold any lawfully qualifying biodiesel mixtures, agri-biodiesel mixtures, renewable diesel mixtures or liquid fuel derived from biomass, Defendants DERMEN, KINGSTON and ISAIAH KINGSTON, through Defendant WASHAKIE,[35] filed, or caused to be filed, by mail 19 IRS Form 8449 claims between February 2013 and February 2016 in which they, acting with the intent to defraud, fraudulently represented to having produced or sold over 1.2 billion gallons of such materials, thereby allowing them to falsely claim  more than 1.1 billion dollars in fuel tax credits as follows:

| Date | Filer | False Item(s) Claimed | Amount of Credit Claimed |
|---|---|---|---|
| 2/13/13 | Washakie | Line 2a – Biodiesel mixtures | $3,901,235 |
| 2/25/13 | Washakie | Line 2a – Biodiesel mixtures | $640,959 |
| 3/11/13 | Washakie | Line 3f – Liquid fuel derived from biomass | $20,283,659 |
| 3/12/13 | Washakie | Line 2a – Biodiesel mixtures Line 3f – Liquid fuel derived from biomass | $806,041 $3,600,000 |
| 3/27/13 | Washakie | Line 2a – Biodiesel mixtures Line 3f – Liquid fuel derived from biomass | $2,398,274 $6,461,246 |
| 4/17/13 | Washakie | Line 3f – Liquid fuel derived from biomass | $11,872,884 |
| 5/20/13 | Washakie | Line 2a – Biodiesel mixtures | $11,700,000 |
| 6/3/13 | Washakie | Line 2a – Biodiesel mixtures | $11,400,000 |
| 7/29/13 | Washakie | Line 2b – Agri-biodiesel mixtures | $25,800,000 |
| 8/13/13 | Washakie | Line 2a – Biodiesel mixtures | $16,200,000 |
| 9/05/13 | Washakie | Line 2a – Biodiesel mixtures | $35,008,437 |
| 9/30/13 | Washakie | Line 2b – Agr—biodiesel mixtures | $33,465,236 |
| 10/20/13 | Washakie | Line 2a – Biodiesel mixtures | $33,581,899 |
| 11/17/13 | Washakie | Line 2a – Biodiesel mixtures | $38,078,529 |
| 12/09/13 | Washakie | Line 2a – Biodiesel mixtures | $33,579,440 |
| 12/24/13 | Washakie | Line 2a – Biodiesel mixtures | $21,789,321 |
| 2/11/15 | Washakie | Line 2a – Biodiesel mixtures | $170,302,364 |
| 1/20/16 | Washakie | Line 2a – Biodiesel mixtures | $322,900,000 |
| 2/4/16 | UFS | Line 2a – Biodiesel mixtures | $321,573,260 |
| | | TOTAL: | $1,125,342,784 |

818.    Prior to when the scheme was detected, Defendants DERMEN, KINGSTON and ISAIAH KINGSTON, through Defendant WASHAKIE, received

---

[35] A single mailing in February 2016 which did not result in the issuance of a payment was submitted in the name of Co-conspirator United Fuel Supply.

at least 19 U.S. Treasury checks[36] by mail totaling approximately $470,000,000 in Fraud Proceeds to which they were not entitled:

| Date Paid | Payor | Payee | Amount |
|---|---|---|---|
| 3/21/13 | U.S. Treasury | WASHAKIE | $640,959 |
| 3/27/13 | U.S. Treasury | WASHAKIE | $20,283,659 |
| 3/27/13 | U.S. Treasury | WASHAKIE | $4,408,041 |
| 4/8/13 | U.S. Treasury | WASHAKIE | $8,859,520 |
| 5/24/13 | U.S. Treasury | WASHAKIE | $11,872,884 |
| 6/10/13 | U.S. Treasury | WASHAKIE | $11,700,000 |
| 6/17/13 | U.S. Treasury | WASHAKIE | $11,400,000 |
| 8/9/13 | U.S. Treasury | WASHAKIE | $25,800,000 |
| 8/27/13 | U.S. Treasury | WASHAKIE | $16,200,000 |
| 9/16/13 | U.S. Treasury | WASHAKIE | $35,008,437 |
| 10/22/13 | U.S. Treasury | WASHAKIE | $33,465,235 |
| 11/12/13 | U.S. Treasury | WASHAKIE | $33,581,899 |
| 12/2/13 | U.S. Treasury | WASHAKIE | $38,078,529 |
| 12/26/13 | U.S. Treasury | WASHAKIE | $33,578,660 |
| 1/13/14 | U.S. Treasury | WASHAKIE | $21,789,321 |
| 3/16/15 | U.S. Treasury | WASHAKIE | $82,102,840 |
| 3/16/15 | U.S. Treasury | WASHAKIE | $82,102,840 |
| | | **TOTAL:** | **$470,871,883** |

819.   This approximately half-billion dollars in illicit Fraud Proceeds has served as the financial lifeblood of the RICO Enterprise and is the source of the illicit funds laundered by Defendants KORKMAZ, DERMEN, KINGSTON, ISAIAH KINGSTON, WASHAKIE, SBK USA, SBK TURKEY, BUGARAJ and MEGA VARLIK, among others, in and through Turkey. These funds, in turn, have been repeatedly tapped into by the RICO Enterprise, including Defendants KORKMAZ and BUGARAJ, to fund the RICO Enterprise's ongoing efforts to illicitly extract money and property from Dr. Ayasli.

820.   Defendant KINGSTON and ISAIAH KINGSTON, through their federal plea agreements, have admitted to having conducted the alleged mail fraud scheme.  Supra, ¶ 441-45.

---

[36] The payments received on 3/27/13 and 4/8/13 each included two checks, the total of which is included in the above chart.

821.   Defendant DERMEN was convicted at trial of having conspired with Defendants KINGSTON and ISAIAH KINGSTON to conduct the alleged mail fraud scheme.  <u>Supra</u>, ¶ 447..

822.   Defendant KORKMAZ currently stands charged with having conspired with Defendant DERMEN, among others, to launder the Fraud Proceeds from this scheme in the United States, Turkey, and elsewhere. <u>Supra</u>, ¶ 454-74.

**Predicate Acts Involving the Enterprise's Money Laundering Conspiracy (18 U.S.C. § 1956(h))[37]**

823.   The RICO Enterprise's multi-tiered money laundering operation was second only to its wildly profitable mail fraud scheme in scope and sophistication. Having stolen approximately half a billion dollars from the U.S. Treasury through its U.S.-based Fraudulent Fuel Tax Credit Scheme, the RICO Enterprise aggressively laundered these funds through numerous Enterprise-controlled businesses and bank accounts in the United States, Turkey, and elsewhere.

824.   To this end, each of the RICO Defendants, as well as multiple Co-conspirators, knowing and intentionally conspired and agreed to violate several anti-money laundering statutes, including multiple provisions of Title 18, United States Code, Section 1956, prohibiting the knowing transfer of illicit proceeds, including transnationally, for the purposes of either concealing the source, location, ownership or control of the funds (18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i)) or promoting additional illegal conduct (18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(2)(A)), and Title 18, United States Code, Section 1957, which prohibits the knowing use of illicit proceeds, including by a United States citizen while abroad (18 U.S.C. §§ 1957(a)(1), (d)(1), (d)(2)).

---

[37] All of the acts in furtherance of the conduct that constitutes substantive violations of the money laundering statutes also serve as overt acts in furtherance of the conspiracy offenses.

825.   These money laundering conspiracies originated by no later than 2013 and have continued to the present day in Los Angeles County, within the Central District of California, and elsewhere, including but not limited to, Salt Lake City, Utah, and the Republic of Turkey. _Supra_, ¶ 404-38.

826.   Central to the success of these conspiracies was a large network of U.S. and internationally-based businesses and bank accounts that were created, opened, acquired or controlled by the RICO Enterprise, including but not limited to, U.S.-based RICO Defendants WASHAKIE and SBK USA and Co-conspirators NOIL ENERGY, SPEEDY LION, GT ENERGY, UNITED FUEL SUPPLY, Turkey-based RICO Defendants SBK TURKEY, BUGARAJ, and MEGA VARLIK, and Co-conspirators BUKOMBIN, BIOFARMA, BLANE, STONE, and KOMAK, and Luxemburg-based Co-conspirator ISANNE.  _Supra_, ¶ 405-38.

827.   These Enterprise-controlled businesses provided a veneer of legitimacy to its illicit monetary transactions, which facially appeared to be business-related, while also serving as vehicles through which the RICO Enterprise conducted additional racketeering activity or facilitated ongoing racketeering activity.  _Supra_, ¶ 436-38.

828.   During the course of, and as part of, these money laundering conspiracies, Defendants DERMEN, KINGSTON, and ISAIAH KINGSTON knowingly and intentionally laundered significant amounts of Fraud Proceeds through monetary transactions between U.S.-based businesses controlled by Defendants DERMEN and KINGSTON, such as Defendants WASHAKIE and SBK USA, and Co-conspirators NOIL ENERGY, SPEEDY LION, GT ENERGY and UNITED FUEL SUPPLY, where these Fraud Proceeds remained available for the U.S.-based members of the RICO Enterprise to further launder or access. Several examples highlight the actual implementation of this agreement:

a.   On January 17, 2014, Defendants DERMEN, KINGSTON, and ISAIAH KINGSTON, acting through Defendant WASHAKIE,

funded Defendant SBK USA through a wire transfer of $10 million in Fraud Proceeds. Over the next several years, Defendant WASHAKIE wired Fraud Proceeds to Defendant SBK USA on multiple occasions totaling more than $25 million. Supra, ¶ 405.

b.   On April 8, 2013, Defendants DERMEN, KINSGTON, and ISAIAH KINGSTON, acting through Defendant WASHAKIE, made separate transfers of Fraud Proceeds when it wired $1,324,670 to Co-conspirator NOIL ENERGY and $10 million to Co-conspirator UNITED FUEL SUPPLY. One week later, Co-conspirator UNITED FUEL SUPPLY conducted an additional laundering transaction when this $10 million was transferred to a Merrill Lynch account controlled by Defendant KINGSTON. Supra, ¶ 405.

829.   Equally significant amounts of Fraud Proceeds were the subject of "round trip" laundering transactions through which Defendants KORKMAZ, DERMEN, KINGSTON, and ISAIAH KINGSTON, occasionally with the assistance of Co-conspirator Defendants YILMAZ and ZOUBKOVA, knowingly and intentionally conducted monetary transactions in which Enterprise-controlled businesses or bank accounts in the United States wired Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme to Enterprise-controlled businesses or bank accounts in Turkey or Luxembourg, after which some, or all, of these funds would be indirectly returned to another Enterprise-controlled U.S.-based business or bank account.  This was done to conceal the source, ownership and control of the funds, as well as to obfuscate the laundering trail. Several examples highlight this conduct:

a.   On September 9, 2013, Defendant WASHAKIE, at the direction of Defendants DERMEN and KINGSTON, and with the

assistance of Defendant ISAIAH KINSGTON, sent separate
wire transfers involving Fraud Proceeds of $5 million and $4
million to Co-conspirator KOMAK. Over the course of the next
10 days, Co-conspirator KOMAK, at the direction of Defendant
KORKMAZ, sent three separate wire transfers to Co-conspirator
SPEEDY LION of $4,999,964, $1,999,964, and $1,999,964,
thereby returning the entirety of the $9 million (with the
exception of the wire fee transaction) to the RICO Enterprise
within the United States. Supra, ¶ 405.

      b.    In May 2015, Defendant WASHAKIE, at the direction of
Defendants DERMEN and KINGSTON, and with the assistance
of Defendant ISAIAH KINGSTON, sent separate wire transfers
of $35 million and $21million in Fraud Proceeds to Co-
conspirator ISANNE. Slightly more than a month later, Co-
conspirator ISANNE, at the direction of Defendant KORKMAZ,
wired $15 million in Fraud Proceeds to Defendant SBK USA.
Supra, ¶ 405.

    830.   Additionally, Defendants KORKMAZ, DERMEN, KINGSTON, and
ISAIAH KINGSTON further agreed to deposit approximately one-third of the
Fraud Proceeds -- over $133 million – in Turkey, where this amount of the Fraud
Proceeds would be controlled by Defendant KORKMAZ for the benefit of the
RICO Enterprise and its members. Supra, ¶ 3, 441-45.

    831.   The RICO Enterprise made this investment in Turkey because, in
addition to being the country where Defendant KORKMAZ resided, Defendant
DERMEN frequently visited, and Defendant KINGSTON had fledgling business
interests, Turkey at the time was not granting most extradition requests with the
United States, thereby making it an attractive place to flee from U.S. law
enforcement, as Defendant DERMEN had done once before.  Supra, ¶ 450.

832.   Masquerading as legitimate investments, Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON, through Defendants WASHAKIE and SBK USA and Co-conspirators SPEEDY LION, NOIL ENERGY, GT ENERGY, and UNITED FUEL SUPPLY, directed tens of millions of dollars of Fraud Proceeds from the United States to Turkey to fund businesses created or acquired by the enterprise, including Defendants SBK TURKEY, BUGARAJ, AND MEGA VARLIK, and Co-conspirators BUKOMBIM, ISANNE, BIO FARMA, BLANE, STONE, and KOMAK.   Again, several examples highlight the implementation of this agreement:

    a.    On November 13, 2013, Defendant WASHAKIE, at the direction of Defendants KORKMAZ, DERMEN, and KINGSTON, funded Defendant SBK TURKEY through a $10 million wire transfer of Fraud Proceeds. In 2015 and 2016, Defendant SBK TURKEY received at least seven additional wire transfers of Fraud Proceeds sent by RICO Defendant SBK USA and Co-conspirator NOIL ENERGY, at the direction of Defendants KORKMAZ and DERMEN, totaling in excess of $80 million. Supra, ¶ 405.

    b.    On March 12, 2014, Defendant ISAIAH KINGSTON, at the direction of Defendants KORKMAZ, DERMEN, and KINGSTON, and acting through Defendant WASHAKIE, wired $10 million in Fraud Proceeds to a bank account opened by Defendant KINGSTON at Garanti Bank in Turkey ("KINGSTON Garanti account"). In June 2015, defendant KINGSTON, at the direction of Defendants KORKMAZ and DERMEN, funded Defendant MEGA VARLIK with a $10 million investment of Fraud Proceeds from Defendant KINGSTON's Garanti Account. Supra, ¶ 103, 405,

c.    From February to August 2018, Defendant KINGSTON, acting at the direction of Defendants KORKMAZ and DERMEN, made ten wire transfers totaling $6 million in Fraud Proceeds: two of which were sent from Defendant WASHAKIE to Defendant KINGSTON's Garanti account, which Defendant KORKMAZ then controlled, and eight of which were sent by Co-conspirator UNITED FUEL SUPPLY to Defendant KINGSTON'S Garanti account (two wire transfers), and to Co-conspirators STONE (five wire transfers) and BLANE (one transfer). Supra, ¶ 405. At the time of these transfers, Defendant KORKMAZ controlled these accounts on behalf of the Enterprise and was fully engaged in its ongoing efforts to extract large-scale payments and valuable property from Dr. Ayasli through sham litigation or extortionate demands.

833.   Once successfully laundered into Turkey, these funds were under the control of Defendant KORKMAZ, who would utilize the Fraud Proceeds as a secret war chest to further the RICO Enterprise's financial interests. Defendant KORKMAZ, with the assistance of RICO Defendants OZKARAMAN and AKOL and Co-conspirators including YILMAZ and ZOUBKOVA, would conduct additional "layering" to further "clean" the laundered funds. This involved moving the funds between the various enterprise-controlled businesses and bank accounts where they occasionally would be comingled with other funds or used either to purchase goods or services that would be utilized in service of the RICO Enterprise, or to acquire assets through which additional funds could be laundered or exploited for additional money or property. Again, several examples highlight the conduct:

a.    In 2014-2105, Defendant SBK TURKEY, utilizing Fraud Proceeds that it possessed through its participation in the RICO Enterprise's money laundering conspiracies and operating under

1  Defendant KORKMAZ's direction, provided either initial or

2  principal funding to Defendant BUGARAJ, and Co-conspirators

3  BUKOMBIN, ISANNE, and BIOFARMA. <u>Supra</u>, ¶ 405-35.

4    b. In the spring of 2017, following the Enterprise's acquisition of

5      BoraJet and Aydin Jet, Defendant KORKMAZ, through

6      Defendants SBK TURKEY and BUGARAJ, and aided and

7      abetted by Defendant AKOL, conducted several dozen

8      transactions through which six million dollars in Fraud Proceeds

9      flowed into these newly acquired businesses. <u>Supra</u>, ¶ 612.

10    834. From late 2016 forward, the RICO Enterprise's efforts to secure Dr.

11  Ayasli's business and property have incorporated its money laundering

12  conspiracies. Beyond further concealing Fraud Proceeds by laundering them

13  through BoraJet, the RICO Enterprise used laundered funds: (1) to assist in its

14  acquisition of BoraJet to serve this purpose; and (2) to fund additional racketeering

15  activity designed to exploit both BoraJet's existing assets and Dr. Ayasli's money

16  and property for the benefit of the Enterprise.

17    835. Defendants KINGSTON and ISAIAH KINGSTON have pled guilty to

18  participating in a money laundering conspiracy involving the concealment and

19  knowing use of the Fraud Proceeds, which included laundering in excess of $100

20  million through Turkey. <u>Supra</u>, ¶ 441-45.

21    836. Defendant DERMEN was convicted at trial of being a member of this

22  conspiracy. <u>Supra</u>, ¶ 447-49.

23    837. Defendant KORKMAZ stands charged with being a member of this

24  conspiracy, with the operative indictment expressly noting that laundered funds

25  were used to acquire BoraJet and Aydin Jet. <u>Supra</u>, ¶ 451, 454-65.

26

27

28

**Predicate Acts Involving Concealment Money Laundering**
**(18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i))**

838.    Given the magnitude of Fraud Proceeds generated through its mail fraud scheme, a principal focus of the RICO Enterprise's multi-tiered money laundering operation has been to conceal the location, source, ownership and control of these funds. By doing so, the RICO Defendants and their Co-conspirators have sought to limit the likelihood of law enforcement seizures or prosecutions, while preserving the availability of the funds for future use by the RICO Enterprise.

839.    The RICO Defendants, under the direction of Defendants KORKMAZ, DERMEN and KINGSTON, and with the assistance of Defendants ISAIAH KINGSTON, AKOL, and OZKARAMAN and Co-conspirators YILMAZ and ZOUBKOVA, and operating through Defendants WASHAKIE, SBK TURKEY, SBK USA, BUGARAJ, and MEGA VARLIK and Co-conspirators BUKOMBIN, NOIL ENERGY, SPEEDY LION, GT ENERGY, UNITED FUEL SUPPLY, ISANNE, BIOFARMA, BLANE, STONE and KOMAK, engaged in multiple acts of concealment money laundering when they:

a.    conducted financial transactions affecting interstate and foreign commerce involving the proceeds of specified unlawful activity, namely, mail fraud, in violation of Title 18, United States Code, Section 1341, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of said proceeds, each act of which violated Title 18, United States Code, Section 1956(a)(1)(B)(i);

b.    transported, transmitted, and transferred a monetary instrument from a place in the United States to or through a place outside

the United States (or vice versa), knowing that the monetary instrument or funds represented the proceeds of prior unlawful conduct, and knowing that the transmission was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful conduct, namely mail fraud, in violation of Title 18, United States Code, Section 1341, each act of which violated Title 18, United States Code, Section 1956(a)(2)(B)(i).

840.   Again, the RICO Enterprise's use of the network of businesses that it created, acquired or controlled in the United States, Turkey, and Luxembourg was instrumental to the success of these concealment efforts. In many instances, these companies, which were Enterprise controlled and which were interconnected principally through their involvement in the RICO Enterprise's money laundering schemes, entered fake business contracts when no actual business relationship existed, created false business records to support the individual transfer of Fraud Proceeds, or otherwise took steps to prop up bogus business relationships that facilitated the concealment of the Fraud Proceeds generated through the U.S.-based Fraudulent Fuel Tax Credit Scheme.

841.   While all of the Enterprise-controlled businesses in the United States, with the exception of SBK USA, were pre-existing entities under the control of Defendants DERMEN, KINGSTON and ISAIAH KINGSTON when the money laundering conspiracies began, the majority of businesses that served as money laundering hubs in Turkey were created and principally funded by the RICO Enterprise using Fraud Proceeds, at least in part, to facilitate the RICO Enterprise's ongoing money laundering operations, including its concealment efforts.  This includes Defendants SBK TURKEY, BUGARAJ, MEGA VARLIK and Co-Conspirator BUKOMBIN, each of which initially was funded with illicit Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme. This funding

1  infusion served as the first, frequently of many, acts of concealment money

2  laundering involving these entities. Supra, ¶ 405-35.

3      842.   From April 2013 to August 2018, Defendants KORKMAZ, DERMEN,

4  KINGSTON and ISAIAH KINSGTON conducted several dozen monetary

5  transactions involving more than $360 million in Fraud Proceeds as part of the

6  RICO Enterprise's money laundering concealment efforts, approximately $133

7  million of which remained in Turkey. The majority of these transactions, as

8  represented in the following chart, involved transnational wire transfers from

9  Enterprise-controlled businesses or accounts in the United States to Enterprise-

10  controlled businesses or accounts in Turkey, or vice versa, and were conducted with

11  the knowledge that the funds transferred involved Fraud Proceeds and that the act

12  of transfer was intended to help conceal the source, location, ownership and control

13  of the Fraud Proceeds:

| Date | Payor | Payee | Amount |
|---|---|---|---|
| April 8, 2013 | WASHAKIE | NOIL ENERGY | $1,324,670 |
| April 8, 2013 | WASHAKIE | UNITED FUEL SUPPLY | $10,000,000 |
| April 15, 2013 | UNITED FUEL SUPPLY | MERRILL LYNCH #4805 | $10,000,000 |
| September 9, 2013 | WASHAKIE | KOMAK | $4,000,000 |
| September 9, 2013 | WASHAKIE | KOMAK | $5,000,000 |
| September 12, 2013 | KOMAK | SPEEDY LION | $4,999,964 |
| September 17, 2013 | KOMAK | SPEEDY LION | $1,999,964 |
| September 19, 2013 | KOMAK | SPEEDY LION | $1,999,964 |
| November 13, 2013 | WASHAKIE | SBK TURKEY | $10,000,000 |
| December 31, 2013 | WASHAKIE | KOMAK | $13,000,000 |
| January 17, 2014 | WASHAKIE | SBK USA | $10,000,000 |
| January 21, 2014 | KOMAK | SPEEDY LION | $9,000,000 |
| March 5, 2014 | WASHAKIE | DERMEN (VAT – MV mansion) | $483,000 |
| March 12, 2014 | WASHAKIE | KINGSTON (MV initial funding) | $10,000,000 |
| March 24, 2014 | WASHAKIE | BLANE | $4,055,700 |
| March 24, 2014 | WASHAKIE | BLANE | $5,000,000 |
| May 9, 2014 | WASHAKIE | BLANE | $2,000,000 |
| August 21, 2014 | SBK USA | WASHAKIE | $5,000,000 |
| March 20, 2015 | WASHAKIE | SBK USA | $8,550,000 |
| March 26, 2015 | SBK USA | Huntington Beach, CA property | $3,520,085 |
| April 28, 2015 | WASHAKIE | Garanti Bank (Turkey) | $15,000,000 |
| May 19, 2015 | WASHAKIE | ISANNE (Garanti) | $35,000,000 |
| May 27, 2015 | WASHAKIE | ISANNE (Garanti) | $21,300,000 |
| June 3, 2015 | WASHAKIE | SBK USA | $10,000,000 |
| June 11, 2015 | WASHAKIE | Garanti Bank (Turkey) | $200,000 |
| June 22, 2015 | WASHAKIE | SBK USA | $5,000,000 |
| June 22, 2015 | BLANE/YILMAZ | SPEEDY LION | $6,999,950 |

| Date | Payor | Payee | Amount |
|------|-------|-------|--------|
| June 23, 2015 | BLANE/YILMAZ | SPEEDY LION | $12,999,950 |
| July 3, 2015 | ISANNE (Garanti) | SBK USA | $15,000,000 |
| July 6, 2015 | WASHAKIE | SBK USA | $2,000,000 |
| September 23, 2015 | KORKMAZ (Garanti) | KORKMAZ/DERMEN JA-BOA | $6,000,000 |
| October 16, 2015 | KORKMAZ (Garanti) | KORKMAZ/DERMEN JA-BOA | $4,000,000 |
| October 27, 2015 | NOIL ENERGY | SBKTURKEY/KOMAK/YILMAZ | $6,999,950 |
| October 28, 2015 | NOIL ENERGY | SBKTURKEY/KOMAK/YILMAZ | $12,999,950 |
| November 3, 2015 | BLANE | GT ENERGY | $19,999,950 |
| December 10, 2015 | SBK USA | WASHAKIE | $2,100,000 |
| December 14, 2015 | WASHAKIE | KINGSTON (Garanti) | $2,100,000 |
| December 28, 2015 | WASHAKIE | KINGSTON (Garanti) | $6,900,000 |
| December 28, 2015 | SBK USA | SBK TURKEY | $14,000,000 |
| February 17, 2016 | NOIL ENERGY | SBK TURKEY | $3,885,135 |
| March 22, 2016 | NOIL ENERGY | KOMAK | $3,810,000 |
| March 25, 2016 | SBK USA | SBK TURKEY | $458,000 |
| September 28, 2016 | NOIL ENERGY | SBK TURKEY | $11,000,000 |
| October 21, 2016 | SBK USA | SBK TURKEY | $6,000,000 |
| November 8, 2016 | SBK USA | SBK TURKEY | $15,000,000 |
| November 8, 2016 | SBK USA | SBK TURKEY | $265,000 |
| February 12, 2018 | WASHAKIE | KINGSTON (Garanti) | $1,000,000 |
| February 13, 2018 | WASHAKIE | KINGSTON (Garanti) | $1,000,000 |
| May 7, 2018 | UNITED FUEL SUPPLY | KINGSTON (Garanti) | $350,000 |
| May 8, 2018 | UNITED FUEL SUPPLY | KINGSTON (Garanti) | $400,000 |
| June 21, 2018 | UNITED FUEL SUPPLY | STONE | $250,000 |
| June 28, 2018 | UNITED FUEL SUPPLY | STONE | $100,000 |
| July 18, 2018 | UNITED FUEL SUPPLY | STONE | $1,500,000 |
| August 6, 2018 | UNITED FUEL SUPPLY | STONE | $100,000 |
| August 8, 2018 | UNITED FUEL SUPPLY | STONE | $100,000 |
| August 15, 2018 | UNITED FUEL SUPPLY | BLANE | $1,200,000 |

843.   Each transfer constitutes a separate act of concealment money laundering, and therefore, a separate racketeering act, for the involved RICO Defendants.

**Concealment Money Laundering Targeting Dr. Ayasli's Business And Property**

844.   Having amassed within Turkey approximately $133 million in Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme, Defendants KORKMAZ, DERMEN and KINGSTON sought to further conceal these funds through additional levels of layering, which included acquiring interests in businesses and property – to include Dr. Ayasli's business, BoraJet, and his properties, which included his XRS executive jet, and his many prized commercial and residential properties in Turkey.

**Scheme to Acquire BoraJet**

845.   In the Spring of 2016, Defendant DERMEN, while at Defendant SBK USA's Beverly Hills offices, announced to associates the RICO Enterprise's intent to acquire the airline BoraJet and its plan to use approximately $200 million in U.S. currency – *i.e.*, the Fraud Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme that were then being laundered to, and through, Turkey -- to do so. Supra, ¶ 529-31.

846.   BoraJet was a particularly attractive property because it was an emerging airline, with a strong, but comparatively reasonable valuation, through which large amounts of money could be laundered without notice, and was backed by an extremely wealthy American who the RICO Enterprise could further exploit to secure additional funds and property.

847.   To acquire BoraJet, Defendants KORKMAZ, DERMEN, and KINGSTON implemented a classic organized crime scheme centered on devaluing and destabilizing the targeted business so that it could be acquired by the RICO Enterprise at a greatly reduced cost.

848.   This scheme was greatly aided by the July 2016 failed coup attempt in Turkey purportedly carried out by deposed cleric Fetullah Gulen and his organization, the Fetulluchi Teror Orgutu ("FETO"). From that point forward, any person or entity associated with Gulen or FETO effectively was deemed to be an enemy of the Turkish state, subject to prosecution and public ostracism. Supra, ¶ 532-33.

849.   Capitalizing on this development, Defendant KORKMAZ, on behalf of Defendants DERMEN and KINGSTON, coordinated a sophisticated disinformation campaign that used laundered Fraud Proceeds to generate false stories in prominent publications with globally accessed media platforms which were designed to devalue BoraJet by claiming that Dr. Ayasli was affiliated with FETO, created the ByLock communication device utilized by the plotters of the

attempted coup, and utilized BoraJet planes and facilities to assist in the attempted coup. ("Enterprise-Directed Disinformation Campaign")   Supra, ¶ 534-53.

850.   The unyielding series of unfounded media articles planted by Defendant KORKMAZ as part of this campaign operated to devastating effect, as they caused Turkish Airways to cancel major codeshare and wet lease contracts with BoraJet,  supra, ¶ 572-74, banks to extinguish lines of credit and to refuse new loans, supra ¶ 576-79, BoraJet to suffer reduced ridership, supra, ¶ 569, and Dr. Ayasli to expend over $27,3000,000 from his U.S. financial accounts over a three month period to maintain the airline as an operating business. Supra, ¶ 582-83.  The value of BoraJet plunged with no meaningful hope of recovery as long as Dr. Ayasli retained ownership and remained falsely tied to FETO.

851.   Through a series of misrepresentations made in November and December 2016, Defendant KORKMAZ, operating through Defendants SBK TURKEY and BUGARAJ, and aided and abetted by of Defendants OZKARAMAN and AKOL, then falsely presented himself as an experienced purchaser of distressed assets with high-ranking contacts in the Ministry of Transportation who could take over BoraJet, infuse it with approximately $50 million in new working capital, reverse its slide by securing it access to the new state-of-the-art airport within Istanbul, and then quickly "flip" BoraJet in a sale to a major airline or investor, at which time Dr. Ayasli would receive 25 % of the net profit from the sale. Supra, ¶ 585-97.

852.   Due to the economic duress imposed through the Enterprise-directed Disinformation Campaign, Dr. Ayasli was compelled to enter the December 2016 Agreement transferring ownership of BoraJet to Defendant BUGARAJ

853.   On December 29, 2016, Defendant KORKMAZ, operating through Defendants SBK TURKEY and BUGARAJ, acquired both BoraJet and the XRS executive jet on behalf of the RICO Enterprise, as Defendant DERMEN had foretold just months before. Supra, ¶ 599.

**Laundering of Fraud Proceeds Through BoraJet and Aydin Jet**

854.  The RICO Enterprise, through Defendant BUGARAJ, never attempted to stabilize or rebuild BoraJet, as Defendant KORKMAZ represented it would do during the negotiations.

855.  To the contrary, Defendant KORKMAZ, on behalf of Defendants DERMEN, KINGSTON, and ISAIAH KINGSTON, aided and abetted by Defendants OZKARAMAN and AKOL, used BoraJet as yet another vehicle through which to launder the Enterprise's massive cache of Fraud Proceeds while the RICO Enterprise simultaneously acted to loot BoraJet's remaining assets. Supra, ¶ 612.

856.  From January 2017 through June 2017, Defendant KORKMAZ, through Defendants SBK TURKEY[38] and BUGARAJ, on behalf of Defendants DERMEN and KINGSTON, and aided by Defendants OZKARAMAN and AKOL[39], knowingly laundered approximately $6,411,127 and 63,744,145 TL through BoraJet and Aydin Jet in thirty monetary transactions designed to further conceal the source, ownership and control of these assets:

| Date: | From: | To: | Amount: | Description: |
|---|---|---|---|---|
| 1/03/2017 | Bugaraj | BoraJet | 750,000 USD | Cash transfer to the Aviation account |
| 1/10/2017 | Bugaraj | BoraJet | 975,000 USD | Cash transfer to the Aviation account |
| 1/13/2017 | Bugaraj | BoraJet | 700,000 USD | Cash transfer to the Aviation account |
| 1/13/2017 | Bugaraj | BoraJet | 100,000 USD | Cash transfer to the Aviation account |
| 1/25/2017 | Bugaraj | BoraJet | 500,000 USD | Cash transfer to the Aviation account |
| 2/01/2017 | Bugaraj | Aydin Jet | 175,611 USD | Cash transfer to the Aviation account |
| 2/22/2017 | SBK Turkey | GE Commercial Aviation Funding | 500,000 USD | Direct transfer from "Holding" to GECAS |
| 2/23/2017 | Bugaraj | BoraJet | 42,916 USD | Cash transfer to the Aviation account |
| 2/27/2017 | Bugaraj | BoraJet | 124,000 USD | Cash transfer to the Aviation account |
| 3/13/2017 | Bugaraj | BoraJet | 5,700,000 TL | Checks paid to Celebi Aviation |
| 3/14/2017 | SBK Turkey | GE Commercial Aviation Funding | 500,000 USD | Direct transfer from "Holding" to GECAS |
| 3/28/2017 | Bugaraj | BoraJet | 289,000 USD | Cash transfer to the Aviation account |
| 3/31/2017 | Bugaraj | BoraJet | 184,000 USD | Cash transfer to the Aviation account |
| 4/3/2017 | Bugaraj | BoraJet | 13,000 USD | Cash transfer to the Aviation account |

---

[38] In October and November of 2016, Defendant SBK USA laundered over $21 million into Turkey through a series of financial transactions with Defendant SBK TURKEY.

[39] Defendant AKOL remained BoraJet's General Manager through early February 2017.

| Date: | From: | To: | Amount: | Description: |
|-------|-------|-----|---------|-------------|
| 4/3/2017 | Bugaraj | BoraJet | 55,000 USD | Cash transfer to the Aviation account |
| 4/5/2017 | Bugaraj | BoraJet | 248,200 USD | Cash transfer to the Aviation account |
| 4/12/2017 | Bugaraj | BoraJet | 107,000 USD | Cash transfer to the Aviation account |
| 4/21/2017 | Bugaraj | BoraJet | 132,000 USD | Cash transfer to the Aviation account |
| 5/4/2017 | Bugaraj | BoraJet | 370,000 TL | Checks paid to Aviation Akdeniz Petur |
| 5/8/2017 | Bugaraj | BoraJet | 11,500 USD | Cash transfer to the Aviation account |
| 5/10/2017 | Bugaraj | BoraJet | 24,000 USD | Cash transfer to the Aviation account |
| 5/12/2017 | Bugaraj | BoraJet | 8,600 USD | Cash transfer to the Aviation account |
| 5/15/2017 | Bugaraj | BoraJet | 18,500 USD | Cash transfer to the Aviation account |
| 5/16/2017 | Bugaraj | BoraJet | 74,145 TL | Checks paid to Garanti Filo |
| 5/17/2017 | Bugaraj | BoraJet | 18,000 USD | Cash transfer to the Aviation account |
| 5/26/2017 | Bugaraj | BoraJet | 14,800 USD | Cash transfer to the Aviation account |
| 6/2/2017 | Bugaraj | BoraJet | 70,000 USD | Cash transfer to the Aviation account |
| 6/5/2017 | SBK Turkey | Aydin Jet | 63,000,000 TL | Checks paid from SBK to Aydin Jet |
| 6/7/2017 | Bugaraj | BoraJet | 300,000 TL | Checks paid to Bilin Gumruk |
| 6/28/2017 | Bugaraj | BoraJet | 350,000 USD | Cash transfer to the Aviation account |
| | | Total | $6,411,127 USD + 63,744,145 TL | |

857.   Each transaction constitutes a separate concealment laundering violation and thus, a separate racketeering act for each of the involved parties.

858.   By using BoraJet as a money laundering vessel and having failed to make the promised and necessary capital investment to maintain the airline as a going concern, the RICO Enterprise, through Defendants KORKMAZ and BUGARAJ, ensured BoraJet's demise, scuttling the airline in April 2017. By doing so, the Enterprise deprived Dr. Ayasli of his contracted interest in the 25% net profit to which he would have been entitled post sale. Dr. Ayasli's investments in BoraJet, totaling approximately a quarter of a billion dollars, were completely lost.

### Predicate Acts Involving Promotional  Money Laundering
### (18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(2)(A))

859.   The RICO Enterprise, under the direction of Defendants KORKMAZ, DERMEN and KINGSTON, assisted by Defendants ISAIAH KINGSTON, AKOL, OZKARAMAN and others, and operating through Defendants WASHAKIE, SBK TURKEY, SBK USA, BUGARAJ, AND MEGA VARLIK and Co-conspirators YILMAZ, ZOUBKOVA, BUKOMBIN, NOIL ENERGY, SPEEDY LION, GT ENERGY, UNITED FUEL SUPPLY, ISANNE, BIOFARMA, BLANE and KOMAK, also conducted repeated acts of promotional money laundering by:

a.  conducting financial transactions affecting interstate and foreign commerce involving the proceeds of specified unlawful activities, namely, mail fraud, in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of additional specified unlawful activity, namely, mail fraud, in violation of Title 18, United States Code, Section 1341, wire fraud, in violation of Title 18, United States Code, Section 1343, obstruction of justice, in violation of Title 18, United States Code, Sections 1510-13, Hobbs Act Extortion, in violation of Title 18, United States Code, Section 1951, Travel Act offenses, in violation of Title 18, United States Code, Section 1952, concealment money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), (a)(2)(B)(i); the use of criminally derived proceeds, in violation of Title 18, United States Code, Section 1957, and bribery, in violation of Title 18, United States Code, Section 201, each act of which constituted a violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b.  transporting, transmitting, and transferring a monetary instrument or funds from a place in the United States to or through a place outside the United States (or vice versa), knowing that the monetary instrument or funds represented the proceeds of prior unlawful conduct, with the intent to promote the carrying on additional specified unlawful activity, including mail fraud, in violation of Title 18, United States Code, Section 1341, wire fraud, in violation of Title 18, United States Code, Section 1343, obstruction of justice, in violation of Title 18, United States Code, Sections 1510-13, Hobbs Act Extortion, in

violation of Title 18, United States Code, Section 1951, Travel Act offenses, in violation of Title 18, United States Code, Section 1952, concealment money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), (a)(2)(B)(i); the use of criminally derived proceeds, in violation of Title 18, United States Code, Section 1957, and bribery, in violation of Title 18, United States Code, Section 201, each act of which violated Title 18, United States Code, Section 1956(a)(2)(A).

860.   Defendants DERMEN and KINGSTON created, and Defendant KORKMAZ helped grow and expand, a RICO Enterprise that laundered its illicit Fraud Proceeds not only to conceal the source, ownership, and control of these funds but also to free up the funds such that they would serve as the life-blood of the Enterprise and be used to further its future criminal conduct.

861.   With the limited exception of select transactions in which Fraud Proceeds were laundered to allow for the purchase of purely personal goods, such as homes, the financial transactions that comprise concealment money laundering, supra 405, also constitute individual violations of promotional money laundering, as the laundered Fraud Proceeds were transferred with the intent of promoting future criminal conduct.  In fact, the laundered Fraud Proceeds served as the principal revenue source relied upon by Defendants KORKMAZ, DERMEN and KINGSTON to fund the ongoing and forward-facing operations of the RICO Enterprise.  By way of example, the RICO Enterprise's laundered funds were used to build a large physical infrastructure at WASHAKIE that provided a veneer of legitimacy to the RICO Enterprise's mail fraud scheme, to create and fund its network of money laundering hubs in the U.S. and Turkey, to support repeated Travel Act violations, and to pay for Defendant KINGSTON and ISAIAH

1   KINGSTON'S attempted bribes of law enforcement and judicial officials, among

2   other conduct.

3

**Using Laundered Funds to Exploit BoraJet's Assets for the**

4   **Enterprise's Financial Benefit Through Further Racketeering Conduct**

5       862.   The Enterprise's promotional money laundering operation extended to

6   its actions against, and involving, Dr. Ayasli.

7       863.   Defendants KORKMAZ, DERMEN, and KINGSTON, through

8   Defendant SBK TURKEY, created Defendant BUGARAJ in August 2015 as a shell

9   company that would hold its acquisition of BoraJet and funded it with Fraud

10   Proceeds from the U.S.-based Fraudulent Fuel Tax Credit Scheme.  Supra, ¶ 97-

11   100.

12       864.   Defendant BUGARAJ's funding through Defendant  SBK TURKEY

13   was used to support BoraJet's operations during the approximately four month

14   period in early 2017 that it took the Enterprise to exploit BoraJet's assets before

15   scuttling the airline – a period during which BoraJet provided cover to the

16   Enterprise's concealment money laundering conspiracy.  Supra, ¶ 281, 419-20, 612.

17       865.   Further, during that time, Defendants KORKMAZ, through Defendant

18   BUGARAJ, utilized Fraud Proceeds to extort and defraud Dr. Ayasli into

19   extinguishing BoraJet debt which either was not yet due or for which he should not

20   have been responsible.

21       866.   On February 28, 2017, Defendant KORKMAZ, through Defendant

22   BUGARAJ, influenced Odea Bank into requiring a 24 hour repayment of a

23   $5,300,000 loan that was not in default but was held principally by BoraJet, and

24   personally guaranteed by Dr. Ayasli.  Supra, ¶ 620, 624-25.

25       867.   When liquidity limitations precluded Dr. Ayasli from meeting this

26   accelerated payment demand, Defendant KORKMAZ, through Defendant MEGA

27   VARLIK, and on behalf of Defendants DERMEN and KINGSTON, acquired this

28

debt obligation through a self-claimed payment to Odea Bank of approximately 5.7 million dollars in Fraud Proceeds.  Supra, ¶ 626-27.

868.   Defendant MEGA VARLIK, in turn, acquired a court order requiring Dr. Ayasli, not BoraJet (which was owned by Defendant BUGARAJ), to pay off this debt obligation, and as part of the ensuing enforcement action, placed liens on all of Dr. Ayasli's commercial and residential property within Turkey, valued at approximately $150 million. Supra, ¶ 629-30.

869.   Defendant KORKMAZ, through Defendant MEGA VARLIK, and on behalf of Defendants DERMEN, KINGSTON, and BUGARAJ, required Dr. Ayasli to pay $5,800,000 from his U.S.-based financial accounts to extinguish this obligation and release the liens on his property without ever disclosing that Defendant MEGA VARLIK was an Enterprise-controlled business. The practical effect was to relieve Defendant BUGARAJ, and thereby the RICO Enterprise, of this debt obligation and to have Dr. Ayasli pay an additional $5,800,000 to the RICO Enterprise through a payment made to an Enterprise created, funded, and controlled business, Defendant MEGA VARLIK ("BUGARAJ/MEGA VARLIK Loan Acceleration Scheme"). Supra, ¶ 631-32.

870.   Defendant KORKMAZ, through Defendant BUGARAJ, sought to accelerate all other loans personally guaranteed by Dr. Ayasli despite any lack of default. Having witnessed not just the acceleration of the Odea Bank loan but the threat to his extensive property holdings that accompanied the assignment of this debt obligation, Dr. Ayasli was forced to quickly acquire a new, $20 million loan, that would allow him to pay off these accelerated debt obligations, and in connection with doing so, was further required to by Garanti Bank to pay off all of BoraJet's leasing debts  -- 487,607 liras (approximately $123,000 USD) – in advance of receipt of this loan.  Supra, ¶ 633-37.

871.   Similarly, when Defendant BUGARAJ intentionally defaulted on its trade obligations, Dr. Ayasli, although not legally responsible for this debt under

the December 2016 Agreement with Bugaraj, nevertheless was forced to pay approximately $3,200,000 from his U.S.-based funds to pay off this obligation. <u>Supra</u>, ¶ 638-41.

872. From 2017 through the present, Defendant KORKMAZ, DERMEN, and KINGSTON, principally through Defendant BUGARAJ, further used laundered funds to support sham litigation seeking to extort and defraud Dr. Ayasli of additional money and allow for the further liquidation of Dr. Ayasli's real estate interests. This includes civil fraud suits filed on March 13, 2017 and November 21, 2017 seeking tens of millions of dollars in damages and through which Defendant BUGARAJ has secured liens on approximately $150 million of Dr. Ayasli's commercial and real property in Turkey. <u>Supra</u>, ¶ 645-55, 701-05.

873. As is true with all of Defendant BUGARAJ's operations, its pursuit of these civil suits against Dr. Ayasli have been funded with Fraud Proceeds. <u>Supra</u>, ¶ 646.

874. To increase Defendant BUGARAJ's leverage in these civil suits, Defendant KORKMAZ weaponized criminal charges and penalties by personally filing a criminal complaint that reiterated the FETO allegations that were at the core of the Enterprise-Directed Disinformation Campaign, despite knowing these allegations to be false, and through Defendant BUGARAJ, filed a separate criminal case alleging aggravated fraud by Dr. Ayasli. <u>Supra</u>, ¶ 656-65.

875. With the benefit of significantly increased leverage artificially created by the existence of dual ongoing criminal investigations against Dr. Ayasli, Defendant KORKMAZ, through Defendant BUGARAJ, aggressively pursued the civil litigation utilizing Fraud Proceeds.

876. At a February 2019 hearing in which Dr. Ayasli was neither present nor represented by counsel, Defendant BUGARAJ succeeded in securing a $90 million judgment against Dr. Ayasli. <u>Supra</u>, ¶ 756-60.

877.   Defendant KORKMAZ, through Defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGSTON, further has used this judgment to achieve the Enterprise's goal of securing liens on all of Dr. Ayasli's remaining commercial and residential real estate in Turkey.  Supra, ¶ 761.

878.   For the past several years, Defendant KORKMAZ, acting through Defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGSTON, while using laundered funds, has made multiple efforts to liquidate Dr. Ayasli's properties for the benefit of the Enterprise.  Supra, ¶ 765-74.

879.   In the summer of 2020, Defendant KORKMAZ, operating through Defendant BUGARAJ, and on behalf of the Enterprise, acted to liquidate Dr. Ayasli's Nuruosmaniye property by triggering an auction for that property.  Supra, ¶ 769-70.

880.   On July 27, 2020, Defendant KORKMAZ, through Defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGSTON, purchased this property with approximately $14,530,000 in Fraud Proceeds.  Supra, ¶ 770.

881.   In the spring of 2021, Defendant KORKMAZ, through defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGTON, triggered an auction of another property: a family residence in Ortakoy, Turkey. As was done with the Dr. Ayasli's Nuruosmaniye property, Defendant KORKMAZ, through defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGTON, purchased this residence as well as personal effects and artwork, for approximately $14,160,000 in Fraud Proceeds on May 21, 2021.[40]  Supra, ¶ 772-13.

882.   In July 2022, Defendant KORKMAZ, through Defendant BUGARAJ, and on behalf of Defendants DERMEN and KINGSTON, triggered yet another auction, this time of six of Dr. Ayasli's properties. At the August 23, 2022, Defendant BUGARAJ did not purchase the properties, instead electing to collect

---

[40] This purchase later was unwound when a court found it to be a fraudulent transfer.

the amount owed under the liens.  Dr. Ayasli, through his spouse, effectively repurchased four of his properties, and spent approximately  $2,760,000 in U.S.-based funds to do so. The remaining two properties were purchased by Garanti Bank.  Supra, ¶ 774.

883.   In sum, the RICO Enterprise, through its promotional money laundering activities, successfully took over BoraJet and Aydin Jet at great loss to Dr. Ayasli, forced Dr. Ayasli to pay off more than $28 million in BoraJet debt that was not due or not his obligation to repay, secured a fraudulent $90 million judgment through sham litigation, attached liens to all of Dr. Ayasli's commercial and residential property in Turkey, and has begun the process of liquidating these properties.

**Predicate Acts Involving Knowing Use of Criminally Derived Property (18 U.S.C. §§ 1957(a)(1), (d)(i), (d)(2))**

884.   The RICO Defendants, including Defendants KORKMAZ, DERMEN, and KINGSTON, regularly conducted or had others conduct, including but not limited to Defendant ISAIAH KINGSTON, transactions of more than $10,000 that they knew involved criminally derived proceeds, namely, Fraud Proceeds, through a financial institution operating in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1957(a), (d)(1).

885.   As addressed throughout this Complaint, Defendants KORKMAZ, DERMEN, KINGSTON, and ISAIAH KINGSTON each well knew that the RICO Enterprise was funded through hundreds of millions of dollars in illicit Fraud Proceeds from its U.S.-based Fraudulent Fuel Tax Credit Scheme and knowingly made dozens of transactions through accounts that originated or ended at U.S. financial institutions in which more than $10,000 in Fraud Proceeds were sent in interstate, and frequently foreign, commerce by Defendant WASHAKIE and SBK USA, as well as Co-conspirators NOIL OIL, SPEEDY LION, GT ENERGY and UNITED FUEL SUPPLY.  Supra, ¶ 405.

886.   This includes the transactions used to fund the Turkish-based companies that served as hubs within the RICO Enterprise's money laundering network.  Supra, ¶ 406-35.

887.   For example, Defendants KORKMAZ, DERMEN and KINGSTON, through Defendants WASHAKIE and SBK USA, knowingly conducted the following financial transactions in which fraud proceeds were wired from the U.S. bank accounts of Defendants WASHAKIE and SBK USA and Co-conspirator NOIL ENERGY to accounts held by Defendant SBK TURKEY for the purpose of funding its operations: $10 million sent from Defendant WASHAKIE's U.S. bank account on November 13, 2103, $6,999,950 and $12,999,950 sent from Co-conspirator NOIL ENERGY's U.S. bank account on October 27, 2015 and October 28, 2015, $14 million sent from Defendant SBK USA's U.S. bank account on December 28, 2015, $3,885,135 sent from Co-conspirator NOIL ENERGY's U.S. bank account on February 17, 2016, $458,000 sent from Defendant SBK USA's U.S. bank account on March 25, 2016, $11 million sent from Co-conspirator NOIL ENERGY's U.S. bank account on September 28, 2016, and $6 million, $15 million and $265,000 sent from Defendant SBK USA's U.S. bank account on October 21, 2016, and  November 8, 2016 (2 deposits).  Supra, ¶ 405.

888.   Defendant BUGARAJ, which is a subsidiary of Defendant SBK TURKEY, also is funded through these Fraud Proceeds – funding that has directly supported its acquisition of BoraJet, its laundering of proceeds through BoraJet, its looting of BoraJet's assets, and the subsequent sham litigation that has been ongoing since 2017.

889.   Similarly, on March 12, 2014, Defendant KINGSTON, at the direction of Defendants KORKMAZ and DERMEN, had Defendant ISAIAH KINGSTON conduct a financial transaction in which $10 million in Fraud Proceeds were wired from the U.S. bank account of Defendant WASHAKIE to Defendant KINGSTON'S Garanti account in Turkey for later use in funding Defendant

1    MEGA VARLIK, a bank that would be used to further the Enterprise's money

2    laundering operations.  Supra, ¶ 103, 405.

3        890.   Defendant KINGSTON, at the direction of Defendants KORKMAZ

4    and DERMEN, conducted numerous additional financial transactions, including a

5    series of 2018 transactions, all of which exceeded $10,000, made when Defendant

6    KINGSTON knowingly sent a total of $6 million from U.S. bank accounts held by

7    Defendant WASHAKIE and Co-conspirator UNITED FUEL SUPPLY to accounts

8    controlled by Defendant KORKMAZ in Turkey, including Defendant

9    KINGSTON's personal account at Garanti bank and the account held by Co-

10   conspirators BLANE AND STONE. Supra, 405.

11       891.   The Fraud Proceeds sent by Defendant KINGSTON were the only

12   payments directed to Turkey by the Enterprise during that time period – a period

13   when Defendants KORMAZ and BUGARAJ, on behalf of Defendants DERMEN

14   and KINGSTON, were fully entrenched in their efforts to secure monetary

15   settlements from Dr. Ayasli and control of Dr. Ayasli's real estate through both its

16   Fraud Proceeds-funded sham litigation and Defendant KORKMAZ's extortionate

17   communications with Dr. Ayasli and his associates.[41] Supra, ¶ 405.

18       892.   Defendants DERMEN and KINGSTON, United States citizens, also

19   have knowingly engaged, and aided, abetted, counseled, or caused the engaging in,

20   a monetary transaction affecting international commerce by, though, or to a

21   financial institution, involving property of a value greater than $10,000 that

22   Defendants DERMEN and KINGSTON knew to have been criminally derived,

23   with each transaction constituting a violation of Title 18, United States Code,

24   Section 1957(a), (d)(2).

25

26       [41] Defendant KORKMAZ traveled to the United States in both February and March 2018 to
27   secure an in-person meeting with Dr. Ayasli, outside the presence of counsel, to discuss a
     "settlement" in which Dr. Ayasli would pay him upwards of tens of millions of dollars in
28   fraudulently asserted losses.  Supra, ¶ 716-22, 731-52.

893.   From 2013 through their arrests by federal authorities in 2018, Defendants DERMEN and KINGSTON regularly traveled to Turkey to assist with the oversight, implementation, and operation of the RICO Enterprise's transnational money laundering operation, including trips in September 2013, January 2014, August 2014, June 2015, January 2016, fall 2017, and February 2018.  This included not only directing "round trip" money laundering transactions, and money laundering transactions between the U.S. and Turkey, but also the purely foreign movement of Fraud Proceeds involving foreign financial institutions.

894.   For example, in June 2015, Defendant KINGSTON, at the direction of Defendants KORKMAZ and DERMEN, conducted a financial transaction in which the $10 million that previously was laundered into Defendant KINGSTON'S Garanti account through a transnational transaction involving Defendant WASHAKIE, was then used to conduct a separate, purely foreign transaction through which Defendant KINGSTON, again at Defendants KORKMAZ and DERMEN's direction, sent $10 million to fund Defendant MEGA VARLIK.

895.   Defendants KORKMAZ and KINGSTON, through Defendant MEGA VARLIK, latter employed these funds, or others with which were comingled, to acquire BoraJet's $5,300,000 Odea Bank loan obligation at a purported cost of $5,7000,0000, which Dr. Ayasli was required to payoff at the cost of $5,8000,0000. Supra, ¶ 624-31.

**Predicate Acts of Hobbs Act Extortion (18 U.S.C. § 1951)**

896.   At all times relevant to this Complaint, Dr. Ayasli, through his ownership of BoraJet and his other companies, charities and real estate holdings, was engaged in interstate or foreign commerce and in industries that affect interstate and foreign commerce.

897.   Beginning no later than December 2016, lasting over the course of years, and as reflected through multiple acts, Defendants KORKMAZ, DERMEN, KINGSTON and BUGARAJ, aided and abetted by Defendants AKOL and

OZKARAMAN, attempted to obstruct, delay and affect, and, in fact, did unlawfully obstruct, delay and affect commerce, through use of actual or threatened force, violence or fear, or under color of official right, as referenced in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in Section 1951, in that the RICO Defendants attempted to compel Dr. Ayasli to relinquish his property, to include tens of millions of dollars in funds and commercial and residential real estate valued at approximately $150 million, through the wrongful use of actual and threatened force, violence, and fear, including fear of economic harm.

898.   In 2016, Defendants KORKMAZ, DERMEN and KINGSTON unleashed the first salvo in its long running extortion campaign to deprive Dr. Ayasli of business and property, when it implemented its plan to devalue and destabilize BoraJet, and thereby facilitate its takeover, through intensely inflammatory, and fundamentally false FETO claims that were the centerpiece of the Enterprise-Directed Disinformation Campaign. Supra, ¶ 538-53.

899.   Through the Enterprise-Directed Disinformation Campaign, Defendants KORKMAZ, DERMEN, and KINGSTON succeeded in creating treacherous business and personal environments for BoraJet and Dr. Ayasli. Supra, ¶ 554-58, 568-83.

900.   The false, terrorism-based claims were intended to, and in fact did, directly impact BoraJet's ability to operate as an airline as major contracts were terminated, reliable lines of credit were closed, ridership dropped precipitously, and its value plummeted during the four month period in the fall of 2016 when Dr Ayasli and BoraJet were targeted by the Enterprise-Directed Disinformation Campaign. Supra, ¶ 568-83.

901.   Smaller scale operations, such as the Turkish offices of  Dr. Ayasli's U.S.-based charity Turkish Coalition of America, were forced to shut down

operations due to the threats to its employees arising from the publication of these false, terrorism-based claims. Supra, ¶ 559-67.

902.    The Enterprise-Directed Disinformation Campaign posed a direct threat to Dr. Ayasli's personal safety and freedom, initially causing him to leave Turkey in September 2016 and precluding his much needed return to help guide BoraJet through the torrent of false claims that cratered its value and threatened its continued existence. Supra, ¶ 554-58.

903.    Having spent over $27 million in U.S.-based funds in little more than three months to minimize the mounting financial challenges triggered by the Enterprise-Directed Disinformation Campaign and with no sign that these false attacks and attendant damage against BoraJet would cease as long  as he owned the company, Dr. Ayasli was coerced in December 2016 to transfer ownership of both BoraJet and his XRS executive jet  – assets in which he had invested approximately a quarter of a billion dollars – to Defendant BUGARAJ for only a contractual interest to 25 % of the net profits from a future sale of BoraJet. Supra, ¶ 582-83, 599-607.

904.    After having succeeded in the scheme to extortionately acquire BoraJet, Defendants KORKMAZ, DERMEN and KINGSTON pursued additional extortion schemes to divest Dr. Ayasli of significant monetary funds and property though the weaponization of unfounded criminal allegations against Dr. Ayasli and his associates, the manipulation of accounts at financial institutions, the filing of sham lawsuits, and the use of threats of violence and actual violence.

905.    Within two months of acquiring BoraJet and during the period when the RICO Enterprise was acting to exploit its assets, Defendants KORKMAZ, DERMEN and KINGSTON, through Defendant BUGARAJ, successfully accelerated each of BoraJet's loans that Dr. Ayasli had personally guaranteed, including loans that were Defendant BUGARAJ's responsibility under the ownership agreement.

906.   In the BUGARAJ/MEGA VARLIK Loan Acceleration Scheme, supra 624-32, Defendant KORKMAZ, through Defendant BUGARAJ, successfully manipulated Odea bank into accelerating the $5,300,000 balance on the outstanding loan and then having that debt obligation assigned to Defendant MEGA VARLIK, which immediately placed liens on all of Dr. Ayasli's commercial and residential real estate in Turkey. Upon threat of loss of that real estate – valued at approximately $150 million – Dr. Ayasli was forced to pay Defendant MEGA VARLIK $5,800,000 to pay off a $5,300,000 loan that was never in default, which he did on March 10, 2017.

907.   As Defendants KORMAZ, DERMEN and KINGSTON, through Defendant BUGARAJ, simultaneously were pursuing a series of similar loan acceleration schemes that threatened Dr. Ayasli's holdings, Dr. Ayasli, was forced out of fear of significant financial loss, to prematurely pay off $20 million in outstanding loans held by BoraJet, which he did in March 2017, and approximately $3,200,000 following Defendant BUGARAJ's default on BoraJet's trade debts, which he did in March 2017. Supra, ¶ 632-41.

908.   The RICO Enterprise's extortionate activities also extended to its efforts to extract tens of millions of dollars in additional U.S.-based funds from Dr. Ayasli and to acquire control of Dr. Ayasli's extensive real estate holdings through sham litigation and other "settlement" demands and included, but were not limited to the following acts of violence, force, and intimidation designed to impose fear:

a.   In or about February 2017, Defendant KORKMAZ assaulted Defendant AKOL with an iron ashtray, at least in part, to intimidate him into assisting with the civil fraud claims that Defendants KORKMAZ and BUGARAJ would be bringing against Dr. Ayasli; Supra, ¶ 617, 751.

b.   On February 25, 2017, Defendant KORKMAZ initiated a series of text messages sent by WhatsApp phone messaging to Dr. Ayasli in the United

States in which he threatened Dr. Ayasli, Dr. Ayasli's family, and several associates;  Supra, ¶ 617.

c.  On March 13, 2017, Defendant KORKMAZ, through Defendant BUGARAJ, filed a sham civil fraud suit against Dr. Ayasli seeking approximately $72 million in damages related to its acquisition of BORAJET. As part of this suit, Defendant BUGARAJ unsuccessfully attempted to attach liens to all of Dr. Ayasli's commercial and residential real estate in Turkey;  Supra, ¶ 645-46.

d.  On March 18, 2017, Defendants KORKMAZ, AKOL, and OZKARAMAN attended a meeting at the offices of Dr. Ayasli's attorney to advance Defendant BUGARAJ's claims of fraud and to pursue settlement. At this meeting, Defendant KORKMAZ smashed a table, attempted to physically assault Ms. Uner, and verbally threatened Dr. Ayasli, his family, and Ms. Uner;  Supra, ¶ 649-51.

e.  In April 2017, Defendant OZKARAMAN engaged in multiple threatening communications with Ms. Uner in efforts to secure her testimony against Dr. Ayasli, making clear that Dr. Ayasli and Ms. Uner faced potential criminal liability if Dr. Ayasli did not agree to a monetary settlement with Defendant KORKMAZ; Supra, ¶ 666-76.

f.  On May 5, 2017, Defendant KORKMAZ, through Defendant BUGARAJ, weaponized criminal charges and penalties when it filed an unfounded criminal complaint alleging Dr. Ayasli and Ms. Uner had engaged in aggravated fraud in connection with the BoraJet transaction;  Supra, ¶ 663-65.

g.  On May 10, 2017, Defendant KORKMAZ surreptitiously attempted to contact and/or locate Ms. Uner by calling the Turkish Cultural Foundation under an assumed name and when unsuccessful in doing so, identified

1    himself while threatening to physically assault the individual with whom

2    he was speaking; <u>Supra</u>, ¶ 677-81.

3    h.   On May 17, 2017, Defendant KORKMAZ elevated his weaponization of

4         criminal charges and penalties when he personally filed a FETO-based

5         terrorism complaint against Dr. Ayasli, Ms. Uner, Dr. Ayasli's attorney in

6         the civil suit, and Dr. Ayasli's publicist responsible for countering the

7         false FETO allegations.  Defendant KORKMAZ well knew the FETO

8         allegations were false but filed the complaint to ensure Dr. Ayasli would

9         not return to Turkey to help defend his civil fraud suit, to frame Dr.

10        Ayasli's character in an exceptionally negative light, and to threaten the

11        safety and liberty of individuals who were critical to Dr. Ayasli's defense

12        of his civil fraud suit;[42] <u>Supra</u>, ¶ 657-62.

13   i.   In July 2017, Defendant KORKMAZ targeted former BoraJet General

14        Manager Peker with physical and economic threats, thereby coercing Mr.

15        Peker into providing sworn false testimony against Dr. Ayasli; <u>Supra</u>, ¶

16        682-690.

17   j.   In late summer 2017, Defendant KORKMAZ, through Defendant

18        BUGARAJ, sought to engage U.S.-based criminal authorities against Dr.

19        Ayasli by "self-reporting" alleged OFAC violations involving BoraJet

20        flights to Iran;  <u>Supra</u>, ¶ 695-700.

21   k.   In late summer 2017, Defendant KORKMAZ reignited the Enterprise-

22        Directed Disinformation Campaign, resulting in a new round of published

23        articles falsely identify Dr. Ayasli as a FETO associate; <u>Supra</u>, ¶ 706-15.

24

25

---

26   [42] While Dr. Ayasli and his associates were exonerated after full investigation by the
27   government in both criminal matters, such exoneration did not come before Defendant
     KORKMAZ, through Defendant BUGARAJ, was able to secure a $90 million civil judgment
28   against Dr. Ayasli at a hearing in which he was not present and not represented by counsel.

l.  On October 5, 2017, Defendant KORKMAZ threatened Dr. Ayasli's counsel before a hearing in the civil fraud proceedings that he was working to expose this attorney as a FETO associate; Supra, ¶ 726.

m. In late November 2018,  Defendant KORKMAZ offered $5 million in an unsuccessful attempt to bribe one of Dr. Ayasli's attorneys into transferring all of Dr. Ayasli's real estate to Defendant KORKMAZ; Supra, ¶ 729.

n.  In February 2018, Defendant KORKMAZ, in Utah, threatened harm to Professor Yavuz's family in Turkey should Professor Yavuz not cease publicly defending Dr. Ayasli against the false FETO allegations advanced by Defendant KORKMAZ and not assist Defendant KORKMAZ in securing Dr. Ayasli's presence at a one-on-one meeting that Defendant KORKMAZ to address Defendant KORKMAZ's financial demands;  Supra, ¶ 731-53.

o.  In March 2018, Defendant KORKMAZ sent a series of text messages by WhatsApp phone messaging to Dr. Ayasli in the United States in which Defendant KORKMAZ attempted to compel Dr. Ayasli to meet him in the United States outside the presence of counsel to address their dispute; Supra, ¶ 716-722.

p.  On February 14, 2019, two weeks before a hearing in the civil fraud proceedings in which the court was to consider expert valuation reports, the attorney against whom Defendant KORKMAZ had filed FETO terrorism charges and whom he had threatened to unmask as FETO before the October 5, 2017 court hearing, was arrested on FETO charges and had his law office searched in connection with this Terrorism Investigation. Although subsequently released, this attorney did not appear on Dr. Ayasli's behalf at the court hearing resulting in a $90 million judgment

being issued against Dr. Ayasli at a hearing in which he was not able to participate and lacked representation; <u>Supra</u>, ¶ 754-55, 760-61.

q. In connection with this judgment, Defendant KORKMAZ secured liens on all of Dr. Ayasli's commercial and real property in Turkey. Defendant KORKMAZ since acquired one property through auction in 2020 and attempted to similarly acquire a second property in May 2021.  <u>Supra</u>, ¶ 761, 765-774.

909.   Defendants KORKMAZ and BUGARAJ's repeated acts and threats of violence and his propagation of unfounded criminal claims against Dr. Ayasli were tied to a common end purpose: to force Dr. Ayasli to meet the Enterprise's extortionate demands for the payment of millions of dollars held by Dr. Ayasli in the U.S. and to force him to forfeit ownership of his commercial and real property.

910.   To date, Defendants KORKMAZ' and BUGARAJ's extortionate actions have both caused Dr. Ayasli to credibly and reasonably fear physical and economic harm and to actually experience multiple forms of economic harm, as addressed above.

**Predicate Acts involving Travel Act Violations (18 U.S.C. § 1952)**

911.   Defendants KORKMAZ, DERMEN and KINGSTON committed multiple Travel Act violations, prohibited under Title 18, United States Code, Section 1952, when they: (1) traveled in interstate or foreign commerce or used facilities of interstate commerce, including telephones; (2) with the intent to commit or otherwise promote, manage, establish or carry on unlawful acts, namely, obstruction of justice, in violation of Title 18, United States Code, Section 1512, Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951, and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 and (3) then did, or attempted to do, an act that promoted, managed, established, or facilitated the unlawful act.

912.   In April 2019, Defendant KORKMAZ flew to the State of Utah for the purpose of obstructing the U.S. government's mail fraud and money laundering investigation into Defendants DERMEN, KINGSTON and ISAIAH KINGSTON. Upon arriving for his interview, Defendant KORKMAZ made a series of materially false statements to federal agents in an effort to hinder the government's investigation. Supra, ¶ 466-73. Through this act of willful obstruction, Defendant KORKMAZ precluded the U.S. government from obtaining an understanding of the full scope the money laundering operations conducted by Defendants KORKMAZ, DERMEN, KINGSTON and ISAIAH KINGSTON in the United States, Turkey, and elsewhere, which remained ongoing, and which included the repeated use of laundered funds to deprive Dr. Ayasli of money and property.

913.   From February 2017 to September 2017, Defendant KORKMAZ used a facility of interstate commerce, namely, a cellphone, with the intent to extort tens of millions of dollars of Dr. Ayasli's U.S.-based wealth, to send from a location outside the United States more than 100 text messages received by Dr. Ayasli in the United States that threatened harm to Dr. Ayasli, his children, and his close associates, as well as the release of additional FETO-related claims, should Dr. Ayasli not meet the RICO Enterprise's extortionate demands.  Supra, ¶ 615-19.

914.   Through a series of trips beginning in September 2013 and extending through February 2018, Defendants KINGSTON and DERMEN traveled from the United States to Turkey with the intent initially of establishing, and then maintaining, under Defendant KORKMAZ'S oversight, the Enterprise's cross-border money laundering operations in Turkey and Luxembourg.  This includes the following instances of travel, each of which constitutes a separate violation and therefore a separate racketeering act for the involved parties:

   a. In September 2013, Defendants DERMEN and KINGSTON traveled to Turkey to meet with Defendant KORKMAZ to address the expansion of the Enterprise's money laundering operations, and

as part of the discussions that followed, agreed to launder $9 million through Co-conspirator KOMAK;

b.  In January 2014, Defendants DERMEN and KINGSTON traveled to Turkey to meet with Defendant KORKMAZ to address the founding of a bank, at which time they set forth the creation of Defendant MEGA VARLIK, agreed that it would be funded using Fraud Proceeds sent from the United States, and that it would be used by Defendant KORKMAZ to facilitate Defendant KORKMAZ's ability to acquire distressed assets as part of the Enterprise's money laundering scheme. Consistent with this plan, Defendant KINGSTON completed documentation necessary to open this bank and through a series of laundering transactions in March 2014 and June 2015, funded Defendant MEGA VARLIK with $10 million in Fraud Proceeds;

c.  In August 2014, Defendants DERMEN and KINGSTON traveled to Turkey to meet with Defendant KORKMAZ to address their ongoing money laundering operation, at which time they reviewed the sum total of payments laundered through Turkey to that date and made plans regarding future laundering activities;

d.   In June 2015, Defendants DERMEN and KINGSTON traveled to Turkey to meet with Defendant KORKMAZ to address matters related to the Enterprise's ongoing money laundering operations, which included additional planned transactions through Turkey such as a $200,000 payment that Defendant ISAIAH KINGSTON would make to an Enterprise-controlled bank account later that month;

e.  In January 2016, Defendant KINGSTON traveled to Turkey to meet with Defendants KORKMAZ and DERMEN to address the Enterprise's ongoing money laundering operation, at which time they discussed the need to create false documents to bolster the "cycling" of fuel shipments that created a veneer of legitimacy to the Enterprise's mail fraud scheme and Defendant KINGSTON signed a bogus contract between Defendant WASHAKIE and Co-conspirators KOMAK and SPEEDY LION to provide coverage for the ongoing money laundering between the companies;

f.  In the fall of 2017, Defendant KINGSTON traveled to Turkey to meet with Defendants KORKMAZ and DERMEN to address the Enterprise's ongoing money laundering operations, at which time they discussed Defendant DERMEN's flight to Turkey following the execution of search warrants at his residence and businesses, how long Defendant DERMEN would remain in Turkey, and what steps should be taken to maintain the Enterprise's money laundering operations moving forward; and

g.  In February of 2018, Defendant KINGSTON traveled to Turkey to meet with Defendant KORKMAZ to address the continuation of the Enterprise's money laundering operations, at which time Defendants KORKMAZ and KINGSTON discussed the payments that Defendant KINGSTON would be called on to send to Defendant KORKMAZ that year.

915.  These acts of travel were instrumental to the ongoing implementation and execution of the Enterprise's ongoing transnational money laundering operations. As addressed throughout this Complaint, the funds laundered into Turkey funded the RICO Enterprise's takeover of BoraJet, its looting of BoraJet's assets, including but not limited to the $5,300,000 loan that Defendant MEGA VARLIK accelerated at a payment amount of $5,800,000, and the funding of sham litigation through which Defendants KORKMAZ and BUGARAJ have sought to extorts tens of millions of dollars in additional funds from Dr. Ayasli's U.S.-based accounts as well as acquire, or liquidate, Dr. Ayasli's property holdings throughout Turkey.

### Predicate Acts of Wire Fraud (18 U.S.C. § 1343)

916.  The RICO Enterprise also conspired to, and did in fact, engage in multiple acts of wire fraud as they targeted Dr. Ayasli's business and property. Defendant KORKMAZ, on behalf of Defendants DERMEN and KINGSTON, and aided and abetted by Defendants AKOL and OZKARAMAN, knowingly, and with intent to defraud, devised a series of related schemes to fraudulently obtain Dr. Ayasli's money and property by means of false and fraudulent pretenses,

representations, and promises, as well as the knowing concealment of material facts, and used wires in interstate and international commerce to do so, as prohibited under Title 18, United States Code, Section 1343.

917.   As addressed above, the principal scheme focused on the acquisition of BoraJet, which itself involved separate schemes to devalue the airline through the Enterprise-Directed Misinformation Campaign and then to deceive Dr. Ayasli into believing both that the RICO Enterprise's offer was the best available and that Defendant KORKMAZ'S representations regarding future investment, his intent and ability to stabilize BoraJet, and his intent to then quickly sell BoraJet at a profit in which Dr. Ayasli would share were credible.

918.   As addressed throughout this Complaint, the Enterprise's execution of the first step of this scheme – the devaluation and destabilization of BoraJet -- was devastatingly effective.  Capitalizing on the fervent anti-FETO sentiment that marked the immediate aftermath of the 2016 coup attempt, Defendants KORKMAZ, on behalf of Defendants DERMEN and KINGSTON. planted stories for internet publication at several major news platforms in the fall of 2016 that were transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, including into the United States, and that contained multiple misrepresentations falsely associating Dr. Ayasli with FETO, falsely claiming that he created the Bylock communication device, and falsely claiming that BoraJet's planes and  hangers facilitated the failed coup attempt. Supra, ¶ 538-553.

919.   These fraudulent statements, which were known by Defendants KORKMAZ, DERMEN, and KINGSTON to be false and which were advanced by Defendant KORKMAZ with the specific intent to deceive, succeeded in their purpose, causing BoraJet's business, contracts, accounts, and valuation to crater, and forcing BoraJet and Dr. Ayasli into a manufactured state of acute financial distress. Supra, ¶ 568-83.

920.   The RICO Enterprise's weaponization of these false FETO charges had the additional impact of achieving essentially the banishment of Dr. Ayasli from Turkey. This precluded Dr. Ayasli from effectively rebutting the false FETO claims, stabilizing BoraJet, and/or from participating directly in the negotiation process through which competing suitors were closely analyzed. Supra, ¶ 554-58.

921.   This allowed for the second phase of materially misrepresentations and fraudulent omissions to be equally as effective.

922.   As Dr. Ayasli was tied to the U.S., he had to delegate in-person negotiation and principal due diligence responsibilities to Defendant AKOL. Supra, ¶ 584-601.

923.   Dr. Ayasli did not directly communicate with Defendant KORKMAZ and relied considerably upon Defendant AKOL's recounting of the negotiation terms and his assessments of all competing offers. Supra, ¶ 586, 598.

924.   The use of the wires throughout the deal process was not only reasonably foreseeable, it was also absolutely necessary, which Defendants KORKMAZ, BUGARAJ, AKOL, and OZKARAMAN well knew.

925.   During the negotiation phase, Defendants KORKMAZ, BUGARAJ and OZKARAMAN, on behalf of RICO Enterprise, made multiple material misrepresentations and omissions designed to fraudulently deceive Dr. Ayasli into parting with BoraJet under the exceptionally favorable conditions sought by the RICO Enterprise.

926.   As recounted by Defendant AKOL, these representations included, but were not limited to, assertions that (1) Defendant KORKMAZ was a distressed property investor; (2) Defendant KORKMAZ was a well regarded businessman in Ankara; (3) the BoraJet acquisition would involve Defendant KORKMAZ infusing BoraJet with $50 million in new working capital; (4) that Defendant KORKMAZ would access his high-ranking contacts within the Ministry of Transportation to secure for BoraJet highly desirable space at Istanbul's new airline terminal; (5) that

Defendant BUGARAJ planned to conduct a quick turnaround and resale of BoraJet to an established carrier or investor;  and (6) that Dr. Ayasli would share in 25 % of the net profits of this sale. Each representation was false. Supra, ¶ 589, 593, 596-97.

927.   Defendants KORKMAZ, BUGARAJ, and OZKARAMAN, also materially omitted that, while Defendant BUGARAJ was the acquiring party, BoraJet was actually being acquired by a criminal Enterprise, that the Enterprise's actual plan was not to infuse BoraJet with the adequate working capital needed to restabilize the company but rather to use it as a vehicle through which to launder a portion of the Fraud Proceeds, that Defendant KORKMAZ, through Defendant BUGARAJ, intended to accelerate portions of debt guaranteed by Dr. Ayasli under the December 2016 Agreement, that the RICO Enterprise intended to "gut" rather than "flip" the airline, and that there was no intent to follow through with a sale that would allow Dr. Ayasli to ever profit from this transaction.

928.   Through e-mails and telephone calls that Defendant AKOL had with Dr. Ayasli during the two-month negotiation period transpiring in November and December 2016, Defendant AKOL also  misrepresented the lack of interest of other suitors for BoraJet, the nature of his relationship with Defendant KORKMAZ, and his purported assessment that Defendant BUGARAJ's offer was "better, faster, and safer" and would not come with any "additional costs."  Supra ¶ 597.

929.   Based on these representations, Dr. Ayasli, in fact, was defrauded into entering the agreement to sell BoraJet and Aydin Jet to Defendant BUGARAJ at a greatly reduced price and to far less advantageous terms than were available in a competing offer.

930.   The agreement was finalized on December 29, 2016 and executed via wire sent through interstate and foreign commerce from Dr. Ayasli  in the United States to Defendants KORKMAZ and BUGARAJ, in Turkey.  Supra, ¶ 604, 607.

931.   Following this acquisition, the RICO Enterprise advanced the related scheme to secure additional payments and property from Dr. Ayasli through a series

of material misrepresentations sent by Defendant KORKMAZ, on behalf of Defendant BUGARAJ, in interstate and foreign commerce regarding outstanding amounts purportedly owed by Dr. Ayasli under the December 2016 Agreement, and the amounts purportedly invested by Defendant BUGARAJ into BoraJet.

932.   For example, in the BUGARAJ/MEGA VARLIK Loan Acceleration Scheme, Defendant KORKMAZ, acting through Defendants BUGARAJ and MEGA VARLIK, demanded immediate payment of $5,800,000 to pay off a $5,300,000 debt obligation that was accelerated despite not being in default.  In doing so, Defendant MEGA VARLIK materially omitted any reference to the fact that it was not a bank that purchased the debt obligation in a neutral transaction but rather was an Enterprise founded, funded and controlled entity operating under the concealed leadership of Defendant KORKMAZ.  Supra, ¶ 624-32.

933.   Dr. Ayasli, therefore, lacked the critical information that would allow him to pursue a meritorious challenge to this demand.

934.    Unable to challenge this demand, Dr. Ayasli, on March 10, 2017 wired the $5,800,000 payment from his account in the United States to Defendant MEGA VARLIK's account in Turkey, thereby extinguishing an undue debt at a $500,000 markup. Supra, ¶ 632.

935.   On March 17, 2017, in an effort to extract a $10 million payment, Defendant KORKMAZ, through WhatsApp text messages sent from outside the United States to Dr. Ayasli's phone within the United States, knowingly and with intent to deceive, falsely represented that he had sustained losses of "83 mil dollars" and would proceed against Dr. Ayasli for the full amount and "take a cautionary judgment against all of your assets" if Dr. Ayasli did not meet his $10 million settlement demand.  Supra, ¶ 716-721.

936.   On May 8, 2017, Defendant KORKMAZ, through WhatsApp text messages sent from outside the United States to Dr. Ayasli's phone within the United States, knowingly and with intent to deceive, continued in his efforts to

extract a settlement from Dr. Ayasli, by misrepresenting that he succeeded in having "the tax evasion case from 2013 [] reopened."

937. On March 26, 2018, Defendant KORKMAZ, through WhatsApp text messages sent from outside the United States to Dr. Ayasli's phone within the United States, knowingly and with intent to deceive, demanded an immediate "settlement" from Dr. Ayasli premised on what he represented was an impending suspension of BoraJet's flight license that would increase the damages in the BoraJet litigation to "$150 mil dollars."

938. During the ensuing WhatsApp text conversations that occurred through April 11, 2018, Defendant KORKMAZ, knowingly and with intent to deceive, sought to entice Dr. Ayasli to meet with him in person, outside the presence of counsel, in Massachusetts so that Defendant KORKMAZ could extract a settlement.

939. In doing so, Defendant KORKMAZ, knowingly and with intent to deceive, repeatedly made misrepresentations minimizing the physical threat that Dr. Ayasli would face by attending this meeting and further claiming that his intentions in acquiring BoraJet were, as represented at the time of the December 29, 2016 acquisition, to stabilize and then sell BoraJet.

940. On each such occasion, the RICO Defendant(s) participated in the scheme knowingly, willfully, and with the specific intent to deceive and/or defraud Dr. Ayasli, initially to sell BoraJet at a significantly reduced price, and later to secure his agreement to pay the claimed outstanding balances using additional cash from his U.S. bank accounts to the RICO Defendants and the RICO Enterprise as a whole.

941. Each statement that the RICO Defendants transmitted over the wires related to a fact material to the allegations made in this Complaint, and was either (a) known by the RICO Defendants to be untrue either directly or by omission; or (b) made with reckless indifference to their truth or falsity; or (c) although not itself

deceptive, was sent with the purpose of assisting, carrying out, furthering or perpetuate the fraud.

## PRAYER FOR RELIEF

942. As a direct, proximate, and reasonably foreseeable result of the RICO Enterprise's commission of a pattern of racketeering activity, Dr. Ayasli has been injured in his business and property. Such injuries, include, but are not limited to:

(1) the loss of Dr. Ayasli's investment in BoraJet and Aydin Jet, valued at approximately a quarter of a billion dollars;

(2) the loss as determined in difference between his investment and the appraised value of BoraJet immediately before the RICO Enterprise used laundered funds to conduct its disinformation campaign against Dr. Ayasli and BoraJet, significantly devaluing BoraJet;

(3) the loss to Dr. Ayasli of his Nuruosmaniye property, which the RICO Enterprise liquidated in 2020;

(4) the money expended by Dr. Ayasli to undue the RICO Enterprise's fraudulent transfer of Dr. Ayasli's Ortakoy family residence, artwork, and furniture in 2021;

(5) the money expended by Dr. Ayasli to counter sham lawsuits filed by the RICO Enterprise as part of its ongoing efforts to extort additional money from Dr. Ayasli and to liquidate additional commercial and residential real estate owned by Dr. Ayasli;

(5) the money expended by Dr. Ayasli to banks to pay off accelerated loan obligations artificially triggered by the RICO Enterprise's extortionate efforts to secure additional capital or property from Dr. Ayasli;

(8) losses incurred due to the disruption of Dr. Ayasli's other business interests in Turkey as a result of having been targeted by the RICO Enterprise;

(9) the reputational harm and lost goodwill to Dr. Ayasli as a result of having

been publicly accused by the RICO Enterprise in a sham court filing of being associated with FETO as part of its efforts to secure a litigation advantage; and

(10) all attorney's fees and costs incurred by Dr. Ayasli.

943.   The injuries and damages to Dr. Ayasli's business and property, the full extent of which will be determined at trial, well exceed this Court's jurisdictional minimum. Such damages will continue to accrue until the RICO Enterprise's actions directed at him, which remain ongoing, are terminated.

944.   Pursuant to Title 18, United States Code, Section 1962(c), Dr. Ayasli is entitled to recover treble damages, costs, attorney's fees, and both prejudgment and post judgment interest from the RICO Defendants.

945.   Dr. Ayasli's recovery of damages under this statute is joint and several against one or more of the RICO Defendants.

## SECOND CLAIM FOR RELIEF

### (RICO Conspiracy, 18 U.S.C. § 1962(d))

### (All Defendants)

946.   Dr. Ayasli realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

947.   Defendants KORKMAZ, DERMEN, KINGSTON, ISAIAH KINGSTON, AKOL, YILMAZ, ZOUBKOVA, OZKARAMAN,WASHAKIE, SBK TURKEY, SBK USA, BUKOMBIN, BUGARAJ, MEGA VARLIK, NOIL ENERGY, SPEEDY LION, GT ENERGY, UNITED FUEL SUPPLY, ISANNE, BIOFARMA, BLANE, STONE, and KOMAK ("RICO Co-conspirators"), and others, unlawfully and knowingly combined, conspired, confederated, and agreed to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as described more fully in paragraphs 775

to 799. This agreement constitutes a violation of Title 18, United States Code, Section 1962(d).

948.   The RICO Co-conspirators are a group of persons associated together in fact for the common purpose of achieving the objectives of the enterprise (the "RICO Enterprise").

949.   The RICO Enterprise engaged in, or had some effect on, interstate or foreign commerce.

950.   The RICO conspiracy originated in the United States by no later than 2011 and remains ongoing.

951.   The RICO Enterprise operates within Los Angeles County, within the Central District of California, within the District of Utah, and internationally, principally in the Republic of Turkey.

952.   Each RICO Co-conspirator knowingly joined the conspiracy by indicating through words or actions an agreement to facilitate the affairs of the RICO Enterprise.

953.   Each of the RICO Co-conspirators agreed that a co-conspirator would participate in the operation and management of the RICO Enterprise by committing at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

954.   In furtherance of the RICO conspiracy, RICO Defendants KORKMAZ, DERMEN, KINGSTON, ISAIAH KINGSTON, AKOL, OZKARAMAN, WASHAKIE, SBK TURKEY, SBK USA, BUGARAJ, and MEGA VARLIK knowingly committed racketeering activity that included, but was not limited to, acts of mail fraud, wire fraud, money laundering, obstruction of justice, Hobbs Act Extortion, and Travel Act violations, including those acts specifically set forth in paragraphs 800 to 941.

955.   Also, in furtherance of the RICO Conspiracy, RICO Co-conspirators YILMAZ, ZOUBKOVA, BUKOMBIN, NOIL ENERGY, SPEEDY LION, GT

ENERGY, UNITED FUEL SUPPLY, ISANNE, BIOFARMA, BLANE, STONE and KOMAK agreed to facilitate and further the actions of one or more of the RICO Defendants.

956.   Over the course of, and as part of, the RICO conspiracy, the RICO Enterprise has directed, and continues to direct, racketeering activity against Dr. Ayasli as part of its ongoing  efforts to deprive him of his business and property.

957.   This first included a series of racketeering acts designed to devalue BoraJet and to allow the RICO Enterprise to acquire BoraJet and Aydin jet at well below their appraised value, later extended to the RICO Enterprise's use of BoraJet as a money laundering vessel rather than a viable airline, which caused the airline to implode and deprived Dr. Ayasli of his contracted property interest to 25% of the net profits from a future sale, and has continued with the exploitation of BoraJet's assets and efforts to extort and defraud Dr. Ayasli of tens of millions of dollars in additional funds and to acquire up to $150 million of commercial and residential real estate owned by him.

## PRAYER FOR RELIEF

958.   As a direct, proximate, and reasonably foreseeable result of the RICO Co-conspirators agreement, as effectuated in the acts of racketeering activity committed by the RICO Enterprise, Dr. Ayasli has been injured in his business and property by:

(1) the loss of Dr. Ayasli's investment in BoraJet and Aydin Jet, valued at approximately a quarter of a billion dollars;

(2) the loss as determined in difference between his investment and the appraised value of BoraJet immediately before the RICO Enterprise used laundered funds to conduct its disinformation campaign against Dr. Ayasli and BoraJet, significantly devaluing BoraJet;

(3) the loss to Dr. Ayasli of his Nuruosmaniye property, which the RICO Enterprise liquidated in 2020;

(4) the money expended by Dr. Ayasli to undue the RICO Enterprise's fraudulent transfer of Dr. Ayasli's Ortakoy family residence, artwork, and furniture in 2021;

(5) the money expended by Dr. Ayasli to counter sham lawsuits filed by the RICO Enterprise as part of its ongoing efforts to extort additional money from Dr. Ayasli and to liquidate additional commercial and residential real estate owned by Dr. Ayasli;

(5) the money expended by Dr. Ayasli to banks to pay off accelerated loan obligations artificially triggered by the RICO Enterprise's extortionate efforts to secure additional capital or property from Dr. Ayasli;

(8) losses incurred due to the disruption of Dr. Ayasli's other business interests in Turkey as a result of having been targeted by the RICO Enterprise;

(9) the reputational harm and lost goodwill to Dr. Ayasli as a result of having been publicly accused by the RICO Enterprise in a sham court filing of being associated with FETO as part of its efforts to devalue BoraJet; and

(10) all attorney's fees and costs incurred by Dr. Ayasli.

959.   The injuries and damages to Dr. Ayasli's business and property, the full extent of which will be determined at trial, well exceed this Court's jurisdictional minimum. Such damages will continue to accrue until the RICO Enterprise's actions directed at him, which remain ongoing, are terminated.

960.   Pursuant to Title 18, United States Code, Section 1964(c), Dr. Ayasli is entitled to recover treble damages, costs, attorney's fees, and both prejudgment and post judgment interest from the RICO Co-conspirators.

961.   Dr. Ayasli's recovery of damages under this statute is joint and several against one or more of the RICO Co-conspirators.

### THIRD CLAIM FOR RELIEF

**(Violations of RSA 358:A)**
**(All Defendants)**

962.   Dr. Ayasli repeats and incorporates his allegations contained in the preceding paragraphs of this Complaint.

963.   Defendants are natural persons and/or legal entities and are therefore "persons" as defined under the New Hampshire Consumer Protection Act.   See RSA 358-A:1, I (2004) ("'Person' shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity").

964.   Defendants acted in trade or commerce by seeking to purchase assets owned by a resident of the State of New Hampshire, and by doing so, participated in trade or commerce directly or indirectly affecting a New Hampshire citizen. See RSA 358-A:1, II ("'Trade' and 'commerce' shall include the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state.")

965.   Defendants committed acts in violation of 358-A:2 by causing likelihood of confusion or of misunderstanding as to the affiliation, connection or association with another. See 358-A:2(III).

966.   Defendants committed acts in violation of 358-A:2 by representing that that a person (Dr. Ayasli) has a status, affiliation or connection (with FETO) that Dr. Ayasli does not have. See 358-A:2(V).

967.   Defendants committed acts in violation of 358-A:2 by disparaging Dr. Ayasli's businesses by false or misleading representations of fact.  See 358-A:2(VIII).

968.   Defendants committed acts in violation of 358-A:2 that are both unlawful and offends public policy as established by statutes and common law such that it is within the penumbra of established concepts of unfairness.

969.   Defendants' conduct was objectionable and attained a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

970.   Dr. Ayasli suffered actual damages as the result of Defendants' acts and conduct.

971.   Because Defendants' acts and conduct were willful and knowing, Dr. Ayasli is entitled to multiplication of his damages. 358-A:10

972.   Dr. Ayasli is also entitled to his reasonable attorney's fees and costs. Respectfully submitted,

**DR. YALCIN AYASLI**

By His Attorneys,

**MCGUIREWOODS LLP**

By: /s/ Kevin M. Lally                    .
Kevin M. Lally, Esq. (CA Bar No. 226402)
355 South Grand Avenue, Suite 4200
Los Angeles, CA 90071
213-457-9862
klally@mcguirewoods.com

**SHEEHAN PHINNEY, PA**

By:  /s/ Robert H. Miller                    .
Robert H. Miller, Esq.
 (Admitted Pro Hac Vice)
1000 Elm Street, 17th Floor
Manchester, NH 03110
603-627-8145
rmiller@sheehan.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Yalcin Ayasli, declare as follows:

1.      I am the Plaintiff in the present case and a citizen of the United States of America. I have reviewed the foregoing First Amended Complaint and declare under penalty of perjury that it is true and correct to the best of my knowledge and information.

Executed on: 8 / 31 / 2022

Yalcin Ayasli